Gregory M. Nespole (GM-6820)
Mark C. Rifkin (MR-0904)
Michael Jaffe (MJ-1671)
Robert B. Weintraub (RW-2897)
WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
270 Madison Avenue
New York, New York 10016
(212) 545-4600

*Attorneys for Plaintiff*
*Carolyn Egan and the Proposed Class*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



CAROLYN EGAN, on behalf of herself and all
others similarly situated,

       Plaintiff,

    -against-

MORGAN STANLEY & CO. INCORPORATED,
MORGAN STANLEY, THE INVESTMENT
COMMITTEE OF THE MORGAN STANLEY
401(k) PLAN (f/k/a THE MORGAN STANLEY
DPSP/START PLAN), THE MORGAN
STANLEY GLOBAL DIRECTOR OF HUMAN
RESOURCES, WALID A. CHAMMAH,
CHARLES CHASIN, ZOE CRUZ, RICHARD
PORTOGALLO, JAMES P. GORMAN, NEAL A.
SHEAR, CORDELL G. SPENCER, and JOHN
DOE DEFENDANTS 1-30,

       Defendants.

Civ.

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY
ACT

   Plaintiff Carolyn Egan, a participant in the Morgan Stanley 401(k) Plan (f/k/a The Morgan Stanley DPSP/START Plan), as amended (the "Plan"), on behalf of herself and all other persons similarly situated (the "Class," as defined below), and the Plan, makes the following allegations based upon the investigation of her counsel, except as to the allegations pertaining

specifically to Plaintiff and Plaintiff's counsel, which are based on personal knowledge. The investigation conducted by Plaintiff's counsel included, *inter alia*, a review and analysis of: (i) public filings by Defendants including, but not limited to, filings with the Securities and Exchange Commission ("SEC"); (ii) publicly-available news articles and reports; (iii) press releases issued by Defendants; and (iv) other matters of public record.

## I.    INTRODUCTION

1.    Plaintiff brings this suit as a civil enforcement action pursuant to section 502(a) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a), against the Plan fiduciaries for relief on behalf of the Plan. Plaintiff was a participant in the Plan during the Class Period (defined below).

2.    The Plan is operated by Morgan Stanley as a benefit for its employees to permit tax-advantaged savings for retirement and other long-term goals. Morgan Stanley & Co., Inc. ("MS&Co."), a wholly owned subsidiary of Morgan Stanley, is the "sponsor" of the Plan as defined by Section 3(16)(B) of ERISA, 29 U.S.C. § 1002(16)(B).

3.    The Plan is a defined contribution retirement plan that is intended to qualify under Section 401(a) of the Internal Revenue Code of 1986 and is subject to the provisions of ERISA.

4.    This action arises from Defendants' failure to act in the best interests of participants and beneficiaries of the Plan. Defendants are individuals and entities that serve in a fiduciary capacity and/or undertook a fiduciary role in the Plan. As Plan fiduciaries, Defendants are required to exercise skill, care, prudence, and diligence in administering the Plan, and are responsible for selecting and monitoring the Plan's investments and assets.

5.    From December 1, 2005, through the present (the "Class Period"), Defendants allowed the Plan to heavily invest in the Morgan Stanley Stock Fund, which consists

2

entirely of the common stock of Morgan Stanley ("Company Stock"), while Defendants knew or should have known about Morgan Stanley's gross mismanagement and improper business practices. Morgan Stanley currently suffers under the weight of massive credit deterioration necessitating enormous write-downs of its collateralized debt obligations, and has already announced that it would take a pretax charge of at least $3.7 billion related to its exposure to the subprime mortgage market. Market observers predict that there are billions in additional write-downs to come.

      6.    Defendants violated ERISA because, among other reasons, they knew that Company Stock was not a prudent retirement investment, yet they failed to take steps to eliminate or reduce the amount of Company Stock in the Plan. Instead, throughout the Class Period, Defendants caused or permitted the Plan to offer, purchase, and hold large amounts of Company Stock.

      7.    In addition, throughout the Class Period, Defendants failed to give Plaintiff and the Class complete and accurate information about Morgan Stanley's financial condition so that Plan participants could make informed investment decisions under the Plan. The myriad instances of material nondisclosures include, but are not limited to, the following:

      a)    forming and managing off-balance-sheet structured investment vehicles ("Conduits" or "SIVs") without adequately disclosing Morgan Stanley's contingent liabilities or risks related thereto;

      b)    causing the Conduits or SIVs to issue billions of dollars worth of commercial paper and short term notes based on false and misleading statements;

c)      marketing and extending subprime loans, without adequate consideration of the borrower's ability to pay and with unreasonably high risk of borrower default;

d)      failing to adequately disclose Morgan Stanley's increased credit risk, including its subprime loan loss exposure, to investors, including the Plan's participants;

e)      operating without the requisite internal controls to determine appropriate loan loss provisions;

f)      understating loan loss provisions that did not properly reflect the risk facing Morgan Stanley; and

g)      failure to disclose the extent to which exposure to increased levels of credit risk subjected Morgan Stanley to drastically increased overall risk.

8.      During the Class Period, Company Stock lost approximately 35% of its value, dropping from its 52-week high of $74.13 on June 14, 2007, to $47.95 on November 26, 2007. Plaintiff and the Class suffered as the value of their retirement accounts invested pursuant to the Plan dropped precipitously in line with the decline in the price of the Company's Stock.

9.      Defendants are liable under ERISA to restore to the Plan losses sustained by the Plan resulting from the breach of their fiduciary duties.

## II.      JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and section 502(e)(l) of ERISA, 29 U.S.C. § 1132(e)(l).

11.     Venue is proper in this district pursuant to section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), because this is the district where some or all of the breaches took place, where one or more Defendants reside or may be found, and/or where the acts and transactions alleged herein occurred, including the administration of the Plan.

## III.    PARTIES

**Plaintiff**

12.    Plaintiff Carolyn Egan ("Plaintiff") is a resident of Pennsylvania. During the Class Period, she was a participant of the Plan, as defined by Sections 3(7) and 502(a) of ERISA, 29 U.S.C. §§ 1102(7) and 1132(a) and held shares of Company Stock in the Plan.

**Defendants**

13.    Defendant MS&Co. is the sponsor of the Plan. Defendant MS&Co. is a wholly owned subsidiary of Morgan Stanley. As set forth in the Form 11-K for the Plan for the fiscal year ended December 31, 2006, Defendant MS&Co. had the authority to control and manage the operation and administration of the Plan, to make rules and regulations with respect to the Plan, and to take actions to administer the Plan. Throughout the Class Period, MS&Co. also had the authority and discretion to appoint, monitor and remove Investment Committee members from their individual fiduciary roles with respect to the Plan. Therefore, throughout the Class Period, MS&Co. acted as a fiduciary of the Plan in that it had (i) discretionary authority, control, or responsibility over Plan management or Plan administration and/or (ii) authority or control over management or disposition of Plan assets.

14.    Throughout the Class Period, in addition to its independent obligations as a fiduciary, MS&Co. acted through its directors, officers and employees. MS&Co. had, at all applicable times, effective control over the activities of its officers, employees and the Investment Committee, including Plan related activities, and through its Board of Directors, executive officers or otherwise had the authority and discretion to hire and terminate said officers and employees. The actions of the fiduciaries of the Plan, who failed to properly discharge their fiduciary duties under ERISA, are imputed to MS&Co. under the doctrine of *respondeat superior*, and MS&Co. is liable for such actions.

5

15.    Defendant Morgan Stanley, the parent of MS&Co., is a business entity organized under the laws of the state of Delaware with its executive offices located in New York. Morgan Stanley, through its wholly owned subsidiary MS&Co., is also liable under the doctrine of *respondeat superior*.

16.    Defendant Morgan Stanley Global Director of Human Resources (the "Global Director" or "Plan Administrator"), was the administrator of the Plan at all times during the Class Period and was responsible for administering and managing the Plan on a day-to-day basis and advising Morgan Stanley and the MS&Co. Board regarding the Plan and the Plan's assets. At all times during the Class Period, Defendant Global Director was a "Named Fiduciary," as such term is defined in ERISA § 402(a), with respect to the Plan.

