# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| C. KENNETH COULTER, On Behalf of Himself and All Others Similarly Situated, | : | Civil Action No.: 07 Civ. 11624 (RWS) |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MORGAN STANLEY, MORGAN STANLEY & CO. INCORPORATED, MORGAN STANLEY, THE INVESTMENT COMMITTEE, THE PLAN ADMINISTRATOR, THE MORGAN STANLEY GLOBAL DIRECTOR OF HUMAN RESOURCES, JOHN J. MACK, ROY J. BOSTOCK, ERSKINE B. BOWLES, SIR HOWARD J. DAVIES, KAREN JAMESLEY, C. ROBERT KIDDER, DONALD T. NICOLAISEN, CHARLES H. NOSKI, HUTHAM S. OLAYAN, CHARLES E. PHILLIPS, JR., O. GRIFFITH SEXTON, DR. LAURA D. TYSON, DR. KLAUS ZUMWINKEL, and JOHN DOES 1-30, | : | (Caption Continued) |
| | : | |
| Defendants. | : | |

## JOINT DECLARATION OF LORI G. FELDMAN AND ROBERT I. HARWOOD IN SUPPORT OF THE MOTION OF C. KENNETH COULTER FOR CONSOLIDATION, APPOINTMENT AS INTERIM LEAD PLAINTIFF AND APPOINTMENT OF INTERIM CO-LEAD COUNSEL

| | | |
|---|---|---|
| CAROLYN EGAN, On Behalf of Herself and All Others Similarly Situated, | : : : | Civil Action No.: 07 Civ. 11285 (RWS) |
| Plaintiff, | : : | |
| v. | : : | |
| MORGAN STANLEY & CO. INCORPORATED, MORGAN STANLEY, MORGAN STANLEY, THE INVESTMENT COMMITTEE OF THE MORGAN STANLEY 401(k) PLAN (f/k/a THE MORGAN STANLEY DPSP/START PLAN), THE MORGAN STANLEY GLOBAL DIRECTOR OF HUMAN RESOURCES, WALID A. CHAMMAH, CHARLES CHASIN, ZOE CRUZ, RICHARD PORTOGALLO, JAMES P. GORMAN, NEAL A. SHEAR, CORDELL G. SPENCER, and JOHN DOE DEFENDANTS 1-30, | : : : : : : : : : : : : : | |
| Defendants. | : | |
| JOHN SIEFKEN, On Behalf of Himself and All Others Similarly Situated, | : : : | Civil Action No.: 07 Civ. 11456 (JGK) |
| Plaintiff, | : : | |
| v. | : : | |
| MORGAN STANLEY, MORGAN STANLEY & CO. INC., MORGAN STANLEY PLANS "INVESTMENT COMMITTEE," MORGAN STANLEY PLANS "ADMINISTRATIVE COMMITTEE," JOHN J. MACK, C. ROBERT KIDDER, ERSKINE B. BOWLES, DONALD T. NICOLAISEN, and JOHN DOES 1-10, | : : : : : : : : | |
| Defendants. | : | |

LORI G. FELDMAN and ROBERT I. HARWOOD, hereby declare the following under penalty of perjury:

1.      I, Lori G. Feldman, am an attorney duly licensed to practice before the courts of the State of New York and Washington State.  I, Robert I. Harwood, am an attorney duly licensed to practice before the courts of the State of New York.  We are members of the firms Milberg Weiss LLP ("Milberg Weiss") and Harwood Feffer LLP ("Harwood Feffer"), respectively, and are attorneys for Plaintiff C. Kenneth Coulter and the putative class members in the above-referenced actions.  We have personal knowledge of the matters stated herein and, if called upon, we could and would competently testify thereto.

2.      We submit this declaration in support of Plaintiff C. Kenneth Coulter's motion for consolidation, appointment of Interim Lead Plaintiff, and the appointment of Milberg Weiss and Harwood Feffer as Interim Co-Lead Counsel for the plaintiffs in the ERISA litigation involving Morgan Stanley, et. al.

3.      Attached hereto as Exhibit A is a true and correct copy of the order regarding consolidating related ERISA actions in *In re Royal Dutch/Shell Transport ERISA Litig*., No. 04-CV-1398-JWB-SDW (D.N.J. June 30, 2004).

4.      Attached hereto as Exhibit B is a true and correct copy of Milberg Weiss's firm resume.

5.      Attached hereto as Exhibit C is a true and correct copy of Harwood Feffer's firm resume.

6.      Attached hereto as Exhibit D is a true and correct copy of the Transcript of Proceeding before Honorable John W. Bissell, *In re Royal Dutch/Shell Transport ERISA Litig*., No. 04-CV-1398-JWB-SDW (D.N.J. Aug. 22, 2005).

7.      Attached hereto as Exhibit E is a true and correct copy of Judge Scheindlin's decision in *In re Citigroup Pension Plan ERISA Litig.,* Master File 05 Civ. 5296 (SAS).

We declare under penalty of perjury under the laws of the United States that the

foregoing is true and correct.  Executed this 9th day of January 2008, at New York, New York.


$\qquad$ */s/ Lori G. Feldman* $\qquad$
Lori G. Feldman


$\qquad$ */s/ Robert I. Harwood* $\qquad$
Robert I. Harwood

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY


In re:                        :
                                  Civil Action No. 04-1398(JWB)
ROYAL DUTCH/SHELL TRANSPORT   :      (Consolidated Cases)
ERISA LITIGATION                   Hon. John W. Bissell
                              :

                              :        **O R D E R**


        Pursuant to the agreement of counsel as to the disposition

of several initial motions in related class actions assigned to

this Court; and good cause appearing in the papers submitted,

        IT IS on this 30th day of June 2004, **ORDERED:**

        (1.)  The following actions are consolidated for all

purposes under "Consolidated Action No. 04-1398."

------------------------------
GORDON LANCASTER, Individually:
and on behalf of all others
similarly situated;           :
                                  Civil Action No. 04-1398
        v.                    :

ROYAL DUTCH PETROLEUM COMPANY;:
JEROEN VAN DER VEER; PHILIP
WATTS and PERVIS THOMAS, JR., :

            Defendants.       :
------------------------------
KENNETH LOTTINGER, Individually
and on behalf of a class of all
others similarly situated,    :

        Plaintiffs,           :
                                  Civil Action No. 04-1655(JWB)
        v.                    :

N.V. KONINKLIJKE NEDERLANDSCHE:
PETROLEUM MAATSCHAPPIJ, a/k/a
ROYAL DUTCH PETROLEUM COMPANY;:
THE SHELL TRANSPORT AND
TRADING COMPANY, PLC; et al.; :

        Defendants.    :

------------------------------:

JOHN TRISTAN, JOSE VALADEZ,
OSCAR PENA, HERNALDO RIVERA  :
and JOHN R. ROSENBOOM,
Individually and on behalf of :
all others similarly situated
and on behalf of the Shell   :
Provident Fund and the Shell
Pay Deferral Investment Fund, :

        Plaintiffs,   :

                Civil Action No. 04-1636(JWB)

       v.        :

ROYAL DUTCH PETROLEUM COMPANY;:
JEROEN VAN DER VEER; PHILIP  :
WATTS and PERVIS THOMAS, JR.,

                 :

        Defendants.   :

------------------------------

SCOTT FRANKLIN, JR., Individ- :
ually and on behalf of all
others similarly situated,   :

        Plaintiffs,  :

                Civil Action No. 04-1694(JWB)

       v.        :

ROYAL DUTCH COMPANY;       :
JEROEN VAN DER VEER;
PHILIP WATTS and         :
PERVIS THOMAS, JR.,

                :

        Defendants.

------------------------------:


    (2.)  Any action hereinafter filed in the Court or

-2-

transferred to this Court arising out of the same facts and asserting the same or substantially similar claims as alleged in these consolidated cases shall also be consolidated under that docket number.  All papers submitted herein shall hereafter bear the caption "IN RE ROYAL DUTCH/SHELL TRANSPORT ERISA LITIGATION" under the above-mentioned docket number.

(3.)  The terms of this Order shall not have the effect of making any person, firm or corporation a party to any action in which he, she, or it has not been named, served or added in accordance with the Federal Rules of Civil Procedure.

(4.)  When a case which relates to the subject matter of this Consolidated Action is hereafter filed in this Court or transferred here from another court, the Clerk of this Court shall:

> (a)  Mail a copy of this Order to the attorney(s) for the plaintiff(s) in the newly filed or transferred case and to the attorneys for any new defendant(s)in the newly filed or transferred case; and
>
> (b)  Mail a copy of the Order of Assignment to counsel for plaintiffs and to counsel for defendants in the Consolidated Action.

(5.)  This Court directs counsel to call to the attention of the Clerk of this Court the filing or transfer of any case which might properly be consolidated with these actions.

(6.)  This Order shall apply to each case subsequently filed in this Court or transferred to this Court unless a party

-3-

objecting to the consolidation of such case or to any other
provision of this Order shall, within fifteen (15) days after the
date upon which a copy of this Order is mailed to counsel for
such party, file an application for relief from this Order or any
provision herein and this Court deems it appropriate to grant
such application.

(7.)  All references to filing of documents with the Court
or its Clerk shall include electronic filing where feasible and
appropriate.

(8.)  The Court hereby designates the following plaintiffs
to act as co-lead plaintiffs in this action:  Gordon Lancaster,
John Tristan, Jose Valadez, Oscar Pena, Hernaldo Rivera, John R.
Rosenboom and Scott Franklin, Jr.

(9.)  The Court designates the following firm to act as co-
lead counsel on behalf of plaintiffs with the responsibilities
described later in this Order:  Wechsler Harwood LLP, Scott &
Scott, LLC and Milberg Weiss Bershad Hynes & Lerach LLP.

(10.)  Subject to this Court's exercise of discretion to
review any disputed material decision, lead counsel shall have
sole authority over the following matters on behalf of all
plaintiffs in their respective cases:  (a) the establishment of
working committees for the efficient prosecution of the
litigation and the appointment of chairpersons and members of
such committees; (b) the initiation, response, scheduling,

-4-

briefing and argument of all motions; (c) the scope, order and conduct of all discovery proceedings; (d) such work assignments to other plaintiffs' counsel as they may deem appropriate; (e) the retention of experts; (f) designation of which attorneys may appear at hearings and conferences with the Court; (g) the timing and substance of any settlement negotiations with defendants; and (h) other matters concerning the prosecution or resolution of their respective cases.

(11.)  No motion shall be initiated or filed on behalf of any plaintiff except through lead counsel in these cases.  Any discovery dispute shall be brought to the attention of Magistrate Judge Haneke by letter with five business days to respond.  There are to be no formal discovery motions filed without prior permission of the Court.

(12.)  Subject to this Court's exercise of discretion to review any disputed material decision, lead counsel shall have sole authority to communicate with defendants' counsel and the Court on behalf of all plaintiffs in their respective cases, unless that authority is expressly delegated to other counsel. Defendants' counsel may rely on all agreements made with lead or designated counsel, and such agreement shall be binding on all other plaintiffs' counsel in their respective cases.

(13.)  The Court designates the following firm to act as liaison counsel on behalf of plaintiffs:  Lite DePalma Greenberg

-5-

& Rivas, LLC.

(14.) Defendants shall effect service of papers on
plaintiffs by serving a copy of the papers electronically, by
overnight mail service, telecopy or hand delivery on:   (a)
liaison counsel and (b) lead counsel.  Liaison counsel shall
effect service on all other plaintiffs' counsel either
electronically or by first class United States mail.  Plaintiffs
shall effect service of papers on defendants by serving a copy of
the paper by overnight mail service, telecopy or hand delivery on
counsel for defendants.  This Court's Master Service List shall
govern in all proceedings.

(15.)  The Court directs all counsel in this Consolidated
Action to make every effort to avoid duplication, inefficiency
and inconvenience to the Court, the parties, counsel and
witnesses.  However, nothing in this Order is intended to
diminish the right of any counsel to be heard on matters that are
not appropriate for joint or common action or as to which there
is a genuine and substantial disagreement among counsel.

(16.)  Each attorney not a member of the Bar of this Court,
who is acting as counsel for a plaintiff or defendant herein and
who is in good standing in any district court of the United
States, shall be deemed admitted pro hac vice to practice before
this Court in connection with this Consolidated Action.

(17.)  The Court recognizes that cooperation by and among

-6-

counsel is essential for the orderly and expeditious resolution
of this litigation.  Accordingly, the communication of
information among and between plaintiffs' counsel and among or
between defendants' counsel shall not be deemed a waiver of the
attorney-client privilege or the attorney work product privilege.

(18.)  Plaintiffs, under the direction of lead counsel,
shall file and serve their Consolidated Amended Class Action
Complaint as to all claims brought by all plaintiffs within
thirty (30) days of the date of this Order.  Defendants shall
answer, move or otherwise plead within thirty (30) days after
service of the Consolidated Amended Complaint.  No dispositive
motion shall be filed without prior permission of the Court,
unless a schedule for filing, briefing and arguing any such
motion shall be set forth in one or more Case Management Orders
herein.

(19.)  The parties shall schedule promptly a conference with
Hon. G. Donald Haneke, USMJ, in order to, _inter alia_, generate
the initial Case Management Order.


/s/     John W. Bissell
        JOHN W. BISSELL
        Chief Judge
United States District Court

-7-

# EXHIBIT B

# Milberg Weiss LLP

## THE FIRM'S PRACTICE AND ACHIEVEMENTS

Milberg Weiss was founded in 1965 and was one of the first law firms to prosecute class actions in federal courts on behalf of investors and consumers. The Firm pioneered this type of litigation and is widely recognized as one of the nation's leading defenders of the rights of victims against corporate and other large-scale wrongdoing. The Firm has principal offices in New York City and Los Angeles. The Firm's practice focuses on the prosecution of class and complex actions in many fields of commercial litigation, emphasizing securities, corporate fiduciary, ERISA, consumer, insurance, antitrust, mass tort, human rights, and related areas of litigation.

In the Firm's early years, its founding partners, Lawrence Milberg and Melvyn I. Weiss, built a new area of legal practice in representing shareholders' interests under the then recently amended federal procedure Rule 23, which allowed securities fraud cases, among others, to proceed as class actions. In the following decades, the Firm's lawyers obtained decisions that established important legal precedents in many of their areas of practice, and prosecuted cases that set benchmarks in terms of case theories, organization, discovery, trial results, methods of settlement, and amounts recovered and distributed to clients and class members.

Important milestones included the Firm's involvement in the *U.S. Financial* litigation in the early 1970s, one of the earliest large class actions, which resulted in the recovery of over $50 million by purchasers of the securities of a failed real estate development company; the Ninth Circuit decision in *Blackie v. Barrack* in 1975, which established the fraud-on-the-market doctrine for securities fraud actions; co-lead counsel position in the *In re Washington Public Power Supply System (WPPSS) Securities Litigation*, a seminal securities fraud action in the 1980s in terms of complexity and amounts recovered; representation of the Federal Deposit Insurance Corp. in a year-long trial to recover banking losses from a major accounting firm, leading to a precedent-setting global settlement; attacking the Drexel-Milken "daisy chain" of illicit junk-bond financing arrangements with numerous cases that resulted in substantial recoveries for investors; representing life insurance policyholders defrauded by "vanishing premium" and other improper sales tactics and obtaining large recoveries from industry participants; and ground-breaking roles in the multi-front attack on deception and other improper activities in the tobacco industry.

Milberg Weiss remains at the forefront in its areas of practice. Recent litigation results include: *In re Tyco International Ltd., Securities Litigation.* ($3.2 billion settlement); *Nortel Networks* (settlement for cash and stock valued at $1.142 billion); *Lucent Technologies Securities Litigation* ($600 million recovery); *Raytheon Co. Securities Litigation* ($460 million recovery); *Managed Care Litigation* (recoveries over $1 billion and major changes in HMO practices); and *NASDAQ Market Makers Antitrust Litigation* ($1 billion recoveries).

The Firm is consistently active in *pro bono* litigation, highlighted by its leadership role in the *Swiss Bank Litigation*, which led to the recovery of $1.25 billion from Swiss banks to benefit victims of the Holocaust and its recent efforts representing claimants of the September 11 Victim Compensation Fund.

The Firm's lawyers come from many different professional backgrounds. They include former federal or state prosecutors, private defense attorneys, and government lawyers. The Firm's ability to pursue claims against defendants is augmented by its team of investigators, headed by a former agent for the Federal Bureau of Investigation, and a full-time staff of forensic accountants.

In 2003, the partners of Milberg Weiss Bershad Hynes & Lerach LLP decided to separate into two groups, with Milberg Weiss LLP serving as the continuing firm.

Milberg Weiss has been responsible for more than $45 billion in recoveries during the life of the Firm. Examples of cases in which the Firm has taken lead roles include the *WPPSS* litigation, which resulted in settlements totaling $775 million; the *Lincoln Savings and Loan Litigation*, with total recoveries of $240 million out of $288 million in estimated total losses; the *NASDAQ Market-Makers Antitrust Litigation*, which resulted in a $1.027 billion settlement; and actions against major life insurers, including Prudential and MetLife, where the Firm has recovered billions of dollars on behalf of policyholders who were the victims of alleged churning and other improper practices. For more information, please visit www.milbergweiss.com.

# JUDICIAL COMMENDATIONS

In *In re September 11 Victim Compensation Fund*, Preliminary Hearing, Claim No. 212-003658 (Dec. 9 2003), Special Master Kenneth R. Feinberg stated the following regarding the Firm's commitment to the public interest:

> Once again, as I have learned over the years here in New York, the Milberg Weiss firm steps up to the plate in the public interest time and time again. The social conscience of the Milberg Weiss firm, acting through its excellent associates and partners, help deal with crises that confront the American people and others, and I am personally in the debt of Milberg Weiss for the work that it is doing, even under the gun with the December 22 deadline looming. I am once again in Milberg Weiss' debt for their extraordinary willingness to help out in the public interest, and I hope you'll relay that message back to the firm. . . . [T]hey are second among none in terms of the public interest, and I'm very, very grateful, not only to you guys for doing this, but . . . for the firm's willingness to help out. I wanted to let everybody know that.

Mr. Feinberg echoed this sentiment in a subsequent hearing (September 11th Victim Compensation Fund Hearing before Special Master Kenneth R. Feinberg, May 11, 2004):

> I also note on the record that the pro bono service of the Milberg Weiss firm is well-known to lawyers and the public throughout the nation, and I'm grateful that this is one more example of how Milberg Weiss serves the nation.

> I want to note on the record the extraordinary professionalism and skill of counsel in the preparation of this claim. They have exhibited the finest character of the Bar, and I thank them for a job well done.

Milberg Weiss has been commended by countless judges all over the country for the quality of its representation in class action lawsuits. In *In re Rite Aid Corp. Securities Litigation*, 269 F. Supp. 2d 603, 611 (E.D. Pa. 2003), Judge Dalzell commented on the skill and efficiency of Milberg Weiss attorneys in litigating the complex case:

> At the risk of belaboring the obvious, we pause to say a specific word about… the skill and efficiency of the attorneys involved…Milberg Weiss [was] extraordinarily deft and efficient in handling this most complex matter… they were at least eighteen months ahead of the United States Department of Justice in ferreting out the conduct that ultimately resulted in the write-down of over $1.6 billion in previously reported Rite Aid earnings… In short, it would be hard to equal the skill class counsel demonstrated here.

In *In re Lucent Technologies, Inc. Securities Litigation*, No. 00 CV-621, slip op. at 14-15, 26 (D.N.J. Feb. 24, 2004), Judge Joel A. Pisano of the United States District Court for the District of New Jersey recently issued an Opinion approving the Settlement of the Lucent Technologies Securities Litigation, in which he complimented Milberg Weiss (Co-Lead Counsel for the Plaintiff Class) saying:

> [T]he attorneys representing the Plaintiffs are highly experienced in securities class action litigation and have successfully prosecuted numerous class actions throughout the United States. They are more than competent to conduct this action. Co-Lead Counsel diligently and aggressively represented Plaintiffs before this Court and in the negotiations that resulted in the Settlement . . . the efforts and ingenuity of Lead Plaintiffs and Lead Counsel resulted in an extremely valuable Settlement for the Benefit of the Class.

In *In re IKON Office Solutions, Inc. Securities Litigation*, 194 F.R.D. 166, 195 (E.D. Pa. 2000), where Milberg Weiss served as co-lead counsel, Judge Marvin Katz of the United States District Court for the Eastern District of Pennsylvania commented on the skill and professionalism of plaintiffs' co-lead counsel:

> First, class counsel is of high caliber and has extensive experience in similar class action litigation… Each of the co-lead counsel firms has a national reputation for advocacy in securities class actions, and there is no doubt that this standing enhanced their ability both to prosecute the case effectively and to negotiate credibly. Similarly, defense counsel has a fine reputation and has displayed great skill in defending this complex class action. Their opposition to plaintiffs has been anything but token, and many of the battles on crucial issues were hard fought.

> Of particular note in assessing the quality of representation is the professionalism with which all parties comported themselves. The submissions were of consistently high quality, and class counsel has been notably diligent in preparing filings in a timely manner even when under tight deadlines. This professionalism was also displayed in class counsel's willingness to cooperate with other counsel when appropriate… This cooperation enabled the parties to focus their disputes on the issues that mattered most and to avoid pointless bickering over more minor matters.

In *In re NASDAQ Market-Makers Antitrust Litigation*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998), in an opinion dated November 9, 1998, approving settlements totaling over $1.027 billion, Judge Sweet commented:

Counsel for the Plaintiffs [Milberg Weiss] are preeminent in the field of class action litigation, and the roster of counsel for Defendants includes some of the largest, most successful and well regarded law firms in the country. It is difficult to conceive of better representation than the parties in this action achieved.

In *In re Prudential Insurance Co. of America Sales Practices Litigation*, 962 F. Supp. 572, 585-86 (D.N.J. 1997), vacated on other grounds, in approving the settlement of a nationwide class action against a life insurer for deceptive sales practices, where Milberg Weiss was co-lead counsel, Judge Wolin observed:

[T]he results achieved by plaintiffs' counsel in this case in the face of significant legal, factual and logistical obstacles and formidable opposing counsel, are nothing short of remarkable.

*    *    *

Finally, the standing and professional skill of plaintiffs' counsel, in particular Co-Lead Counsel, is high and undoubtedly furthered their ability to negotiate a valuable settlement and argue its merits before this Court. Several members of plaintiffs' counsel are leading attorneys in the area of class action litigation.

At the Fairness Hearing, Judge Wolin stated that "there is no doubt that Class Counsel have prosecuted the interests of the class members with the utmost vigor and expertise." *In re Prudential Ins. Co. of Am. Sales Practices Litigation*, 962 F. Supp. 450, 519 (D.N.J. 1997) (emphasis added).

In approving a $100 million settlement in *In re Prudential Securities Inc. Partnership Litigation*, 912 F. Supp. 97, 101 (S.D.N.Y. 1996), in which Milberg Weiss was one of the lead counsel, Judge Pollack noted that he had "had the opportunity at first hand to observe the quality of plaintiffs' class counsel's representation, both here and in prior complex litigation, and is impressed with the quality of Plaintiffs' Class Counsel."

In *Roy v. The Independent Order of Foresters*, Civ. No. 97-6225 (SKC) at 32 (D.N.J. Aug. 3, 1999), in his opinion on class certification, Judge Chesler noted:

The firm of Milberg Weiss, which is co-lead counsel for the plaintiff, was also counsel for the plaintiff class in the Prudential case. Thus, the adequacy of the plaintiff's representation is beyond reproach. Furthermore, the tremendous and unprecedented settlements which the Milberg firm has helped to secure for the plaintiff classes in both this case and the Prudential case are a testament to counsel's vigorous pursuit of the class interests.

In *In re Buspirone Patent Litigation*, MDL Docket No. 1413 at 34:2-3 (S.D.N.Y. Nov. 6, 2003) (Final Approval Hearing Transcript), Judge Koeltl commented on plaintiffs' counsel:

Let me say that the lawyers in this case have done a stupendous job.

In *Kruman v. Christie's International*, PLC, 00 Civ. 6322 (LAK) at 36:13-16 (S.D.N.Y. June 2, 2003) (Final Approval Hearing Transcript), Judge Kaplan commented on class counsel's representation:

I have satisfied myself in examining these papers that counsel involved in this case pursued this very difficult matter tenaciously, with skill, and got what I view to be an excellent result.

# PROMINENT CASES

• *In re Tyco International Ltd., Securities Litigation*, MDL Docket No. 02-1335-B (D.N.H.). Milberg Weiss served as co-lead counsel in this litigation, which involved claims under the Securities Act of 1933 and the Securities Exchange Act of 1934 against Tyco and its former CEO, CFO, general counsel and certain former directors that arise out of Tyco's $5.8 billion overstatement of income and $900 million in insider trading, plus hundreds of millions of dollars looted by insiders motivated to commit the fraud. Claims were also made under the 1933 and 1934 Acts against PricewaterhouseCoopers, LLP, which is alleged to have published false audit opinions on Tyco's financial statements during the Class Period and to have failed to audit Tyco properly, despite knowledge of the fraud. On December 19, 2007, the court approved a $3.2 billion settlement of the plaintiffs' claims and praised the work of co-lead counsel.

• *In re Sears, Roebuck and Co. Securities Litigation*, No. 02 C 7527 (N.D. Ill.). This case involved allegations that Sears concealed material adverse information concerning the financial condition, performance and prospects of Sears' credit card operations. The approved settlement provides $215 million to compensate investors who purchased Sears securities between October 24, 2001 and October 17, 2002 and suffered a loss thereon. As an additional benefit to the Class, Sears is separately also paying for the costs of class notice and settlement administration.

• *In re Lucent Technologies, Inc. Securities Litigation*, No. 00 CV 621 (AJL) (D.N.J.). This settlement provides compensation of $600 million to aggrieved shareholders who purchased Lucent stock between October 1999 and December 2000.

• *In re Raytheon Securities Litigation*, 99 CV 12142 (E.D. Mass.). This case concerned claims that a major defense contractor failed to write down assets adequately on long term construction contracts. In May 2004, Raytheon and its auditor PricewaterhouseCoopers LLP settled for a total of $460 million.

• Milberg Weiss served as co-lead counsel in *In re Oxford Health Plans, Inc. Securities Litigation*, MDL Dkt. No. 1222 (CLB) (S.D.N.Y.), in which settlements totaling $300 million in cash were approved by the Court in June 2003. Plaintiffs alleged that Oxford Health Plans, Inc. issued fraudulent financial statements that misstated its premium revenues and medical claims expense. KPMG LLP, Oxford's outside auditor, was also named as a defendant and was alleged to have issued a materially false and misleading audit opinion on Oxford's financial statements for the year ended December 31, 1996.

• In *In re Rite Aid Securities Litigation*, Master File No. 99-1349 (E.D. Pa.), Judge Stewart Dalzell approved class action settlements totaling $334 million against Rite Aid ($207 million), KPMG ($125 million -- the second largest amount ever recovered from an accounting firm in a federal securities class action, and the largest ever against an auditor in a case where the securities claims were limited to claims under section 10(b), which requires proof of knowing or reckless misconduct), and certain former executives of Rite Aid ($1.6 million).

• In *In re CMS Energy Securities Litigation*, Case No. 02-72004 (E.D. Mich.), Judge Steeh approved a cash settlement in excess of $200 million in a federal securities fraud case arising out of alleged round-trip trading practices by CMS Energy Corporation. Milberg Weiss served as co-lead counsel in this litigation.

• *In re Deutsche Telekom AG Securities Litigation*, Civil Action No. 00-CV-9475 (NRB) (S.D.N.Y.). Milberg Weiss served as co-lead counsel in this securities class action, alleging that Deutsche Telekom issued a false and misleading registration statement which improperly failed to disclose its plans to acquire VoiceStream Wireless Corporation and materially overstated the value of the Company's real estate assets. On July 29, 2005, Judge Naomi Reice Buchwald approved a settlement of $120 million in cash.

• *In re CVS Corp. Securities Litigation*, C.A. No. 01-11464 (JLT) (D. Mass.). Milberg Weiss served as co-lead counsel in this class action alleging that defendants engaged in a series of accounting improprieties and issued false and misleading statements which artificially inflated the price of CVS stock. On September 7, 2005, Judge Joseph Tauro approved a settlement of $110 million dollars in cash for shareholders who acquired CVS stock between February 6, 2001 and October 30, 2001.

• *In re Scheiner v. i2 Technologies, Inc.*, Civ. No. 3:01-CV-418-H (N.D. Tex.). May 2004 settlement of $84.85 million with i2 Technologies and certain individual defendants. Case alleged securities fraud against defendants relating to company's software product descriptions and alleged violations of Generally Accepted Accounting Principles.

• Milberg Weiss served as co-lead counsel in *Irvine v. ImClone Systems*, Inc., No. 02 Civ. 0109 (RO) (S.D.N.Y.), in which a settlement of $75 million in cash was approved by the Court on July of 2005. Plaintiffs alleged that ImClone issued a number of misrepresentations and fraudulent statements to the market regarding the likelihood of approval of the drug Erbitux, thereby artificially inflating the price of ImClone stock.

• The Firm was lead counsel in *In re Prudential Insurance Co. Sales Practice Litigation*, Civ. No. 95-4707 (AMW) (D.N.J.), a landmark case which concerned securities claims as well as common law claims and which resulted in a recovery exceeding $4 billion for Prudential policyholders. The settlement was approved in a comprehensive decision handed down by the Third Circuit. Milberg Weiss has led the litigation of numerous other class actions involving alleged churning practices by other insurance companies and their agents, recovering billions of dollars in actions against major insurers, including MetLife, American Express/IDS, New York Life, ManuLife and John Hancock.

• In *In re NASDAQ Market-Makers Antitrust Litigation*, MDL 1023 (S.D.N.Y.), Milberg Weiss served as court-appointed co-lead counsel for a class of investors. The class alleged that the NASDAQ market-makers set and maintained wide spreads pursuant to an industry-wide conspiracy in one of the largest and most important antitrust cases in recent history. After three and one half years of intense litigation, the case was settled for a total of $1.027 billion, the largest antitrust settlement ever.

• *In re Washington Public Power Supply System Securities Litigation*, MDL 551 (D. Ariz.). A massive litigation in which Milberg Weiss served as co-lead counsel for a class that obtained settlements totaling $775 million after several months of trial.

• In *In re American Continental Corp./Lincoln Savings & Loan Securities Litigation*, MDL 834 (D. Ariz.), Milberg Weiss served as the court-appointed co-lead counsel for a class of persons who purchased debentures and/or stock in American Continental Corp., the parent company of the now-infamous Lincoln Savings & Loan. The suit charged Charles Keating, other insiders, three major accounting firms, three major law firms, Drexel Burnham, Michael Milken and others with racketeering and violations of securities laws. Recoveries totaled $240 million on $288 million in losses. A jury also rendered verdicts of more than $1 billion against Keating and others.

• *In re Exxon Valdez*, No. A89-095 Civ. (D. Alaska) and *In re Exxon Valdez Oil Spill Litigation*, 3 AN-89-2533 (Alaska Super. Ct. 3d Jud. Dist.). Milberg Weiss is a member of the Plaintiffs' Coordinating Committee and co-chair of Plaintiffs' Law Committee in the massive litigation resulting from the Exxon Valdez oil spill in Alaska in March 1989. A jury verdict of $5 billion was obtained and is currently on appeal.

• In *In re Managed Care Litigation*, MDL 1334 (S.D. Fla.). Final approval of a settlement between a nationwide class of physicians and defendant CIGNA Healthcare valued in excess of $500 million dollars was granted on April 22, 2004. A similar settlement valued in excess of $400 million involving a nationwide class of physicians and Aetna was approved by the Court on November 6, 2003. The settlements stem from a series of lawsuits filed in both state and federal court by physicians and medical associations currently pending against many of the nation's largest for-profit health insurers arising from conduct involving issues dating back to 1990. These settlements bring sweeping changes to the health care industry and involve improvements to physician-related business practices and provide for the establishment of an independent foundation dedicated to improving the quality of health care in America.