17.    Defendant Investment Committee of the Morgan Stanley 401(k) Plan (the "Investment Committee") means the Investment Committee of the Morgan Stanley 401(k) Plan established to manage the assets of the Trust Fund that holds all assets of the Plan, which includes the assets maintained of the Morgan Stanley Employee Stock Ownership Plan ("ESOP"). Defendant Investment Committee is, upon information and belief, responsible for selecting, monitoring, and evaluating the Plan's investment options. Defendant Investment Committee consisted of three or more members during the Class Period, each of whom were appointed by and serve at the pleasure of the Board of Directors of MS&Co. At all times during the Class Period Defendant Investment Committee was a "Named Fiduciary," as such term is defined in ERISA § 402(a).

18.    During the Class Period, the following Defendants served as Directors of MS&Co. (the "MS&Co. Directors"):

(i)      Walid A. Chammah (Managing Director of MS&Co. and Head of Investment Banking of Morgan Stanley);

(ii)      Charles Chasin (Managing Director of MS&Co. and Chief of Staff to Co-President of Morgan Stanley);

(iii)      Zoe Cruz (Managing Director, Chairman, Chief Executive Officer and President of MS&Co. and Co-President of Morgan Stanley);

(iv)      Richard Portogallo (Managing Director of MS&Co. and Regional Co-Head of Americas, Institutional Sales and Trading of Morgan Stanley);

(v)      James P. Gorman (Managing Director of MS&Co. and President and COO, Global Wealth Management Group of Morgan Stanley);

(vi)      Neal A. Shear (Managing Director of MS&Co. and Co-Head of Institutional Sales and Trading of Morgan Stanley); and

(vii)      Cordell G. Spencer (Managing Director of MS&Co. and Deputy Head of Investment Banking of Morgan Stanley).

19.      Each of the MS&Co. Directors was a Plan fiduciary because each had and exercised (i) discretionary authority, control, or responsibility over Plan management or Plan administration and/or (ii) authority or control over management or disposition of Plan assets.  In addition, the MS&Co. Directors had ultimate oversight over the Plan, with the power and responsibility to appoint, monitor and replace if necessary, members of Defendant Investment Committee and appoint, monitor and replace if necessary the Plan Administrator.  Therefore, at all times during the Class Period, the MS &Co. Directors were fiduciaries of the Plan pursuant to Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21).

7

20.    The John Doe Defendants 1-30 include individuals during the Class Period whose names and identities are not presently known to Plaintiff, including any unnamed directors of MS&Co., any delegatee of the Investment Committee the individual members of the Investment Committee, the individual members of any separate committee that may have been established to manage the ESOP, and any delegate of the Plan Administrator.

### IV.    THE PLAN

21.    The Plan is subject to the provisions of ERISA. The Plan is an "employee pension benefit plan," as defined by Sections 3(2)(A) and 3(3) of ERISA, 29 U.S.C. §§ 1002(2)(A) and 1002(3).    The Plan covers eligible employees of Morgan Stanley and its subsidiaries and affiliates. The Plan is not a party to this action. Pursuant to ERISA, however, the relief requested is for the benefit of the Plan.

22.    At all times during the Class Period, all of the Plan's investments were held in a trust account at Mellon Bank, N.A. (the "Trustee"), which included all assets of the ESOP.

23.    The Plan is a defined contribution plan, which means the Plan's fiduciaries are responsible for selecting the investment options made available to participants in the Plan. The Plan sponsor has the authority to control and manage the operation and administration of the Plan, make rules and regulations for the Plan, and take actions to administer the Plan.

24.    All eligible participants may elect to make pre-tax contributions of 1% to 20% of annual earnings, subject to certain Internal Revenue Code limits. Eligible participants may elect to contribute after-tax contributions of 1% to 10% of annual earnings.

25.    Plan participants direct how to allocate their salary deferrals among the various investment options offered by the Plan. Individual accounts are maintained for each Plan participant.    Each participant's account is credited with the participant's contributions,

allocations of MS&Co.'s contributions and Plan earnings, and charged with an allocation of Plan losses and administrative expenses not otherwise paid by MS&Co.

26.    Participants in the Plan were, at all times during the Class Period, eligible for matching contributions from MS&Co. for the given year in which they were participants. Any employee who participated in the Plan by making pretax contributions during the year and was employed by MS&Co. as of the last day of the year was eligible to receive the matching contribution. (Employees were also eligible to receive a matching contribution for the last calendar year in which they worked, if they terminated employment with MS&Co. due to death, total and permanent disability, retirement or release, as defined by the Plan.) MS&Co. also provided discretionary profit sharing contributions to certain Plan participants during the Class Period.

27.    At all times during the Class Period, the contributions of MS&Co., including matching contributions, profit sharing contributions and otherwise, were allocated exclusively in Company Stock and maintained in the ESOP component of the Plan. Defendants restricted the sale or transfer of such Company Stock, in whole or part, during all or part of the Class Period.

28.    According to the Plan's Annual Report, as of December 31, 2006, approximately $4.036 billion of the Plan's $7.299 billion of assets were invested in Company Stock.

## V.    DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

29.    ERISA requires every plan to provide for one or more named fiduciaries. ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A). The person named as "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a definition, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

30.    ERISA also treats as fiduciaries persons who act as fiduciaries by performing fiduciary functions.    Section 3(21)(A)(i) of ERISA, 29 U.S.C. § 1002(21)(A)(i), makes a person a fiduciary "to the extent … he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets … or … has any discretionary authority or discretionary responsibility in the administration of such plan."

31.    Throughout the Class Period, all of the Defendants were either named fiduciaries of the Plan or acted as fiduciaries of the Plan under ERISA.

## VI.    CLASS ACTION ALLEGATIONS

32.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the following Class of persons similarly situated:

> All persons who were participants in or beneficiaries of the Plan at any time from December 1, 2005, through the present, and whose accounts included investments in Company Stock.

33.    The members of the Class are so numerous that joinder of all members is impracticable.    While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class who participated in or were beneficiaries of the Plan during the Class Period.

34.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.    Among the questions of law and fact common to the Class are:

a)    whether Defendants each owed a fiduciary duty to the Plan and members of the Class;

b)     whether Defendants breached their fiduciary duties to the Plan and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

c)     whether Defendants violated ERISA; and

d)     whether the Plan and members of the Class have sustained damages and, if so, what is the proper measure of damages.

35.     Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff and the other members of the Class each sustained damages arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

36.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

37.     Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members of the Class or substantially impair or impede their ability to protect their interests.

38.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any

questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VII.    COMMON FACTUAL ALLEGATIONS

39.    Morgan Stanley joined the Wall Street rush into underwriting pools of securities tied to subprime mortgages,[1] or collateralized debt obligations ("CDOs")[2], beginning in late 2005. The Company's investment in the subprime mortgage area was spurred in large part by John J. Mack who, when he took his post at Morgan Stanley as Chief Executive Officer in the summer of 2005, indicated that he would put more of Morgan Stanley's capital at risk in order to garner possibly greater returns. Beginning in late 2005, Morgan Stanley began to dramatically increase its exposure to credit assets with little or no price transparency.

40.    Acting in line with Mr. Mack's stated determination to take more risk with the firm's capital, Morgan Stanley's 2006 Annual Report, filed with the SEC on February 13, 2007, reported that "on December 4, 2006, Morgan Stanley acquired Saxon Capital, Inc. ("Saxon"), a servicer and originator of residential mortgages," for $706 million.

41.    The acquisition of Saxon, a subprime mortgage underwriter, was intended to gain Morgan Stanley access to subprime mortgages that could be repackaged into complex investment vehicles. In a press release issued by Morgan Stanley on December 4, 2006, the Company announced that "[t]his acquisition is another important step in our long-term strategy of building a global, vertically integrated residential mortgage business . . . Saxon adds a premier

---

[1] "Subprime" generally refers to borrowers who do not qualify for prime interest rates because they exhibit one or more of the following characteristics: weak credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-value ratios.

[2] CDO is defined as an investment-grade security backed by a pool of bonds, loans and other assets such as mortgages.

servicing operation with a scalable U.S. origination platform to our substantial existing residential mortgage franchise. " Armed with Saxon, Morgan Stanley quickly climbed to the No. 1 ranking in subprime-mortgage-securities underwriting in 2007, according to Inside Mortgage Finance, a trade publication in Bethesda, Maryland.