• *In re Baldwin United Annuity Litigation*, No. M-21-35 (S.D.N.Y.). Milberg Weiss served as co-lead counsel in this consolidated proceeding on behalf of purchasers of annuities that was settled for over $160 million.

• *In re MicroStrategy, Inc. Securities Litigation*, No. 00-473-A (E.D. Va.). Milberg Weiss served as co-lead counsel in this action, which alleged securities fraud based on a massive restatement. Settlements with the defendants totaled in excess of $150 million.

• *In re Sunbeam Securities Litigation* (No. 98-8258) (S.D. Fla) Milberg Weiss acted as co-lead counsel for the class. Plaintiffs alleged that Sunbeam, its auditor, and its management engaged in a massive accounting fraud which led to a restatement of over three years of

previously reported financial results. The Court approved a combined settlement of over $140 million. The settlement amount included a $110 million settlement with Arthur Andersen, LLP, Sunbeam's auditor. The Andersen settlement is one of the largest amounts ever paid by a public accounting firm to settle claims brought under the federal securities laws. The settlement with the individuals was achieved on the eve of trial, and ended almost four years of litigation against Andersen and Sunbeam's insiders, including Albert Dunlap, Sunbeam's former Chairman and CEO. The settlement included a personal contribution from Dunlap of $15 million.

• In *In re Computer Associates Securities Litigation*, Nos. 98-CV-4839, 02-CV-1226 (TCP) (E.D.N.Y.), Milberg Weiss served as co-lead counsel and obtained a pretrial settlement valued at over $134 million in these securities fraud class actions.

• In *In re IKON Office Solutions, Inc. Securities Litigation*, MDL 1318, Docket No. 98-4286 (E.D. Pa.), Milberg Weiss served as co-lead counsel and obtained a pretrial settlement of $111 million in this securities fraud class action.

• In *In re W.R. Grace & Co. (Official Committee of Asbestos Personal Injury Claimants v. Sealed Air. Corp. and Official Committee of Asbestos Personal Injury Claimants v. Fresenius Medical Care Holdings, Inc.)*, Nos. 02-2210 and 02-2211 (D. Del.), Milberg Weiss acted as lead counsel for the asbestos personal injury and property damage committees in two separate fraudulent conveyance actions within the W.R. Grace bankruptcy. The actions sought to return the assets of Sealed Air Corporation and Fresenius Medical Care Holdings (each of which had been Grace subsidiaries pre-bankruptcy) to the W.R. Grace bankruptcy estate. Complaints in both cases were filed in mid-March 2002, and agreements in principle in both cases were reached on November 27, 2002, the last business day before trial was set to begin in the Sealed Air matter. The total of the two settlements, which consisted of both cash and stock, was approximately $1 billion.

• *In re Kruman v. Christie's International, PLC*, 284 No. 01-7309 (S.D.N.Y.), resulted in the first U.S. Court of Appeals holding that antitrust class actions on behalf of all purchasers injured worldwide can be brought in U.S. courts under U.S. law when an antitrust conspiracy has sufficient effects in the U.S. Decided in March 2002; led to successful settlement in 2003 of claims against Christie's and Sotheby's on behalf of purchasers and sellers at auctions outside the U.S.

• *In re Nortel Networks Corp. Securities Litigation*, Civ. No. 01-CV-1855-RMB (S.D.N.Y.). This federal securities fraud class action was commenced in February

2001 against Nortel Networks Corp. and certain of its officers and directors. In February 2002, Milberg Weiss was appointed to serve as sole Lead Counsel for the Class and for the Court-appointed Lead Plaintiff, the Trustees of the Ontario Public Service Employees' Union Pension Plan Trust Fund. In January 2003, the Court sustained the Complaint in its entirety, denying defendants' motion to dismiss and, in September 2003, certified a Class for all purposes. In certifying the Class, the Court specifically rejected defendants' argument that those who traded in Nortel securities on the Toronto Stock Exchange (and not the New York Stock Exchange) should be excluded from the Class. The Second Circuit denied defendants' attempted appeal. A Stipulation of Settlement was entered in June 2006 settling the action based substantially on Nortel's ability to pay. The Settlement provided cash and stock valued at $1.142 billion for the Plaintiff Class. The Settlement was approved by the Court on January 29, 2007.

• *In re Xerox Securities Litigation*, No. 3:99-CV-2374 (AWT) (D. Conn.) and *Carlson v. Xerox Corp.*, No. 3:00-CV-1621 (AWT) (D. Conn.). Milberg Weiss was appointed co-lead counsel in both of these cases. The first case was brought on behalf of a class of purchasers of Xerox common stock from October 22, 1998 (when Xerox first claimed that it was benefiting from a restructuring) through October 7, 1999 (when Xerox finally disclosed the massive problems with the restructuring that affected its operations and the impact of these problems on its revenues) and alleged misrepresentations regarding Xerox's restructuring. The second case was brought on behalf of a class of purchasers of Xerox common stock from February 17, 1998 through June 28, 2002 and alleged misrepresentations and failure to disclose massive accounting improprieties. As a result of these alleged accounting improprieties, on June 28, 2002 (the last day of the Class Period), Xerox issued a $6.4 billion restatement of equipment sales revenues booked over a five year period.

• Milberg Weiss is prosecuting numerous class actions involving a major area of investment abuse: deceptive sales of deferred annuity tax shelters to investors for placement in retirement plans that are already tax-qualified. In *Nelson v. Pacific Life Ins. Co.*, No. CV203-131 (S.D. Ga.) the district court approved a $60 million settlement of claims arising from such deception. In *American United Life Insurance Co. v. Douglas*, No. 29A02-0304-CV-350 (Ind. Ct. App.), denial of defendant's summary judgment motion was sustained on interlocutory appeal. The SEC and NASD have begun regulatory programs to address these problems.

• Milberg Weiss is co-lead counsel in *In re Vivendi Universal, S.A. Securities Litigation*, 02 Civ. 5571 (RJH), a securities fraud class action on behalf of U.S. and foreign investors who purchased Vivendi ordinary shares or American Depository Shares. Plaintiffs allege that Vivendi embarked on a $77 billion acquisition spree in order to transform itself into a huge international conglomerate. Throughout the Class Period (October 30, 2000 through August 14, 2002), defendants (and in particular, Vivendi's former CEO and Chairman, Jean-Marie Messier, and Vivendi's former CFO, Guillaume Hannezo) reported strong revenue and earnings, and portrayed Vivendi as a company that was generating sufficient cash flow to satisfy its debt obligations on approximately $21 billion in debt that it had amassed in connection with financing its acquisition binge. Plaintiffs, however, allege that Vivendi's operations and financial condition were in fact much weaker than what their public statements portrayed. The Court denied the defendants' motions to dismiss the complaint and certified an international class of plaintiffs. Fact discovery was conducted both in the U.S. and France (where French regulators are conducting their own formal investigations) and has now closed; the Court has scheduled a trial of the action for late 2008.

• *Rabi Abdullahi v. Pfizer, Inc.*, 01 Civ. 8118 (WHP), (S.D.N.Y.). This is a case in which the Firm has brought claims under the Alien Tort Claims act on behalf of Nigerian children and their families who were enrolled in a clinical trial of a drug by Pfizer without their knowledge. Plaintiff alleges that Pfizer's conduct violated the international prohibition on medical experimentation without informed consent when children suffering from meningitis, whose families had brought them to a local hospital for treatment, were secretly enrolled in a clinical trial of the Pfizer drug, Trovan. Plaintiff survived a motion to dismiss for failure to state a claim. The case was dismissed by trial court on jurisdictional grounds and is now back before Second Circuit.

• In *In re General Instrument Corp. Securities Litigation*, No. 01-3051 (LR) (E.D. Pa.), Milberg Weiss served as co-lead counsel and obtained a pretrial settlement of $48 million in this securities fraud class action.

• *In re Royal Dutch/Shell Transport ERISA Litig.*, No. 04-1398 (JWB) (D.N.J.). This was an ERISA breach of fiduciary duty class action against the Royal Dutch/Shell Oil Group of Companies on behalf of certain of the company's U.S. employees invested in the company's stock fund. The $90 million settlement is one of the largest recoverable amounts obtained in an ERISA breach of fiduciary duty case. Notably, the settlement included important provisions regarding the

monitoring and training of individuals appointed to be ERISA fiduciaries.

• *In re Triton Energy Limited Securities Litigation*, Civil Action No. 5-98-CV-256 (E.D. Tex. Texarkana Division), settled for $42 million. Plaintiffs alleged that defendants misrepresented, among other things, the nature, quality, classification and quantity of Triton's Southeast Asia oil and gas reserves during the period March 30, 1998 through July 17, 1998.

• Milberg Weiss served as co-lead counsel in *In re Thomas & Betts Securities Litigation*, Civil Action No. 00-CV-2127 (W.D. Tenn), in which plaintiffs recovered $46.5 million dollars in cash from the Company and $4.65 in cash from its outside auditor, KPMG. Plaintiffs alleged that Thomas & Betts engaged in a series of accounting improprieties while publicly representing that its financial statements were in compliance with GAAP, and failed to disclose known trends and uncertainties regarding its internal control system and computer and information systems.

• *In re MTC Electronic Technologies Shareholder Litigation*, Master File No. CV-93-0876 (JG) (E.D.N.Y.). Plaintiffs alleged that defendants issued false and misleading statements concerning, among other things, purported joint venture agreements to establish telecommunications systems and manufacture telecommunications equipment in China. The Court approved a settlement of $70 million, including $65 million in cash and $5 million worth of MTC Class A shares with "put" rights.

• In *In re Painewebber Limited Partnerships Litigation*, Master File 94 Civ. 8547 (SHS) (S.D.N.Y.), Milberg Weiss represented investors alleging that PaineWebber developed, marketed and operated numerous investment partnerships as part of an ongoing conspiracy to defraud investors and enrich itself through excessive fees and commissions over a twelve-year

period. On March 20, 1997, Judge Sidney Stein approved a settlement of $200 million, which consisted of $125 million in cash and $75 million worth of guarantees and fee waivers.

• In *In re Ames Department Stores, Inc.*, MDL Dkt. No. 924 (MP) (S.D.N.Y.), Milberg Weiss represented purchasers of Ames securities alleging that defendants issued false and misleading statements regarding the success of Ames' integration of a major acquisition and the Company's future financial prospects. The Court approved a settlement of $41 million in cash.

• In *In re VMS Securities Litigation*, No. 89 C 9448 (N.D. Ill.), Milberg Weiss secured a settlement of $59 million on behalf of a class of investors alleging that defendants committed securities fraud by engaging in misrepresentations concerning a group of real estate investment trusts. Plaintiffs alleged that defendants had misrepresented the funds' business practices, loan portfolios and financial well-being and concealed liquidity problems and the financial status of many of the funds' borrowers.

• In *Andrews v. AT&T*, No. CV 191-175 (S.D. Ga.). The Firm represented a class of persons who paid for premium-billed "900-number" calls that involved allegedly deceptive games of chance, starting in 1993. Defendants included major long-distance companies, which approved the call programs and billed for the calls. Defendant MCI settled for $60 million in benefits; the class against AT&T was decertified on appeal and the Firm prosecuted the individual plaintiffs' claims, obtaining a jury verdict in 2003 for compensatory and punitive damages.

# PRECEDENT-SETTING DECISIONS

Milberg Weiss has consistently been a leader in developing the law for investors and consumers under the federal securities, antitrust and consumer protection laws. The Firm has represented individual and institutional plaintiffs in hundreds of class action litigations in federal and state courts throughout the country. In most of those cases, Milberg Weiss has served as lead or co-lead counsel for the class. The Firm has also been responsible for establishing many important precedents, including:

• *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975), cert. denied, 429 U.S. 816 (1976). This is the seminal

appellate decision on the use of the "fraud-on-the-market" theory, allowing investors who purchase stock at artificially inflated prices to recover even if they were personally unaware of the false and misleading statements reflected in the stock's price. The court stated that class actions are necessary to protect the rights of defrauded purchasers of securities.

• *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000). The Firm was lead counsel in this seminal securities fraud case in which the Second Circuit undertook an extensive analysis of the statutory text and the legislative history of the PSLRA and pre-existing Second Circuit case law.

Among other things, the Second Circuit held that the PSLRA's pleading standard for scienter was largely equivalent to the pre-existing Second Circuit standard and vacated the district court's dismissal which sought to impose a higher standard for pleading scienter under the PSLRA. The Second Circuit also rejected any general requirement that plaintiffs' confidential sources must be disclosed to satisfy the PSLRA's newly-enacted particularity requirements.

• *In re Cabletron Systems, Inc.*, 311 F.3d 11 (1st Cir. 2002). The First Circuit joined the Second Circuit in allowing a complaint to be based on confidential sources. The Court also accepted the argument made by Milberg Weiss that courts should consider the amount of discovery that has taken place in deciding a motion to dismiss and that the lack of discovery will result in a less stringent standard for pleading securities fraud claims with particularity.

• *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824 (8th Cir. 2003). This important decision strongly reaffirmed the principle that whether an undisclosed fact would have been material to investors cannot ordinarily be decided on a motion to dismiss. The Eighth Circuit, stressing that "[t]he question of materiality hinges on the particular circumstances of the company in question," observed that even relatively small errors in financial statements might be material if they concern areas of particular importance to investors and raise questions about management integrity.

• *In re Advanta Corp. Securities Litigation*, 180 F.3d 525 (3d Cir. 1999). Here, the Firm successfully argued that, under the PSLRA, the requisite scienter is pled by making an adequate showing that the defendants acted knowingly or with reckless disregard for the consequences of their actions. As urged by this Firm, the Third Circuit specifically adopted the Second Circuit's scienter pleading standard for pleading fraud under the PSLRA.

• *In re NASDAQ Market-Makers Antitrust Litigation*, 169 F.R.D. 493 (S.D.N.Y. 1996). The court certified a class of millions of investors, who were harmed by an industry-wide conspiracy where NASDAQ market-makers set and maintained wide spreads, over defendants' strenuous objections.

• *In re Initial Public Offering Securities Litigation*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003). The Court sustained, in large part, the plaintiffs' complaints against more than 50 underwriters of high-tech stocks in one of the most comprehensive decisions issued under the securities laws. Milberg Weiss sits on the Plaintiffs' Executive Committee in this landmark litigation. A second round of motions to dismiss has been filed by defendants in response to a limited set of recently amended complaints.

• *Asher v. Baxter International, Inc.*, 377 F.3d 727 (7th Cir. 2004). In reversing and remanding the dismissal by the District Court, the Seventh Circuit resolved an important issue involving the PSLRA "safe harbor" for forward-looking statements in plaintiffs' favor. The Court held that whether a cautionary statement is meaningful is an issue of fact, because whether a statement is meaningful or not depends in part on what the defendant knew as well as other issues of fact. Thus, this issue is not appropriately resolved on a motion to dismiss.

• In *In re Vivendi Universal, S.A. Securities Litigation*, 2003 U.S. Dist. LEXIS 19431 (S.D.N.Y. Nov. 3, 2003), Judge Harold Baer upheld plaintiffs' claims under Section 10(b) of the Securities Exchange Act of 1934, which alleged that Vivendi and two of its former executives (CEO Jean-Marie Messier and CFO Guillaume Hannezo) did not disclose to investors that: (1) Vivendi's corporate acquisition programs had brought Vivendi to the brink of a potentially catastrophic liquidity crisis; (2) although it consolidated the financial results of several majority owned subsidiaries, Vivendi did not have access to the cash flows of these entities; (3) Vivendi failed to write down billions of dollars of impaired goodwill from prior acquisitions; and (4) one of Vivendi's U.S. subsidiaries improperly recognized revenue "up front" on the full value of long term contracts. The case is particularly notable because the court held that because of defendants' activities in New York promoting Vivendi stock, defendants' conduct was more than "merely prepatory" to the alleged fraudulent scheme, and thus the court had jurisdiction not only over purchasers of Vivendi ADRs on the NYSE, but also over the claims of foreign purchasers who purchased Vivendi ordinary shares on foreign exchanges.

• In *Hunt v. Alliance North American Government Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998), the Second Circuit reversed the district court's ruling, which denied plaintiffs a cause of action against defendants for failing to disclose that the Trust was unable to utilize proper "hedging" techniques to insure against risk of loss. In the Court's view, taken together and in context, the Trust's representations would have misled a reasonable investor.

• In *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996), the First Circuit remanded plaintiffs' action after affirming, in part, Milberg Weiss' position that in association with the filing of a prospectus related to the issuance of securities, a corporate-issuer must disclose intra-quarter, materially adverse changes in its business, if such adverse changes constitute "material changes"

the disclosure of which is required pursuant to the Securities Act of 1933.

• *In re Salomon, Inc. Shareholders Derivative Litigation*, 68 F.3d 554 (2d Cir. 1995). The Second Circuit affirmed the district court's holding that derivative federal securities claims against defendants would not be referred to arbitration pursuant to the arbitration provisions of the Rules of the New York Stock Exchange, but would be tried in district court. Shortly thereafter, the case settled for $40 million, which is among the largest cash recoveries ever recorded in a derivative action.

• *Kamen v. Kemper Financial Services*, 500 U.S. 90 (1991). The Supreme Court upheld the right of a stockholder of a mutual fund to bring a derivative suit without first making a pre-suit demand.

• *Goldman v. Belden*, 754 F.2d 1059 (2d Cir. 1985). The Second Circuit reversed the district court's dismissal of a securities fraud complaint, in an important opinion clarifying the "fraud" pleading requirements of Federal Rules of Civil Procedure, Rule 9(b).

• *Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873 (9th Cir.), cert. denied, 469 U.S. 932 (1984). The Ninth Circuit upheld an investor's right to pursue a class action against an accounting firm, adopting statute of limitation rules for §10(b) suits that are favorable to investors.

• *Hasan v. CleveTrust Realty Investors*, 729 F.2d 372 (6th Cir. 1984). The Sixth Circuit very strictly construed, and thus narrowed, the ability of a "special litigation committee" of the board of a public company to terminate a derivative action brought by a shareholder.

• *Cowin v. Bresler*, 741 F.2d 410 (D.C. Cir. 1984). The Court of Appeals reversed the lower court's dismissal of the complaint. The Firm had sought the extraordinary remedy of the appointment of a receiver over the affairs of a public company due to the highly specific allegations of fraud, dishonesty and gross mismanagement by the corporation's controlling shareholders.

• *Fox v. Reich & Tang, Inc.*, 692 F.2d 250 (2d Cir. 1982), aff'd sub nom, *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984). The court held that a derivative action to recover excessive advisory fees may be brought on behalf of an investment company without any prior demand on the board.

• *Rifkin v. Crow*, 574 F.2d 256 (5th Cir. 1978). The Fifth Circuit reversed an order granting summary judgment for defendants in a §10(b) case, paving the way for future acceptance of the "fraud-on-the-market" rationale in the Fifth Circuit.

• *Bershad v. McDonough*, 300 F. Supp. 1051 (N.D. Ill. 1969), aff'd, 428 F.2d 693 (7th Cir. 1970). The plaintiff obtained summary judgment for a violation of §16(b) of the Securities Exchange Act in which the transaction was structured by the defendants to look like a lawful option. The decision has been cited frequently in discussions as to the scope and purpose of §16(b).

• *Heit v. Weitzen*, 402 F.2d 909 (2d Cir. 1968), rev'g, 260 F. Supp. 598 (S.D.N.Y. 1966). The court held that liability under §10(b) of the Securities Exchange Act extends to defendants who were not in privity with the named plaintiffs or the class represented by the named plaintiffs.

• *In re Cox v. Microsoft*, No. 03-2922 (App. Div. 1st Dep't, June 2004). First appellate ruling in New York state courts that class actions may be pursued in the New York state courts for some antitrust violations on behalf of indirect purchasers under New York deceptive practices laws as well as common law claims for unjust enrichment. May open the door to class action recovery of damages on behalf of New York purchasers of Microsoft software comparable to settlements reached in various other states such as California, where Microsoft settled for approximately $1 billion.

• *In re JLM Industries, Inc. v. Stolt-Nielsen SA*, No. 3:03CV348 (D. Conn. June 24, 2003). Milberg Weiss succeeded in establishing that arbitration of horizontal conspiracy claims, arising under Section 1 of the Sherman Act, cannot be compelled on grounds that such claims do not "arise from" the injured person's purchase contract. (Currently on appeal and awaiting decision from the Second Circuit.)

• In *Puckett v. Sony Music Entertainment*, No. 108802/98 (New York Co. 2002), Milberg Weiss achieved a precedent-setting decision in which a class action was certified against Sony Music Entertainment on behalf of a class of recording artists who were parties to standard Sony recording or production agreements entered into at any time during the period of January 1, 1965 to the date of the filing of the complaint in 1998. The complaint alleged that Sony had a policy of treating the value added tax on foreign sales of recordings improperly thereby impermissibly reducing the royalties paid or credited to the class members. Justice DeGrasse of the New York State Supreme Court determined that class certification was appropriate and that Gary Puckett (of Gary Puckett & the Union Gap) and jazz musician and composer Robert Watson were appropriate class representatives to represent the class of artists and producers to whom Sony accounts for foreign record royalties.

Additionally, in the context of shareholder derivative actions, Milberg Weiss has been at the forefront of protecting shareholders' investments by causing important changes in corporate governance as part of the global settlement of such cases.  Cases in which such changes were made include:

• ***In re Marketspan Corporate Shareholder Litigation***, CV No. 98-15884 (N.Y. Sup. Ct.) (settlement agreement required modifications of corporate governance structure, changes to the audit committee and changes in compensation awards and the nominating committee);

• ***Abramsky v. Computer Sciences Corp.***, CV No. 98-00306-JBR (RLH) (D. Nev. 1998) (significant changes to the company's by-laws and governance procedures to enhance shareholder voting rights and the role of outside directors).

# Milberg Weiss LLP

## THE FIRM'S PARTNERS

**MELVYN I. WEISS**, Senior and Founding Partner of Milberg Weiss LLP, is a leading practitioner in the fields of securities, insurance, environmental, antitrust, and consumer litigation.

Mr. Weiss's expertise has been recognized on numerous occasions by courts appointing him to leadership positions in prosecuting complex litigations. Among the more prominent of the outstanding recoveries in cases where he has represented defrauded investors or consumers are the *Drexel/Milken* litigations (recoveries of over $1 billion for investors in, among others, *Columbia Savings & Loan* and *Executive Life Insurance Company of America*); *In re Washington Public Power Supply System Securities Litigation* ($775 million recovered after the country's largest municipal bond default); *Butcher Bank Litigation* (leading to $400 million recovery on behalf of the FDIC against Ernst & Young); *Oxford Healthcare Securities Litigation* ($300 million); *Prudential Limited Partnership Litigation* ($200 million); *Mercedes Brake Defect Litigation* ($100 million in settlement benefits); life insurance policy holder cases against *Prudential Life Insurance* ($4 billion), *John Hancock* ($400 million), *New York Life* ($300 million), *ManuLife* ($500 million) and *Metropolitan Life* ($1.7 billion). He was a pro bono lead counsel in the *Swiss Bank Litigation* involving Holocaust confiscations, which settled for $1.25 billion, and was a lead counsel in recovering $5 billion for Holocaust victims from German banks and companies.

Mr. Weiss received a B.B.A. in accounting from Baruch College of the City College of New York in 1957, and a J.D. degree from New York University School of Law in 1959. He was admitted to the Bar of the State of New York in 1960 and is presently a member of the Bar of the United States District Courts for the Southern and Eastern Districts of New York, the United States Courts of Appeals for the Second, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits, and the United States Supreme Court.

Mr. Weiss has lectured extensively to lawyers, law students, and other professionals throughout the country and abroad. He has been a guest lecturer at the New York University School of Law, Stanford University Law School, Harvard Law School, Duke Law School, University of Buenos Aires (where he is an honorary professor), and at the Salzburg Seminar Foundation in Austria. He has addressed the New York State Society of Certified Public Accountants, National Association of Accountants, National Association of Internal Auditors,

and in 1993 delivered the Abraham Briloff Distinguished Lecture at the State University of New York at Binghamton on the role of the auditor in our society. He has frequently been quoted as a leading authority on shareholder and consumer rights in the national media and he has testified before congressional committees on securities litigation and accountants' liability. Mr. Weiss is a Fellow of The American College of Trial Lawyers. He received the 1993 Arthur T. Vanderbilt Medal from New York University Law School, the highest award given annually to an outstanding alumnus, and is a member of the law school's Board of Trustees and a recipient of the Alumni Achievement Award. In 2005, *Accounting Today* named Mr. Weiss as one of its Top 100 Most Influential People.

Mr. Weiss is a member of the American Bar Association (from 1986-1988, he served as a Co-Chair of the Class and Derivative Committee of the Litigation Section; from 1983-1986, he served as a member of the FRCP Rule 23 Class Action Improvement Committee; and from 1976-1982, he served as a member of the Corporate Law Committee of the Banking and Business Law Section), the Association of the Bar of the City of New York, and the New York Inns of Court. In 2000, Mr. Weiss was selected by Chief Judge Edward R. Becker of the Third Circuit to serve as a member of the Third Circuit Task Force on Selection of Class Counsel.

Mr. Weiss was a Commissioner of the Nassau County Charter Revision Commission, which proposed the new legislative form of government for the county's 1.3 million residents. He has testified before the U.S. Senate on tort "reform" proposals. He is a director and a member of the Executive Committee of the Israel Policy Forum, an organization devoted to encouraging peace in the Middle East. Until recently, Mr. Weiss served on the Board of Directors of the Salzburg Seminar Foundation and he is presently on the Boards of the Lawyers' Committee for Civil Rights Under Law, the World Council of the American Jewish Congress and the American Constitution Society. Mr. Weiss is the Vice Chairman of the Drum Major Institute for Public Policy, a think tank founded during the civil rights movement that today provides ideas to fuel the progressive agenda.

Mr. Weiss and his wife established the Melvyn and Barbara Weiss Public Interest Foundation at New York University School of Law to assist graduating public-interest lawyers in retiring their student loans. He has received the Anti-Defamation League's Gotham Award and Humanitarian Award; the United Jewish Appeal's

Proskauer Award, given annually to an exemplary Jewish lawyer and humanitarian; the B'nai B'rith of Argentina Dignity & Justice Award for humanitarian activities; and the Ellis Island Medal of Honor from the National Ethnic Coalition of Organizations Foundation, Inc. Mr. Weiss is the International Chair of the Hatikva Project, which built a memorial on the site of the Israeli Embassy in Buenos Aires, which had been destroyed by terrorists.

**JEROME M. CONGRESS** received an A.B. degree with honors from Cornell University. From 1960 to 1962 he was a Fulbright Scholar at Oxford University, England, where he studied philosophy, politics and economics. He received an LL.B. degree *cum laude* from Harvard Law School where he was an editor of *Harvard Law Review* during 1963-1964.

Since graduating from law school, Mr. Congress has spent the bulk of his time in commercial and securities litigation.

Mr. Congress is admitted to practice in the courts of the State of New York, as well as the United States District Courts for the Southern and Eastern Districts of New York and the United States Court of Appeals for the Second Circuit.

**MICHAEL C. SPENCER** graduated from Yale University in 1973 with a B.A. degree, *magna cum laude*, with distinction, in philosophy. While at Yale, he was elected to Phi Beta Kappa. Mr. Spencer received a J.D. degree from Harvard Law School, *cum laude*, in 1976.

Mr. Spencer focuses his practice primarily on class actions on behalf of defrauded investors and consumers, as well as complex commercial litigation.

Mr. Spencer began his legal career as a law clerk to Hon. Wm. Matthew Byrne Jr., United States District Court, Central District of California, in 1976-77. He then returned to New York and joined Cravath, Swaine & Moore as an associate, where he worked until 1986 on antitrust, banking, real estate, commercial and securities litigation matters. In his later years at Cravath, he represented the bond fund trustee in connection with bond defaults of Washington Public Power Supply System nuclear plants.

In 1986, he joined Milberg Weiss as an associate and became a partner later that year. He worked on the WPPSS securities fraud litigation and many of the Firm's other cases, prominently including representation of the FDIC in its failed bank audit litigation involving the Butcher Brothers banks in Tennessee, which led to a year-long trial and a global settlement of all bank-related claims against Ernst & Whinney just before closing arguments to the jury in late 1992. He has since worked on many of the Firm's securities fraud cases, and cases in other areas, including representation of a broad coalition of union health care funds seeking to recover costs for treating smoking-related illnesses from the tobacco industry; Year 2000 litigation; cases involving alleged kickbacks in the mortgage insurance industry; and consumer and securities fraud cases against insurance companies selling deferred annuities into qualified retirement plans.

Mr. Spencer is admitted to practice in the courts of the States of New York and California, as well as the United States District Courts for the Southern and Eastern Districts of New York, the Central District of California, and the United States Courts of Appeals for the Second, Third, Fourth, Seventh, Ninth, Eleventh, and D.C. Circuits.

**ROBERT A. WALLNER** received his B.A. degree from the University of Pennsylvania in 1976 graduating *magna cum laude*. He attended New York University School of Law, earning his J.D. degree in May 1979. He was elected to the law school's Order of the Coif and served as an editor of *New York University Law Review*.

Prior to joining Milberg Weiss, Mr. Wallner was associated with Cravath, Swaine & Moore. He has litigated complex securities, consumer and antitrust class actions throughout the country. He currently represents investors in *In re Initial Public Offering Securities Litigation* (S.D.N.Y) and *In re CMS Energy Corporation Securities Litigation* (E.D. Mich.). He has also represented consumers in *In re Synthroid Marketing Litigation* (N.D. Ill.) and the *Mercedes-Benz Tire Litigation* (D.N.J.).

Mr. Wallner is a frequent lecturer on securities and complex litigation issues. He served as a member of the Federal Courts Committee of the Association of the Bar of the City of New York, and as a faculty member of the American Bar Association's First Annual National Institute on Securities Litigation and Arbitration. Mr. Wallner is a member of the New York Bar.

**SANFORD P. DUMAIN** attended Columbia University where he received his B.A. degree in 1978. He graduated *cum laude* from Benjamin N. Cardozo School of Law of Yeshiva University in 1981.

Mr. Dumain represents plaintiffs in cases involving securities fraud, consumer fraud, insurance fraud and violations of the antitrust laws.

Mr. Dumain began his career as a law clerk to Judge Warren W. Eginton, U.S. District Court, District of Connecticut 1981-1982. During the early years of his practice, he also served as an Adjunct Instructor in Legal Writing and Moot Court at Benjamin N. Cardozo School of Law.

Mr. Dumain has lectured for ALI-ABA concerning accountants' liability and has prosecuted several actions against accounting firms.

During 1990, Mr. Dumain served on the trial team for a six-month trial in which the Firm represented the City of San Jose, California, that resulted in a verdict for the city against defendants totaling over $18 million plus pre-judgment interest. The city's claims against two of the defendants were settled for $12 million while appeals to the Ninth Circuit were pending. Previously, settlements with eleven other defendants totaled over $12 million.

Judge Janet C. Hall of the District of Connecticut made the following comment in *In re: Fine Host Securities Litigation*, (No. 3:97-CV-2619 (JCH)): "The court also finds that the plaintiff class received excellent counseling, particularly from the Chair of the Plaintiffs' Executive Committee, Attorney Dumain."

Mr. Dumain is admitted to practice to the State Bar of New York, U.S. District Court for the Southern and Eastern Districts of New York and District of Connecticut, and U.S. Courts of Appeals for the First, Second, Sixth, Seventh and Eighth Circuits.

### GEORGE A. BAUER III earned his B.B.A. degree *magna cum laude* in 1976 from Bernard M. Baruch College of the City University of New York, where he majored in accounting. He was awarded the Andrew J. Coppola prize in Law from Baruch College. Mr. Bauer attended New York University School of Law and graduated with a J.D. degree in 1979.