42.    In addition to its acquisition of Saxon, Morgan Stanley took huge positions in super-senior segments of CDOs throughout the Class Period. The Company held approximately $13 billion worth of the super-senior CDOs at the start of 2007 to hedge and finance its bearish subprime bet. At first, the CDOs paid a higher interest rate than Morgan Stanley's cost of financing, which generated seductive profits until the bottom fell out in October after more modest declines in August and September. The bearish subprime bet, which took the form of derivatives called swaps, required Morgan Stanley to pay interest on those contracts. To offset the bearish subprime bet and help generate interest income to pay the cost of the swaps, the firm amassed the CDO position that produced most of the losses announced in November 2007.

43.    Insiders and directors of Morgan Stanley anticipated carnage from Morgan Stanley's exposure to subprime mortgage investments as far back as 2006, but failed to take any action with respect to protecting Plan participants. Indeed, the Morgan Stanley Board has a risk management panel tasked to oversee these types of credit issues. That panel, however, and the MS&Co. Board, failed to disclose its findings and concerns to Plan participants though the assets of Plan participants continued to flow into Company Stock.

44.    Morgan Stanley also failed to adequately disclose contingent liabilities associated with Conduits and SIVs. A SIV is an investment vehicle that earns income through spread lending (i.e., profits from the difference between borrowing short term and investing long

13

term).  Generally, a SIV earns income from the purchase of long term high yielding securities, such as mortgage backed securities or credit card receivables, which it turns into marketable securities to be purchased by investors.  These investments are typically funded through the sale of short term lower yielding senior debt (e.g., asset backed commercial paper).

45.     SIVs make payments on the securities in the form of interest to the buyer. The buyer, in turn, issues commercial paper to raise the funds needed to buy the security.  It is a co-dependant relationship.  If the commercial paper market dries up, nobody buys the SIV's securities and the SIV must hold them, technically, they can revert back to the SIV's manager – in this case Morgan Stanley.  What was an off balance sheet expense could quickly return to Morgan Stanley's balance sheet.  Moreover, with many of these securities consisting of subprime loans, there is a greater chance of default on the underlying asset.  Thus, Morgan Stanley will be left on the hook for the security and have no place to sell it.

46.     Given the recent dislocation in financial markets, the cost of commercial paper increased substantially as LIBOR (proxy rate for commercial paper) rose to abnormally high levels.  As such, the usually very liquid commercial paper market became illiquid, causing serious funding concerns for SIVs.  With the uncertainty of funding for certain SIVs, the assets held by those SIVs may be sold at fire sale prices.

47.     Morgan Stanley SIVs invested in subprime loans and, as a result, many investors are no longer willing to purchase commercial paper from its SIVs.  Because the SIVs still owe money to commercial paper holders, and they can not raise money by selling new commercial paper, they are being forced to sell their assets at fire-sale prices to pay off debts. Consequently, Morgan Stanley SIVs are on the verge of collapse.  Moreover, Morgan Stanley may have to move its SIVs onto its balance sheet, and recognize billions of dollars in potential

liability that Morgan Stanley had not fairly disclosed to investors in Company Stock, including Plan participants.

48.     Throughout the Class Period, members of Morgan Stanley management issued false and misleading statements and omitted information concerning Morgan Stanley to Plan participants concerning, inter alia, (i) Morgan Stanley's exposure to subprime credit, off-balance entities, CDO exposure, and other credit-specific problems; (ii) the nature and extent of risk taken by the Company in connection with its investment in subprime mortgages, off-balance entities, and other credit-specific problems; (iii) the aggressiveness of Morgan Stanley's proprietary trades related to collateralized debt obligations ("CDO"); and (iv) the lack of adequate internal controls to hedge the risks associated with its CDO exposure.  Specifically:

49.     On December 19, 2006, Morgan Stanley reported record income from continuing operations for the fourth quarter and full year 2006.  The press release stated, in relevant part, as follows:

> The Firm achieved record income from continuing operations for the fiscal year ended November 30, 2006 of $7,497 million, a 44 percent increase from $5,192 million a year ago. Diluted earnings per share from continuing operations were a record $7.09 compared with $4.81 last year. Record net revenues (total revenues less interest expense and the provision for loan losses) of $33.9 billion were 26 percent higher than last year. Non-interest expenses of $22.9 billion were 18 percent above 2005. Compensation expenses increased 27 percent primarily reflecting higher revenues. Non-compensation expenses increased 5 percent as costs associated with higher levels of business activity were partly offset by lower charges for legal and regulatory matters.1 Results for the current year include an income tax benefit of $280 million, or $0.27 per diluted share, resulting from the outcome of a federal tax audit, while the prior year included a tax benefit of $309 million, or $0.29 per diluted share, related to the provisions of the American Jobs Creation Act. The return on average common equity from continuing operations was 23.6 percent compared with 19.0 percent a year ago.

Income from continuing operations for the fourth quarter was a record $2,206 million, an increase of 26 percent from $1,746 million in the fourth quarter of 2005. Diluted earnings per share from continuing operations were a record $2.08 compared with $1.64 a year ago. Net revenues were $8.6 billion, 24 percent above last year's fourth quarter. Non-interest expenses of $5.8 billion increased 19 percent from last year. The results for the fourth quarters of 2006 and 2005 include the $0.27 and $0.29 per diluted share tax benefits noted above. The annualized return on average common equity from continuing operations was 26.0 percent in the current quarter, compared with 24.9 percent in the fourth quarter of 2005.

Net income (including discontinued operations) for the year was a record $7,472 million, a 51 percent increase from $4,939 million a year ago. For the quarter, net income was $2,206 million, compared with $2,465 million in the fourth quarter of 2005, which included an after-tax gain of approximately $700 million related to the sale of the Company's aircraft leasing business. Diluted earnings per share were a record $7.07 for the year compared with $4.57 a year ago and the return on average common equity was 23.5 percent compared with 17.3 percent last year. For the quarter, diluted earnings per share were $2.08, compared with $2.32 in the fourth quarter of 2005, and the annualized return on average common equity for the fourth quarter was 26.0 percent compared with 34.6 percent a year ago.

50.    Commenting on Morgan Stanley's successful quarter and 2006 fiscal year Mr. Mack stated, in relevant part, as follows:

2006 was a year of outstanding performance and progress for Morgan Stanley. Capitalizing on a strong market environment, the people of Morgan Stanley achieved record fourth quarter results and the best full-year revenues and earnings in the Firm's history. In our securities business, we delivered powerful performance across our Institutional Securities franchise and made significant strides in our Asset Management and Global Wealth Management businesses.

51.    On March 21, 2007, Morgan Stanley announced its results for the first quarter ended February 28, 2007. The announcement stated, in relevant part, as follows:

Morgan Stanley (NYSE: MS) today reported record income from continuing operations for the first quarter ended February 28, 2007 of $2,559 million, an increase of 60 percent from $1,602 million in

the first quarter of 2006.1 Diluted earnings per share from continuing operations were a record $2.40 compared with $1.51 a year ago. Net revenues were a record $11.0 billion, 29 percent above last year's first quarter. Non-interest expenses of $7.1 billion increased 17 percent from last year. The annualized return on average common equity from continuing operations was 28.8 percent in the current quarter, compared with 21.9 percent in the first quarter of 2006.

Net income was a record $2,672 million, an increase of 70 percent from $1,574 million in the first quarter of 2006. This quarter's results included an after-tax gain of $109 million reported in discontinued operations related to the sale of Quilter Holdings Ltd. Record diluted earnings per share were $2.51, compared with $1.48 in the first quarter of 2006, and the annualized return on average common equity for the first quarter was 29.9 percent compared with 21.3 percent a year ago.