Mr. Bauer's practice concentrates on Class Action Settlements and Settlement Administration. He has played a lead role in documenting and effectuating many of the largest and most complex securities litigations settlements ever obtained, notably including: the proposed $1.14 billion settlement for cash and stock of the *In re Nortel Networks Corp. Securities Litigation* No. 01-CV-1855 (RMB) (S.D.N.Y.); the $1.027 billion settlement of the *In re NASDAQ Market-Makers Antitrust Litigation*, MDL No. 1023, (S.D.N.Y.); settlements relating to the $2 billion estate of the Drexel Burnham Lambert, including *In re Drexel Burnham Lambert Group*, No. 90 Civ. 6954 (MP) (S.D.N.Y.) and the $1.3 billion settlement of the *In re Michael Milken & Associates Securities Litigation*, MDL 924 (S.D.N.Y.); settlements worth over $775 million in *In re Washington Public Power Supply Systems Securities Litigation*, MDL 551 (D. Ariz.); settlements including cash and securities worth over $615 million in *In re Lucent Technologies Inc. Securities Litigation*, No. 00-CV-621 (JAP) (D. N.J.); the $300 million cash settlement of *In re Oxford Health Plans Inc., Securities Litigation*, MDL No. 1222 (CLB) (S.D.N.Y.); the $200 million settlement in *In re*

*PaineWebber Limited Partnerships Litigation*, No. 94-Civ.8547 (SHS) (S.D.N.Y.); the settlement for cash and securities worth over $137.5 million in *In re Microstrategy Inc. Securities Litigation*, No. 00-473-A (E.D. Va, Alexandria Division); the settlements for securities worth over $133.5 million in *In re Computer Associates Class Action Securities Litigation*, No. 98 Civ. 4839 (TCP), and *In re Computer Associates 2002 Class Action Securities Litigation*, No. 02-CV-1226 (TCP) (E.D.N.Y.); and the $110 million settlement in *In re Prudential Securities Inc. Limited Partnerships Securities Litigation*, MDL 1005 (MP) (S.D.N.Y.).

Mr. Bauer is a member of the Firm's Library Committee. He is also a member of the American Bar Association, the New York State Bar Association, the Association of Trial Lawyers of America, and the New York County Lawyers Association.

Mr. Bauer was admitted as a member of the New York Bar in January 1980 and is also admitted to the United States District Court for the Southern and Eastern Districts of New York. Mr. Bauer is admitted to practice before the United States Supreme Court and the United States Courts of Appeals for the Second and Fourth Circuits.

### BARRY A. WEPRIN graduated from Harvard College in 1974. He received a J.D. degree from the New York University School of Law in 1978, and a master of public affairs from the Woodrow Wilson School of Princeton University in 1978. While in law school, Mr. Weprin was notes and comments editor of *New York University Law Review*.

Since joining Milberg Weiss in 1989, Mr. Weprin has specialized in securities and insurance litigation. He has served as co-lead counsel in a number of complex securities class action litigations, including *In re AremisSoft Securities Litigation* (D.N.J.), *In re All Star Inns Securities Litigation* (S.D.N.Y.), *In re York Research Securities Litigation* (S.D.N.Y.), and *Bharucha v. Reuters, PLC* (E.D.N.Y.). He was one of the principal attorneys in the sales practice litigations against The New York Life Insurance Company, The New England Life Insurance Service Company, The John Hancock Mutual Life Insurance Company, and The Prudential Life Insurance Company.

Previously, Mr. Weprin served as law clerk to Judge Charles P. Sifton of the United States District Court for the Eastern District of New York and was associated with the law firm of Wachtell Lipton Rosen & Katz, where he specialized in commercial and securities litigation. From 1985 to 1989 he served as general counsel to the New York State Housing Finance Agency and the New York State Medical Care Facilities Finance Agency, two agencies that issue tax exempt bonds for

financing nonprofit medical facilities and qualified housing projects.

In approving the settlement in the *Allstar Inns* case, Judge Peter Leisure stated:

> We have a situation here which is a classic example of the benefits to be derived through the class action vehicle, to have the high quality representation of the class. The reputation of counsel . . . Barry Weprin of Milberg Weiss, precedes them to this court and I'm familiar in other matters with the case in which these lawyers work.

> The class was indeed fortunate to have lawyers of this caliber on this matter and the court is satisfied that the class was well-represented and had the benefits of the quality of representation that would not have otherwise been available if the class action vehicle had not been used.

Mr. Weprin is a frequent lecturer on complex litigation issues.

Mr. Weprin is a member of the American Bar Association, the Association of the Bar of the City of New York, the New York County Lawyers Association, and the New York State Bar Association. Mr. Weprin is admitted to practice in New York, the United States District Court for the Southern and Eastern Districts of New York, the United States Court of Appeals for the Second Circuit, and the United States Supreme Court.

**RICHARD H. WEISS** received an A.B. degree *summa cum laude* from Princeton University in 1979. In 1980, he received an M.Phil. degree in international relations from Cambridge University, England. He graduated from Yale Law School in 1983.

Mr. Weiss is admitted to practice in the State of New York, the United States District Court for the Eastern and Southern Districts of New York, the United States Courts of Appeals for the Second, Sixth and Tenth Circuits, United States Supreme Court, and the United States Claims Court.

**BRAD N. FRIEDMAN** received a B.A. degree in government from Cornell University in 1982 and a J.D. degree *cum laude* from New York University School of Law in 1986, where he was an editor of the Law Review.

Mr. Friedman began his legal career as a clerk for the Honorable Max Rosenn, United States Court of Appeals for the Third Circuit. He was an associate at Simpson, Thacher & Bartlett for seven years before joining Milberg Weiss.

Mr. Friedman specializes in complex commercial matters, including securities, consumer, and life insurance class actions. He also has an active mass tort practice. He has recovered billions of dollars on behalf of injured plaintiffs, including as lead counsel in numerous "vanishing premium" and "churning" life insurance sales practice class actions (including cases against Prudential and Metropolitan Life). In 2002, Mr. Friedman acted as lead counsel on behalf of various asbestos committees in the W.R. Grace bankruptcy, and successfully recovered approximately $1 billion through a fraudulent conveyance litigation that settled on the eve of trial.

Mr. Friedman is a member of the Federal Bar Council, the American Bar Association, the American Trial Lawyer Association, the New York State Bar Association and the New York City Bar Association.

Mr. Friedman is admitted in the courts of the State of New York and New Jersey, as well as the United States Courts of Appeals for the Third and Fifth Circuits, and the United States District Courts for the Southern and Eastern Districts of New York and the District of New Jersey.

**JOSHUA H. VINIK** graduated with honors from the State University of New York at Oneonta in 1983, where he majored in economics. After graduating *cum laude* from Brooklyn Law School, Mr. Vinik clerked for Magistrate (now Judge) Carol B. Amon of the United States District Court for the Eastern District of New York.

Mr. Vinik's practice focuses primarily on class actions on behalf of defrauded investors, as well as complex commercial litigation, including accountants' liability actions and derivative actions. Mr. Vinik's extensive litigation efforts on behalf of aggrieved investors include many actions which have led to significant recoveries for investors, including *In re Baan Securities Litigation* (D.D.C.); *Lasky v. Brown (United Companies Financial Securities Litigation)* (M.D. La.), *Kaufman v. Motorola, Inc.* (N.D. Ill.) and *In re Salomon Inc. Shareholders Derivative Litigation* (S.D.N.Y.).

Mr. Vinik is a member of the American Bar Association, The New York State Bar Association and the Association of the Bar of the City of New York. Mr. Vinik is admitted to practice in the courts of the State of New York, as well as the United States District Courts for the Southern and Eastern Districts of New York and the United States Courts of Appeals for the Second, Third, and Fifth Circuits.

**JEFF S. WESTERMAN** received his B.A. degree from Northwestern University in 1977, where he was selected to be a member of two senior honorary societies. He received his J.D. degree from the University of Pittsburgh in 1980, where he was a member of the Law Review.

Mr. Westerman's practice is primarily in the areas of securities fraud class actions, shareholder derivative actions and corporate mergers and acquisition litigation. He has served as lead or co-lead counsel in cases resulting in significant corporate governance changes and shareholder recoveries totaling more than $330 million. In 2005, *The Daily Journal* recognized him as one of the top 30 securities litigators in California.

Mr. Westerman has also been the moderator or speaker for programs on complex litigation, developments in class action practice, settlements, the Sarbanes-Oxley Corporate Responsibility Act, shareholder derivative actions and trends in business litigation.

Mr. Westerman was a member (2001-2003) and Co-Chair (2002-2003) of the Central District of California Attorney Delegation to the United States Ninth Circuit Judicial Conference. He serves on the Central District of California, U.S. Magistrate Judge Merit Selection Panel (2003-present) and the standing committee on Attorney Discipline (2004-present). He is also a member of the Central District of California Attorney Settlement Officer Panel (1998-present).

Mr. Westerman was the president of the Association of Business Trial Lawyers (2004-2005); a member of the Board of Governors (1997-2005), Treasurer (2001-2002), Secretary (2002-2003) and Vice President (2003-2004). He is also on the Board of Governors of the Consumer Attorneys Association of Los Angeles (2003-present).

Mr. Westerman is a member of the Los Angeles County Bar Executive Committee for the Litigation Section for special projects and the Board of the Los Angeles Chapter of the Federal Bar Association. He is also on the Complex Courts Bench-Bar Committee, and the Bench-Bar Civil Courts Committee; and served as Judge Pro Tem in the Los Angeles Small Claims Court in 1987-1988, 1990, 1992-1993 and 1996-1997. He is a member of the Los Angeles County and Federal Bar Associations. He was on the California State Bar Task Force on Complex Litigation, and Chair of the Judicial Education Subcommittee (1997). In 2007, he was named one of Lawdragon's 3000 Leading Plaintiffs' Lawyers In America.

Mr. Westerman is admitted to practice in the courts of the State of California, as well as the United States District Courts in California, the United States Court of Appeals for the Ninth Circuit and the United States Supreme Court.

**JANINE L. POLLACK** graduated from Rutgers University in 1986, with high honors, with a B.A. She majored in English and French and was a member of Phi Beta Kappa. In 1989, Ms. Pollack earned her J.D. from the University of Pennsylvania School of Law. She was a member of the International Journal of Business Law. Since joining Milberg Weiss in 1991, Ms. Pollack has prosecuted numerous different class actions, including securities and consumer fraud, sex discrimination and annuities cases. She is a member of the Firm's Hiring Committee; runs the Firm's CLE program; is in charge of, and a mentor in, the Firm's Mentor program; and is an editor for numerous of the Firm's publications and brochures. Ms. Pollack has spoken at numerous conferences and CLE programs, including Mealey's and the Firm's in-house CLE program.

Ms. Pollack is a member of the American Bar Association. She was admitted to the New York State Bar in 1990. She was also admitted to the New Jersey State Bar in 1989, as well as the U.S. District Court for the District of New Jersey. In 1990, Ms. Pollack was admitted to the U.S. District Court for the Southern and Eastern Districts of New York.

**KIRK E. CHAPMAN** graduated *cum laude* from Harvard University in 1985 with a B.A. degree in biochemistry. He received his J.D. in 1989 from the University of Chicago where he was a member of the *Legal Forum* publication. Mr. Chapman's major practice areas are securities fraud class actions and employment discrimination matters.

Mr. Chapman is admitted to practice in the Courts of the State of New York as well as the United States District Courts for the Southern and Eastern Districts of New York.

**ARIANA J. TADLER** graduated from Hamilton College in 1989 with a Bachelor of Arts degree. In 1992, she received her J.D. from Fordham University School of Law, where she was the Articles and Commentary Editor of the Fordham Urban Law Journal, a member of the Moot Court Board and the 1990 recipient of the American Jurisprudence Award in Criminal Law.

Ms. Tadler has extensive experience litigating complex securities class actions, including certain high-profile, fast-paced cases. In less than four years, she litigated three cases in the Eastern District of Virginia (aka the "Rocket Docket"), including *In re MicroStrategy Securities Litigation*, in which plaintiffs' counsel negotiated settlements valued at more than $150 million with the company and the auditor. Ms. Tadler is also one of the principal liaison counsel on behalf of plaintiffs in the *Initial Public Offering Securities Litigation*, which is pending before Judge Shira A. Scheindlin in the United States District Court for the Southern District of New York. In that capacity, she manages on a day-to-day basis 309 separate class actions which have been coordinated for pretrial purposes. Among the thousands of defendants in these actions are

55 of the nation's most prominent investment banks and more than 300 corporate issuers.

Ms. Tadler has attended numerous lectures and seminars nationwide at which she has been a selected speaker on various topics. Recent conferences include: The Sedona International Conference, "International Electronic Information Management Discovery and Disclosure" (July 2005); ABA Panel Securities Section Meeting, "Recent Developments in Federal Securities Class Actions" (August 2005); 8th Circuit Judicial Conference, "Panel on E-Discovery;" Women's Judicial Conference, "Ruling on Discovery in a High Tech World" (October 2005); SEC Institute Conference, "Staying Out of Trouble with the SEC, Analysts and the Plaintiff's Bar" (October 2005); Morrison & Foerster LLP/NASDAQ, Panel Series: "Corporate Board Member Liability: How Your Personal Assets Could Be At Risk In the Event Of Corporate Litigation"; PLUS Seminar: "Corporate Governance And Corporate Risk: Implications Of Sarbanes-Oxley For Underwriting And Claims" (February 2005); Mealey's Advanced E-Discovery Conference (September 2004); Directors and Officers Symposium: An Overview of the Mediation Process; Practicing Law Institute, Symposium: "D&O Liability and Insurance 2004: Directors & Officers Under Fire;" National Economic Research Associates: IPO Allocation; and American Bar Association: Pros and Cons of Laddering Cases.

Ms. Tadler is the co-author of "Damages in Federal Securities Litigation," Securities Litigation 1991: Strategies and Current Developments, Practicing Law Institute, 1991. Ms. Tadler is also a member of the Steering Committee of The Sedona Conference and has been a selected speaker on various panels regarding "Electronic Document Retention and Production." She is also an active member of the New York Inn of Court.

Ms. Tadler is a member of the Federal Bar Council, the American Bar Association, the Association of Trial Lawyers of America, the New York State Bar Association and the New York County Lawyers Association. Ms. Tadler is also involved in various charity and community organizations. She is currently a board member and Co-Chair of Development for MFY Legal Services. She was named one of Lawdragon's 3000 Leading Plaintiffs' Lawyers In America.

Ms. Tadler is admitted to the Bars of the States of New York and New Jersey, as well as the United States District Court for the Southern and Eastern Districts of New York, the District of New Jersey and the United States Court of Appeals for the Third Circuit.

**LORI G. FELDMAN** is a daughter of retired public employees and understands the importance of protecting the investments of all workers and their families against corporate fraud. In 2002-2003 and 2004-2005, she was named a "Rising Star of Washington Law" by her fellow practitioners in Seattle.

In addition to lecturing on class action practice, she has served as Co-Chair of the Continuing Legal Education Committee of the Federal Bar Association for the Western District of Washington.

Ms. Feldman's representative recoveries exceed $100 million. Recently, she recovered millions of dollars for class members in litigation involving ConAgra Foods, Inc. (D. Neb.), Amazon.com (W.D. Wash.), Paradigm Medical Industries (D. Utah), SpectraLink Corporation (D. Colo.) and Cutter & Buck (W.D. Wash.). She is currently representing shareholders in litigation involving, among several others, Beazer Homes (N.D. Ga.), China Life (S.D.N.Y.), Washington Mutual, Inc. (W.D. Wash.), Select Medical (E.D. Pa.), Rhythms Net Connections (D. Colo.), Gilead Sciences, Inc. (N.D. Cal.), and Digimarc Corporation (D. Oregon). She is also currently representing participants of defined contribution retirement plans in ERISA litigation involving, among others, General Electric (N.D.N.Y.), Fremont General Corp. (C.D. Cal.), and Boston Scientific Corp. (D. Mass.).

Ms. Feldman's zealous advocacy has resulted in important reported decisions by courts interpreting the federal securities laws. Ms. Feldman graduated from Albany Law School in 1990, where she served as an Executive Editor of the *Albany Law Review*. She has interned at the Civil Division of the United States Attorney's Office in Brooklyn, New York. She is admitted to the Bars of the States of Washington and New York and federal district and appellate courts throughout the country.

**BENJAMIN Y. KAUFMAN** earned his B.A. degree from Yeshiva University in 1985 and his J.D. degree from Benjamin N. Cardozo School of Law, Yeshiva University in 1988, where he was a Belkin Fellow, Belkin Scholar, and a member of the *Cardozo Arts and Entertainment Law Journal*. Mr. Kaufman also received a M.B.A. degree in finance from the Stern School of Business of New York University in 1999. Prior to joining Milberg Weiss in August of 1998, Mr. Kaufman was a court attorney for the New York State Supreme Court, New York County (1988-1990) and principal law clerk to Justice Herman Cahn of the Commercial Division of the New York State Supreme Court, New York County (1990-1998).

Mr. Kaufman focuses on class action litigating on behalf of defrauded investors and consumers as well as complex commercial litigation. Mr. Kaufman is a member of the bars of New York, New Jersey, the United States District Courts for the Districts of New

York and New Jersey and the United States Court of Appeals for the Fourth Circuit.

**CLIFFORD S. GOODSTEIN** earned his A.B. degree from Harvard University in 1988 and his J.D. degree from New York University School of Law in 1993. After graduation, he served as a law clerk to the Honorable Alex T. Howard, Jr., Chief Judge of the United States District Court for the Southern District of Alabama, and then as an associate at Reboul, MacMurray, Hewitt, Maynard & Kristol, and Baker & Botts, prior to joining Milberg Weiss in January of 1998.

Mr. Goodstein works on a variety of actions on behalf of classes as well as individuals in consumer fraud, securities, antitrust, health care, and other areas. Mr. Goodstein is a member of the bars of New York and New Jersey.

**PETER SAFIRSTEIN** graduated from The George Washington University in 1978 with a B.A. degree. He received an M.A. degree in government (concentration in international relations) from Georgetown University in 1980. In 1985, he earned his J.D. degree from Brooklyn Law School, where he was a member of the *Brooklyn Law Review* and the Moot Court Honors Society. Prior to joining Milberg Weiss, Mr. Safirstein was in private practice. In addition, Mr. Safirstein served as a staff attorney in the Enforcement Division for the U.S. Securities and Exchange Commission from 1985-1990. In 1988-89, Mr. Safirstein was designated as a special assistant United States attorney in the Southern District of New York, where he was part of the trial team which prosecuted *United States v. Regan*, (the "Princeton/Newport" case) and *United States v. Lisa Jones*. Mr. Safirstein later served as an assistant United States attorney in the Southern District of Florida.

Mr. Safirstein is a member of the American Bar Association and the Association of the Bar of the City of New York. Mr. Safirstein is a member of the Bars of the State of New York and the State of New Jersey and is also admitted to practice before the Supreme Court of the United States, the United States Courts of Appeals for the Second and Third Circuits, the District Court of the Southern and Eastern Districts of New York and the District Court of New Jersey.

**PETER E. SEIDMAN** earned his B.A *cum laude* from Hobart College in 1979, following which he served as a Peace Corps volunteer living and working among the Guarani, an indigenous tribe in Paraguay. He earned an M.A. degree in journalism in 1982 from the University of Michigan and subsequently worked as a journalist for a variety of publications. In 1994, he was awarded a J.D. degree *cum laude* from the University of Michigan Law School.

Mr. Seidman joined Milberg Weiss in 2000 as an associate. He actively engages in the investigation and prosecution of securities litigation on behalf of defrauded investors. Before joining Milberg Weiss, he was an associate with the New York law firm of Orans, Elsen & Lupert LLP for five years, where he was active in both civil and white collar criminal litigation in federal and state courts.

Mr. Seidman is admitted to practice in the courts of the State of New York, as well as the United States District Courts for the Northern, Southern, and Eastern Districts of New York.

**ANITA KARTALOPOULOS** graduated with a B.A. degree from the University of Toledo, with honors in 1974, majoring in classics, and graduated from Seton Hall Law School in 1982, with emphasis on health care law. Ms. Kartalopoulos works primarily in the areas of insurance, consumer fraud, securities and managed care. Before joining Milberg Weiss in 1998, she was in government service in the State of New Jersey, holding several positions, including deputy commissioner of insurance for life and health, director of legal regulatory affairs for the Department of Health and Senior Services and executive director of the New Jersey Real Estate Commission.

As deputy commissioner of insurance she managed the New Jersey Insurance Department's Multi-State Task Force investigating the sales practices of the Prudential Insurance Company. She also served on the Board of Directors of MBL Insurance Company as a rehabilitator and managed litigation pursuant to the company's rehabilitation.

Thereafter as director of legal and regulatory affairs for the Department of Health and Senior Services, Ms. Kartalopoulos was responsible for litigation management, the development of all regulations implementing the New Jersey Healthcare statutes, the development and implementation of a streamlined Certificate of Need (CN) law, and the development of stringent prompt payment regulations to ensure that HMO's meet contractual obligations to physicians and ensure the stability of the health care network for the benefit of consumers.

As executive director of The New Jersey State Real Estate Commission, Ms. Kartalopoulos was responsible for implementing consumer disclosure/protection regulations which had been long opposed by the New Jersey real estate industry. She was also responsible for all disciplinary investigations and hearings against realtors, the inspection and registration of out of state land sales marketed in the State of New Jersey, continuing licensing of 84,000 realtors and brokers and the on-going development of real estate regulations. Ms.

Kartalopoulos also worked with New Jersey Attorney General Deborah Poritz in the development of Megan's Law.

Prior to government service, Ms. Kartalopoulos specialized in local government law and land use, representing a number of municipal governments, planning boards, and boards of adjustment. She was responsible for litigation before both the State and Federal Courts, and negotiated significant settlements with the New Jersey Council on Affordable Housing (COAH) for the benefit of low income residents of the State.

Ms. Kartalopoulos has co-authored the following publications on the subject of securities and shareholder litigation: *Deterring Executive Compensation Excesses: Regulatory Weaknesses, Litigation Strengths* (03/05, NY, NY) and *Vintage Wine In New Bottles: The Curious Evolution of the Concept of Loss Causation* (11/05, NY, NY).

Ms. Kartalopoulos is admitted to the bar of New Jersey. She is also admitted to appear in the U.S. District Court, District of New Jersey and the U.S. Courts of Appeals for the Federal Circuit and the 3rd Circuit.

### KAREN ROGERS earned her B.A. degree from

the University of California, Irvine, in 1983, her M.B.A. degree from Pepperdine University in 1990, and her J.D. degree from Southwestern University School of Law in 1996.

Ms. Rogers specializes in representing investors, including individual and institutional investors, in securities fraud class actions and shareholder derivative litigation. Ms. Rogers has been with the firm since March 1997. While at Milberg Weiss, Ms. Rogers has successfully litigated numerous class action lawsuits which have resulted in multi-million dollar recoveries for defrauded investors, including, among others, cases such as *Mattel Securities Litigation*, *Accelerated Securities Litigation*, and *Hoeck v. CompUSA*.

While at Southwestern, Ms. Rogers was on the Dean's List from 1994-1995 and a member of the Law Review from 1995-1996. Ms. Rogers authored "Embryo Theft: The Misappropriation of Human Eggs at an Irvine Fertility Clinic Has Raised a Host of New Legal Concerns for Infertile Couples Using Reproductive Technologies," 26 Sw. U.L. Rev. 1133 (1997). In 1996, Ms. Rogers served as judicial extern for The Honorable Ronald S.W. Lew, U.S. District Court of California.

Prior to law school, Ms. Rogers earned an NASD Series 7 securities license and worked in the securities industry for five years at Drexel Burnham Lambert's Beverly Hills office.

Ms. Rogers is a member of the Association of Business Trial Lawyers, as well as the Los Angeles County, San Fernando Valley, and American Bar Associations. Ms. Rogers is admitted to practice in the courts of the State of California, as well as the United States District Court for the Central District of California.

### CHRISTOPHER S. POLASZEK earned his

B.S. degree from Florida State University in 1992, *cum laude*, his M.B.A. degree from Florida State University in 1997, his J.D. degree from Florida State University in 1997, *cum laude*, and his LL.M. degree in Securities Regulation from Georgetown University in 2000. While pursuing his legal education, Mr. Polaszek interned with the Florida Senate and United States Senator Bob Graham.

Mr. Polaszek currently specializes in securities fraud litigation. Prior to joining Milberg Weiss, Mr. Polaszek spent several years practicing commercial litigation with an emphasis on securities litigation and arbitration. In this regard, in addition to litigating matters in state and federal courts, he has represented numerous clients in securities arbitration proceedings conducted by the National Association of Securities Dealers, Inc., the New York Stock Exchange, and the American Arbitration Association.

Mr. Polaszek is a member of the Bar of State of Florida, and is also admitted to practice before the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit and the United States District Courts for the Northern, Middle, and Southern Districts of Florida. Mr. Polaszek is also a member of the Federal Bar Association and the American Bar Association.

### MATTHEW GLUCK was a litigation partner in

Fried, Frank, Harris, Shriver & Jacobson LLP prior to joining Milberg Weiss. He frequently represented U.S. and foreign businesses and individuals in major litigation cases and other complex matters. He has also assisted clients in both formal bankruptcies and out-of-court restructurings of financially troubled companies.

Mr. Gluck served as adviser to the court in the restructuring of the Manville Trust in *In re Johns-Manville Corp.*, No. 85-8922 (S.D.N.Y.) and as the legal representative for future claimants in the Chapter 11 filing of Keene Corporation in In re Keene Corp., No. 93-46090 (Bankr. S.D.N.Y.).

### NEIL R. FRASER graduated from the University

of Massachusetts, Amherst in 1989 with a B.A. degree in political science. In 1992, he received his J.D. degree from Whittier Law School. While in law school, Mr. Fraser externed for the Hon. Vincent P. Zurzolo, United

States Bankruptcy Judge for the Central District of California.

Mr. Fraser focuses his practice in the areas of securities, mass torts, and employment discrimination. He represented the plaintiffs in the recently settled class action alleging employment discrimination at the Jacob K. Javits Convention Center, *Cokely, et al. v. NYCCOC, et al.* (S.D.N.Y.). In the mass torts practice, Mr. Fraser is a key part of the team representing over 330 individuals relating to injuries they sustained by their ingestion of the diet drug combination known as *Fen-Phen* in *In re Diet Drug Litigation Venued in Bergen County*. In securities, he worked on the successfully resolved *In re Racing Champions Securities Litigation* (N.D. Ill.) and is currently a member of the team handling the landmark *In re IPO Securities Litigation*, alleging various forms of market manipulation.

Mr. Fraser is admitted to practice in New York, New Jersey and the U.S. District Courts for the Southern District of New York, the Eastern District of New York and the District of New Jersey.

### SABRINA KIM graduated from the University of California, Los Angeles, in 1992, Phi Beta Kappa, *magna cum laude*, with a B.A. degree in Sociology. She received her J.D. degree from the University of California, Hastings College of Law in 1996.

Ms. Kim focuses primarily on securities and consumer class actions on behalf of defrauded investors and consumers. Ms. Kim came to Milberg Weiss from the California Department of Justice, where she was a deputy attorney general in the Consumer Law Section for six years. During her tenure as a state prosecutor, Ms. Kim served on the Attorney General's Asian Pacific Islander Advisory Board and prosecuted several high-profile, complex state and federal consumer fraud cases, including those against major predatory lenders, insurance companies, annuity mills, and others who engaged in unlawful and deceptive business practices. Ms. Kim has served as a speaker on Business and Professions Code Section 17200 and Proposition 64 for the Los Angeles County Bar Association Symposium, Mealey's Section 17200 Conference, Consumer Attorneys of California, and the American Bar Association. Ms. Kim has also taught Consumer Law as an adjunct professor at Loyola Law School, is a board member of the Association of Business Trial Lawyers, and was named a "Southern California Rising Star" (Securities Litigation) by Los Angeles Magazine in 2006 and 2007.

Ms. Kim is admitted to practice in the courts of the State of California, as well as the United States District Court for the Central District of California, Eastern District, the Northern District and the Ninth Circuit.

### MATTHEW A. KUPILLAS graduated from the State University of New York at Albany in 1990 with a B.A. degree in philosophy. In 1994, Mr. Kupillas received his J.D. degree from New York University School of Law. Mr. Kupillas focuses his practice primarily on class actions on behalf of defrauded investors and consumers, as well as complex commercial litigation. His involvement in the *In re Oxford Health Plans, Inc. Securities Litigation* helped shareholders recover an aggregate settlement of $300 million. Mr. Kupillas is a member of the New York State Bar Association and the American Bar Association. He is a member of the bar of the State of New York and is admitted to practice before the United States District Court for the Eastern District of Wisconsin.

### ROSS B. BROOKS earned his B.A. degree from Cornell University in 1992, *cum laude*, and his J.D. degree from the University of Chicago Law School in 1997. Prior to joining Milberg Weiss in 2003, Mr. Brooks worked as an associate with law firms in New York and New Jersey, concentrating in the areas of complex commercial litigation and intellectual property.

Mr. Brooks focuses his practice on representation of whistleblowers, public and private payors, and injured consumers in disputes addressing abusive practices of healthcare providers, including False Claims Act, class action, consumer and mass tort litigation against prescription drug and medical device manufacturers. Mr. Brooks is a member of the New York State Bar Association, the New York City Bar Association, Taxpayers Against Fraud, the American Health Lawyers Association and the American Association for Justice. Mr. Brooks is also a member of the Health Law Committee of the New York City Bar Association

Mr. Brooks is admitted to practice in the courts of the State of New York, as well as the United States District Court for the Southern District of New York.

### PAUL J. ANDREJKOVICS graduated from Union College in 1992, Phi Beta Kappa, *magna cum laude*, with a B.A. degree in political science. In 1995, Mr. Andrejkovics received his J.D. degree from Albany Law School. He was admitted as a member of the New York Bar in 1996 and is also admitted to the United States District Court for the Northern, Southern, and Eastern Districts of New York.

His practice concentrates on Class Action Settlements and Settlement Administration. Mr. Andrejkovics has played a supporting role in documenting and effectuating some of the largest and most complex securities litigations settlements ever obtained, notably including: the proposed $1.14 billion settlement for cash and stock of the *In re Nortel Networks Corp. Securities Litigation*, No. 01-CV-1855

(RMB) (S.D.N.Y.); the $300 million cash settlement of *In re Oxford Health Plans Inc., Securities Litigation*, MDL No. 1222 (CLB) (S.D.N.Y.); and the settlements for securities worth over $133.5 million in *In re Computer Associates Class Action Securities Litigation*, No. 98 Civ. 4839 (TCP) and *In re Computer Associates 2002 Class Action Securities Litigation*, No,.02-CV-1226 (TCP) (E.D.N.Y.).

**KENT A. BRONSON** received a B.A. from State University of New York at Binghamton in 1994. He graduated *cum laude* from University of Pittsburgh School of Law in 1998. During law school, Mr. Bronson was a research editor on the Law Review and a recipient of the Dean's Scholarship.

Mr. Bronson's practice is focused on securities, consumer and class action litigation. Prior to joining Milberg Weiss in 2005, as an associate at another law firm, Mr. Bronson was part of the team that successfully litigated a securities fraud class action lawsuit alleging that a major credit card company inflated its profits with illegal charges to consumers. *In re Providian Fin. Corp. Securities Litig.* (E.D. Pa.). Also, in *In re Coordinated Title Insurance Litigation* (Sup. Ct. Nassau County), Mr. Bronson helped successfully litigate class actions against eight title insurers for allegedly violating New York's consumer protection act in connection with the sale of mortgage refinance title insurance.

Mr. Bronson is admitted to the New York State Bar.

**LEIGH SMITH** focuses her practice primarily on class actions on behalf of defrauded investors. She also has significant experience with complex commercial litigation. Her involvement in the *In re Tyco Int'l Ltd. Securities Litigation*, MDL No. 02-1335-PB, helped recover an aggregate settlement of $3.2 billion.