52.    Commenting on Morgan Stanley's robust first quarter results, Mr. Mack stated, in relevant part, as follows:

Morgan Stanley delivered outstanding results this quarter - with record revenues and earnings along with ROE of more than 20 percent for the sixth quarter in a row. *This strong performance was in large part the result of effective, disciplined risk-taking by our team in Institutional Securities, which helped deliver record results across our sales and trading businesses*. Our Global Wealth Management business this quarter delivered its highest revenues since 2000 and we continued to make substantial progress in executing our growth plan in Asset Management. We see many opportunities to further improve our performance, and remain intensely focused on helping our clients navigate the constantly changing markets and leveraging our global franchise to create additional value for our shareholders. (emphasis added)

53.    After the announcement of its first quarter results on March 21, 2007, Morgan Stanley held a conference call to discuss Morgan Stanley's performance. Executive Vice President and Chief Financial Officer David Sidwell represented Morgan Stanley on the call. Regarding Morgan Stanley's position in the subprime mortgage market, Mr. Sidwell stated, in relevant part, as follows:

Financing products also contributed to the overall increase in revenues. This was a record quarter in prime brokerage, with revenues up substantially on both new accounts and growth in global client balances for the 16th consecutive quarter. In fixed income sales and trading, $3.6 billion in revenues was our best quarter ever, up 57% driven by broad-based strength across credit products, interest rate, and currency products and commodities. We sold very strong trading performance and good levels of client activity across our fixed income businesses. *Looking at the results by product area, credit products rose 110% to a new record, with the largest increase in securitized products driven by favorable positioning in the Subprime Mortgage Markets, strong customer flows, and robust growth in our Global Commercial Mortgage business* . . .

*Before I leave Institutional Securities, let me turn to a topic that's been a focus in the market in the past several weeks, subprime mortgage. We participate in the subprime mortgage market in a number of ways. Through our securitized product groups we purchased loans from originators and originate loans, including through Saxon, which closed this quarter. We are active in the structuring, securitization, and distribution of subprime products, including CLOs and CDOs. Third, we manage our risk through a variety of hedging strategies and we also take proprietary risk positions. In the aggregate, these activities were a significant contributor to our results this quarter. In addition, we extend loans and lending commitments to clients that are secured by assets of the borrower such as loan pools. At the end of the quarter, whereas lending commitments to the subprime lenders totaled $5.2 billion, of which $2.3 billion was funded and fully collateralized. The largest component of this was the New Century. Our current funded balance with New Century is $2.5 billion. Finally, through our acquisition of Saxon, we have servicing capabilities* . . .

The consumer credit environment in the U.S. remains very favorable for our business, with bankruptcies remaining low throughout the quarter. As a result we're revising slightly our outlook for the full year charge-off rate to a range of 4 to 4.5% versus the prior estimate of 4.5 to 5%. *While there has been considerable media coverage regarding higher delinquencies in the subprime mortgage industry, we have not seen any impact on our Card portfolio. Nevertheless, we continue to monitor the situation closely.* In summary, our U.S. business is performing well with growth in usage and receivables and strong credit performance. In the U.K., we're working hard to limit the impact, we are facing due to the adverse credit environment.

Finally, as a regard to outlook, the markets have been very volatile over the last few weeks with a decline in stock markets, widening credit spreads, higher interest rates, and higher volatility as well as concerns which have continued about the subprime market and whether it would spread to other markets. *At this time we believe this could be a reasonably limited event, as we have not seen any signs that the subprime deterioration could spread to other parts of the market. At this early point in the second quarter, we remain reasonably optimistic.* I mentioned earlier that our investment banking pipeline across advisory equities of fixed income are strong. The level of client activity in our sales and trading businesses remain strong, with the increase in volatility providing trading opportunities for our clients as well as for us . . . (emphasis added).

54.    During the conference call, Guy Moszkowski of Merrill Lynch asked Mr. Sidwell if Morgan Stanley would consider increasing the amount of subprime origination or alt A type origination, capability that it has, or whether that Morgan Stanley's appetite was already satisfied. Mr. Sidwell responded, in relevant part, as follows:

We had felt as we looked at the firm and its strategy, we felt that we were underrepresented in the mortgage business that our fixed income business, which is a leader in many areas, that we did not have the scale of penetration in the mortgage markets that we should have had. It was with that, that we have said over the last couple of years that we wanted to increase our footprint in mortgages, Saxon was part of that as was some of the expansion that we've done overseas. Obviously, I think we will continue to look at opportunities in the marketplace, but it's something that we have at this point made no definitive plans on or else I'd share them with you.

55.    William Tanona of Goldman Sachs also questioned Mr. Sidwell about Morgan Stanley's subprime strategy, as follows:

**William Tanona - Goldman Sachs**

[I]n terms of mortgages, obviously you've highlighted that as an area of particular strength. Could you give us a sense as to kind of the contribution of mortgages relative to the fourth quarter as it related to the increased 1% of the increase in thick had been in mortgages? And then also, could you give us a sense as to what

your residuals might look like across mortgage and specifically subprime as it ended the quarter?

**David Sidwell**

I think the major point I've been trying to make, actually, is that if you look at our institutional businesses across equities and fixed income, it was really the breadth of performance compared with the fourth quarter. So looking at equities, all areas of that business were up, if you look at our fixed income, it's the same thing. Within fixed income, when going down a little bit, the largest driver of the increase compared with fourth quarter was in credit markets and the residential mortgage business was a big part of that driver. As I gave a rough sizing of it, but I'm not going to break it down further into the actual contribution from that one business.

**William Tanona - Goldman Sachs**

Okay, that's fair and then just on the residuals?

**David Sidwell**

Again, that's part of the overall evaluation of that residential mortgage business, so I'd rather not just address one of the types of instruments that are a part of that overall business strategy, which includes many instruments.

56.    Ron Mendell of DIC also asked Mr. Sidwell about Morgan Stanley's position in the subprime mortgage market.

**Ron Mendell - DIC**

Okay. Then in regard to fixed income sales and trading, one thing I was taking away from your comments on the contribution that mortgages made was you took advantage of the volatility and basically what I took away was that you were short subprime very successfully, and I guess that's possibly going to be very hard to repeat going forward since so much of the activity, although not all of it took place in that quarter.

**David Sidwell**

I actually don't really want to address specifically how we were positioned, but I think the thrust of what you said in terms of the trading and hedging activity, I don't think you want to model that in.

57.    On May 1, 2007, Morgan Stanley issued a press release announcing the planned retirement of Mr. Sidwell as Chief Financial Officer.  The press release also stated that Thomas Colm Kelleher would succeed Mr. Sidwell as Chief Financial Officer of Morgan Stanley upon Mr. Sidwell's retirement.

58.    On June 20, 2007, Morgan Stanley announced its results for the second quarter ended May 31, 2007.  The press release stated, in relevant part, as follows:

> Morgan Stanley (NYSE: MS) today reported record income from continuing operations for the second quarter ended May 31, 2007 of $2,582 million, an increase of 41 percent from $1,828 million in the second quarter of 2006. Diluted earnings per share from continuing operations were a record $2.45 compared with $1.74 a year ago. Net revenues were a record $11.5 billion, 32 percent above last year's second quarter. Non-interest expenses of $7.6 billion increased 31 percent from last year. The annualized return on average common equity from continuing operations was 27.5 percent in the current quarter, compared with 23.7 percent in the second quarter of 2006.
>
> For the first six months of 2007, income from continuing operations was a record $5,141 million, a 50 percent increase from $3,430 million a year ago. Diluted earnings per share from continuing operations were a record $4.86 compared with $3.25 last year. Net revenues rose 31 percent to a record $22.5 billion and non-interest expenses increased 24 percent to $14.8 billion. The annualized return on average common equity from continuing operations was 28.2 percent, compared with 22.8 percent a year ago.
>
> Net income for the quarter was $2,582 million, an increase of 40 percent from $1,841 million in the second quarter of 2006. For the first six months of 2007, net income was a record $5,254 million, a 54 percent increase from $3,415 million a year ago. Diluted earnings per share were $2.45 for the quarter, compared with $1.75 in the second quarter of 2006, and the annualized return on average common equity for the second quarter was 27.5 percent compared with 23.7 percent a year ago. For the first six months, diluted earnings per share were a record $4.96, compared with $3.23 a year ago, and the annualized return on average common equity was 28.7 percent compared with 22.5 percent last year.

59.    Commenting on Morgan Stanley's successful second quarter, John Mack stated, in relevant part, as follows:

> Morgan Stanley delivered record revenues and earnings in the second quarter and the first half of the year, as we continued to build momentum across our securities businesses and continued to see the benefits of our diverse mix of products, clients and businesses around the globe. Thanks to the commitment and focus of our people, we've now achieved seven straight quarters with ROE above 20 percent, and we're well on our way to reaching our goal of doubling 2005 earnings over five years. But we believe there is still work that remains to be done, and we remain intensely focused on delivering value to Morgan Stanley's clients and shareholders over the long term.