While at Rutgers University, Ms. Smith majored in French and was elected to Phi Beta Kappa and Phi Sigma Iota. As a graduate student, she studied French literature and film and spent a year in France working as an assistant English teacher. Ms. Smith taught French at Rutgers and at the University of Iowa prior to law school. During law school, Ms. Smith served as the Acquisitions Editor for the *Cornell Journal of Law and Public Policy* and was a member of the Cornell Moot Court Board. She was a finalist in the Cuccia Cup Moot Court Competition and received a CALI Award for Outstanding Achievement for her work in Cornell's Legal Aid Clinic. She also was active in a number of student organizations.

Prior to joining Milberg Weiss, Ms. Smith worked at large law firms in New York and New Jersey. She is admitted in the United States District Courts for the Southern District of New York, the Eastern District of New York, the District of New Jersey, and the District of Massachusetts.

**ELIZABETH LIN** earned her B.A. degree from the University of California, Los Angeles in 1991 and her J.D. degree from UCLA Law School in 1994. Ms. Lin focuses her practice on investigating fraud and litigating class action lawsuits on behalf of defrauded individual and institutional investors. Prior to joining Milberg Weiss, Ms. Lin was a senior associate at Weiss & Yourman. Ms. Linn has successfully litigated class action lawsuits resulting in multi-million dollar recoveries for members of the class.

Ms. Lin is admitted to practice in the courts of the State of California, as well as the United States District Courts for the Central, Northern, Southern and Eastern Districts of California, the Western District of Michigan, the District of Colorado, and the United States Courts of Appeals for the Ninth and Tenth Circuits.

# OF COUNSEL

**JARED SPECTHRIE** graduated from Harvard College with honors in 1954 having majored in economics. After four years as a deck officer in the United States Coast Guard, he received a M.B.A. degree in accounting from Rutgers University in 1959, graduating first in his class. He is a Certified Public Accountant in the State of New York and practiced accounting for several years with a major auditing firm. He was graduated from New York Law School in 1965, *summa cum laude*, where he was first in his class and valedictorian. He was admitted to the Bar in New York State in 1965, and is admitted to practice before the U.S. District Court in the Southern and Eastern Districts of New York, and the United States Courts of Appeals for

the Second and Fifth Circuits. He has served on the faculty of New York Law School and has lectured on "Accountants' Liability" for the Practising Law Institute. He has been engaged in the full-time practice of law since 1965 and has specialized in federal securities law litigation for the past several years. Mr. Specthrie was lead counsel in *In re Viatron*, MDL 138 (D. Mass.), where aggregate settlements exceeding $15 million were obtained after several months of trial and a jury verdict on liability.

**SOL SCHREIBER** received a B.A. degree, *cum laude*, in 1952 from the City College of New York, and his LL.B. degree from Yale Law School in 1955.

From 1971 through 1978, Mr. Schreiber was a United States Magistrate Judge in the United States District Court for the Southern District of New York, where he conducted more than 1,500 criminal and 3,500 civil pretrial hearings and settled approximately 1,000 civil cases. In addition to trying numerous civil and criminal cases, Mr. Schreiber supervised pretrial practice in derivative, class and complex actions in the admiralty, antitrust, aviation, securities, directors' and officers' and product liability fields, including *Berkey v. Kodak*, *Litton v. ATT*, the *Penn Central Commercial Paper Litigation*, the *New York Times* and *Readers' Digest* gender discrimination, the Argo Merchant-Nantucket stranding, and the Tenerife 747 collision cases.

From November 1978 to January 1982, when he joined Milberg Weiss, Mr. Schreiber served as the President and Chief Executive Officer of a unit of the Federation of Jewish Philanthropies of New York which provided centralized legal, risk management and insurance services for the Federation's hospitals, homes for the aged, and health, education and community service agencies. He was Trial Counsel from 1955 through 1971 and Resident Counsel from 1966 through 1971 of the Brooklyn office of Liberty Mutual Insurance Co.

Mr. Schreiber has been a participant in numerous special project committees for the American Bar Association and the Second Circuit. From 1960 to present, Mr. Schreiber has been the Planning and Program Chairman of more than 125 national programs, including ALI-ABA and PLI Continuing Professional Education national courses of study on evidence, civil practice and employment discrimination litigation in federal and state courts. He has been a frequent lecturer at professional programs and workshops on federal and state court civil procedure, federal and state court trial evidence and federal criminal practice and procedure. Mr. Schreiber was a reporter for the ABA Advocacy Task Force (1970-1971), which led to the formation of the National Institute for Trial Advocacy.

From 1972 to 1987, he served as an adjunct professor at Fordham Law School teaching courses in trial advocacy, product liability, mass torts and insurance disputes. He has been editor for more than 40 CLE course handbooks and major publications on civil practice and litigation, including ALI-ABA's three-volume *Civil Practice Guide, Litigation in Federal and State Courts* (8th ed. 1998). Mr. Schreiber is a member of the Board of Editors, *Moore's Federal Practice* (2d ed.).

Mr. Schreiber served as a Court-Appointed Special Master in the *Marcos Human Rights Litigation*. He was Special Master in the Pan American Lockerbie cases, the *Agent Orange Litigation* (March 1982-January 1984), and a series of other complex federal civil cases.

Mr. Schreiber was Judicial Member, Anglo American Exchange on Civil Procedure (March 1974), and Hearing Officer, N.Y. State Master Energy Plan (fall 1979). He is the recipient of the Francis Rawle Award for outstanding achievements in post-admission legal education (ALI-ABA, July 1985) and the Presidential Award, Legal Aid Society (November 1984). Mr. Schreiber is also the founder and co-chair of the Ovarian Cancer Research Fund, Inc.

Mr. Schreiber is a member of the American Bar Association, the New York State Bar Association, the Association of the Bar of the City of New York and the American Law Institute. He is admitted to the bar of the State of New York, to the United States District Courts for the Southern and Eastern Districts of New York and to the Second Circuit Court of Appeals.

**PAUL D. YOUNG** received his B.A. *magna cum laude* from Yale University in 1981. He was elected to Phi Beta Kappa and granted with distinction in the history major. As a Fulbright Scholar, he studied at the Universitaet Bielefeld, Germany from 1981 to 1983. He graduated from Columbia University School of Law in 1986, where he was named a Harlan Fiske Stone Scholar.

Selected published decisions: *In re APAC Teleservices, Inc. Securities Litigation*, No. 97 Civ. 9145 (BSJ), 1999 U.S. Dist. LEXIS 17908 (S.D.N.Y. Nov. 19, 1999); *In re Ashanti Goldfields Securities Litigation*, 184 F. Supp. 2d 247 (E.D.N.Y. 2002); *In re Ashanti Goldfields Securities Litigation.*, No. 00 CV 717 (DGT)(RML), 2003 U.S. Dist. LEXIS 724, (E.D.N.Y. Jan. 7, 2003); *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65 (S.D.N.Y. 2000); *Dorchester Investors v. Peak International Limited*, 134 F. Supp. 2d 569 (S.D.N.Y. 2001); *Dorchester Investors v. Peak TrENDS Trust*, No. 99 Civ. 4696 (LMM), 2002 U.S. Dist. LEXIS 3067 (S.D.N.Y. Feb. 26, 2002); *Dorchester Investors v. Peak TrENDS Trust*, No. 99 Civ. 4696 (LMM) (FM), 2003 U.S. Dist. LEXIS 1446 (S.D.N.Y. Feb. 3, 2003); *In re General Instrument Corp. Securities Litigation*, No. 96 C 1129, 2000 U.S. Dist. LEXIS 17078 (N.D. Ill. Nov. 22, 2000); *Hunt v. Alliance North American Government Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998); *Lipinski v. Skinner*, 781 F. Supp. 131 (N.D.N.Y. 1991); *In re MTC Electronic Technologies Shareholder Litigation*, 898 F. Supp. 974 (E.D.N.Y. 1995); *In re MTC Electronic Technologies Shareholder Litigation*, 993 F. Supp. 160 (E.D.N.Y. 1997); *Olczyk v. Cerion Technologies, Inc.*, 721 N.E.2d 732; (Ill. App. Ct. 1999); *Siemer v. Associates Financial Services.*, No. CV-97-281-TUC-JC (JMR), 1999 U.S. Dist. LEXIS 22784, (D. Ariz. July 23, 1999); *Siemer v. Associates First Capital Corp.*, No. CV

97-281 TUC JMR (JCC), 2001 U.S. Dist. LEXIS 12810 (D. Ariz. Mar. 30, 2001); *Siemer v. Associates First Capital Corp.*, No. CV 97-281-TUC-JC (JMR), 2000 U.S. Dist. LEXIS 21244, (D. Ariz. Dec. 14, 2000). He was a guest lecturer on predatory lending at the annual meetings of the NAACP in July 2001 and July 2002.

Mr. Young is admitted to practice before the United States District Court for the Southern, Northern and Eastern Districts of New York and the United States Courts of Appeals for the First, Second, Fourth, Fifth and Seventh Circuits and the United States District Court for the District of Arizona.

**ANDREW MORGANTI** practices in the fields of antitrust and securities litigation. He is one of the attorneys responsible for the prosecution of the *Initial Public Offering Securities Litigation* pending in the United States District Court for the Southern District of New York. Prior to joining Milberg Weiss in November 2006, Mr. Morganti managed his own boutique antitrust and shareholders' rights practice. In addition, between 1999 and 2003, Mr. Morganti practiced antitrust litigation with firms based in Chicago and Washington, D.C. He also served as an intern at the Federal Reserve Bank of Boston and Department of Justice of Canada, Civil Litigation Division.

## SENIOR COUNSEL

**JEFFREY MESSINGER** received his B.A. from the State University of New York at Stony Brook in 1980, and his J.D., from Boston University School of Law in 1985. Mr. Messinger focuses his practice primarily in the following areas: mass tort litigation, employment discrimination and False Claims Act litigation. Currently, he represents hundreds of individuals in Vioxx, Bextra, Fen Phen and Medtronic litigation in the mass torts area. He has also obtained significant settlements on behalf of victims of employment discrimination.

**ARVIND B. KHURANA** received his B.A. from State University of New York at Albany in 1993 and a J.D. from St. John's University School of Law in 1999, *Dean's List Graduate*. While in law school, Mr.

Khurana was on the Dean's List from 1995-1999 and a member of the *American Bankruptcy Institute Law Review*.

Mr. Khurana focuses his practice primarily on class actions on behalf of defrauded investors and consumers, as well as complex commercial litigation. Prior to joining Milberg Weiss in August 2005, Mr. Khurana worked as an associate with a major international law firm in New York, concentrating in the area of complex commercial litigation.

Mr. Khurana is a member of the Federal Bar Council and admitted to practice in the state and federal courts of New York.

## SPECIAL COUNSEL

**JAMES M. SHAUGHNESSY** graduated *cum laude* from Adelphi University in 1967 with a B.A. degree in political science and *cum laude* from New York University School of Law in 1969. While at N.Y.U., Mr. Shaughnessy was elected to the Order of the Coif, was the administrative director of the moot court program, and, upon graduation, received the Benjamin F. Butler Award for scholarship and outstanding service to the law school.

Mr. Shaughnessy joined the firm of Casey, Lane & Mittendorf in New York City as a litigation associate in 1969 and became a litigation partner at that firm in 1976. In 1982, Mr. Shaughnessy joined the firm of Haythe & Curley as a litigation partner, and he was the managing partner of the firm for two years. In 1987, Mr. Shaughnessy joined the firm of Windels, Marx, Davies & Ives (now known as Windels, Marx, Lane & Mittendorf, LLP) as a litigation partner. He was the

chairman of the Windels, Marx Litigation Department from 1988 through 1998, and was a member of the firm's Executive Committee from 1990 to 1992. Mr. Shaughnessy joined Milberg Weiss in 2001.

Over the course of his career, Mr. Shaughnessy has specialized in commercial, securities, insurance, aviation and bankruptcy litigation. Mr. Shaughnessy was lead defense counsel for Pan American World Airways, Inc. in *In re Air Disaster at Lockerbie, Scotland on December 21, 1988*, M.D.L. 799 (TCP) (E.D.N.Y.), and tried that case on behalf of Pan Am to a jury for three months.

Mr. Shaughnessy is a member of the American Bar Association, the New York State Bar Association, the Association of the Bar of the City of New York, and Federal Bar Council. Mr. Shaughnessy is admitted to practice in New York, California and New Jersey as well as before the United States Supreme Court, the United

States Courts of Appeals for the Second, Fifth and Ninth Circuits, the United States District Courts for the Southern, Eastern, Northern and Western Districts of New York, the Southern District of California and the District of New Jersey, and the United States Tax Court.

# ASSOCIATES

**LAUREN BLOCK** received a B.A. degree, *cum laude*, from University of Pennsylvania in 1982, and a J.D. degree from George Washington University Law School in 1985.

Ms. Block focuses her practice on class actions on behalf of defrauded investors, as well as complex commercial litigation. She was admitted to the bars of New York and Pennsylvania in 1986.

**JENNIFER S. CZEISLER** graduated from Hofstra University in 1994 with a B.A. degree in psychology. After completing graduate degree work at Hunter School of Social Work (1994-95), she pursued a J.D. degree, which she earned in 1999 from the University of Miami School of Law, where she graduated *cum laude*. Ms. Czeisler was on the editorial board of the *Law Review of Psychology, Public Policy & Law* and earned numerous awards, including the CALI excellence for the Future Award, Dean's Certificate of Achievement Award, and membership in the Phi Delta Phi National Honor Society.

Ms. Czeisler is admitted to practice in the State of New York and is a member of the American Bar Association, where she is committed to her *pro bono* work with the American Bar Association Commission on Legal Problems of the Elderly.

**LISA DEROSE** received a B.A. degree, *cum laude,* from Dartmouth College in 1994 and a J.D. degree from New York University in 1997.

Ms. DeRose focuses her practice primarily on securities class action litigation. She was part of the Milberg Weiss team that served as co-lead plaintiffs' counsel in a securities fraud and accountant liability class action lawsuit that settled for over $3 billion.

Prior to joining Milberg Weiss, Ms. DeRose was an associate at a New Jersey law firm where she practiced general commercial litigation.

**ANNA DOVER** received a B.A. degree from Wesleyan University in 1995, and a J.D. degree from the University of California at Davis School of Law in 2001. While in law school, Ms. Dover was a member of the *UC Davis Law Review*.

Ms. Dover focuses her practice on class actions on behalf of defrauded investors and consumers. She currently represents shareholders in actions against various mutual fund families in which Milberg Weiss has been appointed lead counsel, including *In re American Mutual Funds Fee Litigation* (C.D. Cal.).

She is admitted to practice in the courts of the State of California and New York.

**CARLA FREDERICKS** graduated *magna cum laude* from the University of Colorado in 1997 and from Columbia Law School in 2001. While at Columbia, she was a Public Interest Fellow, a Charles Evans Hughes Scholarship recipient, Executive Editor of the Columbia Journal of Environmental Law, and Treasurer of the Columbia Native American Law School Association. Prior to law school, Ms. Fredericks served as an AmeriCorps volunteer in Colorado. She has performed extensive *pro bono* work on behalf of community organizations and the wrongfully convicted.

Ms. Fredericks joined Milberg Weiss in 2005. She focuses her practice on securities and class action litigation. She also has significant experience in civil rights litigation and labor and employment law.

Ms. Fredericks was admitted to the New York State Bar in 2002. She is a member of the New York State Bar Association, the Federal Bar Association, the National Native American Bar Association, the New York County Lawyers Association, and the National Congress of American Indians.

**SARA FUKS** focuses her practice primarily on securities class action litigation on behalf of defrauded individual and institutional investors.

Prior to joining Milberg Weiss in October 2006, Ms. Fuks was an associate in the New York office of Dewey Ballantine LLP. where she practiced general commercial litigation. During law school Ms. Fuks was a member of the *Fordham Law Review*.

**MICHELLE FURUKAWA** focuses her practice on securities class actions on behalf of defrauded investors. While in law school at UCLA, Ms. Furukawa served as editor in chief of the *Asian Pacific American Law Journal*, clerked for the U.S. Securities & Exchange Commission, Division of Enforcement, and was a judicial extern for the Honorable Sheri Bluebond, U.S. Bankruptcy Court, Central District of California. Ms. Furukawa is a member of the Japanese American Bar Association of Greater Los Angeles, Association of Business Trial Lawyers, and the Los Angeles County Bar Association.

**STEPHANIE HATZAKOS** received a B.A. degree from the University of South Florida in 1995. She graduated her J.D., *cum laude*, from Touro Law School in 1997. Ms. Hatzakos focuses her practice primarily on mass torts litigation, representing injured consumers in actions brought against pharmaceutical and medical device manufacturers. Prior to joining Milberg Weiss in 2006, Ms. Hatzakos worked as a court attorney at the New York Appellate Division, Second Department and as an associate with law firms in New York, concentrating in the areas of both personal injury and insurance defense.

**TODD KAMMERMAN** received his B.A. degree *cum laude* with honors in politics from Brandeis University in 1999. In 2002, he received his J.D. degree from the Benjamin N. Cardozo School of Law. While at Cardozo, Mr. Kammerman was named an Alexander Fellow, through which he worked as a judicial intern in the chambers of the Honorable Joseph A. Greenaway, Jr., U.S.D.J. in Newark, New Jersey. Mr. Kammerman is a member of the bars of the States of New York and New Jersey and is admitted to practice before the United States District Court for the District of New Jersey.

**JOSHUA KELLER** graduated from the University of North Carolina in 1998 and from Albany Law School of Union University in 2004. Prior to entering law school, Mr. Keller was a Trial Preparation Assistant in the New York County District Attorney's Office. While in law school, Mr. Keller was associate editor of *Albany Law Review* and participated in the Senior Prize Trials competition.

Mr. Keller focuses his practice on securities class action litigation on behalf of defrauded individual and institutional investors. He currently represents classes in several securities fraud and consumer fraud class actions.

Mr. Keller is admitted in New York State, the State of Colorado, the U.S. District Court for the Southern District of New York and Northern District of Illinois.

**TODD KUSSIN** received his B.A. degree from Cornell University in 1997 and his J.D. degree from Hofstra University School of Law in 2002. While a law student, Mr. Kussin served as Research Editor of the *Hofstra Law Review*. He also worked for the Unemployment Action Center, providing counsel to indigent clients seeking unemployment insurance.

Mr. Kussin focuses his practice primarily on securities class action litigation on behalf of defrauded individual and institutional investors. Prior to joining Milberg Weiss, Mr. Kussin was an associate at Clifford Chance US LLP.

Mr. Kussin was admitted to the New York State Bar in 2003.

**BERNA M. LEE** graduated from Dartmouth College with a B.A. degree in 1991 and earned a J.D. from Georgetown University Law Center, *cum laude*, in 1999.

Ms. Lee focuses her practice on securities class action and complex commercial litigation. Prior to joining Milberg Weiss, Ms. Lee gained significant experience in the areas of white collar crime, securities fraud, and complex insurance coverage matters. She has performed extensive *pro bono* work on behalf of the wrongfully convicted. Ms. Lee was part of the team that successfully appealed the 1990 conviction of a defendant in a high-profile case involving murder and attempted murder of bouncers at the Palladium nightclub.

**JEAN LEE** graduated from New York University with a B.A. degree in Politics and Psychology and a M.S.W. in Social Work. Ms. Lee received her J.D. degree from Rutgers School of Law. During law school, she served as a Senior Editor of the *Rutgers Law Record*. Upon graduation from law school, Ms. Lee was a law clerk to the Honorable John J. Hughes, United States Magistrate Judge, in the District of New Jersey.

Currently, Ms. Lee devotes her practice to representing the interests of defrauded investors in securities class actions. She is admitted to practice law in New York and New Jersey. Ms. Lee is also a licensed social worker.

**ROLANDO MARQUEZ** received a B.S. degree from Brown University in 1994 and his M.S. degree from New York University in 1998. In 2003 he received his J.D. degree from Fordham Law School.

Mr. Marquez is part of the False Claims Act practice group, representing whistleblowers in actions primarily involving Medicare and Medicaid fraud. He was also part of the Milberg Weiss team that served as co-lead plaintiffs' counsel in a securities fraud and accountant liability class action suit that settled for over $3 billion.

Prior to joining Milberg Weiss, Mr. Marquez was an associate at a patent boutique firm, where he concentrated on patent litigation matters involving medical device, computer software, and consumer electronic device technologies.

Mr. Marquez is also admitted to practice in the United States District Courts for the Southern and Eastern Districts of New York and the United States Patent and Trademark Office.

**JOHN R. S. MCFARLANE** received a B.Comm. degree from Dalhousie University School of Business Administration in 1996, and an LL.B from Dalhousie Law School in 2002. Mr. McFarlane focuses his practice on class actions on behalf of defrauded investors, as well as actions against various mutual fund families in which Milberg Weiss has been appointed lead counsel,

including *In re American Express Financial Advisors Securities Litigation* (S.D.N.Y.).    Prior to joining Milberg Weiss, he practiced securities law at Cassels, Brock & Blackwell LLP in Toronto, Ontario.

Mr. McFarlane was admitted to the Law Society of Upper Canada in 2003, and the New York State Bar in 2006.

**KRISTI STAHNKE MCGREGOR** received her B.A. degree in political science, Phi Beta Kappa, from the University of Florida in 1995.  She spent two years, 1993-94 and 1995-96, studying political science and economics at the Rheinische Friedrich-Wilhelms-Universitaet Bonn in Bonn, Germany.  In 1999, Ms. McGregor received her J.D. degree from Emory University School of Law, where she was the Research Editor of the *Emory International Law Review* and student law clerk to Justice Norman Fletcher of the Georgia Supreme Court.

After graduating law school, Ms. McGregor was a recipient of the German Chancellor Fellowship through the Alexander Von Humboldt Foundation, which allowed her to attend the Westfaelische Wilhelms-Universitaet Muenster in Muenster, Germany and receive her LL.M. degree *magna cum laude* in German civil law in 2001.

Prior to joining Milberg Weiss in 2002, Ms. McGregor practiced in the international section of a large Atlanta law firm.  She focuses her practice primarily on class actions on behalf of defrauded investors, as well as complex commercial litigation.  She has particular experience in international litigation, primarily involving European companies.  She is fluent in German.  Ms. McGregor was admitted to the State Bar of Georgia in 1999, the New York Bar in 2003 and the Florida Bar in 2004.

**ROLAND RIGGS** received his J.D. *cum laude* from Case Western Reserve in 2004.  Prior to joining the Firm, Mr. Riggs worked at Abraham, Fruchter & Twersky, LLP, where his practice areas included ERISA and securities litigation.

**WILLIAM B. SCOVILLE, JR.** received a B.A. degree from Yale University in 1985 and a J.D. degree with Specialization in International Legal Affairs from Cornell Law School in 1992.  As a law student, he participated in Cornell's Legal Aid Clinic, Criminal Justice Clinic, and Prison Project.

Mr. Scoville's practice consists primarily of complex securities litigation.  He is fluent in French, Spanish, and Russian and has assisted in prosecuting the claims of an international class of plaintiffs in *In re Vivendi Universal, S.A. Securities Litigation*.

**JENNIFER J. SOSA** graduated from Northeastern University with a B.S. degree, *cum laude*, in 2002.  In 2005, she earned her J.D. degree from Temple University Beasley School of Law.

Prior to joining Milberg in February 2006, Ms. Sosa worked as a legal consultant under the Director of Business and Legal Affairs at WhenU.com, Inc.  During law school, she was a member of the Environmental Moot Court Team and was awarded the David Sive Award for Best Brief in the 2004 Pace National Environmental Law Moot Court Competition.  Prior to law school, Ms. Sosa worked as a Chemical Engineer.

**TED J. SWIECICHOWSKI** received his B.A. degree from Marquette University in 1989 and his J.D. from The Catholic University of America, Columbus School of Law in 1996.  He focuses his practice on securities class action litigation on behalf of defrauded individual and institutional investors. Mr. Swiecichowski was employed previously by MortgageIT Holdings, Inc. (a residential mortgage REIT) and Liddle & Robinson, LLP (a firm specializing in securities and employment arbitrations).    Mr. Swiecichowski's experience also extends to the securities industry, having been employed as an Equity Research Associate in UBS's Global Technology Equity Research Group and as a consultant with Deutsche Bank's Mergers & Acquisitions group.  He currently represents shareholders in securities fraud cases, including *In re Xerox Securities Litigation*.

**ANNE MARIE VU** received her B.A. degree in Political Science and French from the University of Portland in 2000.  She spent an academic year studying at the Université de Paris-IV (La Sorbonne) in Paris, France.  Ms. Vu earned her J.D. degree from the Benjamin N. Cardozo School of Law in 2003.  During law school Ms. Vu was a member of the Willem C. Vis International Commercial Moot.  She also worked as a legal intern for the Federal Trade Commission, where she received a Certificate of Appreciation for Outstanding Contribution. Following law school Ms. Vu provided *pro bono* legal assistance to the New York office of Reporters Without Borders from 2003 to 2004.

Ms. Vu concentrates her practice primarily on securities fraud litigation.  She is one of the attorneys prosecuting the *In re Vivendi Universal, S.A. Securities Litigation* pending in the United States District Court for the Southern District of New York.

Ms. Vu is a member of the New York State Bar Association, the California Young Lawyers Association, the American Bar Association, the National Asian Pacific American Bar Association, and the Moot Alumni Association.  She is admitted to the Bars of the States of New York and California.

**BELINDA WILLIAMS** focuses her practice on class actions on behalf of defrauded investors and consumers. Prior to joining Milberg Weiss, Ms. Williams was associated with law firms in New York City and was a Principal Law Secretary to the Hon. Leland DeGrasse of the Supreme Court for the State of New York, County of New York.

**CHERYL WILLIAMS** currently specializes in securities fraud litigation. Prior to joining Milberg Weiss, Ms. Williams practiced commercial litigation with an emphasis on products liability and Business and Professions Code Section 17200 actions. In this regard, Ms. Williams represented Fortune 500 companies in high profile, complex litigation including several trials. Ms. Williams also has a personal and professional interest in developing a practice in Native American Law. In addition to studying in the field throughout law school and beyond, Ms. Williams has represented Native American clients on a *pro bono* basis including members of the Wabauskang Nation in Ontario, Canada (her own Tribal affiliation).

Ms. Williams is also a member of the Federal Bar Association, the Native American Bar Association, the American Business Trial Lawyers Association, and the Consumer Attorneys Association of Los Angeles.

**JENNIFER L. YOUNG** received a B.A. degree from University of South Carolina in 1996. She graduated *cum laude* from the University of South Carolina School of Law in 2002. During law school, Ms. Young was Associate Editor in Chief of the *South Carolina Law Review*, as well as a member of the South Carolina Moot Court Bar.

Ms. Young focuses her practice primarily on consumer fraud and complex commercial litigation. Ms. Young is admitted to the bars of South Carolina and New York. Ms. Young sits on the junior board of directors of Court Appointed Special Advocates (New York), a non-profit organization that shepherds children through New York City's foster care system. Ms. Young is an active member of the New York Inn of Court.

# EXHIBIT C



# HARWOOD FEFFER LLP

## FIRM DESCRIPTION

The law firm of Harwood Feffer LLP ("Harwood Feffer" or the "Firm") specializes in complex, multi-party litigation with an emphasis on securities class actions, shareholder derivative and ERISA litigation. The Firm also handles more general complex commercial litigation involving allegations of breach of contract, breach of fiduciary duty, fraud, and negligence, as well as litigation involving consumer fraud, anti-competitive conduct, and other commercial claims.

Harwood Feffer is dedicated to prosecuting socially useful actions in the most efficient manner and with the highest level of professional competence. The structure of the Firm allows us a far greater degree of independence, flexibility, and satisfaction than a large firm environment, without sacrificing the quality of representation necessary to successfully litigate complex actions throughout the country. The Firm maintains an excellent reputation -- among both the plaintiffs' and defense bars. Our adversaries and co-counsel know that we take a case to trial, if necessary, to achieve a satisfactory result for our clients.

Harwood Feffer has been acknowledged by courts and by its peers to be one of the leaders in the plaintiffs' shareholder advocacy bar. In this regard, we have developed new law in the areas of tender offers, fiduciary duty of corporate insiders to public shareholders in mergers and takeovers, and general principles of required disclosure to shareholders and institutional investors in public companies.

As a result, the Firm has been designated as lead, co-lead or special counsel in numerous complex cases and other actions involving shareholder rights and corporate governance. In the vast majority of such actions, the Firm's skill and



**HARWOOD FEFFER LLP**
PAGE 2

expertise has led to the recovery of substantial monetary and equitable benefits for investors, stockholders, corporations, and partnerships. By way of example, the following litigated actions, in which the Firm served in a leadership capacity, were all brought to highly successful conclusions:  1) In re First Capital Holdings Corporation Financial Products Securities Litigation, MDL 901 (C.D.Cal.) (restoration of over $1 billion in insurance policies and benefits); 2) In re Royal Dutch/Shell Transport ERISA Litigation, (D.N.J.) (creation of settlement fund of $90 million plus implementation of structural relief); 3) In re Prudential Bache Energy Income Partnerships Securities Litigation, MDL 880 (E.D.La.) (creation of settlement fund in excess of $90 million); 4) In re JWP Inc. Securities Litigation, (S.D.N.Y.) (creation of settlement fund in excess of $37 million); 5) Morse v. McWhorter, (M.D. Tenn.)(creation of a settlement fund of $49.5 million on behalf of investors in Columbia/HCA Healthcare Corp.); 6) In re BankOne Securities Litigation, (N.D. Ill.) (creation of a $45 million settlement fund); and 7) Sidney Morse, et al. v. Abbott Laboratories, et al., (N.D. Ill.) (creation of a $14.1 million settlement fund following a jury verdict for plaintiffs).

Courts have often recognized the Firm's skill in class actions.  For example, in In re Electro-Catheter Securities Litigation, Judge Nicholas Politan of the District of New Jersey stated:

> [C]ounsel in this case are highly competent, very skilled in this very specialized area and were at all times during the course of the litigation that I participated in, which was perhaps the major part of the Court litigation here, always well prepared, well spoken, and knew their stuff and they are a credit to their profession.  They are the top of the line.



**HARWOOD FEFFER LLP**
PAGE 3

## THE ATTORNEYS OF THE FIRM

**Robert I. Harwood**, senior partner of the Firm, graduated from William and Mary Law School in 1971, and has specialized in securities law and securities litigation since beginning his career in 1972 at the Enforcement Division of the New York Stock Exchange. He has prosecuted numerous securities, class, derivative, and ERISA actions. He is a member of the Trial Lawyers' Section of the New York State Bar Association and has served as a guest lecturer at trial advocacy programs sponsored by the Practicing Law Institute.

Commenting on Mr. Harwood's abilities, in In re Royal Dutch/Shell Transport ERISA Litigation, (D.N.J.), Judge Bissell stated:

> the Court knows the attorneys in the firms involved in this matter and they are highly experienced and highly skilled in matters of this kind. Moreover, in this case it showed. Those efforts were vigorous, imaginative and prompt in reaching the settlement of this matter with a minimal amount of discovery . . . . So both skill and efficiency were brought to the table here by counsel, no doubt about that.

Likewise, Judge Hurley stated in connection with In re Olsten Corporation Securities Litigation, 97 CV-5056 (E.D.N.Y. Aug. 31, 2001), wherein a settlement fund of $24.1 million was created: "The quality of representation here I think has been excellent." Mr. Harwood was lead attorney in Meritt v. Eckerd, 86 Civ. 1222 (E.D.N.Y. May 30, 1986), where then Chief Judge Weinstein observed that counsel conducted the litigation with "speed and skill" resulting in a settlement having a value "in the order of $20 Million Dollars." Mr. Harwood prosecuted the Hoeniger v. Aylsworth class action litigation in the United States District Court for the



Western District of Texas (SA-86-CA-939), which resulted in a settlement fund of $18 million and received favorable comment in the August 14, 1989 edition of The Wall Street Journal ("Prospector Fund Finds Golden Touch in Class Action Suit" p. 18, col. 1). Mr. Harwood served as co-lead counsel in In Re Interco Incorporated Shareholders Litigation, Consolidated C.A. No. 10111 (Delaware Chancery Court) (May 25, 1990), resulting in a settlement of $18.5 million, where V.C. Berger found, "This is a case that has an extensive record that establishes it was very hard fought. There were intense efforts made by plaintiffs' attorneys and those efforts bore very significant fruit in the face of serious questions as to ultimate success on the merits."