60.    In a conference call on June 20, 2007, following the announcement of Morgan Stanley's second quarter results, Mr. Sidwell reported the following regarding Morgan Stanley's concerns regarding the subprime market:

> As you've seen from our press release, we achieved record net revenues, profit before tax, income, and earnings per share from continuing operations.
>
> We are very pleased with these results, as they reflect execution of our strategic growth plans and strong trading performance and client execution in very favorable markets. Markets were strong, and provided good opportunities. ***Concerns early in quarter about, whether issues in the Subprime market were going to spread dissipated*** . . .

61.    During the conference call, Roger Freeman of Lehman Brothers questioned Mr. Sidwell about Morgan Stanley's subprime strategy in the second quarter, in relevant part, as follows:

> **Roger Freeman - Lehman Brothers**
>
> [Y]ou commented how fixed income benefited last quarter from sort of favorable positioning from hedging standpoint in the mortgage area. How would you characterize your positioning in the mortgage space in the second quarter? Were you down just more as a function of declining activity in the market and some

marks or was there sort of negative positioning bending the wrong way?

**David Sidwell**

The first quarter we really did benefit from the market conditions in Subprime as I mentioned spreads didn't really move a whole lot during the second quarter, so there were lower opportunities. We certainly did not loose money in this business.

62.     The information disclosed in the press releases and conference calls were materially incomplete, false and misleading.   Nowhere did Morgan Stanley disclose any problems with its subprime loan portfolio or its CDO hedging strategy.  In reality, however, Morgan Stanley faced tremendous exposure to the subprime mortgage market.   Moreover, Morgan Stanley lacked adequate internal financial controls to address the burgeoning subprime crisis and to hedge the risks associated with its CDO exposure, in spite of its repeated public announcements to the contrary.

63.     On September 19, 2007, Morgan Stanley announced its results for the third quarter ended August 31, 2007.  The press release stated, in relevant part, as follows:

> Morgan Stanley (NYSE: MS) today reported income from continuing operations for the third quarter ended August 31, 2007 of $1,474 million, a decrease of 7 percent from $1,588 million in the third quarter of 2006. Diluted earnings per share from continuing operations were $1.38 compared with $1.50 a year ago. Net revenues were $8.0 billion, 13 percent above last year's third quarter. Non-interest expenses of $5.7 billion increased 18 percent from last year. The annualized return on average common equity from continuing operations was 17.2 percent in the current quarter compared with 23.3 percent in the third quarter of 2006.
>
> For the first nine months of 2007, income from continuing operations was a record $6,151 million, a 41 percent increase from $4,353 million a year ago. Diluted earnings per share from continuing operations were a record $5.79 compared with $4.12 last year. Net revenues rose 29 percent to a record $28.5 billion and non-interest expenses increased 24 percent to $19.2 billion. The annualized return on average common equity from continuing

operations was 25.5 percent compared with 22.4 percent a year ago.

The results for Discover Financial Services prior to its spin-off on June 30, 2007 are reported in discontinued operations on an after-tax basis. Including these results, net income for the quarter was $1,543 million, a decrease of 17 percent from $1,851 million in the third quarter of 2006. For the first nine months of 2007, net income was a record $6,797 million, a 29 percent increase from $5,266 million a year ago. Diluted earnings per share were $1.44 for the quarter compared with $1.75 in the third quarter of 2006, and the annualized return on average common equity for the third quarter was 17.1 percent compared with 22.7 percent a year ago. For the first nine months, diluted earnings per share were a record $6.40 compared with $4.99 a year ago, and the annualized return on average common equity was 24.9 percent compared with 22.6 percent last year.

64.   Commenting on Morgan Stanley's third quarter results, Mr. Mack stated as follows:

Morgan Stanley's diversification across businesses and regions helped us deliver ROE of 17.2% this quarter, despite the impact of the severe market disruption on some areas of the Firm--including our credit products, leveraged lending and quantitative strategies businesses. Even with these turbulent markets, Morgan Stanley still delivered strong performances across many core businesses and achieved record results in our prime brokerage, derivatives and interest rate & currencies businesses. In addition, we continued making progress in executing our growth plans and vastly improving performance in Asset Management and Global Wealth Management.

65.   In a conference call on September 19, 2007, following the announcement of the Morgan Stanley's third quarter results, Mr. Sidwell explained Morgan Stanley's disappointing performance, in relevant part, as follows:

Let me highlight the areas that are key to understanding our results. *The credit markets deteriorated considerably over the course of the quarter, with increased volatility, significant spread widening, lower levels of liquidity and reduced price transparency at all parts of the capital structure. These factors affected the leveraged lending markets, the effectiveness of hedging strategies, sub-prime mortgage markets including the*

24

*CDO market, as well as other structured credit products.* This credit environment significantly impacted our results in relationship and leveraged lending, and credit sales and trading.

First in relationship and leveraged lending, where markdowns to our loans and commitments led to *losses of approximately $940 million* reported in our other sales and trading net revenues. The earnings per share impact from these losses was approximately $0.33 a share. These losses include the $726 million impact of marking to market including certain fees a $31 billion pipeline of leveraged loan commitments made to support acquisitions made by financial sponsors.

Second, *corporate credit and securitized credit product sales and trading businesses, including our residential and commercial mortgage businesses, had lower revenues than the strong second quarter. Revenues were approximately $260 million this quarter, compared with $1.3 billion last quarter*, with the largest decrease in corporate credit where losses in our structured credit business, as the extreme market moves impaired the performance of hedge strategies, more than offset strong investment grade and other trading results.

Our residential and commercial mortgage business had lower revenues than the second quarter as the market continued to deteriorate, particularly in the senior portion of the capital structure. We significantly reduced our positions during the course of the quarter in light of the market continues in corporate, residential, and commercial credit.

66.    Morgan Stanley was also suffering under the weight of massive credit deterioration necessitating enormous write-downs of its collateralized debt obligations as its Level 3 assets continued to balloon. Level 3 assets are holdings that are so illiquid, or trade so infrequently, that they lack a reliable price, so their valuations are based on management's best guess. Regarding Morgan Stanley's Level 3 assets, Mr. Sidwell commented, in relevant part, as follows:

Given the third quarter market dynamics, more instruments have become illiquid and as you would expect, the level of financial assets categorized in Level 3, which is the most illiquid category, have increased. Our total asset position of Level 3 in the second

quarter was approximately 5% of our total assets. Level 3 liabilities represented approximately 2% of total liabilities.

*While we are still working on the third quarter disclosures, we anticipate that the total of Level 3 asset positions will increase to approximately 8% of total assets when we file our Q.* Of the increase, approximately one-fourth or one-quarter represents Level 2 assets moving into the Level 3 category. Level 3 liabilities will represent about 3% of total liabilities.

*The major components of Level 3 are the same as we disclosed in the second quarter. Corporate and other debt, derivatives — which is primarily complex structured instruments — and investments which includes real estate funds and private equity.* Corporate and other debt in the assets category includes closed leveraged acquisition finance loans, commercial and residential whole loans to be securitized, commercial whole loans for private placements, and mortgage-backed residuals. Corporate and other debt in the liability category includes the marking to market of our pipeline of leveraged loan commitments.

Turning to the income statement on page 44 of last quarter's Q, you saw that we recognized just under $600 million in gains on Level 3 assets and liabilities. When we report our 10-Q for this quarter, you will see a net increase in gains in Level 3 driven by derivative contracts, which offset losses on other cash instruments included in those classified within Level 1 and 2.

Level 3 is where there are unobservable inputs, and includes situations where there is little if any market activity for the asset or liability. This is, generally speaking, the category where we are marking to model. The valuation methodology on these illiquid instruments applies modeling techniques that use relevant empirical data, including available indices to extrapolate an estimated fair value. The input reflects assumptions that market participants use in pricing an asset or liability in a current transaction. Representing a determined exit price, and also the cash flows ultimately expected.

Our valuation models are calibrated to the market on a frequent basis. The parameters and inputs are adjusted for assumptions about risk, and in all cases if market data exists, that data will be used to price the assets or liabilities. The valuation of these instruments are reviewed by an independent valuation group outside of the business units and subject to the scrutiny of our auditors so we are confident that we have appropriately valued these positions.