Mr. Harwood recently served as lead counsel in Morse v. McWhorter, (Columbia/HCA Healthcare Securities Litigation) (M.D. Tenn.), in which a settlement fund of $49.5 million was created for the benefit of the Class, as well as In re Bank One Securities Litigation, (N.D. Ill.), which resulted in the creation of a $45 million settlement fund. Mr. Harwood also served as co-lead counsel in In re Safety-Kleen Corp. Stockholders Litigation, (D.S.C.), which resulted in a settlement fund of $44.5 million; In re Laidlaw Stockholders Litigation, (D.S.C.), which resulted in a settlement fund of $24 million; In re JWP Inc. Securities Litigation, (S.D.N.Y.), which resulted in a $37 million settlement fund; In re Oxford Health Plans, Inc. Derivative Litigation, (S.D.N.Y.), which resulted in a settlement benefit of $13.7 million and corporate therapeutics; and In re UNUMProvident Corp. Securities Litigation, (D. Me.), which resulted in the creation of settlement fund of $45 million.



**Joel C. Feffer**, one of the senior members of the firm, was the partner supervising the litigation of <u>In re Home Shopping Network, Inc., Derivative Litigation</u>, (S.D. Fla.), which created a settlement benefit in excess of $20 million, and <u>Edge Partners, L.P. v. Dockser, et al.</u>, (D. Md.), which created a settlement benefit in excess of $11 million.   In addition, Mr. Feffer was in charge of <u>Dornberger v. Metropolitan Life Insurance Company</u> in the Southern District of New York, which created a settlement benefit of more than $20 million; the successful prosecution of the <u>Regeneron Pharmaceuticals, Inc. Securities Litigation</u> in the Southern District of New York, which created a settlement fund in excess of $4 million; and <u>Croyden Assoc. v. Tesoro Petroleum Corp., et al.</u>, (Del. Ch.), which created a settlement benefit of $19.2 million on behalf of holders of preferred stock of Tesoro Petroleum Corp.

Mr. Feffer graduated from Georgetown University Law Center in 1967 and specialized in corporate law and securities litigation.  Mr. Feffer is a member of both the New York State and American Bar Associations.

**Daniella Quitt**, a member of the Firm, graduated from Fordham University School of Law in 1988, is a member of the Bar of the State of New York, and is also admitted to the United States District Courts for the Southern and Eastern Districts of New York and the United States Court of Appeals for the Second and Fifth Circuits.

Ms. Quitt has played a significant role in numerous actions in which Harwood Feffer served as lead or co-lead counsel, wherein substantial benefits were conferred upon plaintiff shareholders, such as <u>In re Safety-Kleen Corp. Stockholders Litigation</u>, (D.S.C.) ( settlement fund of $44.5 million); <u>In re Laidlaw Stockholders Litigation</u>, (D.S.C.) (settlement fund of $24 million; <u>In re</u>



UNUMProvident Corp. Securities Litigation, (D. Me.) (settlement fund of $45 million); In re Harnischfeger Industries (E.D. Wisc.) (settlement fund of $10.1 million); In re Oxford Health Plans, Inc. Derivative Litigation, (S.D.N.Y.) (settlement benefit of $13.7 million and corporate therapeutics); In re JWP Inc. Securities Litigation, (S.D.N.Y.) (settlement fund of $37 million; In re Home Shopping Network, Inc., Derivative Litigation, (S.D. Fla.) (settlement benefit in excess of $20 million); In re Rexel Shareholder Litigation, (Sup. Ct. N.Y. County) (settlement benefit in excess of $38 million); and Croyden Assoc. v. Tesoro Petroleum Corp., et al., (Del. Ch.) (settlement benefit of $19.2 million).

Recently, in connection with the settlement of Alessi v. Beracha, (Del. Ch.), a class action brought on behalf of the former minority shareholders of Earthgrains, Chancellor Chandler commented: "I give credit where credit is due, Ms. Quitt. You did a good job and got a good result, and you should be proud of it."

Prior to joining Harwood Feffer in May 1991, Ms. Quitt represented both plaintiffs and defendants in complex commercial litigation. Since her affiliation with Harwood Feffer, Ms. Quitt has focused her practice on shareholder rights but continues to handle general commercial and consumer litigation.

**Matthew M. Houston**, a member of the Firm, graduated from Boston University School of Law in 1988. Mr. Houston is a member of the Bar of the State of New York and the Commonwealth of Massachusetts. Mr. Houston is also admitted to the United States District Courts for the Southern and Eastern Districts of New York and the District of Massachusetts. Since his affiliation with Harwood Feffer in 1992, Mr. Houston has concentrated his practice exclusively in the field of shareholder rights.



**HARWOOD FEFFER LLP**
PAGE 7

Mr. Houston has played a principal role in numerous class actions wherein substantial benefits were conferred upon plaintiffs: <u>Pace American Shareholder Litigation</u>, 94-92 TUC-RMB (securities fraud class action settlement resulting in a recovery of $3.75 million); <u>In re Bay Financial Securities Litigation</u>, Master File No. 89-2377-DPW, (J. Woodlock) ( D. Mass.) (settlement of action based upon federal securities law claims resulting in class recovery in excess of $3.9 million); <u>Crandon Capital Partners v. Sanford M. Kimmel</u>, C.A. No. 14998 (J. Chandler) (Del. Ch. 1996) (settlement of an action on behalf of shareholders of Transnational Reinsurance Co. whereby acquiring company provided an additional $10.4 million in merger); <u>Goldsmith v. Technology Solutions Company</u>, 92 C 4374 (J. Manning) (N.D. Ill. 1992) (recovery of $4.6 million as a result of action alleging false and misleading statements regarding revenue recognition).

**Samuel K. Rosen**, a member of the Firm, graduated Princeton University in 1965 and <u>cum laude</u> from Harvard Law School in 1968.  Mr. Rosen has had extensive experience in securities class action litigation, as well as complex corporate and commercial litigation.  Mr. Rosen has also represented public and private companies in matters of general corporate concern.

In 1979, Mr. Rosen argued in the United States Supreme Court, and won, the landmark case, <u>Park Lane Hosiery Co., Inc. v. Shore</u>, 439 U.S. 322 (1979).  Mr. Rosen played a key role in the successful prosecution of <u>Morse v. McWhorter,</u> (M.D. Tenn.) (creation of a settlement fund of $49.5 million on behalf of investors in Columbia/HCA Healthcare Corp.) and <u>In re Olsten Corporation Securities Litigation,</u> (E.D.N.Y.) (creation of a settlement fund of $24.1 million).



**HARWOOD FEFFER LLP**
PAGE 8

**James G. Flynn**, a member of the Firm, graduated <u>cum laude</u> from Fordham College in 1980 and <u>cum laude</u> from St. John's School of Law in 1988. Mr. Flynn is a member of the Bar of the State of New York and is also admitted to the United States District Courts for the Southern and Eastern Districts of New York and to the United States Court of Appeals for the Second and the Fifth Circuits.

Mr. Flynn has played a principal role in numerous class, derivative, and consumer actions wherein substantial benefits were conferred upon investors and consumers, such as <u>In re Executive Telecard, Ltd. Securities Litigation</u>, 94 Civ. 7846 (CLB) (S.D.N.Y.) (settlement benefit in cash and options of over $4 million in Federal securities action); <u>In re Verizon Three Way Calling Litigation</u>, No. 603484-01 (Sup. Ct. N.Y. County) (class action settlement providing full refund of improper three way calling charges of up to $2 million collected); <u>In re Graham-Field Health Products, Inc. Securities Litigation</u>, No. 98-CV-1923 (DRH) (E.D.N.Y.) ($5,650,000 settlement of Federal securities class action); and <u>Geer v. Cox, et al.</u>, Case No. 01-2583-JAR (D. Kan.) (derivative settlement of $2.5 million in class and derivative action).

Prior to joining Harwood Feffer, Mr. Flynn represented both plaintiffs and defendants in commercial and securities litigations and in class actions. Since his affiliation with Harwood Feffer in 1994, Mr. Flynn has focused his practice in the field of shareholder and consumer rights but continues to handle general and complex commercial litigation as well.



**HARWOOD FEFFER LLP**
PAGE 9

**Jeffrey M. Norton**, a member of the Firm, graduated with honors from Arizona State University in 1992 where he also earned a Junior Fellowship position within the Political Science Department. Mr. Norton graduated cum laude from Pace University School of Law in 1997 where he received a Dean's Grant as well as a Public Interest Law Scholarship for his work with the Center for Constitutional Rights in New York City and Pace University's Social Justice Center. Mr. Norton has argued matters before numerous state and federal courts and played a key role in numerous securities and ERISA actions in which substantial benefits were conferred upon class members, including In re Royal Dutch/Shell Transport ERISA Litigation, (D.N.J.) (creation of a settlement fund of $90 million plus implementation of structural relief).

Prior to joining Harwood Feffer, Mr. Norton represented both plaintiffs and defendants in a wide range of commercial and civil litigation matters, including civil rights, voting rights, mass tort and complex class action litigation, products liability, consumer protection, and professional liability litigation. He drafted supplement to Paul D. Rheingold, MASS TORT LITIGATION (1996) and assisted in litigating the seminal voting rights case of Goosby v. Town Board of the Town of Hempstead, 981 F. Supp. 751 (E.D.N.Y. 1997), aff, 180 F.3d 476 (2d. Cir. 1999), cert. denied, 528 U.S. 1138 (2000). Mr. Norton is admitted in the State Courts of New York and Connecticut as well as the United States District Courts for the Southern and Eastern Districts of New York, the Eastern District of Michigan, and the United States Courts of Appeals for the Second, Third, Fourth, and Eleventh Circuits.



**HARWOOD FEFFER LLP**
**PAGE 10**

**Peter W. Overs, Jr.**, an associate of the firm, was admitted to the New York Bar in 1994 and the U.S. District Court, Southern and Eastern Districts of New York in 1995. He is a graduate of St. Johns University (J.D., 1993) and New York University (B.A., magna cum laude, departmental honors in Philosophy, 1990). Mr. Overs authored "U.S. v. Fagg: Stretching the Bounds of Privacy," 66 St. Johns L. Rev. 1193 (1993). He is a member of the Association of the Bar, City of New York. Upon graduation from law school, Mr. Overs served as law clerk to the Honorable Paul J. Kelly, Jr., Circuit Judge, Unites States Court of Appeals for the Tenth Judicial Circuit. Prior to becoming an associate of the Firm, Mr. Overs represented both plaintiffs and defendants in antitrust and securities class actions, complex commercial litigation and federal appeals.

**Jennifer K. Hirsh**, an associate at the Firm, graduated from Brown University with a Bachelor of Arts in History. She received her J.D. from the Benjamin N. Cardozo School of Law in 2001, where she was the Senior Articles Editor of the Journal of International and Comparative Law. Ms. Hirsh is a member of the Bar of the State of New York. Prior to joining the Firm, Ms. Hirsh represented plaintiffs in a variety of complex commercial, securities, class action, and shareholder litigation, including as senior member of the trial team in In re Walt Disney Deriviative Litig.

**Tanya Korkhov**, an associate of the firm, was admitted to the bar in 2006. Ms. Korkhov graduated from New York University with a Bachelor of Arts in English and American Literature. She received her J.D. from the Benjamin N. Cardozo School of Law in 2005, where as a member of the Securities Arbitration Clinic, she represented clients in securities-related matters. Ms. Korkhov represented



Cardozo on a four-member team in the 2005 and 2004 annual Willem C. Vis International Commercial Arbitration Moot Competition held in Vienna, Austria.

**Roy Shimon**, an associate of the Firm, was admitted to the Bar of the State of New York in 2007. Prior to becoming an associate of the Firm, Mr. Shimon served as judicial intern to New York Supreme Court Justice Ronald D. Hollie, and to New York State Supreme Court Justice/Associate Justice Appellate Term Jaime A. Rios.

Mr. Shimon graduated with honors from Franklin & Marshall College in 2003, where he was also inducted into the Pi Sigma Alpha and Alpha Kappa Delta National Honor Societies. He received his J.D. from St. John's University in 2006, where he served on the Board of the Moot Court Honor Society, and as Vice President of the Entertainment & Sports Law Society.

# EXHIBIT D

lancaster82205

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL NO. 04-1398

GORDON LANCASTER, et al.,          :
                                   :
        Plaintiffs,                :
                                   :
        -vs-                       :
                                   :
ROYAL DUTCH PETROLEUM, et          :
Al,                                :   TRANSCRIPT OF PROCEEDINGS
                                   :
        Defendants.                :
                                   :
- - - - - - - - - - - - - - - - -

                        Newark, New Jersey
                        August 22, 2005

    B E F O R E:

          THE HONORABLE JOHN W. BISSELL
          UNITED STATES DISTRICT COURT JUDGE

    A P P E A R A N C E S:

    LITE DEPALMA GREENBERG & RIVAS
    BY:  JOSEPH J. DE PALMA, ESQ.,
    For the Plaintiffs.

    Pursuant to Section 753 Title 28 United States
    Code, the following transcript is certified to be
    an accurate record as taken stenographically in the
    above-entitled proceedings.

                Joanne M. Caruso, CSR, CRR
                   Official Court Reporter
                      (908)334-2472

    JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

☐

lancaster82205

APPEARANCES CONTINUED:

MILBERG WEISS
BY:   BRAD N. FRIEDMAN, ESQ.,
      And
WECHSLER HARWOOD
BY:   ROBERT I. HARWOOD, ESQ.,
      And
SCOTT & SCOTT
BY:   DAVID R. SCOTT, ESQ.,
For the Plaintiffs.

LEBOEUF, LAMB, GREENE & MACRAE
BY:   RALPH C. FERRARA, ESQ.,
      ANN M. ASHTON, ESQ.,
For the Corporate Defendants.

9

MAYER, BROWN, ROWE & MAW
BY:   BRUCE M. BETTIGOLE, ESQ.,
For Defendant Watts.

11

FOLEY & LARDNER
BY:   NANCY J. SENNETT, ESQ.,
For Defendant Boynton.

13

SMYSER KAPLAN & VESELKA
BY:   LARRY R. VESELKA, ESQ.,
For Defendant Thomas, Jr.

15

DEWEY BALLANTINE
BY:   MIKE STENGLEIN, ESQ.,
For U.S. Trust.

17

STEPHEN TSAI, ESQ.,
For Jay Lambert.

19

20

21

22

23

24

25

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

3

August 22, 2005

Page 2

lancaster82205
2          THE COURT:    Good morning.

3              The Court is prepared to proceed with the fairness

4     hearing in the matter of In Re Royal Dutch/Shell Transport

5     ERISA litigation.

6              I apologize in the first instance.  I think I'm

7     getting over a case of laryngitis rather than contracting one,

8     but nevertheless, this may be a blessing in disguise.  You may

9     not listen to me as much as might otherwise be the case.

10             In any event, I'll take appearances first on behalf

11    of the plaintiffs.

12             MR. DePALMA:    Joseph DePalma of Lite, DePalma for the

13    plaintiffs.

14             Your Honor, I'd like to introduce co-lead counsel,

15    Robert Harwood.

16             MR. HARWOOD:    Good morning.

17             MR. FRIEDMAN:  Brad Friedman from Milberg Weiss.

18             MR. SCOTT:    Good morning.

19             Daivd Scott, from Scott & Scott.

20             MR. DePALMA:    With the Court's permission, we would

21    like to split the argument.  Mr. Harwood is prepared to

22    address the fairness of the settlement and Mr. Friedman the

23    fee issues, if that is okay.

24             THE COURT:    Counsel, the gentlemen to your immediate

25    right, I didn't catch the name.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.


                                                        4


1              MR. SCOTT:    David Scott, Scott & Scott.

2              THE COURT:    Thank you.

3              Counsel?

lancaster82205

4          MR. FERRARA:  Ralph Ferrara, appearing for the

5  corporate defendants.

6          MS. ASHTON:  Ann Ashton, also from LeBoeuf, Lamb.

7          THE COURT:  We have some applications for admissions

8  pro hac and persons who have sought to present positions on

9  behalf of objectors.

10         We'll continue with that.

11         MR. BETTIGOLE:  Bruce Bettigole for Sir Philip Watts.

12         MS. SENNETT:  Nancy Sennett for Judith Boynton.

13         MR. MORIN:  Phil Morin for defendant Pervis Thomas,

14  Jr.

15         MR. VESELKA:  Larry Veselka.  I'm the subject of one

16  of the pro hac motions.

17         THE COURT:  Thank you.

18         MR. VESELKA:  On behalf of Pervis Thomas, Jr.

19         THE COURT:  You're Mr. Thomas?

20         MR. THOMAS:  Yes.

21         THE COURT:  Welcome.

22         Mr. Veselka, I'll deal first with your motion to be

23  admitted pro hac on behalf of Mr. Thomas.  I've read the

24  papers involved.

25         Is there any objection on behalf of the other parties

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

5

1  to the case?

2          MR. DePALMA:  There is no objection.

3          MR. FERRARA:  No, your Honor.

4          THE COURT:  Thank you.

5          Your papers are in order.  I'll sign the order.

lancaster82205

6    Welcome to this court.

7             MR. VESELKA:  Thank you, your Honor.

8             THE COURT:  Mr. Stenglein?

9             MR. STENGLEIN:  Yes.

10            THE COURT:  Will you join the Court in the well,

11   please?  Find a seat wherever you can.

12            MR. STENGLEIN:  Thank you, your Honor.

13            THE COURT:  Mr. Stenglein, I have your application

14   for admission pro hac on behalf of U.S. Trust Company.  Is

15   that correct?

16            MR. STENGLEIN:  Correct.

17            THE COURT:  I note that you're being moved by Mr.

18   Krovatin who is one of the best advocates in this entire

19   district.  If he were here, I was going to ask him if he

20   needed your help, but since he isn't, I won't.

21            Your papers are in order.

22            Any objection to the admission of Mr. Stenglein pro

23   hac in this case?

24            MR. DePALMA:  No objection.

25            MR. FERRARA:  No.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

6

1             THE COURT:  Thank you.

2             I'll sign the order.

3             MR. STENGLEIN:  Thank you.

4             THE COURT:  Now, we had an objection filed on behalf

5    of one Jay Lambert by a Stephen Tsai.

6             MR. TSAI:  That's me.

7             THE COURT:  You're present, sir?

Page 5

lancaster82205

8          MR. TSAI: Yes, sir.

9          THE COURT:   I'll enter your appearance.

10         MR. TSAI:  Stephen Tsai, appearing for class member

11   and objector, Jay Lambert.

12         THE COURT:   Thank you.

13         I received an objection by letter from a William S.

14   Gill of Kingwood, Texas, who apparently was not represented by

15   counsel and presented a position to the Court pro se

16   contesting only the amount of the allowance of plaintiffs'

17   attorneys' fees in this case.

18         Is Mr. Gill in court or anyone on his behalf?

19         All right.  That's an issue that's common to many of

20   the objections advanced today.  We'll address that in turn.

21         Are there any other persons present here in court who

22   are lodging objections to the terms of the settlement in this

23   matter?

24         Court notes no presentation.

25         Mr. Tsai, I'll hear you first on behalf of Mr.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

7

1   Lambert.

2          I've read your papers, of course, as well as those

3   submitted in response and I'll hear anything you would like to

4   add at this time.

5          MR. TSAI: At this point, I'll just highlight a few

6   main points, I'm not going to belabor the Court's time.

7          We feel, your Honor, that there are certain

8   deficiencies in the notice and also in the release.  The

9   notice, your Honor, does not provide enough information about

Page 6

lancaster82205
10   how many class members there are, how many employees there
11   are, what is the aggregate value of the settlement, what are
12   the damages that are computed such that a class member could
13   determine what is the value of the settlement to him or her in
14   terms of percentage of losses.

15          THE COURT:   Let us assume for the moment that I
16   would accept your argument, at least in part. We've had
17   papers submitted here in response to those objections which I
18   believe set forth a valid estimation of the potential number
19   of class members, that have talked in terms of what would
20   appear to be a reasonable maximum recovery of $115 million in
21   this case by the plaintiffs' own calculation.

22          Frankly, I haven't -- I don't believe you specified
23   much about what the deficiencies in the plan of allocation,
24   which I reread not ten minutes ago and which seem fairly
25   explicit on its face. Have any of the papers that have been

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

8

1   filed here in answer to some of the objections that you have
2   raised, in fact, answered them adequately?

3          MR. TSAI:   Your Honor, they seem to be fairly -- I
4   would just say that they're estimates only, one person's best
5   estimate. Your Honor, we feel that more specific information
6   be more appropriate.

7          THE COURT:   Are you aware of the complexities
8   involved in this matter in connection with the terms of the
9   release, potential losses are?

10          MR. TSAI:   Sorry to interrupt.

11          I'm aware that it is very complex, yes.

Page 7

lancaster82205
12        THE COURT:   Anything further?

13        MR. TSAI:  Your Honor, we also felt that the

14  release's overbroad.  It seemed to release not only the

15  defendants, but also related parties and entities which have

16  privity with the defendant and the parties related to it,

17  perhaps possibly for claims or causes of action that are not

18  related to the subject matter of this litigation.

19        THE COURT:   Well, are you referring to specifically

20  to the Texas action or a greater overbreadth of the release?

21        MR. TSAI:  I'm sorry.

22        THE COURT:   Are you referring specifically to the

23  Texas action or to the general overbreadth of the release?

24        MR. TSAI:  The general overbreadth.

25        THE COURT:   Thank you.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

9

1         Anything further?

2         MR. TSAI:  Nothing.

3         THE COURT:   Thank you.

4         Counsel, in support -- as far as the deficiencies

5  raised by Mr. Lambert regarding anything other than the scope

6  of releases, this Court determines that they have not been

7  substantiated here.

8         The Court, in the course of its ultimate findings of

9  fact and conclusions of law, will address the adequacy of the

10  notice and its terminology.  Excuse me, I may have taken a

11  step in advance.  It doesn't appear that other objectors here

12  are joined, at least in writing, in the objections by Mr.

13  Lambert.

Page 8

lancaster82205

14        Do any of the other objectors, in quotes, here

15   endorse or want to be heard further on the Lambert objection?

16   I note none.

17            I'll continue with my analysis.

18            So the Court's findings of fact and conclusions of

19   law will encompass the determinations with regard to the lack

20   of merit in the Lambert allegation.

21            what about the question of scope of releases,

22   however?  while I'm not inclined to feel that that is

23   overbroad under the entire circumstances of this case, I think

24   I would like a response on that point.

25            I'll be happy to hear one on behalf of the

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

10

1   plaintiffs, perhaps with a synopsis with the scope of releases

2   because they are rather lengthy documents.

3            MR. HARWOOD:  It is, your Honor.  If it pleases the

4   Court, Robert Harwood, co-lead counsel.

5            The releases release agents and others in privity

6   with the defendants is the objection that Mr. Lambert has

7   lodged without excluding certain actions that are not part of

8   the lawsuit, he says.  But, in fact, I think the release's

9   narrowly tailored to include only the claims that were

10   asserted or could have been asserted in this lawsuit.  He also

11   argues that --

12            THE COURT:  And in the Texas action as I understand

13   it.

14            MR. HARWOOD:  I was about to mention the Texas

15   action.  He also mentions that we are releasing valuable

Page 9

lancaster82205

16  claims that could be asserted in the Texas action. My firm
17  filed the Texas action. The Texas action is a duplicate, a
18  carbon of the action pending in this court, and it's most
19  likely if we had pushed, if there was a need to push the Texas
20  action, which there isn't, the defendants would have resisted
21  fighting a war on two fronts and the Texas action would have
22  been either dismissed, stayed or most likely transferred to
23  your Honor, which is the way it should be.

24          So this release, in addition, was scrutinized by the
25  independent fiduciary U.S. Trust and they seem satisfied with

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

☐

11

1   the scope of the release.

2           The release was a document, I can tell your Honor,
3   that was contentiously negotiated over. My co-counsel and I
4   scrutinized that language to make sure that we were releasing
5   only the claims that could have been asserted in this action.
6   Indeed, we vetted that release not only with the Court, with
7   the approval phase, but we vetted that release with the
8   counsel, lead counsel in the parallel securities class action
9   because we wanted to make sure that they wouldn't come in and
10  say you're releasing claims that we're asserting.  That
11  frequently happens.

12          Mr. Bernstein, the Bernstein Liebhard firm was
13  satisfied with the scope of the language of the release, that
14  it wasn't overbroad and wasn't throwing in claims that there
15  was no right.

16          THE COURT:   Transgressing over into the claims that
17  were in the securities action?

Page 10

lancaster82205
18          MR. HARWOOD:   That's right.

19          THE COURT:   Anything further?

20          MR. HARWOOD:   Thank you.

21          THE COURT:   This Court agrees.   The Court also

22   determines that the release is appropriate, sufficiently

23   comprehensive to resolve and, where appropriate, bar claims

24   that are the subject of the settlement, but also determines

25   that it is sufficiently clear with regard to its terms and not

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

12

1   overbroad as argued on behalf of Mr. Lambert.

2          There was, once again, as I said, the proposed

3   findings of fact and conclusions of law, which I'll ask the

4   parties to prepare jointly for the Court at the conclusion of

5   this hearing, should indicate that ruling and its basis.

6          I was advised in papers submitted on behalf of the

7   plaintiffs that a Mr. McGuinniss, who hasn't filed any papers

8   in the court as such, did raise a question with regard to

9   perhaps some deficiency or failing in the settlement because

10  of the fact that the taxability of funds coming to him through

11  this settlement and, of course, through whatever fund he

12  participated in was taxable, whereas those which might be

13  payable to him directly in the course of the lawsuit would

14  not.

15         No one appears on Mr. McGuinniss' behalf and the

16  Court believes that the plaintiffs and defendants both have

17  adequately answered that question; namely that the

18  beneficiaries and recipients of the funds from this settlement

19  are, in fact, the Shell Funds, themselves, so we were not

Page 11

lancaster82205
20  dealing with the prospect of an individual distribution in any
21  case.

22          The taxability, of course, of the ultimate
23  distribution of a portion of the settlement funds here to Mr.
24  McGuinniss or anyone else, among other things, is going to be
25  governed, I presume, by the terms of the fund itself and maybe

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

                                                        13

1  their investments and also whatever applicable state and
2  federal tax laws would apply.

3          The Court also denies any objections based upon Mr.
4  McGuinniss' position.

5          I'd like to hear now from counsel on behalf of Mr.
6  Thomas.  I have read your papers, sir.  I'd be happy to hear
7  anything you would like to emphasize.

8          MR. VESELKA:  May it please the Court, Larry Veselka,
9  your Honor.  I appreciate this opportunity.

10          Mr. Thomas appreciates this opportunity.  He
11  understands the somewhat novel nature of his position, but
12  it's a matter of some seriousness to him.

13          Every defendant is entitled to make their own
14  decisions with regard to the process when they're accused of
15  violating fiduciary duties that are crucial to their daily
16  activities and their profession.  It's a serious charge
17  against him.

18          As the Court notes from our papers, Mr. Pervis does
19  not object to the amount of the settlement or most of the
20  terms of the settlement.  He objects mainly that he did not
21  see and have an opportunity to find and decide and approve the
                        Page 12

lancaster82205
22  final terms of the settlement and would have wanted to have
23  had other treatment.  Therefore, he objects to the statement
24  that he has approved the settlement.

25          He would ask that he be removed as a party signatory

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

14

1   to the settlement and would have wanted to have been, as Mr.
2   Jeroen Van der Veer was, dismissed.  The plaintiffs' response
3   itself in trying to justify their fees explains the task, in
4   trying to explain the benefits that they've brought to the
5   class the problems they were facing.

6           Though Mr. Thomas, as plan administrator, is clearly
7   a fiduciary, a matter he takes seriously and why any
8   allegations of his breaching those fiduciary duties is very
9   serious to him and any implication --

10          THE COURT:    Let me interrupt you.

11          There has been time, of course, since the papers were
12  filed.  Mr. Thomas, presumably with your assistance or other
13  counsel, has had the opportunity to review those papers and
14  let us assume for the moment that he did not have the
15  opportunity to either review or actually approve for execution
16  by his then counsel the proposed final settlement papers and
17  all of their facets.

18          Does he remain opposed to that settlement including
19  his present status in it, or is that not a fair question and
20  should I be measuring this from the time of the purported
21  execution of that consent rather than the latter?

22          MR. VESELKA:    I believe it's a fair question because
23  the Court and various parties engage in these types of

Page 13

lancaster82205
24  litigation on a regular basis are used to proceeding in a
25  certain way.  Why Mr. Thomas persisted after seeing the terms

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

0

                                                            15

1   in wanting to raise the motion to reform is because he, as an
2   individual, and as a professional fiduciary, considered it a
3   serious matter that he was not given the opportunity to
4   participate in the final approval because in so doing, he had
5   hoped that he would have been able to negotiate a similar
6   treatment as Mr. Jeroen Van der Veer, if I'm pronouncing that
7   properly, which would he believes mattered significantly to
8   his professional standing.

9           If there were reasons for the benefit of the plan or
10  for reasons for benefit of his employer that he needed to be
11  in the settlement in these various ways, it should have been
12  presented to him to make his choice because he was not
13  presented with the final package to know the specific terms.
14  He never gave that approval.

15          Therefore, that's why we think it is still a matter,
16  even though it's outside the norm of this process, that it is
17  a matter of importance to him individually that the settlement
18  be reformed to reflect that he's not -- that he did not
19  authorize it in that form and he's not a party signatory to
20  it, and he would like to have it reflect that he be dismissed.

21          And the Court need not worry about Rule 23 notice
22  requirements because the Court only needs to provide such
23  notice as is necessary, and the entire class was given a
24  notice that presented a plan where he would be dismissed with
25  prejudice and released at the conclusion, under the terms of

                            Page 14

lancaster82205

🞐

16

1  the stipulation and settlement.

2       So rather he's reflected as having been dismissed in

3  the manner as Mr. Jeroen Van der Veer or in the manner as

4  presently written makes no substantive difference to members

5  of the class.  The fund will still flow to them, but it did

6  matter to him.

7       THE COURT:  All right.

8       I think it's bought out in the plaintiffs' papers, I

9  suppose is inherent in the argument you just made in support,

10  they say well, there is no damage to Mr. Thomas because he's

11  not being asked to pay any money.  Your point is there is no

12  adverse impact on the settlement of the settlement funds

13  because if he's released based upon lack of authority to have

14  the document executed on his behalf, then neither the fund nor

15  the settlement nor the certification of the class or anything

16  else is in peril either.  Is that your point?

17       MR. VESELKA:  Yes, your Honor.

18       THE COURT:  Okay.

19       MR. VESELKA:  In response to that specific point, the

20  technical language, it is obviously not the perception of any

21  of the parties on the subject, the technical language does

22  provide for him as one of the defendants to make the payments.

23  Now, obviously he's not paying $90 million.

24       This is one of the reasons he would like to not be

25  listed as a named defendant when it's the named defendant

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

Page 15

lancaster82205

17

1  Shell.  That payment is going to come from the corporate
2  defendant.  That's understood by the parties, but that's not
3  the way it's drawn up.  So that's one of the reasons that he
4  would like to be listed not as being at the time of the
5  settlement a named defendant as part of that stipulation.