67.    During its third quarter, Morgan Stanley took approximately $1.2 billion in write-downs related to leveraged loans, but had yet to take any subprime mortgage-related write-downs.  Most of the other investment banks had already taken billions of dollars in write-downs related to the weakening market.  Citigroup Inc., for example, which took more than $6 billion in write-downs in the third quarter, announced its plan to take an additional $8 billion to $11 billion in the fourth quarter.  Morgan Stanley's silence regarding its subprime exposure led the market to speculate that Morgan Stanley had gone relatively unscathed in the subprime mortgage mess.  Accordingly, analysts questioned Morgan Stanley about Morgan Stanley's exposure to the subprime mortgage markets and its CDO positions during the September 19 conference call, as follows:

**Michael Hecht - Banc of America Securities**

The marks you mentioned on the credit side of the business more coming from the corporate side versus the mortgage side, which I think was included in credit and on the mortgage side any write-downs related to Saxon?

**David Sidwell**

Obviously we look at our residential and commercial mortgage business as a total business, and so Saxon is now integrated very much as we think about our residential mortgage business. As I said overall, that business had positive revenues. To answer in a very technical manner, there was an impairment of our goodwill in the quarter on Saxon. There was no impairment because we evaluate goodwill at the fixed income level, not at the Saxon level. There was a slight impairment of the intangible assets that was very small.

**Michael Hecht - Bank of America Securities**

Can you clarify for us what your exposure is to ABCP Conduits? I think there is some rating agencies out there that put your liquidity lines at relatively big numbers, and I was hoping for a little clarification there.

**Colm Kelleher**

We have ABCP Conduits as such, in terms of providing stand-bys, we have negligible exposure. In terms of investment management we act basically in ABCP as an arranger and placer of paper. As you know, that market actually is showing signs of life and issuance is coming back.

Within investment management we clearly, like everybody, hold a commercial paper issued by the Conduits, and some of the SIVs; not surprising, given that the outstanding of that market was $1.2 trillion out of $2.2 trillion, and you know that position has been significantly reduced. We stopped buying that paper rolling it over early on, and we feel pretty relaxed about the positions we hold there for the time being.

**David Sidwell**

We were given a bit of a note here too that the rating agencies seem to have a wrong number for us here, so as Colm said, we do not think we have a significant number.

68.    Following the earnings conference, on October 11, 2007, Morgan Stanley announced that Mr. Kelleher would take over for Sidwell as the Executive Vice President and Chief Financial Officer of Morgan Stanley.

69.    Despite Morgan Stanley's silence regarding its exposure to the subprime crisis, the Wall Street Journal published an article on November 7, 2007, revealing that two analysts - David Trone of Fox-Pitt, Kelton and Mike Mayo of Deutsche Bank AG - projected a range of $3 billion to $6 billion on a possible Morgan Stanley write-down.   Mr. Trone characterized the basis for his Morgan Stanley estimate as an "educated guesses" tied to the firm's disclosed levels of credit and real-estate exposure.  He estimated the firm's exposure to CDOs is about $16 billion and that the write-downs are likely to total 25% of its CDO exposures, or $4 billion.  He also said the firm could take an additional $2 billion hit on straight mortgages and other risks such as exposure to SIVs, or structured investment vehicles.

70.     In a late reporting, on November 7, 2007, Morgan Stanley announced that it would write-down the value of its subprime mortgage-related exposure by $3.7 billion, due to the "continued market deterioration" since August.   Morgan Stanley attributed the loss to deterioration in capital markets, which was triggered in large part by the struggles of thousands of homeowners to keep up with mortgage payments.   Morgan Stanley further explained that the actual hit to its fourth-quarter results will depend on future market developments and could differ from the amount noted.   "It is expected that market conditions will continue to evolve, and that the fair value of these exposures will frequently change and could further deteriorate," Morgan Stanley said.

71.     The biggest piece of the $3.7 billion in pretax paper losses, Morgan Stanley's data indicated, came from a write-down of the CDO position from $11.4 billion on August 28 to $8.3 billion on October 31.   Such securities fell as much as 4.4% in August and 4.5% in September, but tumbled as much as 27% in October.   Mr. Kelleher noted that the mortgage-related bets "did not come out of our client-facing activities" such as underwriting; rather, Morgan Stanley "began with a short position in the subprime asset class, which went right through to the first quarter."   As the downturn spread to the senior CDO holdings that were meant to hedge the subprime bet, Morgan Stanley's exposure changed "from short to flat to long."   According to Mr. Kelleher, "[y]ou go short, expecting a certain predefined range of losses . . . that range of losses was burnt through by the excessive market action.   And then you ended up effectively going long."   One of Morgan Stanley's problems with its residential exposure in recent months was the weakening of its hedging positions as the market plunged far deeper than risk-management models had predicted, explained Mr. Kelleher.

72.     Through the first nine months of the fiscal year that ended in August, Morgan Stanley's bearish hedge on subprime returned a profit of $1 billion, according to Goldman Sachs Group Inc. analyst William Tanona.  But the firm's disclosure of the paper losses and its remaining positions in early November prompted two ratings firms to issue negative outlooks for Morgan Stanley's credit.

73.     Speculation by investors that Morgan Stanley had gone relatively unscathed in the subprime mortgage mess was immediately dashed and the gravity of the situation weighed on the stock, contributing to the eventual broad sell-off in the market.

74.     Standard & Poor's ("S&P") changed its outlook on Morgan Stanley to negative from stable after the bank said it will write down $3.7 billion in securities backed by residential mortgages.  A negative outlook indicates that a ratings cut is likely over the next two years.  S&P rates Morgan Stanley's senior unsecured debt "AA-minus," the fourth-highest investment grade.  Fitch Ratings also affirmed its ratings of "AA-minus" on the bank, saying the loss is manageable.  Fitch has a negative outlook on Morgan Stanley.

75.     The loss is a result of increased risk-taking in proprietary trading at the bank, S&P said in a statement.  "This misstep points to the increased risk Morgan Stanley bears owing to management's growth strategy and, more broadly, increased trading risks for all the broker-dealers in the current environment," S&P said.

76.     Moody's Investors Service also cut the ratings on 86 classes of Morgan Stanley mortgage securities while placing another 37 tranches under review on November 9, 2007.  "The ratings were downgraded and placed under review for downgrade based on higher than anticipated rates of delinquency, foreclosure, and REO in the underlying collateral relative to credit enhancement levels," Moody's said in a release.  The collateral backing the deals

consists of first lien fixed and adjustable-rate, Alt-A mortgage loans which were originated in late 2005 through 2006, it said.

77.    Although John Mack remains committed to taking more risk in trading, investing and lending for the firm and its clients, the ongoing credit markets crunch is making its mark on Morgan Stanley's balance sheet. "Clearly there is a risk of contagion" from residential to commercial mortgage-backed securities, Mr. Kelleher said. "The trend is clearly not looking good..."

78.    On November 13, 2007, Morgan Stanley held a conference in which it noted that it expects revenue and common equity growth to decline in 2008 amid a more challenging environment. "While we expect 2008 to be another growth year, we do not expect the current growth trajectory in revenue and average common equity to continue," Mr. Kelleher said at the Merrill Lynch Banking and Financial Services conference.    "We plan to be more judicious in how we allocate capital, to ensure the highest risk-return in this environment," he said. According to Mr. Kelleher, Morgan Stanley intends to "bring down" its balance sheet to keep leverage levels on par with previous quarter. Mr. Kelleher also said that Morgan Stanley expects "the market to take longer, several quarters, to return to more normal operating levels." Demand for CDOs will remain muted, hobbling the structured finance business "for an extended period."

### VIII.    CAUSATION

79.    The Plan suffered significant losses because substantial assets of the Plan were imprudently allowed to be put at great risk by Defendants, through investment by the Plan in Company Stock during the Class Period, in breach of Defendants' fiduciary duties.

80.    Defendants are responsible for losses caused by investment of Plan assets in Company Stock through matching and discretionary contributions to the extent that

Defendants prevented the sale or transfer of such Company Stock. Defendants are also responsible for losses caused by participant direction of investment in Company Stock by failing to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision making process, as required by section 404(c) of ERISA, 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. Defendants concealed material, non public facts from participants and provided misleading, inaccurate, and incomplete information to them regarding the nature of the Defendants' improper activities, the credit risk undertaken by Defendants and therefore the risks to Morgan Stanley's earnings levels, as well as the true underlying values of Company Stock offered by the Plan, misrepresenting its soundness as an investment vehicle. As a consequence, participants did not exercise independent control over their investments in Company Stock and Defendants remain liable under ERISA for losses caused by such investment.