6          The Court -- the stipulation of settlement itself,
7  one other argument to make, your Honor, was that the Court
8  can't change a settlement.  Stipulation of settlement itself
9  reflects that the Court can reform or make changes because the
10 parties reserve the right to decide, depending upon what
11 changes or modifications are made, to determine whether
12 they're material and whether to go forward with the settlement
13 or not.

14         The negotiations themselves envision, and the Court
15 has the inherrent authority pursuant to Rule 23 to be able to
16 make those changes.

17         Finally, we'd like to draw attention to the Court the
18 decision of the Superior Court of New Jersey, Appellate
19 Division in Amatuzzo v. Kozmiuk, at 305 New Jersey Superior
20 469 and that's 703, Atlantic 2d., from 1997; the decision
21 where the Court said even though an attorney may have apparent
22 authority, that's only a presumption.  The apparent authority
23 cannot come from actions, words soley of the attorney.  There
24 must be the party itself that must provide grounds for the
25 apparently authority and only that would still only be

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

18

Page 16

lancaster82205

1   apparent authority.  It's a presumption that can be overcome.

2        Mr. Thomas' affidavit which has been submitted to the

3   Court, which we would argue removes that presumption and that

4   that would provide justification under New Jersey authority

5   applicable to this stipulation of settlement to allow the

6   Court to make the reformation, to remove the deletion to his

7   having authorized the settlement and delete paragraph 58(b)

8   out.

9        THE COURT:    Thank you.

10        Before I hear on behalf of counsel either for the

11   plaintiffs or the defendants, counsel who appear here on

12   behalf of the other objectors, et cetera, do they take any

13   positions on the application on behalf of Mr. Thomas?

14        I hear none.

15        I'll hear from the plaintiffs in response to that

16   application.

17        MR. HARWOOD:  Again, unfortunately, this valuable

18   settlement has been sucked up into a dispute between Mr.

19   Thomas and his former counsel, the Cleary, Gottlieb firm.  At

20   the risk of sounding too colloquial, here's what's really

21   going on:   One of the named defendants was Mr. Jeroen Van der

22   Veer.  As the settlement process was coming to fruition, and

23   we were negotiating final round of settlement documents, we

24   were approached and asked to let Mr. Van der Veer out.  He's

25   in a different position, he had different responsibilities and

☐

1   obligations and we did that and we said at the time, Mr. Van

2   der Veer, but nobody else.  Subsequently everybody else came,
                       Page 17

lancaster82205

3   as you might expect, and we said no.

4        We said specifically no to Mr. Thomas not because we
5   have it in for him, your Honor. He seems like a perfectly
6   nice gentleman, but he was a plan fiduciary. He was the only
7   named fiduciary in the case for the plans and everybody else
8   was a so-called de facto fiduciary. And had the motions to
9   dismiss been decided, he was certainly the most likely
10  defendant to remain in the case before all the other
11  defendants.

12       So he was given that knowledge. The settlement
13  memorandum of understanding was entered into and we completed
14  our additional and necessary discovery. Mr. Thomas at the
15  time was still represented by the Cleary firm. Mr. Thomas sat
16  for a deposition in New York, represented by the Cleary firm.

17       From our perspective, the Cleary firm had full
18  appearance and apparent authority to continue to negotiate and
19  to sign the documents on behalf of their client, Mr. Thomas,
20  and they did.

21       I think Mr. Thomas has maybe the largest case of
22  buyer's remorse I've ever come across, but he had misgivings,
23  but I don't understand what he wants because when the
24  settlement is approved, he's going to get a dismissal with
25  prejudice. He is not required to pay a single penny. All he

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

20

1   is required to do is to give us a mutual release, and as I
2   understand it, and as his papers make clear, he doesn't oppose
3   giving us that release. So I don't know how to go about
4   satisfying Mr. Thomas. As long as we get that mutual release,

lancaster82205

5   we're satisfied and I think he is bound by the apparent

6   authority that his counsel had.  If the settlement can be

7   reformed and the mutual releases are forthcoming, we take no

8   position on that.

9          THE COURT:   As I recall also, the terms of the

10  settlement include a recitation of no acknowledgement of

11  liability whatsoever on behalf of any defendant, correct?

12         MR. HARWOOD:  Correct, your Honor.

13         There are other defendants who could also be

14  characterized as professional fiduciaries.  I believe Miss

15  Boynton was a fiduciary of the Polaroid ERISA plans.  He's not

16  being singled out and he doesn't stand alone.

17         THE COURT:   Remind me, when are the settlement funds

18  payable?  Are they being paid in a lump sum?

19         MR. HARWOOD:  A lump sum with interest, I think 30

20  days after the settlement is finally approved.  Thirty days

21  after the settlement becomes final, no longer appealable.

22         THE COURT:   Is it at that point that the dismissals

23  of the individual defendants will become final or do they

24  become final upon the Court's entry of an order concluding

25  today's proceedings?

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

☐

21

1          MR. HARWOOD:  Probably 30 days.

2          MR. FRIEDMAN:  I believe, your Honor, when the

3   settlement is no longer subject to appeal.

4          THE COURT:   Fine, thank you.

5          MR. HARWOOD:  One last point, your Honor.

6          The Amatuzzo case that was cited to you by counsel is

Page 19

lancaster82205

7  so distinguishable.  The client voiced his vigorous objection,

8  refused to sign the settlement agreement.  It was clear from

9  day one that he was not on board and counsel for plaintiffs

10  knew it.  We did not.

11        Thank you, your Honor.

12        THE COURT:    Thank you.

13        Mr. Veselka, anything to add?

14        MR. VESELKA:  Very briefly.

15        I agree with Mr. Harwood that any concerns between

16  Mr. Thomas and his previous counsel are between them and are

17  not matters that need to be dealt with here.

18        The settlement itself is only signed on I believe

19  July 5, signed July 5, presented to the Court on July 8th.

20  Regardless of why or whether in the dispute with his previous

21  counsel he was entitled to see the final version and/or to see

22  if he could be dismissed as Mr. Jeroen Van der Veer was, at

23  the time he did not get that opportunity to present that and

24  to insist on it.  That's why it's so important to him, because

25  he is a fiduciary.

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

22

1        Now, in this release, this case is releasing and he

2  would be released even if this is granted, he would be covered

3  by the releases, as are the other fiduciaries which are

4  trustees which are fiduciaries, which are parties to the Texas

5  case.  He's also a party to the Texas case.  So he's going to

6  be covered by the releases there as well.  He does, as they

7  stated, he does not object to giving the mutual release.

8        What he wants is merely to reflect paragraph 58(B)

Page 20

lancaster82205

9   because he did not give approval, to preserve the sanctity of

10  the process of each individual involved in litigation, to be

11  not listed as a named defendant that's one of the people

12  making the payments and, therefore, we submit that

13  respectfully to the Court.

14          THE COURT:   Thank you.

15          Mr. Thomas' objection is denied, essentially on two

16  grounds.  Once again, I'll leave it to the parties to amplify

17  these remarks in the proposed findings of fact and conclusions

18  of law.

19          First, the Court determines that Mr. Thomas' prior

20  attorney was clothed with apparent authority to execute the

21  settlement agreement on his behalf.  Mr. Thomas also was

22  adequately informed of the nature and the state of the

23  proceedings leading up to the settlement agreement so that he

24  presumably was in a position to make his position very clear

25  to his own attorney if, indeed, there were objections to the

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

23

1  form of settlement and/or his particular treatment.

2          As we know, the genesis of this argument is that he

3  feels he should have been treated as Mr. Van der Veer was, who

4  was dismissed even prior to the present stage.

5          Secondly, the Court determines that there is no true

6  tangible detriment enuring to Mr. Thomas as a result of the

7  fact that he was not dismissed previously as opposed to

8  remaining in this case as a named defendant through and

9  including the time of the payment of the settlement funds from

10  other sources that would then lead to the final dismissal of

Page 21

lancaster82205

11  himself and all defendants.

12        In connection with that, as his counsel acknowledges,
13  he will receive the full benefit of the releases that are
14  extended to him and for that reason alone will carry no
15  baggage away from this litigation, certainly nothing tangible
16  or measurable.

17        Finally, the Court determines that Mr. Thomas is not
18  left without recourse. If he has sustained some injury, be it
19  to reputation, the need to incur additional expenses in order
20  to present himself to the Court or otherwise as a result of
21  the inappropriate actions of his prior attorneys without
22  authority, in fact, if indeed that is the case, he has
23  recourse against that attorney to be made whole.

24        That's where his main dispute lies, that's where his
25  opportunity for remedies lie and, accordingly, the application

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

▯

24

1  to have the settlement revised with regard to Mr. Thomas'
2  status before this Court is denied.

3        We'll now move ahead I believe to the final item on
4  today's list which is the objections that have been raised to
5  the attorneys' fees sought.

6        Before I do that, is that the one remaining item on
7  the menu? I believe it is based upon things that have been
8  tendered here.

9        I think at this point I'd like to hear on behalf of
10  U.S. Trust. Let's see what your position is on this and then
11  I'll permit others to be heard as the matter presses.

12        MR. STENGLEIN:  Good morning.  Mike Stenglein, U.S.
                              Page 22

lancaster82205

13  Trust.

14          Anything that I would say would really be just

15  repetitive of what's in our papers.  I will offer no

16  additional argument at this time.  If the Court has any

17  questions about our papers, I'd be happy to try to answer

18  them.

19          THE COURT:  All right.

20          Your view, I guess, essentially is that at the very

21  least this demand ought to be closely scrutinized in

22  connection with the population of ERISA class action

23  settlements with which you're acquainted.  This might appear

24  to be on the high side.  Is that a fair recap?

25          MR. STENGLEIN:  Well, it's a fair recap and I would

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

25

1  add to that that, and I think both parties agree, that also

2  securities class action settlements would also provide the

3  Court with information about what a reasonable attorney fee

4  award would be.

5          In the most recent analysis performed by NERA

6  suggests for a settlement this size, 26 percent is the

7  appropriate number.  Those two data points we wanted to put

8  before the Court for purposes of its decision process.

9          THE COURT:  All right.

10          Counsel on behalf of any of the objectors, Mr.

11  Veselka, do you wish to be heard on this issue?

12          MR. VESELKA:  No, your Honor.

13          THE COURT:  Thank you.

14          Mr. Tsai, do you wish to be heard further on this
                        Page 23

lancaster82205

15  issue?

16           MR. TSAI:  No, your Honor.

17           THE COURT:   Nothing further.

18           Fine.   Anything on behalf of counsel for defendant

19  Boynton?

20           MR. BETTIGOLE:  Nothing.

21           MS. SENNETT:  Nothing, your Honor.

22           THE COURT:   Thank you.

23           Mr. DePalma, I'll hear from you on that point.

24           Mr. Friedman.

25           MR. FRIEDMAN:  Thank you, your Honor.


JOANNE M. CARUSO, CSR, CRR,   OFFICIAL COURT REPORTER, NEWARK, N.J.

0

                                                        26


1            I would begin I guess by saying there really appears
2   to be no dispute among any of the parties, including U.S.
3   Trust, that the Common Funds Doctrine applies to this fee
4   request and that the fees therefore should be based on a
5   percentage of the common fund.

6            As we say in our brief, the general range in this
7   circuit is 19 to 45 percent.  The Court has discretion where
8   to set the fee, but is to go through the seven Gunter factors.
9   The factor that U.S. Trust points to, of course, is only one
10  of those seven factors.  With respect to most of the other six
11  factors, they actually do address the factors and find that
12  those factors weigh in our favor.

13           With the Court's permission, I'd like to go fairly
14  quickly but through the seven factors because I think they're
15  all relevant and not just one.

16           THE COURT:   Please do.
                           Page 24

lancaster82205

17        MR. FRIEDMAN:  The first factor is the size of the
18   fund and the number of people that are benefiting.  That
19   factor we think is strongly in our favor.  This is one of the
20   largest ERISA settlements ever achieved not only on an
21   absolute basis, but as a percentage of the class damages which
22   is a very significant issue.

23        As far as the number of people benefited, we have
24   over 40,000 people which is also a very significant number.
25   U.S. Trust seems to agree that that factor weighs in our

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

27

1   favor.  They write in their objection "the fund is a large one
2   and the number of beneficiaries are many."

3        The next factor we get to is the presence or absence
4   of substantial objections to the settlement terms or the fee
5   request.  Here we had over 42,000 notices and only three
6   actual class members have objected, which is about less than
7   one one-hundreth of a percent and those three class member
8   objections we think really don't even fall within the category
9   of being substantial.

10        We have Mr. Thomas' objection which is really an
11   effort to reform the settlement, and then we have U.S. Trust's
12   objection to the fee request which I won't say is not a
13   substantial issue or substantial reduction, but we think
14   they're wrong for reasons --

15        THE COURT:   I think they brought it out of what they
16   perceive is their duty given their position they're assigned.

17        MR. FRIEDMAN:  Yes, they have that duty and I don't
18   begrudge it.

Page 25

lancaster82205

19      When you go through their objection, what you see is
20 the fund's a large one. They say the number of beneficiaries
21 are many.

22      They also go through and note, and we appreciate
23 this, that the settlement was rapidly achieved; they recognize
24 "the skill of plaintiffs' counsel is evident and exemplary."
25 They characterize the underlying litigation as, quote unquote,

JOANNE M. CARUSO, CSR, CRR,   OFFICIAL COURT REPORTER, NEWARK, N.J.

28

1 complex and they note that the settlement "was achieved with
2 diligence and speed." These are all Gunter factors. These
3 are all things that weigh in favor of the application.

4      Of course, ultimately both in their objection and
5 more importantly in their independent fiduciary's report, they
6 conclude the settlement is reasonable even net of attorneys'
7 fees, even net of full request, they think the settlement is
8 reasonable and the objection, I think they use the word
9 "fair." Obviously, we as plaintiffs' counsel think these are
10 statements that the Court ought to take into account when
11 deciding the application.

12      With respect to the skill and efficiency of the
13 attorneys involved, which is the third Gunter factor,
14 plaintiffs' counsel in this case moved the case to resolution
15 with near record speed, and I would submit achieved a result
16 that really speaks for itself; 78 percent recovery which is
17 what we believe we achieved in this case. We think is really
18 extraordinary and the absolute amount makes it one of the
19 highest ERISA settlement amounts, if not the highest
20 settlement, in the history of ERISA.

lancaster82205

21          Again, as I said, U.S. Trust agrees that this factor
22   weighs in our favor, saying the skill of plaintiffs' counsel
23   is evident and exemplary and the settlement was achieved with
24   diligence and speed.
25          The fourth factor is complexity and duration of the

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

                                                                29

1   litigation.  Now, according to the Third Circuit's opinion in
2   G.M. Trucks, this factor is really intended to capture -- this
3   is language from the case, the probable costs in both time and
4   money of continued litigation.  Clearly, this ERISA case was
5   complex and because we were able to achieve such an early
6   settlement, it is necessarily the case that absent the
7   settlement, there's going to be a lot of continued litigation.
8          Again, U.S. Trust seems to agree this factor weighs
9   in our favor, recognizing that the underlying litigation was
10  complex and that the settlement was rapidly achieved.
11          These are all things they say in their papers.
12          THE COURT:    I don't think there's any doubt,
13  certainly not in my own mind, that had this litigation not
14  settled and eventually gone to the mat, it would have been an
15  extremely complex and difficult litigation, among other things
16  in terms of the assessment of fiduciary duties, whether or not
17  those duties were breached or abdicated and/or the
18  quantification of the relief affordable to respective class
19  members or a formula therefore.  No doubt about that.
20          MR. FRIEDMAN:   Okay.
21          THE COURT:    Please continue.
22          MR. FRIEDMAN:   Actually you've stolen a bit of my
                            Page 27

lancaster82205

23  thunder for the next factor which is the risk of nonpayment.

24  We invested millions of dollars and time in this case and

25  nearly a million dollars in real out-of-pocket expenses with

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

30

1   no guarantee that we'd ever see any recovery at all.

2        Specific risks to this case were particularly high

3   because the law in this area is still developing, but included

4   all of the issues that your Honor just laid out, as well as a

5   serious standing issue.  Many of the defendants raised

6   standing issues not being U.S. citizens and of course there's

7   also the ever-present problem of motion practice, motions to

8   dismiss, briefs for summary judgment, the need to rely on

9   experts, appellate practice.

10       As your Honor may be aware, just last week in the

11  State Farm litigation in Illinois, plaintiffs' counsel who had

12  achieved a billion dollar verdict after trying it and then had

13  that verdict reduced by the appellate court, just in the

14  Illinois Supreme Court the class decertified and the entire

15  verdict thrown out.  So a decade of litigation, millions and

16  millions and millions of dollars both in time and

17  out-of-pockets all gone.  Those lawyers will not see a cent

18  after decades of litigation.

19       There's a real risk of nonpayment in any of these

20  kinds of cases, but for the reasons your Honor set forth, I

21  think were particularly high here.

22       Now, U.S. Trust doesn't address these risks, but

23  instead contend that our risk was, quote unquote, was

24  significantly reduced by the Davis Polk report, claiming that

Page 28

lancaster82205

25  the Davis Polk report provided us with a road map.  We would

31

1  respectfully suggest that the analysis there is wrong.

2          In this case, as your Honor knows, Shell restated the

3  amount of its proved oil reserves.  Now, that restatement

4  established that the accounting treatment was wrong and that

5  restatement, perhaps, reduced our risk somewhat because it did

6  establish that, in fact, the reserves were wrong.

7          The Davis Polk report then puts together a bunch of

8  e-mails which, in essence, establish or blames plaintiff in

9  the securities case will establish scienter.  Scienter is a

10  huge issue in the case, there is no doubt about that, but it's

11  not an issue.  Our issue's standing, existence of a fiduciary

12  duty, who breached the duty, perhaps negligence and damages,

13  the Davis Polk doesn't really help us with that stuff.

14          So in our case, in the ERISA case, the Davis Polk

15  report is really of minor, if any, significance.  Where it is

16  significant is in the 10b-5 securities litigation where they

17  have to fight over scienter, but we don't have that element of

18  our claim.

19          The sixth factor is time devoted to the case.  I

20  won't belabor that because I don't think anybody challenges

21  that.  We put in more than 18,670 hours, more than $6.8

22  million of lodestar and more than $726,000 in reasonable

23  out-of-pocket expenses, actual money out of our pockets.

24          This time was all expended in a concentrated time

25  period so that this case could be quickly concluded, which is

Page 29

lancaster82205

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

32

1   significant because it means that we were precluded from
2   taking on other work. We didn't sort of spend a few hours a
3   day on this case and slip in a bunch of other stuff.
4           THE COURT:    On the other hand, through its early
5   conclusion you're now free to take on other work whereas your
6   time might be otherwise consumed in this case for several
7   years, correct?
8           MR. FRIEDMAN:  That's true.  That's true.
9           We do say in our papers for lodestar crosscheck
10  purposes, the result and multiplier of 4.4 which we show in
11  the papers is within the range and nobody is contesting that.
12          Where the rubber really seems to be hitting the road
13  is the seventh factor only which is the awards in similar
14  cases.  Now, as we show in our brief and our reply brief, our
15  request of one-third is consistent with awards in similar
16  cases, including as we show in the reply papers, cases with
17  bigger funds than this one.
18          But even if we were wrong about that and I'll explain
19  why we're right, that's only one factor and it's not the be
20  all and end all of the analysis. For example, Judge Wolin
21  ruled in the Prudential litigation in his fee opinion on
22  remand from the Third Circuit, after the Third Circuit
23  remanded the fee back to him, Judge Wolin noted that the Third
24  Circuit held that the size of the recovery is not the only
25  factor in determining a fair fee award; other factors such as

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

Page 30

lancaster82205

33

1   quality of counsel are also very significant and come into
2   play at any given time and so Judge Wolin wrote, "at any given
3   level of recovery, the percentage fee that Courts awarded has
4   varied." Quote, "there is no perfect correlation between the
5   appropriate percentage and size of the recovery."
6          We can't look only at the seventh factor. Even if we
7   do, we think we're very, very strong on that factor. U.S.
8   Trust's first argument is to the Court is don't look at the
9   full range of settlements that are out there in the universe,
10  put on the blinders and only look at the 15 ERISA class action
11  settlements, some but not even all of those having awarded
12  lower fees. We think that's wrong for three reasons.
13         First, we don't think there's any reason in the
14  world, and U.S. Trust hasn't cited any, that the Court ought
15  to limit its analysis only to ERISA class actions.
16         Second, we think, and this is highlighted, we think a
17  15-case sample size is far too small.
18         Third, and perhaps most important, is that the U.S.
19  Trust's analysis just blindly pointing to these 15 cases fails
20  to account for the differences between those 15 cases and our
21  case here. Unlike those cases, here the ERISA class is not
22  the tail being wagged by a 10b-5 dog. Usually in these cases
23  the ERISA case just kind of hobbles along as a tail to the
24  securities case and gets settled when the defendants are ready
25  to settle the securities case.

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

34

lancaster82205
1           Here, we pushed our case forward ahead of the
2   securities case, we got our briefing -- we got our
3   consolidated amended complaint on file and our briefing on the
4   motions to dismiss done while the securities plaintiffs were
5   still messing around filing and writing their own consolidated
6   amended complaint.  We pushed forward with discovery while
7   they were doing the brief on motions to dismiss and we got our
8   case settled before those plaintiffs ever even got a decision
9   or I think even completed briefing on their motions to
10  dismiss.  We pushed our case and we're not the tail of the
11  10b-5 dog which is different from the other cases.
12          Second, we got an unusually prompt settlement.
13          And, third, as I said before, we achieved a
14  settlement that is extraordinarily rich not only on an
15  absolute basis, but as a percentage of the class's losses.  So
16  we believe that we are entitled to be rewarded for these
17  accomplishments and to get a higher percentage than was
18  recognized in those other 15 ERISA cases.
19          U.S. Trust then argues in the alternative that even
20  if all securities cases are considered, and, Judge, we think
21  that all cases, not just all securities cases, all cases
22  should be considered, they say even if all securities cases
23  are considered, a NERA study found that fee awards in
24  securities class actions where the settlement was between 25
25  and $100 million, average 26 percent.

JOANNE M. CARUSO, CSR, CRR,   OFFICIAL COURT REPORTER, NEWARK, N.J.

☐

35

1           Again, we think there's three problems with the
2   argument.  First, it ignores the specifics of those other
                            Page 32

lancaster82205
3  cases just like their ERISA argument, the 15-ERISA case
4  argument did.  For example, settlements in that range, 25 to
5  $100 million range typically are in huge, huge mega cases and,
6  therefore, reflect only a very small percentage of the class
7  damages.  There are cases where maybe the class lost a billion
8  dollars and a recovery of 25 or $100 million is mere pennies
9  on the dollar.

10      Here, we recovered 78 percent of the damages and as I
11  said, we think we deserve to be rewarded for that.  The later
12  dollars after all are the hardest dollars in negotiations to
13  get.  Those are the tough ones.  The defendants came in and
14  they knew what the damages were, they were arguing about the
15  market value of these cases.  Those last dollars are the tough
16  ones to get.

17      Second, the NERA study that U.S. Trust points to is
18  "contradicted by NERA's only slightly earlier study."  They
19  had a study a few years early in 1996, that finds that
20  "regardless of case size, fees average approximately 32
21  percent of the settlement."

22      "Third, U.S. Trust's reliance on the NERA study is
23  limited to averages."  It ignores the median, which is the
24  middle number if you were to lay them all out and the mode,
25  which would be the most frequent.

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

ロ

36

1      The NERA study also ignores the median.  It does
2  address the mode, the most frequent.  The one U.S. Trust cites
3  to concedes that "33 percent is still the most frequent
4  percentage, requested in over 40 percent of cases."

Page 33

lancaster82205

5      Finally, in a separate but related argument, U.S.
6  Trust contends that the cases cited in our opening memorandum
7  are not entirely applicable because many of the cases cited
8  are smaller settlements.  So we attempted to address that in
9  our reply brief by showing that there are any number of very
10  large settlements in which the Court awarded fees of at or
11  neared a third.

12      For example, there's a case from this district that's
13  very recent, within the last year, I think it was mid or late
14  November, before Judge Chesler, the Galanti v. Goodyear Tire &
15  Rubber case.  That was a $300 million settlement,
16  substantially more than the settlement in this case.  Judge
17  Chesler awarded a 30 percent or $90 million fee.

18      So as I said at the outset, we believe the Court
19  ought to look at all seven of the Gunter factors.  Indeed,
20  although the fee is a matter in your Honor's discretion, I
21  think the Third Circuit requires that the Court go through all
22  seven of the Gunter factors.  We think all seven of those
23  factors weigh in our favor.

24      Essentially, five or six out of the seven we think
25  U.S. Trust agrees weigh in our favor and even with respect to

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

37

1  comparables, I think when the Court really looks at them, the
2  Court will see that we did better than in those other cases.
3  So we think that we deserve to be on the high end, if indeed,
4  your Honor concludes we are on the high end.

5      THE COURT:    Thank you.

6      Any reply, counsel?

Page 34

lancaster82205

 7          MR. STENGLEIN:  Just a short reply, your Honor.

 8          We have attached the NERA study as exhibit 15,

 9  actually 16 to our papers.  I'll just take issue with a couple

10  of points raised by Mr. Friedman.

11          He's making the assumption in here when he talks

12  about -- which is on page seven of the report, shows for

13  settlements of 25 to $100 million, 26 percent is the average

14  settlement -- average fee award.

15          He says -- he represented to the Court or I guess he

16  was assuming that in those settlements, in the NERA's study

17  that those percentages are based on settlements that are in

18  the billions of dollars.  No where in the NERA report is that

19  issue addressed, so that is for speculation.

20          It doesn't say, frankly, in here for the 26 percent

21  average that it finds for settlements of 25 to 100 million

22  what the claimed damages actually were in those cases, so that

23  is up to speculation.

24          Then as to his point on the NERA's settlement that

25  U.S. Trust doesn't address, that is as he refers to the mode,


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.


                                                    38


 1  he says -- he told the Court, and it's in his papers, that

 2  this 40 percent requested number, the interesting point on

 3  that is that NERA does conclude that in 40 percent of the

 4  cases, counsel requests a 33-percent recovery.  It doesn't

 5  mean that in 40 percent of the cases a 33-percent recovery is

 6  granted.  In fact, NERA makes clear the 25 to $100 million

 7  settlement range, that 26 percent recovery is granted.

 8          That's all, your Honor.

                    Page 35

lancaster82205
9          THE COURT:    Thank you.

10         Court will take a recess until 11:30.  That clock is

11    of no use to you.  It's five minutes after 11.  We'll

12    reconvene at 11:30 and I'll have at least a brief oral

13    presentation and my decision on the counsel fee issue.

14         Thank you.

15         (Recess.)

16         THE COURT:    Remain seated, please, everyone.

17         Before concluding today on a more general note, I

18    will deal specifically with the application for counsel fees.

19         In doing so, I'm, indeed, consulting in depth the

20    particular factors set forth in the Third Circuit Gunter

21    opinion.  I realize these are not to be applied

22    formalistically, and I'll have more to say about that.

23         Let me take them in order.  The first is the

24    reference to the size of the fund and the number of persons

25    benefiting.  For the generation of a $90 million settlement

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

39

1    fund here, approximately 78 percent of the reasonable estimate

2    of punitive damages I believe prepared on the plaintiffs' own

3    behest, if my recollection serves me, it is considerable,

4    certainly weighs in favor of an appropriate award for

5    plaintiffs' counsel.

6         We also have more than 40,000 class members have

7    benefited.  That I think weighs perhaps on both sides of the

8    equation.

9         First, of course, there are a number of persons here

10   who are going to be benefiting by these recoveries, a sizable

Page 36

lancaster82205
11 number who might otherwise have sustained losses, but

12 secondly, that also means that there are a large number of

13 persons who will be participating and who will be looking to

14 this fund to be made whole.

15         I think one has to be concerned, at least somewhat,

16 about the preservation of that portion of the fund which will

17 be available to them as opposed to counsel for the class who

18 are seeking an award as a percentage of the fund.

19         Secondly, the reaction of the class to the terms of

20 the settlement, including, of course, the proposed attorneys

21 fee of 33-and-a-third-percent of the $90 million.  Through the

22 absence of objections, with the few isolated instances that

23 have been addressed in this courtroom today, there has been

24 overwhelming approval or acknowledgement by class members of

25 the appropriateness of the settlement, including at least

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

[]

40

1 inferentially, the amount of the fee requested.  It's not as

2 if dozens and dozens of objectors emerged here contesting the

3 amount of the fee and the impact that that fee would have on

4 the fund available for their recovery.

5         U.S. trustees -- U.S. Trust Company, excuse me, as

6 the independent fiduciary that it is in this matter, validly

7 raised some objection and considerations for the Court and I

8 have done so.  On the other hand, even the U.S. Trust

9 indicated that it had no overall objection to the terms of the

10 settlement, the adequacy of the recovery for the plaintiff

11 class, even on a net basis.  In other words, even a net of 60

12 million would, in U.S. Trust's view, be a good settlement of

Page 37

lancaster82205

13   the class.

14         Item number three, the skill and efficiencies of the
15   attorneys. First, of course, the Court notes that the
16   attorneys in the firms involved in this matter and they are
17   highly experienced and highly skilled in matters of this kind.
18   Moreover, in this case it showed. Those efforts were
19   vigorous, imaginative and prompt in reaching the settlement of
20   this matter with a minimal amount of discovery, for instance,
21   all that was needed to make all parties fully informed and
22   without getting into a full-blown battle on threshold motions
23   as a prelude to settlement which is also the case. It was not
24   necessary here.

25         So both skill and efficiency were brought to the

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

41

1   table here by counsel, no doubt about that.

2         I've already commented briefly on the complexity of
3   this litigation and its likely duration if it had gone through
4   all phases to try, and almost necessarily these matters to at
5   least one level of appeals. The issues would have been
6   complex. The litigation would have been extensive. Among
7   other things, the establishment of damages would have been an
8   equally complex matter.

9         Item number five talks about the risk of nonpayment,
10  to wit:  What risks were taken by plaintiffs' counsel about
11  the possibility of pursuing this action vigorously, ultimately
12  though based on the contingent fee arrangement with no
13  ultimate compensation, plus of course a substantial outlay of
14  expenses are not likely recoverable either. There were,

lancaster82205
15 indeed, factual and legal impediments to the success of the
16 plaintiffs here and also to the detriment of their damages.
17          Needless to say, also, there were uncertainties with
18 regard to the trial and appellate process. That being said,
19 while I agree with plaintiffs' counsel that the Davis Polk
20 report is not a roadmap to success here in the ERISA
21 litigation, it certainly did assist plaintiffs in achieving a
22 basis for the assessment of liability and in large measure at
23 least the assessment of losses due to the impact on the Shell
24 stock, from the activities of those in the Shell security
25 litigation.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

☐

42

1          I note we're dealing here only with allegations in
2 that matter which remains pending. I want to be cautious
3 there, but Davis Polk report surely was of some assistance
4 here and I think I can properly infer that that document,
5 perhaps among others, was a significant catalyst to the
6 settlement in this matter, even on behalf of the present
7 defendants.

8          Item number six talks in terms of the time devoted
9 and that's documented here. A sizable number of hours with
10 approximately $6 million plus in lodestar value, if the Court
11 were approaching the awarded fees on a lodestar basis rather
12 than as a proportion of the fund. Plaintiffs suggest that a
13 4.4 multiplier of this lodestar, if I were approaching the
14 case in this fashion, would have been appropriate here. I'm
15 inclined to disagree somewhat on that point.