81.    Where a breach of fiduciary duty consists of or includes misrepresentations and omissions material to a decision by a reasonable participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment.

82.    Defendants' statements, acts, and omissions alleged herein constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in Company Stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of its plan assets in Company Stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on Defendants' deceptive statements, acts, and omissions.

83.    Had the Defendants properly discharged their fiduciary and/or co fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Company Stock, eliminating Company Stock as an investment option when it became imprudent, and divesting the Plan from Company Stock offered by the Plan when maintaining such an investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered through its continued investment in Company Stock.

## IX.    ERISA SECTION 404(C) DEFENSE INAPPLICABLE

84.    Section 404(c) of ERISA, 29 U.S.C. § 1104(c), is inapplicable as an affirmative defense here. Section 404(c) provides a limited exception to fiduciary liability for losses that result from Plan participants' exercise of "independent control" over investment decisions. It applies only when plan participants in fact exercise independent control over investment decisions, and the fiduciaries must otherwise satisfy the numerous procedural and substantive requirements of the statute and the regulations promulgated pursuant thereto.

85.    There are several reasons why said affirmative defense is inapplicable here. First, section 404(c) does not provide any defense to the Plan's fiduciaries' imprudent decision to select and continue offering Company Stock as investment option in the Plan, which is a decision that is completely out of Plan's participants' control.

86.    Second, even as to participant directed investment in Company Stock, section 404(c) does not apply because Defendants failed to ensure effective participant control by neglecting to provide complete and accurate material information to the Plan's participants regarding Company Stock. Due to Defendants' failure in this respect, the Plan's participants did not have informed control over the portion of the Plan's assets that were invested in Company Stock at their direction, and Defendants remain entirely responsible for losses arising therefrom.

87.    Accordingly, a section 404(c) affirmative defense to this action is inapt.

## COUNT I
### (As against all Defendants)

### Breach of Duty of Care
### Section 404(a)(1)(B) of ERISA, 29 U.S.C. § 1104(a)(1)(B)

88.     Plaintiff incorporates the foregoing paragraphs herein by reference.

89.     At all times relevant hereto, Section 404(a)(1)(B) of ERISA, 29 U.S.C. § 1104(a)(1)(B), required Defendants to act, with respect to the Plan, with the care, skill, prudence, and diligence that a prudent person acting in a like capacity and familiar with such matters would use in managing an enterprise of like character and with like aims.

90.     During the Class Period, Defendants breached their duty of care.  They failed to act prudently and failed to use reasonable care, skill, or diligence in offering Company Stock as an investment option, purchasing Company Stock for the Plan, monitoring the Plan's investment in Company Stock, communicating information concerning Morgan Stanley's financial performance to Plan participants, and holding Company Stock when it was no longer a prudent retirement investment.

91.     At all relevant times, Defendants knew or should have known, by virtue of their status as directors, officers or senior employees, of the above-mentioned facts, all of which made Company Stock an imprudent Plan investment.

92.     Defendants also knew that the price of Company Stock would materially decline once the market became aware that Company had overstated earnings growth.  Yet, Defendants failed to impute this knowledge to the Plan and Plan participants and continued to cause the Plan to acquire and retain shares of Company Stock.

93.     Defendants failed properly to take into account the numerous practices that put Company Stock at risk as well as the fact that Company Stock was inflated in value when determining the prudence of investing and holding Plan assets in Company Stock.

94.    As a result of Defendants' knowledge of and, at times, participation in creating and maintaining public misconceptions concerning the true financial health of Morgan Stanley, any generalized warnings of market and diversification made to Plan participants did not effectively inform Plan participants of the past, immediate, and future dangers of investing in Company Stock.

95.    Because Defendants knew or should have known that Company Stock was an imprudent investment for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and reasonably foreseeable losses incurred as a result of the Plan's investment in Company Stock.

96.    Defendants had available to them several different options for satisfying this duty, including: making appropriate disclosures as necessary; prohibiting future investment in Company Stock; divesting the Plan of Company Stock; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; or resigning as fiduciaries of the Plan to the extent that as a result of their employment by the Company they could not loyally serve participants in the Plan in connection with the Plan's acquisition and holding of Company Stock.

97.    Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses as a result of Plan investment in Company Stock.

98.    According to Plan documents, the Investment Committee and its members were responsible for the selection, maintenance, and monitoring of the Plan's investments.

99.    Under ERISA, Defendants were responsible for ensuring that all Plan investments in Company Stock were prudent and are liable for losses incurred as a result of such investments being imprudent.

100.    Moreover, a fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.   29 U.S.C. § 1104(a)(l)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the Plan, to do so.

101.    Defendants breached their duties to prudently and loyally manage the Plan's assets.  During the Class Period, Defendants knew or should have known that Company Stock was not a suitable and appropriate investment for the Plan.  Nonetheless, during the Class Period, these fiduciaries continued to offer the Company Stock as an investment for the Plan and to direct and approve Plan investment in Company Stock.  Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take adequate steps to prevent the Plan, and indirectly the Plan participants and beneficiaries, from suffering losses as a result of the Plan's investment in Company Stock.

102.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants, not only lost a significant portion of its assets and retirement investments, but also failed to achieve the gains that the Plan, and indirectly the Class, would have realized had Defendants performed their fiduciary duties.

103.    Pursuant to sections 409 and 502(a) of ERISA, 29 U.S.C. §§ 1109(a) and 1132(a), Defendants are liable to restore to the Plan the losses caused by their breaches of fiduciary duties alleged in this Count.

### COUNT II
### (As against all Defendants)

**Breach of Fiduciary Duty of Loyalty to Avoid Conflicts of Interest --**
**Section 404(a)(1)(A) of ERISA, 29 U.S.C. § 1104(a)(1)(A)**

104.    Plaintiff incorporates the foregoing paragraphs herein by reference.

105.    At all relevant times, Section 404(a)(1)(A) of ERISA, 29 U.S.C. § 1104(a)(1)(A), required Defendants to act solely in the interests of the Plan participants, including Plaintiff, and for the exclusive purpose of providing benefits to the Plan participants.

106.    The fiduciary duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single minded devotion to the interests of the Plan and its participants, regardless of the interests of the fiduciaries themselves or the Plan sponsor.

107.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, inter alia: failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investment in Company Stock; failing to notify appropriate federal agencies, including the United States Department of Labor, of the facts and transactions which made Company Stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company, their co-defendants, and themselves above the interests of the participants with respect to the Plan's investment in Company Stock.

108.    In addition, upon information and belief, many of the Defendants had significant personal investments in Company Stock through, *inter alia*, receipt of Company Stock pursuant to incentive and nonqualified stock options and restricted share awards. Thus, Defendants had a significant personal financial incentive to maintain a high price for Company Stock. Defendants had an incentive not to disclose negative financial results to the Plan participants in hopes that such participants would select Company Stock for their retirement accounts and therefore help maintain a high price for Company Stock.

109.    Defendants also had an incentive to maintain Company Stock as an investment option under the Plan because the elimination of Company Stock as an investment option in the Plan would have sent a negative signal to Wall Street analysts, which in turn would result in reduced demand for Company Stock and a drop in the stock price. Since the compensation of certain Defendants included Company Stock, this sequence of events would reduce their compensation and also reduce their profits from selling Company Stock.

110.    As such, Defendants breached their fiduciary duty of loyalty because they were faced with a conflict of interest, which they did not promptly resolve, between their own interest and the interests of the Plan participants and beneficiaries. Defendants' interest in maintaining an artificially high price for Company Stock was in direct conflict with Plan participants' interests in (i) avoiding investing their retirement accounts in Company Stock when it was imprudent to do so and (ii) receiving accurate information concerning the Company upon which to base their investment decisions.

111.    Defendants also breached their fiduciary duty of loyalty because they endorsed unreasonable earnings and growth estimates for the Company. Such endorsement was in the interests of Defendants to maintain an artificially high price for Company Stock, but was

detrimental to the interests of the Plan participants and beneficiaries who were holding and continuing to invest in Company Stock based upon misinformation.