16          Once again, albeit due to the abilities and the
Page 39

lancaster82205
17  diligence of counsel here, this case did settle in its earlier
18  stages.  While I might be more inclined to apply a multiplier
19  of that sort to a lodestar in the case that went all the way
20  through to conclusion, I'm not sure that I would do so in a
21  case which settled early.  I also don't feel that that
22  approach generates a disincentive to settlement.
23          We then get to the question of awards in similar
24  cases and all parties seem to acknowledge that that is, at
25  best, an inexact science.  The statistics establish that a

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

43

1  mode for request in the population of cases comparable to the
2  case at bar is somewhere in the vicinity of 33-and-a-third
3  percent.  The Court doesn't find that particularly surprising.
4  Indeed, of course, it has a traditional relationship to
5  contingent fee arrangements in any number of actions.
6          As U.S. Trust pointed out today, what's applied for
7  doesn't necessarily become awarded.  The cases cited by all
8  parties to this Court would seem to generate recovery in a
9  range of somewhere between 19 and 45 percent.  The ERISA
10  population of cases on which U.S. Trust asks the Court to
11  focus is not the only one considered but it surely was worth
12  considering.
13          As I mentioned before, this is not an exact science.
14  Much of course has to be left up to the Court's own experience
15  and feel for what is fair, because what we are ultimately put
16  to here is a question of what award of counsel fees is fair
17  and reasonable, not only to reflect the efforts of plaintiffs'
18  counsel, but also in terms of the residue of the fund to be

Page 40

lancaster82205
19  remaining for the class members.

20          The Court notes that in the Weiss case and that is

21  Weiss v. Mercedes-Benz of North America, at 899 F. Supp. 1297,

22  1995, the very same counsel before this Court on the

23  plaintiffs' side sought an award of 15 percent.  Frankly, that

24  award was -- that application was rather modest and the Court

25  allowed it, although against a different quantification of the

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

44

1   value of the settlement between that which had been tendered

2   by the plaintiffs.

3           The Court also notes that that fee was awarded over

4   and above the settlement fund or the settlements value.  In

5   other words, it was not taken out of the corpus of the fund

6   made available to the class members.

7           Thus, in this Court's view, considering all of the

8   Gunter factors, and once again realizing that it's ultimately

9   charge is fair and reasonable attorneys fee in this case, both

10  expressed in terms of the percentage allowed and of course the

11  absolute dollars of the recovery which are going to be

12  significant in any case, this Court allows attorneys fees of

13  25 percent against the $90 million or a figure of $22.5

14  million.

15          As I understand it, of course, there will be an

16  additional $1 million paid by defendants in expenses to

17  plaintiffs' counsel that is not to be taken from the fund but

18  is from an outside source.

19          I'll now turn back to the question of the order

20  approving the settlement in this case.  The Court determines

Page 41

lancaster82205
21 that the terms of settlement approved in all of its facets are
22 acceptable, fair, reasonable and are approved by this Court.
23         I have dealt with the respective objections tendered
24 here today and those ones stand and can be reflected in any
25 proposed findings of fact and conclusions of law submitted

JOANNE M. CARUSO, CSR, CRR,   OFFICIAL COURT REPORTER, NEWARK, N.J.

0

45

1 here.
2         I considered the factors sometimes known as the
3 Girsch factors, also recited and dealt with seriatim in the
4 Weiss opinion and in doing so, have reached the decision which
5 I have here today with regard to the overall fairness and
6 acceptability of the settlement.
7         Accordingly, merely to summarize here without never
8 to be complete because the findings of fact and conclusions of
9 law obviously will be in greater depth, the Court certifies
10 the class that has been tendered here as an appropriate
11 settlement class, approves the settlement in all its aspects
12 and awards counsel fees of $22.5 million from the $90 million
13 settlement fund, plus the $1 million in expenses also sought.
14         As you know, my tenure on this bench is limited to
15 another nine days and for that reason, I would like to have
16 proposed findings of fact and conclusions of law and any
17 objections to them submitted promptly. I would ask that the
18 plaintiffs and defendants, particularly since you have a
19 sizable familiarity with this matter, submit proposed findings
20 of fact and conclusions of law, as well as proposed finding
21 order or orders as the case may be, electronically filed with
22 the Court by the close of business on this coming Wednesday;

lancaster82205

23  that any objections from any corner either to form or content

24  of those papers shall also be electronically filed no later

25  than 12 noon on this Friday.  That will give the Court the

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

□

46

1  opportunity to review those papers over the weekend and

2  presumably execute them with the proper terms the first of

3  next week.

4        Anything further before we adjourn on behalf of the

5  plaintiffs?

6        MR. HARWOOD:  Your Honor, we have the approved order

7  approving settlement and the judgment.  If your Honor pleases,

8  I can hand these up now.

9        THE COURT:   If you would hand those up now, and I

10  know I've seen them in various forms along the way.  I'm happy

11  to receive them and I can stop my inquiry.

12        MR. HARWOOD:  Paragraph 16 of the order approving the

13  judgment deals with attorneys' fees and there are appropriate

14  blanks in there.

15        THE COURT:   Fair enough.  I can complete them.

16        Anything further on behalf of defendants?

17        MS. ASHTON:  No, your Honor.

18        THE COURT:   Anything on behalf of other counsel?

19        MR. VESELKA:  No, your Honor.

20        MR. BETTIGOLE:  No.

21        MS. SENNETT:  No.

22        THE COURT:   We're adjourned.

23        (Matter concluded.)

24

lancaster82205

25

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------X

In re CITIGROUP PENSION PLAN
ERISA LITIGATION

                                        :
                                        :
                                        :
                                        :    **OPINION AND ORDER**
                                        :
                                        :    **MASTER FILE:  05 Civ. 5296**
**THIS DOCUMENT RELATES TO:**           :    **(SAS)**
**ALL ACTIONS**                         :

------------------------------------------------X

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.   INTRODUCTION

Michael Lonecke, Raymond Duffy, Anne Nelson, Robert S. Fash and

Craig A. Harris, on behalf of themselves and a class of similarly situated

individuals, filed consolidated actions alleging that the Citibuilder Cash Balance

Plan ("Plan") violates the Employee Retirement Income Security Act of 1974, as

amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*  In summary, plaintiffs lodge three

challenges against the Plan.  *First*, they challenge the legality of the Plan's accrual

formula.  *Second*, they assert that because Plan participants never received

adequate notice of Plan amendments in 2000 and 2002, those amendments never

took effect as a matter of law.  *Third,* plaintiffs argue that the Plan unlawfully

discriminates on the basis of age.

Specifically, plaintiffs allege in Counts 1 and II, respectively, that the

Plan is impermissibly backloaded due to insufficient interest credits and that even

if this backloading is cured, the Plan will produce an illegal accrual phenomenon known as a "whipsaw." In Count III, plaintiffs allege that the Plan's "fractional test" method of computing accrued benefits is precluded under ERISA and, in the alternative, the test is being wrongfully applied. In Counts IV and V, plaintiffs allege that the Plan discriminates based on age. Count VI has been withdrawn. In Count VII, Plaintiffs allege that Citigroup Inc., and its Plans Administration Committee ("defendants") failed to provide Plan participants proper notice that the 2000 and 2002 cash balance amendments ("CBAs") would reduce the rate of future benefit accrual.

On August 25, 2006, the parties filed cross-motions for summary judgment on all counts.[1] For the reasons set forth below, summary judgment for plaintiffs is granted in part and denied in part. Summary judgment for defendants is denied.

## II.    BACKGROUND

### A.    Cash Balance Plans

Under a cash balance pension plan, an employer guarantees each participant a retirement benefit premised on a hypothetical account that has been established in each participant's name. These accounts grow over time according to a predetermined formula, driven by two components: (1) the employer's

---

[1]    Plaintiffs also moved for class certification, which I will address in a separate Opinion.

2

hypothetical "contributions," expressed either in dollars or a specified percentage of the participant's current yearly salary (making it a "career average" formula); and (2) hypothetical earnings expressed as interest credits, which can either increase at a fixed rate or be tied to an extrinsic index, such as 30-year Treasury bonds. Employer contributions and interest credits are usually allocated to the accounts annually. Each year participants receive a balance statement so they can review the value of their pension.

Since 1985, when cash balance plans were first introduced, they have become an increasingly popular way to structure retirement pensions. As of 2004, "nearly one-third of Fortune 100 companies had adopted some form of cash balance plan, and a 2002 survey of firms with pension plans containing more than 1000 participants revealed that 10 percent of plans were cash balance plans."[2] Proponents of cash balance plans maintain that from an employee's perspective, they are superior to traditional defined benefit plans because they are easier to understand and they allow benefits to accrue more evenly over the course of a career. They are also more portable than other defined benefit plans, thus allowing workers to change jobs without experiencing significant reductions in benefits.[3]  It

---

[2]    John H. Langbein, et al., *Pension and Employee Benefit Law* 62 (4th ed. 2006) ("Langbein") (citation and quotation marks omitted).

[3]    *See generally* Regina T. Jefferson, *Striking a Balance in the Cash Balance Plan Debate*, 49 Buffalo L. Rev. 513 (2001).

3

is also commonly accepted that cash balance plans are advantageous for employers in that: (1) they are cheaper and less administratively burdensome to maintain; (2) employers retain funding flexibility as long as plans remain solvent; (3) their simplicity fosters employees' appreciation for the value of their pensions; (4) they can significantly reduce future payouts overall, thereby boosting their earnings; and (5) employers reap the benefit of any investment experience on plan assets that exceeds the interest rate assumption.[4]

## B.    Citigroup's Cash Balance Plan

Both parties have agreed to all material facts.[5] The named plaintiffs are present or former employees of either Smith Barney or Citibank, N.A., both of which are divisions of Citigroup Inc. ("Citigroup").[6] They all accrued benefits under the Plan during all or part of the period since January 1, 2000.[7] Two named plaintiffs were vested participants at the time their employment terminated.[8]

### 1.    January 1, 2000 CBA

---

[4]    *See Esden v. Bank of Boston*, 229 F.3d 154, 158 (2d Cir. 2000); *see generally* Dan M. McGill, et al., *Fundamentals of Private Pensions* 262-64 (8th ed. 2005) ("McGill").

[5]    *See* Joint Stipulations ("Joint Stips.").

[6]    *See id.* ¶¶ 1-6.

[7]    *See id.* ¶ 7. The cash balance plan at issue here is one of three pension plans that presently comprise the Citigroup Pension Plan ("Citigroup Plan"). *See id.* ¶ 8.

[8]    *See id.* ¶ 7.

4

In October 1998, Citicorp merged with Travelers Corporation ("Travelers"), and their respective pension plans also merged.[9]  Importantly, the provisions on plan amendments set forth in the Travelers Plan were incorporated into the Citibank Plan as of December 31, 1998.  Pursuant to these provisions, authority to amend the Citibank Plan was vested with the plan sponsor, Citigroup, "by action of its Board of Directors" ("Board").[10]

In a meeting on October 19, 1999, the Board exercised this authority by adopting a series of resolutions going to the heart of plaintiffs' case.  Pertinent excerpts of the meeting minutes state:

> an amendment to the Citigroup Inc. Pension Plan incorporating the cash balance design for certain subsidiaries of the Company, on substantially the terms as previously presented to the Board is hereby approved . . . .[11]

Although the provisions of the amendment were not set forth in an executed Citibuilder Retirement Plan document until May 2001,[12] plan participants

---

[9]    See id. ¶¶ 2, 14, 15.

[10]    Id. ¶ 14.

[11]    Minutes of the 10/19/99 Board meeting ("10/19/99 Minutes"), Ex. 4 to Joint Stips.  This resolution refers to an earlier presentation on employee benefits made to the Board on March 16, 1999, by Paul J. Collins, Vice Chairman of Citigroup. Collins' presentation included a report on how a cash balance formula could be incorporated into the Citigroup Pension Plan. See Joint Stips. ¶ 16.

[12]    See Joint Stips. ¶ 18; 5/27/01 Action of Senior Human Resources Officer Michael Schlein ("Schlein Action"), Ex. 7 to Joint Stips.  The 2000 CBA was also

5

did receive notification of the amendment in December 1999 – after the Board's
vote and prior to the CBA's effective date, January 1, 2000. Notice was mailed to
all effected employees by a letter dated December 9, 1999, from Tim Peach,
Director of Retirement Benefits.[13] Attached to the letter was a document entitled –
in large boldfaced letters – "The Citigroup Pension Plan Notice of Significant
Reduction in Benefit Accruals for Certain Employees of Citigroup Inc. and its
Subsidiaries" ("December 1999 § 204(h) notice").[14] This notice contained a
general summary of how the cash balance formula would work, as well as a table
listing the percentages of salaries that would be credited to accounts annually, such
percentages being based on an employee's age and years of service.[15] The notice
did not include specifics or mention the Plan's application of the fractional test for
compliance with statutory accrual principles. Readers with questions were directed

---

described in a summary plan description dated January 1, 2001, but this document
was not made available to employees until June 2001. *See* Joint Stips. ¶ 18. As of
January 2000, information about the 2000 CBA was also available on the
Company intranet, as part of a question and answer document ("Q & A Doc.")
offering information to Plan participants about their new benefits. *See* Q & A
Doc., Ex. 15 to Joint Stips.

[13]    *See* 12/9/99 Letter and Attachments from Tim Peach ("December 1999 §
204(h) notice"), Ex. 16 to Joint Stips.

[14]    *Id.* At least one named plaintiff, Lonecke, recalls receiving this notice at his
residence in late 1999. *See* Joint Stips. ¶ 31.

[15]    *See* December 1999 § 204(h) notice.

6

to "[p]lease see the brochure titled *Your New Citigroup Benefits,* which [they] received earlier this year, for more details."[16]

As noted above, the provisions of the newly adopted cash balance plan were not set forth in a written document until May 27, 2001.[17] Plan Article 4.1 lays out the funding scheme giving rise to plaintiffs' claims, and states, in pertinent part, as follows:

4.1    Accounts

(a)    General.  The Account of a Participant shall be the sum of the Interest Credits and Benefit Credits credited to the Account established for such Participant following his entry into this Plan in accordance with Article II.  The opening balance for each Participant in his Account shall be zero.  Notwithstanding any provision to the contrary, in no event shall an Account be credited with any amount prior to January 1, 2000.

(b)    Benefit Credits.    The Account of a Participant shall be credited with a Benefit Credit as of the last day of each of the Plan Years in the period beginning with the Plan and ending with the Plan Year in which a Participant's employment with an Employer is terminated.    The Benefit Credit shall be equal to the applicable percentage of the Participant's Compensation paid by an Employer during the Plan Year, as determined by the Participant's age and Years of Credited Service as of the end of such Plan Year in accordance with Table 4.1(b) below; provided,

(1)    [omitted]

---

[16]    *Id.*

[17]    *See* Schlein Action.

7

(2)    with regard to the Plan Year in which the Participant's employment with an Employer is terminated, (A) the Benefit Credit shall be determined by the Participant's age and Years of Credited Service as of the date of termination, (B) Compensation shall be recognized for this purpose only through such date of termination, and (C) such Benefit Credit shall be made as of the date of termination instead of the last day of such Plan Year.

| TABLE 4.1(b) | | | |
|---|---|---|---|
| **Benefit Credits Based on Participant's Age and Years of Credited Service** | | | |
| | **Percentage of Plan Year Compensation Credited to Participant's Account** | | |
| **Participant's Age** | Less Than 6 Years of Credited Service | At Least 6 But Less Than 11 Years of Credited Service | At Least 11 But Less Than 15 Years of Credited service | 15 Years of Credited Service or More |
| Up to Age 24 | 2.0% | 2.0% | n/a | n/a |
| Age 25 to 29 | 2.5% | 2.5% | 2.5% | n/a |
| Age 30 to 34 | 3.0% | 3.0% | 3.0% | 3.0% |
| Age 35 to 39 | 4.0% | 4.0% | 4.0% | 4.0% |
| Age 40 to 44 | 4.0% | 4.0% | 4.0% | 4.0% |
| Age 45 to 49 | 4.0% | 5.0% | 6.0% | 6.0% |
| Age 50 and Over | 4.0% | 5.0% | 6.0% | 7.0% |

(c)    Minimum Benefit Credit.  [T]he minimum Benefit Credit each Plan Year . . . for any Participant who is a Full-Time Employee shall be $500 . . . .

(d)    Interest Credits.  The Account of a Participant shall be credited with an Interest Credit as of the last day of each of the Plan Years in the period beginning with the Plan Year next following the date on which a Benefit Credit is first made to a Participant's Account and ending with the

Plan Year in which the Participant's Benefit Commencement Date occurs . . . .[18]

Article 4.1(e) establishes the fractional rule as the Plan's mechanism for complying with ERISA's minimum accrual standards:

(e)   Minimum Account. Notwithstanding the benefit described in § 4.1(a) above, if the Account at the date a Participant ceases to be eligible to earn Benefit Credits ("Determination Date") has accrued so that the accrual does not meet the requirements of § 411(b)(1) of the Code and the Treasury regulations issued thereunder, there shall be added to the Account the amount described in paragraph (4) below calculated as follows:

(1)   The projected value ("Projected Value") of a Participant's Account is calculated by projecting the Account at the Determination Date to the Participant's Normal Retirement date (using the *average* Compensation for the Participant, as determined in accordance with § 411(b)(1)(A) of the Code and the Treasury regulations issued thereunder, and the same rate used to calculate Interest Credit ("Interest Rate") as in the year of the Determination Date) assuming for these purposes that the Participant continued to earn Benefits Credits through the Normal Retirement Date.

(2)   Determine the minimum account ("Minimum Account") by multiplying the Projected value by a fraction, the numerator of which is the Participant's Years of Vesting Service and the denominator of which is the Years of Vesting Service plus the number of years and months from the Participant's Determination Date to the Participant's Normal Retirement Date.

(3)   Calculate the excess, if any, of the Minimum Account, over the Account at Determination Date future valued to the

---

[18]   Plan Article 4.1(a)-(d), Ex. 1 to Joint Stips. ("Plan Article 4.1").

9

Normal Retirement Age of the Participant using the Interest Rate.

(4) Calculate the quotient of the amount determined in paragraph (3) above divided by a present value factor (equal to 1 plus the Interest Rate, the sum of which is raised to a power equal to the number of months divided by 12 from Determination Date to Normal Retirement Date).[19]

## 2.    January 1, 2002 CBA

The 2002 CBA incorporated the same cash balance regime adopted in 2000, but recalibrated the range of benefit credits that would be allotted annually to employees' hypothetical accounts. It lowered the floor from 2% to 1.5% of compensation for participants under age twenty-nine in their first five years of credited service. It also lowered the ceiling from 7% to 6% of compensation for participants fifty-five years or older with fifteen or more years of credited service ("2002-Present Benefit Credits").[20] The application of the fractional rule under Article 4.1(e) remained unchanged.

The first and only communication to Plan participants in 2001 of an amendment pursuant to ERISA § 204(h) was an information package dated December 2001.[21] Although different versions of the packages were prepared,

---

[19]    *Id.* (emphasis added).

[20]    *See* Joint Stips. ¶¶ 24-25.

[21]    *See id.* ¶¶ 35-36.

they all contained:  (i) a cover letter dated December 5, 2001, from Tyrrell Erbes,

Citigroup's Director of Retirement Benefits; (ii) a document entitled "Notices to

Interested Parties;" and (iii) a document entitled "Citigroup Pension Plan 204(h)

Notice."[22]  As with the December 1999 § 204(h) notice, there is no mention of the

Plan's application of the fractional rule.[23]  The named plaintiffs do not recall

receiving these packages, nor do they recall being aware in December 2001 that the

2002 CBA "might substantially reduce benefit accruals for themselves or others."[24]

## III.    APPLICABLE LAW

### A.    Standard of Review

Summary judgment is appropriate if the record "show[s] that there is

no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."[25]  An issue of fact is genuine if "the evidence is such

---

[22]    December 2001 § 204(h) Packages (collectively, "December 2001 § 204(h)
notices"), Exs. 19-21 to Joint Stips.  Exhibits 19, 20, and 21 are different versions
of the package that were specifically tailored for, respectively, legacy Citibank
employees, legacy Travelers employees and legacy employees of Associates First
Capital ("Associates"), a company acquired by Citigroup in 2000.

[23]    *See id.*

[24]    Joint Stips. ¶ 37.  Defendants stipulate that had plaintiffs been aware of the
implications of the 2002 CBA, they would have initiated legal action earlier than
they did. *See id.*

[25]    Fed. R. Civ. P. 56(c).

11

that a jury could return a verdict for the nonmoving party."[26] A fact is material

when it "'might affect the outcome of the suit under the governing law.'"[27] The

movant has the burden of demonstrating that no genuine issue of material fact

exists.[28]

In turn, to defeat a motion for summary judgment, the non-moving

party must raise a genuine issue of material fact that does "'not rely on conclusory

allegations or unsubstantiated speculation.'"[29] To do so, it must do more than

show that there is "'metaphysical doubt as to the material facts.'"[30] In determining

whether a genuine issue of material fact exists, the court must construe the

evidence in the light most favorable to the non-moving party and draw all

justifiable inferences in that party's favor.[31]

---

[26]    *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). *Accord Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).

[27]    *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).

[28]    *See Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[29]    *Jeffreys*, 426 F.3d at 554 (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2002)).

[30]    *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[31]    *See Golden Pac. Bancorp v. FDIC*, 375 F.3d 196, 201 (2d Cir. 2004).

**B.     Statute of Limitations**

Although ERISA does not prescribe a statute of limitations for civil

actions, where parties seek to recover higher benefits from a pension plan, the

appropriate statute of limitations is six years – the limitations period specified in

the most analogous state statute.[32] The Second Circuit has held that the six-year

statute of limitations does not begin to run until "there has been a repudiation by

the fiduciary which is *clear* and made known to the beneficiaries."[33] Typically, the

statute of limitations period begins when a participant's formal application for

benefits is denied.[34] In some circumstances, however, the time period may begin

earlier.[35]

**C.     ERISA's Minimum Accrual Rules**

Although cash balance plans mimic some of the same features of

defined contribution plans, in this Circuit they are treated as defined benefit

---

[32]    *See Miles v. New York State Teamsters Conference Pension and Ret. Fund,*
698 F.2d 593, 598 (2d Cir. 1983) (holding that because employee benefit plans are
contracts, under New York law the applicable statute of limitations is six years)
(citing N.Y. C.P.L.R. § 213).

[33]    *Davenport v. Harry N. Abrams, Inc.,* 249 F.3d 130, 134 (2d Cir. 2001).

[34]    *See Lewis v. John Hancock Mut. Life Ins. Co.,* 6 F. Supp. 2d 244, 247
(S.D.N.Y. 1998).

[35]    *See Carey v. International Bhd. of Elec. Workers Local 363 Pension Plan,*
201 F.3d 44, 49 (2d Cir. 1999) (holding that the statute of limitations may be
triggered upon a participant's receipt of a plan amendment or letter).

plans.[36]  "The regulatory consequences of this [defined benefit plan] classification

are wide-reaching."[37]  One critical consequence is that the term "accrued benefit"

under a cash balance plan means "a participant's accrued benefit determined under

the plan . . . *expressed in the form of an annual benefit commencing at normal*

*retirement age.*"[38]

Although ERISA does not require pension plans to pay out a specific

dollar amount, it does regulate the rate at which benefits accrue.[39]  A paramount

reason for this is to prevent "backloading," a term of art describing a plan's use of

a benefit accrual formula that postpones the bulk of an employee's accrual to her

---

[36]     *See Esden*, 229 F.3d at 158.

[37]     *Id.*

[38]     *Id.* at 163 (citation and quotation marks omitted).  By contrast, for defined
contribution plans, the term "accrued benefit" is "simply 'the balance of an
individual's [hypothetical] account.'"  *Id.* at 162 (citation omitted).

[39]     *See* ERISA § 204(b)(1), 29 U.S.C. § 1054(b)(1).  There is significant
statutory overlap between ERISA and the Internal Revenue Code ("I.R.C.") on
matters such as funding, vesting and benefit accrual.  This is because much of Title
I of ERISA, codified at Title 29 of the United States Code, was duplicated in Title
II, which was codified as amendments to the I.R.C.  While the Internal Revenue
Service ("IRS") has primary jurisdiction and rule-making authority over these
ERISA provisions, "[r]egulations prescribed by the Secretary of the Treasury
[under I.R.C. §§ 440 and 441] shall also be used to implement the related
provisions contained in [ERISA]," and ERISA § 3002(c) specifically adopts the
regulations promulgated under I.R.C. §§ 410(a), 411, and 412.  *Esden*, 229 F.3d at
158.

14

later years of service. Given the time value of money, it is not surprising that plan sponsors are often tempted to backload pension benefits.

To combat backloading, ERISA requires plans to accrue benefits relatively evenly over the course of an employee's career.[40] ERISA sets forth three alternative tests for monitoring accrual rates; in order to be lawful a plan must satisfy at least one of these formulas.[41] These formulas are construed as "minimum accrual standards" to the extent that they tether plans to a controlled, steady baseline of benefit accrual.[42] The first alternative is the "3 percent rule."[43] The

---

[40]    It is well-established that the purpose of section 204(b)(1) is to limit the extent of backloading in benefit plans. *See, e.g., Langman v. Laub*, 328 F.3d 68, 71 (2d Cir. 2003); McGill at 262; Langbein at 157.

[41]    ERISA § 204(b)(1); 29 U.S.C. § 1054(b)(1). *Accord Esden*, 229 F.3d at 158-59. ERISA's vesting rules by themselves offer insufficient protection against backloading. Langbein explains this with a simple hypothetical: "Consider what might happen if the statute prescribed vesting but did not regulate accrual rates. A plan could be designed that would vest employees in 100 percent of accrued benefits after five years, thereby complying fully with ERISA's five-year cliff vesting schedule; yet the formula for accruing benefits under the plan could provide that employees accrue no benefits (or very skimpy benefits) over, say, the first twenty years of employment. Thereafter benefits would accrue very rapidly. Under such a plan, an employee would be 100 percent vested after the fifth year in a pension plan with a benefit of nothing . . . [as] 100 percent of nothing is [still] nothing." Langbein at 157.

[42]    *See* Plaintiffs' Memorandum in Support of Summary Judgment ("Pl. SJ Mem.") at 3.

[43]    *See* ERISA § 204(b)(1)(A); 29 U.S.C. § 1054(b)(1)(A). Neither party advocates utilizing this test.

15

second alternative, set forth in ERISA section 204(b)(1)(B), is known as the "133

⅓ percent rule" and provides that:

> A defined benefit plan satisfies the requirements of this paragraph of a particular plan year if under the plan the accrued benefit payable at the normal retirement age is equal to the normal retirement benefit and the annual rate at which any individual who is or could be a participant can accrue the retirement benefits payable at normal retirement age under the plan for any later plan year is not more than 133 1/3 percent of the annual rate at which he can accrue benefits for any plan year beginning on or after such particular plan year and before such later plan year. For purposes of this subparagraph--
>
> (i) any amendment to the plan which is in effect for the current year shall be treated as in effect for all other plan years;
> (ii) any change in an accrual rate which does not apply to any individual who is or could be a participant in the current year shall be disregarded [;]
> (iii) the fact that benefits under the plan may be payable to certain employees before normal retirement age shall be disregarded; and
> (iv) social security benefits and all other relevant factors used to compute benefits shall be treated as remaining constant as of the current year for all years after the current year.[44]

Thus the 133 ⅓ percent rule prevents backloading by constricting the fluctuation of

accrual rates from year to year.

The third alternative, set forth in ERISA section 204(b)(1)(C), is

called the "fractional rule" because it prorates the projected normal retirement

benefit over the years of plan participation.[45]  A plan satisfies the fractional rule

---

[44]    ERISA § 204(b)(1)(B); 29 U.S.C. § 1054(b)(1)(B).

if the accrued benefit to which any participant is entitled upon his separation from the service is not less than a fraction of the annual benefit commencing at normal retirement age to which he would be entitled under the plan as in effect on the date of his separation if he continued to earn annually until normal retirement age the same rate of compensation upon which his normal retirement benefit would be computed under the plan, determined as if he had attained normal retirement age on the date on which any such determination is made (but taking into account no more than the 10 years of service immediately preceding his separation from service). Such fraction shall be a fraction, not exceeding 1, the numerator of which is the total number of his years of participation in the plan (as of the date of his separation from the service) and the denominator of which is the total number of years he would have participated in the plan if he separated from the service at the normal retirement age.[46]

In simpler terms, under the fractional rule, in any given year, benefit accrual is "based upon the assumption that the participant will continue, until normal retirement age, to earn the same rate of compensation that would have been taken into account under the plan had the employee retired in that year."[47]

### D.    Unlawful Whipsaws

The "whipsaw" phenomenon is "widely recognized in the practice literature."[48] Whipsaws occur because in order for cash balance plans to satisfy the

---

[45]    *See* ERISA § 204(b)(1)(C); 29 U.S.C. § 1054(b)(1)(C).

[46]    *Id.*

[47]    McGill at 263.

[48]    *Esden*, 229 F.3d at 159.

interest rate requirements of ERISA and the I.R.C., participants' accrued benefits must not fall below the actuarial equivalents of such benefits.

> [T]his means that: (1) the accrued benefit under a defined benefit plan must be valued in terms of the annuity that it will yield at normal retirement age; and (2) if the benefit is paid at any other time (*e.g.*, on termination rather than retirement) or in any other form (*e.g.*, a lump sum distribution, instead of annuity) it must be worth at least as much as that annuity.[49]

The actuarial equivalent is determined by projecting the account balance forward to normal retirement age using a plan's prescribed "projection interest rate"[50] and then discounting it back to present value using the applicable statutory interest rate ("discount rate").[51] "If the plan's projection rate exceeds the [] discount rate, then the present value of the accrued benefit will exceed the participant's account balance."[52] A "whipsaw" has occurred. If the larger amount is not paid out, an "impermissible forfeiture has occurred in violation of ERISA § 203(a) and I.R.C. § 411(a)(2)."[53]

### E.     Adequate § 204(h) Notice

---

[49]     *Id.* at 163-64.

[50]     This rate is different from the variable interest rate used by a plan to determine the interest credit allocated to account balances each year.

[51]     *See Esden*, 229 F.3d at 159.

[52]     *Id.*

[53]     *Id.*

In order "to safeguard benefits that have been promised to employees," Congress enacted notice requirements that forbid plan sponsors to amend "a plan in a way that reduces future benefit accrual without notice to plan participants."[54] Congress predicated the legitimacy of plan amendments on two critically important ERISA provisions.[55] "First, ERISA's anti-cutback rule protects employees' expectations in their accrued benefits" by prohibiting amendments that would decrease "'the accrued benefit of a participant under a plan.'"[56] Second, ERISA § 204(h) forbids plan sponsors to amend "a plan in a way that reduces future benefit accrual without notice to plan participants."[57] Providing adequate notice is a precondition to the effectiveness of plan amendments.[58] As the Second Circuit recently held, an ERISA amendment "tak[es] place at the

---

[54]    *Frommert v. Conkright*, 433 F.3d 254, 263 (2d Cir. 2006).

[55]    *See id.*

[56]    *Id.* (quoting ERISA § 204(g)(1); 29 U.S.C. § 1054(g)(1)).

[57]    *Id.*

[58]    *See, e.g., Hirt v. Equitable Ret. Plan for Employees, Managers and Agents*, 441 F. Supp. 2d 516, 531 (S.D.N.Y. 2006) (citation omitted).

moment when employees are properly *informed* of a change . . . in the text of the plan."[59]    At all times relevant to the 2000 and 2002 CBAs, § 204(h) stated:

> (h)    Notice of significant reduction in benefit accruals
> (1) A [pension] plan . . . may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than fifteen days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date, to –
> (A) each participant in the plan . . . .[60]

Guidelines promulgated by the IRS[61] clarify that § 204(h) notice is required where an amendment is "reasonably expected to change the amount of the future annual benefit commencing at normal retirement age."[62]    Specifically, whether an

---

[59]    *Frommert*, 433 F.3d at 262-63 (looking to the "plain meaning" of the term and rejecting defendants' argument that an amendment occurs upon administrators' modification of a plan).

[60]    ERISA § 204(h); 29 U.S.C. 1054 § 204(h).  Section 204(h) was amended in 2001. *See* Pub. L. 107-16 § 659(b), 115 Stat. 38 (2001).