112.     Defendants also breached their fiduciary duty of loyalty because they did not timely disclose negative financial information regarding Morgan Stanley.  Such non-disclosure aided the interests of Defendants in maintaining an artificially high price for Company Stock, but ran against the interests of the Plan participants who were holding and continuing to invest in Company Stock based upon misinformation.

113.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, not only lost a significant portion of its retirement investments, but also failed to achieve the gains that the Plan, and indirectly the Class, would have realized had Defendants performed their fiduciary duties.

114.     Pursuant to sections 409(a) and 502(a)(1)(B) of ERISA, 29 U.S.C. §§ 1109(a) and 1132(a)(1)(B), Defendants are liable to restore to the Plan the losses caused by their breaches of fiduciary duties alleged in this Count.

**COUNT III**
**(As against all Defendants)**

**Breach of Fiduciary Duty to Provide Complete and Accurate Information**
**Section 404(a)(1)(A) and (B) of ERISA, 29 U.S.C. § 1104(a)(1)(A) and (B)**

115.     Plaintiff incorporates the foregoing paragraphs herein by reference.

116.     The fiduciary duties of loyalty and prudence also entail a duty to deal candidly with Plan participants.  This duty of candor requires Plan fiduciaries to provide complete and accurate information concerning the Plan's investment options, including the financial performance of Morgan Stanley, to Plan participants.  This duty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the Plan or Plan

assets, and to disclose material information that Plan participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding Plan investment options, so that Plan participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan. This duty applies to all Plan investment options, including investment in Company Stock.

117.    Defendants breached their duty of candor to Plan participants by failing to provide complete and accurate information regarding, *inter alia,* Morgan Stanley's business improprieties, public misrepresentations, credit risks, inflated revenues and earnings, and the consequent inherent risks and/or artificial inflation of the value of Company Stock. Defendants also failed to convey accurate information regarding the soundness of Company Stock and the prudence of investing retirement contributions in Morgan Stanley equity. These failures were particularly devastating to the Plan, and thus Plan participants, because losses in Company Stock had an enormous impact on the value of participants' retirement assets.

118.    During the Class Period, Defendants fostered a positive attitude toward Company Stock and/or allowed participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in Company Stock. As such, participants in the Plan could not appreciate the true risks presented by investments in Company Stock and therefore could not make informed decisions regarding their investments in the Plan.

119.    Defendants failed to provide Plan participants with material information regarding Company Stock. Thus, the participants could not appreciate the true risks presented by

investments in Company Stock and could not make informed decisions regarding investments in the Plan.

120.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable Plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment. Here, the above described statements, acts, and omissions of the defendants in this Complaint constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in Company Stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of their invested Plan assets in Company Stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of Defendants as described herein.

121.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, not only lost a significant portion of its retirement investments, but also failed to achieve the gains that the Plan, and indirectly the Class, would have realized had Defendants performed their fiduciary duties.

122.    Pursuant to sections 409 and 502(a) of ERISA, 29 U.S.C. §§ 1109(a) and 1132(a), Defendants are liable to restore to the Plan the losses caused by their breaches of fiduciary duties alleged in this Count.

**COUNT IV**
**(As against Defendants MS&Co., Morgan Stanley and MS&Co. Directors)**

**Breach of Fiduciary Duty to Monitor**
**Section 404(a)(1)(A) and (B) of ERISA, 29 U.S.C. § 1104(a)(1)(A) and (B)**

123.    Plaintiff incorporates the foregoing paragraphs herein by reference.

124.    At all relevant times, ERISA Section 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), required Defendants to monitor other fiduciaries.

125.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.  In this case, that meant that Defendants had the duty to:

(viii)    ensure that the monitored fiduciaries possessed the needed credentials and experience or used qualified advisors and service providers to fulfill their duties.  They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of Plan participants;

(ix)    ensure that the monitored fiduciaries had ready access to such outside, impartial advisors, counsel, and experts when needed;

(x)    ensure that the monitored fiduciaries were provided with adequate financial resources to do their job;

(xi)    ensure that the monitored fiduciaries had adequate information to do their job of overseeing the Plan investments; and

(xii)    ensure that the monitored fiduciaries maintained adequate records of the information on which they based their decisions and analysis with respect to Plan investment options.  The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

126.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the

investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not. The duty to monitor encompasses a duty to periodically monitor the performance of the appointees so as to ensure compliance with their fiduciary duties under ERISA and the plan.

127.    The duty of prudence requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether investment fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

128.    Pursuant to sections 409 and 502(a) of ERISA, 29 U.S.C. §§ 1109(a) and 1132(a), Defendants are liable to restore to the Plan the losses caused by their breaches of fiduciary duties alleged in this Count.

## COUNT V
### (As against all Defendants)

### Co-Fiduciary Liability
### Section 405(a) of ERISA, 29 U.S.C. § 1105(a)

129.    Plaintiff incorporates the foregoing paragraphs herein by reference.

130.    Section 405(a) of ERISA, 29 U.S.C. § 1105(a), imposes liability upon a fiduciary for a breach of fiduciary responsibility committed by another fiduciary.

131.    Each Defendant is also liable as a co-fiduciary because each (1) knowingly participated in and knowingly undertook to conceal (i) the failure of the other fiduciaries to provide complete and accurate information regarding Company Stock, (ii) the

conflict of interest facing the other fiduciaries, (iii) the failure to monitor and investigate Plan

investments, (iv) the imprudence of the Plan investing in Company Stock, and (v) the failure to

diversify the Plan investments; (2) enabled other fiduciaries to breach their duties as a result of

each Defendant's own failure to satisfy his or her fiduciary duties; and (3) had knowledge of the

other fiduciaries' failures to satisfy their fiduciary duties, yet did not make any effort to remedy

the breaches.

132.    As a direct and proximate result of the breaches of fiduciary duties alleged

herein, the Plan, and indirectly Plaintiff and the Plan's other participants, lost a significant

portion of his retirement investments.

133.    Pursuant to sections 409 and 502(a) of ERISA, 29 U.S.C. §§ 1109(a) and

1132(a), Defendants are liable to restore to the Plan the losses caused by their breaches of

fiduciary duties alleged in this Count.

## REMEDIES FOR DEFENDANTS' BREACH OF FIDUCIARY DUTIES

134.    Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), authorizes a plan

participant to bring a civil action for appropriate relief under section 409.  Section 409, 29 U.S.C.

§ 1109, requires "any person who is a fiduciary … who breaches any of the … duties imposed

upon fiduciaries … to make good to such plan any losses to the plan …."  Section 409 also

authorizes "such other equitable or remedial relief as the court may deem appropriate …."

135.    But for Defendants' breaches of fiduciary duty, the participants and

beneficiaries in the Plan would not have made or maintained investments in Company Stock and,

would have instead invested in the most profitable alternative investments available.

136.    Plaintiff and the Class are therefore entitled to relief from Defendants in

the form of: (1) a monetary payment to the Plan to compensate for the losses to the Plan resulting

from the breaches of fiduciary duties alleged above, in an amount to be proven at trial based on

the principles described above, as provided by section 409(a) of ERISA, 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by sections 409(a) and 502(a) of ERISA, 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by section 502(g) of ERISA, 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

137.    Each Defendant is personally liable and jointly liable for the acts of the other Defendants as a co-fiduciary.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against defendants, jointly, severally, or individually, in the alternative, as follows:

A.    declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Plan participants;

B.    an order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if defendants had fulfilled their fiduciary obligations;

C.    imposition of a constructive trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.    an order enjoining defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

E.     actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.     an order that defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in Company Stock maintained by the Plan in proportion to the accounts' losses attributable to the decline in the price/value of Company Stock;

G.     an order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.     an order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.     an order for equitable restitution and other appropriate equitable monetary relief against the defendants.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: New York, New York
         December 14, 2007

                                    WOLF HALDENSTEIN ADLER
                                    FREEMAN & HERZ LLP

                         By:    _____
                                    Gregory M. Nespole (GN-6820)
                                    Mark C. Rifkin (MR-0904)
                                    Michael Jaffe (MJ-1671)
                                    Robert B. Weintraub (RW-2897)
                                    270 Madison Avenue
                                    New York, New York 10016
                                    (212) 545-4600

                                    *Attorneys for Plaintiff Carolyn Egan and the
                                    Proposed Class*

494338