[61]    Temporary regulations were issued in 1995, and final regulations were issued in 1998. *See* Temp. Treas. Reg. § 1.411(d)-6T, 60 Fed. Reg. 64,320 (1995); Prop. Treas. Reg. § 54.4980F-1, 60 Fed. Reg. 64,401 (Dec. 15, 1995). The temporary regulations were applicable for plan amendments adopted on or after December 15, 1995, and effective on or after January 2, 1996, in order to "assure that the rights of participants in plans subject to § 204(h) of ERISA are protected." 60 Fed. Reg. at 64,402. After notice and comments, final regulations were issued December 14, 1998, and applied to plan amendments adopted on or after December 12, 1998. *See* Treas. Reg. § 1.411(d)-6, 63 Fed. Reg. 68,678 (1998).

[62]    63 Fed Reg. 68,681 (1998).

20

amendment provides for a "significant reduction" in accrual rates under § 204(h) is determined "based on reasonable expectations taking account the relevant facts and circumstances at the time the amendment is adopted."[63]  In order to comply, notices may contain "a summary of the amendment, rather than the text of the amendment, if the summary is written in a manner calculated to be understood by the average plan participant."[64]

### F.    ERISA's Age-Based Accrual Rules

ERISA's anti-age discrimination provision for defined benefit plans states that "[a] defined-benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the *rate of an employee's benefit accrual* is reduced, because of the attainment of any age."[65]  Presently, there is a split within this Circuit as to whether cash balance plans violate this provision. Two district courts have held that cash

---

[63]    *Id.*

[64]    *Id.* at 68,682.

[65]    ERISA § 204(b)(1)(H)(i); 29 U.S.C. § 1054(b)(1)(H)(i) (emphasis added). The age discrimination test for defined-contribution plans differs significantly: "A defined-contribution plan satisfies the requirements of this paragraph if, under the plan, allocations to the employee's account are not ceased, and the rate at which amounts are allocated to the employee's account is not reduced, because of the attainment of any age." ERISA § 204(b)(2)(A); 29 U.S.C. § 1054(b)(2)(A).

balance plans are age discriminatory, [66] and two have held they are not. [67] For reasons set forth in Part IV.D below, I join in finding that cash balance plans unlawfully discriminate on the basis of age.

### G.    Remedial Measures

ERISA provides for the civil enforcement of its provisions. Under section 502(a)(1)(B), a participant or beneficiary may bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."[68] The statute further provides that plaintiffs may seek "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."[69]

## IV.    DISCUSSION

### A.    Statute of Limitations

---

[66]    *See Hirt*, 441 F. Supp. 2d 516; *Laurent v. PriceWaterhouseCoopers, LLP*, 448 F. Supp. 2d 537 (S.D.N.Y. 2006). *Hirt* is now pending before the Second Circuit Court of Appeals (notice of appeal filed Oct. 13, 2006).

[67]    *See In re J.P. Morgan Chase Cash Balance Litig.*, No. 06 Civ. 732, 2006 WL 3063424 (S.D.N.Y. Oct. 30, 2006) ("*J.P. Morgan*"); *Richards v. Fleet Boston*, 427 F. Supp. 2d 150 (D. Conn. 2006).

[68]    ERISA § 502(a)(1)(B); 29 U.S.C. § 1132(a)(1)(B).

[69]    ERISA § 502(a)(3); 29 U.S.C. § 1132(a)(3).

As a preliminary matter, I find that plaintiffs' claims are timely.[70]  For

even assuming, arguendo, that the clock began at the earliest plausible moment –

upon plaintiffs' receipt of the December 1999 § 204(h) notice[71] – this action would

still be timely because it was commenced on February 3, 2005, less than six years

from that date.

### B.    The Plan's Accrual Formula (Counts I, II, III)

#### 1.  Application of the Fractional Rule and Impermissible Backloading

The Plan's cash balance formula misapplies the fractional rule in a

way that not only fails to guard against backloading – it *enables* backloading.  The

Plan's use of the fractional rule violates section 204(b)(1) because as a career

average plan, the only applicable accrual test is the 133 ⅓ rule.[72]  By its very terms,

---

[70]    Defendants argue that the Court should apply a three-year statute of limitations. *See* Defendants' Memorandum of Law in Support of Summary Judgment ("Def. SJ Mem.") at 17-18.  In arguing for a three-year time limit, defendants ignore – without attempting to distinguish – many Second Circuit decisions.

[71]    *See Carey*, 201 F.3d at 47-48 (the limitations period begins upon a clear and known repudiation of the benefits to which participants were previously entitled); *see also Miles*, 698 F.2d at 598.

[72]    *See Eaton v. Onan Corp.,* 117 F. Supp. 2d 812, 843 (S.D. Ind. 2000) (observing that the three percent rule and the fractional rule "pertain only to plans that take into account no more than ten years of service in calculating benefits"); *Register v. PNC Fin. Servs. Group, Inc.,* No. 04 Civ. 6097, 2005 WL 3120268, at *3 (E.D. Pa. Nov. 21, 2005) ("Since a cash balance plan is calculated using a career pay history, only [the 133 ⅓ percent test] is applicable"); *see also* McGill at

23

the fractional rule may only be applied to participants with ten or fewer years of service.[73] Defendants argue that the Citigroup cash balance formula does not violate this limitation because "for purpose of applying the fractional test, average compensation is calculated based only on the last ten" years of an employee's service.[74] Under Plan Article 4.1(e), if this calculation reveals that an individual's hypothetical account balance is less than the minimum amount required by section 204(b)(1)(C) of ERISA, Citigroup credits the participant the difference.[75] Defendants assert that this supplementary contribution brings accrued pensions into compliance with the minimum benefit required by the fractional rule.[76] However, this lump-sum contribution, made on the eve of the benefit payout, is

---

263 (noting that the "133 ⅓ percent rule governs all plans using a career average formula").

[73]    *See* ERISA § 204(b)(1)(C); 29 U.S.C. § 1054(b)(1)(C); *see also* Treas. Reg. § 1.411(b)-1(b) (observing that consistent with the ten year limitation, the fractional rule could be applied "to a benefit based on average compensation").

[74]    Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment ("Def. Opp. Mem.") at 2-4.

[75]    *See* Plan Article 4.1(e).

[76]    *See* Def. Opp. Mem. at 3.

inadequate precisely because it permits the backloading that the fractional rule was designed to prevent.[77]

The Plan's unorthodox application of the fractional test only upon a participant's separation from service, rather than on a year-by-year basis, ignores the statutory scheme requiring pension plans to *be able* to test compliance with accrual rules "in any given year," or even any given moment.[78] The Citigroup formula also contravenes the well-acknowledged purpose of the mandatory accrual tests, which is to prevent the backloading of benefits.[79] In applying the fractional

---

[77] Defendants' contention that the Secretary of the Treasury has "unequivocally" offered his "express endorsement of the fractional test for career average plans" misinterprets the Treasury Regulations. Def. Opp. Mem. at 2-3. *See* 26 C.F.R. § 1.411(b)-1(b)(3)(iii) Ex. (2). Not a single authority cited by defendants in support of the Plan's legality approved of an accrual schedule similar to that prescribed by Plan Article 4.1(e).

[78] *Alessi v. Raybestos-Manhattan*, 451 U.S. 504, 514 (1981) (describing the fractional rule as "essentially a pro rata rule under which *in any given year*, the employee's accrued benefit is proportionate to the number of years of service as compared with the number of total years of service appropriate to the normal retirement age") (emphasis added); *see also* Treas. Reg. § 1.411(b)-1(b) ("The fractional rule operates to prevent back-loading and ensures a *proportional rate of benefit accrual*. It compares the part of the final benefit payable to a participant *at any time* (for example, accrued benefit) to the normal retirement benefit . . . .").

[79] *See Langman*, 328 F.3d at 71 (quoting the House Report on ERISA: "The primary purpose of [minimum accrual rates] is to prevent attempts to defeat the objectives of the minimum vesting provisions by providing undue 'backloading,' i.e., by providing inordinately low rates of accrual in the employee's early years of service when he is most likely to leave the firm and by concentrating the accrual of benefits in the employee's later years of service when he is most likely to remain

rule only once, at the end of an employee's Plan participation, Article 4.1(e) strips the rule of its functionality because it can no longer "regulate the rate at which benefits may accrue."[80] Without its consistent application, the fractional test is powerless to "prevent [the Plan] from designing accrual schedules that circumvent the vesting rules by providing that the great preponderance of benefits accrues only in the last years of employment."[81] If such applications of the fractional rule were permissible, plans would be free to adopt formulas providing a mere pittance of benefit accrual over, say, the first twenty years of employment, and thereafter have benefits accrue rapidly by tacking on an additional amount, much like the Citigroup Plan does.

To the Court's dismay, plaintiffs' characterization of Article 4.1(e) as a novel end-run around ERISA's minimum accrual standards is accurate.[82] Defendants downplay their gutting of the fractional rule as a harmless modification that is permissible because it is not expressly prohibited by statutory text.[83] More

---

with the firm until retirement." H.R. Rep. No. 93-807 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4688).

[80]     *Esden*, 229 F.3d at 154.

[81]     *Id.*

[82]     *See* Pl. SJ Mem. at 8.

[83]     *See* Def. SJ Mem. at 7.

accurately, it is a bold and exploitative contortion of the rule. While defendants "do[] not (and cannot) dispute" that they are bound to comply with ERISA's accrual rules, they have nonetheless "resist[ed] – and ha[ve] tried to draft around – [their] consequences."[84] The Court takes Congress' efforts to prevent the backloading of pension benefits quite seriously. The Plan's accrual formula is unlawfully structured to allow for impermissible backloading. Accordingly, summary judgment is granted in plaintiffs' favor on Counts I and III.[85]

### 2. Reformation of the Plan to Comply with the 133 ⅓ Percent Rule and Avert Whipsaw

Having found Article 4.1(e)'s use of the fractional rule impermissible, I turn to the Plan's mandatory compliance with the 133 ⅓ percent rule. Defendants have stipulated that since January 1, 2002, the accrual formula has not satisfied the 133 ⅓ percent rule.[86] In arguing for a reformation of the Plan, plaintiffs request the

---

[84]    *Esden*, 229 F.3d at 159.

[85]    Having granted summary judgment for plaintiffs on Counts I and III, I need not engage in a theoretical and mathematically complicated discussion of whether the Plan – once cured of its unlawful backloading – produces an impermissible whipsaw. Accordingly, plaintiffs' motion for summary judgment on this issue is denied without prejudice and with leave to renew should it become necessary to do so.

[86]    By virtue of the 30-Year Treasury Bill rates in effect from January 1, 2000 through December 31, 2001, which ranged from 5.12% to 6.63%, the Plan's overall rate of accrual during these years satisfied the 133 ⅓ percent rule. *See* Joint Stips. ¶ 49.

imposition of an interest credit floor that will compensate for the backloaded pay credits while averting whipsaw.[87]  The Court declines to direct defendants to adopt plaintiffs' reformation proposals, but hereby orders defendants to reform the Plan consistent with the requirements of ERISA, retroactive to January 1, 2000.

### C.    Adequate § 204(h) Notice (Count VII)

Both the December 1999 § 204(h) and December 2000 § 204(h) notices omitted any mention of the benefit formula's unorthodox approach to calculating benefits and monitoring accrual rates.  Because it was ultimately revealed that the formula included an unlawful application of the fractional rule, which had the effect of keeping accrual rates below the minimum rate prescribed by statute, defendants' failure to either include or summarize Article 4.1(e) in the notices violated § 204(h).[88]

Adequate notice is critical to ensure the "meeting of expectations in the context of ERISA."[89]  Plaintiffs had every reason to expect that under the new

---

[87]    *See* Pl. SJ Mem. at 11.  Plaintiffs would fix this minimum interest rate at twenty-five percent.  *See id.*  However, defendants' actuary maintains that this percentage would result in enormous windfalls for participants.  *See* 9/28/06 Affidavit of Lawrence Sher ("Sher Aff.") ¶¶ 4-5.

[88]    Because I find the December 1999 and the December 2000 § 204(h) notices substantively inadequate, I need not, and do not, reach the issue of whether distribution of the December 2000 § 204(h) notice was procedurally adequate.

[89]    *Hirt*, 441 F. Supp. 2d at 538.  *Accord Amato v. Western Union International, Inc.*, 773 F.2d 1402, 1409 (2d Cir. 1985) ("[T]here can be no doubt that ERISA

cash balance plan, their pensions would continue to accrue at a rate approved by Congress. It therefore is immaterial that the December 1999 § 204(h) notice stated in bolded font that the 2000 CBA could result in a reduction of their benefits. Given the material omissions, it remained "insufficiently 'accurate and comprehensive to reasonably apprise [Plan] participants and beneficiaries of their rights.'"[90] Nor can it be said that the notices "allow[ed] applicable individuals to understand the effect of the plan amendment" because plaintiffs were without fair warning that the formula endangered their right to a minimum rate of benefit accrual.[91]

Defendants submit that the notice claims should be dismissed for plaintiffs' failure to show that they suffered any prejudice as a result of the allegedly deficient § 204(h) notices, as required by *Frommert*.[92] Defendants argue that the "only consequence" here was plaintiffs' failure to commence this litigation

---

was enacted for the purpose of assuring employees that they would not be deprived of their reasonably-anticipated pension benefits . . . .").

[90]    *Frommert*, 433 F.3d at 267 (quoting 29 U.S.C. § 1022(a)).

[91]    68 Fed. Reg. at 17,283 (1998). It is also difficult to imagine that the authors of Plan Article 4.1(e) were unaware that it pushed the boundaries of section 204(b)(1) compliance. Given the sub-standard accrual rates that resulted and the long delay in publishing the provision in a written Plan document, it is not difficult to infer a nefarious intent behind this particular cash balance plan's design and execution.

[92]    *See Frommert*, 433 F.3d at 267 (citations omitted).

29

sooner, which "hardly constitutes prejudice."[93] This argument is unavailing for two reasons. *First*, in *Frommert*, the prejudice issue arose in the context of tardy notice, not substantively inadequate notice.[94] Here, because both the December 1999 and December 2000 § 204(h) notices failed to mention the formula's fractional rule application, which kept accrual rates below the statutory minimum, the amendments never took legal effect. *Second*, in *Frommert,* the Second Circuit explicitly *rejected* the notion that beneficiaries must demonstrate the type of prejudice urged by defendants:

> Contrary to defendants' arguments and the district court's conclusion, the fact that the plaintiffs remained at Xerox's employ does not demonstrate that they suffered no prejudice through the purported adoption [of the challenged amendment] . . . . Imposing such a requirement that plan participants must show actual prejudice . . . by terminating their employment imposes an unduly harsh burden on dissatisfied plan participants.[95]

---

[93]   Def. SJ Mem. at 24-25. Defendants further assert that there was no prejudice because "[n]one of the Plaintiffs are claiming that they would have left their jobs, and none did, upon learning of either of the amendments." *Id.*

[94]   *See Frommert*, 433 F.3d at 267 ("Allowing 'tardy notice' several years after the effective date of an amendment to stand in for the advance notice that is actually required under § 204(h) upends the purpose of the provision by turning 'future benefit accrual' into past accrual.").

[95]   *Id.*

30

Like the plaintiffs in *Frommert*, the plaintiffs here "were deprived of the opportunity to take timely action in response to the purported 'amendment.'"[96] "Such action might have included seeking injunctive relief, altering their retirement investment strategies, or perhaps considering other employment."[97] Accordingly, summary judgment for plaintiffs is granted with respect to Count VII.

### D.    Age Discrimination (Count IV and V)[98]

Plaintiffs allege that even after the Plan is reformed to cure the ERISA violations alleged in Counts I through III, the overall accrual formula violates ERISA's prohibition on age discrimination because rates of benefit accrual diminish each year based on increasing age.[99]  I agree, for very much the same reasons explained by this Court in *J.P. Morgan*.[100]

---

[96]    *Id.* at 266.

[97]    *Id.*

[98]    In addition to finding the Plan to be age discriminatory under ERISA, the Citigroup formula is invalid on the alternative grounds set forth in Parts IV.B and C, supra.

[99]    I make no determination here as to whether the Plan's misapplication of the fractional rule, by itself, resulted in age discriminatory accrual rates (Count IV).

[100]    *See J.P. Morgan*, 2006 WL 3063424, at *4 (concluding that the J.P. Morgan Plan was age discriminatory because "the unambiguous statutory language, as well as ERISA's different regulatory requirements for defined-contribution and defined-benefit plans, compels this result").

1.    **ERISA Age-Based Accrual Provisions Are Applicable Before Normal Retirement Age**

Although neither party raised it here, courts are divided on the threshold issue of whether ERISA's age-based accrual provisions apply to all workers, including those younger than sixty-five.[101]   ERISA section 204(b)(1)(H)(i) prohibits the reduction of an employee's benefit accrual "because of the attainment of *any age*."[102]   Despite this broad terminology, some courts have held that the provision does not apply to individuals before they reach normal retirement age.[103]   However, because the statutory language "any age" is unambiguous, I respectfully disagree with those courts.[104]   As the Supreme Court

---

[101]   *Compare Eaton,* 117 F. Supp. 2d at 826 (finding that despite the wording of the statute, "[t]here are strong indications in the statutes and the legislative history . . . that Congress did not intend to apply those provisions to the rate of benefit accrual for employees who have not yet reached normal retirement age"), *with Hirt,* 441 F. Supp. 2d at 550 (ultimately finding a cash balance plan non-discriminatory but noting that "[t]he application of the age discrimination prohibition contained in § 204(b)(1)(H) of ERISA to workers of all ages is . . . the necessary consequence of the broad language employed by the statute").

[102]   29 U.S.C. § 1054(b)(1)(H)(i) (emphasis added).

[103]   *See, e.g., Tootle v. ARINC, Inc.,* 222 F.R.D. 88, 92-93 (D. Md. 2004); *Engers v. AT&T Corp.,* 428 F. Supp. 2d 213, 221-22 (D. N.J. 2001); *Eaton,* 117 F. Supp. 2d at 825-29; *see also Campbell v. BankBoston, N.A.,* 327 F.3d 1, 9 (1st Cir. 2003) (ruling in dicta that "the ERISA age discrimination provision may not even apply to workers younger than the age of normal retirement").

[104]   *See Richards,* 427 F. Supp. 2d at 158-59 ("The inclusion of the word 'any,' when given its ordinary, common meaning . . . renders this language unambiguous with respect to the question of whether it protects only employees who have

has directed, "[t]he preeminent canon of statutory interpretation requires us to presume that [the] legislature says in a statute what it means and means in a statute what it says there."[105] By its own terms, the ERISA age provision protects individuals of all ages.

### 2.   Definition of "Rate of Benefit Accrual"

The crux of the age discrimination issue is the definition of the "rate of an employee's benefit accrual" as it is used in section 204(b)(1)(H)(i) of ERISA. If the phrase refers to an employee's retirement benefit (output), as plaintiffs contend, then cash balance plans are discriminatory because they afford younger employees higher rates of benefit accrual than their similarly situated older counterparts.[106] However, if the phrase refers to the employer's annualcontributions to the hypothetical accounts (inputs), then there is no discrimination.[107] Plaintiffs argue that the relevant "benefit" is the overall benefit

---

reached age 65.") (quotation marks and citation omitted); *Register*, 2005 WL 3120268, at *7 ("The [IRS 2002] proposed regulations emphatically reject the first holding in *Eaton*, that the age discrimination provisions only apply after normal retirement age.").

[105]   *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (internal citation omitted). *Accord Nicolaou v. Horizon Media, Inc.*, 402 F.3d 325, 329 (2d Cir. 2005) (citing *BedRoc*).

[106]   *See* Pl. SJ Mem. at 22-25.

[107]   *See* Def. SJ Mem. at 10-13.

33

an employee receives upon retirement (*i.e.*, the annuity at normal retirement age). Under this interpretation, in order to avoid age discrimination, the rate at which a participant accumulates her retirement benefit cannot decrease as she ages. Defendants, however, contend that "the presence or absence of age discrimination should be measured based on the change in participant's cash balance account from year to year, rather than the total value of the annual contributions to the account at retirement age."[108] Under this view, using annual allocations of interest and pay credits as the relevant paradigm, as long as the employer makes ever-increasing contributions to accounts, there is no ERISA violation.[109] Under defendants' reading, the methodology used to detect age discrimination in a cash balance plan – which is a defined benefit plan – becomes, for all intents and purposes, the same as that which is prescribed for defined contribution plans.

I decline defendants' invitation to "seiz[e] on the obvious similarities" between the parallel anti-discrimination provisions governing defined contribution and defined benefit plans.[110] Although other courts, including the Seventh

---

[108]    *Id.* at 12.

[109]    *See Hirt*, 441 F. Supp. 2d at 550 ("The compounding of interest, that is, the payment or contribution of interest on prior months' accumulations, make it possible for all participants to be treated equally . . . .").

[110]    Def. SJ Mem. at 11.

Circuit,[111] have treated cash balance plans as defined contribution plans for this

purpose, doing so would ignore the plain language of the statute as well as the

critical distinctions between the types of plans outlined by the Second Circuit in

*Esden*.[112]

Defendants ally themselves with the Seventh Circuit's position, which

is that

> [i]nterest is not treated as age discrimination for a defined-contribution plan, and the fact that [the respective] subsections are so close in both function and expression implies that it should not be treated as discriminatory for a defined-benefit plan either. The phrase "benefit accrual" reads most naturally as a reference to what the employer puts in (either in absolute terms or as a rate of change), while the defined phrase "accrued benefit" refers to outputs after compounding.[113]

Underlying this interpretation is a presumption that Congress wrote "rate of benefit

accrual" in one provision and "allocations to employee's account" in the other, but

intended those phrases to say the same thing. Rules of construction preclude me

from adopting this view. The simple

> fact is that 'accrual,' using its dictionary meaning and in line with the structure of defined benefit plans, refers to what the employee accumulates [], whereas 'allocation,' using its

---

[111]    *See Cooper v. IBM Pension Plan and IBM Corp.*, 457 F.3d 636 (7th Cir. 2006).

[112]    *See Esden*, 229 F.3d at 158-63.

[113]    *Cooper*, 457 F.3d at 638-39.

> dictionary definition and in line with the structure of defined
> contribution plans, refers to what an employer puts into the
> account.[114]

As the Second Circuit has instructed, "[w]hen Congress uses particular language in

one section of a statute and different language in another, we presume its word

choice was intentional."[115]  If Congress had intended for "the rate of an employee's

benefit accrual" to mean "the rate at which amounts are allocated to the

employee's account," it would have copied those terms from the analogous

provision.

      The other persuasive argument favoring plaintiffs' interpretation of the

statute is ERISA's binary regulatory framework for defined contribution plans and

defined benefit plans.  This duality exists because defined contribution plans and

defined benefit plans make categorically different promises to employees.[116]  As a

result, the respective anti-discrimination provisions prescribe distinct metrics for

detecting discrimination.  Specifically, because employees with defined

contribution plans are guaranteed employer contributions to retirement accounts

but are not guaranteed a retirement benefit, discrimination is better discerned by

---

[114]    *J.P. Morgan,* 2006 WL 3063424, at *5.

[115]    *United States v. Peterson,* 394 F.3d 98, 107 (2d Cir. 2005).

[116]    *See generally Esden,* 229 F.3d at 159-63.

looking at "the rate at which amounts are allocated to the employee's account." [117]
By contrast, because employees with defined benefit plans are guaranteed a
retirement benefit ("output"), the sheer "*import* of the statutory language" connotes
that "'rate of benefit accrual' refers to the outputs from the Plan."[118]

A binary regulatory approach was also required because by their very
nature, "'[p]rojections' and 'guesswork' are at the heart of defined benefit
plans."[119] Effective regulation of such plans necessarily involves monitoring the
future value of the overall pension benefit that will be payable at normal retirement
age. This focus on the value of accrued benefits is apparent throughout the
statutory scheme. For example, for purposes of testing compliance with ERISA's
three accrual rules, the rate at which participants earn their accrued benefit is
examined. Similarly, "the rules governing distributions from defined benefit plans
are framed in terms of the normal retirement benefit," which explains why
distributions in optional forms, such as lump-sum payments, are required to be
equal or greater than the actuarial equivalent of such benefit.[120]

---

[117]    ERISA § 204 (b)(2)(A); 29 U.S.C. § 1054(b)(2)(A).

[118]    *J.P. Morgan*, 2006 WL 3063424, at *6 (emphasis added).

[119]    *Esden*, 229 F.3d at 166.

[120]    *Id.* at 159.

Nevertheless, defendants insist that the proper test for age

discrimination concerns the *present value* of the hypothetical accounts, rather than

their value at the normal retirement age. If Congress wanted to divorce ERISA's

age-based accrual standards from its otherwise consistent approach toward

regulating defined benefit plans it could have done so by either using explicit

language to that effect or using a single provision to apply to both types of plans.

Congress did just this elsewhere in the statutory regime, "unsurprisingly" using

one provision where they intended one standard to apply to both defined benefit

and defined contribution plans.[121]

Defendants also urge this Court to find that a "mere correlation" exists

between reduced rates of accrual and older age, because any reduction in rates of

benefit accrual is really a function of the time value of money. While this is a fair

statement, it is inaccurate to the extent it assumes that the time value of money and

age are mutually exclusive.[122] Under a cash balance plan, employees never receive

---

[121]    *J.P. Morgan*, 2006 WL 3063424, at *9 (contrasting 29 U.S.C. § 1052(a)(1)(A), which enumerates in a single provision the participation standards applicable to both types of plans, to the dual anti-discrimination provisions of 29 U.S.C. §§ 1054(b)(1) and 1054(b)(2)).

[122]    *But see Cooper*, 457 F.3d at 642 (stating that "age *discrimination*" should be separated "from other characteristics that may be correlated with age"). Whereas the cash balance plan at issue in *Cooper* was facially age neutral, the Citigroup Plan is not, which perhaps makes its age discrimination more readily apparent. And while I credit the Plan's method of including both years of service and age in the pay credit index as an attempt to mitigate the disparity in age-65 annuity

the amount in their hypothetical accounts as their retirement benefit. Instead, the

cash balance in the account must be converted to the age 65 annuity.[123] Because

this actuarial conversion requires knowing an individual's age, cash balance plans

are not age neutral.

The short of it is that because of this conversion to an age 65 annuity,

younger workers are credited with more years to accumulate interest on their

hypothetical accounts.[124] Therefore, as a matter of plain arithmetic, a greater

value is added to a younger employee's account than to an older employee's

account. In other words, "for similarly situated workers (same salary and work

history), the older worker, by definition, will receive a smaller retirement benefit

---

values, the record does not reflect that pay credits increase with age quickly
enough to make up the difference. *See* Sher Aff. ¶¶ 4, 5.

[123]    *See Esden*, 229 F.3d at 164. Although the Second Circuit did not address an
age-discrimination claim, it held in *Esden* that ERISA requires *all* distributions
from cash balance plans to be the actuarial equivalent of the accrued benefit
expressed as an annual benefit payable at retirement age. Applying this rule where
an employee chose to collect a lump sum annuity payment before reaching age 65,
the court found that she was entitled to receive the present value of her accrued
benefit, $1,595.52, as opposed to the smaller amount in her hypothetical account,
$1,533.98. *See id.*

[124]    *See Esden*, 229 F.3d at 170 (holding that "interest adjustments to a
hypothetical allocation [i.e. cash balance account] must be provided through
normal retirement age, even though the employee terminates employment or
commences benefits before that age").

simply because he is older, and thus closer to age 65."[125]  This problem is exacerbated further by the phenomenon of compound interest:  as the same interest rate is applied to participants' ever-increasing principal balances, the rate at which older workers accrue benefits is slower than that of younger workers.  In this light, the rate of contributions to an individual's account is dependent on age.

Defendants proffer several policy arguments that weigh against measuring the rate of benefit accrual as an annuity beginning at normal retirement age.[126]  For instance, they argue that such a finding will "discourage employers from guaranteeing a level growth in the value of a pension over time," resulting in the widespread adoption of defined contribution plans, and also preclude plans like this one from using a variable interest credit rate.[127]  While these practical considerations may have merit, the language of section 204(b)(1)(H), this Circuit's

---

[125]    *J.P. Morgan*, 2006 WL 3063424, at *8.

[126]    *See* Def. SJ Mem. at 14-15.  *See also Tootle*, 222 F.R.D. at 94 ("The potential claim of age discrimination arises only by applying a definition for accrued benefits which does not fit with the way cash balance plans are structured. The more sensible approach is to measure benefit accrual under cash balance plans by examining the rate at which amounts are allocated and the changes over time in an individual's account balance, as the ERISA provisions designed for traditional defined contribution plans would direct."); *Hirt*, 441 F. Supp. 2d at 551.

[127]    Def. SJ Mem. at 14-15.

holding in *Esden*, and the construction of ERISA itself compel the conclusion that

such plans are age-discriminatory.[128]

     This "dispute is not over what a 'better' regulatory regime, more

accommodating to the design objectives of cash balance plans might look like."[129]

*Esden* fully acknowledged that "the governing statutes [including ERISA] and

regulations were developed with traditional final-pay defined benefit plans in

mind" and that "they do not always fit in a clear fashion with cash balance plans

and they sometimes require outcomes that are in tension with the objectives of

those plans."[130] Nevertheless, I must adhere to *Esden*'s classification of cash

balance plans as defined benefit plans. I am not "free to pursue [what may indeed

be salutary objectives] at the expense of a textual interpretation . . . ."[131] Under

these circumstances, I must "'apply the text, not [] improve upon it.'"[132] Thus

---

[128]    *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").

[129]    *Esden*, 229 F.3d at 171.

[130]    *Id.* at 159.

[131]    *Pavelic & LeFlore v. Marvel Entm't Group*, 493 U.S. 120, 126 (1989).

[132]    *In re Pennie & Edmonds LLP*, 323 F.3d 86, 101 (2d Cir. 2003) (quoting *Pavelic & LeFlore*, 493 U.S. at 126).

while this ruling will likely increase the difficulty of designing cash balance plans that comport with ERISA, the proper forum for redress is Congress.[133]

## V.    CONCLUSION

For the reasons discussed above, summary judgment in plaintiffs' favor is granted on Count I for impermissible backloading, Count III for violations of ERISA's minimum accrual tests, Count V for age discrimination, and Count VII for failing to meet statutory notice requirements. Summary judgment for plaintiffs on Count II, alleging whipsaw, is denied without prejudice. Summary judgment for defendants is denied.

Defendants are ordered to reform the Plan to comply with ERISA. Other appropriate remedies have yet to be determined, in relation to the several claims for relief alleged in the Amended Complaint filed September 21, 2005. The parties, by their respective counsel, shall make written submissions by January 16, 2007, addressing the issue of a remedy not inconsistent with the rulings contained in this Opinion, and shall appear for a conference on January 2, 2007, at 4:30 p.m. The Clerk of Court is directed to close these motions [Nos. 31, 36 and 43 on the Docket Sheet].

---

[133] *See, e.g.,* The Pension Protection Act of 2006, Pub. L. No. 109-280 § 701(A)(i) (carving out a distinct regulatory scheme for cash balance plans).

SO ORDERED:

Shira A. Scheindlin,
U.S.D.J.

Dated:    New York, New York
          December 11, 2006

43

– Appearances –

**For Plaintiffs:**

Edgar Pauk, Esq.
144 E. 44th Street, Suite 600
New York, New York 10017
(212) 983-4000

Brad N. Friedman, Esq.
Milberg Weiss Bershad & Schulman, LLP
One Pennsylvania Plaza
New York, New York 10119
(212) 594-5300

William D. Frumkin, Esq.
Sapir & Frumkin LLP
399 Knollwood Road, Suite 310
White Plains, New York 10603
(914) 328-0366

Richard S. Schiffrin, Esq.
Joseph H. Meltzer, Esq.
Edward W. Ciolko, Esq.
Schiffrin & Barroway, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

**For Defendants:**

Myron Rumeld, Esq.
Proskauer Rose LLP
1585 Broadway
New York, New York 10036-8299
(212) 969-3021