UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CAROLYN EGAN, on behalf of herself and all
others similarly situated,

                          Plaintiff,

                    -against-

MORGAN STANLEY & CO. INCORPORATED,
MORGAN STANLEY, THE INVESTMENT
COMMITTEE OF THE MORGAN STANLEY
401(k) PLAN (f/k/a THE MORGAN STANLEY
DPSP/START PLAN), THE MORGAN
STANLEY GLOBAL DIRECTOR OF HUMAN
RESOURCES, WALID A. CHAMMAH,
CHARLES CHASIN, ZOE CRUZ, RICHARD
PORTOGALLO, JAMES P. GORMAN, NEAL A.
SHEAR, CORDELL G. SPENCER, and JOHN
DOE DEFENDANTS 1-30,

                          Defendants.

Civ.:  07 Civ. 11285 (RWS)

*(Captions Continued)*

**JOINT DECLARATION OF MARK C. RIFKIN AND EDWARD W. CIOLKO (1) IN
OPPOSITION TO THE MOTION OF C. KENNETH COULTER FOR APPOINTMENT
AS INTERIM LEAD PLAINTIFF AND APPOINTMENT OF MILBERG WEISS LLP
AND HARWOOD FEFFER LLP AS INTERIM CO-LEAD COUNSEL; AND (2) IN
SUPPORT OF THE MOTION OF CAROLYN EGAN AND JOHN SIEFKEN FOR
CONSOLIDATION OF THE ACTIONS AND APPOINTMENT OF WOLF
HALDENSTEIN ADLER FREEMAN & HERZ LLP AND SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP AS INTERIM CLASS COUNSEL**

499727

JOHN SIEFKEN, On Behalf of Himself and
All Others Similarly Situated,

<div style="margin-left:auto">Civil Action No.:  07 Civ. 11456 (JGK)</div>

       Plaintiff,

    -against-

MORGAN STANLEY, MORGAN STANLEY
& CO. INC., MORGAN STANLEY PLANS
"INVESTMENT COMMITTEE," MORGAN
STANLEY PLANS "ADMINISTRATIVE
COMMITTEE," JOHN J. MACK, C. ROBERT
KIDDER, ERSKINE B. BOWLES, DONALD
T. NICOLAISEN, and JOHN DOES 1-10,

       Defendants.

C. KENNETH COULTER, on behalf of himself
and all others similarly situated,

<div style="margin-left:auto">Civ.:  07 Civ. 11624 (RWS)</div>

       Plaintiff,

    -against-

MORGAN STANLEY, MORGAN STANLEY
& CO. INCORPORATED, MORGAN
STANLEY, THE INVESTMENT COMMITTEE,
THE PLAN ADMINISTRATOR, THE MORGAN
STANLEY GLOBAL DIRECOR OF HUMAN
RESOURCES, JOHN J. MACK, ROY j.
BOSTOCK, ERSKINE b. BOWLES, KIR
HOWARD J. DAVIES, KAREN JAMESLEY,
C. ROBERT KIDDER, DONALD T.
NICHOLAISEN, CHARLES h. NOSKI,
HUTHAM s. OLAYAN, CHARLES E.
PHILLIPS, JR., O. GRIFFITH SEXTON,
DR. LAURA D. TYSON, DR. KLAUS
ZUMWINKEL and JOHN DOE 1-30,

       Defendants.

*(Caption Continued)*

GREGORY MAJOR, On Behalf of Himself and
All Others Similarly Situated,

                              Plaintiff,                    Civil Action No.:  08 Civ. 00496

                    -against-

MORGAN STANLEY, MORGAN STANLEY
& CO. INCORPORATED, THE INVESTMENT
COMMITTEE OF THE MORGAN STANLEY
401(k) PLAN, THE PLAN ADMINISTRATOR,
THE MORGAN STANLEY GLOBAL
DIRECTOR OF HUMAN RESOURCES, JOHN J.
MACK, ROY J. BOSTOCK, ERSKINE b.
BOWLES, SIR HOWARD j. DAVIES, KAREN
JAMESLEY, C. ROBERT KIDDER, DONALD
T. NICOLAISEN, CHARLES H. NOSKI,
HUTHAM S. OLAYAN, CHARLES E.
PHILLIPS, JR., O GRIFFITH SEXTON,
DR. LAURA D. TYSON, DR. KLAUS
ZUMWINKEL, and JOHN DOES 1-30,

                              Defendants.

---

MARK C. RIFKIN and EDWARD W. CIOLKO declare and state as follows:

1.      I, Mark C. Rifkin, am a member of the Bar of this Court and a partner in the law

firm of Wolf Haldenstein Adler Freeman & Herz ("Wolf Haldenstein").  I, Edward W. Ciolko,

am a member of the Bar of the State of New Jersey and a partner in the law firm of Schiffrin

Barroway Topaz & Kessler, LLP ("SBTK").  We jointly make this declaration (1) in opposition

to the motion of plaintiff C. Kenneth Coulter, made by and through his attorneys Milberg

Weiss LLP and Harwood and Feffer LLP ("Milberg/Harwood"), to be appointed as "interim lead

plaintiff" and for Milberg/Harwood to be appointed as interim co-lead counsel; and (2) in

support of the motion of plaintiffs Carolyn Egan and John Siefken for an Order consolidating these related actions together with any subsequently-filed related ERISA cases filed in or removed or transferred to this Court, pursuant to Federal Rule of Civil Procedure 42(a), and appointing Wolf Haldenstein and Schiffrin Barroway ("Wolf/Schiffrin") as interim class counsel, pursuant to Federal Rule of Civil Procedure 23(g).  We have personal knowledge of the matters stated herein and, if called upon, we would competently testify thereto.

2.      Attached hereto as Exhibit A is a true and correct copy of the complaint filed by Wolf Haldenstein on behalf of Carolyn Egan on December 14, 2007, Egan v. Morgan Stanley & Co. Incorporated, et al., No. 07 Civ. 11285 (RSW), the first of the above-captioned actions that was filed.

3.      Attached hereto as Exhibit B is a true and correct copy of a press release issued by Milberg Weiss on December 19, 2007.

4.      Attached hereto as Exhibit C is a true and correct copy of the complaint filed by Schiffrin Barroway on behalf of John Siefken on December 20, 2007, Siefken v. Morgan Stanley, et al., No. 07 Civ. 11456 (JGK), the second of the above-captioned actions that was filed.

5.      Attached hereto as Exhibit D is a true and correct copy of the complaint filed by the firm of Milberg Weiss on behalf of C. Kenneth Coulter on December 28, 2007, C. Kenneth Coulter v. Morgan Stanley, et al., No. 07 Civ. 11624 (RWS).

6.      Attached hereto as Exhibit E is a true and correct copy of the complaint filed by the firm of Abraham, Fruchter & Twersky, LLP on January 28, 2008, Major v. Morgan Stanley, et al., No. 08 Civ. 00496.

499727

7.      Attached hereto as Exhibit F is the Docket Sheet in this case, showing the filing of proof of service on defendants.

8.      Attached hereto as Exhibit G is a true and correct copy of correspondence and stipulation between Wolf Haldenstein and counsel for defendants herein.

9.      Attached hereto as Exhibit H is a true and correct copy of a request for documents made by Wolf Haldenstein pursuant to ERISA§ 104(b), 29 U.S.C.§ 1034(b)(4) and a true and correct copy of a request for documents made by Schiffrin Barroway pursuant to ERISA§ 104(b), 29 U.S.C.§ 1034(b)(4).

10.      Attached hereto as Exhibit I is SBTK's firm resume, which provides a detailed description of SBTK's litigation department.

11.      Attached hereto as Exhibit J is Wolf Haldenstein's firm resume, which provides a detailed description of Wolf Haldenstein's litigation department and other Wolf Haldenstein partners who consult with Wolf Haldenstein's litigation attorneys on various cases when the need arises.

12.      As reflected in the attached resumes, Wolf Haldenstein and Schiffrin Barroway are recognized nationwide as among the country's premier class action firms and are in a position to dedicate substantial resources to representing the class in this case.

13.      Attached hereto as Exhibit K is a true and correct copy of a transcript of proceedings in In re Westar Energy, Inc. ERISA Litigation, No. 03-cv-4032-JAR (D. Kan. July 27, 2006).

14.      Attached hereto as Exhibit L is a true and correct copy of a transcript of proceedings in In re Mirant Corp. ERISA, et al., No. 03-cv-1027-RWS (N.D. Ga. Nov. 16, 2006).

15.    Attached hereto as Exhibit M is a true and correct copy of a transcript of proceedings in In re Citigroup Litigation, No. 03-cv-2932 (S.D.N.Y. Nov. 15, 2006).

16.    Attached hereto as Exhibit N is a true and correct copy of a transcript of proceedings in In re Honeywell Intern'l ERISA Litig., No. 03–cv-1214-DRD (D.N.J. July 19, 2005).

17.    Attached hereto as Exhibit O is a true and correct copy of portions of a transcript of proceedings in In re Tyco International, Ltd., No. 02–MD-1335-B (D.N.H. Nov. 2, 2007).

18.    We respectfully submit that appointing Wolf/Schiffrin as Interim Class Counsel herein is appropriate.  If appointed Interim Class Counsel, Wolf/Schiffrin will responsibly lead the prosecution and resolution of all claims asserted, or which may be asserted, in these cases and each future related action that may be filed in or transferred or removed to this Court, and direct the efforts of plaintiffs' counsel in these cases to streamline the litigation, provide efficiencies, and avoid duplication of efforts.

19.    We also respectfully submit that maximum efficiency and utility will be achieved in these cases if the Court orders that Interim Class Counsel be charged with performing the following specific duties, as other courts have done in other similar contexts, cf. Manual for Complex Litigation (4th ed.) (Federal Judicial Center 2004) at §40.22:

(a)    direct, and execute on behalf of plaintiffs, all pleadings and other filings with the Court;

(b)    direct the briefing and argument of all motions;

(c)    direct the conduct of discovery proceedings including, among other things, the scheduling and examination of witnesses in depositions;

(d)    direct the selection of counsel to act as spokespersons with the Court;

4

(e)     accept service of papers for all plaintiffs with respect to any document served by defendants;

(f)     call meetings of plaintiffs as they deem necessary and appropriate from time to time and to distribute to all plaintiffs copies of motions, orders, and decisions of the Court, where appropriate, and to maintain up-to-date service lists, to be made available to the Court;

(g)     direct and conduct all settlement negotiations;

(h)     direct and conduct all pretrial proceedings, trial preparation, trials and post-trial proceedings, and delegate work responsibilities to selected counsel as may be required;

(i)     collect time records from plaintiffs' counsel; and

(j)     supervise any other matters concerning the prosecution or resolution of the above-captioned litigation and otherwise manage the prosecution of any claims asserted.

We each declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 25th day of January 2008, at New York, New York and in Radnor, Pennsylvania, respectively.


_____/s/  Mark C. Rifkin_____
Mark C. Rifkin


_____/s/  Edward W. Ciolko_____
Edward W. Ciolko



Gregory M. Nespole (GM-6820)
Mark C. Rifkin (MR-0904)
Michael Jaffe (MJ-1671)
Robert B. Weintraub (RW-2897)
WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
270 Madison Avenue
New York, New York 10016
(212) 545-4600

*Attorneys for Plaintiff*
*Carolyn Egan and the Proposed Class*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CAROLYN EGAN, on behalf of herself and all
others similarly situated,

                         Plaintiff,

            -against-

MORGAN STANLEY & CO. INCORPORATED,
MORGAN STANLEY, THE INVESTMENT
COMMITTEE OF THE MORGAN STANLEY
401(k) PLAN (f/k/a THE MORGAN STANLEY
DPSP/START PLAN), THE MORGAN
STANLEY GLOBAL DIRECTOR OF HUMAN
RESOURCES, WALID A. CHAMMAH,
CHARLES CHASIN, ZOE CRUZ, RICHARD
PORTOGALLO, JAMES P. GORMAN, NEAL A.
SHEAR, CORDELL G. SPENCER, and JOHN
DOE DEFENDANTS 1-30,

                        Defendants.

Civ. _____

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY
ACT

Plaintiff Carolyn Egan, a participant in the Morgan Stanley 401(k) Plan (f/k/a The Morgan Stanley DPSP/START Plan), as amended (the "Plan"), on behalf of herself and all other persons similarly situated (the "Class," as defined below), and the Plan, makes the following allegations based upon the investigation of her counsel, except as to the allegations pertaining

specifically to Plaintiff and Plaintiff's counsel, which are based on personal knowledge. The investigation conducted by Plaintiff's counsel included, *inter alia*, a review and analysis of: (i) public filings by Defendants including, but not limited to, filings with the Securities and Exchange Commission ("SEC"); (ii) publicly-available news articles and reports; (iii) press releases issued by Defendants; and (iv) other matters of public record.

## I.    INTRODUCTION

1.    Plaintiff brings this suit as a civil enforcement action pursuant to section 502(a) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a), against the Plan fiduciaries for relief on behalf of the Plan. Plaintiff was a participant in the Plan during the Class Period (defined below).

2.    The Plan is operated by Morgan Stanley as a benefit for its employees to permit tax-advantaged savings for retirement and other long-term goals. Morgan Stanley & Co., Inc. ("MS&Co."), a wholly owned subsidiary of Morgan Stanley, is the "sponsor" of the Plan as defined by Section 3(16)(B) of ERISA, 29 U.S.C. § 1002(16)(B).

3.    The Plan is a defined contribution retirement plan that is intended to qualify under Section 401(a) of the Internal Revenue Code of 1986 and is subject to the provisions of ERISA.

4.    This action arises from Defendants' failure to act in the best interests of participants and beneficiaries of the Plan. Defendants are individuals and entities that serve in a fiduciary capacity and/or undertook a fiduciary role in the Plan. As Plan fiduciaries, Defendants are required to exercise skill, care, prudence, and diligence in administering the Plan, and are responsible for selecting and monitoring the Plan's investments and assets.

5.    From December 1, 2005, through the present (the "Class Period"), Defendants allowed the Plan to heavily invest in the Morgan Stanley Stock Fund, which consists

entirely of the common stock of Morgan Stanley ("Company Stock"), while Defendants knew or should have known about Morgan Stanley's gross mismanagement and improper business practices. Morgan Stanley currently suffers under the weight of massive credit deterioration necessitating enormous write-downs of its collateralized debt obligations, and has already announced that it would take a pretax charge of at least $3.7 billion related to its exposure to the subprime mortgage market. Market observers predict that there are billions in additional write-downs to come.

6.      Defendants violated ERISA because, among other reasons, they knew that Company Stock was not a prudent retirement investment, yet they failed to take steps to eliminate or reduce the amount of Company Stock in the Plan. Instead, throughout the Class Period, Defendants caused or permitted the Plan to offer, purchase, and hold large amounts of Company Stock.

7.      In addition, throughout the Class Period, Defendants failed to give Plaintiff and the Class complete and accurate information about Morgan Stanley's financial condition so that Plan participants could make informed investment decisions under the Plan. The myriad instances of material nondisclosures include, but are not limited to, the following:

a)      forming and managing off-balance-sheet structured investment vehicles ("Conduits" or "SIVs") without adequately disclosing Morgan Stanley's contingent liabilities or risks related thereto;

b)      causing the Conduits or SIVs to issue billions of dollars worth of commercial paper and short term notes based on false and misleading statements;

c)    marketing and extending subprime loans, without adequate consideration of the borrower's ability to pay and with unreasonably high risk of borrower default;

d)    failing to adequately disclose Morgan Stanley's increased credit risk, including its subprime loan loss exposure, to investors, including the Plan's participants;

e)    operating without the requisite internal controls to determine appropriate loan loss provisions;

f)    understating loan loss provisions that did not properly reflect the risk facing Morgan Stanley; and

g)    failure to disclose the extent to which exposure to increased levels of credit risk subjected Morgan Stanley to drastically increased overall risk.

8.    During the Class Period, Company Stock lost approximately 35% of its value, dropping from its 52-week high of $74.13 on June 14, 2007, to $47.95 on November 26, 2007. Plaintiff and the Class suffered as the value of their retirement accounts invested pursuant to the Plan dropped precipitously in line with the decline in the price of the Company's Stock.

9.    Defendants are liable under ERISA to restore to the Plan losses sustained by the Plan resulting from the breach of their fiduciary duties.

## II.    JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1).

11.    Venue is proper in this district pursuant to section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), because this is the district where some or all of the breaches took place, where one or more Defendants reside or may be found, and/or where the acts and transactions alleged herein occurred, including the administration of the Plan.

## III.    **PARTIES**

**Plaintiff**

12.    Plaintiff Carolyn Egan ("Plaintiff") is a resident of Pennsylvania. During the Class Period, she was a participant of the Plan, as defined by Sections 3(7) and 502(a) of ERISA, 29 U.S.C. §§ 1102(7) and 1132(a) and held shares of Company Stock in the Plan.

**Defendants**

13.    Defendant MS&Co. is the sponsor of the Plan. Defendant MS&Co. is a wholly owned subsidiary of Morgan Stanley. As set forth in the Form 11-K for the Plan for the fiscal year ended December 31, 2006, Defendant MS&Co. had the authority to control and manage the operation and administration of the Plan, to make rules and regulations with respect to the Plan, and to take actions to administer the Plan. Throughout the Class Period, MS&Co. also had the authority and discretion to appoint, monitor and remove Investment Committee members from their individual fiduciary roles with respect to the Plan. Therefore, throughout the Class Period, MS&Co. acted as a fiduciary of the Plan in that it had (i) discretionary authority, control, or responsibility over Plan management or Plan administration and/or (ii) authority or control over management or disposition of Plan assets.

14.    Throughout the Class Period, in addition to its independent obligations as a fiduciary, MS&Co. acted through its directors, officers and employees. MS&Co. had, at all applicable times, effective control over the activities of its officers, employees and the Investment Committee, including Plan related activities, and through its Board of Directors, executive officers or otherwise had the authority and discretion to hire and terminate said officers and employees. The actions of the fiduciaries of the Plan, who failed to properly discharge their fiduciary duties under ERISA, are imputed to MS&Co. under the doctrine of *respondeat superior*, and MS&Co. is liable for such actions.

15. Defendant Morgan Stanley, the parent of MS&Co., is a business entity organized under the laws of the state of Delaware with its executive offices located in New York. Morgan Stanley, through its wholly owned subsidiary MS&Co., is also liable under the doctrine of *respondeat superior*.

16. Defendant Morgan Stanley Global Director of Human Resources (the "Global Director" or "Plan Administrator"), was the administrator of the Plan at all times during the Class Period and was responsible for administering and managing the Plan on a day-to-day basis and advising Morgan Stanley and the MS&Co. Board regarding the Plan and the Plan's assets. At all times during the Class Period, Defendant Global Director was a "Named Fiduciary," as such term is defined in ERISA § 402(a), with respect to the Plan.

17. Defendant Investment Committee of the Morgan Stanley 401(k) Plan (the "Investment Committee") means the Investment Committee of the Morgan Stanley 401(k) Plan established to manage the assets of the Trust Fund that holds all assets of the Plan, which includes the assets maintained of the Morgan Stanley Employee Stock Ownership Plan ("ESOP"). Defendant Investment Committee is, upon information and belief, responsible for selecting, monitoring, and evaluating the Plan's investment options. Defendant Investment Committee consisted of three or more members during the Class Period, each of whom were appointed by and serve at the pleasure of the Board of Directors of MS&Co. At all times during the Class Period Defendant Investment Committee was a "Named Fiduciary," as such term is defined in ERISA § 402(a).

18. During the Class Period, the following Defendants served as Directors of MS&Co. (the "MS&Co. Directors"):

(i)    Walid A. Chammah (Managing Director of MS&Co. and Head of Investment Banking of Morgan Stanley);

(ii)    Charles Chasin (Managing Director of MS&Co. and Chief of Staff to Co-President of Morgan Stanley);

(iii)    Zoe Cruz (Managing Director, Chairman, Chief Executive Officer and President of MS&Co. and Co-President of Morgan Stanley);

(iv)    Richard Portogallo (Managing Director of MS&Co. and Regional Co-Head of Americas, Institutional Sales and Trading of Morgan Stanley);

(v)    James P. Gorman (Managing Director of MS&Co. and President and COO, Global Wealth Management Group of Morgan Stanley);

(vi)    Neal A. Shear (Managing Director of MS&Co. and Co-Head of Institutional Sales and Trading of Morgan Stanley); and

(vii)    Cordell G. Spencer (Managing Director of MS&Co. and Deputy Head of Investment Banking of Morgan Stanley).

19.    Each of the MS&Co. Directors was a Plan fiduciary because each had and exercised (i) discretionary authority, control, or responsibility over Plan management or Plan administration and/or (ii) authority or control over management or disposition of Plan assets.  In addition, the MS&Co. Directors had ultimate oversight over the Plan, with the power and responsibility to appoint, monitor and replace if necessary, members of Defendant Investment Committee and appoint, monitor and replace if necessary the Plan Administrator.  Therefore, at all times during the Class Period, the MS &Co. Directors were fiduciaries of the Plan pursuant to Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21).

20.     The John Doe Defendants 1-30 include individuals during the Class Period whose names and identities are not presently known to Plaintiff, including any unnamed directors of MS&Co., any delegatee of the Investment Committee the individual members of the Investment Committee, the individual members of any separate committee that may have been established to manage the ESOP, and any delegate of the Plan Administrator.

## IV.    THE PLAN

21.     The Plan is subject to the provisions of ERISA. The Plan is an "employee pension benefit plan," as defined by Sections 3(2)(A) and 3(3) of ERISA, 29 U.S.C. §§ 1002(2)(A) and 1002(3).    The Plan covers eligible employees of Morgan Stanley and its subsidiaries and affiliates. The Plan is not a party to this action. Pursuant to ERISA, however, the relief requested is for the benefit of the Plan.

22.     At all times during the Class Period, all of the Plan's investments were held in a trust account at Mellon Bank, N.A. (the "Trustee"), which included all assets of the ESOP.

23.     The Plan is a defined contribution plan, which means the Plan's fiduciaries are responsible for selecting the investment options made available to participants in the Plan. The Plan sponsor has the authority to control and manage the operation and administration of the Plan, make rules and regulations for the Plan, and take actions to administer the Plan.

24.     All eligible participants may elect to make pre-tax contributions of 1% to 20% of annual earnings, subject to certain Internal Revenue Code limits.  Eligible participants may elect to contribute after-tax contributions of 1% to 10% of annual earnings.

25.     Plan participants direct how to allocate their salary deferrals among the various investment options offered by the Plan. Individual accounts are maintained for each Plan participant.  Each participant's account is credited with the participant's contributions,

allocations of MS&Co.'s contributions and Plan earnings, and charged with an allocation of Plan losses and administrative expenses not otherwise paid by MS&Co.

26.     Participants in the Plan were, at all times during the Class Period, eligible for matching contributions from MS&Co. for the given year in which they were participants. Any employee who participated in the Plan by making pretax contributions during the year and was employed by MS&Co. as of the last day of the year was eligible to receive the matching contribution.  (Employees were also eligible to receive a matching contribution for the last calendar year in which they worked, if they terminated employment with MS&Co. due to death, total and permanent disability, retirement or release, as defined by the Plan.)  MS&Co. also provided discretionary profit sharing contributions to certain Plan participants during the Class Period.

27.     At all times during the Class Period, the contributions of MS&Co., including matching contributions, profit sharing contributions and otherwise, were allocated exclusively in Company Stock and maintained in the ESOP component of the Plan.  Defendants restricted the sale or transfer of such Company Stock, in whole or part, during all or part of the Class Period.

28.     According to the Plan's Annual Report, as of December 31, 2006, approximately $4.036 billion of the Plan's $7.299 billion of assets were invested in Company Stock.

## V.    DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

29.     ERISA requires every plan to provide for one or more named fiduciaries. ERISA § 402(a)(1). 29 U.S.C. § 1002(21)(A).  The person named as "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a definition, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

30.    ERISA also treats as fiduciaries persons who act as fiduciaries by performing fiduciary functions.   Section 3(21)(A)(i) of ERISA, 29 U.S.C. § 1002(21)(A)(i), makes a person a fiduciary "to the extent … he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets … or … has any discretionary authority or discretionary responsibility in the administration of such plan."

31.    Throughout the Class Period, all of the Defendants were either named fiduciaries of the Plan or acted as fiduciaries of the Plan under ERISA.

## VI.    CLASS ACTION ALLEGATIONS

32.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the following Class of persons similarly situated:

> All persons who were participants in or beneficiaries of the Plan at any time from December 1, 2005, through the present, and whose accounts included investments in Company Stock.

33.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class who participated in or were beneficiaries of the Plan during the Class Period.

34.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

a)    whether Defendants each owed a fiduciary duty to the Plan and members of the Class;

b)      whether Defendants breached their fiduciary duties to the Plan and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

c)      whether Defendants violated ERISA; and

d)      whether the Plan and members of the Class have sustained damages and, if so, what is the proper measure of damages.

35.     Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff and the other members of the Class each sustained damages arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

36.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

37.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members of the Class or substantially impair or impede their ability to protect their interests.

38.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any

questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VII.    COMMON FACTUAL ALLEGATIONS

39.    Morgan Stanley joined the Wall Street rush into underwriting pools of securities tied to subprime mortgages,[1] or collateralized debt obligations ("CDOs")[2], beginning in late 2005. The Company's investment in the subprime mortgage area was spurred in large part by John J. Mack who, when he took his post at Morgan Stanley as Chief Executive Officer in the summer of 2005, indicated that he would put more of Morgan Stanley's capital at risk in order to garner possibly greater returns. Beginning in late 2005, Morgan Stanley began to dramatically increase its exposure to credit assets with little or no price transparency.

40.    Acting in line with Mr. Mack's stated determination to take more risk with the firm's capital, Morgan Stanley's 2006 Annual Report, filed with the SEC on February 13, 2007, reported that "on December 4, 2006, Morgan Stanley acquired Saxon Capital, Inc. ("Saxon"), a servicer and originator of residential mortgages," for $706 million.

41.    The acquisition of Saxon, a subprime mortgage underwriter, was intended to gain Morgan Stanley access to subprime mortgages that could be repackaged into complex investment vehicles. In a press release issued by Morgan Stanley on December 4, 2006, the Company announced that "[t]his acquisition is another important step in our long-term strategy of building a global, vertically integrated residential mortgage business . . . Saxon adds a premier

---

[1] "Subprime" generally refers to borrowers who do not qualify for prime interest rates because they exhibit one or more of the following characteristics: weak credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-value ratios.

[2] CDO is defined as an investment-grade security backed by a pool of bonds, loans and other assets such as mortgages.

servicing operation with a scalable U.S. origination platform to our substantial existing residential mortgage franchise. " Armed with Saxon, Morgan Stanley quickly climbed to the No. 1 ranking in subprime-mortgage-securities underwriting in 2007, according to Inside Mortgage Finance, a trade publication in Bethesda, Maryland.

42.     In addition to its acquisition of Saxon, Morgan Stanley took huge positions in super-senior segments of CDOs throughout the Class Period. The Company held approximately $13 billion worth of the super-senior CDOs at the start of 2007 to hedge and finance its bearish subprime bet. At first, the CDOs paid a higher interest rate than Morgan Stanley's cost of financing, which generated seductive profits until the bottom fell out in October after more modest declines in August and September. The bearish subprime bet, which took the form of derivatives called swaps, required Morgan Stanley to pay interest on those contracts. To offset the bearish subprime bet and help generate interest income to pay the cost of the swaps, the firm amassed the CDO position that produced most of the losses announced in November 2007.

43.     Insiders and directors of Morgan Stanley anticipated carnage from Morgan Stanley's exposure to subprime mortgage investments as far back as 2006, but failed to take any action with respect to protecting Plan participants. Indeed, the Morgan Stanley Board has a risk management panel tasked to oversee these types of credit issues. That panel, however, and the MS&Co. Board, failed to disclose its findings and concerns to Plan participants though the assets of Plan participants continued to flow into Company Stock.

44.     Morgan Stanley also failed to adequately disclose contingent liabilities associated with Conduits and SIVs. A SIV is an investment vehicle that earns income through spread lending (i.e., profits from the difference between borrowing short term and investing long

term). Generally, a SIV earns income from the purchase of long term high yielding securities, such as mortgage backed securities or credit card receivables, which it turns into marketable securities to be purchased by investors. These investments are typically funded through the sale of short term lower yielding senior debt (e.g., asset backed commercial paper).

45.    SIVs make payments on the securities in the form of interest to the buyer. The buyer, in turn, issues commercial paper to raise the funds needed to buy the security. It is a co-dependant relationship. If the commercial paper market dries up, nobody buys the SIV's securities and the SIV must hold them, technically, they can revert back to the SIV's manager – in this case Morgan Stanley. What was an off balance sheet expense could quickly return to Morgan Stanley's balance sheet. Moreover, with many of these securities consisting of subprime loans, there is a greater chance of default on the underlying asset. Thus, Morgan Stanley will be left on the hook for the security and have no place to sell it.

46.    Given the recent dislocation in financial markets, the cost of commercial paper increased substantially as LIBOR (proxy rate for commercial paper) rose to abnormally high levels. As such, the usually very liquid commercial paper market became illiquid, causing serious funding concerns for SIVs. With the uncertainty of funding for certain SIVs, the assets held by those SIVs may be sold at fire sale prices.

47.    Morgan Stanley SIVs invested in subprime loans and, as a result, many investors are no longer willing to purchase commercial paper from its SIVs. Because the SIVs still owe money to commercial paper holders, and they can not raise money by selling new commercial paper, they are being forced to sell their assets at fire-sale prices to pay off debts. Consequently, Morgan Stanley SIVs are on the verge of collapse. Moreover, Morgan Stanley may have to move its SIVs onto its balance sheet, and recognize billions of dollars in potential

14

liability that Morgan Stanley had not fairly disclosed to investors in Company Stock, including Plan participants.

48.    Throughout the Class Period, members of Morgan Stanley management issued false and misleading statements and omitted information concerning Morgan Stanley to Plan participants concerning, inter alia, (i) Morgan Stanley's exposure to subprime credit, off-balance entities, CDO exposure, and other credit-specific problems; (ii) the nature and extent of risk taken by the Company in connection with its investment in subprime mortgages, off-balance entities, and other credit-specific problems; (iii) the aggressiveness of Morgan Stanley's proprietary trades related to collateralized debt obligations ("CDO"); and (iv) the lack of adequate internal controls to hedge the risks associated with its CDO exposure. Specifically:

49.    On December 19, 2006, Morgan Stanley reported record income from continuing operations for the fourth quarter and full year 2006. The press release stated, in relevant part, as follows:

> The Firm achieved record income from continuing operations for the fiscal year ended November 30, 2006 of $7,497 million, a 44 percent increase from $5,192 million a year ago. Diluted earnings per share from continuing operations were a record $7.09 compared with $4.81 last year. Record net revenues (total revenues less interest expense and the provision for loan losses) of $33.9 billion were 26 percent higher than last year. Non-interest expenses of $22.9 billion were 18 percent above 2005. Compensation expenses increased 27 percent primarily reflecting higher revenues. Non-compensation expenses increased 5 percent as costs associated with higher levels of business activity were partly offset by lower charges for legal and regulatory matters.1 Results for the current year include an income tax benefit of $280 million, or $0.27 per diluted share, resulting from the outcome of a federal tax audit, while the prior year included a tax benefit of $309 million, or $0.29 per diluted share, related to the provisions of the American Jobs Creation Act. The return on average common equity from continuing operations was 23.6 percent compared with 19.0 percent a year ago.

Income from continuing operations for the fourth quarter was a record $2,206 million, an increase of 26 percent from $1,746 million in the fourth quarter of 2005. Diluted earnings per share from continuing operations were a record $2.08 compared with $1.64 a year ago. Net revenues were $8.6 billion, 24 percent above last year's fourth quarter. Non-interest expenses of $5.8 billion increased 19 percent from last year. The results for the fourth quarters of 2006 and 2005 include the $0.27 and $0.29 per diluted share tax benefits noted above. The annualized return on average common equity from continuing operations was 26.0 percent in the current quarter, compared with 24.9 percent in the fourth quarter of 2005.

Net income (including discontinued operations) for the year was a record $7,472 million, a 51 percent increase from $4,939 million a year ago. For the quarter, net income was $2,206 million, compared with $2,465 million in the fourth quarter of 2005, which included an after-tax gain of approximately $700 million related to the sale of the Company's aircraft leasing business. Diluted earnings per share were a record $7.07 for the year compared with $4.57 a year ago and the return on average common equity was 23.5 percent compared with 17.3 percent last year. For the quarter, diluted earnings per share were $2.08, compared with $2.32 in the fourth quarter of 2005, and the annualized return on average common equity for the fourth quarter was 26.0 percent compared with 34.6 percent a year ago.

50.    Commenting on Morgan Stanley's successful quarter and 2006 fiscal year Mr. Mack stated, in relevant part, as follows:

2006 was a year of outstanding performance and progress for Morgan Stanley. Capitalizing on a strong market environment, the people of Morgan Stanley achieved record fourth quarter results and the best full-year revenues and earnings in the Firm's history. In our securities business, we delivered powerful performance across our Institutional Securities franchise and made significant strides in our Asset Management and Global Wealth Management businesses.

51.    On March 21, 2007, Morgan Stanley announced its results for the first quarter ended February 28, 2007. The announcement stated, in relevant part, as follows:

Morgan Stanley (NYSE: MS) today reported record income from continuing operations for the first quarter ended February 28, 2007 of $2,559 million, an increase of 60 percent from $1,602 million in

the first quarter of 2006.1 Diluted earnings per share from continuing operations were a record $2.40 compared with $1.51 a year ago. Net revenues were a record $11.0 billion, 29 percent above last year's first quarter. Non-interest expenses of $7.1 billion increased 17 percent from last year. The annualized return on average common equity from continuing operations was 28.8 percent in the current quarter, compared with 21.9 percent in the first quarter of 2006.

Net income was a record $2,672 million, an increase of 70 percent from $1,574 million in the first quarter of 2006. This quarter's results included an after-tax gain of $109 million reported in discontinued operations related to the sale of Quilter Holdings Ltd. Record diluted earnings per share were $2.51, compared with $1.48 in the first quarter of 2006, and the annualized return on average common equity for the first quarter was 29.9 percent compared with 21.3 percent a year ago.

52.    Commenting on Morgan Stanley's robust first quarter results, Mr. Mack stated, in relevant part, as follows:

Morgan Stanley delivered outstanding results this quarter - with record revenues and earnings along with ROE of more than 20 percent for the sixth quarter in a row. *This strong performance was in large part the result of effective, disciplined risk-taking by our team in Institutional Securities, which helped deliver record results across our sales and trading businesses*. Our Global Wealth Management business this quarter delivered its highest revenues since 2000 and we continued to make substantial progress in executing our growth plan in Asset Management. We see many opportunities to further improve our performance, and remain intensely focused on helping our clients navigate the constantly changing markets and leveraging our global franchise to create additional value for our shareholders. (emphasis added)

53.    After the announcement of its first quarter results on March 21, 2007, Morgan Stanley held a conference call to discuss Morgan Stanley's performance. Executive Vice President and Chief Financial Officer David Sidwell represented Morgan Stanley on the call. Regarding Morgan Stanley's position in the subprime mortgage market, Mr. Sidwell stated, in relevant part, as follows:

Financing products also contributed to the overall increase in revenues. This was a record quarter in prime brokerage, with revenues up substantially on both new accounts and growth in global client balances for the 16th consecutive quarter. In fixed income sales and trading, $3.6 billion in revenues was our best quarter ever, up 57% driven by broad-based strength across credit products, interest rate, and currency products and commodities. We sold very strong trading performance and good levels of client activity across our fixed income businesses. *Looking at the results by product area, credit products rose 110% to a new record, with the largest increase in securitized products driven by favorable positioning in the Subprime Mortgage Markets, strong customer flows, and robust growth in our Global Commercial Mortgage business . . .*

*Before I leave Institutional Securities, let me turn to a topic that's been a focus in the market in the past several weeks, subprime mortgage. We participate in the subprime mortgage market in a number of ways. Through our securitized product groups we purchased loans from originators and originate loans, including through Saxon, which closed this quarter. We are active in the structuring, securitization, and distribution of subprime products, including CLOs and CDOs. Third, we manage our risk through a variety of hedging strategies and we also take proprietary risk positions. In the aggregate, these activities were a significant contributor to our results this quarter. In addition, we extend loans and lending commitments to clients that are secured by assets of the borrower such as loan pools. At the end of the quarter, whereas lending commitments to the subprime lenders totaled $5.2 billion, of which $2.3 billion was funded and fully collateralized. The largest component of this was the New Century. Our current funded balance with New Century is $2.5 billion. Finally, through our acquisition of Saxon, we have servicing capabilities . . .*

The consumer credit environment in the U.S. remains very favorable for our business, with bankruptcies remaining low throughout the quarter. As a result we're revising slightly our outlook for the full year charge-off rate to a range of 4 to 4.5% versus the prior estimate of 4.5 to 5%. *While there has been considerable media coverage regarding higher delinquencies in the subprime mortgage industry, we have not seen any impact on our Card portfolio. Nevertheless, we continue to monitor the situation closely.* In summary, our U.S. business is performing well with growth in usage and receivables and strong credit performance. In the U.K., we're working hard to limit the impact, we are facing due to the adverse credit environment.

Finally, as a regard to outlook, the markets have been very volatile over the last few weeks with a decline in stock markets, widening credit spreads, higher interest rates, and higher volatility as well as concerns which have continued about the subprime market and whether it would spread to other markets. *At this time we believe this could be a reasonably limited event, as we have not seen any signs that the subprime deterioration could spread to other parts of the market. At this early point in the second quarter, we remain reasonably optimistic.* I mentioned earlier that our investment banking pipeline across advisory equities of fixed income are strong. The level of client activity in our sales and trading businesses remain strong, with the increase in volatility providing trading opportunities for our clients as well as for us . . . (emphasis added).

54.     During the conference call, Guy Moszkowski of Merrill Lynch asked Mr. Sidwell if Morgan Stanley would consider increasing the amount of subprime origination or alt A type origination, capability that it has, or whether that Morgan Stanley's appetite was already satisfied. Mr. Sidwell responded, in relevant part, as follows:

We had felt as we looked at the firm and its strategy, we felt that we were underrepresented in the mortgage business that our fixed income business, which is a leader in many areas, that we did not have the scale of penetration in the mortgage markets that we should have had. It was with that, that we have said over the last couple of years that we wanted to increase our footprint in mortgages, Saxon was part of that as was some of the expansion that we've done overseas. Obviously, I think we will continue to look at opportunities in the marketplace, but it's something that we have at this point made no definitive plans on or else I'd share them with you.

55.     William Tanona of Goldman Sachs also questioned Mr. Sidwell about Morgan Stanley's subprime strategy, as follows:

**William Tanona - Goldman Sachs**

[I]n terms of mortgages, obviously you've highlighted that as an area of particular strength. Could you give us a sense as to kind of the contribution of mortgages relative to the fourth quarter as it related to the increased 1% of the increase in thick had been in mortgages? And then also, could you give us a sense as to what

your residuals might look like across mortgage and specifically subprime as it ended the quarter?

**David Sidwell**

I think the major point I've been trying to make, actually, is that if you look at our institutional businesses across equities and fixed income, it was really the breadth of performance compared with the fourth quarter. So looking at equities, all areas of that business were up, if you look at our fixed income, it's the same thing. Within fixed income, when going down a little bit, the largest driver of the increase compared with fourth quarter was in credit markets and the residential mortgage business was a big part of that driver. As I gave a rough sizing of it, but I'm not going to break it down further into the actual contribution from that one business.

**William Tanona - Goldman Sachs**

Okay, that's fair and then just on the residuals?

**David Sidwell**

Again, that's part of the overall evaluation of that residential mortgage business, so I'd rather not just address one of the types of instruments that are a part of that overall business strategy, which includes many instruments.

56.    Ron Mendell of DIC also asked Mr. Sidwell about Morgan Stanley's position in the subprime mortgage market.

**Ron Mendell - DIC**

Okay. Then in regard to fixed income sales and trading, one thing I was taking away from your comments on the contribution that mortgages made was you took advantage of the volatility and basically what I took away was that you were short subprime very successfully, and I guess that's possibly going to be very hard to repeat going forward since so much of the activity, although not all of it took place in that quarter.

**David Sidwell**

I actually don't really want to address specifically how we were positioned, but I think the thrust of what you said in terms of the trading and hedging activity, I don't think you want to model that in.

57.    On May 1, 2007, Morgan Stanley issued a press release announcing the planned retirement of Mr. Sidwell as Chief Financial Officer.  The press release also stated that Thomas Colm Kelleher would succeed Mr. Sidwell as Chief Financial Officer of Morgan Stanley upon Mr. Sidwell's retirement.

58.    On June 20, 2007, Morgan Stanley announced its results for the second quarter ended May 31, 2007.  The press release stated, in relevant part, as follows:

> Morgan Stanley (NYSE: MS) today reported record income from continuing operations for the second quarter ended May 31, 2007 of $2,582 million, an increase of 41 percent from $1,828 million in the second quarter of 2006. Diluted earnings per share from continuing operations were a record $2.45 compared with $1.74 a year ago. Net revenues were a record $11.5 billion, 32 percent above last year's second quarter. Non-interest expenses of $7.6 billion increased 31 percent from last year. The annualized return on average common equity from continuing operations was 27.5 percent in the current quarter, compared with 23.7 percent in the second quarter of 2006.
>
> For the first six months of 2007, income from continuing operations was a record $5,141 million, a 50 percent increase from $3,430 million a year ago. Diluted earnings per share from continuing operations were a record $4.86 compared with $3.25 last year. Net revenues rose 31 percent to a record $22.5 billion and non-interest expenses increased 24 percent to $14.8 billion. The annualized return on average common equity from continuing operations was 28.2 percent, compared with 22.8 percent a year ago.
>
> Net income for the quarter was $2,582 million, an increase of 40 percent from $1,841 million in the second quarter of 2006. For the first six months of 2007, net income was a record $5,254 million, a 54 percent increase from $3,415 million a year ago. Diluted earnings per share were $2.45 for the quarter, compared with $1.75 in the second quarter of 2006, and the annualized return on average common equity for the second quarter was 27.5 percent compared with 23.7 percent a year ago. For the first six months, diluted earnings per share were a record $4.96, compared with $3.23 a year ago, and the annualized return on average common equity was 28.7 percent compared with 22.5 percent last year.

59.    Commenting on Morgan Stanley's successful second quarter, John Mack stated, in relevant part, as follows:

> Morgan Stanley delivered record revenues and earnings in the second quarter and the first half of the year, as we continued to build momentum across our securities businesses and continued to see the benefits of our diverse mix of products, clients and businesses around the globe. Thanks to the commitment and focus of our people, we've now achieved seven straight quarters with ROE above 20 percent, and we're well on our way to reaching our goal of doubling 2005 earnings over five years. But we believe there is still work that remains to be done, and we remain intensely focused on delivering value to Morgan Stanley's clients and shareholders over the long term.

60.    In a conference call on June 20, 2007, following the announcement of Morgan Stanley's second quarter results, Mr. Sidwell reported the following regarding Morgan Stanley's concerns regarding the subprime market:

> As you've seen from our press release, we achieved record net revenues, profit before tax, income, and earnings per share from continuing operations.
>
> We are very pleased with these results, as they reflect execution of our strategic growth plans and strong trading performance and client execution in very favorable markets. Markets were strong, and provided good opportunities. *Concerns early in quarter about, whether issues in the Subprime market were going to spread dissipated . . .*

61.    During the conference call, Roger Freeman of Lehman Brothers questioned Mr. Sidwell about Morgan Stanley's subprime strategy in the second quarter, in relevant part, as follows:

> **Roger Freeman - Lehman Brothers**
>
> [Y]ou commented how fixed income benefited last quarter from sort of favorable positioning from hedging standpoint in the mortgage area. How would you characterize your positioning in the mortgage space in the second quarter? Were you down just more as a function of declining activity in the market and some

marks or was there sort of negative positioning bending the wrong way?

**David Sidwell**

The first quarter we really did benefit from the market conditions in Subprime as I mentioned spreads didn't really move a whole lot during the second quarter, so there were lower opportunities. We certainly did not loose money in this business.

62.    The information disclosed in the press releases and conference calls were materially incomplete, false and misleading.  Nowhere did Morgan Stanley disclose any problems with its subprime loan portfolio or its CDO hedging strategy.  In reality, however, Morgan Stanley faced tremendous exposure to the subprime mortgage market.  Moreover, Morgan Stanley lacked adequate internal financial controls to address the burgeoning subprime crisis and to hedge the risks associated with its CDO exposure, in spite of its repeated public announcements to the contrary.

63.    On September 19, 2007, Morgan Stanley announced its results for the third quarter ended August 31, 2007.  The press release stated, in relevant part, as follows:

> Morgan Stanley (NYSE: MS) today reported income from continuing operations for the third quarter ended August 31, 2007 of $1,474 million, a decrease of 7 percent from $1,588 million in the third quarter of 2006. Diluted earnings per share from continuing operations were $1.38 compared with $1.50 a year ago. Net revenues were $8.0 billion, 13 percent above last year's third quarter. Non-interest expenses of $5.7 billion increased 18 percent from last year. The annualized return on average common equity from continuing operations was 17.2 percent in the current quarter compared with 23.3 percent in the third quarter of 2006.
>
> For the first nine months of 2007, income from continuing operations was a record $6,151 million, a 41 percent increase from $4,353 million a year ago. Diluted earnings per share from continuing operations were a record $5.79 compared with $4.12 last year. Net revenues rose 29 percent to a record $28.5 billion and non-interest expenses increased 24 percent to $19.2 billion. The annualized return on average common equity from continuing

operations was 25.5 percent compared with 22.4 percent a year ago

The results for Discover Financial Services prior to its spin-off on June 30, 2007 are reported in discontinued operations on an after-tax basis. Including these results, net income for the quarter was $1,543 million, a decrease of 17 percent from $1,851 million in the third quarter of 2006. For the first nine months of 2007, net income was a record $6,797 million, a 29 percent increase from $5,266 million a year ago. Diluted earnings per share were $1.44 for the quarter compared with $1.75 in the third quarter of 2006, and the annualized return on average common equity for the third quarter was 17.1 percent compared with 22.7 percent a year ago. For the first nine months, diluted earnings per share were a record $6.40 compared with $4.99 a year ago, and the annualized return on average common equity was 24.9 percent compared with 22.6 percent last year.

64.    Commenting on Morgan Stanley's third quarter results, Mr. Mack stated as follows:

Morgan Stanley's diversification across businesses and regions helped us deliver ROE of 17.2% this quarter, despite the impact of the severe market disruption on some areas of the Firm--including our credit products, leveraged lending and quantitative strategies businesses. Even with these turbulent markets, Morgan Stanley still delivered strong performances across many core businesses and achieved record results in our prime brokerage, derivatives and interest rate & currencies businesses. In addition, we continued making progress in executing our growth plans and vastly improving performance in Asset Management and Global Wealth Management.

65.    In a conference call on September 19, 2007, following the announcement of the Morgan Stanley's third quarter results, Mr. Sidwell explained Morgan Stanley's disappointing performance, in relevant part, as follows:

Let me highlight the areas that are key to understanding our results. *The credit markets deteriorated considerably over the course of the quarter, with increased volatility, significant spread widening, lower levels of liquidity and reduced price transparency at all parts of the capital structure. These factors affected the leveraged lending markets, the effectiveness of hedging strategies, sub-prime mortgage markets including the*

*CDO market, as well as other structured credit products.* This credit environment significantly impacted our results in relationship and leveraged lending, and credit sales and trading.

First in relationship and leveraged lending, where markdowns to our loans and commitments led to *losses of approximately $940 million* reported in our other sales and trading net revenues. The earnings per share impact from these losses was approximately $0.23 a share. These losses include the $726 million impact of marking to market including certain fees a $31 billion pipeline of leveraged loan commitments made to support acquisitions made by financial sponsors.

Second, *corporate credit and securitized credit product sales and trading businesses, including our residential and commercial mortgage businesses, had lower revenues than the strong second quarter. Revenues were approximately $260 million this quarter, compared with $1.3 billion last quarter*, with the largest decrease in corporate credit where losses in our structured credit business, as the extreme market moves impaired the performance of hedge strategies, more than offset strong investment grade and other trading results.

Our residential and commercial mortgage business had lower revenues than the second quarter as the market continued to deteriorate, particularly in the senior portion of the capital structure. We significantly reduced our positions during the course of the quarter in light of the market continues in corporate, residential, and commercial credit.

66.     Morgan Stanley was also suffering under the weight of massive credit deterioration necessitating enormous write-downs of its collateralized debt obligations as its Level 3 assets continued to balloon. Level 3 assets are holdings that are so illiquid, or trade so infrequently, that they lack a reliable price, so their valuations are based on management's best guess. Regarding Morgan Stanley's Level 3 assets, Mr. Sidwell commented, in relevant part, as follows:

Given the third quarter market dynamics, more instruments have become illiquid and as you would expect, the level of financial assets categorized in Level 3, which is the most illiquid category, have increased. Our total asset position of Level 3 in the second

quarter was approximately 5% of our total assets. Level 3 liabilities represented approximately 2% of total liabilities.

*While we are still working on the third quarter disclosures, we anticipate that the total of Level 3 asset positions will increase to approximately 8% of total assets when we file our Q.* Of the increase, approximately one-fourth or one-quarter represents Level 2 assets moving into the Level 3 category. Level 3 liabilities will represent about 3% of total liabilities.

*The major components of Level 3 are the same as we disclosed in the second quarter. Corporate and other debt, derivatives — which is primarily complex structured instruments — and investments which includes real estate funds and private equity.* Corporate and other debt in the assets category includes closed leveraged acquisition finance loans, commercial and residential whole loans to be securitized, commercial whole loans for private placements, and mortgage-backed residuals. Corporate and other debt in the liability category includes the marking to market of our pipeline of leveraged loan commitments.

Turning to the income statement on page 44 of last quarter's Q, you saw that we recognized just under $600 million in gains on Level 3 assets and liabilities. When we report our 10-Q for this quarter, you will see a net increase in gains in Level 3 driven by derivative contracts, which offset losses on other cash instruments included in those classified within Level 1 and 2.

Level 3 is where there are unobservable inputs, and includes situations where there is little if any market activity for the asset or liability. This is, generally speaking, the category where we are marking to model. The valuation methodology on these illiquid instruments applies modeling techniques that use relevant empirical data, including available indices to extrapolate an estimated fair value. The input reflects assumptions that market participants use in pricing an asset or liability in a current transaction. Representing a determined exit price, and also the cash flows ultimately expected.

Our valuation models are calibrated to the market on a frequent basis. The parameters and inputs are adjusted for assumptions about risk, and in all cases if market data exists, that data will be used to price the assets or liabilities. The valuation of these instruments are reviewed by an independent valuation group outside of the business units and subject to the scrutiny of our auditors so we are confident that we have appropriately valued these positions.

67.    During its third quarter, Morgan Stanley took approximately $1.2 billion in write-downs related to leveraged loans, but had yet to take any subprime mortgage-related write-downs. Most of the other investment banks had already taken billions of dollars in write-downs related to the weakening market. Citigroup Inc., for example, which took more than $6 billion in write-downs in the third quarter, announced its plan to take an additional $8 billion to $11 billion in the fourth quarter. Morgan Stanley's silence regarding its subprime exposure led the market to speculate that Morgan Stanley had gone relatively unscathed in the subprime mortgage mess. Accordingly, analysts questioned Morgan Stanley about Morgan Stanley's exposure to the subprime mortgage markets and its CDO positions during the September 19 conference call, as follows:

### Michael Hecht - Banc of America Securities

The marks you mentioned on the credit side of the business more coming from the corporate side versus the mortgage side, which I think was included in credit and on the mortgage side any write-downs related to Saxon?

### David Sidwell

Obviously we look at our residential and commercial mortgage business as a total business, and so Saxon is now integrated very much as we think about our residential mortgage business. As I said overall, that business had positive revenues. To answer in a very technical manner, there was an impairment of our goodwill in the quarter on Saxon. There was no impairment because we evaluate goodwill at the fixed income level, not at the Saxon level. There was a slight impairment of the intangible assets that was very small.

### Michael Hecht - Bank of America Securities

Can you clarify for us what your exposure is to ABCP Conduits? I think there is some rating agencies out there that put your liquidity lines at relatively big numbers, and I was hoping for a little clarification there.

**Colm Kelleher**

We have ABCP Conduits as such, in terms of providing stand-bys, we have negligible exposure. In terms of investment management we act basically in ABCP as an arranger and placer of paper. As you know, that market actually is showing signs of life and issuance is coming back.

Within investment management we clearly, like everybody, hold a commercial paper issued by the Conduits, and some of the SIVs; not surprising, given that the outstanding of that market was $1.2 trillion out of $2.2 trillion, and you know that position has been significantly reduced. We stopped buying that paper rolling it over early on, and we feel pretty relaxed about the positions we hold there for the time being.

**David Sidwell**

We were given a bit of a note here too that the rating agencies seem to have a wrong number for us here, so as Colm said, we do not think we have a significant number.

68.     Following the earnings conference, on October 11, 2007, Morgan Stanley announced that Mr. Kelleher would take over for Sidwell as the Executive Vice President and Chief Financial Officer of Morgan Stanley.

69.     Despite Morgan Stanley's silence regarding its exposure to the subprime crisis, the Wall Street Journal published an article on November 7, 2007, revealing that two analysts - David Trone of Fox-Pitt, Kelton and Mike Mayo of Deutsche Bank AG - projected a range of $3 billion to $6 billion on a possible Morgan Stanley write-down.  Mr. Trone characterized the basis for his Morgan Stanley estimate as an "educated guesses" tied to the firm's disclosed levels of credit and real-estate exposure.  He estimated the firm's exposure to CDOs is about $16 billion and that the write-downs are likely to total 25% of its CDO exposures, or $4 billion.  He also said the firm could take an additional $2 billion hit on straight mortgages and other risks such as exposure to SIVs, or structured investment vehicles.

70.    In a late reporting, on November 7, 2007, Morgan Stanley announced that it would write-down the value of its subprime mortgage-related exposure by $3.7 billion, due to the "continued market deterioration" since August.    Morgan Stanley attributed the loss to deterioration in capital markets, which was triggered in large part by the struggles of thousands of homeowners to keep up with mortgage payments.    Morgan Stanley further explained that the actual hit to its fourth-quarter results will depend on future market developments and could differ from the amount noted.    "It is expected that market conditions will continue to evolve, and that the fair value of these exposures will frequently change and could further deteriorate," Morgan Stanley said.

71.    The biggest piece of the $3.7 billion in pretax paper losses, Morgan Stanley's data indicated, came from a write-down of the CDO position from $11.4 billion on August 28 to $8.3 billion on October 31.    Such securities fell as much as 4.4% in August and 4.5% in September, but tumbled as much as 27% in October.    Mr. Kelleher noted that the mortgage-related bets "did not come out of our client-facing activities" such as underwriting; rather, Morgan Stanley "began with a short position in the subprime asset class, which went right through to the first quarter."    As the downturn spread to the senior CDO holdings that were meant to hedge the subprime bet, Morgan Stanley's exposure changed "from short to flat to long."    According to Mr. Kelleher, "[y]ou go short, expecting a certain predefined range of losses . . . that range of losses was burnt through by the excessive market action.    And then you ended up effectively going long."    One of Morgan Stanley's problems with its residential exposure in recent months was the weakening of its hedging positions as the market plunged far deeper than risk-management models had predicted, explained Mr. Kelleher.

72.    Through the first nine months of the fiscal year that ended in August, Morgan Stanley's bearish hedge on subprime returned a profit of $1 billion, according to Goldman Sachs Group Inc. analyst William Tanona.  But the firm's disclosure of the paper losses and its remaining positions in early November prompted two ratings firms to issue negative outlooks for Morgan Stanley's credit.

73.    Speculation by investors that Morgan Stanley had gone relatively unscathed in the subprime mortgage mess was immediately dashed and the gravity of the situation weighed on the stock, contributing to the eventual broad sell-off in the market.

74.    Standard & Poor's ("S&P") changed its outlook on Morgan Stanley to negative from stable after the bank said it will write down $3.7 billion in securities backed by residential mortgages.  A negative outlook indicates that a ratings cut is likely over the next two years.  S&P rates Morgan Stanley's senior unsecured debt "AA-minus," the fourth-highest investment grade.  Fitch Ratings also affirmed its ratings of "AA-minus" on the bank, saying the loss is manageable.  Fitch has a negative outlook on Morgan Stanley.

75.    The loss is a result of increased risk-taking in proprietary trading at the bank, S&P said in a statement.  "This misstep points to the increased risk Morgan Stanley bears owing to management's growth strategy and, more broadly, increased trading risks for all the broker-dealers in the current environment," S&P said.

76.    Moody's Investors Service also cut the ratings on 86 classes of Morgan Stanley mortgage securities while placing another 37 tranches under review on November 9, 2007.  "The ratings were downgraded and placed under review for downgrade based on higher than anticipated rates of delinquency, foreclosure, and REO in the underlying collateral relative to credit enhancement levels," Moody's said in a release.  The collateral backing the deals

consists of first lien fixed and adjustable-rate, Alt-A mortgage loans which were originated in late 2005 through 2006, it said.

77.    Although John Mack remains committed to taking more risk in trading, investing and lending for the firm and its clients, the ongoing credit markets crunch is making its mark on Morgan Stanley's balance sheet. "Clearly there is a risk of contagion" from residential to commercial mortgage-backed securities, Mr. Kelleher said. "The trend is clearly not looking good..."

78.    On November 13, 2007, Morgan Stanley held a conference in which it noted that it expects revenue and common equity growth to decline in 2008 amid a more challenging environment. "While we expect 2008 to be another growth year, we do not expect the current growth trajectory in revenue and average common equity to continue," Mr. Kelleher said at the Merrill Lynch Banking and Financial Services conference.   "We plan to be more judicious in how we allocate capital, to ensure the highest risk-return in this environment," he said. According to Mr. Kelleher, Morgan Stanley intends to "bring down" its balance sheet to keep leverage levels on par with previous quarter. Mr. Kelleher also said that Morgan Stanley expects "the market to take longer, several quarters, to return to more normal operating levels." Demand for CDOs will remain muted, hobbling the structured finance business "for an extended period."

## VIII.    CAUSATION

79.    The Plan suffered significant losses because substantial assets of the Plan were imprudently allowed to be put at great risk by Defendants, through investment by the Plan in Company Stock during the Class Period, in breach of Defendants' fiduciary duties.

80.    Defendants are responsible for losses caused by investment of Plan assets in Company Stock through matching and discretionary contributions to the extent that

Defendants prevented the sale or transfer of such Company Stock. Defendants are also responsible for losses caused by participant direction of investment in Company Stock by failing to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision making process, as required by section 404(c) of ERISA, 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. Defendants concealed material, non public facts from participants and provided misleading, inaccurate, and incomplete information to them regarding the nature of the Defendants' improper activities, the credit risk undertaken by Defendants and therefore the risks to Morgan Stanley's earnings levels, as well as the true underlying values of Company Stock offered by the Plan, misrepresenting its soundness as an investment vehicle. As a consequence, participants did not exercise independent control over their investments in Company Stock and Defendants remain liable under ERISA for losses caused by such investment.

81.    Where a breach of fiduciary duty consists of or includes misrepresentations and omissions material to a decision by a reasonable participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment.

82.    Defendants' statements, acts, and omissions alleged herein constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in Company Stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of its plan assets in Company Stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on Defendants' deceptive statements, acts, and omissions.

83.    Had the Defendants properly discharged their fiduciary and/or co fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Company Stock, eliminating Company Stock as an investment option when it became imprudent and divesting the Plan from Company Stock offered by the Plan when maintaining such an investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered through its continued investment in Company Stock.

## IX.    ERISA SECTION 404(C) DEFENSE INAPPLICABLE

84.    Section 404(c) of ERISA, 29 U.S.C. § 1104(c), is inapplicable as an affirmative defense here. Section 404(c) provides a limited exception to fiduciary liability for losses that result from Plan participants' exercise of "independent control" over investment decisions. It applies only when plan participants in fact exercise independent control over investment decisions, and the fiduciaries must otherwise satisfy the numerous procedural and substantive requirements of the statute and the regulations promulgated pursuant thereto.

85.    There are several reasons why said affirmative defense is inapplicable here. First, section 404(c) does not provide any defense to the Plan's fiduciaries' imprudent decision to select and continue offering Company Stock as investment option in the Plan, which is a decision that is completely out of Plan's participants' control.

86.    Second, even as to participant directed investment in Company Stock, section 404(c) does not apply because Defendants failed to ensure effective participant control by neglecting to provide complete and accurate material information to the Plan's participants regarding Company Stock. Due to Defendants' failure in this respect, the Plan's participants did not have informed control over the portion of the Plan's assets that were invested in Company Stock at their direction, and Defendants remain entirely responsible for losses arising therefrom.

87.    Accordingly, a section 404(c) affirmative defense to this action is inapt.

**COUNT I**
**(As against all Defendants)**

**Breach of Duty of Care**
**Section 404(a)(1)(B) of ERISA, 29 U.S.C. § 1104(a)(1)(B)**

88.    Plaintiff incorporates the foregoing paragraphs herein by reference.

89.    At all times relevant hereto, Section 404(a)(1)(B) of ERISA, 29 U.S.C. § 1104(a)(1)(B), required Defendants to act, with respect to the Plan, with the care, skill, prudence, and diligence that a prudent person acting in a like capacity and familiar with such matters would use in managing an enterprise of like character and with like aims.

90.    During the Class Period, Defendants breached their duty of care.  They failed to act prudently and failed to use reasonable care, skill, or diligence in offering Company Stock as an investment option, purchasing Company Stock for the Plan, monitoring the Plan's investment in Company Stock, communicating information concerning Morgan Stanley's financial performance to Plan participants, and holding Company Stock when it was no longer a prudent retirement investment.

91.    At all relevant times, Defendants knew or should have known, by virtue of their status as directors, officers or senior employees, of the above-mentioned facts, all of which made Company Stock an imprudent Plan investment.

92.    Defendants also knew that the price of Company Stock would materially decline once the market became aware that Company had overstated earnings growth.  Yet, Defendants failed to impute this knowledge to the Plan and Plan participants and continued to cause the Plan to acquire and retain shares of Company Stock.

93.    Defendants failed properly to take into account the numerous practices that put Company Stock at risk as well as the fact that Company Stock was inflated in value when determining the prudence of investing and holding Plan assets in Company Stock.

94.    As a result of Defendants' knowledge of and, at times, participation in creating and maintaining public misconceptions concerning the true financial health of Morgan Stanley, any generalized warnings of market and diversification made to Plan participants did not effectively inform Plan participants of the past, immediate, and future dangers of investing in Company Stock.

95.    Because Defendants knew or should have known that Company Stock was an imprudent investment for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and reasonably foreseeable losses incurred as a result of the Plan's investment in Company Stock.

96.    Defendants had available to them several different options for satisfying this duty, including: making appropriate disclosures as necessary; prohibiting future investment in Company Stock; divesting the Plan of Company Stock; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; or resigning as fiduciaries of the Plan to the extent that as a result of their employment by the Company they could not loyally serve participants in the Plan in connection with the Plan's acquisition and holding of Company Stock.

97.    Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses as a result of Plan investment in Company Stock.

98.    According to Plan documents, the Investment Committee and its members were responsible for the selection, maintenance, and monitoring of the Plan's investments.

99.    Under ERISA, Defendants were responsible for ensuring that all Plan investments in Company Stock were prudent and are liable for losses incurred as a result of such investments being imprudent.

100.    Moreover, a fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.    29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the Plan, to do so.

101.    Defendants breached their duties to prudently and loyally manage the Plan's assets.  During the Class Period, Defendants knew or should have known that Company Stock was not a suitable and appropriate investment for the Plan.  Nonetheless, during the Class Period, these fiduciaries continued to offer the Company Stock as an investment for the Plan and to direct and approve Plan investment in Company Stock.  Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take adequate steps to prevent the Plan, and indirectly the Plan participants and beneficiaries, from suffering losses as a result of the Plan's investment in Company Stock.

102.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants, not only lost a significant portion of its assets and retirement investments, but also failed to achieve the gains that the Plan, and indirectly the Class, would have realized had Defendants performed their fiduciary duties.

103.  Pursuant to sections 409 and 502(a) of ERISA, 29 U.S.C. §§ 1109(a) and 1132(a), Defendarts are liable to restore to the Plan the losses caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II
### (As against all Defendants)

**Breach of Fiduciary Duty of Loyalty to Avoid Conflicts of Interest --
Section 404(a)(1)(A) of ERISA, 29 U.S.C. § 1104(a)(1)(A)**

104  Plaintiff incorporates the foregoing paragraphs herein by reference.

105  At all relevant times, Section 404(a)(1)(A) of ERISA, 29 U.S.C. § 1104(a)(1)(A), required Defendants to act solely in the interests of the Plan participants, including Plaintiff, and for the exclusive purpose of providing benefits to the Plan participants.

106.  The fiduciary duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with single minded devotion to the interests of the Plan and its participants, regardless of the interests of the fiduciaries themselves or the Plan sponsor.

107.  Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, inter alia: failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investment in Company Stock; failing to notify appropriate federal agencies, including the United States Department of Labor, of the facts and transactions which made Company Stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company, their co-defendants, and themselves above the interests of the participants with respect to the Plan's investment in Company Stock.

108. In addition, upon information and belief, many of the Defendants had significant personal investments in Company Stock through, *inter alia*, receipt of Company Stock pursuant to incentive and nonqualified stock options and restricted share awards. Thus, Defendants had a significant personal financial incentive to maintain a high price for Company Stock. Defendants had an incentive not to disclose negative financial results to the Plan participants in hopes that such participants would select Company Stock for their retirement accounts and therefore help maintain a high price for Company Stock.

109. Defendants also had an incentive to maintain Company Stock as an investment option under the Plan because the elimination of Company Stock as an investment option in the Plan would have sent a negative signal to Wall Street analysts, which in turn would result in reduced demand for Company Stock and a drop in the stock price. Since the compensation of certain Defendants included Company Stock, this sequence of events would reduce their compensation and also reduce their profits from selling Company Stock.

110. As such, Defendants breached their fiduciary duty of loyalty because they were faced with a conflict of interest, which they did not promptly resolve, between their own interest and the interests of the Plan participants and beneficiaries. Defendants' interest in maintaining an artificially high price for Company Stock was in direct conflict with Plan participants' interests in (i) avoiding investing their retirement accounts in Company Stock when it was imprudent to do so and (ii) receiving accurate information concerning the Company upon which to base their investment decisions.

111. Defendants also breached their fiduciary duty of loyalty because they endorsed unreasonable earnings and growth estimates for the Company. Such endorsement was in the interests of Defendants to maintain an artificially high price for Company Stock, but was

detrimental to the interests of the Plan participants and beneficiaries who were holding and continuing to invest in Company Stock based upon misinformation.

112. Defendants also breached their fiduciary duty of loyalty because they did not timely disclose negative financial information regarding Morgan Stanley. Such non-disclosure aided the interests of Defendants in maintaining an artificially high price for Company Stock, but ran against the interests of the Plan participants who were holding and continuing to invest in Company Stock based upon misinformation.

113. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, not only lost a significant portion of its retirement investments, but also failed to achieve the gains that the Plan, and indirectly the Class, would have realized had Defendants performed their fiduciary duties.

114. Pursuant to sections 409(a) and 502(a)(1)(B) of ERISA, 29 U.S.C. §§ 1109(a) and 1132(a)(1)(B), Defendants are liable to restore to the Plan the losses caused by their breaches of fiduciary duties alleged in this Count.

### COUNT III
### (As against all Defendants)

**Breach of Fiduciary Duty to Provide Complete and Accurate Information
Section 404(a)(1)(A) and (B) of ERISA, 29 U.S.C. § 1104(a)(1)(A) and (B)**

115. Plaintiff incorporates the foregoing paragraphs herein by reference.

116. The fiduciary duties of loyalty and prudence also entail a duty to deal candidly with Plan participants. This duty of candor requires Plan fiduciaries to provide complete and accurate information concerning the Plan's investment options, including the financial performance of Morgan Stanley, to Plan participants. This duty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the Plan or Plan

assets, and to disclose material information that Plan participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding Plan investment options, so that Plan participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan. This duty applies to all Plan investment options, including investment in Company Stock.

117. Defendants breached their duty of candor to Plan participants by failing to provide complete and accurate information regarding, *inter alia*, Morgan Stanley's business improprieties, public misrepresentations, credit risks, inflated revenues and earnings, and the consequent inherent risks and/or artificial inflation of the value of Company Stock. Defendants also failed to convey accurate information regarding the soundness of Company Stock and the prudence of investing retirement contributions in Morgan Stanley equity. These failures were particularly devastating to the Plan, and thus Plan participants, because losses in Company Stock had an enormous impact on the value of participants' retirement assets.

118. During the Class Period, Defendants fostered a positive attitude toward Company Stock and/or allowed participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in Company Stock. As such, participants in the Plan could not appreciate the true risks presented by investments in Company Stock and therefore could not make informed decisions regarding their investments in the Plan.

119. Defendants failed to provide Plan participants with material information regarding Company Stock. Thus, the participants could not appreciate the true risks presented by

investments in Company Stock and could not make informed decisions regarding investments in the Plan.

120. Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable Plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment. Here, the above described statements, acts, and omissions of the defendants in this Complaint constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in Company Stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of their invested Plan assets in Company Stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of Defendants as described herein.

121. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, not only lost a significant portion of its retirement investments, but also failed to achieve the gains that the Plan, and indirectly the Class, would have realized had Defendants performed their fiduciary duties.

122. Pursuant to sections 409 and 502(a) of ERISA, 29 U.S.C. §§ 1109(a) and 1132(a), Defendants are liable to restore to the Plan the losses caused by their breaches of fiduciary duties alleged in this Count.

### COUNT IV
### (As against Defendants MS&Co., Morgan Stanley and MS&Co. Directors)

#### Breach of Fiduciary Duty to Monitor
#### Section 404(a)(1)(A) and (B) of ERISA, 29 U.S.C. § 1104(a)(1)(A) and (B)

123.    Plaintiff incorporates the foregoing paragraphs herein by reference.

124.    At all relevant times, ERISA Section 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), required Defendants to monitor other fiduciaries.

125.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries. In this case, that meant that Defendants had the duty to:

(viii)    ensure that the monitored fiduciaries possessed the needed credentials and experience or used qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of Plan participants;

(ix)    ensure that the monitored fiduciaries had ready access to such outside, impartial advisors, counsel, and experts when needed;

(x)    ensure that the monitored fiduciaries were provided with adequate financial resources to do their job;

(xi)    ensure that the monitored fiduciaries had adequate information to do their job of overseeing the Plan investments; and

(xii)    ensure that the monitored fiduciaries maintained adequate records of the information on which they based their decisions and analysis with respect to Plan investment options  The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

126.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the

investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not. The duty to monitor encompasses a duty to periodically monitor the performance of the appointees so as to ensure compliance with their fiduciary duties under ERISA and the plan.

127.    The duty of prudence requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether investment fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

128.    Pursuant to sections 409 and 502(a) of ERISA, 29 U.S.C. §§ 1109(a) and 1132(a), Defendants are liable to restore to the Plan the losses caused by their breaches of fiduciary duties alleged in this Count.

## COUNT V
### (As against all Defendants)

#### Co-Fiduciary Liability
#### Section 405(a) of ERISA, 29 U.S.C. § 1105(a)

129.    Plaintiff incorporates the foregoing paragraphs herein by reference.

130.    Section 405(a) of ERISA, 29 U.S.C. § 1105(a), imposes liability upon a fiduciary for a breach of fiduciary responsibility committed by another fiduciary.

131.    Each Defendant is also liable as a co-fiduciary because each (1) knowingly participated in and knowingly undertook to conceal (i) the failure of the other fiduciaries to provide complete and accurate information regarding Company Stock, (ii) the

conflict of interest facing the other fiduciaries, (iii) the failure to monitor and investigate Plan investments, (iv) the imprudence of the Plan investing in Company Stock, and (v) the failure to diversify the Plan investments; (2) enabled other fiduciaries to breach their duties as a result of each Defendant's own failure to satisfy his or her fiduciary duties; and (3) had knowledge of the other fiduciaries' failures to satisfy their fiduciary duties, yet did not make any effort to remedy the breaches.

132    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants, lost a significant portion of his retirement investments.

133.    Pursuant to sections 409 and 502(a) of ERISA, 29 U.S.C. §§ 1109(a) and 1132(a), Defendants are liable to restore to the Plan the losses caused by their breaches of fiduciary duties alleged in this Count.

## REMEDIES FOR DEFENDANTS' BREACH OF FIDUCIARY DUTIES

134.    Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), authorizes a plan participant to bring a civil action for appropriate relief under section 409. Section 409, 29 U.S.C. § 1109, requires "any person who is a fiduciary ... who breaches any of the ... duties imposed upon fiduciaries .. to make good to such plan any losses to the plan ...." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate ...."

135.    But for Defendants' breaches of fiduciary duty, the participants and beneficiaries in the Plan would not have made or maintained investments in Company Stock and, would have instead invested in the most profitable alternative investments available.

136.    Plaintiff and the Class are therefore entitled to relief from Defendants in the form of: (1) a monetary payment to the Plan to compensate for the losses to the Plan resulting from the breaches of fiduciary duties alleged above, in an amount to be proven at trial based on

the principles described above, as provided by section 409(a) of ERISA, 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by sections 409(a) and 502(a) of ERISA, 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by section 502(g) of ERISA, 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

137.    Each Defendant is personally liable and jointly liable for the acts of the other Defendants as a co-fiduciary.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against defendants, jointly, severally, or individually, in the alternative, as follows:

A.    declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Plan participants;

B.    an order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if defendants had fulfilled their fiduciary obligations;

C.    imposition of a constructive trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.    an order enjoining defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

E.    actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.    an order that defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in Company Stock maintained by the Plan in proportion to the accounts' losses attributable to the decline in the price/value of Company Stock;

G.    an order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.    an order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.    an order for equitable restitution and other appropriate equitable monetary relief against the defendants.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury on all issues so triable.

Dated: New York, New York
       December 14, 2007

<div style="text-align: right">

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

By: _____

Gregory M. Nespole (GN-6820)
Mark C. Rifkin (MR-0904)
Michael Jaffe (MJ-1671)
Robert B. Weintraub (RW-2897)
270 Madison Avenue
New York, New York 10016
(212) 545-4600

*Attorneys for Plaintiff Carolyn Egan and the
Proposed Class*

</div>

494338



Yahoo! Canada  Mail                                    Search the Web [          ] [ Search ]

**YAHOO!** FINANCE    Sign  Finance Home – Accueil – Help    **BusinessWire**
CANADA                In
                      New
                      User?
                      Sign
                      Up

                                                                      • Stock
                                                                        Short
                                                                      • Inflati
                                                                        Year:
                                                                      • JPMc
                                                                        Perce
                                                                      • Boeir
                                                                        - AP (9

                                                                      ———
                                                                      • Most:

**Press Release**                              Source: Milberg Weiss LLP

# Milberg Weiss Announces Its Investigation Relating to the Morgan Stanley 401(k) Plan and the Morgan Stanley Employee Stock Ownership Plan

Wednesday December 19, 11:38 am ET

NEW YORK--(BUSINESS WIRE)--Attorney Advertising. The law firm of Milberg Weiss LLP is investigating possible illegal conduct relating to the Morgan Stanley 401(k) Plan (the "401(k) Plan") and the Morgan Stanley Employee Stock Ownership Plan (the "ESOP") (NYSE: MS - News).

ADVERTISEMENT



Specifically, Milberg Weiss is investigating whether certain fiduciaries of the plans may have violated the Employee Retirement Income Security Act of 1974 ("ERISA") in at least two ways: (1) by continuing to offer Morgan Stanley common stock as a 401(k) Plan investment option for participant contributions when it was imprudent to do so, and (2) by maintaining the ESOP's pre-existing heavy investment in Morgan Stanley equity when company stock was no longer a prudent investment for the 401(k) Plan and the ESOP.

The Milberg investigation relates to whether certain fiduciaries of the plans knew or should have known that Morgan Stanley was concealing its large exposure to highly risky Collateralized Debt Obligations and the subprime mortgage market crisis, which has rendered Morgan Stanley common stock an imprudent, inappropriate and risky investment for the retirement savings of the 401(k) Plan's and ESOP's participants. A case against Morgan Stanley and the fiduciaries of the plans has been filed in federal court in New York.

If you have an individual account with the Morgan Stanley 401(k) Plan or the ESOP, and your account holds Morgan Stanley common stock, you may have legal claims under ERISA.

Milberg Weiss LLP has been representing individual and institutional investors for nearly 40 years and serves as lead counsel in U.S. federal and state courts. Please visit the Milberg Weiss website (http://www.milbergweiss.com) for more information about the firm. If you wish to discuss this matter with us, or have any questions concerning your rights and interests with regard to this matter, please contact the following attorneys:

Lori G. Feldman
Anita B. Kartalopoulos

Milberg Weiss LLP
One Pennsylvania Plaza, 49th Fl.
New York, NY 10119-0165
Phone number: (800) 320-5081
Email: contactus@milbergweiss.com
Website: http://www.milbergweiss.com

Attorney Advertising. Prior Results Do Not Guarantee A Similar Outcome.

*Contact:*

Milberg Weiss LLP
Lori G. Feldman/Anita B. Kartalopoulos, 800-320-5081
contactus@milbergweiss.com
http://www.milbergweiss.com

Source: Milberg Weiss LLP

⊠ Email Story        📞 Set News Alert        🖨 Print Story

[                    ]  Search News

Sponsor Results

Countrywide® Home Loans
No Closing Cost Refi. No Points. No Credit Report or Processing Fees.
www.Countrywide.com

Trade Forex Online
Free Forex Software & One-on-One Training. Try GFT risk-free now.
www.GFTforex.com

Try Forex Currency Trading at Forex.com
Free $50,000 practice account with real-time charts, news and research.
www.forex.com

(What's This?)

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN SIEFKEN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MORGAN STANLEY, MORGAN STANLEY & CO., INC., MORGAN STANLEY PLANS "INVESTMENT COMMITTEE," MORGAN STANLEY PLANS "ADMINISTRATIVE COMMITTEE," JOHN J. MACK, C. ROBERT KIDDER, ERSKINE B. BOWLES, DONALD T. NICOLAISEN and JOHN DOES 1-10,<br><br>Defendants. | CIVIL ACTION NO.<br><br>CLASS ACTION COMPLAINT<br><br>**JURY TRIAL DEMANDED** |

Plaintiff John Siefken ("Plaintiff"), by his attorneys, on behalf of the Morgan Stanley 401(k) Plan (the "401(k) Plan")[1] and Morgan Stanley Employee Stock Ownership Plan (the "ESOP") (collectively, the "Plan" or "Plans") and a class of similarly situated current and former participants ("Participants") in the Plans during the proposed Class Period (defined below), alleges as follows:

---

[1] Upon information and belief, prior to December 24, 2003, the 401(k) Plan was known as the Morgan Stanley DPSP/START Plan as a result of the merger between Morgan Stanley & Co. Incorporated Deferred Profit Sharing Plan with and into the Dean Witter START Plan (Saving Today Affords Retirement Tomorrow), effective October 1, 2002. *See* Securities and Exchange Commission Form 10-K for the fiscal year ended November 30, 2003 ("2003 10-K"), p. E-3 (describing exhibit No. 10.18).

**INTRODUCTION**

1.    This is a class action brought pursuant to §§ 409, 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109, 1132, against Defendants, fiduciaries of the Plan.

2.    Plaintiff was employed with Morgan Stanley ("Morgan Stanley" or the "Company") and was a participant in the Plans during the Class Period, during which time the Plans held interests in the Company's common stock. Plaintiff's retirement investment portfolio in the Plans during the Class Period included Morgan Stanley stock.

3.    Plaintiff brings this action for Plan-wide relief on behalf of the Plans and on behalf of a class of all Participants in the Plans for whose individual accounts the Plans held shares of Morgan Stanley common Stock and/or a fund invested in Morgan Stanley common stock (collectively, "Morgan Stanley Stock," "Stock," or "Fund")

4.    401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals. An employee participating in a 401(k) plan may have the option of purchasing the common Stock of his or her employer, often the sponsor of the plan, for part of his or her retirement investment portfolio. Morgan Stanley Stock was one of the investment alternatives of the Plans throughout the Class Period.

5.    Plaintiff alleges that Defendants, as "fiduciaries" of the Plans as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties to him and to the other participants and beneficiaries of the Plans in violation of ERISA §§ 404(a), 405, 29 U.S.C. §§ 1104(a), 1105, particularly with regard to the Plans' heavy holdings of Morgan Stanley Stock.

6.    Specifically, Plaintiff alleges in Count I that certain Defendants, each having certain responsibilities regarding the management and investment of Plan assets, breached their fiduciary duties to him, the Plans and proposed Class by failing to prudently and loyally manage the Plans' investment in Company securities by (1) continuing to offer Morgan Stanley Stock as a Plan investment option for participant contributions when it was imprudent to do so; and (2) maintaining the Plans' pre-existing heavy investment in Morgan Stanley equity when Company Stock was no longer a prudent investment for the Plans.  These actions/inactions run directly counter to the express purpose of ERISA pension plans which are designed to help provide funds for participants' retirement.  *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

7.    Plaintiff's Count II alleges that certain Defendants failed to communicate to the Plans' participants complete and accurate information regarding the Plans' investment in Morgan Stanley securities sufficient enough to advise participants of the true risks of investing their retirement savings in Company Stock.

8.    Plaintiff's Count III alleges that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single-minded" fiduciaries with only the Plans' and their participants' best interests in mind.

9.    Plaintiff's Count IV alleges that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan assets was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plans to continue offering Morgan Stanley Stock as an investment option and investing Plan assets in Morgan Stanley Stock when it was no longer prudent to do so.

10.    Plaintiff alleges that Defendants allowed the heavy imprudent investment of the Plans' assets in Morgan Stanley equity throughout the Class Period despite the fact that they clearly knew or should have known that such investment was imprudent due to, as explained in detail below, among other things, (a) the Company's failure to disclose material adverse facts about its financial well-being, business relationships and prospects; (b) the foreseeable deleterious consequences to the Company resulting from its substantial entrenchment in the subprime mortgage market; (c) the fact that, as a consequence of the above, the Company's Stock price was artificially inflated; and (d) the fact that heavy investment of retirement savings in Company Stock would inevitably result in significant losses to the Plans, and consequently, to its participants.

11.    This action is brought on behalf of the Plans and seeks recovery of losses to the Plans for which Defendants are liable pursuant to ERISA §§ 409, 502, 29 U.S.C. §§ 1109, 1132. Because Plaintiff's claims apply to the Plans, inclusive of all participants with accounts invested in Company Stock during the Class Period, and because ERISA specifically authorizes participants such as Plaintiff to sue for Plan-wide relief from breaches of fiduciary duty such as those alleged herein, Plaintiff brings this as a class action on behalf of the Plans and all participants and beneficiaries of the Plans during the proposed Class Period.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

13.    Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans were administered in this district, some or all of the fiduciary

breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary places of business in this district.

14.    More specifically, this district is an appropriate venue for this action because, on a recent Form 5500 annual filing with the Internal Revenue Service and Department of Labor, the address listed for the sponsor of each of the Plans is in this district. *See* IRS and DOL Form 5500 for the Plan, filed 2006 ("2006 Form 5500"). Accordingly, it is likely that many of the parties and potential witnesses, including corporate executives and many of the Plans' participants, are located in or within close proximity to this district.

<div align="center">

**PARTIES**

</div>

**Plaintiff**

15.    Plaintiff John Siefken is a "participant," within the meaning of § 3(7) of ERISA, 29 U.S.C. § 1102(7), in the Plans and held Morgan Stanley shares in his retirement investment portfolio during the Class Period.

**Defendants**

**Morgan Stanley**

16.    Defendant Morgan Stanley is a Delaware corporation with its principal place of business located at 1585 Broadway, New York, New York 10036. Morgan Stanley is a global financial services firm that, through its subsidiaries and affiliates, provides its products and services – namely, financial advisory services, investment advisory services covering various investment alternatives, global asset management products and services in equity, fixed income, alternative investments and private equity – to a large and diversified group of clients and customers, including corporations, governments, financial institutions and individuals. *See* Securities and Exchange Commission Form 10-K for the fiscal year ended November 30, 2006

field on February 13, 2007 ("2006 10-K"). As of November 30, 2006, Morgan Stanley had 55,310 employees worldwide. *Id.*

17.    Morgan Stanley is the Plan Sponsor for the ESOP.[2] *See* 2006 Form 5500. Further, the Company exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets, and was therefore a fiduciary of the Plans in its own right. Morgan Stanley acted through its Board of Directors, as well as officers and employees including its Chief Executive Officer ("CEO"), and members of any Company oversight and/or Plan administrative committees, appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment.

18.    Morgan Stanley & Co. Inc. is the Plan Sponsor for the 401(k) Plan. *See* 2006 Form 5500 at schedule D, Part II (a)-(b). Morgan Stanley & Co. Inc. is a wholly owned subsidiary of Morgan Stanley. 2006 11-K at p. 3.[3]

19.    Morgan Stanley had, at all applicable times, effective control over the activities of its directors, officers and employees, including over their Plans-related activities. Through its Board of Directors or otherwise, Morgan Stanley had the authority and discretion to hire and terminate said officers and employees. In addition, upon information and belief, the Company and/or its Board of Directors also had the authority and discretion to appoint, monitor, and remove individual directors, officers and employees from their individual fiduciary roles with

---

[2] As explained further below, the assets of the Plans are combined and commingled in the Morgan Stanley Defined Contribution Master Trust ("Master Trust") (*see* Securities and Exchange Commission Form 11-K for the fiscal year ended December 31, 2006 ("2006 11-K") at p. 3).

[3] References to Morgan Stanley include reference to Morgan Stanley & Co., Inc., unless otherwise noted.

respect to the Plans. By failing to properly discharge their fiduciary duties under ERISA, the director, officer and employee fiduciaries breached duties they owed to the Plans, its participants and their beneficiaries. Accordingly, the actions of the Board of Directors, the Plans' administrative and/or investment committees and/or any other employee fiduciaries are imputed to the Company under the doctrine of *respondeat superior*, and the Company is liable for these actions.

20.    The Company and its Board of Directors (the "Board") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets. Indicative of the Board's authority, upon information and belief, the Board was ultimately responsible for monitoring and administering the Plans, appointing, monitoring and removing members of committees charged with the operation of the Plans, and for determining the amount, if any, of any additional discretionary contributions by the Company to the Plans. Upon information and belief, the Board also had the authority and obligation to appoint and remove other fiduciaries of the Plans, including, without limitation, members of the Plans' Investment Committee and Administrative Committee, if necessary in order to best serve the interests of the Plans' participants.

**Investment Committee Defendants**

21.    Upon information and belief, the Investment Committee consists of no fewer than three persons, each of whom is an employee and/or an advisory director of the Company. Management of the investment options of the Plans is placed in the hands of the Investment Committee who are appointed from time to time by, and serve at the pleasure of the Board. *See* Morgan Stanley DPSP/START Plan, effective October 1, 2002 ("2002 Plan").

22.    More specifically, the Investment Committee is delegated responsibility for the selection of investment options for the Plans and monitoring the performance of the Investment Funds and is a "Named Fiduciary" for purposes of Section 402(a)(2) of ERISA. *See* 2002 Plan at 48.

23.    The Investment Committee and its members were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

**Administrative Committee Defendants**

24.    Upon information and belief, the general administration of the Plans is placed in the hands of the Administrative Committee. The members of the Committee are appointed from time to time by, and serve at the pleasure of, the Board.[4] *See* 2002 Plan at p. 74. The Committee consists of no fewer than three persons, each of whom is either an employee and/or an advisory director of the Company. *Id.*

25.    Upon information and belief, the Administrative Committee is a "Named Fiduciary" for purposes of Section 402(a)(2) of ERISA. *Id.*

26.    The Administrative Committee and its members were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

---

[4] The ESOP was amended, effective November 27, 2006, to place direct administration of the ESOP within the purview of the Board: "The Plan shall be administered by the Board of Directors, which may . . . but need not, delegate some or all of its authority under the Plan to and Administrator." *See* Ex. 10.16 to 2006 10-K at p.8.

Director Defendants

**Chairman/CEO**

27.    Defendant John J. Mack ("Mack") served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board during the Class Period. Defendant Mack was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

**Compensation, Management Development and Succession Committee**

28.    The Compensation, Management, Development and Succession Committee ("Compensation Committee") is a committee of the Board of Directors. The Compensation Committee's charter provides, in relevant part, that:

> The Committee shall: . . . . Administer and amend, as it determines appropriate, any present or future incentive compensation plan, equity-based plan or employee benefit plan providing that is shall be administered or amended by the Board or the Committee. The Committee is also authorized to exercise and perform any power, authority, discretion or duty of the Board or the Committee that any such plan provides shall be exercised or performed by the Board or the Committee, including without limitation to (i) issue or grant equity-based awards pursuant to such plan, (ii) authorize or reserve shares of common stock for issuance thereunder and (iii) make any such equitable anti-dilution adjustments required in the event of an equity restructuring or similar event.

29.    Defendant C. Robert Kidder ("Kidder") served as a member and the Chairman of the Compensation Committee during the Class Period. Defendant Kidder was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

9

30.    Defendant Erskine B. Bowles ("Bowles") served as a member of the Compensation Committee during the Class Period. Defendant Bowles was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

31.    Defendant Donald T. Nicolaisen ("Nicolaisen") served as a member and the Chairman of the Compensation Committee during the Class Period. Defendant Nicolaisen was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

32.    Defendants Mack, Kidder, Bowles and Nicolaisen are referred to collectively as the "Director Defendants."

**Additional "John Doe" Defendants**

33.    Without limitation, unknown "John Doe" Defendants 1-10 include other individuals, including members of the Administrative and/or Investment Committees, as well as Company officers, directors and employees who are or were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period. The identities of the John Doe Defendants are currently unknown to Plaintiff. Once their identities are ascertained, Plaintiff will seek leave to join them to the instant action under their true names.

## THE PLANS

34.    Each of the Plans is an "employee pension benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A). The Plans are legal entities that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such

as this, the Plans are neither defendants nor plaintiffs. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plans and their participants and beneficiaries.

**401(k) Plan**

35.    The 401(k) Plan is a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34). It is described as a profit-sharing plan that includes a "qualified cash or deferred arrangement." 2006 Form 11-K at p. 3.

36.    All of the 401(k) Plan's investments are held in a trust account at Mellon Bank, N.A. (the "Trustee"). *Id.* Further, the Master Trust (defined above) "includes commingled assets of the Plan and the ESOP." *Id.*

37.    Full-time, Flex Part-time, and Regular Part-time employees are eligible to participate in the 401(k) Plan at commencement of employment.[5]

38.    Individual accounts are maintained for each 401(k) participant. Each participant's account is credited with employee contributions, Company matching contributions and profit share contributions, the 401(k) Plan's earnings, and charged with the allocation of investment losses and administrative expenses not otherwise paid by the Company. 2006 Form 11-K at p. 4.

39.    All contributions to the 401(k) Plan may be allocated among any of the available investments selected by the participant from among the investments designated by the Investment Committee.

40.    As of December 31, 2006, there were 25 investment vehicles within the Master

---

[5] Part-time employees regularly scheduled to work less than 20 hours per week and Discover employees classified as Part-Time, Prime-time, Hourly or Temporary are only eligible to participate after completing one year of service and attaining age 21. 2006 Form 11-K at 3. Further, employees hourly employees hired after July 1, 2004 are not eligible to participate in the 401(k) Plan.

47.    Participants in the 401(k) Plan hired on or after January 1, 2004 become vested in Company contributions and earnings thereon upon the earlier of the following: (1) completion of three years of service; or (2) if a participant terminates employment due to death, total and permanent disability, retirement or release as defined by the 401(k) Plan document.[7] 2006 Form 11-K.

48.    Prior to January 1, 2007, Participants of the 401(k) Plan age 55 and older or no longer with the Company could diversify a portion of their accounts in the ESOP by transferring them to the 401(k) Plan. However, effective January 1, 2007, these participants have the option to diversify all of their Company Contributions. Participants under age 55 "may diversify when they have at least three years of service" for any contributions made in or after January, 2007. 2006 11-K at p. 15. For contributions made prior to January 2007, participants under the age of 55 may diversify their pre-2006 contributions as follows: up to 25% on or after January 31, up to 50% on or after May 1, up to 75% on or after August 1, and 100% on or after October 31.

49.    As of December 31, 2006, the 401(k) Plan held Morgan Stanley Common Stock, valued at $12,464,606. In order to provide participants the "opportunity to elect to receive cash payment of the dividends paid on the [Morgan Stanley Common Stock Fund] the . . . shares are transferred quarterly to the ESOP wherein dividends are earned." 2006 Form 11-K at p. 12.

50.    As a result of the 401(k) Plan's holdings of Morgan Stanley Stock, the Plan and its participants have suffered significant losses due to the breaches described herein.

---

[7] Different vesting rules apply to employees of the Company's subsidiaries hired before January 1, 2004. For instance, an employee of Global Wealth Management, Individual Asset Management, Discover or Infrastructure and Company, hired prior to January 1, 2004, who is a participant of the 401(k) Plan is 100% vested in Company contributions under the ESOP upon the earliest of (i) attaining age 65 in-service, (ii) termination of employment due to death, total and permanent disability, retirement or release, or (iii) completing three years of credited service for contributions attributable to 401(k) Plan Years beginning before January 1, 2002. 2006 Form 11-K at p. 5.

service; or (2) if a participant terminates employment due to death, total and permanent

disability, retirement or release as defined by the 401(k) Plan document. 2006 Form 11-K.

57.    As further noted above, prior to January 1, 2007, Participants of the 401(k) Plan

age 55 and older or no longer with the Company could diversify a portion of their accounts in the

ESOP by transferring them to the Plan. However, effective January 1, 2007, these participants

have the option to diversify all of their Company Contributions. Participants under age 55 "may

diversify when they have at least three years of service." 2006 11-K at p. 15.

58.    At year end 2006, the Master Trust held $2,985,709,923 of commingled 401(k)

Plan and ESOP Company securities, out of total assets of $5,817,564,015. 2006 Form 5500,

Schedule H, Part I.

59.    Each and every participant of the ESOP had Company Stock in their ESOP

account during the Class Period. As a result, a substantial portion of the ESOP's assets are

invested in Company Stock.

## CLASS ACTION ALLEGATIONS

60.    Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), and/or

(b)(2) of the Federal Rules of Civil Procedure on behalf of himself and the following class of

persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the
> Morgan Stanley 401(k) Plan (the "401(k) Plan") and the Morgan
> Stanley Employee Stock Purchase Plan (the "ESOP") (collectively,
> "Plan" or "Plans") at any time between August 9, 2006 and the
> present (the "Class Period") and whose Plan accounts included
> investments in Morgan Stanley Stock. Excluded from the Class
> are the defendants, any entity in which the defendants have a
> controlling interest, or is a parent or subsidiary of or is controlled
> by the Company, and the officers, directors, employees, affiliates,
> legal representatives, heirs, predecessors, successors and assigns of
> the defendants.

61.    The members of the Class are so numerous that joinder of all members is

**ESOP**

51.     Morgan Stanley sponsors the Morgan Stanley ESOP. *See* 2006 Form 5500 at Schedule D, Part II. The assets of the ESOP, which consist purely of Morgan Stanley Stock are held in the Mater Trust along with assets from the 401(k) Plan. *See* 2006 11-K at 3.

52.     Employees are eligible to participate in the ESOP beginning on the later of (i) the employee's date of hire by the Company or any subsidiary and (ii) the date such employee becomes an eligible employee.[8] *See* Ex. 10.16 to 2006 Form 10-K, at p. 8.

53.     The ESOP is administered by the Board of Directors which has "full power and authority to construe and interpret the [ESOP], to prescribe, amend and rescind rules and regulations relating to it, and to make all other determinations necessary or advisable in administering the [ESOP]. *Id.*

54.     Upon information and belief, participants make contributions to the ESOP through their contributions to the 401(k) Plan which then transfers all investments in the Morgan Stanley Common Stock to the ESOP. "Quarterly transfers are made from the Morgan Stanley Stock Fund under the [401(k)] Plan to the ESOP throughout the [401(k)] Plan year and all forfeitures are transferred to the ESOP." 2006 Form 11-K at 4.

55.     Further, all Company contributions, including profit sharing contributions and Company matching contributions, are made to ESOP. 2006 Form 11-K at 4.

56.     As noted above, vesting in Company contributions occurs when participants hired on or after January 1, 2004 achieve the earlier of the following: (1) completion of three years of

---

[8] Each Eligible Employee who is first hired by the Company or a subsidiary on or after April 1, 2002 shall be eligible to participate in the ESOP beginning on the later of (i) the first day of the month following the date the employee has completed one year of service for the Company and its subsidiaries, provided that he is employed on such date and (ii) the date such employee becomes an Eligible Employee. *See* Ex. 10.16 to 2006 Form 10-K, at p. 8.

impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are several tens of thousands of members of the Class who participated in, or were beneficiaries of, the Plans during the Class Period and whose Plans accounts included investment in Morgan Stanley Stock.

62.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants each owed a fiduciary duty to the Plans, Plaintiff and members of the Class;

(b)    whether Defendants breached their fiduciary duties to the Plans, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plans and the Plans' participants and Beneficiaries;

(c)    whether Defendants violated ERISA; and

(d)    whether the Plans and members of the Class have sustained damages and, if so, what is the proper measure of damages.

63.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff, the Plans and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

64.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Plans or the Class.

16

65.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

66.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

<u>**DEFENDANTS' FIDUCIARY STATUS**</u>

67.    During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plans and/or the management or disposition of the Plans' assets.

68.    During the Class Period, all of the Defendants acted as fiduciaries of the Plans pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

69.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(1), 29 U.S.C. § 1102(a)(1). Upon information and belief, the Company, the Board and the Plans Committees were named fiduciaries of the Plans.

70.    Instead of delegating fiduciary responsibility for the Plans to external service providers, Morgan Stanley chose to internalize at least certain aspects of this fiduciary function.

71.    Upon information and belief, the Company administered the Plans and the Plans'

assets through the Board, Investment Committee and the Administrative Committee, which had discretionary authority to manage and control the operation and administration of the Plans and investment of their assets, as noted and described above. The Company, through the Board, was, upon information and belief, responsible for appointing, evaluating and monitoring the Plans' committees, including, without limitation, the Investment Committee and Administrative Committee, including their members and delegees.

**Additional Fiduciary Aspects of Defendants' Actions/Inactions**

72.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, performed fiduciary functions. Section 3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets . . . ." During the Class Period, Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

73.     Further, ERISA mandates that pension plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the Plan and its participants when communicating with them. A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and Beneficiaries. "[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996). Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct the inaccurate or misleading information so that plan participants will not be injured. *See, e.g., Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 381 (4th Cir. 2001)

18

("[An] ERISA fiduciary that knows or should have known that a beneficiary labors under a material misunderstanding of plan benefits that will inure to his detriment cannot remain silent – especially when that misunderstanding was fostered by fiduciary's own material representations or omissions."); *Jones v. Am. Gen. Life & Accident Ins. Co.*, 370 F.3d 1065, 1072 (11th Cir. 2004); *Bixler v. Central Penn. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3rd Cir. 1993).

74.    During the Class Period, upon information and belief, Defendants made direct and indirect communications with the Plans' participants including statements regarding investments in Company Stock. These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions ("SPDs") and/or prospectuses regarding Plans/participant holdings of Company Stock), which included and/or reiterated these statements. Upon information and belief, at all times during the Class Period, Morgan Stanley's SEC filings were incorporated into and part of the SPDs, the Prospectus and/or the Form S-8 registration statements. Defendants also acted as fiduciaries to the extent of this activity.

75.    Further, Defendants, as the Plans' fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plans' participants, well-recognized in the 401(k) literature and the trade press,[9] concerning investment in company Stock, including that:

---

[9] Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. Econ. 4, 1149 (2001) (available at http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf); Nellie Liang & Scott Weisbenner, 2002, *Investor behavior and the purchase of company Stock in 401(k) plans - the importance of plan design*, Finance and Economics Discussion Series 2002-36, Board of Governors of the Federal Reserve System (U.S.) (available at http://www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf).

(a)    Employees tend to interpret a match in company Stock as an endorsement of the company and its Stock;

(b)    Out of loyalty, employees tend to invest in company Stock;

(c)    Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(d)    Employees tend not to change their investment option allocations in the plan once made;

(e)    No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company Stock, and many retirement professionals would advise employees to avoid investment in company Stock entirely;

(f)    Lower income employees tend to invest more heavily in company Stock than more affluent workers, though they are at greater risk; and

(g)    Even for risk-tolerant investors, the risks inherent to company Stock are not commensurate with it rewards.

76.    Even though Defendants knew or should have known these facts, and even though Defendants knew of the high concentration of the Plans' funds in Company Stock, they still disseminated inaccurate, incomplete and materially misleading statements Plan-wide regarding the Company's financial and operational health and future prospects, and/or did nothing to correct such statements.

## DEFENDANTS' CONDUCT

77.    Morgan Stanley is one of the world's largest wealth management, capital market and advisory companies, and one of the top investment banks in the United States. As such, the

Trust, including a Company Stock Fund, which were available for selection in the 401(k) Plan, including Company stock.

Participant Contributions

41.    Each participant may elect to make contributions to the 401(k) on a pre-tax basis through payroll deductions from 1% through 20% of such participant's eligible annual compensation up to an annual maximum of $15,000 for 2006. 2006 Form 11-K at p. 3.

42.    In addition, participants who are age 50 or older may make a pre-tax catch-up contribution to the 401(k) Plan through payroll deductions from 1% to 20% of eligible compensation to an annual maximum of $5,000 in 2006.[6] A participant can elect to change the rate at which his/her contribution is determined at any time during the year.

43.    Employees -- other than those considered to be non-highly compensated employees -- may also elect to contribute up to 10% of eligible compensation in after-tax dollars up to an annual maximum of $10,000.

44.    Participants are always 100% vested in contributions to the 401(k) Plan made from their eligible compensation and in the earnings thereon. 2006 401(k) Plan at p. 5.

Company Contributions

45.    To be eligible for a company match for a year, an employee must participate in the 401(k) Plan by making pretax contributions in the year the match is received and must be employed by the Company on December 31 of that year. 2006 Form 11-K at 4.

46.    In 2006 all Company contributions were to the ESOP. These contributions include profit sharing contributions and Company matching contributions on a pre-tax basis. *Id.* These contributions are allocated in the Morgan Stanley Stock under the ESOP.

---

[6] Effective May 16, 2006, Puerto Rico residents age 50 or over will be limited to maximum catch-up contributions of $500.

loans. For example, one product marketed by some subprime lenders is a Pay Option ARM, which is an adjustable rate mortgage with an interest rate that changes monthly and payments that change annually. The borrower can choose from a variety of payment options, including one that is below what would be paid in an interest-only mortgage. Selection of this option would result in negative amortization, meaning that the loan's principal would actually *increase* during this period. Increases in monthly payments are capped at 7.5% per year unless the principal balance of the loan is 115% of the original loan amount or 5 or 10 years have passed since the loan was made. In both cases, the loan will become fully amortizing (meaning interest and principal payments will be made like a traditional mortgage. The reversion to full amortization is referred to as a "reset" or "recast" and can result in a substantial increase in a borrower's monthly mortgage payment. If the borrower does not obtain a more favorable arrangement through refinancing, they may be in a position where they will be simply unable to meet their new mortgage payment.

83.    An additional product marketed by many subprime lenders is the 2/28 ARM, which is an adjustable rate mortgage that fixes rates for two years, and then resets to an ARM rate index value (*e.g.* the Treasury Bill rate or the London Inter-Bank Offering Rate (LIBOR)) plus a "margin" ("fixed percentage points above the "index " rate) after the two-year mark. For example if the rate is 5% for two years but after two years, the index is 4% and the margin is 4.5%, a 5% loan becomes an 8.5% loan. As with the Pay Option ARM discussed above, if borrowers are unable to refinance the loan and obtain a more favorable arrangement, they may be in a position where they cannot meet their new mortgage payment once their fixed mortgage loan resets.

84.    Rather than hold mortgage loans, generally, lenders sell subprime mortgages

bundled into bonds and offered to individual and institutional investors. Morgan Stanley publicly expressed interest in subprime mortgage lenders two years ago when Defendant Mack "spoke publicly of adopting a higher risk profile and pushed [Morgan Stanley] into in-vogue investment areas like subprime mortgages." *See* "Morgan Stanley Executive Ousted After Trading Loss," *The New York Times*, November 30, 2007.

85.     As Wall Street's interest in the subprime mortgage market increased, lenders had an increased incentive to increase their volume of loans. Too often, this had the effect of providing lenders with financial incentive to lower their underwriting standards and make more risky loans. In other words, many lenders became less concerned with borrowers' ability to repay over the long term and more concerned with their mere volume of loans over the short term. This is because lenders' profits largely depended on the quantity, rather than the quality of loans that they closed. As a result, many loans were made to borrowers that exceeded the borrowers' ability to repay.

86.     Thus, as home prices declined and interest rates began to rise in late 2006 and early 2007, the default rates for these mortgages rose as well. For example, early defaults in the mortgages (within the first six months of securitization) rose from between the .5% to .75% range in 2003-2004 to over 2.5% in 2006, as reflected in the chart below:



Source: *The New York Times*, "Tremors at the Door," January 26, 2007.

87.     The substantial increase in mortgage loan defaults has had a tremendous impact upon the mortgage market. During the first half of 2007, dozens of lenders participating in the subprime mortgage market went out of business as defaults and delinquencies on recent loans spiked.

**B.     Morgan Stanley Gambled on the Subprime Market**

88.     Generally speaking, a collateralized debt obligation ("CDO") is a security backed by a pool of bonds, loans and other assets. Morgan Stanley was/is deeply entrenched in investments in the subprime mortgage market, including CDOs and other mortgage-backed securities, having "recently [become] a lead player in underwriting subprime-mortgage securities." *See The Wall Street Journal*, "AIG, Morgan Stanley Show Subprime Losses Aren't Quite Over Yet," November 8, 2007.

89.     Despite the fact that most investment banks recognized warning signs and reduced their exposure to CDOs, Morgan Stanley inexplicably chose to charge forward and

24

*increase* its entrenchment in the subprime mortgage market. In fact, "[a]fter acquiring subprime mortgage originator Saxon Capital Inc. for $706 million, Morgan Stanley ranked No. 1 in underwriting securities backed by subprime mortgages." *See* "AIG, Morgan Stanley Show Subprime Losses Aren't Quite Over Yet," *The Wall Street Journal*, November 8, 2007.

90.    This is particularly alarming as it has been noted that investing in subprime mortgages was "outside the traditional expertise of Morgan Stanley." *See* "Morgan Stanley Executive Ousted After Trading Loss," *The New York Times*, November 30, 2007.

91.    Morgan Stanley's involvement in the subprime mortgage is immense. It recently indicated that it had "subprime net exposures of $10.4 billion at the end of its third quarter on [August 31, 2007] which had declined to $6 billion as of [October 31, 2007] – [only] a month before the end of the firm's fourth quarter." *See* "AIG, Morgan Stanley Show Subprime Losses Aren't Quite Over Yet," *The Wall Street Journal*, November 8, 2007.

92.    Thus, despite the fact that they knew or should have known that Morgan Stanley's heavy involvement in the CDO and subprime loan origination markets could lead to a substantial devaluation of the Company's Stock once the underlying financial realities and true risks became known, certain of Defendants had a very strong financial incentive to conceal the truth and keep the Company's Stock price artificially high and write-downs for subprime losses artificially low.

C.    **During the Class Period, Morgan Stanley Disseminated Materially Inaccurate, Incomplete and Misleading Information to Plan participants**

93.    Throughout the Class Period, Defendants repeatedly issued inaccurate, incomplete and materially misleading statements to investors and to the Plans' participants, including statements that concealed that: (1) the Company was grossly over-exposed to the potential for substantial losses as conditions in the subprime industry inevitably deteriorated; (2) the Company concealed the ominous dangers it faced as a result of its huge exposure to CDOs; (3) the

25

Company failed to take accurate and timely write-downs for losses resulting from the collapse of the subprime market; and (4) the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

94.    Morgan Stanley's dissemination of inaccurate, incomplete and materially misleading statements prevented the market from realistically assessing Morgan Stanley and its financial well-being, thus resulting in the overvaluation and artificial inflation of its Stock. Defendants further knew or should have known that the Company's Stock price would plummet—and that the Plans' participants would suffer tremendously and unnecessarily—once the foreboding truth became known.

95.    Nonetheless, throughout the Class Period, the Company fostered a positive image to assure the market and the Plans' participants that Morgan Stanley would not fall prey to adverse trends in the credit industry—particularly, the subprime mortgage industry.

96.    For example, on August 9, 2006, the first day of the Class Period, Morgan Stanley issued a press release announcing that it had reached an agreement to acquire Saxon Capital, Inc., a premier servicer and originator of residential mortgages, for $706 million, or $14.10 per share in cash for Saxon Stock.[10]

97.    In touting Morgan Stanley's latest acquisition, Anthony Tufriello, Global Head of the Securitized Products Group proudly stated:

> The acquisition of Saxon is another important step in our long-term strategy of broadening the Firm's global franchise in the critical residential mortgage business, which represents the single largest segment of the global debt market.  Saxon builds on our existing origination and securitization capabilities by providing us with an extremely strong servicing platform. This is an important part of the residential mortgage business, and the addition of Saxon will

---

[10] The actual acquisition of Saxon Capital, Inc., occurred on December 4, 2006. *See* 2006 Form 10-K.

> further enhance our risk management of mortgage portfolios. This deal also provides Morgan Stanley with new origination capabilities in the non-prime market, which we can build upon to provide access to high-quality product flow across all market cycles.

August 9, 2006, Morgan Stanley Press Release.

98.    On March 1, 2007, Morgan Stanley reported record income from continuing operations for the first quarter ended February 28, 2007 of $2,559 million, an increase of 60 percent from $1,602 million in the first quarter of 2006. Net revenues were a record $11.0 billion, 29 percent above last year's first quarter. Defendant Mack was ecstatic. He stated:

> Morgan Stanley delivered outstanding results this quarter - with record revenues and earnings along with ROE of more than 20 percent for the sixth quarter in a row. This strong performance was in large part the result of effective, disciplined risk-taking by our team in Institutional Securities, which helped deliver record results across our sales and trading businesses. Our Global Wealth Management business this quarter delivered its highest revenues since 2000 and we continued to make substantial progress in executing our growth plan in Asset Management. We see many opportunities to further improve our performance, and remain intensely focused on helping our clients navigate the constantly changing markets and leveraging our global franchise to create additional value for our shareholders.

March 21, 2007 Morgan Stanley Press Release.

99.    On June 15, 2007, Morgan Stanley Stock hit a 52-week high of $90.95.

100.    On June 20, 2007, Morgan Stanley announced continued record breaking results. It had record income from continuing operations for the second quarter ended May 31, 2007 of $2,582 million, an increase of 41 percent from $1,828 million in the second quarter of 2006. Diluted earnings per share from continuing operations were a record $2.45 compared with $1.74 a year ago. Net revenues were a record $11.5 billion, 32 percent above last year's second quarter. *See* June 20, 2007 Morgan Stanley Press Release.

101.    Defendant Mack again was effusive in his praise for the Company's outlook:

> Morgan Stanley delivered record revenues and earnings in the second quarter and the first half of the year, as we continued to build momentum across our securities businesses and continued to see the benefits of our diverse mix of products, clients and businesses around the globe. Thanks to the commitment and focus of our people, we've now achieved seven straight quarters with ROE above 20 percent, and we're well on our way to reaching our goal of doubling 2005 earnings over five years. But we believe there is still work that remains to be done, and we remain intensely focused on delivering value to Morgan Stanley's clients and shareholders over the long term.

102.    Amidst a cacophony of concerns regarding the collapse of the subprime mortgage market, the Company continued to conceal the truth regarding its true financial condition and uttered nothing regarding its potential liability.

103.    Throughout autumn 2007, the stock prices of many large lenders dropped significantly. This was due to the immense problems within the subprime mortgage industry, as hundreds of millions of dollars worth of subprime mortgage-backed securities became virtually worthless and numerous lenders announced substantial mortgage-related charges. Nevertheless—and despite the Plans' heavy investment in Company Stock—Morgan Stanley stubbornly stood its ground and continued to hide the truth about its financial condition.

**The Truth Finally Begins to Emerge**

104.    Morgan Stanley's third quarter 2007 results were disappointing. Compared to the first half of 2007 where it had experienced record results, Morgan Stanley reported on September 19, 2007 that income from continuing operations ended August 31, 2007 had decreased 7 percent from the third quarter in 2006.

105.    Finally, on November 7, 2007, Morgan Stanley issued a press release "announcing significant declines since August 31, 2007 in the fair value of its U.S. subprime related exposures as result of the continued deterioration in the market . . . ." *See* Securities and Exchange Commission Form 8-K filed on November 8, 2007 ("Nov. 2007 8-K"). As a result,

28

Morgan Stanley recorded a $3.7 billion write-down. Morgan Stanley's Stock slid 6.1% after the announcement to $51.19.

106. Morgan Stanley stock hit a new 52-week low on November 21, 2007 closing at $47.56 per share.

107. Further fall-out was to follow. On November 30, 2007, Morgan Stanley co-president Zoe Cruz was terminated. *See* "Ahead of the Bell: Morgan Stanley," *Bloomberg.com*, November 30, 2007. This helped fuel speculation that further losses were in store for Morgan Stanley. Wachovia Capital Markets LLC analyst Douglas Sipkin wrote in a client note that Morgan Stanley will likely take a write-down larger than the $3.7 billion it announced on October 31, 2007. *See Chron.com*, November 30, 2007. "Sipkin now expects Morgan Stanley to lose 36 cents per share." *Id.*

108. As the truth began to emerge, Plan participants suffered drastically as Morgan Stanley's Stock price plunged to a low of $47.56 on November 21, 2007 from a 52-week high of $90.95 on June 15, 2007.

109. Morgan Stanley's misfortunes continued into December 2007. On December 19, 2007, Morgan Stanley announced that it would have to take a *$9.4 billion* write-down related to mortgages, more than double its prior prediction. Standard and Poor's called the write-down unexpected and "massive." See "Morgan Gets Infusion from China After Swinging to a Quarterly Loss," *Wall Street Journal*, December 19, 2007.

110. In addition, the Fourth Quarter results were disappointing; Morgan Stanley lost $3.6 billion ($3.61 per share) versus a profit of $2.0 billion ($1.87 per share) from the prior year. *See* "Morgan Stanley's Subprime Submergence," *Forbes. Com*, December 19, 2007.

111. As a result of the dismal Fourth Quarter announcement, Fitch Ratings maintained

its Negative outlook, stating that the loss "is consistent with the extreme stress scenario that prevails upon mortgages and structured credit products." *See* "Fitch Affirms Morgan Stanley Ratings," *The Motley Fool (fool.com)*, December 19, 2007.

112.   The Company was forced to look for outside sources of capital and agreed to sell a 9.9% stake in the Company to China Investment Corp. in exchange for a $5 billion stake.

**D.   Defendants Knew or Should Have Known That Morgan Stanley Stock Was An Imprudent Investment For The Plans, Yet Mislead Plan Participants.**

113.   During the Class Period, the Company concealed, distorted and misrepresented its true financial condition, thereby precluding Plan participants from properly assessing the prudence of investing in Company Stock.

114.   As a result of the enormous erosion of the value of Company Stock, the Plans' participants, the retirement savings of whom was heavily invested in Morgan Stanley Stock, suffered unnecessary and unacceptable losses.

115.   At all relevant times, Defendants knew or should have known that Morgan Stanley Stock was an imprudent investment for the Plans as a result of the risks to the Company's financial well-being and prospects due to the inherent risks associated with Morgan Stanley for among other things: (a) placing such a heavy "bet" in the subprime lending market, through CDOs, corporate acquisition, and otherwise; and (b) failing to properly report estimated losses.

116.   Through their high ranking positions within the Company – especially the Director Defendants – Defendants knew or should have known of the existence of the above-mentioned problems.

117.   As a result of Defendants' knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any

generalized warnings of market and diversification risks that Defendants made to the Plans' participants regarding the Plans' investment in Morgan Stanley Stock did not effectively inform the Plans' participants of the past, immediate, and future dangers of investing in Company Stock.

118.    In addition, upon information and belief, Defendants failed to adequately review the performance of the other fiduciaries of the Plans to ensure that they were fulfilling their fiduciary duties under the Plans and ERISA. Defendants also failed to conduct an appropriate investigation into whether Morgan Stanley Stock was a prudent investment for the Plans and, in connection therewith, failed to provide the Plans' participants with information regarding Morgan Stanley's deep-rooted problems so that participants could make informed decisions regarding whether to include Morgan Stanley Stock in the Plans.

119.    An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plans in Morgan Stanley Stock, under these circumstances, was clearly imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

120.    Because Defendants knew or should have known that Morgan Stanley was not a prudent investment option for the Plans, they had an obligation to protect the Plans and their participants from unreasonable and entirely predictable losses incurred as a result of the Plans' investment in Morgan Stanley Stock.

121.    Defendants had available to them several different options for satisfying this duty, including, but not limited to: making appropriate public disclosures as necessary; divesting the Plans of Morgan Stanley Stock; discontinuing further contributions to and/or investment in Morgan Stanley Stock under the Plans; consulting independent fiduciaries regarding appropriate

measures to take in order to prudently and loyally serve the participants of the Plans; and/or

resigning as fiduciaries of the Plans to the extent that as a result of their employment by Morgan

Stanley they could not loyally serve the Plans and its participants in connection with the Plans'

acquisition and holding of Morgan Stanley Stock.

122.    Despite the availability of these and other options, Defendants failed to take any

action to protect participants from losses resulting from the Plans' investment in Morgan Stanley

Stock. In fact, the Defendants continued to invest and to allow investment of the Plans' assets in

Company Stock even as Morgan Stanley's problems came to light.

**E.**    **Defendants Regularly Communicated with the Plans' Participants Regarding**
        **Investments in Morgan Stanley Stock Yet Failed to Disclose the Imprudence of Plan**
        **Investment in Morgan Stanley Stock**

123.    Upon information and belief, the Company regularly communicated with

employees, including participants in the Plans, about the performance, future financial and

business prospects of the Company whose common Stock was, one of, if not the, largest assets of

each of the Plans. During the Class Period, upon information and belief, the Company fostered a

positive attitude toward the Company's Stock, and/or allowed participants in the Plans to follow

their natural bias towards investment in the equities of their employer by not disclosing negative

material information concerning investment in the Company's Stock. As such, participants in

the Plans could not appreciate the true risks presented by investments in the Company's Stock

and therefore could not make informed decisions regarding their investments in the Plans.

124.    The SEC filings and related Company statements and releases issued during the

Class Period were inaccurate, incomplete and materially misleading in that they failed to

properly inform the Plans' participants of the Company's ever-increasing problems with its key

product lines, including loan defaults, liquidity concerns and shrinking demand. These

statements were made with the implicit knowledge that the Plans' participants would rely upon

such information in determining whether to maintain investment in Morgan Stanley Stock.

F.    **Defendants Suffered From Conflicts of Interest**

125.    Morgan Stanley's SEC filings, including Form DEF 14A Proxy Statements, during the Class Period make clear that a significant percentage of the CEO's and other Company Officers' compensation was in the form of Stock option awards.

126.    Because the compensation of at least several of the Defendants was significantly tied to the price of Morgan Stanley Stock, Defendants had incentive to keep the Plans' assets heavily invested in Morgan Stanley Stock on a regular, ongoing basis. Elimination of Company Stock as an investment option/vehicle for the Plans would have reduced the overall market demand for Morgan Stanley Stock and sent a negative signal to Wall Street analysts; both results would have adversely affected the price of Morgan Stanley Stock, resulting in reduced compensation for the Defendants.

127.    For instance, Defendant Mack was awarded $40 million in Stock and options for 2006 – at the time, the highest amount ever awarded to a Wall Street CEO. *See CNNMoney.Com.*, "Is John Mack Worth $40 Million?" December 15, 2006.

128.    Some Defendants may have had no choice in tying their compensation to Morgan Stanley Stock (because compensation decisions were out of their hands), but Defendants did have the choice of whether to keep the Plan participants' and beneficiaries' retirement savings tied up to a large extent in Morgan Stanley Stock or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

129.    These conflicts of interest put the Defendants in the position of having to choose between their own interests as executives and Stockholders, and the interests of the Plan participants and Beneficiaries, whose interests the Defendants were obligated to loyally serve

33

with an "eye single" to the Plan. *See generally Hill v. BellSouth Corp.,* 313 F. Supp. 2d 1361, 1369-70 (N.D. Ga. 2004).

## CLAIMS FOR RELIEF UNDER ERISA

130.    At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

131.    ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

132.    ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

133.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan *solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence* under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. (Emphasis added)

134.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the *duties of loyalty, exclusive purpose and prudence* and are the "highest known to the law." They

entail, among other things:

    a.    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

    b.    A duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

    c.    A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

135.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

136.    Plaintiff therefore brings this action under the authority of ERISA § 502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1) and

ERISA § 405(a).

## COUNT I

### Failure to Prudently and Loyally Manage the Plans' Assets
### (Breaches of Fiduciary Duties in Violation of ERISA § 404 and § 405 by All Defendants)

137.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

138.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in they exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

139.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments in the Company Stock in the Plans were prudent and that such investment was consistent with the purpose of the Plans. Defendants are liable for losses incurred as a result of such investments being imprudent.

140.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

141.    Defendants breached their duties to prudently and loyally manage the Plans' assets. During the Class Period these Defendants knew or should have known that the Company Stock was not a suitable and appropriate investment for the Plans as described herein. Investment in the Company Stock during the Class Period clearly did not serve the Plans' purpose of helping participants save for retirement, and in fact caused significant losses/depreciation to participants' retirement savings. During the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect Plan participants from the inevitable losses that they knew would ensue as the non-disclosed material problems, concerns and business slowdowns took hold and became public.

142.    The Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the other Defendants failure to disclose crucial information regarding the Company's operations and artificial inflation of the price of the Company Stock.  Defendants had knowledge of such breaches by other Plan fiduciaries, yet made no effort to remedy the same.

143.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and Beneficiaries, lost a significant portion of their retirement investment.

144.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### Failure to Provide Complete and Accurate Information
### to the Plans' Participants and Beneficiaries
### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and
### 405 of ERISA by all Defendants)

145.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

146.    At all relevant times, as alleged above, the above-listed Defendants were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C.§ 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

147.    At all relevant times, the scope of the fiduciary responsibility of the above-listed Defendants included Plans-related communications and material disclosures.

148.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the Plans. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plans' investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plans. This duty applies to all of the Plans' investment options, including investment in Company Stock.

149.    These Defendants knew that investment in Company Stock carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important.

150.    These Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding the Company's difficulties with its various product lines, their concealment of the same and the consequent artificial inflation of the value of the Company Stock and, generally, by conveying inaccurate information regarding the Company's future outlook.  These failures were particularly devastating to the Plans and their participants— losses in this investment had an enormous impact on the value of participants' retirement assets.

151.    These actions and failures to act were uniform and caused the Plans, and/or the participants and beneficiaries of the Plans, to continue to make and maintain substantial investments in Company Stock in the Plans at a time when these Defendants knew or should have known that the Plans' participants and beneficiaries (and non-defendant fiduciaries) did not have complete and accurate information concerning their investments.  Plaintiff and the Class relied to their detriment on these Defendants' incomplete, inaccurate and materially misleading statements regarding the performance and future health of Company Stock.

152.    Defendants in this Count are also liable as co-fiduciaries because (1) they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding the Company Stock, despite knowing of their breaches; (2) they enabled such conduct as a result of their own failure to satisfy their fiduciary duties; and (3) they had knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to participants, yet did not make any effort to remedy the breaches.

153.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable participant of a plan that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such

39

misrepresentations and omissions to his detriment. Here, the above-described statements, acts and omissions of the Defendants in this Complaint constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in the Company Stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of their invested assets of the Plans in the Company Stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of the Defendants as described herein.

154.    As a consequence of these Defendants' breaches of fiduciary duty, the Plans suffered hundreds of millions of dollars in losses. If the Defendants had discharged their fiduciary duties to prudently manage and invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

155.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

### Breach of Duty to Avoid Conflicts of Interest
### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by all Defendants)

156.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

157.    At all relevant times, as alleged above, Defendants were fiduciaries within the

meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

158.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

159.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plans' investments in Company's own securities; and by otherwise placing their own and the Company's interests above the interests of the participants with respect to the Plans' investment in the Company's securities.

160.    As a consequence of Defendants' breaches of fiduciary duty, the Plans suffered hundreds of millions of dollars in losses. If Defendants had discharged their fiduciary duties to prudently manage and invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

161.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count

## COUNT IV

### Failure to Adequately Monitor Other Fiduciaries and Provide Them with Accurate Information
### (Breaches of Fiduciary Duties in Violation of ERISA § 404 by Morgan Stanley & Director Defendants)

162. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

163. At all relevant times, as alleged above, Morgan Stanley and the Director Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

164. At all relevant times, as alleged above, the scope of the fiduciary responsibility of Morgan Stanley and the Director Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including the members of the Investment Committee, the Administrative Committee and any other Plan committees.

165. The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries. In this case, that means that the monitoring fiduciaries, Morgan Stanley and the Director Defendants, had the duty to:

> (1) Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plans, the goals of the Plans, and the behavior of the Plans' participants;

> (2) Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

> (3) Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plans' investments;

(4)    Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

(5)    Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plans' investment options; and

(6)    Ensure that the monitored fiduciaries report regularly to the Company and/or the Director Defendants. The Company and/or Director Defendants must then review, understand, and approve the conduct of the hands-on fiduciaries.

166.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not. In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

167.    Morgan Stanley and the Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company Stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company Stock, an investment that was imprudent and subject to inevitable and significant depreciation. Morgan Stanley and the Director Defendants knew or should have known that the fiduciaries they were responsible for monitoring were (i)

imprudently allowing the Plans to continue offering the Morgan Stanley Stock fund as an investment alternative for the Plans, and (ii) continuing to invest the assets of the Plan in Morgan Stanley Stock when it no longer was prudent to do so. Despite this knowledge, Morgan Stanley and the Director Defendants failed to take action to protect the Plans, and concomitantly the Plans' participants, from the consequences of these fiduciaries' failures.

168.    In addition, Morgan Stanley and the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of Morgan Stanley that they knew or should have known that these Defendants needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plans and ERISA.

169.    Morgan Stanley and the Director Defendants are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

170.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

171.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## CAUSATION

172.   The Plans suffered hundreds of millions of dollars in losses because substantial assets of the Plans were imprudently invested, or allowed to be invested by Defendants, in Company Stock during the Class Period, in breach of Defendants' fiduciary duties. These losses were reflected in the diminished account balances of the Plans' participants.

173.   Defendants are responsible for losses caused by participants' failure to exercise voluntary diversification options because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. By failing to apprise participants of the problems within the Company and of the fact that the Company Stock price was artificially inflated, as further described *infra*, Defendants misrepresented the soundness of Company Stock as an investment vehicle. As a consequence, participants did not exercise independent control over their investments in the Company Stock, and Defendants remain liable under ERISA for losses caused by such investment.

174.   Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plans and participants would have avoided a substantial portion of the losses that they suffered through their continued investment in the Company Stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

175.   As noted above, as a consequence of the Defendants' breaches, the Plans suffered significant losses.

176.   ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any

45

person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

177.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Plans would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plans' assets to what they would have been if the Plans had been properly administered.

178.    Plaintiff, the Plans, and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

179.    Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## SECTION 404(c) DEFENSE INAPPLICABLE

180.    The Plans suffered losses, and the Plaintiff and the other Class members suffered losses, because substantial assets in the Plans were invested in Morgan Stanley Stock during the Class Period in violation of the Defendants' fiduciary duties.

181.    As to contributions invested in Company Stock, Defendants were responsible for the prudence of investments provided under the Plans during the Class Period, unless the Plans satisfied the procedural and substantive requires of ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

182.    Section 404(c) provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions, but not for liability for the selection of imprudent investment options for the Plans.    In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions.    In addition, § 404(c) only applies if participants are informed that "the Plan is intended to constitute a plan described in § 404(c) and [the regulations], and that fiduciaries of the plan may be relieved of liability for any losses which are the direct and necessary result of investment instructions given by such participants or Beneficiary." 29 C.F.R. § 2550.404c-1(b)(2)(B)(1)(i)

183.    As alleged above, Defendants failed to provide participants with complete and accurate information regarding Morgan Stanley Stock in the Plans.    Accordingly, participants failed to exercise the requisite independent control over their investment in Morgan Stanley Stock in the Plans.

184.    In addition, § 404(c) does not apply to any portion of the Plan (1) derived from Company matching or profit-sharing contributions as those investments/investment vehicles were made/invested by/through the sole discretion of the Company or (2) deemed an ESOP in

that the Secretary of Labor has interpreted the provision to apply only to plans that provide plan participants with a full range of investment options, which an ESOP by its very nature does not. *See* 29 C.F.R. § 2550.404c-1 (1996); *Herman v. Nationsbank Trust Co.*, 126 F.3d 1354, 1361 (11th Cir. 1997).

185.    The Defendants' liability to the Plans, Plaintiff and the Class for relief stemming from the Plans' imprudent investments in Morgan Stanley Stock, is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plans during the Class Period, without regard to whether or not the participants relied upon statements, acts, or omissions of Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    A Declaration that the Defendants, collectively and separately, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

48

E.     Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.     An Order that Defendants allocate the Plans' recoveries to the accounts of all participants who had any portion of their account balances invested in the common Stock of Morgan Stanley maintained by the Plans in proportion to the accounts' losses attributable to the decline in the Stock price of Morgan Stanley;

G.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H      An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.     An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

DATED: December 20, 2007                    Respectfully submitted,

**DEALY & SILBERSTEIN, LLP**
Milo Silberstein (MS 4637)
225 Broadway, Suite 1405
New York, NY 10007
Telephone: (212) 385-0066
Facsimile: (212) 385-2117

**SCHIFFRIN BARROWAY**
**TOPAZ & KESSLER, LLP**
Joseph H. Meltzer
Edward W. Ciolko
Katherine B. Bornstein
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile:  (610) 667-7056

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| C. KENNETH COULTER, On Behalf of Himself and All Others Similarly Situated, | |
| Plaintiff, | |
| v. | |
| MORGAN STANLEY, MORGAN STANLEY & CO. INCORPORATED, THE INVESTMENT COMMITTEE OF THE MORGAN STANLEY 401 (K) PLAN, THE PLAN ADMINISTRATOR, THE MORGAN STANLEY GLOBAL DIRECTOR OF HUMAN RESOURCES, JOHN J. MACK, ROY J. BOSTOCK, ERSKINE B. BOWLES, SIR HOWARD J. DAVIES, KAREN JAMESLEY, C. ROBERT KIDDER, DONALD T. NICOLAISEN, CHARLES H. NOSKI, HUTHAM S. OLAYAN, CHARLES E. PHILLIPS, JR., O. GRIFFITH SEXTON, DR. LAURA D. TYSON, DR. KLAUS ZUMWINKEL, and JOHN DOES 1-30, | |
| Defendants. | |

Civil Action No **07 CV 11624**

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974**



Plaintiff, participant in the Morgan Stanley 401(k) Plan ("401(k) Plan") and the Morgan Stanley Employee Stock Ownership Plan ("ESOP") (collectively, the "Plans") during the proposed Class Period, on behalf of the Plans, himself, and all others similarly situated, alleges as follows:

**NATURE OF THE ACTION**

1.    Plaintiff brings this suit as a civil enforcement action under the Employee Retirement Income Security Act of 1974 ("ERISA") §§ 405, 409, 502(a)(2), (3), 29 U.S.C. §§ 1105, 1109 and 1132(a)(2), (3), for relief on behalf of the Plans.  The Plans are retirement plans operated and established by Morgan Stanley as a benefit for its employees to permit tax-advantaged savings for retirement and other long-term goals.  Morgan Stanley common stock

("Company stock") is one of the investments offered in the 401(k) Plan, and the only investment

offered in the ESOP. According to the Company's Form 11-K filed with the U.S. Securities and

Exchange Commission ("SEC") on June 28, 2007 for the 401(k) Plan, in excess of $1.8 billion of

the 401(k) Plan's $3.3 billion or more in assets were invested in Morgan Stanley stock.

Likewise, according to the Company's Form 5500 filed with the U.S. Department of Treasury

and U.S. Department of Labor on July 12, 2006 for the ESOP, approximately $3 billion of the

ESOP's $3.1 billion or more in assets were invested in Morgan Stanley stock. Indeed, the Plans

were heavily invested in Morgan Stanley stock at all times relevant to this action, as discussed

herein.

2.      Plaintiff C. Kenneth Coulter is a current participant in the Plans during the class

period of January 1, 2007 through the present (the "Class Period"). During the Class Period, his

retirement portfolio included Morgan Stanley stock.

3.      Plaintiff alleges that Defendants, as fiduciaries of the Plans, breached their duties

to him and to other participants and beneficiaries of the Plans during the Class Period in violation

of ERISA, particularly with regard to the Plans' holdings of Morgan Stanley stock.

4.      Morgan Stanley & Co., Incorporated ("MS & Co.") is the sponsor of the 401(k)

Plan. Morgan Stanley is the sponsor of the ESOP Plan. Mellon Bank, N.A. is the trustee for the

Plans.

5.      Since the Plans' holdings in Morgan Stanley stock comprised a significant

percentage of the overall value of the assets held by the Plans, the long-term retirement savings

of the Plans' participants were dependent to a substantial degree both on the performance of

Morgan Stanley stock, as well as the related need for prudent fiduciary decisions by Defendants

concerning such a large, ongoing investment of assets of the Plans. This action alleges that the

fiduciaries of the Plans breached their fiduciary duties to the Plans and their participants under ERISA, by, inter alia, selecting and maintaining Company stock as an investment alternative for participant contributions and Company matching contributions, when it was no longer a suitable or prudent investment option for the Plans.

6.    The breaches were ongoing and arose out of Defendants' continuing duties to review, evaluate, and monitor the suitability of the Plans' investment in Morgan Stanley stock, and to provide accurate material information to enable participants to make informed investment decisions concerning their holdings invested in Company stock.

7.    The basic prudence allegations arise from the fact that Defendants knew, or should have known, that Morgan Stanley was engaging in risky and unsound business practices in connection with its investments in conduits, Collateralized Debt Obligations ("CDOs") and Structured Investment Vehicles ("SIVs"), which were heavily exposed to the subprime credit market. These investment practices rendered Morgan Stanley stock an imprudent, inappropriate and extraordinarily risky investment for the retirement savings of the Plans' participants.

8.    As a result of Defendants' fiduciary breaches, as hereinafter enumerated and described, the Plans have suffered substantial damages, including the erosion of hundreds of millions of dollars of retirement savings and anticipated retirement income for the Plans' participants. Indeed, the Plans' participants have seen their retirement savings accounts devastated as Company stock plummeted from a high of approximately $90 per share near the beginning of the Class Period to a price of approximately $50 per share at the end of the Class Period. Under ERISA, the breaching fiduciaries are obligated to restore to the Plans the losses resulting from these fiduciary breaches.

3

9.    Because Plaintiff's claims apply to the participants and beneficiaries as a whole, and because ERISA authorizes participants such as Plaintiff to sue for Plan-wide relief for breach of fiduciary duty, Plaintiff brings this case as a class action on behalf of all participants and beneficiaries of the Plans during the Class Period. Plaintiff also brings this action as participants seeking Plan-wide relief for breach of fiduciary duty on behalf of the Plans.

10.    Because much of the information and documents on which Plaintiff's claims are based are solely in Defendants' possession, certain of Plaintiff's allegations are by necessity upon information and belief. At such time as Plaintiff has had the opportunity to conduct additional discovery, Plaintiff will, to the extent necessary and appropriate, further amend the Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the claims below.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.    This Court has personal jurisdiction over Defendants under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), as one or more of the Defendants may be found in this District. The Court also has personal jurisdiction over Defendants because the Company maintains its executive offices in this District. Defendants systematically and continuously have done and continue to do business in this District, and this case arises out of Defendants' acts within this District.

13.    Venue is proper under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans were either administered in this District, some or all of the actionable conduct for which relief is sought occurred in this District, and/or one or more of the Defendants reside or may be found in this District.

4

## THE PARTIES

### Plaintiff

14.     Plaintiff C. Kenneth Coulter is a resident of North Port, Florida.  He is a current participant in the Plans, within the meaning of ERISA § 3(7) and 502(a), 29 U.S.C. § 1102(7) and §1132(a), and was a participant in the Plans throughout the Class Period.  During the Class Period, Plaintiff Coulter held Morgan Stanley stock in his individual 401(k) Plan and ESOP accounts.

### Corporate Defendants

15.     Defendant Morgan Stanley is a Delaware corporation with its principal place of business located at 1515 Broadway, New York, New York.  Morgan Stanley is a financial services company that, through its subsidiaries and affiliates, provides investment banking, securities, investment management, and wealth management services to corporations, governments, financial institutions, and individuals worldwide.  The Company has three segments: Institutional Securities, Global Wealth Management Group, and Asset Management. The Institutional Securities segment includes capital raising; financial advisory services, including advice on mergers and acquisitions, restructurings, real estate, and project finance; corporate lending; sales, trading, financing, and market-making activities in equity securities and related products, and fixed income securities and related products, including foreign exchange and commodities; benchmark indices and risk management analytics; research; and investment activities.  The Global Wealth Management Group segment provides brokerage and investment advisory services covering various investment alternatives; financial and wealth planning services; annuity and insurance products; credit and other lending products; banking and cash management services; retirement services; and trust and fiduciary services.  The Asset Management segment provides asset management products and services in equity, fixed income,

5

and alternative investments, which include private equity, infrastructure, real estate, fund of funds, and hedge funds to institutional and retail clients through proprietary and third-party retail distribution channels, intermediaries, and the company's institutional distribution channel. The Company was founded in 1935 and is headquartered in New York, New York.

16.    MS & Co. is a corporation organized and existing under the laws of the state of Delaware. MS & Co., a subsidiary of Morgan Stanley and part of its Global Wealth Management Group, provides its individual and business customers with brokerage and investment advice through products such as annuity, insurance, and credit vehicles. After merging Morgan Stanley DW into it in early 2007, MS & Co. has become Morgan Stanley's primary broker-dealer in the US. MS & Co. is headquartered in New York, New York.

17.    MS & Co. and Morgan Stanley and collectively referenced herein as "Morgan Stanley" or the "Company."

18.    Upon information and belief, Morgan Stanley at all times acted through its officers, directors and employees, including the Chief Executive Officer ("CEO"). Morgan Stanley had, at all times relevant herein, effective control over the activities of its officers and employees, including their Plan-related activities. Morgan Stanley exercises ultimate discretionary decisional authority with respect to all aspects of the administration of the Plans, management and disposition of the Plans' assets, and appointment and removal of fiduciaries through its management employees, Morgan Stanley's Board of Directors (the "Board"), Plan Administrator and/or Investment Committee (terms are defined herein).

19.    Upon information and belief, under the terms of the Plans, Morgan Stanley was given direct control and management over any aspect of the operation, or administration of the Plans that was not specifically delegated to the named fiduciaries under the Plans and upon

6

information and belief, exercised this control. Upon information and belief, the Plans name Morgan Stanley as the administrator, as that term is defined in Section 3(16) of ERISA 29 U.S.C. § 1002(16). Under ERISA, a plan administrator is inherently a fiduciary.

20.    As a matter of corporate law, Morgan Stanley is imputed with the knowledge that its Board and management employees had of the misconduct alleged herein, even if not communicated to Morgan Stanley.

21.    Upon information and belief, Morgan Stanley, together with its Board, exercised responsibility for communicating with participants regarding the Plans, and providing participants with information and materials required by ERISA. In this regard Morgan Stanley, together with the Board, drafted and disseminated various documents and materials related to the Plans, including but not limited to, a Summary Plan Description ("SPD") and the documents incorporated into the SPD. Based on the allegations contained herein, Morgan Stanley is a fiduciary with respect to the Plans because it exercised discretionary authority or discretionary responsibility in the administration of the Plans, exercised discretionary authority or control with respect to the management of the Plans' assets, and exercised discretionary authority and control with respect to the appointment of other Plan fiduciaries.

22.    *The Board*. Upon information and belief, the business and affairs of the Company are managed under the direction of the Board, including with respect to the Company's role as a fiduciary of the Plans. One of the many roles or functions of the Board is the power to appoint the members of the Investment Committee and Plan Administrator (as defined below). Upon information and belief, the Board likewise exercised management or control over the Investment Committee and Plan Administrator. Based on the above, the Board is a fiduciary with respect to the Plans because it exercised discretionary authority or

discretionary responsibility in the administration of the Plans, exercised discretionary authority or control with respect to the management of the Plans' assets, and exercised discretionary authority and control with respect to the appointment of other Plans' fiduciaries.

(a)    *The Compensation, Management Development Committee.* The Board operates through three key standing committees:  (i) Audit; (ii) Compensation, Management Development and Succession ("Compensation Committee"); and (iii) Nominating and Governance.  Upon information and belief, the Compensation Committee had overall responsibility for the Plans.  According to its Charter, the Compensation Committee shall "[a]dminister and amend, as it determines appropriate, any present or future [ ] employee benefit plan providing that it shall be administered or amended by the Board or the [Compensation] Committee."  Moreover, the Charter provides that the Compensation Committee has the duty to "[c]reate and amend, as it determines appropriate, any trusts (including existing trusts) related to any present or future [  ] employee benefit plan providing that it shall be administered or amended by the Board of Directors or the [Compensation] Committee.  The [Compensation] Committee is also authorized to exercise and perform any power, authority, discretion or duty of the Board or the Committee that any such trust provides shall be exercised or performed by the Board or the [Compensation] Committee."

23.    *The Investment Committee.* Upon information and belief, the Plans assigned fiduciary responsibilities to the Investment Committee.  Upon information and belief, the Investment Committee has the authority to designate investment funds for the investment of accounts and to establish rules and procedures with respect to investment funds.  Upon information and belief, members of the Investment Committee are appointed by the Board.  Upon information and belief, the Investment Committee is a "Named Fiduciary" under Plans and

8

under § 402(a) of ERISA, 29 U.S.C. § 1102(a). Upon information and belief, among the powers afforded to the Investment Committee is the ability to direct the investment of the Plans' assets, including buying or selling Company stock. Upon information and belief, the Investment Committee has the power to add or remove certain investment options under the Plans. Upon information and belief, the Investment Committee also has the power to appoint an investment manager for the Plans. Based on the above, the Investment Committee is a fiduciary with respect to the Plans because it exercised discretionary authority or discretionary responsibility in the administration of the Plans, exercised discretionary authority or control with respect to the management of the Plans' assets, and exercised discretionary authority and control with respect to the appointment of other fiduciaries of the Plans.

24.    *The Plan Administrator.* The Plans assigned fiduciary responsibilities to the Plan Administrator (the "Plan Administrator"). The Plan Administrator is a "Named Fiduciary" under the Plans and under § 402(a) of ERISA, 29 U.S.C. § 1102(a). Under the terms of the Plans, the general administration of the Plans shall be placed in the Plan Administrator. Upon information and belief, the Plan Administrator has such powers as may be necessary to carry out the provisions of the Plans, including the power and discretion to determine all benefits and resolve all questions pertaining to the administration, interpretation, and application of Plan provisions. Upon information and belief, the Plan Administrator and its members are appointed by the Compensation Committee. Under the terms of the Plans, the Plan Administrator is Morgan Stanley's Global Director of Human Resources or his or her delegate.

### Individual Defendants

25.    Defendant John J. Mack ("Mack") served as Morgan Stanley's Chief Executive Officer and Chairman of the Board during the Class Period. He has served in that role since June

2005. Mack was a fiduciary in that, in his high-level capacity and role within the Company, he exercised discretionary authority with respect to administration, control and/or management of the Plans.

26.     Defendant Roy J. Bostock ("Bostock") was a member of the Board during the Class Period. He has been a Director since September 2005. During the Class Period, Bostock served as a member of the Nominating and Governance Committee.

27.     Defendant Erskine B. Bowles ("Bowles") was a member of the Board during the Class Period. He has been a Director since December 2005. During the Class Period, Bowles served as a member of the Compensation Committee.

28.     Defendant Sir Howard J. Davies ("Davies") was a member of the Board during the Class Period. He has been a Director since 2004. During the Class Period, Davies served as a member of the Audit Committee.

29.     Defendant Karen Jamesley ("Jamesley") was the Global Director of Human Resources during the Class Period.

30.     Defendant C. Robert Kidder ("Kidder") was a member of the Board during the Class Period. Kidder has been a Director since 1993. During the Class Period, Kidder was the Lead Director of the Board, and Chairman of the Compensation Committee.

31.     Defendant Donald T. Nicolaisen ("Nicolaisen") was a member of the Board during the Class Period. He was a Director since April 2006. During the Class Period, Nicolaisen was a member of the Audit Committee and the Compensation Committee.

32.     Defendant Charles H. Noski ("Noski") was a member of the Board during the Class Period. Noski was a Director since September 2005. During the Class Period, Noski was Chairman of the Audit Committee.

10

33.     Defendant Hutham S. Olayan ("Olayan") was a member of the Board during the Class Period. She was a Director since April 2006. During the Class Period, Olayan served as a member of the Nominating and Governance Committee.

34.     Defendant Charles E. Phillips, R. ("Phillips") was a member of the Board during the Class Period. He served as a Director since June 2006. During the Class Period, Phillips served as a member of the Audit Committee.

35.     Defendant O. Griffith Sexton ("Sexton") was a member of the Board during the Class Period. He was a Director since September 2005.

36.     Defendant Dr. Laura D. Tyson ("Tyson") was a member of the Board during the Class Period. She was a Director since 1997. During the Class Period, Tyson served as Chair of the Nominating and Governance Committee.

37.     Defendant Dr. Klaus Zumwinkel ("Zumwinkel") was a member of the Board during the Class Period. He served as a Director since February 2004. During the Class Period, Zumwinkel was a member of the Nominating and Governance Committee.

38.     The defendants identified in ¶¶ 25 through 37 are sometimes referred to herein as the "Individual Defendants." The Individual Defendants are fiduciaries of the Plans within the meaning of ERISA.

39.     *The Board Defendants.* Morgan Stanley, as a corporate entity, cannot act on its own without any human counterpart. In this regard, during the Class Period, Morgan Stanley relied and continues to rely directly on each of the Board Defendants to carry out its fiduciary responsibilities under the Plans and ERISA as specified in ¶ 22 of this Complaint and therefore each member of the Board is a fiduciary for the reason stated in ¶ 22.

40.    In addition, each member of the Board carried out the Board's role as a fiduciary with respect to the Plan as set forth in ¶ 22, engaged in the conduct and had the powers and duties alleged in ¶ 22, and was, therefore, a fiduciary for the reasons set forth in ¶ 22.

41.    The individuals who served on the Board and acted as fiduciaries with respect to the Plans during the Class Period are as follows:  Defendants Mack, Bostock, Bowles, Davies, Kidder, Nicolaisen, Noski, Olayan, Phillips, Sexton, Tyson, and Zumwinkel (collectively, the "Board Defendants").

42.    *The Management Defendants*.  Morgan Stanley as a corporate entity, cannot act on its own without any human counterpart.  In this regard, during the Class Period, Morgan Stanley relied and continues to rely directly on various high-level corporate officers and employees to carry out its fiduciary responsibilities under the Plans and ERISA.  Upon information and belief, during the Class Period, based on their high-level capacity and role within the Company relating to administration of the Plans, each Defendant listed in this paragraph carried out the Company's role as a fiduciary as specified in ¶¶ 18-21 as well as influenced, managed and controlled the Company in its role as a Plan fiduciary.  The following individuals are therefore fiduciaries for the reasons set forth in ¶¶ 18-21:  Defendant Mack (the "Management Defendants").  Morgan Stanley and the Management Defendants listed in this paragraph shall collectively be referred to as the "Morgan Stanley Defendants."

43.    Plaintiff does not currently know the identity of all the individual Management Defendants during the Class Period.  Therefore, some of the Management Defendants are named fictitiously, as Defendants Does 1 to 10.  Once their true identities are ascertained, Plaintiff will seek leave to join them under their true names.

12

44.    *The Investment Committee Defendants*.  Upon information and belief, during the Class Period each member of the Investment Committee carried out the Investment Committee's role as a fiduciary with respect to the Plans as set forth in ¶ 23, engaged in the conduct and had the power and duties alleged in ¶ 23 and was therefore a fiduciary for the reasons set forth in ¶ 23.

45.    Plaintiff does not currently know the identity of the Investment Committee Defendants during the Class Period.  Therefore, the members of the Investment Committee Defendants are named fictitiously, as Defendants Does 11 to 20.  Once their true identities are ascertained, Plaintiff will seek leave to join them under their true names.

46.    *The Plan Administrator Defendants*.  During the Class Period the Global Director of Human Resources, Karen Jamesley, carried out the Plan Administrator's role as a fiduciary with respect to the Plans as set forth in ¶ 24, engaged in the conduct and had the power and duties alleged in ¶ 24) and was therefore a fiduciary for the reasons set forth in ¶ 24.

47.    Plaintiff does not currently know the identity of all the Plan Administrator Defendants during the Class Period.  Therefore, the members of the Plan Administrator Defendants are named fictitiously, as Defendants Does 21 to 30.  Once their true identities are ascertained, Plaintiff will seek leave to join them under their true names.

48.    The Investment Committee Defendants and the Plan Administrator Defendants are collectively referred to herein as the "Committee Defendants."  The Investment Committee and the Plan Administrator Committee are collectively referred to herein as the "Committee."

## NATURE OF THE PLANS

### The 401(k) Plan

49.    The 401(k) Plan is a defined contribution 401(k) plan that commenced activities on September 1, 1970, and covers eligible employees of Morgan Stanley and certain

participating companies. Morgan Stanley encourages its eligible employees to become active participants in the 401(k) Plan and saving for their financial future. According to the SPD for the 401(k) Plan, the 401(k) Plan is a convenient way for employees to save for retirement through tax-deferred contributions from their pay. Full-time, flex part-time, regular part-time employees of participating companies are eligible to participate in the 401(k) Plan upon hire.

50.    All eligible participants may elect to make pre-tax contributions of 1% to 20% of annual earnings subject to Internal Revenue Code limits of $15,000 per year in 2006. Those participants attaining age 50 during the year may elect a pre-tax catch-up contribution of 1% to 20% of eligible earnings, subject to Code limits of $5,000 per year in 2006.

51.    Participants direct the investment of their contributions into various investment options offered by the 401(k) Plan. One of the investment options during the Class Period was a Company Stock Fund.

52.    To be eligible for a Company match for a year, an employee must participate in the 401(k) Plan by making pre-tax contributions in that year and must be employed by the Company on December 31 of that year. Upon information and belief, during the Class Period, all Company contributions were made to the ESOP. Company contributions are allocated in Morgan Stanley common stock under the ESOP.

53.    All employees of the Company newly hired on or after January 1, 2004, are vested in any Company contributions upon the earlier of: (i) completing three years of credited service, or (ii) terminating employment due to death, total and permanent disability, retirement or release as defined by the 401(k) Plan.

54.    Individual accounts are maintained for each of the Plans' participants. Each participant account is credited with the participant's contributions, allocations of the Company's

contribution and the Plans' earnings, and charged with an allocation of the Plans' losses and administrative expenses not otherwise paid by the Company.

55.    All of the 401(k) Plan's investments are held in a trust account at Mellon Bank, N.A. The Morgan Stanley Defined Contribution Master Trust ("Master Trust") includes commingled assets of the 401(k) Plan and the ESOP. Quarterly transfers are made from the Morgan Stanley Stock Fund under the 401(k) Plan to the ESOP to provide participants with an opportunity to elect to receive cash payments of the dividends paid on the Morgan Stanley Stock Fund.

56.    Upon information and belief, the portion of the 401(k) Plan that is invested in the Morgan Stanley Stock Fund, including the portions that are thereafter transferred to the ESOP, do not qualify as an employee stock ownership plan under the numerous requirements set forth in both ERISA and the Internal Revenue Code. Upon information and belief, the 401(k) Plan's Summary Plan Description is silent with regard to the 401(k) Plan's purported status as an employee stock ownership plan.

57.    Upon information and belief, under the terms of the 401(k) Plan, there was no requirement that any of the 401(k) Plan be invested in the Morgan Stanley Stock Fund. The requirement was simply that if a portion of the 401(k) Plan were invested in the Morgan Stanley Stock Fund, that portion would be transferred to the ESOP. Thus, the 401(k) Plan is not "designed" to invest primarily in qualifying employer securities and the 401(k) Plan's purported employee stock ownership plan status did not, in fact, require the investment in the Morgan Stanley Stock Fund at all, or place any constraints on 401(k) Plan fiduciaries forcing them to invest in the Morgan Stanley Stock Fund.

58.     Similarly, the 401(k) Plan could have held one share of Morgan Stanley common stock and still been an employee stock ownership plan since that "portion" of the 401(k) Plan -- the one share -- would have been primarily invested in Morgan Stanley common stock.

59.     Finally, even if the portion of the 401(k) Plan invested in the Morgan Stanley Stock Fund constituted an employee stock ownership plan, Plan fiduciaries may not invest in employer securities regardless of the circumstances. While the duty of diversification may not apply to certain aspects of investment of qualified employer securities in an employee stock ownership plan, the 401(k) Plan fiduciaries remain bound by their other core ERISA fiduciary duties including the duties to act loyally, prudently and honestly.

60.     Upon information and belief, Morgan Stanley incorporates by reference into the SPDs for the Plans, certain information filed with the SEC, including but not limited to Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Periodic Reports on Form 8-K, and Registration Statements.

61.     The 401(k) Plan is an "employee pension benefit plan" within the meaning of ERISA. § 3(2)(A), 29 U.S.C. § 1002(2)(A). Further, it is an "eligible individual account plan" within the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3), and also a "qualified cash or deferred arrangement" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k). While the 401(k) Plan is not a party to this action, pursuant to ERISA, the relief requested in this action is for the benefit of the 401(k) Plan pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

62.     An employee benefit plan, such as the 401(k) Plan, must be "established and maintained pursuant to a written instrument." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). ERISA requires that every participant in an employee benefit plan be given a Summary Plan Description.

63.    The assets of an employee benefit 401(k) Plan must be held "in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a).  During the Class Period, the assets of the 401(k) Plan were held in trust by Mellon Bank, N.A.

64.    ERISA and the Internal Revenue Code require that plans file an Annual Report, Form 5500, with the Department of Labor and the Department of the Treasury.  The 401(k) Plan filed a Form 5500 in July 2006.

65.    Upon information and belief, Morgan Stanley stock represented a significant portion of the total invested assets of the Plans throughout the Class Period.

## CLASS ACTION ALLEGATIONS

66.    Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and a class consisting of all current and former participants (and beneficiaries thereof) of the Plans, whose individual accounts included investments in Morgan Stanley stock during the Class Period of December 1, 2005 through the present.  Excluded from the Class are Defendants, members of the Defendants' immediate families, any officer, director, or partner of any Defendant, any entity in which a Defendant has a controlling interest, and the heirs, successors, or assigns of any of the foregoing.

67.    This action is properly maintainable as a class action because:

    (a)    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown by Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are, at a minimum, thousands of members of the Class.

    (b)    Plaintiff's claims are typical of those of the Class because Plaintiff, members of the Class and the Plans suffered similar harm and damages as

17

a result of Defendants' systematic unlawful conduct described herein. Absent a class action, the Plans and/or members of the Class may not receive restitution or other appropriate relief, will continue to suffer losses, and these violations of law will proceed without remedy.

(c)     Plaintiff is a representative party who will fairly and adequately protect the interests of the other members of the Class and have retained counsel competent and experienced in class action litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class they seek to represent.

(d)     A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein. Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to individual members of the Class, which would then establish incompatible standards of conduct for Defendants. As the damages suffered by the individual Class members, direct or indirect through their participation in the Plans may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to redress the wrongs done to them and/or the Plan. The likelihood of individual Class members prosecuting separate claims is remote. Furthermore, Defendants' conduct affected and affects all Class members in a similar manner, making declaratory and injunctive relief to the Class as a whole appropriate.

18

68.    The questions of law and fact common to the members of the Class predominate over any questions affecting individual members of the Class.  The questions of law and fact that are common to Plaintiff and the Class include, among others:

      (a)    Whether ERISA applies to the claims at issue;

      (b)    Whether Defendants owe and owed fiduciary duties to the members of the Class;

      (c)    The nature of the fiduciary duties Defendants owe or owed to members of the Class;

      (d)    Whether Defendants breached their fiduciary duties; and

      (e)    The extent of losses sustained by the Plans, and thereby members of the Class, and the appropriate measure of relief.

69.    Plaintiff anticipates no unusual difficulties in the management of this action as a class action.

## DEFENDANTS' FIDUCIARY STATUS

70.    During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plans and/or management or disposition of the Plans' assets.

71.    During the Class Period, all of the Defendants acted as fiduciaries of the Plans pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

72.    **Named Fiduciaries**.  ERISA requires every plan to provide for one or more named fiduciaries of the Plans pursuant to ERISA § 402(a)(1)-(2), 29 U.S.C. § 1102(a)(1) and (2).  Upon information and belief, the Committee Defendants are Named Fiduciaries under the Plans.  In addition, the Morgan Stanley Defendants are Named Fiduciaries since they were appointed the Plans' Administrator.

19

73.    **De Facto Fiduciaries**. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, i.e., perform fiduciary functions (including a juridical person such as Morgan Stanley). ERISA § 3(2 E)(A)(i), 29 U.S.C. § 1002(21)(A)(i), makes a person a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or . . . has any discretionary authority or discretionary responsibility in the administration of such plan." During the Class Period, all of the Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA, by, among other things, the conduct alleged in ¶¶ 97-128.

## DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

74.    ERISA is a comprehensive statute covering virtually all aspects of an employee benefit plan, including retirement savings plans, such as the Plans. The goal of ERISA is to protect the interests of the Plans' participants and their beneficiaries:

> It is hereby declared to be the policy of this chapter to protect interstate commerce and the interests of participants in employee benefit Plan and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit Plan, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

ERISA § 2(b), 29 U.S.C. § 1001(b).

75.    Under ERISA, those responsible for employee benefit plan management stand in a fiduciary relationship to plan participants. Pursuant to ERISA, a "fiduciary" is defined broadly to include all persons or entities that are able to exercise discretionary authority over the management of a plan or the payment of benefits. 29 U.S.C. § 1002(21)(A). ERISA requires strict fidelity and loyalty in the execution of the plan's management.

76.    ERISA imposes on Defendants, who are responsible for the Plans, the requirement to "discharge his [or her] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

77.    ERISA also imposes on Defendants responsible for the Plans a duty of loyalty, requiring these Defendants to "discharge his [or her] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . for the exclusive purpose of . . . providing benefits to the participants and their beneficiaries." ERISA § 404 (a)(1)(A)(i), 29 U.S.C. § 1104(a)(l)(A)(i).

78.    Other duties imposed upon Defendants who are fiduciaries under ERISA by virtue of their exercise of authority or control respecting the management of the Plans or disposition of Plans' assets, include but are not limited to:

(a)    The duty to investigate and evaluate the merits of decisions affecting the use and disposition of Plans' assets;

(b)    The duty to evaluate all investment decisions with "an eye single" to the interests of Plans' participants and beneficiaries;

(c)    The duty to avoid placing themselves in a position where their acts as officers, directors, or employees of the Company will prevent their functioning with the complete loyalty to participants demanded of them as plan fiduciaries and, if they find themselves in such a position, to seek independent, unconflicted advice;

(d)    To the extent that a party is responsible for appointing and removing fiduciaries, the duty to monitor those persons who have been named which includes, among other things:  (1) the duty to ensure that the appointed fiduciary possesses the needed credentials to fulfill his or her duties, (2) the duty to make sure that the appointed fiduciary has adequate knowledge to fulfill his or her duties,  (3) the duty to insure that the appointed fiduciary has access to and retains impartial advisers when needed; (4) the duty to require that the appointed fiduciary report regularly to the monitoring fiduciary; and (5) the duty to remove a fiduciary if that fiduciary has breached his or her fiduciary duty or is not performing his or her fiduciary functions in accordance with ERISA;

(e)    The duty to disclose and inform the Plans' Participants of any material adverse information about the Plans that duty entails, among other things: (1) a duty not to make materially false statements or misinform the Plans' participants concerning any aspect of the Plans including its investments; (2) an affirmative duty to inform the Plans' participants about material adverse factors that were affecting the Plans or its investments at any time the fiduciary knew or should have known, pursuant to his duty to investigate, that failing to make such a disclosure might be harmful; and (3) when a plan is composed of various investment funds, the duty to inform and disclose also includes the duty to impart to plan participants material information that the fiduciary knows or should know is sufficient

to appraise the average plan participant of the comparative risks associated with investing in any particular investment;

(f)    A duty to insure that investments were not purchased at a price above what the Defendants, but not the participants and beneficiaries, knew or should have known to be in excess of fair market value as defined in the relevant Treasury regulations and in most instances at a price that renders it improbable that the investments will bring a fair return commensurate with the prevailing rates;

(g)    A duty to diversify the Plans' investments to minimize the risk of large losses to the Plans and its participants; and

(h)    The duty to not blindly follow plan documents if doing so leads to an imprudent result. A fiduciary may not avoid fiduciary responsibility by relying solely on the language of plan documents.

79.    ERISA permits the fiduciary function to be shared among various individuals and entities. Given ERISA's functional concept of a fiduciary, absent formal discovery it is impossible to know the full extent of which fiduciaries exercised which fiduciary functions.

80.    Insofar as the Plans were not properly diversified funds and therefore more risky to the Plans' participants, the Defendants had heightened fiduciary duties to the Plans' participants with respect to the Plans' investment in Morgan Stanley stock, including heightened duties to disclose all material information relevant to investments in Morgan Stanley stock.

81.    A fiduciary is liable not only for the fiduciary's own breach, but is also liable as a co-fiduciary if:

23

(a)    the fiduciary participates knowingly in, or knowingly undertakes to conceal, an act or omission of another fiduciary, knowing such act or omission is a breach; or

(b)    if, by the fiduciary's failure to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104 (a)(1) in the administration of his specific responsibilities that gives rise to fiduciary status, the fiduciary enables another fiduciary to commit a breach; or

(c)    the fiduciary knew or should have known of a breach by such other fiduciary and does not make reasonable efforts under the circumstances to remedy the breach.

## MORGAN STANLEY STOCK WAS AN IMPRUDENT INVESTMENT FOR THE PLAN

### Background of the Subprime Lending Industry

82.    Subprime lending is the practice of making mortgage loans to persons who are generally unable to access credit from traditional financial institutions because they do not satisfy credit, documentations or other underwriting standards mandated by these traditional mortgage lenders and loan buyers, which typically lend only to more credit-worthy borrowers.

83.    Because subprime borrowers are seen as "higher risk," their loans carry interest rates that are at least 2 percentage points higher than those offered to borrowers with better credit. So, for example, while a credit-worthy borrower could get a mortgage at 5% interest, the same mortgage would cost a subprime customer 7% interest or more.

84.    The subprime market has grown rapidly in recent years. In 1994, fewer than 5% of mortgage originations in the United States were subprime, but by 2005 about 20% of mortgage originations were subprime. The greater access to subprime mortgages has helped homeownership grow.

85.    Subprime mortgages totaled $600 billion last year, accounting for about one-fifth of the U.S. home loan market. An estimate of $1.3 trillion in subprime mortgages are currently outstanding.

86.    The rapid growth of the subprime lending industry has been attributed to a number of factors that occurred in 2004 and 2005. These factors include rising home prices, declining affordability, historically low interest rates, intense lender competition, innovations in the structure and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors.

87.    The mortgage market was further fueled by significant mortgage-backed securities liquidity, with investors increasingly seeking yield through higher risk securitizations that allow financial institutions to access the capital markets to fund mortgage operations, while simultaneously transferring credit risk away from the institutions and to securitization investors. The share of U.S. mortgage debt held outside the government-sponsored enterprises by private mortgage-backed securitizations doubled between 2003 and 2005, helping to fuel the growth of subprime and nontraditional mortgages.

88.    From 2001 to mid-2004, prime borrowers with a preference for fixed-rate mortgages refinanced in record numbers as long-term interest rates fell to the lowest rates in a generation. As interest rates began to rise in 2004 and the pool of potential prime borrowers looking to refinance shrank, lenders struggled to maintain or grow market share in a declining origination environment, and did so by extending loans to subprime borrowers with troubled credit histories.

89.    Lenders accommodated these borrowers by diversifying mortgage offerings as they competed to attract borrowers and meet prospective homebuyers' financing needs. Because

of the affordability aspect already noted, borrowers increasingly turned to products such as

payment option and interest-only (IO) loan structures in 2004 and 2005. These "nontraditional"

mortgages are specifically designed to minimize initial mortgage payments by eliminating or

relaxing the requirement to repay principal during the early years of the loan. Payment option

and interest-only loans appear to have made up as much as 40 to 50% of all subprime and Alt-A

loans securitized by private issuers of mortgage-backed securities during 2004 and 2005, up from

10% in 2003. The majority of subprime originations over the past several years were "2/28 and

3/27" hybrid loan structures. These hybrid loans provide an initial fixed-rate period of two or

three years, after which the loan converts to an adjustable-rate mortgage and the interest rate

adjusts to the designated loan index rate for the remaining 28 or 27 years of the loan. The 2/28

and 3/27 loan products accounted for almost three-quarters of subprime securitized mortgages in

2004 and 2005.

90.    Subprime lenders also eased lending standards to take advantage of these

borrowers, including limited or no verification of borrower income and high loan-to-value

transactions.

91.    In late 2004 and early 2005, there was a growing sense of concern regarding the

subprime industry, and in particular the eased lending standards. To address those concerns, the

Federal Reserve and other banking agencies issued guidance on subprime lending. The

Interagency Guidance on Nontraditional Mortgage Product Risks highlights sound underwriting

procedures, portfolio risk management, and consumer protection practices that institutions

should follow to prudently originate and manage nontraditional mortgage loans. A major aspect

of this guidance is the recommendation that a lender's analysis of repayment capacity should

include an evaluation of the borrower's ability to repay debt by final maturity at the fully indexed

rate, assuming a fully amortizing repayment schedule. The guidance also reminds institutions that they should clearly communicate the risks and features of these products to consumers in a timely manner, before consumers have applied for a loan.

92.     In 2006, mortgage interest rates hit four-year highs, the volume of home sales declined and the rate of home price appreciation decelerated and in some cases home prices fell, leaving the most recent subprime borrowers vulnerable to payment difficulties. Subprime borrowers with ARMs experienced a large increase in delinquency and foreclosure rates, while prime borrowers experienced almost no increase in delinquencies and foreclosures. Borrowers were not able to avoid sharp payment increases as they could in earlier years. Even borrowers with enough equity to refinance their adjustable rate mortgages faced difficulty finding a loan with affordable payments, as interest rates edged higher than in earlier years.

93.     Moreover, an unusually large number of subprime loans defaulted shortly after origination. In many of these "early payment defaults," borrowers stopped making payments before they faced payment shocks, suggesting that in 2006 some lenders may have lowered their underwriting standards in the face of reduced borrower demand for credit. Because of the rapid expansion of subprime lending in recent years, lenders, investors, and ratings agencies had limited data with which to model credit risk posed by new borrowers or novel mortgage types, and so may have underestimated the risk involved. Several lenders have already been forced out of the subprime market, in part because of the wave of early payment defaults on mortgages they originated.

94.     Instead of holding mortgage loans generally, lenders sell subprime mortgages that are bundled into bonds and offer them to individual and institutional investors.

27

95.     In 2006, approximately 80,000 subprime borrowers who took out mortgages that were packaged into securities fell into delinquency and during the first half of 2007, dozens of lenders participating in the subprime mortgage business ceased operating as defaults and delinquencies on recent loans skyrocketed.

96.     Throughout the fall of 2007, the stock prices of many large lenders dropped significantly as a result of problems with the subprime mortgage industry. Having invested hundreds of millions of dollars in securities backed by subprime mortgages which had become nearly worthless, these lenders were forced to announce substantial mortgage related charges.

## Morgan Stanley's Participation in the Subprime Market

97.     Morgan Stanley, the nation's second largest investment bank, is one of the many investment banks that jumped on the bandwagon and began underwriting pools of securities tied to subprime mortgages in late 2005.

98.     These pools of securities are called collateralized debt obligations or CDOs ("CDOs"). A CDO is an investment-grade security backed by a pool of bonds, loans and other assets, such as mortgages.

99.     In the summer of 2005, Defendant Mack became Morgan Stanley's Chief Executive Officer and instituted a policy of putting more of Morgan Stanley's capital at risk in exchange for the possibility of garnering greater returns. Starting in late 2005, Morgan Stanley began the practice of dramatically increasing its exposure to credit assets that had little or no price transparency, making it difficult for the Plans' Participants and the market to determine the risks associated with investing in these assets. "After his return to the firm more than two years ago, Defendant Mack spoke publicly of adopting a higher risk profile and pushed the firm into in-vogue investment areas like subprime mortgages, lending to private equity firms and using more of the firm's own capital to take big trading positions. The strategy produced substantial

profits for a time, but also resulted in a complex and ultimately disastrous trade in collateralized debt obligations. . . ." Landon Thomas, Jr. *Morgan Stanley Executive Ousted After Trading Loss*, N.Y. Times, Nov. 30, 2007, at C1.

100.    In furtherance of Defendant Mack's determination to take more risk with the Company's capital, and despite the impending subprime crisis, Morgan Stanley acquired Saxon Capital, Inc., ("Saxon") a servicer and originator of residential mortgages, for $706 million.

101.    The acquisition of Saxon was reported in Morgan Stanley's 2006 Annual Report, filed on February 16, 2006, and was intended to provide Morgan Stanley with access to subprime mortgages that could be repackaged into complex investment vehicles. In a press release issued by the Company on December 4, 2006, this acquisition was touted as "another important step in our long-term strategy of building a global, vertically integrated residential mortgage business . . . . Saxon adds a premier servicing operation with a scalable U.S. origination platform to our substantial existing residential mortgage franchise."

102.    In addition to acquiring Saxon, Morgan Stanley took enormous positions in super-senior segments of CDOs throughout the Class Period. Upon information and belief, at the start of 2007, Morgan Stanley held approximately $13 billion worth of super-senior CDOs in order to hedge and finance its bearish subprime bet. These CDOs paid a higher interest rate than the Company's cost of financing, generating large profits until the subprime meltdown in October after more modest declines in August and September. The bearish subprime bet, which took the form of derivatives called swaps, required Morgan Stanley to pay interest on those contracts. To off-set the bearish subprime bet and help generate interest income to pay off the cost of the swaps, the Company amassed the CDO position attributable to most of the losses that were announced in November 2007.

103.    Despite the fact that Morgan Stanley was able to anticipate the losses from its exposure to subprime mortgage investments as far back as 2006, it failed to take any action to protect the Plans' participants from these foreseeable losses. Indeed, the Company has a risk management panel who is responsible for overseeing these types of credit issue. Nevertheless, that panel and the Board failed to disclose its findings to the Plans' participants while the Plans continued to invest in the Company Stock Fund.

104.    Upon information and belief, Morgan Stanley also failed to adequately disclose contingent liabilities associated with Conduits and SIVs. Conduits and SIVs (structured investment vehicles) are investment vehicles that banks use to issue commercial paper. Until recently, they were considered to be highly rated, short-term notes that offered investors a safe-haven investment with a yield slightly above certificates of deposit or government debt.

105.    SIVs use the proceeds from the issuance of commercial paper to purchase longer-term investments such as corporate receivables, auto loans, credit-card debt or mortgages. Banks profit from the SIVs by pocketing the spread between the rate at which they borrow money and the rate at which they lend money.

106.    The vehicles are often established in a tax haven and are run solely for investment purposes, as opposed to typical corporate activities.

107.    It is difficult for investors to assess the financial risks imposed by SIVs or conduits because they are off-the-balance-sheet entities.

108.    Morgan Stanley represented to money market fund managers and other investors that SIVs were safe investments that use the proceeds from the issuance of commercial paper and short-term notes to invest strictly in high-quality debt securities.

30

109.    Investors, including money market funds, have pulled back from debt sold by SIVs because of their exposure to subprime mortgage securities. Because SIVs still owe money to commercial-paper holders, and cannot raise money by selling new commercial paper, they are being forced to sell their assets at fire-sale prices to pay off debt.

110.    Morgan Stanley's conduits are on the brink of collapse, subjecting the Company to billions of dollars of liability as a result of investor lawsuits for causing conduits to issue debt based on materially false and misleading statements.

111.    In addition, Morgan Stanley may end up having to move its conduits onto its balance sheets, thereby causing it to recognize billions of dollars in potential liability that it had not adequately disclosed to investors and the Plans' Participants.

### Morgan Stanley Failed to Disclose Material Adverse Information Concerning Its Subprime Assets to the Plans' Participants and Failed to Provide the Plans' Participants with Complete and Accurate Information Regarding Its Loan Loss Exposure

112.    Throughout the Class Period Defendants issued false and misleading statements and omitted material information regarding Morgan Stanley to Plan participants concerning, among other things, Morgan Stanley's exposure to subprime credit, off-balance sheet entities, CDOs and other credit-specific problems, which caused the Company's total fourth quarter 2007 writedown owing to U.S. subprime exposure to be approximately $9.4 billion.

113.    On December 19, 2006, Morgan Stanley reported record income for the fourth quarter and full year 2006, reporting a 51% increase in net income from the previous year and net revenues for the fourth quarter of $8.6 billion, 24% above last year's fourth quarter. Defendant Mack touted these results, stating "2006 was a year of outstanding progress for Morgan Stanley. Capitalizing in a strong market environment, the people of Morgan Stanley

achieved record fourth quarter results and the best full-year revenues and earnings in the Firm's history."

114.    Morgan Stanley's earnings for the first quarter of 2007 were similarly impressive. The Company reported net revenues up 29% from the first quarter of the previous year and a record net income of $2.672 million, an increase of 70% from the first quarter of the previous year. Commenting on these positive results Defendant Mack stated, "This strong performance was in large part the result of effective, disciplined risk-taking by our team in Institutional Securities, which helped deliver record results across our sales and trading businesses."

115.    After announcing these results the Company's Executive Vice President and Chief Financial Officer David Sidwell addressed issues relating to the subprime market on an investor conference call stating that **"While there has been considerable media coverage regarding higher delinquencies in the subprime mortgage industry, we have not seen any impact on our Card portfolio. Nevertheless, we continue to monitor the situation closely."**[1]

116.    On June 15, 2007, Morgan Stanley Stock hit a 52-week high of $90.05.

117.    On June 20, 2007, Morgan Stanley announced more stellar results for the second quarter which ended May 31, 2007, reporting record income from continuing operations of $2.582 million, an increase of 41% from the second quarter of 2006, and net revenues of a record $11.5 billion, 32% above the second quarter from the previous year.

118.    Defendant Mack touted these earnings and painted a rosy picture of the Company's future, stating:

> Morgan Stanley delivered record revenues and earnings in the second quarter and the first half of the year, as we continue to build momentum across our securities businesses and continued to see

---

[1] On May 1, 2007, Morgan Stanley issued a press release announcing the retirement of Mr. Sidwell as CFO and stating that Thomas Colm Kelleher would replace him.

the benefits of our diverse mix of products, clients and businesses around the globe. Thanks to the commitment and focus of our people, we've not achieved seven straight quarters with ROE above 20 percent, and we're all on our way to reaching our goal of doubling 2005 earnings over five years. But we believe there is still work that remains to be done, and we remain intensely focused on delivering value to Morgan Stanley's clients and shareholders over the long term.

119.    Following the announcement of Morgan Stanley's second quarter results, Defendant Sidwell addressed Morgan Stanley's concerns with the subprime market on a June 20, 2007 conference call reassuringly stating:

As you've seen from our press release, we achieved record net revenues, profit before tax, in come and earnings per share from continuing operations.

We are very pleased with these results, as they reflect execution of our strategic growth plans and string trading performance. . . . *Concerns early in quarter about, whether issues in the Subprime market were going to spread dissipated.* . . .

120.    Thus in the wake of an uproar of concerns regarding the collapse of the subprime market, Morgan Stanley continued to assure the market and the Plans' Participants of the continued viability of Morgan Stanley Stock and of the fact that the Company would remain unscathed by the subprime crisis, despite the Plans' heavy investment in Company stock.

**The Truth Comes To Light**

121.    On September 19, 2007, Morgan Stanley announced disappointing results for the third quarter ended August 31, 2007, reporting that income from continuing operations for the quarter had decreased 7% compared to the third quarter of the prior year.

122.    On November 7, 2007, Morgan Stanley issued a press release "announcing significant declines since August 31, 2007 in the fair value of its U.S. subprime related exposures as a result of the continued deterioration in the market. . . ." The Company recorded a $3.7 billion writedown, after which its stock fell 6.1% to $51.19.

123.    On November 21, 2007, Morgan Stanley stock hit a 52-week low closing at $47.56 per share.

124.    As a result of this, Morgan Stanley co-president Zoe Cruz was terminated: "Morgan Stanley, its reputation battered over a recent $3.7 billion loss linked to subprime mortgages, has become the latest Wall Street firm to force the retirement of a senior banking executive . . . . The move represents a sharp reversal for John Mack, the chief executive, who had supported and cultivated the career of Cruz. . . ." *Subprime woes claim Morgan Stanley career*, International Herald Tribune, Dec. 1, 2007, at 14.

125.    More bad news for the Company followed.  On December 19, 2007, Morgan Stanley announced that it was taking an additional $5.7 billion mortgage-related write-down, resulting in a total write down related to mortgages of *$9.4 billion*.  One analyst called this news "a 'complete breakdown' in the company's risk-management."  David Ellis, *More Woes for Morgan Stanley*, CNNMoney.com, Dec. 20, 2007.

126.    Morgan Stanley also suffered its first quarterly loss ever as it reported Fourth Quarter results.  The Company reported a loss of $3.6 billion versus a profit of $2.0 billion from the prior year.

127.    Following these dismal results, S&P downgraded Morgan Stanley and placed its rating on Morgan Stanley on "CreditWatch," commenting that "'MS' dismal fourth-quarter results heighten our concern regarding its strategic direction and risk appetite."  *S&P: Morgan Stanley 'AA-/A-1+' Ratings Put On CreditWatch*, Market News Publishing, Dec.19, 2007.

128.    On December 22, 2007, The Financial Times reported that Morgan Stanley was reviewing the position of chief risk officer Tom Daula: "A person close to Colm Kelleher, Morgan Stanley's chief financial officer, said the bank was 'evaluating the risk function,

34

including the top of that function' and looking at switching the reporting lines for risk

management to Mr. Kelleher. . . . The decision on Mr. Daula's future will shed light on whether

the blame for the losses is seen to lie with people monitoring the risk or with more senior

executives." Henry Sender, *Morgan Stanley reviews position of risk officer over writedowns*,

Financial Times, Dec. 22, 2007, at 15. The article further states that "Mr. Daula's supporters

within the bank say his repeated warnings were ignored." *Id.*

## CONDUCT CONSTITUTING DEFENDANTS' FIDUCIARY BREACHES

129.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the

Defendants as fiduciaries of the Plans. The Defendants breached their duties to prudently and

loyally manage the Plans' assets because, during the Class Period, Defendants knew or should

have known that Company stock was not a prudent investment for the Plans and knew or should

have known that the value of Company stock was exposed to an unacceptable risk of loss.

130.    Defendants' knowledge that the Company stock was an imprudent investment is

based on the fact that Defendants knew or should have known of the unsound business practices

and risky lending activities and other misrepresentations alleged herein. Defendants failed to

take adequate steps to prevent the Plans, and indirectly the participants, from suffering losses as

a result of the Plans' investments in Company stock.

131.    Upon information and belief, not one of the Defendants conducted an appropriate

investigation into whether Company stock was a prudent investment for the Plans in light of the

Company's risky exposure to the subprime credit market and other related serious corporate

misconduct and given the fact that the Plans held enormous investments in Company stock.

Moreover, not one of the Defendants provided the Plans' participants with information regarding

the true nature of these business practices and the extraordinary risks that they presented to

Morgan Stanley such that the Plans' participants could make informed decisions regarding the

35

Company stock in the Plans. Indeed, not one of the Defendants took any meaningful action to protect the Plans against the risk of enormous losses as a result of the Company's very risky and inappropriate corporate misconduct.

132.    On a Class-wide and Plan-wide basis the risk of an undiversified investment in Company stock imposes a greater risk than that of other undiversified investments.

133.    The risk associated with the investment in Company stock during this time of unsound business practices was an extraordinary risk, far above and beyond the normal, acceptable risk associated with investment in company stock. This abnormal investment risk could not have been known by the Plans' participants, and the Defendants knew or should have known that it was not known by them because the Defendant fiduciaries never disclosed it. This extraordinary risk made any investment in Company stock inappropriate and imprudent.

134.    Participants, even before placing any retirement savings in Company stock, relied on the stability and financial viability of Morgan Stanley as the basis for their standard of living. The participants' salaries, healthcare and other benefits, as well as the participants' pension (if any) and retirement health insurance depended upon Morgan Stanley's continued solvency and viability.

135.    Thus, one of the risks that could impair the participant's investment in Company stock – the failure or insolvency of the employer – would also cause the loss of current income and benefits and future non-Plan related retirement benefits. The risks are correlated and, if realized, would financially devastate most employees and participants in the Plans. Therefore, the Defendants had a heightened duty with regard to both the decision to continue investing in Company stock as well as the duty to inform participants concerning the imprudence of investing in Company stock.

136.    Defendants breached their fiduciary duties when they failed to conduct an appropriate investigation into whether Morgan Stanley stock was a prudent investment for the Plans; failed to develop appropriate investment guidelines for Morgan Stanley stock; failed to divest the Plans of Morgan Stanley stock; failed to discontinue further contributions of Morgan Stanley stock to the Plans; failed to remove Morgan Stanley stock as an investment option for the Plans; failed to either consult or appoint independent fiduciaries regarding the appropriateness of an investment in Morgan Stanley stock; and failed to resign as fiduciaries of the Plans if as a result of their employment by Morgan Stanley they could not loyally serve the Plans and their participants. In addition, these Defendants breached their fiduciary duties when they failed to prohibit any participant from making an "investment switch" into Morgan Stanley stock. In fact, the Defendants continued to invest and to allow investment of the Plans' assets in Company stock even though they knew or should have known that Morgan Stanley would be taking billions of dollars in losses to remedy its risky exposure to the subprime credit market, resulting in a decrease in the value of Morgan Stanley stock. No other Defendant fiduciary took any action to remedy the breaches set forth in this paragraph.

137.    Defendants breached their fiduciary duties by direct and indirect communications with the Plans' participants, made in their fiduciary capacity, which contained statements concerning Company stock that these Defendants knew or should have known were untrue and inaccurate. These communications included Class-wide and Plan-wide affirmative and materially misleading statements as to Morgan Stanley's investment practices, Morgan Stanley's earnings, and Morgan Stanley's profitability as detailed in this Complaint, that were contained in the following documents that, upon information and belief, were specifically incorporated into the SPD: SEC S-8 statements, SEC Form 10-K annual reports and interim periodic reports,

37

Morgan Stanley's Annual Report, and the Plan's annual report on SEC Forms 11-K. In addition, the foregoing documents omitted, and continue to omit, material information concerning Morgan Stanley's financial performance, including Morgan Stanley's risky exposure to the subprime credit market. No Defendant took any action to remedy the breaches set forth in this paragraph.

138.    Moreover, Defendants knew or recklessly disregarded certain basic facts about the characteristics and behavior of the Plans' participants, well-recognized in the 401(k) and ESOP industry and trade press:

      (a)    Out of loyalty, employees tend to invest in company stock;

      (b)    Employees tend not to change their investment option allocations in the plan once made;

      (c)    Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

      (d)    Many employees do not recognize their exposure to massive loss from failing to diversify their investment.

139.    As a result of Defendants' knowledge of and implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any warnings of market and diversification risks that Defendants made to the Plans' participants regarding the Plans' investment in Morgan Stanley stock did not effectively inform the Plans' participants of the past, immediate, and future dangers of investing in Company stock.

140.    Based on their actual or constructive knowledge as set forth in ¶¶ 112-120, Defendants knew about Morgan Stanley's exposure to the subprime credit market. Defendants knew or should have known of the affirmative misrepresentations made to Participants in the SEC documents and annual reports incorporated into the SPDs. Defendants knew that the Plans'

participants lacked the knowledge that Defendants had or should have had concerning the unsound business practices and knew or should have known that the Plans' participants would be harmed by this lack of knowledge. Defendants on a Plan-wide and Class-wide basis, never accurately disclosed to Plaintiff or the Plans' participants the true nature, extent, and risks of these problems. Rather, Defendants failed to timely communicate accurate information to the Plans' participants concerning Morgan Stanley's true financial condition, including its unsound business practices in prior periods, when they knew or should have known that the Plans' participants needed this information. Defendants and/or their individual fiduciary delegates, on a Class-wide and Plan-wide basis, failed to provide the Plans' participants with complete and accurate information regarding Morgan Stanley stock, such that the participants could appreciate the true risks presented by investments in Morgan Stanley stock and could make informed decisions thereby avoiding the unreasonable and entirely predictable losses incurred as a result of the Plans' investment in Morgan Stanley stock. No Defendant took any action to remedy the breaches set forth in this paragraph.

141.    The Morgan Stanley Defendants and Board Defendants failed in their fiduciary responsibilities in monitoring the Committee Defendants. The Morgan Stanley Defendants and Board Defendants breached their fiduciary duties because they did not have procedures in place so that they could review and evaluate on an ongoing basis whether the Committee Defendants were performing their duties adequately and in accordance with ERISA's fiduciary provisions. The Morgan Stanley Defendants and Board Defendants breached their fiduciary duty to remove the Committee Defendants when they knew the Committee Defendants had breached their fiduciary duties. The Morgan Stanley Defendants and Board Defendants failed to adequately review the performance of the Committee Defendants to: ensure that they were fulfilling their

fiduciary duties under the Plans and ERISA; ensure that they had adequate information to do their job of overseeing the Plans' investments; ensure that they adequate access to and use of impartial advisors when needed; and ensure that they reported regularly to the Board.

## DEFENDANTS SUFFERED FROM CONFLICTS OF INTEREST

142.　Morgan Stanley's SEC filings make clear that a significant percentage of Morgan Stanley's officer and director compensation is in the form of stock grants or stock option grants.

143.　Because the compensation of many of the Defendants was significantly tied to the price of Morgan Stanley stock, Defendants had an incentive to keep the Plans' assets heavily invested in Morgan Stanley stock on a regular, ongoing basis. Elimination of Company stock as an investment option would have reduced the overall market demand for Morgan Stanley stock and sent a negative signal to Wall Street analysts, which would have adversely affected the price of Morgan Stanley stock, resulting in lower compensation for the Defendants.

144.　Moreover, keeping the Plans' assets heavily invested in Morgan Stanley stock allowed Defendants to sell their personally held Morgan Stanley stock at artificially inflated prices.

145.　This insider selling created a serious conflict of interest between Defendants' fiduciary duties and their personal interests, because Defendants were able to divest their own Company stock when they became aware of the Company's risky exposure to the subprime credit market; they did *not*, however, divest the Plans' investment in Morgan Stanley stock, allowing themselves to personally profit and leaving the Plans to suffer massive losses.

146.　Some Defendants may have had no choice in tying their compensation to Morgan Stanley stock (because compensation decisions were out of their hands), but Defendants did have the choice in what information to disclose to the Participants and whether to keep the Participants' retirement savings invested in Company stock.

147.    These conflicts of interest put the Defendants in the position of having to choose between their own interests and the interests of the Participants.

## CAUSATION

148.    The Plans suffered massive losses because a substantial amount of the Plans' assets were imprudently invested by the Plans in Morgan Stanley stock during the Class Period, and in breach of Defendants' fiduciary duties.

149.    Had Defendants properly discharged their fiduciary duties, including the provision of full and accurate disclosure of material facts concerning Morgan Stanley stock and divesting the Plans from Company stock offered by the Plans when such investment became imprudent, the Plans would have avoided losses suffered in Company stock.

150.    As a result of Defendants' actions, Plaintiffs and the Class, which invested in Morgan Stanley stock through the Plans, were wrongfully damaged, as the Plans suffered substantial losses from Defendants' failure to fulfill their fiduciary responsibilities as described herein. Had the fiduciaries acted prudently and in accordance with their fiduciary duties, they would have taken steps to eliminate or reduce the amount of Morgan Stanley stock held by the Plans, eliminated the option for participants to place funds in Morgan Stanley stock, or fully disclosed the material adverse facts concerning Morgan Stanley stock described herein. Plaintiffs and the Class are entitled to the best alternative investment available to them under the circumstances, and the Plans would have achieved gains and avoided losses but for Defendants' breach of fiduciary duty as described herein.

151.    The Plans and the Plans' fiduciaries do not qualify for any affirmative defense based on ERISA Section 404(c) as the Plans did not satisfy the numerous stringent requirements of Section 404(c) and the Department of Labor Regulations promulgated thereunder, as set forth in 29 C.F.R. § 2550.404c-1. This is because Defendants, among other ERISA § 404(c)

disclosure failures, failed to ensure effective participant control by providing complete and accurate material information to participants regarding Company stock. *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient information to make informed decisions"). As a consequence, participants in the Plans did not have informed control over the portion of the Plans' assets that were invested in Company stock as a result of their investment directions, and the Defendants remained entirely responsible for losses that result from such investment.

152.    Furthermore, under ERISA, fiduciaries - not participants - exercise control over the selection of investment options made available to participants. Thus, whether or not participants are provided with the ability to select among different investment options, and whether or not participants exercised effective control over their investment decisions (which was not the case here), liability attaches to the fiduciaries if an imprudent investment option is selected by the fiduciaries and presented as an option to participants, and as a result of such action the Plans suffer a loss. Because this is precisely what occurred in this case, Defendants are liable for the losses incurred by the Plans and are not entitled to any protection under ERISA § 404(c).

153.    The losses suffered by the Plans and the Plans' participants and beneficiaries, including Plaintiffs and the Class, were the direct and necessary result of the misconduct of Defendants alleged herein. Plaintiffs and the Class were unaware, and in the exercise of reasonable diligence could not have been aware, of the true and accurate extent of Morgan Stanley's risky and unsound business practices, as well as Defendants' continuing breaches of fiduciary duty in failing to disclose such material facts.

## REMEDIES FOR DEFENDANTS' BREACH OF THEIR FIDUCIARY DUTIES

154.    Defendants breached their fiduciary duties in that they knew or recklessly disregarded the facts as alleged above, and therefore knew or recklessly disregarded that the Plans' assets should not have been so heavily invested in Company stock.  As a consequence of the Defendants' breaches, the Plans suffered significant losses.

155.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

156.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plans' assets to what they would have been if the plan had been properly administered.

157.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plans in the amount of the losses to the Plans resulting from the breaches of fiduciary duties alleged above and to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA § 409(a) and 502(a)(2)-(3), 29 U.S.C. § 1109(a) and § 1132(a)(2)-(3); (3) reasonable attorneys' fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common

fund doctrine, and other applicable law; (4) taxable costs; (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

## Count I

### Failure to Prudently Manage the Plans' Assets;
### Breach of Fiduciary Duties in Violation of ERISA § 404
### (Against All Defendants)

158.   Plaintiff incorporates the foregoing paragraphs herein by reference.

159.   The Plans are governed by the provisions of ERISA, 29 U.S.C. § 1001, et. seq., and Plaintiffs and the Class are participants and/or beneficiaries in the Plans. The Defendants are all fiduciaries with respect to the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). They were thereby bound by the duties of loyalty, exclusive purpose, and prudence.

160.   Defendants named in this Count were each responsible, in different ways and degrees, for the Plans' investments in Company stock.

161.   Under ERISA, fiduciaries who exercise discretionary authority or control over the management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to plan participants are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.

162.   The fiduciary duty of loyalty likewise entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

163.    Defendants named in this Count were responsible for ensuring that investment in Company stock was prudent and consistent with the purpose of the Plans. Defendants are liable for any and all losses incurred as a result of such investments being imprudent.

164.    During the Class Period, the Defendants named in this Count knew or should have known that Company stock was not a suitable, prudent or appropriate investment for the Plans as described herein irrespective of any duty of diversification that may exist. Notwithstanding this knowledge, these Defendants offered and continued to offer Company stock as investment options for the Plans and/or offered and continued to offer to direct and approve the investment in Company stock.

165.    Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, the Defendants named in this Count failed to take any meaningful steps to prevent the Plans, and indirectly the Plans' participants and beneficiaries, from suffering losses as a result of the Plans' investments in Company stock. The Defendants named in this Count knew or should have known that a prudent fiduciary acting under similar circumstances would have made different investment decisions with respect to the Company stock and that continued investment in Company stock was not in keeping with the Plans' settlors' expectation on how a prudent fiduciary would operate.

166.    The Defendants named in this Count had actual or constructive knowledge of the Company's serious mismanagement, risky lending practices and other misrepresentations that impacted Company stock as alleged in this Complaint. Despite this knowledge, they participated in each other's failures to prudently manage the Plans' assets and knowingly concealed such failures by not informing the Plans' participants that Company stock was not a prudent investment.

45

167.    In addition to other breaches of fiduciary duty alleged in this Count, the Defendants committed the following fiduciary breaches: (a) failed to conduct an appropriate investigation into whether Company stock was a prudent investment for the Plans; (b) failed to develop appropriate investment guidelines for Company stock; (c) failed to divest the Plans of Company stock; (d) failed to discontinue further Plan contributions to Company stock; (e) failed to remove Company stock as investment options of the Plans; (f) failed to both consult or appoint independent fiduciaries regarding the appropriateness of an investment in Company stock; (g) failed to notify appropriate federal agencies, including the Department of Labor, of the facts and circumstances that made Company stock an unsuitable and imprudent investment for the Plans; and (h) failed to resign as fiduciaries of the Plans if, as a result of their employment by Morgan Stanley or its affiliates, they could not loyally serve the Plans and their participants.  In addition, these Defendants breached their fiduciary duty when they failed to prohibit any participant in the Plans from making an "investment switch" into Company stock.

168.    As a result of the breach of fiduciary duties of the Defendants named in this Count, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, suffered damages, the exact amount of which will be determined at trial.

169.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants named in this Count are personally liable to restore the losses to the Plans caused by their breach of fiduciary duty as alleged in this Count.

## Count II

### Failure to Provide Complete and Accurate Information
### to Participants and Beneficiaries;
### Breaches of Fiduciary Duties in Violation of ERISA § 404
### (Against All Defendants)

170.    Plaintiff incorporates the foregoing paragraphs herein by reference.

171.    At all relevant times herein, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

172.    During the Class Period, Defendants knew or should have known that Company stock was not a suitable, prudent or appropriate investment for the Plans.

173.    As alleged herein, the scope of the Defendants' fiduciary duties and responsibilities included drafting and disseminating Plan documents, SPDs and information to participants regarding the assets of the Plans.

174.    All Defendants had a duty to provide participants with information they possessed that they knew or should have known would have a material impact on the Plans.

175.    The duty of loyalty under ERISA requires the Defendants to speak truthfully to Plans' participants, not to mislead them regarding the Plans or the Plans' assets, and to disclose information that participants need in order to exercise their rights and interests under the Plans. The Defendants' duty of loyalty included not only the negative duty not to misinform, but also an affirmative duty to inform when the Defendants' knew or should have known that silence might be harmful. If a fiduciary knows that a material misrepresentation has been made to a Participant, that fiduciary, without regard to the functions that make that person a fiduciary, has an affirmative duty to correct that misrepresentation. Moreover, Defendants are required to provide each participant with sufficient information to make informed decisions with regard to investment alternatives available under the Plans, including Company stock.

176.    The fiduciary duty of loyalty likewise entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

177.    This duty to inform participants included the Defendants' obligation to provide participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plans' investment options such that participants can make informed decisions with regard to investment options available under the Plans. This duty applies to all of the Plans' investment options, including the Company stock.

178.    Because a substantial percentage of the Plans' assets were invested in Company stock, such investment carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to Company stock.

179.    Because of the disparity in knowledge between Defendants and the Plans' participants, the participants relied on Defendants to provide them with accurate and complete information about Morgan Stanley, which was material to the suitability of Company stock as a prudent investment option.

180.    The fiduciary duty to honestly communicate with participants is designed not merely to inform participants and beneficiaries of conduct, including illegal conduct, bearing on their retirement savings, but also to forestall such illegal conduct in the first instance. By failing to discharge their disclosure duties, the Defendants facilitated the illegal conduct in the first instance.

181.    The Defendants breached their fiduciary duties by direct and indirect communications with the Plans' participants, made in their fiduciary capacity, which contained statements concerning Company stock that these Defendants knew or should have known were untrue and inaccurate. These communications included Class-wide and Plan-wide affirmative

and materially misleading statements as to Morgan Stanley's risky exposure to the subprime credit market as detailed in this Complaint.

182.    The Defendants breached their fiduciary duties not only with regard to the affirmative misrepresentations, but also because those documents omitted, and continue to omit, material information concerning Morgan Stanley's serious mismanagement, including Morgan Stanley's risky exposure to the subprime credit market. In addition, the Defendants breached their fiduciary duties by conveying inaccurate information regarding the soundness or security of Company stock and the prudence of investing retirement contributions in Company stock.

183.    All Defendants breached their fiduciary duty when they failed to provide Plan participants, on a Class-wide and Plan-wide basis, information regarding the imprudence of investing in Company stock. All Defendants knew or should have known that Plan participants lacked the knowledge that Defendants possessed concerning the imprudence of investing in Company stock; knew or should have known that the Plans' participants would be harmed by this lack of knowledge; and knew or should have known that material misrepresentations regarding Company stock were made to Plan participants. All Defendants, on a Plan-wide and Class-wide basis, never accurately disclosed to Plaintiffs or the Plans' participants the true nature, extent, and risks of investing in Company stock when they knew or should have know that investment in Company stock was imprudent. Rather, all Defendants failed to timely communicate accurate information to Plan participants concerning Morgan Stanley's risky exposure to the subprime credit market during the Class Period when they knew or should have known that Plans' participants needed this information.

184.    As a consequence of Defendants' breaches of fiduciary duty alleged in this Count, the Plans suffered tremendous losses. If the Defendants had discharged their disclosure

obligations prudently and in the sole interests of Plan participants and beneficiaries, then losses suffered by the Plan would have been avoided or greatly minimized. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the other Class members, lost hundreds of millions of dollars of retirement savings.

185.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), the Defendants are personally liable to the Plans for these losses incurred as a result of Defendants' misrepresentations to the Plans' participants as well as their breach of the fiduciary duty to disclose and inform.

## Count III

### Failure in Appointing and Monitoring Plan Fiduciaries; Breaches of Fiduciary Duties in Violation of ERISA § 404 (Against the Board Defendants and the Morgan Stanley Defendants)

186.    Plaintiff incorporates the foregoing paragraphs herein by reference.

187.    At all relevant times herein, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

188.    At all relevant times herein, the fiduciary duties of the Board Defendants and Management Defendants included the power and responsibility to appoint, and the duty to oversee and thereby monitor the performance of the Committee.

189.    At all relevant times herein, the scope of the fiduciary duties of the Board Defendants and Morgan Stanley Defendants included the oversight and the power and responsibility to appoint, and thereby monitor the performance of the Committee.

190.    During the Class Period, Defendants knew or should have known that Company stock was not a suitable, prudent or appropriate investment for the Plans, as described herein.

50

191.    Under ERISA, a fiduciary with appointment powers must ensure that the appointed fiduciaries are performing their fiduciary obligations, including those obligations with respect to handling, holding and investing plan assets; and must take prompt and effective action to protect the plan and participants when the appointed fiduciaries are not meeting their fiduciary obligations.

192.    The appointing fiduciary must have procedures in place so that they may review and evaluate on an ongoing basis whether the appointed fiduciaries are doing an adequate job (including, for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for (1) promptly and prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants; or (2) deciding whether to retain or remove their appointees.

193.    An appointing fiduciary must provide the appointed fiduciaries with all the information that they have or reasonably should have in order to prudently manage the plan and the plan assets or that may have a material impact on the plan and the fiduciaries' investment decisions regarding the plan.

194.    The Board Defendants and Morgan Stanley Defendants breached their fiduciary appointing and monitoring duties by, among other things: (1) failing to appoint persons with the requisite knowledge, skill, and expertise to properly administer the Plan and manage its assets; (2) failing to adequately monitor their appointees, evaluate their performance, or have an adequate system in place for doing so, (and standing idly by as the Plans suffered enormous losses as a result of the appointees' imprudent action); (4) failing to ensure that the appointed

51

fiduciaries (although possessing actual knowledge of unsound business practices and risky lending activities and other misrepresentations concerning Company stock as alleged herein) understood the true extent of Morgan Stanley's unsound business practices and risky lending activities and its impact on the value of Company stock and the Plan's concomitant investment in Company stock.

195.    The Board Defendants and the Morgan Stanley Defendants breached their fiduciary duty by failing to remove the appointed fiduciaries, as named herein, whose performance was inadequate. The Board Defendants, knew that the appointed fiduciaries: (a) failed to conduct an appropriate investigation into whether Company stock was a prudent investment for the Plans; (b) failed to develop appropriate investment guidelines for Company stock; (c) failed to divest the Plans of Company stock; (d) failed to discontinue further Plan contributions to Company stock; (e) failed to remove Company stock as investment options for the Plans; (f) failed to consult with or appoint independent fiduciaries regarding the appropriateness of an investment in Company stock; (g) failed to prohibit any participant from making an "investment switch" into Company stock; (h) failed to notify appropriate federal agencies, including the Department of Labor, of the facts and circumstances that made Company stock an unsuitable or imprudent investment for the Plans; and (i) failed to inform Plan participants that investment in Company stock would not be prudent.

196.    As a consequence of the Board Defendants' and the Morgan Stanley Defendants' breaches of fiduciary duty, the Plans suffered tremendous losses. Had Defendants named in this Count discharged their fiduciary duties as described above, the losses suffered by the Plans would have been averted or, at a minimum, lessened. Therefore, as a direct and proximate result

52

of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the other Class members, lost hundreds of millions of dollars of retirement savings.

197.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, suffered damages, the exact amount of which will be determined at trial.

198.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), the Board Defendants and Morgan Stanley Defendants are personally liable to restore the losses to the Plans caused by their failure to monitor and remove fiduciaries as alleged in this Count.

## Count IV

### Co-Fiduciary Liability;
### Breaches of Fiduciary Duties in Violation of ERISA § 405
### (Against all Defendants)

199.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

200.    At all relevant times, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

201.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability that he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if: (i) he participates in, or undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (ii) he fails to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) in the administration of his specific responsibilities that give rise to his status as a fiduciary, by enabling such other fiduciary

to commit a breach; or (iii) he knew or should have known of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

202.    During the Class Period, Defendants knew that Company stock was not a suitable, prudent or appropriate investment for the Plans as described herein.

Failure to Remedy

203.    ERISA § 405(a)(3), 29 U.S.C. § 1105(3) imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

204.    The Board Defendants were aware that the Committee Defendants breached their fiduciary duties as alleged in Count I of the Complaint. Despite this knowledge, the Board Defendants failed to undertake any effort to remedy their co-fiduciaries' failures to prudently and loyally manage the Plans' investment in Company stock, as well as other fiduciary breaches alleged in Count I. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(3). The actions that the Board Defendants could have taken, included but are not limited to: (1) objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Board; (2) disclosing the imprudence of the investment in Company stock to the Plans' participants; (3) notifying the U.S. Department of Labor of their co-fiduciaries actions; or (4) preparing to obtain an injunction from a Federal District Court.

205.    To the extent that it is determined that any Board Defendant and/or Committee Defendant did not breach his fiduciary duty as alleged in Count I of the Complaint, that Defendant was still aware that the remaining Defendants in Count I did, in fact, breach their fiduciary duties. Despite this knowledge, the Defendant(s) named in this paragraph breached

their fiduciary duties by failing to undertake any effort to remedy their co-fiduciaries' failures to prudently and loyally manage the Plan's investment in Company stock and other fiduciary breaches alleged in Count I. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(3). The actions that the Defendant(s) could have taken included but are not limited to: objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Board or Committee; disclosing the imprudence of the investment in Company stock to Plan Participants; notifying the U.S. Department of Labor of their co-fiduciaries' conduct; or preparing to obtain an injunction from a Federal District Court.

206. To the extent that it is determined that any Defendant did not commit any of the fiduciary breaches as alleged in Count II of the Complaint, any such Defendant was still aware that the remaining Defendants named in Count II breached their fiduciary duties. Despite this knowledge, these Defendants breached their fiduciary duty by failing to undertake any effort to remedy the fiduciary breaches alleged in Count II, including the duty to remedy their co-fiduciaries' misrepresentations and their co-fiduciaries' breach of the affirmative duty to inform Plan participants regarding the imprudence of investing in Company stock. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(3). The actions that the Defendant(s) could have taken included but are not limited to: (1) objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Board; (2) disclosing the imprudence of the investment in Company stock to Plan Participants; (3) notifying the U.S. Department of Labor of their co-fiduciaries' conduct; or (4) preparing to obtain an injunction from a Federal District Court.

Enabling a Breach

207.    ERISA § 405(a)(2), 29 U.S.C. § 1105(2) also imposes co-fiduciary liability on a

fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(l), in the

administration of his specific responsibilities that give rise to his status as a fiduciary, he has

enabled another fiduciary to commit a breach.

208.    To the extent that it is determined that any Board Defendant or Committee

Defendant lacked knowledge of the circumstances rendering the Plans' investment in Company

stock imprudent, then all other Defendants enabled the imprudent asset management decisions of

that Defendant by failing to provide that Defendant with complete and accurate information

regarding the Company's risky exposure to the subprime credit market and other

misrepresentations concerning Company stock.  In failing to inform their co-fiduciaries, who

lacked knowledge, if any, these Defendants breached ERISA § 405(a)(2).

209.    Through their failure to properly and effectively monitor their appointees,

including the removal of those whose performance was inadequate as alleged in this Complaint,

the Board Defendants enabled the Committee Defendants imprudent management of Company

stock in the Plans.

210.    Further, through their failure to properly and effectively monitor their appointees,

including the removal of those whose performance was inadequate as alleged above, the Board

Defendants and Committee Defendants enabled the remaining Defendants imprudent

management of Company stock in the Plans.

211.    The Board Defendants' failure to monitor the Committee Defendants enabled the

Committee Defendants to breach their duties.

212.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, suffered damages, the exact amount of which will be determined at trial.

213.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), ERISA § 409, 29 U.S.C. § 1109(a), and ERISA § 405, 29 U.S.C. § 1105, Defendants are liable to restore the losses to the Plans caused by their co-fiduciary breaches of fiduciary duties alleged in this Count.

## Count V

### Breach of Duty to Avoid Conflicts of Interest
### (Against All Individual Defendants)

214.    Plaintiff incorporates the foregoing paragraphs herein by reference.

215.    At all relevant times, as alleged above, the Individual Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

216.    ERISA § 494(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his or her duties with respect to the plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

217.    These Defendants were heavily invested in Morgan Stanley stock and had an interest in ensuring that the Plans' assets were also heavily invested in Morgan Stanley stock on a regular, ongoing basis. Elimination of Company stock as an investment option for the Plans would have reduced the overall market demand for Morgan Stanley stock and sent a negative signal to Wall Street analysts, which would have adversely affected the price of Morgan Stanley stock, resulting in losses for the Defendants named in this Count.

218.　　The Defendants named in this Count placed their own interest in investing the Plans' assets in Morgan Stanley stock over the Plans' participants' interest in maintaining a diversified and prudently invested ERISA plan.

219.　　The Defendants named in this Count breached their duty to avoid conflicts of interest and to promptly resolve them by, inter alia: failing to engage an independent fiduciary who could make independent judgments concerning the Plans' investment in Morgan Stanley stock; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; and by failing to otherwise place the interests of the Plans' participants above the interests of themselves and the Company with respect to the Plans' investment in Morgan Stanley stock.

220.　　As a result of these Defendants' breach of their duty to avoid conflicts of interest, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries suffered damages, the exact amount of which will be determined at trial.

221.　　Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), the Defendants named in this Count are personally liable to restore the losses to the Plans caused by their breach of the duty to avoid conflicts of interest as alleged in this Count.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.  Determining that this is a proper class action to be certified under Rule 23 and appointing Plaintiff class representative on behalf of the Class; Declaring that Defendants, and each of them, are not entitled to protection under ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

B.  Declaring that Defendants have violated the duties, responsibilities, and obligations imposed upon them as fiduciaries and co-fiduciaries and that they violated the ERISA disclosure and monitoring requirements as described above;

C.  Compelling Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, and to restore to the Plans all profits Defendants made through use of the Plans' assets, and to restore to the Plans all profits that the participants would have made had Defendants fulfilled their fiduciary obligations;

D.  Awarding actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

E.  Enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.  Requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plans' investment in Morgan Stanley stock;

G.  Awarding extraordinary, equitable, and/or injunctive relief as permitted by law, equity, and the federal statutory provisions set forth herein, pursuant to Fed. R. Civ. P. 64 and 65;

H.  Awarding the Plans and/or Plaintiff and members of the Class, restitution, disgorgement, and/or other remedial relief;

I.  Awarding the Plans and/or Plaintiff and members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert witness fees, and other costs; and

J.  Awarding such other relief as this Court may deem just and proper.

Dated: December 28, 2007                    Respectfully submitted,

                                            MILBERG WEISS LLP

                                            Lori G. Feldman (LF-3478)

Arvind B. Khurana (AK-3643)
Sara Fuks
One Pennsylvania Plaza
New York, New York 10119
(212) 594-5300 (telephone)
(212) 868-1229 (facsimile)
lfeldman@milbergweiss.com
akhurana@milbergweiss.com
sfuks@milbergweiss.com

*Attorneys for Plaintiff*

08    CV    00496

Jeffrey S. Abraham (JA-2946)
Arthur J. Chen (AC-5233)
**ABRAHAM, FRUCHTER & TWERSKY, LLP**
One Penn Plaza, Suite 2805
New York, NY 10119
Telephone: (212) 279-5050
Fax: (212) 279-3655

**Plaintiff's Counsel**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

GREGORY MAJOR, On Behalf of Himself
and All Others Similarly Situated,

                      Plaintiff,

      v.

MORGAN STANLEY, MORGAN
STANLEY & CO. INCORPORATED, THE
INVESTMENT COMMITTEE OF THE
MORGAN STANLEY 401 (K) PLAN, THE
PLAN ADMINISTRATOR, THE MORGAN
STANLEY GLOBAL DIRECTOR OF
HUMAN RESOURCES, JOHN J. MACK,
ROY J. BOSTOCK, ERSKINE B. BOWLES,
SIR HOWARD J. DAVIES, KAREN
JAMESLEY, C. ROBERT KIDDER,
DONALD T. NICOLAISEN, CHARLES H.
NOSKI, HUTHAM S. OLAYAN, CHARLES
E. PHILLIPS, JR., O. GRIFFITH SEXTON,
DR. LAURA D. TYSON, DR. KLAUS
ZUMWINKEL, and JOHN DOES 1-30,

                      Defendants.

---

Civil Action No.

RECEIVED
JAN 18 2008
U.S.D.C. S.D.N.Y.
CASHIERS

**CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT
INCOME SECURITY ACT OF 1974**

Plaintiff, a participant in the Morgan Stanley 401(k) Plan ("401(k) Plan") and the Morgan Stanley Employee Stock Ownership Plan ("ESOP") (collectively, the "Plans") during the proposed Class Period, on behalf of the Plans, himself, and all others similarly situated, alleges as follows:

## NATURE OF THE ACTION

1.      Plaintiff brings this suit as a civil enforcement action under the Employee Retirement Income Security Act of 1974 ("ERISA") §§ 405, 409, 502(a)(2), (3), 29 U.S.C. §§ 1105, 1109 and 1132(a)(2), (3), for relief on behalf of the Plans.  The Plans are retirement plans operated and established by Morgan Stanley as a benefit for its employees to permit tax-advantaged savings for retirement and other long-term goals.  Morgan Stanley common stock ("Company stock") is one of the investments offered in the 401(k) Plan, and the only investment offered in the ESOP.  According to the Company's Form 11-K filed with the U.S. Securities and Exchange Commission ("SEC") on June 28, 2007 for the 401(k) Plan, in excess of $1.8 billion of the 401(k) Plan's $3.3 billion or more in assets were invested in Morgan Stanley stock.  Likewise, according to the Company's Form 5500 filed with the U.S. Department of Treasury and U.S. Department of Labor on July 12, 2006 for the ESOP, approximately $3 billion of the ESOP's $3.1 billion or more in assets were invested in Morgan Stanley stock.  Indeed, the Plans were heavily invested in Morgan Stanley stock at all times relevant to this action, as discussed herein.

2.      Plaintiff Gregory Major is a current participant in the Plans during the class period of December 19, 2006 through the present (the "Class Period").  During the Class Period, his retirement portfolio included Morgan Stanley stock.

2

3.      Plaintiff alleges that Defendants, as fiduciaries of the Plans, breached their duties to him and to other participants and beneficiaries of the Plans during the Class Period in violation of ERISA, particularly with regard to the Plans' holdings of Morgan Stanley stock.

4.      Morgan Stanley & Co., Incorporated ("MS & Co.") is the sponsor of the 401(k) Plan.  Morgan Stanley is the sponsor of the ESOP Plan.  Mellon Bank, N.A. is the trustee for the Plans.

5.      Since the Plans' holdings in Morgan Stanley stock comprised a significant percentage of the overall value of the assets held by the Plans, the long-term retirement savings of the Plans' participants were dependent to a substantial degree both on the performance of Morgan Stanley stock, as well as the related need for prudent fiduciary decisions by Defendants concerning such a large, ongoing investment of assets of the Plans.  This action alleges that the fiduciaries of the Plans breached their fiduciary duties to the Plans and their participants under ERISA, by, inter alia, selecting and maintaining Company stock as an investment alternative for participant contributions and Company matching contributions, when it was no longer a suitable or prudent investment option for the Plans.

6.      The breaches were ongoing and arose out of Defendants' continuing duties to review, evaluate, and monitor the suitability of the Plans' investment in Morgan Stanley stock, and to provide accurate material information to enable participants to make informed investment decisions concerning their holdings invested in Company stock.

7.      The basic prudence allegations arise from the fact that Defendants knew, or should have known, that Morgan Stanley was engaging in risky and unsound business practices in connection with its investments in conduits, Collateralized Debt Obligations ("CDOs") and Structured Investment Vehicles ("SIVs"), which were heavily exposed to the subprime credit

3

market. These investment practices rendered Morgan Stanley stock an imprudent, inappropriate and extraordinarily risky investment for the retirement savings of the Plans' participants.

8.    As a result of Defendants' fiduciary breaches, as hereinafter enumerated and described, the Plans have suffered substantial damages, including the erosion of hundreds of millions of dollars of retirement savings and anticipated retirement income for the Plans' participants. Indeed, the Plans' participants have seen their retirement savings accounts devastated as Company stock plummeted from a high of approximately $90 per share near the beginning of the Class Period to a price of approximately $50 per share at the end of the Class Period. Under ERISA, the breaching fiduciaries are obligated to restore to the Plans the losses resulting from these fiduciary breaches.

9.    Because Plaintiff's claims apply to the participants and beneficiaries as a whole, and because ERISA authorizes participants such as Plaintiff to sue for Plan-wide relief for breach of fiduciary duty, Plaintiff brings this case as a class action on behalf of all participants and beneficiaries of the Plans during the Class Period. Plaintiff also brings this action as participants seeking Plan-wide relief for breach of fiduciary duty on behalf of the Plans.

10.    Because much of the information and documents on which Plaintiff's claims are based are solely in Defendants' possession, certain allegations made by Plaintiff are by necessity upon information and belief. At such time as Plaintiff has had the opportunity to conduct additional discovery, Plaintiff will, to the extent necessary and appropriate, further amend the Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the claims below.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

4

12.    This Court has personal jurisdiction over Defendants under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), as one or more of the Defendants may be found in this District.  The Court also has personal jurisdiction over Defendants because the Company maintains its executive offices in this District.  Defendants systematically and continuously have done and continue to do business in this District, and this case arises out of Defendants' acts within this District.

13.    Venue is proper under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans were either administered in this District, some or all of the actionable conduct for which relief is sought occurred in this District, and/or one or more of the Defendants reside or may be found in this District.

## THE PARTIES

### Plaintiff

14.    Plaintiff Gregory Major is a resident of Queens County, New York.  He is a current participant in the Plans, within the meaning of ERISA § 3(7) and 502(a), 29 U.S.C. § 1102(7) and §1132(a), and was a participant in the Plans throughout the Class Period.  During the Class Period, Plaintiff held Morgan Stanley stock in his individual 401(k) Plan and ESOP accounts.

### Corporate Defendants

15.    Defendant Morgan Stanley is a Delaware corporation with its principal place of business located at 1585 Broadway, New York, New York.  Morgan Stanley is a financial services company that, through its subsidiaries and affiliates, provides investment banking, securities, investment management, and wealth management services to corporations, governments, financial institutions, and individuals worldwide.  The Company has three segments: Institutional Securities, Global Wealth Management Group, and Asset Management.

The Institutional Securities segment includes capital raising; financial advisory services, including advice on mergers and acquisitions, restructurings, real estate, and project finance; corporate lending; sales, trading, financing, and market-making activities in equity securities and related products, and fixed income securities and related products, including foreign exchange and commodities; benchmark indices and risk management analytics; research; and investment activities.  The Global Wealth Management Group segment provides brokerage and investment advisory services covering various investment alternatives; financial and wealth planning services; annuity and insurance products; credit and other lending products; banking and cash management services; retirement services; and trust and fiduciary services.  The Asset Management segment provides asset management products and services in equity, fixed income, and alternative investments, which include private equity, infrastructure, real estate, fund of funds, and hedge funds to institutional and retail clients through proprietary and third-party retail distribution channels, intermediaries, and the company's institutional distribution channel.  The Company was founded in 1935 and is headquartered in New York, New York.

16.    MS & Co. is a corporation organized and existing under the laws of the state of Delaware. MS & Co., a subsidiary of Morgan Stanley and part of its Global Wealth Management Group, provides its individual and business customers with brokerage and investment advice through products such as annuity, insurance, and credit vehicles.  After merging Morgan Stanley DW into it in early 2007, MS & Co. has become Morgan Stanley's primary broker-dealer in the US.  MS & Co. is headquartered in New York, New York.

17.    MS & Co. and Morgan Stanley and collectively referenced herein as "Morgan Stanley" or the "Company."

18.    Upon information and belief, Morgan Stanley at all times acted through its officers, directors and employees, including the Chief Executive Officer ("CEO"). Morgan Stanley had, at all times relevant herein, effective control over the activities of its officers and employees, including their Plan-related activities. Morgan Stanley exercises ultimate discretionary decisional authority with respect to all aspects of the administration of the Plans, management and disposition of the Plans' assets, and appointment and removal of fiduciaries through its management employees, Morgan Stanley's Board of Directors (the "Board"), Plan Administrator and/or Investment Committee (terms are defined herein).

19.    Upon information and belief, under the terms of the Plans, Morgan Stanley was given direct control and management over any aspect of the operation, or administration of the Plans that was not specifically delegated to the named fiduciaries under the Plans and upon information and belief, exercised this control. Upon information and belief, the Plans name Morgan Stanley as the administrator, as that term is defined in Section 3(16) of ERISA 29 U.S.C. § 1002(16). Under ERISA, a plan administrator is inherently a fiduciary.

20.    As a matter of corporate law, Morgan Stanley is imputed with the knowledge that its Board and management employees had of the misconduct alleged herein, even if not communicated to Morgan Stanley.

21.    Upon information and belief, Morgan Stanley, together with its Board, exercised responsibility for communicating with participants regarding the Plans, and providing participants with information and materials required by ERISA. In this regard Morgan Stanley, together with the Board, drafted and disseminated various documents and materials related to the Plans, including but not limited to, a Summary Plan Description ("SPD") and the documents incorporated into the SPD. Based on the allegations contained herein, Morgan Stanley is a

fiduciary with respect to the Plans because it exercised discretionary authority or discretionary responsibility in the administration of the Plans, exercised discretionary authority or control with respect to the management of the Plans' assets, and exercised discretionary authority and control with respect to the appointment of other Plan fiduciaries.

22.    **The Board.**  Upon information and belief, the business and affairs of the Company are managed under the direction of the Board, including with respect to the Company's role as a fiduciary of the Plans.  One of the many roles or functions of the Board is the power to appoint the members of the Investment Committee and Plan Administrator (as defined below).  Upon information and belief, the Board likewise exercised management or control over the Investment Committee and Plan Administrator.  Based on the above, the Board is a fiduciary with respect to the Plans because it exercised discretionary authority or discretionary responsibility in the administration of the Plans, exercised discretionary authority or control with respect to the management of the Plans' assets, and exercised discretionary authority and control with respect to the appointment of other Plans' fiduciaries.

(a)    **The Compensation, Management Development Committee.**  The Board operates through three key standing committees:  (i) Audit; (ii) Compensation, Management Development and Succession ("Compensation Committee"); and (iii) Nominating and Governance.  Upon information and belief, the Compensation Committee had overall responsibility for the Plans.  According to its Charter, the Compensation Committee shall "[a]dminister and amend, as it determines appropriate, any present or future [ ] employee benefit plan providing that it shall be administered or amended by the Board or the [Compensation] Committee."  Moreover, the Charter provides that the Compensation Committee has the duty to "[c]reate and amend, as it determines appropriate, any trusts (including existing trusts) related to

8

any present or future [ ] employee benefit plan providing that it shall be administered or amended by the Board of Directors or the [Compensation] Committee. The [Compensation] Committee is also authorized to exercise and perform any power, authority, discretion or duty of the Board or the Committee that any such trust provides shall be exercised or performed by the Board or the [Compensation] Committee."

23. *The Investment Committee.* Upon information and belief, the Plans assigned fiduciary responsibilities to the Investment Committee. Upon information and belief, the Investment Committee has the authority to designate investment funds for the investment of accounts and to establish rules and procedures with respect to investment funds. Upon information and belief, members of the Investment Committee are appointed by the Board. Upon information and belief, the Investment Committee is a "Named Fiduciary" under Plans and under § 402(a) of ERISA, 29 U.S.C. § 1102(a). Upon information and belief, among the powers afforded to the Investment Committee is the ability to direct the investment of the Plans' assets, including buying or selling Company stock. Upon information and belief, the Investment Committee has the power to add or remove certain investment options under the Plans. Upon information and belief, the Investment Committee also has the power to appoint an investment manager for the Plans. Based on the above, the Investment Committee is a fiduciary with respect to the Plans because it exercised discretionary authority or discretionary responsibility in the administration of the Plans, exercised discretionary authority or control with respect to the management of the Plans' assets, and exercised discretionary authority and control with respect to the appointment of other fiduciaries of the Plans.

24. *The Plan Administrator.* The Plans assigned fiduciary responsibilities to the Plan Administrator (the "Plan Administrator"). The Plan Administrator is a "Named Fiduciary" under

the Plans and under § 402(a) of ERISA, 29 U.S.C. § 1102(a). Under the terms of the Plans, the general administration of the Plans shall be placed in the Plan Administrator. Upon information and belief, the Plan Administrator has such powers as may be necessary to carry out the provisions of the Plans, including the power and discretion to determine all benefits and resolve all questions pertaining to the administration, interpretation, and application of Plan provisions. Upon information and belief, the Plan Administrator and its members are appointed by the Compensation Committee. Under the terms of the Plans, the Plan Administrator is Morgan Stanley's Global Director of Human Resources or his or her delegate.

### Individual Defendants

25.    Defendant John J. Mack ("Mack") served as Morgan Stanley's Chief Executive Officer and Chairman of the Board during the Class Period. He has served in that role since June 2005. Mack was a fiduciary in that, in his high-level capacity and role within the Company, he exercised discretionary authority with respect to administration, control and/or management of the Plans.

26.    Defendant Roy J. Bostock ("Bostock") was a member of the Board during the Class Period. He has been a Director since September 2005. During the Class Period, Bostock served as a member of the Nominating and Governance Committee.

27.    Defendant Erskine B. Bowles ("Bowles") was a member of the Board during the Class Period. He has been a Director since December 2005. During the Class Period, Bowles served as a member of the Compensation Committee.

28.    Defendant Sir Howard J. Davies ("Davies") was a member of the Board during the Class Period. He has been a Director since 2004. During the Class Period, Davies served as a member of the Audit Committee.

29.     Defendant Karen Jamesley ("Jamesley") was the Global Director of Human Resources during the Class Period.

30.     Defendant C. Robert Kidder ("Kidder") was a member of the Board during the Class Period. Kidder has been a Director since 1993. During the Class Period, Kidder was the Lead Director of the Board, and Chairman of the Compensation Committee.

31.     Defendant Donald T. Nicolaisen ("Nicolaisen") was a member of the Board during the Class Period. He was a Director since April 2006. During the Class Period, Nicolaisen was a member of the Audit Committee and the Compensation Committee.

32.     Defendant Charles H. Noski ("Noski") was a member of the Board during the Class Period. Noski was a Director since September 2005. During the Class Period, Noski was Chairman of the Audit Committee.

33.     Defendant Hutham S. Olayan ("Olayan") was a member of the Board during the Class Period. She was a Director since April 2006. During the Class Period, Olayan served as a member of the Nominating and Governance Committee.

34.     Defendant Charles E. Phillips, R. ("Phillips") was a member of the Board during the Class Period. He served as a Director since June 2006. During the Class Period, Phillips served as a member of the Audit Committee.

35.     Defendant O. Griffith Sexton ("Sexton") was a member of the Board during the Class Period. He was a Director since September 2005.

36.     Defendant Dr. Laura D. Tyson ("Tyson") was a member of the Board during the Class Period. She was a Director since 1997. During the Class Period, Tyson served as Chair of the Nominating and Governance Committee.

37.     Defendant Dr. Klaus Zumwinkel ("Zumwinkel") was a member of the Board during the Class Period. He served as a Director since February 2004. During the Class Period, Zumwinkel was a member of the Nominating and Governance Committee.

38.     The defendants identified in ¶¶ 25 through 37 are sometimes referred to herein as the "Individual Defendants." The Individual Defendants are fiduciaries of the Plans within the meaning of ERISA.

39.     *The Board Defendants.* Morgan Stanley, as a corporate entity, cannot act on its own without any human counterpart. In this regard, during the Class Period, Morgan Stanley relied and continues to rely directly on each of the Board Defendants to carry out its fiduciary responsibilities under the Plans and ERISA as specified in ¶ 22 of this Complaint and therefore each member of the Board is a fiduciary for the reason stated in ¶ 22.

40.     In addition, each member of the Board carried out the Board's role as a fiduciary with respect to the Plan as set forth in ¶ 22, engaged in the conduct and had the powers and duties alleged in ¶ 22, and was, therefore, a fiduciary for the reasons set forth in ¶ 22.

41.     The individuals who served on the Board and acted as fiduciaries with respect to the Plans during the Class Period are as follows: Defendants Mack, Bostock, Bowles, Davies, Kidder, Nicolaisen, Noski, Olayan, Phillips, Sexton, Tyson, and Zumwinkel (collectively, the "Board Defendants").

42.     *The Management Defendants.* Morgan Stanley as a corporate entity, cannot act on its own without any human counterpart. In this regard, during the Class Period, Morgan Stanley relied and continues to rely directly on various high-level corporate officers and employees to carry out its fiduciary responsibilities under the Plans and ERISA. Upon information and belief, during the Class Period, based on their high-level capacity and role

within the Company relating to administration of the Plans, each Defendant listed in this paragraph carried out the Company's role as a fiduciary as specified in ¶¶ 18-21 as well as influenced, managed and controlled the Company in its role as a Plan fiduciary. The following individuals are therefore fiduciaries for the reasons set forth in ¶¶ 18-21: Defendant Mack (the "Management Defendants"). Morgan Stanley and the Management Defendants listed in this paragraph shall collectively be referred to as the "Morgan Stanley Defendants."

43.    Plaintiff does not yet know the identity of all the individual Management Defendants during the Class Period. Therefore, some of the Management Defendants are named fictitiously, as Defendants Does 1 to 10. Once their true identities are ascertained, Plaintiff will seek leave to join them under their true names.

44.    *The Investment Committee Defendants*. Upon information and belief, during the Class Period each member of the Investment Committee carried out the Investment Committee's role as a fiduciary with respect to the Plans as set forth in ¶ 23, engaged in the conduct and had the power and duties alleged in ¶ 23 and was therefore a fiduciary for the reasons set forth in ¶ 23.

45.    Plaintiff does not currently know the identity of the Investment Committee Defendants during the Class Period. Therefore, the members of the Investment Committee Defendants are named fictitiously, as Defendants Does 11 to 20. Once their true identities are ascertained, Plaintiff will seek leave to join them under their true names.

46.    *The Plan Administrator Defendants*. During the Class Period the Global Director of Human Resources, Karen Jamesley, carried out the Plan Administrator's role as a fiduciary with respect to the Plans as set forth in ¶ 24, engaged in the conduct and had the power and duties alleged in ¶ 24) and was therefore a fiduciary for the reasons set forth in ¶ 24.

13

47.     Plaintiff does not currently know the identity of all the Plan Administrator Defendants during the Class Period.  Therefore, the members of the Plan Administrator Defendants are named fictitiously, as Defendants Does 21 to 30.  Once their true identities are ascertained, Plaintiff will seek leave to join them under their true names.

48.     The Investment Committee Defendants and the Plan Administrator Defendants are collectively referred to herein as the "Committee Defendants."  The Investment Committee and the Plan Administrator Committee are collectively referred to herein as the "Committee."

## NATURE OF THE PLANS

### The 401(k) Plan

49.     The 401(k) Plan is a defined contribution 401(k) plan that commenced activities on September 1, 1970, and covers eligible employees of Morgan Stanley and certain participating companies.  Morgan Stanley encourages its eligible employees to become active participants in the 401(k) Plan and save for their financial future.  According to the SPD for the 401(k) Plan, the 401(k) Plan is a convenient way for employees to save for retirement through tax-deferred contributions from their pay.  Full-time, flex part-time, regular part-time employees of participating companies are eligible to participate in the 401(k) Plan upon hire.

50.     All eligible participants may elect to make pre-tax contributions of 1% to 20% of annual earnings subject to Internal Revenue Code limits of $15,000 per year in 2006.  Those participants attaining age 50 during the year may elect a pre-tax catch-up contribution of 1% to 20% of eligible earnings, subject to Code limits of $5,000 per year in 2006.

51.     Participants direct the investment of their contributions into various investment options offered by the 401(k) Plan.  One of the investment options during the Class Period was a Company Stock Fund.

52.     To be eligible for a Company match for a year, an employee must participate in the 401(k) Plan by making pre-tax contributions in that year and must be employed by the Company on December 31 of that year. Upon information and belief, during the Class Period, all Company contributions were made to the ESOP. Company contributions are allocated in Morgan Stanley common stock under the ESOP.

53.     All employees of the Company newly hired on or after January 1, 2004, are vested in any Company contributions upon the earlier of: (i) completing three years of credited service, or (ii) terminating employment due to death, total and permanent disability, retirement or release as defined by the 401(k) Plan.

54.     Individual accounts are maintained for each of the Plans' participants. Each participant account is credited with the participant's contributions, allocations of the Company's contribution and the Plans' earnings, and charged with an allocation of the Plans' losses and administrative expenses not otherwise paid by the Company.

55.     All of the 401(k) Plan's investments are held in a trust account at Mellon Bank, N.A. The Morgan Stanley Defined Contribution Master Trust ("Master Trust") includes commingled assets of the 401(k) Plan and the ESOP. Quarterly transfers are made from the Morgan Stanley Stock Fund under the 401(k) Plan to the ESOP to provide participants with an opportunity to elect to receive cash payments of the dividends paid on the Morgan Stanley Stock Fund.

56.     Upon information and belief, the portion of the 401(k) Plan that is invested in the Morgan Stanley Stock Fund, including the portions that are thereafter transferred to the ESOP, do not qualify as an employee stock ownership plan under the numerous requirements set forth in both ERISA and the Internal Revenue Code. Upon information and belief, the 401(k) Plan's

Summary Plan Description is silent with regard to the 401(k) Plan's purported status as an employee stock ownership plan.

57.     Upon information and belief, under the terms of the 401(k) Plan, there was no requirement that any of the 401(k) Plan be invested in the Morgan Stanley Stock Fund. The requirement was simply that if a portion of the 401(k) Plan were invested in the Morgan Stanley Stock Fund, that portion would be transferred to the ESOP. Thus, the 401(k) Plan is not "designed" to invest primarily in qualifying employer securities and the 401(k) Plan's purported employee stock ownership plan status did not, in fact, require the investment in the Morgan Stanley Stock Fund at all, or place any constraints on 401(k) Plan fiduciaries forcing them to invest in the Morgan Stanley Stock Fund.

58.     Similarly, the 401(k) Plan could have held one share of Morgan Stanley common stock and still been an employee stock ownership plan since that "portion" of the 401(k) Plan -- the one share -- would have been primarily invested in Morgan Stanley common stock.

59.     Finally, even if the portion of the 401(k) Plan invested in the Morgan Stanley Stock Fund constituted an employee stock ownership plan, Plan fiduciaries may not invest in employer securities regardless of the circumstances. While the duty of diversification may not apply to certain aspects of investment of qualified employer securities in an employee stock ownership plan, the 401(k) Plan fiduciaries remain bound by their other core ERISA fiduciary duties including the duties to act loyally, prudently and honestly.

60.     Upon information and belief, Morgan Stanley incorporates by reference into the SPDs for the Plans, certain information filed with the SEC, including but not limited to Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Periodic Reports on Form 8-K, and Registration Statements.

61.    The 401(k) Plan is an "employee pension benefit plan" within the meaning of ERISA. § 3(2)(A), 29 U.S.C. § 1002(2)(A). Further, it is an "eligible individual account plan" within the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3), and also a "qualified cash or deferred arrangement" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k). While the 401(k) Plan is not a party to this action, pursuant to ERISA, the relief requested in this action is for the benefit of the 401(k) Plan pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

62.    An employee benefit plan, such as the 401(k) Plan, must be "established and maintained pursuant to a written instrument." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). ERISA requires that every participant in an employee benefit plan be given a Summary Plan Description.

63.    The assets of an employee benefit 401(k) Plan must be held "in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a). During the Class Period, the assets of the 401(k) Plan were held in trust by Mellon Bank, N.A.

64.    ERISA and the Internal Revenue Code require that plans file an Annual Report, Form 5500, with the Department of Labor and the Department of the Treasury. The 401(k) Plan filed a Form 5500 in July 2006.

65.    Upon information and belief, Morgan Stanley stock represented a significant portion of the total invested assets of the Plans throughout the Class Period.

## CLASS ACTION ALLEGATIONS

66.    Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and a class consisting of all current and former participants (and beneficiaries thereof) of the Plans, whose individual accounts included investments in Morgan Stanley stock during the Class Period of December 1, 2005 through the present. Excluded from the Class are Defendants, members of the Defendants'

17

immediate families, any officer, director, or partner of any Defendant, any entity in which a

Defendant has a controlling interest, and the heirs, successors, or assigns of any of the foregoing.

67.     This action is properly maintainable as a class action because:

(a)     The members of the Class are so numerous that joinder of all members is

impracticable.  While the exact number of Class members is unknown by

Plaintiffs at this time, and can only be ascertained through appropriate

discovery, Plaintiff believes that there are, at a minimum, thousands of

members of the Class.

(b)     Plaintiff's claims are typical of those of the Class because Plaintiff,

members of the Class and the Plans suffered similar harm and damages as

a result of Defendants' systematic unlawful conduct described herein.

Absent a class action, the Plans and/or members of the Class may not

receive restitution or other appropriate relief, will continue to suffer losses,

and these violations of law will proceed without remedy.

(c)     Plaintiff is a representative party who will fairly and adequately protect

the interests of the other members of the Class and have retained counsel

competent and experienced in class action litigation.  Plaintiff has no

interests antagonistic to, or in conflict with, the Class they seek to

represent.

(d)     A class action is superior to other available methods for the fair and

efficient adjudication of the claims asserted herein.  Prosecution of

separate actions by members of the Class would create a risk of

inconsistent adjudications with respect to individual members of the Class,

18

which would then establish incompatible standards of conduct for
Defendants. As the damages suffered by the individual Class members,
direct or indirect through their participation in the Plans may be relatively
small, the expense and burden of individual litigation make it virtually
impossible for the Class members individually to redress the wrongs done
to them and/or the Plan. The likelihood of individual Class members
prosecuting separate claims is remote. Furthermore, Defendants' conduct
affected and affects all Class members in a similar manner, making
declaratory and injunctive relief to the Class as a whole appropriate.

68.    The questions of law and fact common to the members of the Class predominate
over any questions affecting individual members of the Class. The questions of law and fact that
are common to Plaintiff and the Class include, among others:

(a)    Whether ERISA applies to the claims at issue;

(b)    Whether Defendants owe and owed fiduciary duties to the members of the
Class;

(c)    The nature of the fiduciary duties Defendants owe or owed to members of
the Class;

(d)    Whether Defendants breached their fiduciary duties; and

(e)    The extent of losses sustained by the Plans, and thereby members of the
Class, and the appropriate measure of relief.

69.    Plaintiff anticipates no unusual difficulties in the management of this action as a
class action.

## DEFENDANTS' FIDUCIARY STATUS

70.     During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plans and/or management or disposition of the Plans' assets.

71.     During the Class Period, all of the Defendants acted as fiduciaries of the Plans pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

72.     **Named Fiduciaries**.  ERISA requires every plan to provide for one or more named fiduciaries of the Plans pursuant to ERISA § 402(a)(1)-(2), 29 U.S.C. § 1102(a)(1) and (2).  Upon information and belief, the Committee Defendants are Named Fiduciaries under the Plans.  In addition, the Morgan Stanley Defendants are Named Fiduciaries since they were appointed the Plans' Administrator.

73.     **De Facto Fiduciaries**.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, i.e., perform fiduciary functions (including a juridical person such as Morgan Stanley).  ERISA § 3(2 E)(A)(i), 29 U.S.C. § 1002(21)(A)(i), makes a person a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or . . . has any discretionary authority or discretionary responsibility in the administration of such plan." During the Class Period, all of the Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA, by, among other things, the conduct alleged in ¶¶ 97-128.

## DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

74.     ERISA is a comprehensive statute covering virtually all aspects of an employee

benefit plan, including retirement savings plans, such as the Plans.  The goal of ERISA is to

protect the interests of the Plans' participants and their beneficiaries:

> It is hereby declared to be the policy of this chapter to protect
> interstate commerce and the interests of participants in employee
> benefit Plan and their beneficiaries, by requiring the disclosure and
> reporting to participants and beneficiaries of financial and other
> information with respect thereto, by establishing standards of
> conduct, responsibility, and obligation for fiduciaries of employee
> benefit Plan, and by providing for appropriate remedies, sanctions,
> and ready access to the Federal courts.

ERISA § 2(b), 29 U.S.C. § 1001(b).

75.     Under ERISA, those responsible for employee benefit plan management stand in

a fiduciary relationship to plan participants.  Pursuant to ERISA, a "fiduciary" is defined broadly

to include all persons or entities that are able to exercise discretionary authority over the

management of a plan or the payment of benefits.  29 U.S.C. § 1002(21)(A).  ERISA requires

strict fidelity and loyalty in the execution of the plan's management.

76.     ERISA imposes on Defendants, who are responsible for the Plans, the

requirement to "discharge his [or her] duties with respect to a plan solely in the interest of the

participants and their beneficiaries and . . . with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of a like character and with like aims."  ERISA

§ 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

77.     ERISA also imposes on Defendants responsible for the Plans a duty of loyalty,

requiring these Defendants to "discharge his [or her] duties with respect to a plan solely in the

interest of the participants and their beneficiaries and . . . for the exclusive purpose of . . .

providing benefits to the participants and their beneficiaries." ERISA § 404 (a)(1)(A)(i), 29 U.S.C. § 1104(a)(l)(A)(i).

78.    Other duties imposed upon Defendants who are fiduciaries under ERISA by virtue of their exercise of authority or control respecting the management of the Plans or disposition of Plans' assets, include but are not limited to:

(a)    The duty to investigate and evaluate the merits of decisions affecting the use and disposition of Plans' assets;

(b)    The duty to evaluate all investment decisions with "an eye single" to the interests of Plans' participants and beneficiaries;

(c)    The duty to avoid placing themselves in a position where their acts as officers, directors, or employees of the Company will prevent their functioning with the complete loyalty to participants demanded of them as plan fiduciaries and, if they find themselves in such a position, to seek independent, unconflicted advice;

(d)    To the extent that a party is responsible for appointing and removing fiduciaries, the duty to monitor those persons who have been named which includes, among other things:  (1) the duty to ensure that the appointed fiduciary possesses the needed credentials to fulfill his or her duties, (2) the duty to make sure that the appointed fiduciary has adequate knowledge to fulfill his or her duties,  (3) the duty to insure that the appointed fiduciary has access to and retains impartial advisers when needed; (4) the duty to require that the appointed fiduciary report regularly to the monitoring fiduciary; and (5) the duty to remove a fiduciary if that

fiduciary has breached his or her fiduciary duty or is not performing his or her fiduciary functions in accordance with ERISA;

(e)     The duty to disclose and inform the Plans' Participants of any material adverse information about the Plans that duty entails, among other things: (1) a duty not to make materially false statements or misinform the Plans' participants concerning any aspect of the Plans including its investments; (2) an affirmative duty to inform the Plans' participants about material adverse factors that were affecting the Plans or its investments at any time the fiduciary knew or should have known, pursuant to his duty to investigate, that failing to make such a disclosure might be harmful; and (3) when a plan is composed of various investment funds, the duty to inform and disclose also includes the duty to impart to plan participants material information that the fiduciary knows or should know is sufficient to appraise the average plan participant of the comparative risks associated with investing in any particular investment;

(f)     A duty to insure that investments were not purchased at a price above what the Defendants, but not the participants and beneficiaries, knew or should have known to be in excess of fair market value as defined in the relevant Treasury regulations and in most instances at a price that renders it improbable that the investments will bring a fair return commensurate with the prevailing rates;

(g)     A duty to diversify the Plans' investments to minimize the risk of large losses to the Plans and its participants; and

(h)    The duty to not blindly follow plan documents if doing so leads to an

imprudent result. A fiduciary may not avoid fiduciary responsibility by

relying solely on the language of plan documents.

79.    ERISA permits the fiduciary function to be shared among various individuals and

entities. Given ERISA's functional concept of a fiduciary, absent formal discovery it is

impossible to know the full extent of which fiduciaries exercised which fiduciary functions.

80.    Insofar as the Plans were not properly diversified funds and therefore more risky

to the Plans' participants, the Defendants had heightened fiduciary duties to the Plans'

participants with respect to the Plans' investment in Morgan Stanley stock, including heightened

duties to disclose all material information relevant to investments in Morgan Stanley stock.

81.    A fiduciary is liable not only for the fiduciary's own breach, but is also liable as a

co-fiduciary if:

(a)    the fiduciary participates knowingly in, or knowingly undertakes to

conceal, an act or omission of another fiduciary, knowing such act or

omission is a breach; or

(b)    if, by the fiduciary's failure to comply with ERISA § 404(a)(1), 29 U.S.C.

§ 1104 (a)(1) in the administration of his specific responsibilities that

gives rise to fiduciary status, the fiduciary enables another fiduciary to

commit a breach; or

(c)    the fiduciary knew or should have known of a breach by such other

fiduciary and does not make reasonable efforts under the circumstances to

remedy the breach.

**MORGAN STANLEY STOCK WAS AN IMPRUDENT INVESTMENT FOR THE PLAN**

**Background of the Subprime Lending Industry**

82.     Subprime lending is the practice of making mortgage loans to persons who are generally unable to access credit from traditional financial institutions because they do not satisfy credit, documentations or other underwriting standards mandated by these traditional mortgage lenders and loan buyers, which typically lend only to more credit-worthy borrowers.

83.     Because subprime borrowers are seen as "higher risk," their loans carry interest rates that are at least 2 percentage points higher than those offered to borrowers with better credit. So, for example, while a credit-worthy borrower could get a mortgage at 5% interest, the same mortgage would cost a subprime customer 7% interest or more.

84.     The subprime market has grown rapidly in recent years. In 1994, fewer than 5% of mortgage originations in the United States were subprime, but by 2005 about 20% of mortgage originations were subprime. The greater access to subprime mortgages has helped homeownership grow.

85.     Subprime mortgages totaled $600 billion last year, accounting for about one-fifth of the U.S. home loan market. An estimate of $1.3 trillion in subprime mortgages are currently outstanding.

86.     The rapid growth of the subprime lending industry has been attributed to a number of factors that occurred in 2004 and 2005. These factors include rising home prices, declining affordability, historically low interest rates, intense lender competition, innovations in the structure and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors.

87.     The mortgage market was further fueled by significant mortgage-backed securities liquidity, with investors increasingly seeking yield through higher risk securitizations that allow financial institutions to access the capital markets to fund mortgage operations, while

simultaneously transferring credit risk away from the institutions and to securitization investors. The share of U.S. mortgage debt held outside the government-sponsored enterprises by private mortgage-backed securitizations doubled between 2003 and 2005, helping to fuel the growth of subprime and nontraditional mortgages.

88.    From 2001 to mid-2004, prime borrowers with a preference for fixed-rate mortgages refinanced in record numbers as long-term interest rates fell to the lowest rates in a generation. As interest rates began to rise in 2004 and the pool of potential prime borrowers looking to refinance shrank, lenders struggled to maintain or grow market share in a declining origination environment, and did so by extending loans to subprime borrowers with troubled credit histories.

89.    Lenders accommodated these borrowers by diversifying mortgage offerings as they competed to attract borrowers and meet prospective homebuyers' financing needs. Because of the affordability aspect already noted, borrowers increasingly turned to products such as payment option and interest-only (IO) loan structures in 2004 and 2005. These "nontraditional" mortgages are specifically designed to minimize initial mortgage payments by eliminating or relaxing the requirement to repay principal during the early years of the loan. Payment option and interest-only loans appear to have made up as much as 40 to 50% of all subprime and Alt-A loans securitized by private issuers of mortgage-backed securities during 2004 and 2005, up from 10% in 2003. The majority of subprime originations over the past several years were "2/28 and 3/27" hybrid loan structures. These hybrid loans provide an initial fixed-rate period of two or three years, after which the loan converts to an adjustable-rate mortgage and the interest rate adjusts to the designated loan index rate for the remaining 28 or 27 years of the loan. The 2/28

and 3/27 loan products accounted for almost three-quarters of subprime securitized mortgages in 2004 and 2005.

90.     Subprime lenders also eased lending standards to take advantage of these borrowers, including limited or no verification of borrower income and high loan-to-value transactions.

91.     In late 2004 and early 2005, there was a growing sense of concern regarding the subprime industry, and in particular the eased lending standards.  To address those concerns, the Federal Reserve and other banking agencies issued guidance on subprime lending.  The Interagency Guidance on Nontraditional Mortgage Product Risks highlights sound underwriting procedures, portfolio risk management, and consumer protection practices that institutions should follow to prudently originate and manage nontraditional mortgage loans.  A major aspect of this guidance is the recommendation that a lender's analysis of repayment capacity should include an evaluation of the borrower's ability to repay debt by final maturity at the fully indexed rate, assuming a fully amortizing repayment schedule.  The guidance also reminds institutions that they should clearly communicate the risks and features of these products to consumers in a timely manner, before consumers have applied for a loan.

92.     In 2006, mortgage interest rates hit four-year highs, the volume of home sales declined and the rate of home price appreciation decelerated and in some cases home prices fell, leaving the most recent subprime borrowers vulnerable to payment difficulties.  Subprime borrowers with ARMs experienced a large increase in delinquency and foreclosure rates, while prime borrowers experienced almost no increase in delinquencies and foreclosures.  Borrowers were not able to avoid sharp payment increases as they could in earlier years.  Even borrowers

with enough equity to refinance their adjustable rate mortgages faced difficulty finding a loan with affordable payments, as interest rates edged higher than in earlier years.

93.    Moreover, an unusually large number of subprime loans defaulted shortly after origination. In many of these "early payment defaults," borrowers stopped making payments before they faced payment shocks, suggesting that in 2006 some lenders may have lowered their underwriting standards in the face of reduced borrower demand for credit. Because of the rapid expansion of subprime lending in recent years, lenders, investors, and ratings agencies had limited data with which to model credit risk posed by new borrowers or novel mortgage types, and so may have underestimated the risk involved. Several lenders have already been forced out of the subprime market, in part because of the wave of early payment defaults on mortgages they originated.

94.    Instead of holding mortgage loans generally, lenders sell subprime mortgages that are bundled into bonds and offer them to individual and institutional investors.

95.    In 2006, approximately 80,000 subprime borrowers who took out mortgages that were packaged into securities fell into delinquency and during the first half of 2007, dozens of lenders participating in the subprime mortgage business ceased operating as defaults and delinquencies on recent loans skyrocketed.

96.    Throughout the fall of 2007, the stock prices of many large lenders dropped significantly as a result of problems with the subprime mortgage industry. Having invested hundreds of millions of dollars in securities backed by subprime mortgages which had become nearly worthless, these lenders were forced to announce substantial mortgage related charges.

**Morgan Stanley's Participation in the Subprime Market**

97.    Morgan Stanley, the nation's second largest investment bank, is one of the many investment banks that jumped on the bandwagon and began underwriting pools of securities tied to subprime mortgages in late 2005.

98.    These pools of securities are called collateralized debt obligations or CDOs ("CDOs"). A CDO is an investment-grade security backed by a pool of bonds, loans and other assets, such as mortgages.

99.    In the summer of 2005, Defendant Mack became Morgan Stanley's Chief Executive Officer and instituted a policy of putting more of Morgan Stanley's capital at risk in exchange for the possibility of garnering greater returns. Starting in late 2005, Morgan Stanley began the practice of dramatically increasing its exposure to credit assets that had little or no price transparency, making it difficult for the Plans' Participants and the market to determine the risks associated with investing in these assets. "After his return to the firm more than two years ago, Defendant Mack spoke publicly of adopting a higher risk profile and pushed the firm into in-vogue investment areas like subprime mortgages, lending to private equity firms and using more of the firm's own capital to take big trading positions. The strategy produced substantial profits for a time, but also resulted in a complex and ultimately disastrous trade in collateralized debt obligations. . . ." Landon Thomas, Jr. *Morgan Stanley Executive Ousted After Trading Loss*, N.Y. Times, Nov. 30, 2007, at C1.

100.    In furtherance of Defendant Mack's determination to take more risk with the Company's capital, and despite the impending subprime crisis, Morgan Stanley acquired Saxon Capital, Inc., ("Saxon") a servicer and originator of residential mortgages, for $706 million.

101.    The acquisition of Saxon was reported in Morgan Stanley's 2006 Annual Report, filed on February 16, 2006, and was intended to provide Morgan Stanley with access to subprime

mortgages that could be repackaged into complex investment vehicles. In a press release issued by the Company on December 4, 2006, this acquisition was touted as "another important step in our long-term strategy of building a global, vertically integrated residential mortgage business . . . . Saxon adds a premier servicing operation with a scalable U.S. origination platform to our substantial existing residential mortgage franchise."

102.    In addition to acquiring Saxon, Morgan Stanley took enormous positions in super-senior segments of CDOs throughout the Class Period. Upon information and belief, at the start of 2007, Morgan Stanley held approximately $13 billion worth of super-senior CDOs in order to hedge and finance its bearish subprime bet. These CDOs paid a higher interest rate than the Company's cost of financing, generating large profits until the subprime meltdown in October after more modest declines in August and September. The bearish subprime bet, which took the form of derivatives called swaps, required Morgan Stanley to pay interest on those contracts. To off-set the bearish subprime bet and help generate interest income to pay off the cost of the swaps, the Company amassed the CDO position attributable to most of the losses that were announced in November 2007.

103.    Despite the fact that Morgan Stanley was able to anticipate the losses from its exposure to subprime mortgage investments as far back as 2006, it failed to take any action to protect the Plans' participants from these foreseeable losses. Indeed, the Company has a risk management panel who is responsible for overseeing these types of credit issue. Nevertheless, that panel and the Board failed to disclose its findings to the Plans' participants while the Plans continued to invest in the Company Stock Fund.

104.    Upon information and belief, Morgan Stanley also failed to adequately disclose contingent liabilities associated with Conduits and SIVs. Conduits and SIVs (structured

investment vehicles) are investment vehicles that banks use to issue commercial paper. Until recently, they were considered to be highly rated, short-term notes that offered investors a safe-haven investment with a yield slightly above certificates of deposit or government debt.

105.    SIVs use the proceeds from the issuance of commercial paper to purchase longer-term investments such as corporate receivables, auto loans, credit-card debt or mortgages. Banks profit from the SIVs by pocketing the spread between the rate at which they borrow money and the rate at which they lend money.

106.    The vehicles are often established in a tax haven and are run solely for investment purposes, as opposed to typical corporate activities.

107.    It is difficult for investors to assess the financial risks imposed by SIVs or conduits because they are off-the-balance-sheet entities.

108.    Morgan Stanley represented to money market fund managers and other investors that SIVs were safe investments that use the proceeds from the issuance of commercial paper and short-term notes to invest strictly in high-quality debt securities.

109.    Investors, including money market funds, have pulled back from debt sold by SIVs because of their exposure to subprime mortgage securities. Because SIVs still owe money to commercial-paper holders, and cannot raise money by selling new commercial paper, they are being forced to sell their assets at fire-sale prices to pay off debt.

110.    Morgan Stanley's conduits are on the brink of collapse, subjecting the Company to billions of dollars of liability as a result of investor lawsuits for causing conduits to issue debt based on materially false and misleading statements.

111.    In addition, Morgan Stanley may end up having to move its conduits onto its balance sheets, thereby causing it to recognize billions of dollars in potential liability that it had not adequately disclosed to investors and the Plans' Participants.

**Morgan Stanley Failed to Disclose Material Adverse Information Concerning Its Subprime Assets to the Plans' Participants and Failed to Provide the Plans' Participants with Complete and Accurate Information Regarding Its Loan Loss Exposure**

112.    Throughout the Class Period Defendants issued false and misleading statements and omitted material information regarding Morgan Stanley to Plan participants concerning, among other things, Morgan Stanley's exposure to subprime credit, off-balance sheet entities, CDOs and other credit-specific problems, which caused the Company's total fourth quarter 2007 writedown owing to U.S. subprime exposure to be approximately $9.4 billion.

113.    On December 19, 2006, Morgan Stanley reported record income for the fourth quarter and full year 2006, reporting a 51% increase in net income from the previous year and net revenues for the fourth quarter of $8.6 billion, 24% above last year's fourth quarter. Defendant Mack touted these results, stating "2006 was a year of outstanding progress for Morgan Stanley. Capitalizing in a strong market environment, the people of Morgan Stanley achieved record fourth quarter results and the best full-year revenues and earnings in the Firm's history."

114.    Morgan Stanley's earnings for the first quarter of 2007 were similarly impressive. The Company reported net revenues up 29% from the first quarter of the previous year and a record net income of $2.672 million, an increase of 70% from the first quarter of the previous year. Commenting on these positive results Defendant Mack stated, "This strong performance was in large part the result of effective, disciplined risk-taking by our team in Institutional Securities, which helped deliver record results across our sales and trading businesses."

32

115.    After announcing these results the Company's Executive Vice President and Chief Financial Officer David Sidwell addressed issues relating to the subprime market on an investor conference call stating that **"While there has been considerable media coverage regarding higher delinquencies in the subprime mortgage industry, we have not seen any impact on our Card portfolio.  Nevertheless, we continue to monitor the situation closely."**[1]

116.    On June 15, 2007, Morgan Stanley Stock hit a 52-week high of $90.05.

117.    On June 20, 2007, Morgan Stanley announced more stellar results for the second quarter which ended May 31, 2007,  reporting record income from continuing operations of $2.582 million, an increase of 41% from the second quarter of 2006, and net revenues of a record $11.5 billion, 32% above the second quarter from the previous year.

118.    Defendant Mack touted these earnings and painted a rosy picture of the Company's future, stating:

> Morgan Stanley delivered record revenues and earnings in the second quarter and the first half of the year, as we continue to build momentum across our securities businesses and continued to see the benefits of our diverse mix of products, clients and businesses around the globe.  Thanks to the commitment and focus of our people, we've not achieved seven straight quarters with ROE above 20 percent, and we're all on our way to reaching our goal of doubling 2005 earnings over five years.  But we believe there is still work that remains to be done, and we remain intensely focused on delivering value to Morgan Stanley's clients and shareholders over the long term.

119.    Following the announcement of Morgan Stanley's second quarter results, Defendant Sidwell addressed Morgan Stanley's concerns with the subprime market on a June 20, 2007 conference call reassuringly stating:

---

[1] On May 1, 2007, Morgan Stanley issued a press release announcing the retirement of Mr. Sidwell as CFO and stating that Thomas Colm Kelleher would replace him.

As you've seen from our press release, we achieved record net revenues, profit before tax, in come and earnings per share from continuing operations.

We are very pleased with these results, as they reflect execution of our strategic growth plans and string trading performance. . . . *Concerns early in quarter about, whether issues in the Subprime market were going to spread dissipated.* . . .

120.    Thus in the wake of an uproar of concerns regarding the collapse of the subprime market, Morgan Stanley continued to assure the market and the Plans' Participants of the continued viability of Morgan Stanley Stock and of the fact that the Company would remain unscathed by the subprime crisis, despite the Plans' heavy investment in Company stock.

**The Truth Emerges**

121.    On September 19, 2007, Morgan Stanley announced disappointing results for the third quarter ended August 31, 2007, reporting that income from continuing operations for the quarter had decreased 7% compared to the third quarter of the prior year.

122.    On November 7, 2007, Morgan Stanley issued a press release "announcing significant declines since August 31, 2007 in the fair value of its U.S. subprime related exposures as a result of the continued deterioration in the market. . . ." The Company recorded a $3.7 billion writedown, after which its stock fell 6.1% to $51.19.

123.    On November 21, 2007, Morgan Stanley stock hit a 52-week low closing at $47.56 per share.

124.    As a result of this, Morgan Stanley co-president Zoe Cruz was terminated: "Morgan Stanley, its reputation battered over a recent $3.7 billion loss linked to subprime mortgages, has become the latest Wall Street firm to force the retirement of a senior banking executive . . . . The move represents a sharp reversal for John Mack, the chief executive, who

had supported and cultivated the career of Cruz. . . ." *Subprime woes claim Morgan Stanley career*, International Herald Tribune, Dec. 1, 2007, at 14.

125. More bad news for the Company followed. On December 19, 2007, Morgan Stanley announced that it was taking an additional $5.7 billion mortgage-related write-down, resulting in a total write down related to mortgages of *$9.4 billion*. One analyst called this news "a 'complete breakdown' in the company's risk-management." David Ellis, *More Woes for Morgan Stanley*, CNNMoney.com, Dec. 20, 2007.

126. Morgan Stanley also suffered its first quarterly loss ever as it reported Fourth Quarter results. The Company reported a loss of $3.6 billion versus a profit of $2.0 billion from the prior year.

127. Following these dismal results, S&P downgraded Morgan Stanley and placed its rating on Morgan Stanley on "CreditWatch," commenting that "'MS' dismal fourth-quarter results heighten our concern regarding its strategic direction and risk appetite." *S&P: Morgan Stanley 'AA-/A-1+' Ratings Put On CreditWatch*, Market News Publishing, Dec.19, 2007.

128. On December 22, 2007, The Financial Times reported that Morgan Stanley was reviewing the position of chief risk officer Tom Daula: "A person close to Colm Kelleher, Morgan Stanley's chief financial officer, said the bank was 'evaluating the risk function, including the top of that function' and looking at switching the reporting lines for risk management to Mr. Kelleher. . . . The decision on Mr. Daula's future will shed light on whether the blame for the losses is seen to lie with people monitoring the risk or with more senior executives." Henry Sender, *Morgan Stanley reviews position of risk officer over writedowns*, Financial Times, Dec. 22, 2007, at 15. The article further states that "Mr. Daula's supporters within the bank say his repeated warnings were ignored." *Id.*

## CONDUCT CONSTITUTING DEFENDANTS' FIDUCIARY BREACHES

129.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plans. The Defendants breached their duties to prudently and loyally manage the Plans' assets because, during the Class Period, Defendants knew or should have known that Company stock was not a prudent investment for the Plans and knew or should have known that the value of Company stock was exposed to an unacceptable risk of loss.

130.    Defendants' knowledge that the Company stock was an imprudent investment is based on the fact that Defendants knew or should have known of the unsound business practices and risky lending activities and other misrepresentations alleged herein. Defendants failed to take adequate steps to prevent the Plans, and indirectly the participants, from suffering losses as a result of the Plans' investments in Company stock.

131.    Upon information and belief, not one of the Defendants conducted an appropriate investigation into whether Company stock was a prudent investment for the Plans in light of the Company's risky exposure to the subprime credit market and other related serious corporate misconduct and given the fact that the Plans held enormous investments in Company stock. Moreover, not one of the Defendants provided the Plans' participants with information regarding the true nature of these business practices and the extraordinary risks that they presented to Morgan Stanley such that the Plans' participants could make informed decisions regarding the Company stock in the Plans. Indeed, not one of the Defendants took any meaningful action to protect the Plans against the risk of enormous losses as a result of the Company's very risky and inappropriate corporate misconduct.

132.    On a Class-wide and Plan-wide basis the risk of an undiversified investment in Company stock imposes a greater risk than that of other undiversified investments.

133.    The risk associated with the investment in Company stock during this time of unsound business practices was an extraordinary risk, far above and beyond the normal, acceptable risk associated with investment in company stock. This abnormal investment risk could not have been known by the Plans' participants, and the Defendants knew or should have known that it was not known by them because the Defendant fiduciaries never disclosed it. This extraordinary risk made any investment in Company stock inappropriate and imprudent.

134.    Participants, even before placing any retirement savings in Company stock, relied on the stability and financial viability of Morgan Stanley as the basis for their standard of living. The participants' salaries, healthcare and other benefits, as well as the participants' pension (if any) and retirement health insurance depended upon Morgan Stanley's continued solvency and viability.

135.    Thus, one of the risks that could impair the participant's investment in Company stock – the failure or insolvency of the employer – would also cause the loss of current income and benefits and future non-Plan related retirement benefits. The risks are correlated and, if realized, would financially devastate most employees and participants in the Plans. Therefore, the Defendants had a heightened duty with regard to both the decision to continue investing in Company stock as well as the duty to inform participants concerning the imprudence of investing in Company stock.

136.    Defendants breached their fiduciary duties when they failed to conduct an appropriate investigation into whether Morgan Stanley stock was a prudent investment for the Plans; failed to develop appropriate investment guidelines for Morgan Stanley stock; failed to divest the Plans of Morgan Stanley stock; failed to discontinue further contributions of Morgan Stanley stock to the Plans; failed to remove Morgan Stanley stock as an investment option for the

Plans; failed to either consult or appoint independent fiduciaries regarding the appropriateness of an investment in Morgan Stanley stock; and failed to resign as fiduciaries of the Plans if as a result of their employment by Morgan Stanley they could not loyally serve the Plans and their participants. In addition, these Defendants breached their fiduciary duties when they failed to prohibit any participant from making an "investment switch" into Morgan Stanley stock. In fact, the Defendants continued to invest and to allow investment of the Plans' assets in Company stock even though they knew or should have known that Morgan Stanley would be taking billions of dollars in losses to remedy its risky exposure to the subprime credit market, resulting in a decrease in the value of Morgan Stanley stock. No other Defendant fiduciary took any action to remedy the breaches set forth in this paragraph.

137.    Defendants breached their fiduciary duties by direct and indirect communications with the Plans' participants, made in their fiduciary capacity, which contained statements concerning Company stock that these Defendants knew or should have known were untrue and inaccurate. These communications included Class-wide and Plan-wide affirmative and materially misleading statements as to Morgan Stanley's investment practices, Morgan Stanley's earnings, and Morgan Stanley's profitability as detailed in this Complaint, that were contained in the following documents that, upon information and belief, were specifically incorporated into the SPD: SEC S-8 statements, SEC Form 10-K annual reports and interim periodic reports, Morgan Stanley's Annual Report, and the Plan's annual report on SEC Forms 11-K. In addition, the foregoing documents omitted, and continue to omit, material information concerning Morgan Stanley's financial performance, including Morgan Stanley's risky exposure to the subprime credit market. No Defendant took any action to remedy the breaches set forth in this paragraph.

138.   Moreover, Defendants knew or recklessly disregarded certain basic facts about the characteristics and behavior of the Plans' participants, well-recognized in the 401(k) and ESOP industry and trade press:

(a)   Out of loyalty, employees tend to invest in company stock;

(b)   Employees tend not to change their investment option allocations in the plan once made;

(c)   Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(d)   Many employees do not recognize their exposure to massive loss from failing to diversify their investment.

139.   As a result of Defendants' knowledge of and implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any warnings of market and diversification risks that Defendants made to the Plans' participants regarding the Plans' investment in Morgan Stanley stock did not effectively inform the Plans' participants of the past, immediate, and future dangers of investing in Company stock.

140.   Based on their actual or constructive knowledge as set forth in ¶¶ 112-120, Defendants knew about Morgan Stanley's exposure to the subprime credit market. Defendants knew or should have known of the affirmative misrepresentations made to Participants in the SEC documents and annual reports incorporated into the SPDs. Defendants knew that the Plans' participants lacked the knowledge that Defendants had or should have had concerning the unsound business practices and knew or should have known that the Plans' participants would be harmed by this lack of knowledge. Defendants on a Plan-wide and Class-wide basis, never accurately disclosed to Plaintiff or the Plans' participants the true nature, extent, and risks of

these problems. Rather, Defendants failed to timely communicate accurate information to the Plans' participants concerning Morgan Stanley's true financial condition, including its unsound business practices in prior periods, when they knew or should have known that the Plans' participants needed this information. Defendants and/or their individual fiduciary delegates, on a Class-wide and Plan-wide basis, failed to provide the Plans' participants with complete and accurate information regarding Morgan Stanley stock, such that the participants could appreciate the true risks presented by investments in Morgan Stanley stock and could make informed decisions, thereby avoiding the unreasonable and entirely predictable losses incurred as a result of the Plans' investment in Morgan Stanley stock. No Defendant took any action to remedy the breaches set forth in this paragraph.

141. The Morgan Stanley Defendants and Board Defendants failed in their fiduciary responsibilities in monitoring the Committee Defendants. The Morgan Stanley Defendants and Board Defendants breached their fiduciary duties because they did not have procedures in place so that they could review and evaluate on an ongoing basis whether the Committee Defendants were performing their duties adequately and in accordance with ERISA's fiduciary provisions. The Morgan Stanley Defendants and Board Defendants breached their fiduciary duty to remove the Committee Defendants when they knew the Committee Defendants had breached their fiduciary duties. The Morgan Stanley Defendants and Board Defendants failed to adequately review the performance of the Committee Defendants to: ensure that they were fulfilling their fiduciary duties under the Plans and ERISA; ensure that they had adequate information to do their job of overseeing the Plans' investments; ensure that they adequate access to and use of impartial advisors when needed; and ensure that they reported regularly to the Board.

## DEFENDANTS SUFFERED FROM CONFLICTS OF INTEREST

142.    Morgan Stanley's SEC filings make clear that a significant percentage of Morgan Stanley's officer and director compensation is in the form of stock grants or stock option grants.

143.    Because the compensation of many of the Defendants was significantly tied to the price of Morgan Stanley stock, Defendants had an incentive to keep the Plans' assets heavily invested in Morgan Stanley stock on a regular, ongoing basis.  Elimination of Company stock as an investment option would have reduced the overall market demand for Morgan Stanley stock and sent a negative signal to Wall Street analysts, which would have adversely affected the price of Morgan Stanley stock, resulting in lower compensation for the Defendants.

144.    Moreover, keeping the Plans' assets heavily invested in Morgan Stanley stock allowed Defendants to sell their personally held Morgan Stanley stock at artificially inflated prices.

145.    This insider selling created a serious conflict of interest between Defendants' fiduciary duties and their personal interests, because Defendants were able to divest their own Company stock when they became aware of the Company's risky exposure to the subprime credit market; they did **not**, however, divest the Plans' investment in Morgan Stanley stock, allowing themselves to personally profit and leaving the Plans to suffer massive losses.

146.    Some Defendants may have had no choice in tying their compensation to Morgan Stanley stock (because compensation decisions were out of their hands), but Defendants did have the choice in what information to disclose to the Participants and whether to keep the Participants' retirement savings invested in Company stock.

147.    These conflicts of interest put the Defendants in the position of having to choose between their own interests and the interests of the Participants.

## CAUSATION

148.    The Plans suffered massive losses because a substantial amount of the Plans'
assets were imprudently invested by the Plans in Morgan Stanley stock during the Class Period,
and in breach of Defendants' fiduciary duties.

149.    Had Defendants properly discharged their fiduciary duties, including the
provision of full and accurate disclosure of material facts concerning Morgan Stanley stock and
divesting the Plans from Company stock offered by the Plans when such investment became
imprudent, the Plans would have avoided losses suffered in Company stock.

150.    As a result of Defendants' actions, Plaintiffs and the Class, which invested in
Morgan Stanley stock through the Plans, were wrongfully damaged, as the Plans suffered
substantial losses from Defendants' failure to fulfill their fiduciary responsibilities as described
herein.  Had the fiduciaries acted prudently and in accordance with their fiduciary duties, they
would have taken steps to eliminate or reduce the amount of Morgan Stanley stock held by the
Plans, eliminated the option for participants to place funds in Morgan Stanley stock, or fully
disclosed the material adverse facts concerning Morgan Stanley stock described herein.
Plaintiffs and the Class are entitled to the best alternative investment available to them under the
circumstances, and the Plans would have achieved gains and avoided losses but for Defendants'
breach of fiduciary duty as described herein.

151.    The Plans and the Plans' fiduciaries do not qualify for any affirmative defense
based on ERISA Section 404(c) as the Plans did not satisfy the numerous stringent requirements
of Section 404(c) and the Department of Labor Regulations promulgated thereunder, as set forth
in 29 C.F.R. § 2550.404c-1.  This is because Defendants, among other ERISA § 404(c)
disclosure failures, failed to ensure effective participant control by providing complete and
accurate material information to participants regarding Company stock.  *See* 29 C.F.R. §

2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient information to make informed decisions"). As a consequence, participants in the Plans did not have informed control over the portion of the Plans' assets that were invested in Company stock as a result of their investment directions, and the Defendants remained entirely responsible for losses that resulted from such investment.

152.    Furthermore, under ERISA, fiduciaries - not participants - exercise control over the selection of investment options made available to participants. Thus, whether or not participants are provided with the ability to select among different investment options, and whether or not participants exercised effective control over their investment decisions (which was not the case here), liability attaches to the fiduciaries if an imprudent investment option is selected by the fiduciaries and presented as an option to participants, and as a result of such action the Plans suffer a loss. Because this is precisely what occurred in this case, Defendants are liable for the losses incurred by the Plans and are not entitled to any protection under ERISA § 404(c).

153.    The losses suffered by the Plans and the Plans' participants and beneficiaries, including Plaintiffs and the Class, were the direct and necessary result of the misconduct of Defendants alleged herein. Plaintiffs and the Class were unaware, and in the exercise of reasonable diligence could not have been aware, of the true and accurate extent of Morgan Stanley's risky and unsound business practices, as well as Defendants' continuing breaches of fiduciary duty in failing to disclose such material facts.

## REMEDIES FOR DEFENDANTS' BREACH OF THEIR FIDUCIARY DUTIES

154.    Defendants breached their fiduciary duties in that they knew or recklessly disregarded the facts as alleged above, and therefore knew or recklessly disregarded that the

Plans' assets should not have been so heavily invested in Company stock. As a consequence of the Defendants' breaches, the Plans suffered significant losses.

155.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

156.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plans' assets to what they would have been if the plan had been properly administered.

157.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plans in the amount of the losses to the Plans resulting from the breaches of fiduciary duties alleged above and to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA § 409(a) and 502(a)(2)-(3), 29 U.S.C. § 1109(a) and § 1132(a)(2)-(3); (3) reasonable attorneys' fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

## Count I

### Failure to Prudently Manage the Plans' Assets; Breach of Fiduciary Duties in Violation of ERISA § 404 (Against All Defendants)

158.    Plaintiff incorporates the foregoing paragraphs herein by reference.

159.    The Plans are governed by the provisions of ERISA, 29 U.S.C. § 1001, et. seq., and Plaintiffs and the Class are participants and/or beneficiaries in the Plans. The Defendants are all fiduciaries with respect to the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). They were thereby bound by the duties of loyalty, exclusive purpose, and prudence.

160.    Defendants named in this Count were each responsible, in different ways and degrees, for the Plans' investments in Company stock.

161.    Under ERISA, fiduciaries who exercise discretionary authority or control over the management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to plan participants are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.

162.    The fiduciary duty of loyalty likewise entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

163.    Defendants named in this Count were responsible for ensuring that investment in Company stock was prudent and consistent with the purpose of the Plans. Defendants are liable for any and all losses incurred as a result of such investments being imprudent.

164.    During the Class Period, the Defendants named in this Count knew or should have known that Company stock was not a suitable, prudent or appropriate investment for the Plans as described herein irrespective of any duty of diversification that may exist. Notwithstanding this knowledge, these Defendants offered and continued to offer Company stock as investment options for the Plans and/or offered and continued to offer to direct and approve the investment in Company stock.

165.    Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, the Defendants named in this Count failed to take any meaningful steps to prevent the Plans, and indirectly the Plans' participants and beneficiaries, from suffering losses as a result of the Plans' investments in Company stock. The Defendants named in this Count knew or should have known that a prudent fiduciary acting under similar circumstances would have made different investment decisions with respect to the Company stock and that continued investment in Company stock was not in keeping with the Plans' settlors' expectation on how a prudent fiduciary would operate.

166.    The Defendants named in this Count had actual or constructive knowledge of the Company's serious mismanagement, risky lending practices and other misrepresentations that impacted Company stock as alleged in this Complaint. Despite this knowledge, they participated in each other's failures to prudently manage the Plans' assets and knowingly concealed such failures by not informing the Plans' participants that Company stock was not a prudent investment.

167.    In addition to other breaches of fiduciary duty alleged in this Count, the Defendants committed the following fiduciary breaches: (a) failed to conduct an appropriate investigation into whether Company stock was a prudent investment for the Plans; (b) failed to

develop appropriate investment guidelines for Company stock; (c) failed to divest the Plans of Company stock; (d) failed to discontinue further Plan contributions to Company stock; (e) failed to remove Company stock as investment options of the Plans; (f) failed to both consult or appoint independent fiduciaries regarding the appropriateness of an investment in Company stock; (g) failed to notify appropriate federal agencies, including the Department of Labor, of the facts and circumstances that made Company stock an unsuitable and imprudent investment for the Plans; and (h) failed to resign as fiduciaries of the Plans if, as a result of their employment by Morgan Stanley or its affiliates, they could not loyally serve the Plans and their participants.  In addition, these Defendants breached their fiduciary duty when they failed to prohibit any participant in the Plans from making an "investment switch" into Company stock.

168.    As a result of the breach of fiduciary duties of the Defendants named in this Count, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, suffered damages, the exact amount of which will be determined at trial.

169.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants named in this Count are personally liable to restore the losses to the Plans caused by their breach of fiduciary duty as alleged in this Count.

## Count II

### Failure to Provide Complete and Accurate Information to Participants and Beneficiaries; Breaches of Fiduciary Duties in Violation of ERISA § 404 (Against All Defendants)

170.    Plaintiff incorporates the foregoing paragraphs herein by reference.

171.    At all relevant times herein, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

172.    During the Class Period, Defendants knew or should have known that Company stock was not a suitable, prudent or appropriate investment for the Plans.

173.    As alleged herein, the scope of the Defendants' fiduciary duties and responsibilities included drafting and disseminating Plan documents, SPDs and information to participants regarding the assets of the Plans.

174.    All Defendants had a duty to provide participants with information they possessed that they knew or should have known would have a material impact on the Plans.

175.    The duty of loyalty under ERISA requires the Defendants to speak truthfully to Plans' participants, not to mislead them regarding the Plans or the Plans' assets, and to disclose information that participants need in order to exercise their rights and interests under the Plans. The Defendants' duty of loyalty included not only the negative duty not to misinform, but also an affirmative duty to inform when the Defendants' knew or should have known that silence might be harmful.  If a fiduciary knows that a material misrepresentation has been made to a Participant, that fiduciary, without regard to the functions that make that person a fiduciary, has an affirmative duty to correct that misrepresentation.  Moreover, Defendants are required to provide each participant with sufficient information to make informed decisions with regard to investment alternatives available under the Plans, including Company stock.

176.    The fiduciary duty of loyalty likewise entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

177.    This duty to inform participants included the Defendants' obligation to provide participants and beneficiaries of the Plans with complete and accurate information, and to refrain

from providing false information or concealing material information regarding the Plans' investment options such that participants can make informed decisions with regard to investment options available under the Plans. This duty applies to all of the Plans' investment options, including the Company stock.

178.    Because a substantial percentage of the Plans' assets were invested in Company stock, such investment carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to Company stock.

179.    Because of the disparity in knowledge between Defendants and the Plans' participants, the participants relied on Defendants to provide them with accurate and complete information about Morgan Stanley, which was material to the suitability of Company stock as a prudent investment option.

180.    The fiduciary duty to honestly communicate with participants is designed not merely to inform participants and beneficiaries of conduct, including illegal conduct, bearing on their retirement savings, but also to forestall such illegal conduct in the first instance. By failing to discharge their disclosure duties, the Defendants facilitated the illegal conduct in the first instance.

181.    The Defendants breached their fiduciary duties by direct and indirect communications with the Plans' participants, made in their fiduciary capacity, which contained statements concerning Company stock that these Defendants knew or should have known were untrue and inaccurate. These communications included Class-wide and Plan-wide affirmative and materially misleading statements as to Morgan Stanley's risky exposure to the subprime credit market as detailed in this Complaint.

182.    The Defendants breached their fiduciary duties not only with regard to the affirmative misrepresentations, but also because those documents omitted, and continue to omit, material information concerning Morgan Stanley's serious mismanagement, including Morgan Stanley's risky exposure to the subprime credit market. In addition, the Defendants breached their fiduciary duties by conveying inaccurate information regarding the soundness or security of Company stock and the prudence of investing retirement contributions in Company stock.

183.    All Defendants breached their fiduciary duty when they failed to provide Plan participants, on a Class-wide and Plan-wide basis, information regarding the imprudence of investing in Company stock. All Defendants knew or should have known that Plan participants lacked the knowledge that Defendants possessed concerning the imprudence of investing in Company stock; knew or should have known that the Plans' participants would be harmed by this lack of knowledge; and knew or should have known that material misrepresentations regarding Company stock were made to Plan participants. All Defendants, on a Plan-wide and Class-wide basis, never accurately disclosed to Plaintiffs or the Plans' participants the true nature, extent, and risks of investing in Company stock when they knew or should have know that investment in Company stock was imprudent. Rather, all Defendants failed to timely communicate accurate information to Plan participants concerning Morgan Stanley's risky exposure to the subprime credit market during the Class Period when they knew or should have known that Plans' participants needed this information.

184.    As a consequence of Defendants' breaches of fiduciary duty alleged in this Count, the Plans suffered tremendous losses. If the Defendants had discharged their disclosure obligations prudently and in the sole interests of Plan participants and beneficiaries, then losses suffered by the Plan would have been avoided or greatly minimized. Therefore, as a direct and

proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly

Plaintiffs and the other Class members, lost hundreds of millions of dollars of retirement savings.

185.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29

U.S.C. § 1109(a), the Defendants are personally liable to the Plans for these losses incurred as a

result of Defendants' misrepresentations to the Plans' participants as well as their breach of the

fiduciary duty to disclose and inform.

### Count III

#### Failure in Appointing and Monitoring Plan Fiduciaries; Breaches of Fiduciary Duties in Violation of ERISA § 404 (Against the Board Defendants and the Morgan Stanley Defendants)

186.    Plaintiff incorporates the foregoing paragraphs herein by reference.

187.    At all relevant times herein, Defendants were fiduciaries within the meaning of

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

188.    At all relevant times herein, the fiduciary duties of the Board Defendants and

Management Defendants included the power and responsibility to appoint, and the duty to

oversee and thereby monitor the performance of the Committee.

189.    At all relevant times herein, the scope of the fiduciary duties of the Board

Defendants and Morgan Stanley Defendants included the oversight and the power and

responsibility to appoint, and thereby monitor the performance of the Committee.

190.    During the Class Period, Defendants knew or should have known that Company

stock was not a suitable, prudent or appropriate investment for the Plans, as described herein.

191.    Under ERISA, a fiduciary with appointment powers must ensure that the

appointed fiduciaries are performing their fiduciary obligations, including those obligations with

respect to handling, holding and investing plan assets; and must take prompt and effective action

to protect the plan and participants when the appointed fiduciaries are not meeting their fiduciary obligations.

192.    The appointing fiduciary must have procedures in place so that they may review and evaluate on an ongoing basis whether the appointed fiduciaries are doing an adequate job (including, for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for (1) promptly and prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants; or (2) deciding whether to retain or remove their appointees.

193.    An appointing fiduciary must provide the appointed fiduciaries with all the information that they have or reasonably should have in order to prudently manage the plan and the plan assets or that may have a material impact on the plan and the fiduciaries' investment decisions regarding the plan.

194.    The Board Defendants and Morgan Stanley Defendants breached their fiduciary appointing and monitoring duties by, among other things: (1) failing to appoint persons with the requisite knowledge, skill, and expertise to properly administer the Plan and manage its assets; (2) failing to adequately monitor their appointees, evaluate their performance, or have an adequate system in place for doing so, (and standing idly by as the Plans suffered enormous losses as a result of the appointees' imprudent action); (4) failing to ensure that the appointed fiduciaries (although possessing actual knowledge of unsound business practices and risky lending activities and other misrepresentations concerning Company stock as alleged herein) understood the true extent of Morgan Stanley's unsound business practices and risky lending

activities and its impact on the value of Company stock and the Plan's concomitant investment in Company stock.

195.   The Board Defendants and the Morgan Stanley Defendants breached their fiduciary duty by failing to remove the appointed fiduciaries, as named herein, whose performance was inadequate.  The Board Defendants, knew that the appointed fiduciaries: (a) failed to conduct an appropriate investigation into whether Company stock was a prudent investment for the Plans; (b) failed to develop appropriate investment guidelines for Company stock; (c) failed to divest the Plans of Company stock; (d) failed to discontinue further Plan contributions to Company stock; (e) failed to remove Company stock as investment options for the Plans; (f) failed to consult with or appoint independent fiduciaries regarding the appropriateness of an investment in Company stock; (g) failed to prohibit any participant from making an "investment switch" into Company stock; (h) failed to notify appropriate federal agencies, including the Department of Labor, of the facts and circumstances that made Company stock an unsuitable or imprudent investment for the Plans; and (i) failed to inform Plan participants that investment in Company stock would not be prudent.

196.   As a consequence of the Board Defendants' and the Morgan Stanley Defendants' breaches of fiduciary duty, the Plans suffered tremendous losses.  Had Defendants named in this Count discharged their fiduciary duties as described above, the losses suffered by the Plans would have been averted or, at a minimum, lessened.  Therefore, as a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the other Class members, lost hundreds of millions of dollars of retirement savings.

197.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, suffered damages, the exact amount of which will be determined at trial.

198.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), the Board Defendants and Morgan Stanley Defendants are personally liable to restore the losses to the Plans caused by their failure to monitor and remove fiduciaries as alleged in this Count.

## Count IV

### Co-Fiduciary Liability;
### Breaches of Fiduciary Duties in Violation of ERISA § 405
### (Against all Defendants)

199.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

200.    At all relevant times, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

201.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability that he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if: (i) he participates in, or undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (ii) he fails to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) in the administration of his specific responsibilities that give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (iii) he knew or should have known of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

202.    During the Class Period, Defendants knew that Company stock was not a suitable, prudent or appropriate investment for the Plans as described herein.

Failure to Remedy

203.    ERISA § 405(a)(3), 29 U.S.C. § 1105(3) imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

204.    The Board Defendants were aware that the Committee Defendants breached their fiduciary duties as alleged in Count I of the Complaint.  Despite this knowledge, the Board Defendants failed to undertake any effort to remedy their co-fiduciaries' failures to prudently and loyally manage the Plans' investment in Company stock, as well as other fiduciary breaches alleged in Count I.  Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(3).  The actions that the Board Defendants could have taken, included but are not limited to: (1) objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Board; (2) disclosing the imprudence of the investment in Company stock to the Plans' participants; (3) notifying the U.S. Department of Labor of their co-fiduciaries actions; or (4) preparing to obtain an injunction from a Federal District Court.

205.    To the extent that it is determined that any Board Defendant and/or Committee Defendant did not breach his fiduciary duty as alleged in Count I of the Complaint, that Defendant was still aware that the remaining Defendants in Count I did, in fact, breach their fiduciary duties.  Despite this knowledge, the Defendant(s) named in this paragraph breached their fiduciary duties by failing to undertake any effort to remedy their co-fiduciaries' failures to prudently and loyally manage the Plan's investment in Company stock and other fiduciary

breaches alleged in Count I. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(3). The actions that the Defendant(s) could have taken included but are not limited to: objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Board or Committee; disclosing the imprudence of the investment in Company stock to Plan Participants; notifying the U.S. Department of Labor of their co-fiduciaries' conduct; or preparing to obtain an injunction from a Federal District Court.

206.    To the extent that it is determined that any Defendant did not commit any of the fiduciary breaches as alleged in Count II of the Complaint, any such Defendant was still aware that the remaining Defendants named in Count II breached their fiduciary duties. Despite this knowledge, these Defendants breached their fiduciary duty by failing to undertake any effort to remedy the fiduciary breaches alleged in Count II, including the duty to remedy their co-fiduciaries' misrepresentations and their co-fiduciaries' breach of the affirmative duty to inform Plan participants regarding the imprudence of investing in Company stock. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(3). The actions that the Defendant(s) could have taken included but are not limited to: (1) objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Board; (2) disclosing the imprudence of the investment in Company stock to Plan Participants; (3) notifying the U.S. Department of Labor of their co-fiduciaries' conduct; or (4) preparing to obtain an injunction from a Federal District Court.

Enabling a Breach

207.    ERISA § 405(a)(2), 29 U.S.C. § 1105(2) also imposes co-fiduciary liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities that give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

208.    To the extent that it is determined that any Board Defendant or Committee Defendant lacked knowledge of the circumstances rendering the Plans' investment in Company stock imprudent, then all other Defendants enabled the imprudent asset management decisions of that Defendant by failing to provide that Defendant with complete and accurate information regarding the Company's risky exposure to the subprime credit market and other misrepresentations concerning Company stock.  In failing to inform their co-fiduciaries, who lacked knowledge, if any, these Defendants breached ERISA § 405(a)(2).

209.    Through their failure to properly and effectively monitor their appointees, including the removal of those whose performance was inadequate as alleged in this Complaint, the Board Defendants enabled the Committee Defendants imprudent management of Company stock in the Plans.

210.    Further, through their failure to properly and effectively monitor their appointees, including the removal of those whose performance was inadequate as alleged above, the Board Defendants and Committee Defendants enabled the remaining Defendants imprudent management of Company stock in the Plans.

211.    The Board Defendants' failure to monitor the Committee Defendants enabled the Committee Defendants to breach their duties.

212.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, suffered damages, the exact amount of which will be determined at trial.

213.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), ERISA § 409, 29 U.S.C. § 1109(a), and ERISA § 405, 29 U.S.C. § 1105, Defendants are liable to restore the losses to the Plans caused by their co-fiduciary breaches of fiduciary duties alleged in this Count.

## Count V

### Breach of Duty to Avoid Conflicts of Interest
### (Against All Individual Defendants)

214.    Plaintiff incorporates the foregoing paragraphs herein by reference.

215.    At all relevant times, as alleged above, the Individual Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

216.    ERISA § 494(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his or her duties with respect to the plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

217.    These Defendants were heavily invested in Morgan Stanley stock and had an interest in ensuring that the Plans' assets were also heavily invested in Morgan Stanley stock on a regular, ongoing basis. Elimination of Company stock as an investment option for the Plans would have reduced the overall market demand for Morgan Stanley stock and sent a negative signal to Wall Street analysts, which would have adversely affected the price of Morgan Stanley stock, resulting in losses for the Defendants named in this Count.

218. The Defendants named in this Count placed their own interest in investing the Plans' assets in Morgan Stanley stock over the Plans' participants' interest in maintaining a diversified and prudently invested ERISA plan.

219. The Defendants named in this Count breached their duty to avoid conflicts of interest and to promptly resolve them by, inter alia: failing to engage an independent fiduciary who could make independent judgments concerning the Plans' investment in Morgan Stanley stock; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; and by failing to otherwise place the interests of the Plans' participants above the interests of themselves and the Company with respect to the Plans' investment in Morgan Stanley stock.

220. As a result of these Defendants' breach of their duty to avoid conflicts of interest, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries suffered damages, the exact amount of which will be determined at trial.

221. Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), the Defendants named in this Count are personally liable to restore the losses to the Plans caused by their breach of the duty to avoid conflicts of interest as alleged in this Count.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Determining that this is a proper class action to be certified under Rule 23 and appointing Plaintiff class representative on behalf of the Class;

Declaring that Defendants, and each of them, are not entitled to protection under ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

B.     Declaring that Defendants have violated the duties, responsibilities, and obligations imposed upon them as fiduciaries and co-fiduciaries and that they violated the ERISA disclosure and monitoring requirements as described above;

C.     Compelling Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, and to restore to the Plans all profits Defendants made through use of the Plans' assets, and to restore to the Plans all profits that the participants would have made had Defendants fulfilled their fiduciary obligations;

D.     Awarding actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

E.     Enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.     Requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plans' investment in Morgan Stanley stock;

G.     Awarding extraordinary, equitable, and/or injunctive relief as permitted by law, equity, and the federal statutory provisions set forth herein, pursuant to Fed. R. Civ. P. 64 and 65;

H.    Awarding the Plans and/or Plaintiff and members of the Class, restitution, disgorgement, and/or other remedial relief;

I.    Awarding the Plans and/or Plaintiff and members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert witness fees, and other costs; and

J.    Awarding such other relief as this Court may deem just and proper.

Dated: January 18, 2008

ABRAHAM, FRUCHTER & TWERSKY, LLP

Jeffrey S. Abraham (JA-2946)
Arthur Chen (AC-5233)
One Penn Plaza, Suite 2805
New York, New York 10119
(212) 279-5050 (telephone)
(212) 279-3655 (facsimile)
jabraham@aftlaw.com
achen@aftlaw.com

*Attorneys for Plaintiff*



**Portfolio Media. Inc.** | 648 Broadway, Suite 200 | New York, NY 10012 | www.law360.com
Phone: +1 212 537 6331 | Fax: +1 212 537 6371 | customerservice@portfoliomedia.com

# Court Nixes FedEx's Class Certification Appeal

By **Erin Marie Daly**, erin.daly@portfoliomedia.com

*Portfolio Media, New York (January 23, 2008)*

**FedEx** Ground Package System Inc. has lost its bid to appeal a district court's order certifying both a Kansas state and a federal ERISA class of drivers who are seeking benefits under several plans for which they were not eligible because they were deemed independent contractors.

A three-judge panel of the U.S. Court of Appeal for the Seventh Circuit shot down FedEx's petition for permission to appeal a ruling issued Oct. 29 by Chief Judge Robert L. Miller Jr. of the U.S. District Court for the Northern District of Indiana, granting class certification on both the state and federal claims.

Judge Miller's order granted class certification to more than 20,000 current and former drivers nationwide who signed operating contracts that declared the workers as contractors, though, the suit claims, FedEx had control over the workers as employees.

Judge Miller also granted certification for a class of Kansas FedEx drivers. That class will consist of at least 102 current package and delivery drivers, as well as an undisclosed number of former drivers.

The Seventh Circuit apparently rendered its decision to deny FedEx's appeal of the order on Jan. 9, but the ruling was not made public until this week. The court did not elaborate further on its ruling.

FedEx downplayed the significance of the decision on Tuesday, pointing out that the court "did not rule on the validity of the contractor model and has not decided class certification in any other multidistrict litigation case.

"FedEx Ground will continue to vigorously defend the MDL," the company said in a statement. "This procedural ruling does not change any aspect of the FedEx Ground operation and we will continue to provide the world-class service our customers have come to expect."

However, a source familiar with the matter said Tuesday that the ruling was a bigger deal than FedEx would like to admit, because it rejected a review of the district court's order in which the district court advised that it would rule similarly in the remaining actions if the company could not show how those actions were different from the Kansas

and ERISA actions.

FedEx has been fiercely fighting the plaintiffs' bid to notify class members.

In court documents filed in November, the company said that the specific notices that plaintiffs seek to issue contain inaccuracies and are deficient.

FedEx argued that even though the court had determined that the Kansas state law claims and ERISA claims in the Kansas portion of the litigation were appropriate for class treatment, the company's petition to the Seventh Circuit for leave to appeal that determination and the pending class certification motions in 37 other related cases in the multidistrict litigation could affect any notice that is issued.

The Seventh Circuit's recent denial of FedEx's appeal could affect the issue of class notification, which the district court has yet to rule on.

The plaintiffs' motion for approval of class notices, also filed last November, contended that the notices provide "clear, concise, and plain descriptions" of the claims certified for class action status and the rights of class members to participate or opt out of such classes.

Meanwhile, rulings on class certification for drivers under 35 other state laws, as well as the federal Fair Labor Standards Act and Family Medical Leave Act, are pending in the multidistrict litigation.

Last September, after a California appellate court ruled that single-route drivers were employees, not contractors, FedEx announced that it would no longer renew California drivers' single-route contracts and would work exclusively with multiple-route contractors by May 31, 2008. FedEx is offering single-route drivers incentives to take up more routes or sell their routes.

California plaintiffs in the MDL sought a restraining order to stop FedEx from eliminating the contracts, claiming that the program was being implemented in retaliation for the lawsuit.

Miller said in his October decision that he did not doubt that the transition program has a "chilling effect in that it makes drivers fear participation in this case." However, he said that a change in business model is appropriate when an appellate court says a previous model would result in millions of dollars in damages.

"Few changes in business models are cost-free to everyone involved, and suits challenging business models often produce such changes," Miller said. "In effect, the plaintiffs' motion for a preliminary injunction asks that the court make FedEx Ground continue the business model for which it is being sued and for which the plaintiffs seek damages."

Miller also said that the plaintiffs needed to show that they would likely win the case on their retaliation claims. However, he ruled that the drivers had not shown "a better than negligible chance of success on the merits of their retaliation claim" since it was brought under the federal FMLA while the appellate decision dealt with California Labor Code.

"To prevail on a retaliation claim under the FMLA, the plaintiffs will need to prove that FedEx Ground is terminating their [single-route] contracts because they engaged in activity protected by the FMLA," Miller said. "No causal connection between the FedEx Ground 'California Transition' and any protected activity by the plaintiffs seems even remotely apparent."

The California drivers amended their complaint last October to add FMLA retaliation claims and wrongful termination claims under California common law. The new complaint also seeks to void a release agreement which the single-area drivers have to sign to receive incentives or retain a job at the company.

Those claims came in response to FedEx's transition program, under which the shipping company is offering voluntary incentives to single-route drivers to expand their business by taking on multiple routes or putting their single routes up for sale.

The plaintiffs in the MDL class action had said that FedEx was "pressuring" single-route drivers to accept $25,000 to execute a release of claims from retaliation and a chance to be rehired as a multiple-route driver. They said drivers who do seek to become multiple-route drivers then are required to sign another release form that waives other legal claims against FedEx, including claims asserted in the class action.

FedEx has asserted that its decision to transition to an all multiple-route driver network in the state is being pushed "to reduce its exposure to legal claims and substantial financial liabilities in California.

"Any prudent business would take steps to reduce its liability exposure under such circumstances. That is all [FedEx] has done," the company said.

FedEx's decision not to renew the contracts of its 739 single-route California drivers stemmed from a decision by the Court of Appeal for California's Second District in a case known as Estrada v. FedEx Ground.

In August, the appellate court ruled that single-route drivers were employees, not contractors. Multiple-route drivers were previously excluded from the class by a lower court. A few weeks later, the California Unemployment Insurance Appeals Board made a similar finding regarding the single-route drivers.

FedEx has appealed the appellate court's decision.

The plaintiffs in the Indiana MDL have accused FedEx Ground of mischaracterizing its drivers as independent contractors when they were in fact employees, a distinction which the plaintiffs said FedEx Ground used to rob them of rights and benefits.

The Indiana plaintiffs are asserting a variety of state and federal claims for lost employee benefits, including overtime compensation, health insurance and retirement benefits, most of which depend on a preliminary finding of employee status.

Unlike the MDL, the Estrada case was a California class action brought for the limited purpose of getting reimbursed for work-related expenses.

In that case, which had already been appealed twice, the appeals court overturned the Los Angeles Superior Court's 2005 ruling concerning fee awards, calling the lower court's $12.4 million damages award "excessive."

At least 75% of FedEx Ground's 12,000 pickup and delivery drivers are single-route contractors, according to court documents.

The plaintiffs are represented in the case by Leonard Carder LLP, **Harwood Feffer** LLP, Hamilton Law Firm PC and Lockridge Grindal Nauen PLLP.

FedEx is represented by **O'Melveny & Myers** LLP and **Baker & Daniels** LLP.

The case is In re: FedEx Ground Package System Inc., Employment Practices Litigation, case number 05-cv-00527, in the U.S. District Court for the Northern District of Indiana.

--Additional reporting by Ben James, Ron Zapata and Erin Coe

All Content Copyright 2007, Portfolio Media, Inc.

V.

**Defendant**

**Morgan Stanely & Co. Incorporated**

**Defendant**

**Morgan Stanley**

**Defendant**

**The Investment Committee of the
Morgan Stanley 401k Plan**
*formerly known as*
The Morgan Stanley DPSP/Start Plan

**Defendant**

**The Morgan Stanley Global Director
of Human Resources**

**Defendant**

**Walid A. Chammah**

**Defendant**

**Charles Chasin**

**Defendant**

**Zoe Cruz**

**Defendant**

**Richard Portogallo**

**Defendant**

**James P. Gorman**

**Defendant**

**Neal A. Shear**

**Defendant**

**Cordell G. Spencer**

**Defendant**

**John Doe**
*1-30*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/14/2007 | 1 | COMPLAINT against Richard Portogallo, James P. Gorman, Neal A. Shear, Cordell G. Spencer, John Doe, Morgan Stanely & Co. Incorporated, Morgan Stanley, The Investment Committee of the Morgan |

| | | |
|---|---|---|
| | | Stanley 401k Plan, The Morgan Stanley Global Director of Human Resources, Walid A. Chammah, Charles Chasin, Zoe Cruz. (Filing Fee $ 350.00, Receipt Number 636150)Document filed by Carolyn Egan.(jpo) (Entered: 12/18/2007) |
| 12/14/2007 | | SUMMONS ISSUED as to Richard Portogallo, James P. Gorman, Neal A. Shear, Cordell G. Spencer, John Doe, Morgan Stanely & Co. Incorporated, Morgan Stanley, The Investment Committee of the Morgan Stanley 401k Plan, The Morgan Stanley Global Director of Human Resources, Walid A. Chammah, Charles Chasin, Zoe Cruz. (jpo) (Entered: 12/18/2007) |
| 12/14/2007 | | Magistrate Judge Andrew J. Peck is so designated. (jpo) (Entered: 12/18/2007) |
| 12/14/2007 | | Case Designated ECF. (jpo) (Entered: 12/18/2007) |
| 01/04/2008 | 2 | AFFIDAVIT OF SERVICE. Charles Chasin served on 12/20/2007, answer due 1/9/2008. Service was accepted by Scott Tucker. Document filed by Carolyn Egan. (Nespole, Gregory) (Entered: 01/04/2008) |
| 01/04/2008 | 3 | AFFIDAVIT OF SERVICE. John Doe served on 12/20/2007, answer due 1/9/2008. Service was accepted by Scott Tucker. Document filed by Carolyn Egan. (Nespole, Gregory) (Entered: 01/04/2008) |
| 01/04/2008 | 4 | AFFIDAVIT OF SERVICE. James P. Gorman served on 12/20/2007, answer due 1/9/2008. Service was accepted by Scott Tucker. Document filed by Carolyn Egan. (Nespole, Gregory) (Entered: 01/04/2008) |
| 01/04/2008 | 5 | AFFIDAVIT OF SERVICE. Morgan Stanely & Co. Incorporated served on 12/20/2007, answer due 1/9/2008. Service was accepted by Scott Tucker. Document filed by Carolyn Egan. (Nespole, Gregory) (Entered: 01/04/2008) |
| 01/04/2008 | 6 | AFFIDAVIT OF SERVICE. Richard Portogallo served on 12/20/2007, answer due 1/9/2008. Service was accepted by Scott Tucker. Document filed by Carolyn Egan. (Nespole, Gregory) (Entered: 01/04/2008) |
| 01/04/2008 | 7 | AFFIDAVIT OF SERVICE. Neal A. Shear served on 12/20/2007, answer due 1/9/2008. Service was accepted by Scott Tucker. Document filed by Carolyn Egan. (Nespole, Gregory) (Entered: 01/04/2008) |
| 01/04/2008 | 8 | AFFIDAVIT OF SERVICE. Cordell G. Spencer served on 12/20/2007, answer due 1/9/2008. Service was accepted by Scott Tucker. Document filed by Carolyn Egan. (Nespole, Gregory) (Entered: 01/04/2008) |
| 01/07/2008 | 9 | AFFIDAVIT OF SERVICE. Walid A. Chammah served on 12/20/2007, answer due 1/9/2008. Service was accepted by Scott Tucker. Document filed by Carolyn Egan. (Nespole, Gregory) (Entered: 01/07/2008) |
| 01/07/2008 | 10 | AFFIDAVIT OF SERVICE. The Morgan Stanley Global Director of Human Resources served on 12/20/2007, answer due 1/9/2008. Service was accepted by Scott Tucker. Document filed by Carolyn Egan. (Nespole, Gregory) (Entered: 01/07/2008) |

| 01/07/2008 | 11 | AFFIDAVIT OF SERVICE. The Investment Committee of the Morgan Stanley 401k Plan served on 12/20/2007, answer due 1/9/2008. Service was accepted by Scott Tucker. Document filed by Carolyn Egan. (Nespole, Gregory) (Entered: 01/07/2008) |
| --- | --- | --- |
| 01/07/2008 | 12 | AFFIDAVIT OF SERVICE. Morgan Stanley served on 12/20/2007, answer due 1/9/2008. Service was accepted by Scott Tucker, Exec. Director. Document filed by Carolyn Egan. (Nespole, Gregory) (Entered: 01/07/2008) |
| 01/09/2008 | 13 | MOTION to Appoint C. Kenneth Coulter to serve as lead plaintiff(s). Document filed by C. Kenneth Coulter. (Attachments: # 1 Text of Proposed Order)(Feldman, Lori) (Entered: 01/09/2008) |
| 01/09/2008 | 14 | MEMORANDUM OF LAW in Support re: 13 MOTION to Appoint C. Kenneth Coulter to serve as lead plaintiff(s).. Document filed by C. Kenneth Coulter. (Feldman, Lori) (Entered: 01/09/2008) |
| 01/09/2008 | 15 | DECLARATION of Lori G. Feldman and Robert I. Harwood in Support re: 13 MOTION to Appoint C. Kenneth Coulter to serve as lead plaintiff (s).. Document filed by C. Kenneth Coulter. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Feldman, Lori) (Entered: 01/09/2008) |

| PACER Service Center | | | |
| --- | --- | --- | --- |
| **Transaction Receipt** | | | |
| 01/16/2008 11:17:47 | | | |
| PACER Login: | wh0009 | Client Code: | MorganStanleyERISA |
| Description: | Docket Report | Search Criteria: | 1:07-cv-11285-RWS |
| Billable Pages: | 2 | Cost: | 0.16 |

# DAVIS POLK & WARDWELL

450 LEXINGTON AVENUE
NEW YORK, NY 10017
212 450 4000
FAX 212 450 3800

MENLO PARK
WASHINGTON, D.C.
LONDON
PARIS
FRANKFURT
MADRID
TOKYO
BEIJING
HONG KONG

ROBERT F. WISE, JR.
212 450 4512
robert.wise@dpw.com

January 7, 2008

Re:    Egan v. Morgan Stanley & Co., Incorporated, et. al., 07 CV 11285 (RWS)

By Hand

Michael Jaffey, Esq.
Wolf Haldstein Adler Freeman & Herz L.L.P.
270 Madison Avenue
New York, N.Y.  10016

Dear Mr. Jaffey:

In accordance with our telephone conference last week enclosed are three copies of a stipulation extending defendants' time to answer or move in the above matter until February 8, 2008.  Please sign and return two copies to me, and we will arrange for the filing of one with the court.

Very truly yours,

Robert F. Wise, Jr.

Enclosures (3)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAROLYN EGAN, on behalf of herself and all others similarly situated, | |
| Plaintiff, | |
| - against - | 07 Civ. 11285 (RWS) |
| MORGAN STANLEY & CO. INCORPORATED, MORGAN STANLEY, THE INVESTMENT COMMITTEE OF THE MORGAN STANLEY 401(k) PLAN (f/k/a THE MORGAN STANLEY DPSP/START PLAN), THE MORGAN STANLEY GLOBAL DIRECTOR OF HUMAN RESOURCES, WALID A. CHAMMAH, CHARLES CHASIN, ZOE CRUZ, RICHARD PORTOGALLO, JAMES P. GORMAN, NEAL A. SHEAR, CORDELL G. SPENCER, and JOHN DOE DEFENDANTS 1-30, | STIPULATION REGARDING DEFENDANTS' TIME TO ANSWER OR OTHERWISE RESPOND |
| Defendants. | |

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for plaintiff and defendants that the time for all defendants to answer, or otherwise respond to, the complaint filed in the above captioned case shall be extended by thirty (30) days until February 8, 2008.

Dated:    New York, New York
   January 7, 2008

           WOLF HALDENSTEIN ADLER
           FREEMAN & HERZ LLP

           By: _____
             Michael Jaffe

           270 Madison Avenue
           New York, New York  10016
           Tel.: (212) 545-4600

           Attorneys For Plaintiff Carolyn Egan and
            the Proposed Class

           DAVIS POLK & WARDWELL

           By: _____
             Robert F. Wise, Jr.

           450 Lexington Avenue
           New York, New York  10017
           Tel.: (212) 450-4512

           Attorneys For Defendants Morgan Stanley
            and Morgan Stanley & Co., Inc.

SO ORDERED

_____
     U.S.D.J.

January ____, 2008

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

FOUNDED 1888

270 MADISON AVENUE
NEW YORK, NY 10016
212-545-4600

750 B STREET · SUITE 2770
SAN DIEGO, CA 92101

625 NORTH FLAGLER DRIVE
WEST PALM BEACH, FL 33401

MICHAEL JAFFE
DIRECT DIAL: 212-545-4606
FACSIMILE: 212-545-4653
jaffe@whafh.com

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC
55 WEST MONROE STREET, SUITE 1111
CHICAGO, IL 60603

January 4, 2008

**VIA FEDERAL EXPRESS**

Ms. Karen Jamesley
Global Head of Human Resources
Morgan Stanley
1585 Broadway
New York, NY 10036

      Re:    **Egan v. Morgan Stanley & Co., et al., S.D.N.Y. (Civ. No. 07 cv 11285)**

Dear Sir/Madam:

      On behalf of Carolyn Egan, a participant in the Morgan Stanley 401(k) Plan (the "Plan") and a plaintiff in the lawsuit referenced above, we write to request the production of documents relating to the Plan pursuant to 29 U.S.C. § 1024(b)(4), including the latest updated Summary Plan description; (2) the latest annual report and any terminal report; and (3) the bargaining agreement, trust agreement, contract, or other instruments under which the Plan was established. Please also provide any other Summary Plan description in place prior to the most recent one.

      Please send the requested information, along with any bill for the cost of furnishing the information, to my attention.

      Thank you in advance for your prompt attention to this request.

                         Very truly yours,

                         Michael Jaffe

MJ/lg/497780.2

cc: **VIA FEDERAL EXPRESS**
    Morgan Stanley Legal Department
    1633 Broadway
    New York, NY 10019-6708

# SB TK SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP
### Attorneys at Law

280 King of Prussia Road • Radnor, Pennsylvania 19087
(610) 667-7706 • Fax: (610) 667-7056
www.sbtklaw.com

Writer's Direct Dial:  610-822-0242
E-Mail: eciolko@sbtklaw.com

January 4, 2008

**VIA FEDERAL EXPRESS**

Morgan Stanley,
Morgan Stanley Director of Global Human Resources
Harborside Financial Center
Plaza Two, Third Floor
Jersey City, NJ  07311
Attention:  Benefits Department

Re:    **Morgan Stanley Employee Pension Benefit Plans**

Dear Sir or Madam:

On behalf of our client, John Siefken, participant in the Morgan Stanley 401(k) Plan and Morgan Stanley Employee Stock Ownership Plan (collectively the "Plans"), I am requesting copies of each of the following documents: the most recent master Plan Document for each plan, Summary Plan Descriptions for each plan, Summaries of Material Modification created since the Plan's most recent operative versions became effective, the Plans IRS/DOL Form 5500s and SEC Form 11(k)s during the same time period, the Plans' annual reports, and any other bargaining agreement, trust agreement, contract or other instrument under which the Plans and/or any related defined contribution plan are established or operated. *See* ERISA § 104(b)(4). Additionally, this request includes any contract or instrument describing the composition and/or role of any person(s) charged with administering the Plans, including, but not limited to The Compensation, Management, Development and Successor Committee, The Investment Committee, the Administrative Committee (collectively the "Committees"), and any entity or committee of Morgan Stanley with oversight/appointment authority over the Committees, including any of the above named committees or the Board of Directors of Morgan Stanley.

As you are aware, our clients are entitled to these documents under ERISA § 104(b)(4).  Please send the requested documents and any invoice for copying charges to me at the above address within thirty (30) days of receipt of this letter.

Morgan Stanley
January 4, 2008
Page Two

Thank you for your prompt attention to this matter.

Very truly yours,

Edward W. Ciolko

EWC/km

# FIRM PROFILE



## SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP
Attorneys at Law

280 King of Prussia Road * Radnor, PA 19087 * Telephone: (610) 667.7706 * Fax: (610) 667.7056

Schiffrin Barroway Topaz & Kessler, LLP, specializes in representing shareholders and consumers in complex class action litigation in state and federal courts throughout the United States. Since our inception, SBTK has recovered billions of dollars on behalf of defrauded shareholders and aggrieved consumers. The firm is led by its senior partners, Richard S. Schiffrin, Andrew L. Barroway, Marc A. Topaz, and David Kessler, with assistance from partners Stuart L. Berman, Katharine M. Ryan, Gregory M. Castaldo, Michael K. Yarnoff, Joseph H. Meltzer, Darren J. Check, Andrew L. Zivitz, Sean M. Handler, John A. Kehoe, Lee D. Rudy, Kay E. Sickles, Eric L. Zagar, Edward W. Ciolko and numerous experienced associates and staff.

Since its inception in 1987, SBTK has specialized exclusively in the prosecution of class actions, with unique expertise and skill litigating securities class actions. Now in its 21st year, SBTK has grown into one of the largest and most successful firms in the field. Recognized by courts and its clients for achieving exemplary results, SBTK, with its main office located in suburban Philadelphia, Pennsylvania, is comprised of over 60 attorneys, a superior support staff and an in-house investigative team. With SBTK's extensive experience prosecuting securities fraud actions, derivative actions and transactional litigation against public companies and their officers and directors, SBTK has emerged as the leading firm in the campaign to eradicate the egregious practice of options backdating. Recognizing SBTK's experience and commitment to corporate governance reform, courts across the country have appointed SBTK as lead or co-lead counsel in more than 50 options backdating actions. SBTK's depth and breadth of its practice places it in a unique position to track, advise, prosecute and resolve complex securities actions.

In the course of representing various institutional investors from the United States, Canada, Europe, and around the world, including pension funds, mutual fund managers, investment advisors, insurance companies, and hedge funds, SBTK has recovered billions of dollars on behalf of its clients and the classes it represents. SBTK, with the guidance and assistance of its clients serving as lead plaintiff, is especially proud of its ability to create and structure resolutions with financially troubled companies and, when appropriate, to institute corporate governance reforms when serving as lead counsel in shareholder actions.

In addition, SBTK has recently opened an office in suburban San Francisco, California, and has added three California-based attorneys as "of counsel" to the firm, each of whom has significant

class action and complex litigation experience. Demonstrating its commitment to the west coast expansion, several SBTK partners and associates have recently taken the California Bar and are awaiting their results.

## Noteworthy Achievements

During the firm's successful history, SBTK has recovered billions of dollars for defrauded stockholders and consumers. The following are among the firm's notable achievements:

*In re Tyco International, Ltd. Securities Litigation,*
*No. 02-1335-B (D.N.H. 2002):*
SBTK, which served as co-lead counsel in this highly publicized securities fraud class action on behalf of a group of institutional investors, achieved a record $3 billion settlement with Tyco. The largest securities class action settlement by a corporate defendant in history. The action asserted federal securities claims on behalf of all purchasers of Tyco securities between December 13, 1999 and June 7, 2002 against Tyco, certain former officers and directors of Tyco and the Company's auditor PricewaterhouseCoopers. Tyco is alleged to have overstated its income during the Class Period by $5.8 billion. Defendants Kozlowski and Swartz have been sentenced to up to 25 years in prison after being convicted of grand larceny, falsification of business records and conspiracy for their roles in the alleged scheme to defraud investors. Defendant Walsh has also pled guilty to committing fraud.

In October 2004, the Court denied in large part the defendants' motions to dismiss and the parties began the discovery phase of the case. On June 12, 2006, Judge Barbadoro granted the Plaintiffs' motion for class certification for violations of sections 10(b), 20(a) and 20A of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1, and sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2) and 77o. The Court held that the claims asserted satisfy Federal Rule of Civil Procedure 23(a)'s requirements for numerosity, commonality, typicality and adequacy, as well as Rule 23(b)'s requirements that common issues predominate over individual issues and that a class action is superior to other available methods for the fair resolution of the dispute.

The settlement, which represents the single largest payment from any corporate defendant in the history of securities class action litigation, requires Tyco pay $2.975 billion in cash to settle securities and accounting fraud claims relating to the Kozlowski era, but specifically excludes auditor PriceWaterhouseCoopers ("PwC") and, by the time the settlement will be presented to the Court for final distribution, it will exceed $3 billion in value, inclusive of interest.

As part of the settlement, Tyco has agreed to assign the claims it has against PwC related to the accounting fraud to the Class, which intends to vigorously pursue both its own claims and the assigned claims. As Tyco's auditor, PwC was in a unique position to uncover the fraud and to prevent the damages to Tyco's shareholders. Instead, PwC is alleged to have failed in its duties as a corporate watchdog. In addition, as Tyco already has its own claims being pursued against certain of the individual defendants, the Class has assigned its claims against Dennis Kozlowski, Frank Walsh and Mark Swartz to Tyco in exchange for receiving a 50% interest in any net recoveries achieved against these non-settling defendants.

*In re Tenet Healthcare Corp. Securities Litigation,*
*No. CV-02-8462-RSWL (Rx) (C.D. Cal. 2002):*
SBTK serves as co-lead counsel on behalf of the State of New Jersey and its Division of Investment against Tenet Healthcare Corp. and certain of its former officers and directors.

Among other things, the Lead Plaintiff alleges that defendants made a series of materially false or misleading statements and omissions concerning Tenet's business model and financial health from January 11, 2000 through November 7, 2002. After defeating defendants' motions to dismiss and performing substantial document and deposition discovery, a partial settlement has been reached in the amount of $216.5 million in cash which will be submitted for preliminary approval by the Court in the coming weeks. The Partial Settlement is being funded primarily by Tenet and its insurance carriers ($215 million), with personal contributions in the aggregate amount of $1.5 million being made by two of Tenet's former officers, Jeffrey Barbakow and Thomas Mackey. In addition to the substantial cash recovery, the prosecution of this action has played a prominent role in Tenet's initiation of sweeping corporate governance reforms which have led to Tenet being ranked by various institutional rating entities as among the best corporations in America for its corporate governance. The case will continue against KPMG as the Court denied KPMG's motion to dismiss the action in its entirety in December, 2005.

### *In re AremisSoft Corp. Securities Litigation,*
### *C.A. No. 01-CV-2486 (D.N.J. 2002):*
SBTK is particularly proud of the results recently achieved in this case before the Honorable Joel A. Pisano. This case was exceedingly complicated, as it involved the embezzlement of hundreds of millions of dollars by former officers of the Company, who are now fugitives. In settling the action, SBTK, as sole Lead Counsel, assisted in reorganizing the Company as a new Company to allow for it to continue operations, while successfully separating out the securities fraud claims and the bankrupt Company's claims into a litigation trust. The Settlement, which was recently approved, calls for the class to receive the majority of the equity in the new Company, as well as their pro rata share of any amounts recovered by the litigation trust. The Court-appointed cotrustees, Joseph P. LaSala, Esq. and Fred S. Zeidman, have retained SBTK to continue prosecuting the actions on behalf of the litigation trust. In this capacity, we have filed an action in the Isle of Man, and have successfully frozen more than $200 million of stolen funds from one of the fugitives, and are in the process of attempting to recover the money on behalf of the trust. In addition, we are continuing to litigate the trust's claims against the remaining fugitive.

### *In re The Interpublic Group of Companies Securities Litigation,*
### *No. 02 Civ. 6527 (S.D.N.Y. 2002):*
SBTK served as sole Lead Counsel in this action on behalf of an institutional investor and recently received final approval of a settlement consisting of $20 million in cash and 6,551,725 shares of IPG common stock with expected distribution by early summer 2005. As of February 2005, the stock had an approximate value of $87 million, resulting in a total settlement value of approximately $107 million. In granting its approval, the Court praised SBTK for acting responsibly and noted the firm's professionalism, competence and contribution to achieving such a favorable result.

### *In re Digital Lightwave, Inc. Securities Litigation,*
### *Consolidated Case No. 98-152-CIV-T-24E (M.D. Fla. 1999):*
The firm served as Co-Lead Counsel in one of the nation's most successful securities class actions. After extensive litigation and negotiations, a settlement consisting primarily of stock ultimately grew to a value of over $170 million between the time in which the settlement was negotiated and the time at which it was distributed. SBTK took on the primary role in negotiating the terms of the equity component, insisting that the class have the right to share in any upward appreciation in the value of the stock after the settlement was reached. This recovery represented an astounding approximately two hundred percent (200%) of class members' losses. We believe that this represents the largest percentage recovery for shareholders in securities class action history.

*In re Initial Public Offering Securities Litigation,*
*Master File No. 21 MC 92 (SAS) (S.D.N.Y. Dec. 12, 2002):*
SBTK holds a prominent position as an Executive Committee member in this action. Of the sixty plaintiffs firms which originally filed actions in these coordinated proceedings, SBTK was one of only six selected to serve on the Executive Committee. The coordinated actions, which have been filed against 309 separate issuers of publicly traded securities, challenge the legality of the practices which accompany the allocations of shares in initial public offerings. In addition to suing the issuers of such securities, the 309 coordinated actions also name as defendants the primary investment banking firms which underwrote the offerings. This case, which has received a great deal of national and international media attention, is widely considered the largest securities class action litigation in history. At the present time, the Court has preliminarily approved a $1 billion settlement with the insurers and their officers and directors. The case is proceeding against the underwriting defendants.

*In re Global Crossing, Ltd. ERISA Litigation,*
*No. 02 Civ. 7453 (S.D.N.Y. 2004):*
SBTK served as Co-Lead Counsel in this complex and high-profile action which alleged that certain directors and officers of Global Crossing, a former high-flier of the late 1990's tech stock boom, breached their fiduciary duties under the Employee retirement Income Security Act of 1974 to certain company-provided 401(k) plans and their participants. These breaches surrounded the plans' alleged imprudent investment in Global Crossing stock during a time when defendants knew, or should have known, that the company was facing imminent bankruptcy. A settlement of plaintiffs' claims restoring $79 million to the Plans and their participants was approved in November 2004. At the time, this represented the largest recovery received in a company stock ERISA class action.

*In re Honeywell International ERISA Litigation,*
*No. 03-1214 (DRD) (D.N.J. 2004):*
SBTK is serving as Lead Counsel in a breach of fiduciary duty case under ERISA against Honeywell International, Inc. and certain fiduciaries of Honeywell pension plans. The suit alleges that Honeywell and the individual fiduciary defendants, allowed Honeywell's 401(k) plans and their participants to imprudently invest significant assets in company stock, despite that defendants knew, or should have known, that Honeywell's stock was an imprudent investment due to undisclosed, wide-ranging problems stemming from a consummated merger with Allied Signal and a failed merger with General Electric. A settlement f plaintiffs' claims, which includes a $14 million payment to the plans and their affected participants, and significant structural relief affording participants much greater leeway in diversifying their retirement savings portfolios, is currently pending court approval.

*In re Remeron Antitrust Litigation,*
*No. 02-CV-2007 (D.N.J. 2004):*
SBTK is Co-Lead Counsel in an action challenging Organon, Inc.'s filing of certain patents and patent infringement lawsuits as an abuse of the Hatch-Waxman Act, and an effort to unlawfully extend their monopoly in the market for Remeron. Specifically, the lawsuit alleges that defendants violated state and federal antitrust laws in their efforts to keep competing products from entering the market, and seeks damages sustained by consumers and third-party payors. After lengthy litigation, including numerous motions and over 50 depositions, the matter settled for $36 million. The settlement is pending final approval by the court.

*Henry v. Sears, et al.,*
*Case No. 98 C 4110 (N.D. Ill. 1999):*
The firm served as Co-Lead Counsel for one of the largest consumer class actions in history, consisting of approximately 11 million Sears credit card holders whose interest rates were improperly increased in connection with the transfer of the credit card accounts to a national bank. SBTK successfully negotiated a settlement representing approximately 66% of all class members' damages, thereby providing a total benefit exceeding $156 million. All $156 million was distributed automatically to the Class members, without the filing of a single proof of claim form. In approving the settlement, the District Court stated: ". . . I am pleased to approve the settlement. I think it does the best that could be done under the circumstances on behalf of the class. . . . The litigation was complex in both liability and damages and required both professional skill and standing which class counsel demonstrated in abundance."

*Jordan v. State Farm Insurance Company,*
*Case No. 97 CH 11 (Cir. Ct., McLean County, Ill. 1998):*
Plaintiffs alleged that State Farm had engaged in fraudulent sales practices known as "churning," and marketing and selling "vanishing premium" policies that do not actually "vanish." After several years of discovery, motion practice and settlement negotiations, SBTK, as Liaison Counsel, successfully resolved the action for $225 million in cash, dividend enhancements and other monetary benefits for current and former State Farm policyholders.

*In re Liberate Technologies Securities Litigation,*
*No. C-02-5017 (MJJ) (N.D. Cal. 2005):*
Plaintiffs alleged that Liberate engaged in fraudulent revenue recognition practices to artificially inflate the price of its stock, ultimately forcing it to restate its earnings. As sole Lead Counsel, SBTK successfully negotiated a $13.8 million settlement, which represents almost 40% of the damages suffered by the class. In approving the settlement, the district court complimented Lead Counsel for its "extremely credible and competent job."

*In re InfoSpace, Inc. Securities Litigation,*
*Master File No. C-01-0913-Z (D. Wash. 2001):*
SBTK served as Co-Lead Counsel on behalf of plaintiffs alleging that InfoSpace and certain of its officers and directors overstated revenues by using improper accounting methods, overstated the demand for InfoSpace's wireless services, misstated InfoSpace's financial relationships with major customers, and falsely represented that InfoSpace would receive subscription fees from users of web-enabled cell phones. After two years of hard-fought litigation and complex mediation, a settlement of $34.3 million was obtained for members of the class.

*In re Riverstone Networks, Inc. Securities Litigation,*
*Case No. CV-02-3581 (N.D. Cal. 2002):*
SBTK served as sole lead counsel on behalf of plaintiffs alleging that Riverstone and certain of its officers and directors sought to create the impression that the Company, despite the industry-wide downturn in the telecom sector, had the ability to prosper and succeed and was actually prospering. In that regard, plaintiffs alleged that defendants issued a series of false and misleading statements concerning the Company's financial condition, sales and prospects, and used inside information to personally profit. After extensive litigation, the parties entered into formal mediation with the Honorable Charles Legge (Ret.). Following five months of mediation, the parties reached a settlement of $18.5 million which has been preliminarily approved by the Court.

*In re Assisted Living Concepts, Inc. Securities Litigation,*
*Lead Case No. 99-167-AA (D. Or. 1999):*
SBTK served as Co-Lead Counsel and was instrumental in obtaining a $30 million recovery for class members from the Company, its executive officers and directors, and several underwriters for their role in an alleged complex accounting fraud involving the use of a purportedly independent joint venture to absorb the Company's start-up losses. Even after this $30 million recovery, through counsel's efforts, an additional $12.5 million was obtained from the auditors providing for a total recovery of $42.5 million.

*Wanstrath v. Doctor R. Crants, et al.,*
*No. 99-1719-111 (Tenn. Chan. Ct., 20th Judicial District, 1999):*
SBTK served as Lead Counsel in a derivative action filed against the officers and directors of Prison Realty Trust, Inc., challenging the transfer of assets from the Company to a private entity owned by several of the Company's top insiders. Numerous federal securities class actions were pending against the Company at this time. Through the derivative litigation, the Company's top management was ousted, the composition of the Board of Directors was significantly improved, and important corporate governance provisions were put in place to prevent future abuse. Mr. Schiffrin, in addition to achieving these desirable results, was able to personally effectuate a global settlement of all pending litigation against the backdrop of an almost certain bankruptcy. The case was resolved in conjunction with the federal securities cases for the payment of approximately $50 million by the Company's insurers and the issuance of over 46 million shares to the class members.

*In re Cumulus Media Inc. Securities Litigation,*
*Lead Case No. 00-C-391 E.D. Wis. 2000):*
SBTK served as Lead Counsel and successfully litigated the action and negotiated a settlement of $13 million in cash and 240,000 shares of freely tradable stock in Cumulus Media, which traded for approximately $19 per share, for a total settlement value of $17.5 million at the time the settlement was approved by the Court.

# PARTNERS

**RICHARD S. SCHIFFRIN**, founding partner of the firm, is licensed to practice law in Illinois and Pennsylvania, and has been admitted to practice before numerous United States District Courts. In his seven years of practice with the Office of the Public Defender of Cook County, Illinois, Mr. Schiffrin represented hundreds of clients in both bench and jury trials, as well as appeals. Mr. Schiffrin has also taught legal writing and appellate advocacy at John Marshall Law School and has served as a faculty member at numerous legal seminars, including the Annual Institute on Securities Regulation, NERA: Finance, Law & Economics — Securities Litigation Seminar, the Tulane Corporate Law Institute, and the CityBar Center for CLE (NYC): Ethical Issues in the Practice of Securities Law.

Most recently, Mr. Schiffrin spoke at the MultiPensions 2005 Conference in Amsterdam, Netherlands; the Public Funds Symposium 2005 in Washington, D.C.; the European Pension Symposium in Florence, Italy; and the *Pennsylvania Public Employees Retirement Summit (PAPERS)* in Harrisburg, Pennsylvania. Mr. Schiffrin oversees all aspects of litigation on behalf of the firm. Mr. Schiffrin has been recognized for his expertise in numerous cases, including most prominently:

*In re Tenet Healthcare Corp., 02-CV-8462 (C.D. Cal.):*

Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel on behalf of plaintiffs, alleging that Tenet Healthcare and certain of its officers and directors defrauded Medicare out of hundreds of millions of dollars, materially overstated Tenet's revenues, and performed unnecessary cardiac surgeries to increase the Company's earnings. After three years of hard-fought litigation and complex mediation, Schiffrin Barroway Topaz & Kessler helped obtain a settlement involving a $216.5 million payment from Tenet and the Company's former CEO and COO, and specific corporate governance improvements.

*In re AremisSoft Corp. Securities Litigation, C.A. No. 01-CV-2486 (D.N.J. 2002):*

Schiffrin Barroway Topaz & Kessler is particularly proud of the results achieved in this case before the Honorable Joel A. Pisano. This case was exceedingly complicated, as it involved the embezzlement of hundreds of millions of dollars by former officers of the Company, some of whom remain fugitives. In settling the action, Schiffrin Barroway Topaz & Kessler, as sole Lead Counsel, assisted in reorganizing the Company as a new Company which allowed for it to continue operations, while successfully separating out the securities fraud claims and the bankrupt Company's claims into a litigation trust. The Settlement, approved by the court, enabled the class to receive the majority of the equity in the new Company, as well as their pro rata share of all amounts recovered by the litigation trust. The court-appointed co-trustees, Joseph P. LaSala, Esq. and Fred S. Zeidman, retained Schiffrin Barroway Topaz & Kessler to further assist with prosecuting the actions on behalf of the litigation trust.

After filing an action in the Isle of Man, where the trust successfully froze more than $200 million of stolen funds from one of the fugitives, the trust achieved a settlement of this action for $200 million, which was returned to the United States and paid to the trust. Recently, the trust commenced another action in Cyprus, where it obtained a Mareva injunction and interim ancillary relief against bank accounts and assets owned and/or controlled by the other principal wrongdoer.

Thus far, counsel on behalf of the trust and its beneficiaries have achieved settlements with the Company and certain of its directors and officers as well as the Company's auditors, lawyer and underwriters, for a total of more than $250 million. The beneficiaries of the trust have already received in excess of 28% of their recognized losses.

*Henry v. Sears, et al., Case No. 98 C 4110 (N.D. Ill. 1999):*

Schiffrin Barroway Topaz & Kessler served as Lead Counsel on behalf of the largest class of credit card holders in history. At stake was the right of Sears and its newly formed affiliate, Sears National Bank ("SNB"), to retroactively increase the interest rates on eleven million credit card accounts with outstanding balances resulting from purchases made prior to the accounts being transferred to SNB. Schiffrin Barroway Topaz & Kessler alleged that such conduct violated the Truth-in-Lending Act, the National Banking Act and state consumer fraud statutes. After extensively litigating various aspects of liability, an additional nine months were then spent determining damages. The extraordinary complexity of the damage calculations required Mr. Schiffrin and experts from both parties to develop, test and utilize a novel computer model to ascertain total damages for the class and individualized damages for each class member. Ultimately, Mr. Schiffrin and his partner, Mr. Kessler, were able to negotiate a $156 million settlement, which represented approximately 66% of total damages. In approving the settlement, District Court Judge Leinenwebber of the Northern District of Illinois stated:

*. . . I am pleased to approve the settlement. I think it does the best that could be done under the circumstances on behalf of the class. . . . The litigation was complex in both liability and damages and required both professional skill and standing which class counsel demonstrated in abundance.*

The entire settlement fund of $156 million was distributed without the filing of a single proof of claim form by any class member.

### *Wanstrath v. Doctor R. Crants, et al., C.A. No. 99-1719-III (Tenn. Chan. Ct., 20th Judicial District, 1999):*

Schiffrin Barroway Topaz & Kessler served as Lead Counsel in a derivative action filed against the officers and directors of Prison Realty Trust, Inc., challenging the transfer of assets from the Company to a private entity owned by several of the Company's top insiders. Numerous federal securities class actions were pending against the Company at this time. Through the derivative litigation, the Company's top management was ousted, the composition of the Board of Directors was significantly improved and important corporate governance provisions were put in place to prevent future abuse. Mr. Schiffrin, in addition to achieving these desirable results, was able to personally effectuate a global settlement of all pending litigation against the backdrop of an almost certain bankruptcy. The case was resolved in conjunction with the federal securities cases for the payment of approximately $50 million by the Company's insurers and the issuance of over 46 million shares to the class members.

### *Jordan v. State Farm Insurance Company, Case No. 97 CH 11 (Cir. Ct., McLean County, Ill. 1998):*

Schiffrin Barroway Topaz & Kessler brought a claim on behalf of multiple plaintiffs alleging that State Farm had engaged in fraudulent sales practices by "churning" policies and marketing and selling "vanishing premium" policies that never "vanished." After several years of discovery, motion practice and settlement negotiations, Mr. Schiffrin played a critical role in resolving the action for $225 million in cash, dividend enhancements and other monetary benefits for current and former State Farm policyholders. Schiffrin Barroway Topaz & Kessler also has achieved substantial settlements in 20 additional cases alleging fraudulent sales practices by various insurance companies.

Mr. Schiffrin has also represented defrauded shareholders and companies in complex class and derivative actions, including the following:

### *Huscher v. Curley, et al., No. 00 Civ. 21379 (Mich. Cir. Ct., 2000) (In re Sotheby's Holdings, Inc. Derivative Litigation):*

Schiffrin Barroway Topaz & Kessler served as Lead Counsel in a derivative action arising out of Sotheby's alleged antitrust price fixing conspiracy with auction house rival Christie's International PLC. A multi-million dollar settlement was negotiated by Mr. Schiffrin whereby Diana Brooks (Sotheby's President at the time of the alleged wrongdoing) agreed to relinquish all of her Sotheby's stock options, and the Company's insurance carrier made a substantial monetary payment to the Company. In addition, significant changes in the Company's top management and Board of Directors were achieved in conjunction with the settlement of the litigation.

**ANDREW L. BARROWAY**, managing partner of the firm, received his law degree from the University of Pennsylvania Law School, where he was a member of the ABA Negotiation team. He is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania. Mr. Barroway frequently lectures on securities class action and lead plaintiff issues, and recently spoke at the 2005 Institutional Investor Hedge Fund Workshop in New York City and the Public Funds Summit 2005 in Phoenix, Arizona. Mr. Barroway has been actively involved in all aspects of litigation on behalf of the firm, and co-manages the firm's securities department. Of his numerous successful representations of shareholders, the following stand out as exceptional:

*In re The Interpublic Group of Companies Securities Litigation, No. 02 Civ. 6527 (S.D.N.Y. 2002):*

Schiffrin Barroway Topaz & Kessler served as sole Lead Counsel in this action on behalf of an institutional investor and recently received final approval of a settlement consisting of $20 million in cash and 6,551,725 shares of IPG common stock. As of February 2005, the stock had an approximate value of $87 million, resulting in a total settlement value of approximately $107 million. In granting its approval, the Court praised Schiffrin Barroway Topaz & Kessler for acting responsibly and noted the firm's professionalism, competence and contribution to achieving such a favorable result.

*In re Digital Lightwave, Inc. Securities Litigation, Consolidated Case No. 98-152-CIV-T-24E (M.D. Fla. 1999):*

The firm served as Co-Lead Counsel in one of the nation's most successful securities class actions. After extensive litigation and negotiations, a settlement consisting primarily of stock ultimately grew to a value of over $170 million between the time in which the settlement was negotiated and the time at which it was distributed. Schiffrin Barroway Topaz & Kessler took on the primary role in negotiating the terms of the equity component, insisting that the class have the right to share in any upward appreciation in the value of the stock after the settlement was reached. This recovery represented an astounding approximately two hundred percent (200%) of class members' losses. Schiffrin Barroway Topaz & Kessler believes that this represents the largest percentage recovery for shareholders in securities class action history.

Mr. Barroway, along with his partner, Mr. Kessler, has also negotiated substantial settlements of securities class actions in which Schiffrin Barroway Topaz & Kessler was Lead or Co-Lead Counsel against Pinnacle Holdings, Cell Pathways, Gateway, Mercator and NetSolve. Mr. Barroway currently represents numerous public pension funds, private investment funds, money management firms, and individuals in securities fraud litigation as Lead or Co-Lead Counsel.

**MARC A. TOPAZ**, a senior partner of the firm, received his law degree from Temple University School of Law, where he was an editor of the Temple Law Review and a member of the Moot Court Honor Society. He also received his Master of Law (L.L.M.) in taxation from the New York University School of Law, where he served as an editor of the New York University Tax Law Review. He is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania. Mr. Topaz manages the firm's derivative, transactional and antitrust departments. In this regard, Mr. Topaz has been actively involved in litigating the following prominent cases:

*In re MTC Electronic Shareholder Litigation, No. CV-93-0876 (E.D.N.Y. 1993):*

Schiffrin Barroway Topaz & Kessler served as Co-Counsel in a case involving securities fraud by MTC, its officers and directors, underwriters and accountants. The case presented novel issues of Chinese law, and required the construction of a database of hundreds of thousands of documents utilized in numerous party and non-party depositions. A $72 million settlement was achieved on the eve of trial.

### *In re Oppenheimer Capital, L.P., Unitholders Litigation, Consolidated No. 16022NC (Del. Ch. 1997):*

Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel on behalf of plaintiffs alleging that a merger proposed by Pimco Advisors benefitted certain Pimco insiders by disproportionately allocating tax benefits achieved from the restructuring of a limited partnership, and failing to provide adequate compensation to the Oppenheimer shareholders. Plaintiffs moved to enjoin the transaction and a settlement was reached whereby defendants agreed to pay a special dividend to Oppenheimer limited partners of approximately $16 million.

### *Wanstrath v. Doctor R. Crants, et al., C.A. No. 99-1719-III (Tenn. Chan. Ct., 20th Judicial District, 1999):*

Schiffrin Barroway Topaz & Kessler served as Lead Counsel in a derivative action filed against the officers and directors of Prison Realty Trust, Inc., challenging the transfer of assets from the Company to a private entity owned by several of the Company's top insiders. Numerous federal securities class actions were pending against the Company at this time. Through the derivative litigation, the Company's top management was ousted, the composition of the Board of Directors was significantly improved and important corporate governance provisions were put in place to prevent future abuse. Mr. Schiffrin, in addition to achieving these desirable results, was able to personally effectuate a global settlement of all pending litigation against the backdrop of an almost certain bankruptcy. The case was resolved in conjunction with the federal securities cases for the payment of approximately $50 million by the Company's insurers and the issuance of over 46 million shares to the class members.

**DAVID KESSLER**, a senior partner of the firm, graduated with distinction from the Emory School of Law. He is licensed to practice in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania and the United States District Court for the District of New Jersey. Prior to practicing law, Mr. Kessler was a Certified Public Accountant in Pennsylvania. Mr. Kessler co-manages the firm's nationally recognized securities department. In addition, Mr. Kessler often lectures on securities litigation and was a featured speaker on hot topics in securities litigation in a seminar entitled "The Explosion and Evolution of Class Action Law" in December 2004 in Philadelphia, Pennsylvania, and the Corporate Governance Summit on Corporate Accountability in July 2003 in New York City. Mr. Kessler has achieved the following outstanding results in federal securities cases:

### *In re Initial Public Offering Securities Litigation, Master File No. 21 MC 92 (SAS) (S.D.N.Y. Dec. 12, 2002):*

Mr. Kessler, along with Mr. Schiffrin, is presently heading up the firm's litigation efforts in its prominent position as an Executive Committee member in this action. Of the sixty plaintiffs firms which originally filed actions in these coordinated proceedings, Schiffrin Barroway Topaz & Kessler was one of only six selected to serve on the Executive Committee. The coordinated actions, which have been filed against 309 separate issuers of publicly traded securities,

challenge the legality of the practices which accompany the allocations of shares in initial public offerings. In addition to suing the issuers of such securities, the 309 coordinated actions also name as defendants the primary investment banking firms which underwrote the offerings. This case, which has received a great deal of national and international media attention, is widely considered the largest securities class action litigation in history. At the present time, the court has preliminarily approved a $1 billion settlement with the issuers and their officers and directors. The class has also reached an agreement in principle to resolve the action against JP Morgan for $425 million, which is in the process of being memorialized and submitted to the Court for approval. The case is proceeding against the remaining underwriting defendants.

### *In re PNC Financial Services Group, Inc. Litigation, Case No. 02-CV-271 (W.D. Pa. 2002):*

Schiffrin Barroway Topaz & Kessler served as Co-Lease Counsel and was instrumental in opbtaining a $30 million recovery for class members from PNC and the assignment of certain claims it may have had against its audit and other third party law firms and insurance companies, with respect to an alleged fraudulent scheme wherein non-performing assets were removed from PNC's books and transferred to special purpose entities that PNC allegedly still controlled. An additional $6.6 million was recovered from the insurance company and the law firms and an agreement in the principle has now been reached with the audit to resolve all claims for another $9.075 million, providing for a total recovery from the securities litigation of $45.675 million upon approval of the auditor settlement. When coupled with the $156 million restitution fund established through government actions against some of the same defendants and third parties, the total recovery for class members exceeds $200 million.

### *In re Assisted Living Concepts, Inc. Securities Litigation, Lead Case No. 99-167-AA (D. Or. 1999):*

Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel and was instrumental in obtaining a $30 million recovery for class members from the Company, its executive officers and directors, and several underwriters for their role in an alleged complex accounting fraud involving the use of a purportedly independent joint venture to absorb the Company's startup losses. Even after this $30 million recovery, through counsel's efforts, an additional $12.5 million was obtained from the auditors providing for a total recovery of $42.5 million.

### *In re Cumulus Media Inc. Securities Litigation, Lead Case No. 00-C-391 (E.D. Wis. 2000):*

Schiffrin Barroway Topaz & Kessler served as Lead Counsel and successfully litigated the action and negotiated a settlement of $13 million in cash and 240,000 shares of freely tradable stock in Cumulus Media, which traded for approximately $19 per share, for a total settlement value of $17.5 million at the time the settlement was approved by the Court.

**KATHARINE M. RYAN,** a partner of the firm, graduated *cum laude* from Villanova University School of Law in May 1984. Ms. Ryan is admitted to practice before the United States District Court for the Eastern District of Pennsylvania, the Court of Appeals for the Third Circuit and the United States Supreme Court. Ms. Ryan recently participated as a speaker in a legal teleconference entitled "Is the PSLRA's Safe Harbor Provision Safe?" Ms. Ryan is actively involved in litigating several of the firm's most prominent cases and was integral in the excellent results achieved in the following cases:

*In re The Interpublic Group of Companies Securities Litigation, No. 02 Civ. 6527 (S.D.N.Y. 2002):*

Schiffrin Barroway Topaz & Kessler served as sole Lead Counsel in this action on behalf of an institutional investor and recently received final approval of a settlement consisting of $20 million in cash and 6,551,725 shares of IPG common stock. As of February 2005, the stock had an approximate value of $87 million, resulting in a total settlement value of approximately $107 million. In granting its approval, the Court praised Schiffrin Barroway Topaz & Kessler for acting responsibly and noted the firm's professionalism, competence and contribution to achieving such a favorable result.

*In re New Power Holdings, Inc. Securities Litigation, No. 02 Civ. 1550 (S.D.N.Y. 2002):*

Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel and was instrumental in obtaining a recovery of $41 million in cash for class members against a bankrupt company, certain of its officers and directors and the underwriters of the Company's offering. Claims involved New Power, an offshoot of Enron, that was formed to re-enter the deregulated energy market and pursued an IPO with no viable plan to hedge against volatile energy prices.

**STUART L. BERMAN**, a partner of the firm, received his law degree from George Washington University National Law Center, and his undergraduate degree from Brandeis University. He is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania and the United States District Court for the District of New Jersey. Mr. Berman manages the firm's lead plaintiff department and has been instrumental in courts appointing many of the firm's institutional and individual clients as lead plaintiffs in important cases, such as:

*In re Tenet Healthcare Corp. Securities Litigation, No. CV-02-8462- RSWL (C.D. Cal. 2002),*

*State of New Jersey and its Division of Investment v. Sprint Corporation, et al., No. 2:03-CV-02071-JWL (D. Kan. 2003),*

*In re The Interpublic Group of Companies Securities Litigation, No. 02 Civ. 6527 (S.D.N.Y. 2002), State of New Jersey and Its Division of Investment v. Sprint Corporation, et al., No. 03-2071-JWL (D. Kan. 2003),*

*In re Delphi Corp. Sec. Litig., 1:05-CV-2637 (NRB) (S.D.N.Y. 2005);*

*In re Vaxgen Inc. Securities Litigation, No. C 03-01129 JSW (N.D. Cal. 2003),*

*In re American Business Financial Services, Inc., No. 04- 0265 (E.D. Pa. 2004)*

*In re Autobytel, Inc. Securities Litigation, No. CV04-8987 MMM (JWJx) (C.D. Cal. 2004).*

Mr. Berman represents and works with institutional investors worldwide in securities litigation and other related matters. In addition, Mr. Berman is a frequent speaker on securities issues, especially as they relate to institutional investors, and has been a speaker at such events as The European Pension Symposium in Florence, Italy; the Public Funds Symposium 2005 in Washington, D.C.; the Pennsylvania Public Employees Retirement (PAPERS) Summit in

Harrisburg, Pennsylvania; and the New England Pension Summit in Newport, Rhode Island; the Rights and Responsibilities for Institutional Investors 2006 in Amsterdam, Netherlands; and the European Investment Roundtable 2006 in Barcelona, Spain. He speaks with institutional investors located around the world regarding their rights and obligations associated with securities fraud class actions and individual actions. Mr. Berman works closely with the firm's institutional investors and counsels them on fulfilling their fiduciary obligations and exercising their rights in all types of securities related actions.

Mr. Berman has specialized in the area of securities litigation for the past nine years. He is particularly proud of the results achieved in In re AremisSoft Corp. Sec. Litig., C.A. No. 01-CV-2486 (D.N.J. 2002), a case on which Mr. Berman and his partner, Richard Schiffrin, have worked extensively. This case was exceedingly complicated, as it involved the embezzlement of hundreds of millions of dollars by former officers of the Company, some of whom are now fugitives. In settling the action, Schiffrin Barroway Topaz & Kessler, as sole Lead Counsel, assisted in reorganizing AremisSoft as a new Company which allowed for it to continue operations, while successfully separating out the securities fraud claims and the bankrupt Company's claims into a litigation trust. The Settlement, which was approved by the Court, called for the class to receive the majority of the equity in the new Company, as well as their pro rata share of all amounts recovered by the litigation trust. The Court-appointed co-trustees, Joseph P. LaSala, Esq. and Fred S. Zeidman, retained Schiffrin Barroway Topaz & Kessler to continue prosecuting the actions on behalf of the litigation trust. After extensive litigation in the Isle of Man, including the successful freezing of more than $200 million of stolen funds, the trust recently settled its action against one of the principal wrongdoers and recovered approximately $200 million. Thus far, the trust has distributed to beneficiaries of the trust more than 28% of their recognized losses (excluding the value of the equity of the new Company), and is poised to recover even more. Recently, the trust commenced further litigation in Cyprus, where it obtained a Mareva injunction and interim ancillary relief against bank accounts and assets owned and/or controlled by the other principal wrongdoer.

**GREGORY M. CASTALDO**, a partner of the firm, received his law degree from Loyola Law School, where he received the American Jurisprudence award in legal writing. He received his undergraduate degree from the Wharton School of Business at the University of Pennsylvania. He is licensed to practice law in Pennsylvania and New Jersey. Mr. Castaldo has been actively involved in litigating the following cases:

*In re Tenet Healthcare Corp., 02-CV-8462 (C.D. Cal.):*

Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel on behalf of plaintiffs, alleging that Tenet Healthcare and certain of its officers and directors defrauded Medicare out of hundreds of millions of dollars, materially overstated Tenet's revenues, and performed unnecessary cardiac surgeries to increase the Company's earnings. After three years of hard-fought litigation and complex mediation, Schiffrin Barroway Topaz & Kessler helped obtain a settlement involving a $216.5 million payment from Tenet and the Company's former CEO and COO, and specific corporate governance improvements.

*In re Liberate Technologies Securities Litigation, No. C-02-5017 (MJJ) (N.D. Cal. 2005):*

Plaintiffs alleged that Liberate engaged in fraudulent revenue recognition practices to artificially inflate the price of its stock, ultimately forcing it to restate its earning. As sole Lead Counsel, Schiffrin Barroway Topaz & Kessler successfully negotiated a $13.8 million settlement, which

represents almost 40% of the damages suffered by the class. In approving the settlement, the district court complimented Lead Counsel for its "extremely credible and competent job."

### *In re Sodexho Marriott Shareholders Litigation,*

Consol. C.A. No. 18640-NC, Delaware Chancery Court, in which Class Counsel was partially responsible for creating an aggregate financial benefit of approximately $166 million for members of the class.

Mr. Castaldo is also presently *State of New Jersey and Its Division of Investment v. Sprint Corporation, et al.,* No. 03-2071-JWL (D. Kan. 2003) among other actions.

**MICHAEL K. YARNOFF**, a partner of the firm, received his law degree from Widener University School of Law. Mr. Yarnoff is licensed to practice law in Pennsylvania, New Jersey, and Delaware and has been admitted to practice before the United States District Courts for the Eastern District of Pennsylvania and the District of New Jersey. He serves in the firm's securities litigation department and has been actively involved in a number of federal securities cases in which outstanding results were achieved, including the following:

### *In re CVS Corporation Securities Litigation, C.A. No. 01-11464 JLT (D.Mass.):*

After more than three years of contentious litigation and a series of protracted mediation sessions, Schiffrin Barroway Topaz & Kessler, LLP, serving as co-lead counsel, secured a $110 million recovery for class members in the CVS Securities Litigation. Specifically, the suit alleged that CVS violated accounting practices by delaying discounts on merchandise in an effort to prop up its earnings. In addition, the suit charged that in 2001, the Company and its Chief Executive Officer, Thomas M. Ryan, improperly delayed announcement of its intention to close approximately 200 underperforming stores, and that an industry-wide pharmacist shortage would have a materially negative impact on the Company's performance. Settlement was reached just days prior to the commencement of trial, and shortly after the district court had denied the defendants' motions for summary judgment. This substantial recovery, which represents the third-largest settlement in a securities class action case in the First Circuit, received final approval from District Judge Joseph Tauro on September 27, 2004.

### *In re InfoSpace, Inc. Securities Litigation, Master File No. C-01-0913-Z (D. Wash. 2001):*

Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel on behalf of plaintiffs alleging that InfoSpace and certain of its officers and directors overstated revenues by using improper accounting methods, overstated the demand for InfoSpace's wireless services, misstated InfoSpace's financial relationships with major customers, and falsely represented that InfoSpace would receive subscription fees from users of web-enabled cell phones. After two years of hard-fought litigation and complex mediation, a settlement of $34.3 million was obtained for members of the class.

### *In re Riverstone Networks, Inc. Securities Litigation, Case No. CV-02-3581 (N.D. Cal. 2002):*

Schiffrin Barroway Topaz & Kessler served as Lead Counsel on behalf of plaintiffs alleging that Riverstone and certain of its officers and directors sought to create the impression that the Company, despite the industry-wide downturn in the telecom sector, had the ability to prosper and succeed and was actually prospering. In that regard, plaintiffs alleged that defendants issued a series of false and misleading statements concerning the Company's financial condition, sales

and prospects, and used inside information to personally profit. After extensive litigation, the parties entered into formal mediation with the Honorable Charles Legge (Ret.). Following five-months of mediation, the parties reached a settlement of $18.5 million.

**JOSEPH MELTZER**, a partner of the firm, concentrates his practice in the areas of ERISA and antitrust complex litigation. He is licensed to practice law in Pennsylvania and New Jersey and is admitted to practice before numerous United States District Courts and United States Courts of Appeals, including the United States Court of Appeals for the Third Circuit.

Mr. Meltzer manages the firm's ERISA Litigation Department, which has excelled in the highly specialized area of prosecuting claims on behalf of retirement savings plans. Mr. Meltzer is lead counsel in several pending nationwide class actions brought under ERISA, including *Lewis v. El Paso Corp.* (S.D. Tex.); *In re Sears, Roebuck & Co. ERISA Litigation* (N.D. Ill.); *In re Loral Space ERISA Litigation* (S.D.N.Y.) and *In re Schering-Plough Corp. ERISA Litig.*, where the firm obtained an important ruling from the Third Circuit reversing the District Court's dismissal and confirming the rights of pension plan participants to pursue these claims. *See* 420 F.3d 231, *amended by* No. 04-CV-3073, 2005 U.S. App. LEXIS 19826 (3d Cir., Sept. 15, 2005). He is a frequent lecturer on ERISA litigation and employee benefits issues, is a member of the ABA's Section Committee on Employee Benefits and has been recognized by numerous courts for his ability and expertise in this complex area of the law. Since helping to establish the ERISA Litigation Department, Mr. Meltzer has recovered well over $250 million for retirement plan participants, including in the following prominent cases:

*In re AOL Time Warner ERISA Litig.*, C.A. No. 02-8853 (S.D.N.Y.): The firm served as Co-Lead Counsel in one of the most successful ERISA class actions. Following extensive litigation, including motions for summary judgment, Mr. Meltzer helped negotiate a settlement of $100 million for a class of retirement plan participants. To date, this is the second largest settlement for a case of this type and the largest in a case involving a non-bankrupt company.

*In re Global Crossing Ltd. ERISA Litig.*, No. 02-7453 (S.D.N.Y.): The firm served as Co-Lead Counsel in one of the earliest ERISA class actions involving employer securities and seeking relief under ERISA sec. 502(a)(2). After extensive litigation and complex negotiations, the firm helped secure a recovery of over $78 million for retirees whose nest eggs were badly impacted by the collapse of Global Crossing.

Mr. Meltzer also manages the firm's Antitrust Department and serves as lead counsel in numerous nationwide antitrust actions where he represents such clients as the Pennsylvania Turnpike Commission, the Southeastern Pennsylvania Transportation Authority (SEPTA) and the Sidney Hillman Health Center of Rochester. As lead counsel, he has helped obtain several multi-million dollar settlements, including settlements in *In re Remeron Antitrust Litigation*, 02-CV-2007 (D.N.J.) ($36 million settlement) and *In re Augmentin Antitrust Litigation*, 02-442 (E.D. Va.) ($29 million settlement). Mr. Meltzer also lectures on issues related to antitrust litigation and is a member of the ABA's Section Committee on Antitrust Law.

In addition to the ERISA Litigation and Antitrust Departments, Mr. Meltzer manages the firm's Consumer Fraud Department. An honors graduate of the University of Maryland, he received his law degree with honors from Temple University School of Law. Prior to joining Schiffrin & Barroway, Mr. Meltzer practiced at Barrack, Rodos & Bacine in Philadelphia, where he had prominent roles in prosecuting several complex class actions to successful conclusions and also defended clients in antitrust and commercial litigation.

**DARREN J. CHECK**, a partner of the firm, concentrates his practice in the area of securities litigation and institutional investor relations. He is a graduate of Franklin & Marshall College where he received a degree in History, *with honors*. Mr. Check received his law degree from Temple University School of Law and is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania, the United States District Court for the District of New Jersey, and the United States District Court for the District of Colorado. Mr. Check began his career at Schiffrin Barroway Topaz & Kessler by working extensively with partner David Kessler on In re Initial Public Offering Securities Litigation, No. 21 MC 92 (SAS) (S.D.N.Y. Dec. 12, 2002), widely considered the largest securities class action in history.

Currently, Mr. Check concentrates his time as the firm's Director of Institutional Relations. He consults with institutional investors from around the world regarding their rights and responsibilities with respect to their investments and taking an active role in shareholder litigation. Mr. Check assists clients in evaluating what systems they have in place to identify and monitor shareholder litigation that has an affect on their investments, and also assists them in evaluating the strength of such cases and to what extent they may be affected by the conduct that has been alleged. He currently works with clients in the U.S., Canada, United Kingdom, France, Italy, Sweden, Denmark, Finland, Norway, Germany, Austria, and the Netherlands. Mr. Check regularly speaks on the subjects of shareholder litigation, corporate governance, investor activism, and how Schiffrin Barroway Topaz & Kessler's services can be of use to investors. Recently, Mr. Check spoke at the MultiPensions 2005 Conference in Amsterdam, Netherlands; the 2005 European Pension Symposium in Florence, Italy; the Public Funds Summit 2005 in Phoenix, Arizona; the European Investment Roundtable in Barcelona, Spain; The Rights & Responsibilities Of Institutional Investors: European and U.S. Approaches To Active Ownership in Amsterdam, Netherlands; the Corporate Governance & Responsible Investment Summit, Stockholm, Sweden; Pension Fund Investment World – Germany in Frankfurt, Germany; and the 2007 European Pension Symposium in Lisbon, Portugal.

**ANDREW L. ZIVITZ**, a partner of the firm, received his law degree from Duke University School of Law, and received a Bachelor of Arts degree, with distinction, from the University of Michigan, Ann Arbor. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Zivitz practiced with the Philadelphia law firms of Klehr, Harrison, Harvey, Branzburg & Ellers, LLP and Drinker Biddle & Reath, LLP, where he litigated complex commercial and environmental matters.

Mr. Zivitz is admitted to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania and the United States District Court for the District of New Jersey. Mr. Zivitz concentrates his practice in the area of securities litigation, and is Lead or Co-Lead Counsel in several of the largest class action securities cases currently pending nationwide. In addition, Mr. Zivitz has been actively involved in a number of federal securities cases in which outstanding results were achieved, including the following:

*In re Tenet Healthcare Corp., 02-CV-8462 (C.D.Cal.):*

Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel on behalf of plaintiffs, alleging that Tenet Healthcare and certain of its officers and directors defrauded Medicare out of hundreds of millions of dollars, materially overstated Tenet's revenues, and performed unnecessary cardiac surgeries to increase the Company's earnings. After three years of hard-

fought litigation and complex mediation, Schiffrin Barroway Topaz & Kessler helped obtain a settlement involving a $216.5 million payment from Tenet and the Company's former CEO and COO, and specific corporate governance improvements.

### In re Computer Associates, No. 02-CV-1226 (E.D.N.Y.):

Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel on behalf of plaintiffs, alleging that Computer Associates and certain of its officers misrepresented the health of the company's business, materially overstated the company's revenues, and engaged in illegal insider selling. After nearly two years of litigation, Schiffrin Barroway Topaz & Kessler helped obtain a settlement of $150 million from the company.

### In re McLeod USA Inc., No. C02-0001-MWB (N.D. Iowa):

Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel on behalf of plaintiffs, alleging that McLeod USA and certain of its officers misrepresented the health and prospects of the company's business. After more than three years of litigation, Schiffrin Barroway Topaz & Kessler helped obtain a settlement of $30 million from the defendants.

### In re Ligand Pharmaceuticals, Inc., 04-CV-1620-DMS (S.D. Cal):

Schiffrin Barroway Topaz & Kessler served as Lead Counsel and was instrumental in obtaining a recovery of $8.0 million for class members against Ligand Pharmaceuticals and certain of its officers. Plaintiffs brought claims against the defendants on the grounds that they touted the financial condition of the company and their ability to predict and monitor inventory returns when, in fact, the Company's revenues and earnings were artificially inflated and defendants had no ability to meaningfully predict or gauge inventory returns.

### In re Aon Corp., No. 02-CV-5631 (N.D. Ill.):

Schiffrin Barroway Topaz & Kessler served as Lead Counsel and was instrumental in obtaining a recovery of $7.25 million for class members against Aon Corp. and certain of its officers. Plaintiffs brought claims against the defendants on the grounds that they touted the prospects and successes of the company's multi-million dollar "Business Transformation Plan," when in fact they knew that the plan was damaging the company's business.

**SEAN M. HANDLER**, a partner of the firm, received his Bachelor of Arts degree from Colby College, graduating *with distinction* in American Studies. Mr. Handler then earned his Juris Doctor, *cum laude*, from Temple University School of Law.

After law school, Mr. Handler practiced labor law at Reed Smith, LLP in Philadelphia. Since joining Schiffrin Barroway Topaz & Kessler, Mr. Handler has concentrated his practice in the area of securities litigation, with a particular emphasis on client development, litigation strategy and lead plaintiff litigation. In this role, Mr. Handler has been responsible for numerous reported decisions.

In addition to these responsibilities, Mr. Handler also spends considerable time litigating ongoing securities litigation matters on behalf of institutional clients, including:

### In re Delphi Corporation Securities Litigation, No. 06-10026 (GER) (E.D. MI.)

*Smajlaj v. Brocade Communications Systems, Inc., et al., No. 05-cv-02042 (CRB) (N.D. Cal.)*

*State of New Jersey and Its Division of Investment v. Sprint Corporation, et al., No. 03-2071-JWL (D. Kan. 2003).*

**JOHN A. KEHOE**, a partner of the firm, received his B.A. from DePaul University, and an M.P.A., *with high honors*, from the University of Vermont. He earned his J.D., *magna cum laude*, from Syracuse University College of Law, where he was an Associate Editor of the Syracuse Law Review, Associate Member of the Moot Court Board, and Alternate Member of the National Appellate Team.

During his legal career, Mr. Kehoe has litigated high profile securities and antitrust actions in federal and state courts, including *Ohio Public Employees Retirement System et al. v. Freddie Mac et al.*, 03-CV-4261 (S.D.N.Y) (resulting in a $410 million combined class and derivative settlement); *In re Bristol-Myers Squibb Sec. Litig.*, 02-CV-2251 (S.D.N.Y) (resulting in a $300 million class settlement); *In re Adelphia Communications Corp. Sec. & Der. Litig.*, No. 03 MD 1529 (S.D.N.Y) ( resulting in a $460 million class settlement); and *In re Vitamins Antitrust Litig.*, MDL No. 1285 (D.D.C) (resulting in more than $2 billion in federal and state class and direct action settlements).

Mr. Kehoe is currently among the lead trial attorneys representing individual and institutional investors in 309 separate class actions that have been consolidated for pretrial purposes in *In re Initial Public Offering Sec. Litig.*, No. 21 MC 92 (S.D.N.Y.) ( resulting in over $1 billion in class settlements with additional claims pending against various underwriter defendants). He is also serving as lead or co-lead counsel in *Reynolds v. Repsol YPF S.A.*, 06-CV-00733 (S.D.N.Y.); *Mizzaro v. Home Depot Inc.*, 06-CV-1151 (N.D. Ga.); and *In re AremisSoft Corp. Sec. Litig.*, 01-CV-2486 (D.N.J).

Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Kehoe spent six years as an associate at Clifford Chance LLP, where he represented Fortune 500 corporations and their officers and directors in complex commercial litigation and in actions brought by the Department of Justice, the Securities and Exchange Commission and the Federal Trade Commission.

Mr. Kehoe is a member of the Association of the Bar of the City of New York and the New York Bar Association and is admitted to practice before the courts of New York State (1999) and the U.S. District Court for the Southern District of New York (2000).

**LEE D. RUDY**, a partner of the firm, received his law degree from Fordham University in 1996. In law school he was a senior editor of the Fordham Urban Law Journal and published *A Procedural Approach to Limited Public Forum Cases*, 22 Ford. Urb. L.J. 1255 (1995). He received his undergraduate degree, *cum laude*, from the University of Pennsylvania in 1992. Mr. Rudy is licensed to practice law in Pennsylvania and New York. From 1996 to 2002, Mr. Rudy was an Assistant District Attorney in the Manhattan District Attorney's Office, where he prosecuted dozens of felony jury trials to verdict. From 2003 to 2005, Mr. Rudy was an Assistant United States Attorney in the District of New Jersey, where he investigated and prosecuted numerous fraud and violent crime cases, and where he tried several major fraud cases to verdict in federal court. Mr. Rudy co-manages the firm's mergers and acquisition and shareholder derivative litigation department along with Marc Topaz and Eric Zagar.

**KAY E. SICKLES**, a partner of the firm, received her law degree from the University of Pennsylvania School of Law. She received her undergraduate degree from Colgate University, graduating, *with honors,* from the History department. Prior to joining the firm, Ms. Sickles was an associate with Sandals & Langer, LLP, where she litigated complex class actions arising out of violations of the ERISA and antitrust statutes. She is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the Ninth and Seventh Circuit Courts of Appeal, the United States District Court for the Eastern District of Pennsylvania, and the United States District Court for the District of New Jersey.

Ms. Sickles concentrates her practice in the area of securities litigation and specializes in settlement matters. She has played a lead role in effectuating some of the most significant settlements of securities class action in recent years, including the partial settlement with Tenet Healthcare Corp. and certain officer of that corporation for $216.5 million in *In re Tenet Healthcare Corp. Sec. Litig.,* No. CV-02-8462-RSWL (Rzx) (C.D. Ca. 2006); the settlement for cash and common stock worth over $90 million in *In re Interpublic Sec. Litig.,* Civ. 6527 (DLC) (S.D.N.Y. 2004); and the settlements for securities worth over $133.5 million in *In re Computer Associates Class Action Securities Litigation,* Master File No. 98 Civ. 4839 (TCP) and *In re Computer Associated 2002 Cass Action Securities Litigation,* Master File No., 02-CV-1226 (TCP) (E.D.N.Y.).

**ERIC L. ZAGAR**, a partner of the firm, received his law degree from the University of Michigan Law School, *cum laude,* where he was an Associate Editor of the Michigan Law Review. He has practiced law in Pennsylvania since 1995, and previously served as a law clerk to Justice Sandra Schultz Newman of the Pennsylvania Supreme Court. He is admitted to practice in Pennsylvania.

Mr. Zagar concentrates his practice in the area of shareholder derivative litigation. Mr. Zagar has served as Lead or Co-Lead counsel in numerous derivative actions in courts throughout the nation, including *David v. Wolfen,* Case No. 01- CC-03930 (Orange County, CA) (Broadcom Corp. Derivative Action); *In re PolyMedica Corporation Shareholder Derivative Litigation,* Case No. 01-3446 (Middlesex County, MA); *In Re Dynacq Int'l. Shareholder Derivative Litigation,* Case No. 2002- 07135 (Harris County, TX); and *Castillo v. Cavallaro, et al.,* Case No. A467663 (Clark County, NV) (Station Casinos, Inc. Class and Derivative Action). Mr. Zagar has successfully achieved significant monetary and corporate governance relief for the benefit of shareholders, and has extensive experience litigating matters involving Special Litigation Committees.

**EDWARD W. CIOLKO**, a partner of the firm, received his law degree from Georgetown University Law Center, and an MBA from the Yale School of Management. He is licensed to practice law in the State of New Jersey, and has been admitted to practice before the United States District Court for the District of New Jersey. Mr. Ciolko concentrates his practice in the areas of ERISA, Antitrust, RESPA and Consumer Protection.

Mr. Ciolko is counsel in several pending nationwide ERISA breach of fiduciary duty class actions, brought on behalf of retirement plans and their participants alleging, inter alia, imprudent investment of plan assets which caused significant losses to the retirement savings of tens of thousands of workers. These cases include: In re *Beazer Homes USA, Inc. ERISA Litig.,* 07-CV-00952-RWS (N.D. Ga.); *Nowak v. Ford Motor Co.,* 240 F.R.D. 355 (E.D. Mich.); *Gee v. UnumProvident Corp.,* 03-1552 (E.D. Tenn.); *Pettit v. JDS Uniphase Corp.* et al, C.A. No. 03-4743 (N.D. Ca.); *Hargrave v. TXU, et al.,* C.A. No. 02-2573 (N.D. Tex.); *Evans v. Akers,* C.A. No. 04-11380 (D. Mass); *Lewis v. El Paso Corp.* (S.D. Tex.); and In re *Schering-Plough Corp.*

*ERISA Litig.*, where the firm obtained an important ruling from the Third Circuit reversing the District Court's dismissal and confirming the rights of pension plan participants to pursue these claims. See 420 F.3d 231, amended by No. 04-CV-3073, 2005 U.S. App. LEXIS 19826 (3d Cir., Sept. 15, 2005). Mr. Ciolko's efforts have helped achieve a number of large recoveries for affected retirement plan participants. See, e.g., In re *Sears, Roebuck & Co. ERISA Litig.*, C.A. No. 02-8324 (N.D. Ill.)(SBTK helped obtain a $14.5 million recovery); In re *Honeywell Intern'l ERISA Litig.*, No. 03-CV-1214 (DRD) (D.N.J. 2004) (SBTK obtained a $14 million recovery as well as significant structural relief regarding the plan's administration and investment of its assets).

Mr. Ciolko has also concentrated part of his practice to the investigation and prosecution of pharmaceutical antitrust actions, medical device litigation, and related anticompetitive and unfair business practices. Specific examples include: *In re Wellbutrin SR Antitrust Litigation; In re Remeron End-Payor Antitrust Litigation; In re Modafinil Antitrust Litigation*; (involving brand name drug manufacturers' attempts to block entry of lower-priced generic alternatives through sham patent litigation or "payoffs" to generic manufacturers); *In re Medtronic, Inc. Implantable Defibrillator Litigation*; and *In re Guidant Corp. Implantable Defibrillator Litigation* ("end-payor" action against manufacturers of defective medical devices – pacemakers/implantable defibrillators -- for costs of removal and replacement).

Before coming to SBTK, Mr. Ciolko worked for two and one-half years as a Law Clerk and Attorney Advisor to Commissioner Sheila F. Anthony of the Federal Trade Commission ("FTC"). While at the FTC, Mr. Ciolko reviewed commission actions/investigations and counseled the Commissioner on a wide range of antitrust and consumer protection topics including, in pertinent part: the confluence of antitrust and intellectual property law; research and production of "Generic Drug Entry Prior to Patent Expiration: An FTC Study," and the prosecution of an administrative complaint against, among others, Schering- Plough Corporation regarding allegedly unlawful settlements of patent litigation which delayed entry of a generic alternative to a profitable potassium supplement (K-Dur).

## ASSOCIATES AND OTHER PROFESSIONALS

**JULES D. ALBERT**, an associate of the firm, received his J.D. in 2005 from the University of Pennsylvania Law School, where he was a Senior Editor of the University of Pennsylvania Journal of Labor and Employment Law and recipient of the James Wilson Fellowship. Mr. Albert also received a Certificate of Study in Business and Public Policy from The Wharton School at the University of Pennsylvania. Mr. Albert graduated *magna cum laude* with a Bachelor of Arts in Political Science from Emory University. Mr. Albert is licensed to practice law in Pennsylvania, and concentrates his practice in the mergers and acquisitions and stockholder derivative actions department.

**KATIE L. ANDERSON**, an associate of the firm, received her law degree from Widener University School of Law. She received her undergraduate degree from the University of Pittsburgh. Prior to joining Schiffrin Barroway Topaz & Kessler, Ms. Anderson served as a Deputy Attorney General for the Pennsylvania Office of Attorney General, Bureau of Consumer Protection, where she was responsible for enforcing a wide range of consumer oriented laws.

Ms. Anderson is licensed to practice law in Pennsylvania and is admitted to practice in the United States District Court for the Eastern District of Pennsylvania. She concentrates her practice in the area of mass tort litigation.

**IAN D. BERG**, an associate of the firm, received his J.D. and B.A. from Northwestern University. Mr. Berg concentrates his practice in the area of securities litigation and he plays a significant role in investigating and evaluating potential cases, including proprietary claims and direct actions on behalf of institutional clients. Prior to joining Schiffrin, Barroway, Topaz & Kessler, Mr. Berg primarily practiced in the areas of commercial litigation and land use on behalf of corporations and real estate investment trusts. He is licensed to practice law in Pennsylvania and Illinois.

**ROBERT W. BIELA**, an associate of the firm, received his law degree from the Penn State Dickinson School of Law, where he served on the editorial board of the Environmental Law and Policy Journal. Mr. Biela received his undergraduate degree from West Chester University. Prior to joining the firm, Mr. Biela was an associate at Mager White and Goldstein, LLP. Mr. Biela is licensed to practice law in the Commonwealth of Pennsylvania and the United States District Court for the Eastern District of Pennsylvania. His practice focuses primarily in the area of securities litigation.

**KATHERINE B. BORNSTEIN**, an associate of the firm, received her law degree from Emory University School of Law. Ms. Bornstein received her undergraduate degree from the University of Maryland. She is licensed to practice law in Pennsylvania and Maryland. Prior to joining Schiffrin Barroway Topaz & Kessler, Ms. Bornstein was an associate at Provost & Umphrey Law Firm, LLP, where she worked on a number of complex litigation issues. Ms. Bornstein concentrates her practice at Schiffrin Barroway Topaz & Kessler in the areas of ERISA, antitrust and consumer protection.

**NICHOLE BROWNING**, an associate of the firm, received her B.A. degree from Emory University in 1994 and her J.D. degree from The American University, Washington College of Law in 1997. Ms. Browning attended the Universidad de Chile in Santiago, Chile in 1995, where she studied human rights law. She completed her final year of law school at Emory University School of Law.

Ms. Browning has spent most of her legal career representing plaintiffs in federal securities fraud and corporate governance claims. At Schiffrin Barroway Topaz & Kessler LLP, Ms. Browning concentrates her practice in the areas of securities litigation and stockholders' derivative actions.

Ms. Browning is admitted to practice law in Georgia and has been admitted to practice before the Eleventh Circuit Court of Appeals, the United States District Court for the Northern District of Georgia, and all Georgia trial and appellate courts. Ms. Browning is the co-author of "Private Securities Litigation Reform Act of 1995 (PSLRA) Update", which was a chapter in the *Class Actions ICLE of Georgia* (2002).

**JONATHAN R. CAGAN**, an associate of the firm, received his law degree from the Temple University School of Law. Mr. Cagan received his undergraduate degree, *cum laude*, from Temple University. Mr. Cagan is licensed to practice law in New Jersey, and is admitted to the Third Circuit Court of Appeals. Mr. Cagan concentrates his practice in the area of securities litigation and specializes in discovery matters.

**ALISON K. CLARK**, an associate of the firm, received her law degree, *cum laude*, from Boston University School of Law, and received her undergraduate degree in Political Science, with honors, from Lehigh University. Prior to joining Schiffrin Barroway Topaz & Kessler, Ms. Clark was an attorney with a Fairfield County, Connecticut law firm, where she practiced in the areas of civil and commercial litigation, and real estate transactions. Ms. Clark is licensed to practice law in Connecticut, and has been admitted to practice before the United States District Court for the District of Connecticut. Ms. Clark concentrates her practice in the mergers and acquisitions and shareholder derivative department.

**MARK S. DANEK**, an associate of the firm, received his undergraduate degree in Architecture from Temple University in 1996, and his law degree from Duquesne University School of Law in 1999. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Danek was employed as in-house counsel of a real estate investment trust corporation that specialized in the collection of delinquent property tax receivables. He is licensed to practice law in the Commonwealth of Pennsylvania and has been admitted to practice before the Courts of the Commonwealth of Pennsylvania, the United States District Court for the Western District of Pennsylvania and the Supreme Court of the United States of America. Mr. Danek concentrates his practice in the area of securities litigation.

**JENNIFER L. ENCK**, an associate of the firm, received her law degree, *cum laude*, from Syracuse University College of Law in 2003 and her undergraduate degree in International Politics from The Pennsylvania State University in 1999. Ms. Enck also received a Masters degree in International Relations from Syracuse University's Maxwell School of Citizenship and Public Affairs. Prior to joining Schiffrin Barroway Topaz & Kessler, Ms. Enck was an associate with Spector, Roseman & Kodroff, P.C. in Philadelphia, where she worked on a number of complex antitrust, securities and consumer protection cases. Ms. Enck is licensed to practice law in Pennsylvania. She concentrates her practice in the areas of securities litigation and settlement matters.

**ROBERT J. GRAY**, an associate of the firm, received his law degree from the Temple University School of Law. Mr. Gray received Bachelor of Sciences degree from La Salle University with a dual major of Accounting and Finance. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Gray was an associate at Philadelphia boutique litigation firm practicing in the areas of complex commercial litigation and corporate transactions. Mr. Gray also worked as in-house counsel for a small, publicly-traded holding company.

Prior to beginning his law career, Mr. Gray worked as a forensic accountant for six years, conducting a variety of investigations for numerous governmental agencies and law firms. He received his C.P.A. license in 1997.

Mr. Gray is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania. He concentrates his practice in the area consumer protection.

**JOHN GROSS**, an associate of the firm, received his law degree from Widener School of Law, and his undergraduate degree from Temple University. Mr. Gross is licensed to practice law in Pennsylvania, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Gross was an insurance defense litigation associate at a large, Philadelphia based firm. Mr. Gross now concentrates his practice in the areas of securities litigation, antitrust litigation and shareholder derivative actions.

**MARK K. GYANDOH**, an associate of the firm, received his undergraduate degree from Haverford College and his law degree from Temple University School of Law. While attending law school Mr. Gyandoh served as the research editor for the Temple International and Comparative Law Journal. He also interned as a judicial clerk for the Honorable Dolores K. Sloviter of the U.S. Court of Appeals for the Third Circuit and the Honorable Jerome B. Simandle of the U.S. District Court for New Jersey. After law school Mr. Gyandoh was employed as a judicial clerk for the Honorable Dennis Braithwaite of the Superior Court of New Jersey Appellate Division.

Mr. Gyandoh is the author of "Foreign Evidence Gathering: What Obstacles Stand in the Way of Justice?," 15 Temp. Int'l & Comp. L.J. (2001) and "Incorporating the Principle of Co-Equal Branches into the European Constitution: Lessons to Be Learned from the United States" found in Redefining Europe (2005). Mr. Gyandoh is licensed to practice in New Jersey and Pennsylvania and concentrates in the area of ERISA, antitrust and consumer protection.

**BENJAMIN J. HINERFELD** is an associate at the firm, and concentrates his work in securities litigation. In 1996, he graduated from the University of Pittsburgh School of Law, where he served as Lead Note and Comment Editor of the Journal of Law and Commerce. From 1996 to 1997, he clerked for the Hon. Sandra Schultz Newman of the Supreme Court of Pennsylvania. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Hinerfeld worked in a securities litigation firm in Wilmington, Delaware.

From 2000 to 2003, Mr. Hinerfeld was a writing consultant with the Undergraduate Writing Center at the University of Texas at Austin. During that time he also co-authored, with Dr. Sarah Jane Rehnborg and Catherine Fallon, "Investing in Volunteerism: The Impact of Service Initiatives in Selected Texas State Agencies" a report prepared by The RGK Center for Philanthropy and Community Service, LBJ School of Public Affairs. He received his bachelor's degree from Vassar College and a master's degree in American History from the University of Texas at Austin.

Mr. Hinerfeld is licensed to practice law in Pennsylvania.

**MICHAEL J. HYNES**, an associate of the firm, received his law degree from Temple University School of Law, and is a graduate of Franklin and Marshall College. Mr. Hynes is licensed to practice law in Pennsylvania, New Jersey and Montana, and has been admitted to practice in the United States Court of Appeals for the Ninth Circuit, and the United States

District Courts for the Eastern and Middle Districts of Pennsylvania. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Hynes practiced law at Cozen O'Connor, where he concentrated on bankruptcy and commercial litigation. He was an attorney with the Defenders' Association of Philadelphia from 1991 to 1996, where he defended thousands of misdemeanor and felony cases. At Schiffrin Barroway Topaz & Kessler, Mr. Hynes concentrates his practice in the areas of securities litigation and shareholder derivative litigation.

**TARA P. KAO**, an associate of the firm, received her J.D. from Villanova University School of Law, where she was a Managing Editor of Student Works for the Villanova Law Review. Ms. Kao received her Bachelor of Science in Business/Finance, *with honors*, from Carnegie Mellon University. She is licensed to practice law in Pennsylvania, and concentrates her practice in the area of mergers and acquisitions and shareholder derivative actions.

**D. SEAMUS KASKELA, a**n associate of the firm, received his law degree from Rutgers School of Law – Camden, and received his undergraduate degree in Sociology from Saint Joseph's University. Prior to graduating from law school and joining Schiffrin Barroway Topaz & Kessler, LLP, Mr. Kaskela was a law clerk with a large Philadelphia law firm, where he worked in the complex civil litigation department. Mr. Kaskela is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania (pending) and the United States District Court for the District of New Jersey. Mr. Kaskela works in the firm's case development department

**JENNIFER L. KEENEY**, an associate of the firm, received her law degree, *cum laude*, from Temple University Beasley School of Law, where she was the Special Projects Editor for the Temple International and Comparative Law Journal. Ms. Keeney earned her undergraduate degree in History, *with honors*, from Washington University in St. Louis in 2003. She is licensed to practice in Pennsylvania and concentrates her practice at Schiffrin Barroway Topaz & Kessler in the area of securities litigation.

**JAMES A. MARO, JR.,** an associate of the firm, received his law degree from the Villanova University School of Law in 2000. He received a B.A. in Political Science from the Johns Hopkins University in 1997. Mr. Maro is licensed to practice law in Pennsylvania and New Jersey and is admitted to practice in the United States District Court for the Eastern District of Pennsylvania. He concentrates his practice in the area of mergers and acquisitions and shareholder derivative actions.

**RICHARD A. MANISKAS**, an associate of the firm, received his law degree from Widener University School of Law, and received his undergraduate degree from the University of Pittsburgh. While in law school, Mr. Maniskas served as Internal Editor of the *Widener Journal of Public Law*. He is licensed to practice law in Pennsylvania and the District of Columbia, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania. Mr. Maniskas works in the firm's case development department.

**LISA MELLAS**, an associate of the firm, received her law degree from the University of Florida College of Law and her undergraduate degree from the University of Florida. Prior to joining Schiffrin Barroway Topaz & Kessler, LLP, Ms. Mellas was an associate at White and Williams, LLP, where she practiced in the Property Department. Ms. Mellas is licensed to practice in New York, New Jersey and Pennsylvania, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania, the Western District of Pennsylvania, and the District of New Jersey. She concentrates her practice at Schiffrin Barroway Topaz and Kessler in the area of consumer protection and ERISA

**JAMES H. MILLER**, an associate of the firm, received his J.D. in 2005 from Villanova University School of Law, where he was enrolled in Villanova University's J.D./M.B.A. program. Mr. Miller received his Master of Business Administration from Villanova University in 2005, and received his Bachelor of Chemical Engineering from Villanova University in 2002. Mr. Miller is licensed to practice law in Pennsylvania and concentrates his practice in the areas of mergers and acquisitions and shareholder derivative actions.

**CASANDRA A. MURPHY**, an associate of the firm, received her law degree from Widener University School of Law and her undergraduate from Gettysburg College. Prior to joining Schiffrin Barroway Topaz & Kessler, LLP, Ms. Murphy was an associate at Post & Schell, P.C. where she practiced general casualty litigation. Ms. Murphy is licensed to practice in Pennsylvania and New Jersey, and has been admitted to practice before the United State District Court for the Eastern District of Pennsylvania. Ms. Murphy has lectured for the Pennsylvania Bar Institute and the Philadelphia Judicial Conference. She concentrates her practice at Schiffrin Barroway Topaz & Kessler in the areas of consumer protection, ERISA, pharmaceutical pricing and antitrust.

**CHRISTOPHER L. NELSON**, an associate of the firm, received his law degree from Duke University School of Law, and his undergraduate degree in Business, Economics, and the Law from Washington University in St. Louis. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Nelson practiced with the Philadelphia law firm of Berger & Montague, P.C., where he was a securities litigator.

Mr. Nelson is admitted to practice law in the Commonwealth of Pennsylvania, the Supreme Court of the United States, the United States Court of Appeals for the Fourth, Fifth and Ninth Circuits, and the United States District Court for the Eastern District of Pennsylvania.

Mr. Nelson concentrates his practice in the area of securities litigation, and is Lead or Co-Lead Counsel in numerous pending nationwide class action securities cases.

**MICHELLE M. NEWCOMER,** an associate of the firm, received her law degree from Villanova University School of Law. Ms. Newcomer received her undergraduate degrees in Finance and Art History from Loyola College in Maryland in 2002. Ms. Newcomer is licensed to practice law in Pennsylvania and New Jersey. She concentrates her practice at Schiffrin Barroway Topaz & Kessler in the area of securities litigation.

**DAVID PROMISLOFF,** an associate of the firm, received his law degree from the University of Michigan in 2005. While in law school, he served as an associate editor of the Michigan Telecommunications and Technology Law Review. Mr. Promisloff received his undergraduate degree from Emory University in 2002, double majoring in political science and history. Mr. Promisloff is licensed to practice in Pennsylvania, and works in the firm's case development department.

**KAREN E. REILLY**, an associate of the firm, received her law degree from Pace University School of Law, where she was a member of the Moot Court Board and National Moot Court Team. Ms. Reilly received her undergraduate degree from the State University of New York College at Purchase. She is licensed to practice law in Pennsylvania, New Jersey, New York, Connecticut and Rhode Island, and has been admitted to practice before the United States District Courts for the Eastern District of Pennsylvania, District of New Jersey, Southern and Eastern Districts of New York, and the District of Connecticut. Prior to joining Schiffrin Barroway Topaz & Kessler, Ms. Reilly practiced at Pelino & Lentz, P.C., in Philadelphia, where

she litigated a broad range of complex commercial cases. Ms. Reilly concentrates her practice in the area of securities litigation.

**STEVEN D. RESNICK**, an associate of the firm, received his law degree from The Dickinson School of Law of The Pennsylvania State University, and his undergraduate degree, *cum laude*, from West Chester University. Mr. Resnick is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania, the United States Court of Appeals for the Third Circuit, the United States District Court for the District of New Jersey and the United States District Court for the District of Nebraska. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Resnick was an associate at the firm of German, Gallagher & Murtagh, where his practice concentrated in the defense of medical malpractice, products liability and premises liability. Mr. Resnick is active in the American Association for Justice and serves on the Board of Governors of the New Lawyers Division. Mr. Resnick has broad experience in Mass Tort litigation and now concentrates his practice in the area of Securities litigation.

**EMANUEL SHACHMUROVE**, an associate of the firm, received his law degree from The University of Michigan Law School, where he was an Associate Editor of the Michigan Journal of Law Reform. Mr. Shachmurove received his Bachelor of Science in Economics, *cum laude*, from The Wharton School at the University of Pennsylvania, where he was a Joseph Wharton Scholar. Mr. Shachmurove concentrates his practice in mergers and acquisitions and shareholder derivative litigation.

**BHARATI O. SHARMA**, an associate of the firm, received her law degree from the American University Washington College of Law, a Master of Public Administration from The George Washington University, and her undergraduate degree from the University of Pittsburgh. Ms. Sharma is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the District of New Jersey.

Ms. Sharma is a former judicial law clerk to the Honorable Stephen Skillman, Superior Court of New Jersey, Appellate Division, and a former member of American University's International Law Review. She is the founder and current President of the South Asian Bar Association of Philadelphia. Ms. Sharma also serves on the Executive Committees of the North American South Asian Bar Association and the Philadelphia Bar Association Young Lawyer's Division.

Prior to joining Schiffrin Barroway Topaz & Kessler, Ms. Sharma practiced complex civil litigation at a Philadelphia law firm. She now concentrates her practice in the area of securities litigation.

**BENJAMIN J. SWEET**, an associate of the firm, received his juris doctor from The Dickinson School of Law, and his BA, *cum laude*, from the University Scholars Program of The Pennsylvania State University. While in law school, Mr. Sweet served as Articles Editor of the Dickinson Law Review, and was also awarded Best Oral Advocate in the ATLA Junior Mock Trial Competition. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Sweet practiced in the Pittsburgh office of Reed Smith LLP, where he specialized in complex civil litigation. While at Reed Smith, Mr. Sweet co-authored "Assignability of Non-Compete Covenants," 74 Pa. Bar. Q. 64 (April 2003). Mr. Sweet is licensed to practice law in the Commonwealth of Pennsylvania, the United States District Court for the Western District of Pennsylvania and the United States Court of Appeals for the Ninth Circuit.

Mr. Sweet concentrates his practice in the area of securities litigation and has helped obtain several multi-million dollar settlements on behalf of class members in several nationwide federal

securities class actions, including *In re CVS Pharmacy, Inc. Secs. Litig.*, No. 01-11464 (D.Mass. 2005) ($110 million recovery for Class members), *In re Zomax Inc. Secs. Litig.*, No. 04-cv-1155 (D.Minn. 2005) (multi-million dollar cash and stock recovery for Class members), *In re Flextronics Int'l Ltd. Secs. Litig.*, No. 03-cv-2102 (N.D. Cal. 2004) ($4.25 million recovery for Class members) and *In re Black Box Corp. Secs. Litig.*, No. 03-cv-412 (W.D. Pa. 2004) (multi-million dollar recovery for Class Members). Mr. Sweet is currently Lead or Co-Lead Counsel in several pending nationwide class action securities cases, including *In re Tyco Int'l Ltd. Secs. Litig.*, MDL Docket No. 02-1335-B (D.N.H.) and *In re PNC Financial Services Group, Inc. Secs. Litig.*, No. 02cv271 (W.D. Pa.).

**MICHAEL C. WAGNER**, is an associate of the firm, received his undergraduate degree in Government from Franklin & Marshall College, and his law degree from the University of Pittsburgh School of Law in 1996. Mr. Wagner is licensed to practice law in Pennsylvania, and he has been admitted to practice in the United States Court of Appeals for the Third Circuit, and United States District Courts for the Eastern and Western Districts of Pennsylvania, for the Eastern District of Michigan, and for the District of Colorado.

Before joining Schiffrin Barroway Topaz & Kessler, Mr. Wagner worked at Rubin, Fortunato & Harbison, a boutique law firm in Paoli, PA, representing Fortune 100 corporations, as well as individuals and small businesses, in employment matters across the country. Mr. Wagner earlier worked for several years at Spector, Gadon & Rosen, in Philadelphia, concentrating his practice in complex commercial and corporate litigation. At Schiffrin Barroway Topaz & Kessler, Mr. Wagner focuses his practice in the areas of securities litigation and shareholder derivative litigation.

**JOSEPH A. WEEDEN**, an associate of the firm, received his law degree from the University of North Carolina School of Law, where he received the Gressman-Politt Award for outstanding oral advocacy. Mr. Weeden also received his undergraduate degree from the University of North Carolina at Chapel Hill, where he was a Joseph E. Pogue Scholar. Prior to joining the firm, Mr. Weeden was an associate at Kaufman & Canoles, P.C., where he practiced in the areas of commercial and business law. Mr. Weeden is licensed to practice law in Virginia, and concentrates his practice in the area of complex ERISA litigation.

**GERALD D. WELLS, III**, an associate of the firm, received his law degree from Temple University School of Law, where he served on the editorial board of the Environment Law & Technology Journal. He is licensed to practice in Pennsylvania and New Jersey and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania, the United States District Court for the District Court of New Jersey, and the United States District Court for the Eastern District of Michigan.

Mr. Wells concentrates his practice in the areas of antitrust, ERISA, and consumer protection, and FLSA/overtime litigation and has helped obtain several multi-million dollar settlements on behalf of class members, including the recent settlements in *In re Bristol-Myers Squibb ERISA Litigation*, No. 02-CV-10129 (LAP) ($41.22 million in cash plus structural remedies valued at up to $52 million) and *Falk v. Amerada Hess Corp., et al.,* No. 03-CV-2491-FSH-PS ($2.25 million in cash plus structural remedies valued at up to $23.8 million); and *In re Westar Energy Inc. ERISA Litig.,* No. 03-4032-JAR (D. Kan.) ($9.25 million cash settlement). Mr. Wells currently serves as counsel in several pending nationwide class and collective actions.

**ROBIN WINCHESTER**, an associate of the firm, received her law degree from Villanova University School of Law, and received her undergraduate degree in Finance from St. Joseph's University. Prior to joining Schiffrin Barroway Topaz & Kessler, Ms. Winchester served as a law clerk to the Honorable Robert F. Kelly in the United States District Court for the Eastern District of Pennsylvania. Ms. Winchester is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania. She concentrates her practice in the area of shareholder derivative actions.

**TERENCE S. ZIEGLER**, an associate of the firm, received his law degree from the Tulane University School of Law. Mr. Ziegler received a Bachelor of Business Administration degree with a concentration in Finance from Loyola University. Mr. Ziegler is licensed to practice law in the State of Louisiana, and has been admitted to practice before the United States Court of Appeals for the Fifth Circuit, the United States District Court for the Eastern District of Louisiana and the United States District Court for the Middle District of Louisiana. Mr. Ziegler concentrates his practice in the areas of consumer protection, ERISA, pharmaceutical pricing and antitrust.

## OF COUNSEL

**ROBERT M. BRAMSON** has more than twenty-five years of experience in the litigation of antitrust and consumer cases, class actions and other complex litigation. Mr. Bramson received his undergraduate degree in economics, *summa cum laude*, from the University of California at Berkeley in 1977, and obtained his law degree from the Boalt Hall School of Law in 1981. Mr. Bramson is a member of the California Bar.

Mr. Bramson has represented both plaintiffs and defendants in numerous antitrust cases, and has acted as lead counsel in two such actions taken to trial - *Pacific West Cable Co. v. City of Sacramento, et al.* (E.D. Cal.) ($12 Million settlement on 24th day of trial, at close of plaintiff's case; Sherman Act §2 monopolization claims) and *Coleman et al. v. Sacramento Cable Television* (Sacramento Sup. Ct.) ($2.4 Million judgment after 17-day trial; class action/B & P §17200 case; B & P §17204 discriminatory pricing claims).

Mr. Bramson specializes in antitrust, business torts and communications litigation, as well as in class action cases. He served for many years on the Board of Directors of the National Association of Consumer Advocates and co-chaired its class action committee. He is a contributing author to the National Consumer Law Center's publication Consumer Class Actions. He acted as reporter for the National Association of Consumer Advocates in preparing its influential Standards and Guidelines For Consumer Class Actions, 176 F.R.D. 375 (1997).

Mr. Bramson's lecture topics have included "Strategic and Ethical Issues in Litigating 17200 Cases" (Bar Association of San Francisco, San Francisco 2001), "Equitable Remedies In Class Actions and Under California's Section 17200 Statute" (National Association of Consumer Advocates, Chicago 2000), "Ethical Issues Arising in Class Action Settlements" (National Consumer Law Center, Wash. DC and San Diego 1999 and 1998) "California's Business & Professions Code Section 17200" (California Bar Association, Lake Tahoe 1997), "Preparation of Competitive Business Practices Cases" (Continuing Education of the Bar, Sacramento 1997), and "The Cable Communications Policy Act of 1984" (California State University, Fullerton 1993).

In addition to serving as Of Counsel to Schiffrin Barroway Topaz & Kessler, Mr. Bramson is a

partner in the law firm of Bramson, Plutzik, Mahler & Birkhaeuser, LLP, of Walnut Creek, California.

**ALAN R. PLUTZIK** specializes in complex business litigation in state and federal courts throughout the United States. Areas of particular emphasis include class actions, securities fraud and corporate governance litigation, consumer law, antitrust, constitutional and communications law. Mr. Plutzik is admitted to practice in California and the District of Columbia (inactive member), and is a member of the bars of the United States Supreme Court, the Second, Eighth, Ninth, Tenth and District of Columbia Circuits and numerous federal district courts throughout the United States.

Mr. Plutzik received his law degree from the University of California at Berkeley's Boalt Hall School of Law in 1977. He received his undergraduate degree from St. John's College, Annapolis, Maryland, in 1971, and also holds an M. A. from Stanford University. Over the course of his twenty-nine year career, Mr. Plutzik has also handled a wide variety of class actions and derivative cases. He has represented, among other clients, corporate shareholders and limited partners challenging conduct by their general partners, officers or directors; consumers and businesses harmed by price-fixing and other anticompetitive conduct; consumers in actions against insurance companies, banks and other lenders; investors in securities fraud cases and derivative suits; employees in ERISA and wage/hour cases; purchasers of mislabeled and defective products; victims of toxic pollution; persons harmed by defective products; and cellular telephone and cable television subscribers.

Mr. Plutzik has also handled a substantial number of cases that raise First Amendment and other constitutional issues, and has represented broadcasters, cable television companies, communications common carriers and consumers in litigation and in administrative proceedings before the Federal Communications Commission and the California Public Utilities Commission.

Mr. Plutzik has written or lectured on topics that include class actions, California consumer law, substantive and procedural issues under the federal securities laws, First Amendment issues applicable to new media, cable television franchising and cable television companies' access to utility poles and real estate developments. He has appeared as a guest radio commentator on the Len Tillem Show on KGO-Radio in San Francisco, discussing class actions, consumer protection law and investor rights.

Mr. Plutzik has served as a judge pro tem on the Contra Costa County Superior Court. He is also President of the Warren W. Eukel Teacher Trust, a community-based charity that honors outstanding teachers in Contra Costa County, California.

In addition to serving as Of Counsel to Schiffrin Barroway Topaz & Kessler, Mr. Plutzik is a partner in the law firm of Bramson, Plutzik, Mahler & Birkhaeuser, LLP, of Walnut Creek, California.

**L. TIMOTHY FISHER** specializes in consumer and securities class actions and complex business litigation. He has been actively involved in several cases in which multi-million dollar recoveries were achieved for consumers and investors. Mr. Fisher has handled cases involving a wide range of issues including nutritional labeling, health care, telecommunications, corporate governance, unfair business practices and fraud. Mr. Fisher is a member of the California Bar.

Mr. Fisher received his Juris Doctorate from Boalt Hall at the University of California at

Berkeley in 1997. While in law school, he was an active member of the Moot Court Board and participated in moot court competitions throughout the United States. In 1994, Mr. Fisher received an award for Best Oral Argument in the first year moot court competition.

In 1992, Mr. Fisher graduated with highest honors from the University of California at Berkeley and received a degree in political science. Prior to graduation, he authored an honors thesis for Professor Bruce Cain entitled "The Role of Minorities on the Los Angeles City Council." He is also a member of Phi Beta Kappa.

In addition to serving as Of Counsel to Schiffrin Barroway Topaz & Kessler, Mr. Fisher is an associate in the law firm of Bramson, Plutzik, Mahler & Birkhaeuser, LLP, of Walnut Creek, California.

# CONSULTANTS

**KEVIN P. CAULEY** serves in the firm's business development and institutional relations department. Mr. Cauley is a graduate of Temple University. Prior to joining the firm, Mr. Cauley was Director of Business Development for a multi-family office in New York City. Mr. Cauley also has prior experience in institutional fiduciary investment consulting, money manager selection, best trade executions, and asset allocation modeling. He has held the Series 7, 24, 63, and 65 licenses with the NASD. Mr. Cauley has also done political consulting in coordinating and directing various aspects of field operations for local, state, and national campaigns in Southeastern Pennsylvania. He is also an active member of The Pennsylvania Future Fund, A.O.H. Division 88 "Officer Danny Boyle Chapter," The Saint Andrews Society, The Friendly Sons of Saint Patrick, The Clover Club of Philadelphia, The Foreign Policy Research Institute, a Board Member of The Princeton Committee on Foreign Relations, and is an elected member to The Pennsylvania Society and The Union League of Philadelphia, where he serves on the Armed Services Committee.

**PETER KRANEVELD**, an advisor to the firm, will work with Schiffrin Barroway Topaz & Kessler to analyze and work on issues such as corporate governance, shareholder rights and activism and how these fit into the interests of the firm's large international client base of pension funds and other institutional investors. An economist by training, Mr. Kraneveld has a long history of working with pension funds and other institutional shareholders. He recently completed an eight year stint working with Dutch pension fund PGGM, a public pension fund for the healthcare sector in the Netherlands, and one of the largest pension funds in Europe. Mr. Kraneveld's last three years at PGGM were spent as a Special Advisor for International Affairs where his main responsibilities included setting up a network among national and international lobbying organizations, domestic and foreign pension funds and international civil servants and using it to promote the interests of the pension fund industry. Mr. Kraneveld served as Chief Economist for PGGM's Investments Directorate from 1999 until 2004 where his accomplishments included the Tactical Asset Allocation process and designing alternative scenarios for Asset Liability Management.

Prior to his work with PGGM, Mr. Kraneveld worked with the Organisation for Economic Co-operation and Development (OECD) and the Dutch Ministry of Economic Affairs.

**DAVID RABBINER** serves as Schiffrin Barroway Topaz & Kessler's Director of Investigative Services. As the firm's lead investigations necessary to further and strengthen the firm's class-action litigation efforts. Although his investigative services are primarily devoted to securities matters, Mr. Rabbiner routinely provides litigation support, conducts due diligence, and lends general investigative expertise and assistance to the firm's other class-action practice areas. Mr. Rabbiner plays an integral role on the firm's legal team, providing critical investigative services to obtain evidence and information to help ensure a successful litigation outcome. Before joining Schiffrin Barroway Topaz & Kessler, Mr. Rabbiner enjoyed a broad-based, successful career as an FBI Special Agent, including service as an Assistant Special Agent in Charge, overseeing multiple criminal programs, in one of the Bureau's largest field offices. He holds an A.B. in English Language and Literature from the University of Michigan and a Juris Doctor from the University of Miami School of Law.



Firm
Resume

Wolf
Haldenstein
Adler Freeman
& Herz LLP





## Wolf Haldenstein Adler Freeman & Herz LLP

Founded in 1888, Wolf Haldenstein Adler Freeman & Herz LLP is a full service law firm with practice groups in corporate/tax, pension/benefits, real estate, trusts and estates, healthcare, bankruptcy, limited partnerships, and civil and commercial litigation, with a particular specialty in complex class and shareholder litigation under both federal and state law.

Wolf Haldenstein's total practice approach, supported by the Firm's mid-range size, distinguishes the Firm from other firms. Our longstanding tradition of a close attorney/client relationship ensures that each one of our clients receives prompt, individual attention and does not become lost in an institutional bureaucracy. Our team approach is at the very heart of Wolf Haldenstein's practice. All of our lawyers are readily available to all of our clients and to each other. The result of this approach is that we provide our clients with an efficient legal team having the broad perspective, expertise and experience required for any matter at hand. We are thus able to provide our clients with cost effective and thorough counsel focused on our clients' overall goals.

The Firm has its principal office with lawyers in the various practice areas, at 270 Madison Avenue, New York, NY 10016. The Firm's general telephone number in New York is (212) 545-4600. The fax number in New York is (212) 545-4653. The Firm also has offices at Symphony Towers, 750 B Street, Suite 2770, San Diego, CA 92101, telephone: (619) 239-4599, fax: (619) 234-4599; 55 W. Monroe Street, Suite 1111, Chicago, IL 60603, telephone: (312) 984-0000, fax: (312) 984-0001; and 625 N. Flagler Drive, West Palm Beach, Florida 33401. The Firm's web site is accessible at http://www.whafh.com.





# The Firm

Wolf Haldenstein's Class Action Litigation Group has been recognized by courts throughout the country as being highly experienced in complex litigation, particularly with respect to securities, consumer, ERISA, and antitrust class actions and shareholder rights litigation. The Class Action Litigation Group consists of 30 attorneys and 10 paraprofessional assistants. Brief resumes of these attorneys begin on page 13.

Also included are the resumes of attorneys from other areas of the Firm's practice who routinely lend their expertise to the Firm's class action litigators in the areas of tax, bankruptcy, corporate, trusts, labor, and ERISA law. The ability to call upon the internal expertise of practitioners in such varied areas of the law greatly enhances the strength and efficiency of the Firm's representative litigation practice and, indeed, makes Wolf Haldenstein unique among national firms specializing in class action litigation.

The nature of the Firm's activities in representative litigation is extremely broad. In addition to a large case load of securities fraud and other investor class actions, Wolf Haldenstein has represented classes of corn farmers in connection with the devaluation of their crops; contact lens purchasers for contact lens manufacturers' violations of the antitrust laws; merchants compelled to accept certain types of debit cards; insurance policyholders for insurance companies' deceptive sales practices; victims of unlawful strip searches under the civil rights laws; and various cases involving violations of Internet users' on-line privacy rights.

The Firm's experience in class action securities litigation, in particular public shareholder rights under state law and securities fraud claims arising under the federal securities laws and regulations, including the Private Securities Litigation Reform Act of 1995 ("PSLRA"), is particularly extensive. The Firm was one of the lead or other primary counsel in securities class action cases that have recouped billions of dollars on behalf of investor classes, in stockholder rights class actions that have resulted in billions of dollars in increased merger consideration to shareholder classes, and in derivative litigation that has recovered billions of dollars for corporations.





Among its colleagues in the plaintiffs' securities bar, as well as among its adversaries in the defense bar, Wolf Haldenstein is known for the high ability of its attorneys, the exceptionally high quality of its written and oral advocacy on behalf of class action clients, and its pioneering efforts in difficult or unusual areas of securities or investor protection laws, including: groundbreaking claims that have been successfully brought under the Investment Company Act of 1940 regarding fiduciary responsibilities of investment companies and their advisors toward their shareholders; claims under ERISA involving fiduciary duties of ERISA trustees who are also insiders in possession of adverse information regarding their fund's primary stockholdings; the fiduciary duties of the directors of Delaware corporations in connection with change of control transactions; the early application of the fraud-on-the-market theory to claims against public accounting firms in connection with their audits of publicly traded corporations; and the application of federal securities class certification standards to state law claims often thought to be beyond the reach of class action treatment.

Wolf Haldenstein's performance in representative litigation has repeatedly received favorable judicial recognition. The following representative judicial comments over two decades indicate the high regard in which the Firm is held:

- *In Re Dynamic Random Access Memory Antitrust Litigation*, MDL-02-1486 (N.D. Cal.) -- where the Firm was co-lead counsel, Judge Hamilton said (on August 15, 2007), "I think I can conclude on the basis with my five years with you all, watching this litigation progress and seeing it wind to a conclusion, that the results are exceptional. The percentages, as you have outlined them, do put this [case] in one of the upper categories of results of this kind of [antitrust] class action. I am aware of the complexity . . . I thought that you all did an exceptionally good job of bringing to me only those matters that really required the Court's attention. You did an exceptionally good job at organizing and managing the case, assisting me in management of the case. There was excellent coordination between all the various different plaintiffs' counsel with your group and the other groups that are part of this litigation. . . . So my conclusion is the case was well litigated by both sides, well managed as well by both sides."





- *In re Comdisco Sec. Litig.*, No. 01 C 2110 (July 14, 2005) -- Judge Milton Shadur observed: "It has to be said . . . that the efforts that have been extended [by Wolf Haldenstein] on behalf of the plaintiff class in the face of these obstacles have been exemplary. And in my view [Wolf Haldenstein] reflected the kind of professionalism that the critics of class actions . . . are never willing to recognize. . . . I really cannot speak too highly of the services rendered by class counsel in an extraordinary difficult situation."



- *In re MicroStrategy Securities Litigation*, 150 F. Supp. 2d 896, 903 (E.D. Va. 2001) -- where the Firm was a co-lead counsel, Judge Ellis commented: "Clearly, the conduct of all counsel in this case and the result they have achieved for all of the parties confirms that they deserve the national recognition they enjoy."

- *In Re Toys R Us Antitrust Litigation*, 98 MDL 1211 (NG) 191 F.R.D. 347, 351, 356 (E.D.N.Y. 2000) -- where the Firm served as co-lead and liaison counsel, Judge Gershon wrote: "Class counsel are highly skilled and experienced and can fairly and adequately represent the interests of the class . . . . Counsel for both the class plaintiffs and the States have well-earned the compensation that they request."

- *In Yud v. Saf T Lok*, No. 98-8507-Civ-Hurley (S.D. Fla. Dec. 15, 1999) -- where the Firm was sole lead counsel, the court stated: "The attorneys have done an outstanding amount of work and fine legal work in a short period of time to bring this class action to resolution in a successful fashion."

- *In Kurzweil v. Philip Morris Companies*, 94 Civ. 2373, 94 Civ. 2546 (MBM) (S.D.N.Y. Nov. 13, 1998) -- where the Firm was sole lead counsel, then Chief Judge Mukasey, in approving a $116.5 million settlement stated: "In this case, this represents a lot of good, hard, serious work by a lot of talented lawyers and I appreciate it on both sides."

- *In Paramount Communications v. QVC Network Inc.;* In re Paramount Communications Inc. Shareholders' Litigation, 637 A.2d 34, 37 n.2 (Sup. Ct. Del. 1994) -- where the Firm was co-lead counsel for the Paramount shareholders, the Supreme Court of Delaware noted "its appreciation of . . . the professionalism of counsel in this matter in handling this expedited litigation with the expertise and skill which

Wolf
Haldenstein
Adler Freeman
& Herz LLP





characterize Delaware proceedings of this nature." The Court further "commended the parties for their professionalism in conducting expedited discovery, assembling and organizing the record, and preparing and presenting very helpful briefs, a joint appendix, and oral argument."

- *In re Laser Arms Corp. Securities Litigation,* 794 F. Supp. 475, 496 (S.D.N.Y. 1989) -- where the Firm was lead counsel, the Court stated "plaintiffs' counsel have demonstrated their experience in securities litigation and the Court is confident that counsel will proceed vigorously on behalf of all class and subclass members."

- *In re Public Service Co. of Indiana Derivative Litigation,* 125 F.R.D. 484, 486 (S.D. Ind. 1988) -- concerning the construction of the Marble Hill Nuclear Power Plant, where the Firm was lead counsel, the court said: "Throughout the life of this litigation, it has been both vigorously prosecuted and aggressively defended by thoroughly competent counsel on all sides."

- *In re Public Service Co. of New Hampshire Derivative Litigation,* 84-220-D (D.N.H. 1986) -- involving the construction of the Seabrook Nuclear Power Plant, where the Firm was lead counsel, the court said of plaintiffs' counsel that "the skill required and employed was of the highest caliber."

- *In re Warner Communications Securities Litigation,* 618 F. Supp. 735, 749 (S.D.N.Y. 1985) -- where the Firm served as co-lead counsel, the court noted the defendants' concession that "'plaintiffs' counsel constitute the cream of the plaintiffs' bar.' The Court cannot find fault with that characterization."

- *In Steiner v. Equimark Corp.,* No. 81-1988 (W.D. Pa. 1983) -- a case involving complex issues concerning banking practices in which the Firm was lead counsel, then District Judge Mannsman described, in part, the work the Firm performed:

> We look at the complexity of the issue, the novelty of it, the quality of work that, as the trial judge, I am able to perceive, and then, finally, the amount of recovery obtained: I think I have certainly said a lot in that regard. I think it's been an extraordinary

6



case.  I think it's an extraordinary settlement. Certainly defense counsel and plaintiffs' counsel as well are all experienced counsel with a tremendous amount of experience in these particular kinds of cases.  And under those circumstances . . . I think it was, really, the strategy and ingenuity of counsel in dividing up the workload and strategizing the cases as to who was to do what and what ultimately should be done to bring about the settlement that was achieved.

## Current Cases

Wolf Haldenstein is a leader in the class action litigation field and is currently the court-appointed lead counsel, co-lead counsel, or executive committee member in some of the largest and most significant class action lawsuits currently pending across the United States, including:

- *In re Initial Public Offering Securities Litigation,* 21 MC 92 (SAS) (S.D.N.Y.).

- *J.P. Morgan Chase Securities Litigation, (Blau v. Harrison),* Civ. No. 04 C 6592 (N.D. Ill.).

- *In re Collins & Aikman Corp. Sec. Litigation,* 06-cv-13555-AJT-VMM (E.D. Mich.).

- *Lewis v. CNL Restaurant Properties,* No. 05-00083-F (Tex. Dist. Ct.).

- *In re Adelphia Communications Corp. Securities and Derivative Litigation* ("Adelphia Business Actions"), 03-ML 1529, 03 CV 5755 (LMM) (S.D.N.Y.).

- *In re Iridium Securities Litigation,* C.A. No. 99-1002 (D.D.C.).

- *In re Transkaryotic Therapies, Inc., Securities Litigation,* C.A. No. 03-10165-RWZ (D. Mass).

- *In re Loral Space & Communications Shareholders' Securities Litigation,* 03 Civ. 8262 (JES) (S.D.N.Y).





- *In re St. Paul Travelers Securities Litigation II,* Civ. No. 04-cv-4697 (JRT/FLN) (D. Minn.).

- *In re LNR Property Corp. Shareholder Litigation,* Consolidated C.A. No. 647-N (Del. Ch. Ct.).

- *In re Triad Hospitals, Inc. Shareholder Litigation,* Case No. 296-00435-07 (Tex. 296th Dist. Ct.).

- *Station Casinos Shareholder Litigation,* Master Case No. A 532367.

- *Swift Transportation Company Shareholder Litigation,* Case No. A519396 (Nev.).

- *In re Harrah's Entertainment Inc. Shareholder Litigation,* Consolidated Class Action No. 2453-N (Del. Ch.).

- *In re TXU Shareholder Litigation,* Consolidated Case No. 07-01707 (Tex. 44th Dist. Ct.).

- *In re EGL, Inc. Shareholder Litigation,* Cause No. 2007-00139 (Tex. 125th Dist. Ct.).

- *Clear Channel Shareholder Litigation,* Cause No. 2006-CI-17492 (Tex. 408th Dist. Ct.)

- *In re Tyson Foods, Inc. Consolidated Shareholder Litigation,* Consolidated C.A. No. 1106-N (Del. Ch. Ct.).

- *In re American Pharmaceutical Partners, Inc. Shareholder Litigation,* Consolidated C.A. No. 1823-N (Del. Ch. Ct.).

- *In re Tower Automotive ERISA Litigation,* No. 05 CV 2184 (LLS) (S.D.N.Y.).

- *MBNA Corp. ERISA Litigation,* C.A. No. 05-429 GMN (D. Del.).

- *In re Aon ERISA Litigation,* No. 04 C 6875 (N.D. Ill.).

- *In re Aquila, Inc.,* (ERISA Litigation), 04-865 (W.D. Mo.).

- *Spiziri v. The St. Paul Travelers Companies, Inc.* (ERISA Litigation), Civ. No. 04-5096 JRT/FLN (D. Minn.).

Wolf
Haldenstein
Adler Freeman
& Herz LLP





- *In re Harley Davidson, Inc. ERISA Litigation,* Case No. 05-C-00547-CNC (E.D. Wisc).

- *In re Guidant Corp. ERISA Litigation,* 1:05-cv-1009-LJM-TAB (S.D. Ind.)

- *Harris v. Amgen, Inc., et al.,* Case No. CV 07-5442- PSG (C.D. Cal.) (ERISA Action).

- *Schoenbaum v. E.I. DuPont de Nemours and Company, et al.,* Case No. 4:05-cv-01108 ERW (E.D. Mo.) (consolidated antitrust cases concerning genetically modified corn and soybean seeds).

- *In re Genetically Modified Rice Litigation,* MDL 1811 (E.D. Mo.).

- *In re Sulfuric Acid Antitrust Litigation,* Master File No. 03 C 4576 (N.D. Ill.).

- *In re McDonough, et al. v. Toys "R" Us, Inc., et al.,* No 2:06 CV 00242-AB (E.D. Pa.).

- *In re Copper Tubing Antitrust Litigation,* No. 04-2771-DV.

- *In re ACR Copper Tubing Antitrust Litigation,* No. 06-2207-DP (W.D. Tenn.).

- *In re Evanston Northwestern Healthcare Corp. (ENH) Antitrust Litigation,* No. 07-4446-JHL (N.D. Ill.).

Beginning on page 25 is a representative listing of cases in which the Firm has been lead or one of the plaintiffs' primary counsel and the results achieved in those cases. In addition, a representative list of published decisions in cases in which Wolf Haldenstein has played a lead or other significant role begins on page 29.

## Derivative Cases

Wolf Haldenstein is a leader in the derivative litigation field and is currently leading counsel in some of the most significant derivative actions pending in the United States, including:

- *In re Mutual Fund Investment Litigation,* MDL No. 1586 (D. Md.).

Wolf
Haldenstein
Adler Freeman
& Herz LLP



- *Levin v. Kozlowski, (Tyco Derivative Litigation)*, No. 602113/2002 (N.Y. Sup. Ct.).

- *AIG, Inc. Consolidated Derivative Litigation*, C.A. No. 769-N (Del. Chanc.).

- *In re R&G Financial Corp. Derivative Litigation*, 1:05-CV-5547 (S.D.N.Y.).



- *In re Cablevision Systems Corp. Shareholder Derivative Litigation*, Master File No. 06-CV-4130-DGT-AKT.

- *General Motors Derivative Litigation*, MDL Docket No. 1749 (E.D. Mich.).



- *In re Applied Micro Circuits Corp., Inc. Derivative Litigation*, Lead Case No. CV 06-04269 JW (N.D. Cal.).

- *In re Atmel Corp. Derivative Litigation*, Master File No. 06-4592 JF (HRL) (N.D. Cal.).

- *In re Monster Worldwide, Inc. Stock Option Derivative Litigation*, Master File No. 06cv4622 (S.D.N.Y.).

- *In re Novellus Systems, Inc. Derivative Litigation*, Master File No. C 06-03514 RMW (N.D. Cal.).

- *In re Verisign, Inc. Derivative Litigation*, Master File No. C-06-4165-PJH (N.D. Cal.).

- *In re Western Digital Corp. Derivative Litigation*, Master File No. SACV 06-729-AG (RNBx) (C.D. Cal.).

- *Teitelbaum v. Cohen*, No. 2833-VCS (Del. Ch.) (*L-3 Communications Holdings, Inc. Derivative action*).

## OVERTIME AND COMPENSATION CLASS ACTIONS

Wolf Haldenstein is a leader in the field of class action litigation on behalf of employees who have not been paid overtime or other compensation they are entitled to receive, or have had improper deductions taken from their compensation. These claims for violations of the federal Fair Labor Standards Act and state labor laws, allege improper failure to pay overtime and other wages, and improper deductions from compensation for various company expenses. Wolf Haldenstein is currently lead or co-lead counsel, or other similar lead role, in some of the most significant overtime class actions pending in the United States, including those listed below:

10







- *Lavoice v. Citigroup Global Markets, Inc.*, 06-0756 (S.D.N.Y.)

- *Basile v. A.G. Edwards, Inc.*, 06-cv-0833 (N.D.N.Y)

- *Rosenthal v. A.G. Edwards & Sons, Inc.*, 06-3995 (D.N.J.)

- *Palumbo v. Merrill Lynch*, 06-2104 (E.D.N.Y.)

- *Garrison v. Merrill Lynch*, 06-3553 (D.N.J.)

- *Roles v. Morgan Stanley*, 05-7889 (E.D.N.Y.)

- *Lenihan v. Morgan Stanley*, 06-00794 (D. Conn.)

- *Klein v. Ryan Beck*, 06-03460 (S.D.N.Y.)

- *Badain v. Wachovia*, 06-06321 (W.D.N.Y.)

- *Garcia v. Lowe's Home Centers, Inc.*, Case No. GIC 841120 (S.D. Supr.)

- *Weinstein v. MetLife, Inc.*, 06-cv-04444-SI (N.D. Cal.)

## BIOTECHNOLOGY AND AGRICULTURAL LITIGATION

Wolf Haldenstein is a leader in biotechnology and agricultural litigation. The firm has represented U.S. row crop farmers and others harmed by crop supply contamination, price fixing of genetically-modified crop seeds, and false claims and representations relating to purportedly "organic" products. The firm has prosecuted actions in these fields against domestic and international biotechnology and crop science companies under the federal and state antitrust laws, consumer protection and deceptive trade practice statues, and the common law. As a leader in this field, Wolf Haldenstein pioneered approaches now commonly used in these types of cases, including the use of futures-based efficient market analyses to fashion damages models relating to the underlying commodity crops. The firm has served or is currently serving as lead or co-lead counsel in some of the most significant biotechnology and agricultural class actions pending in the United States, including:

- *In re StarLink Corn Products Liability Litigation*, MDL No. 1403 (N.D. Illinois) – class action that recovered $110 million for U.S. corn farmers who sustained market losses arising from defendants' contamination of the U.S. food corn supply with an improperly bioengineered corn seed product.

Wolf
Haldenstein
Adler Freeman
& Herz LLP




- *Schoenbaum v. E.I. DuPont de Nemours and Company, et al.*, Case No. 4:05-cv-01108 ERW (E.D. Mo.) – Consolidated antitrust cases concerning genetically modified corn and soybean seeds.

- *In Re Genetically Modified Rice Litigation*, MDL 1811 (E.D. Mo.) – Consolidated class actions representing the interests of United States long-grain rice producers seeking to recover damages they sustained resulting from the contamination of the U.S. rice supply with unapproved, genetically-modified rice seed traits developed and tested by Bayer CropScience LP and related entities. The website the firm maintains on the case is www.bayerricelitigation.com.

For more information about our efforts in these fields, please contact Wolf Haldenstein partner Adam Levitt at (312) 984-0000.

## PRIVATE ACTIONS FOR INSTITUTIONAL INVESTORS

In addition to its vast class action practice, the Firm also regularly represents institutional clients such as public funds, investment funds, limited partnerships, and qualified institutional buyers. The Firm has represented institutional clients in non-class federal and state actions concerning a variety of matters, including private placements, disputes with investment advisors, and disputes with corporate management. Examples of such cases include:

- *Steed Finance LDC v. Laser Advisers, Inc.*, 99 Civ. 4222 (PKC)(S.D.N.Y.), a fraud, negligence, breach of contract and breach of fiduciary duty action brought by a hub fund, a related feeder fund and individual investors in the feeder fund against the funds' former investment advisors for mispricing certain securities and derivative instruments in the funds' fixed-income securities portfolio.

- *Diversified Asset Securitization Holdings I, L.P. v. Enterprise Mortgage Acceptance Co, LLC, et al.*, 02 Civ. 10228 (SWK) (S.D.N.Y.), a federal and state securities fraud action brought by limited partnerships that pooled the investments of various insurance companies against the issuer and management and controlling shareholder of the issuer, concerning misrepresentations made in connection with a private

12





placement of certificates representing interests in a securitized pool of loans made to franchise operations of car care businesses, gas stations, convenience stores and quick service restaurants.

- *Gramercy Park Investments v. Airfund International*, No. 97-22734B (Mass.Super. Ct.); *Gramercy Park Investments v. The Krupp Realty Fund*, No. 97-1612 (Mass.Super.Ct.); *Geodyne Resources v. Gramercy Park Investments*, No. CJ-96-05548 (Dist.Ct.Okla.); *Gramercy Park Investments v. Wells Real Estate Fund*, No. 97-A-0241-3 (Ga.Super.Ct.); *Gramercy Park Investments v. Swift Energy*, No. 96-61729 (Dist.Ct.Tex.); and *Lexington Family Investments v. Dean Witter*, No. 15217-96 (N.Y.Sup.Ct.); actions brought on behalf of institutional investors in state courts throughout the nation demanding inspection of investor lists and other corporate and partnership information.

- *Madison Partnership Liquidity Investors v. American Cable TV Investors*, 97 Civ. 4950 (JSM) (S.D.N.Y.); and *Madison Partnership Liquidity Investors v. PLM Equipment Growth Fund*, 98 Civ. 4057 (JSM)(S.D.N.Y.); actions brought on behalf of institutional investors against fund management for improper defensive actions taken in response to investors' acquisitions of large positions in funds.

The Firm has also acted as special counsel to investors' committees in efforts to assert the investors' interests without resort to litigation. For example, the Firm served as Counsel to the Courtyard by Marriott Limited Partners Committee for several years in its dealings with Host Marriott Corporation, and as Special Counsel to the Windsor Park Properties 7 and 8 limited partners to insure the fairness of their liquidation transactions.

## THE CLASS ACTION LITIGATION GROUP

The qualifications of the attorneys in the Wolf Haldenstein Litigation Group are set forth below and are followed by descriptions of some of the Firm's attorneys who normally practice outside the Litigation Group who contribute significantly to the class action practice from time to time.

## PARTNERS

**DANIEL W. KRASNER**: *admitted*: New York; Supreme Court of the United States; U.S. Courts of Appeals for the Second, Third, Fourth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits; U.S. District Courts for the Southern

and Eastern Districts of New York, Central District of Illinois, and Northern District of Michigan. *Education*: Yeshiva College (B.A. 1962); Yale Law School (LL.B., 1965). Lecturer: Practicing Law Institute; Rutgers Graduate School of Business. Member: the Association of the Bar of the City of New York; Rockland County, New York State and American Bar Associations; Federal Bar Council. Mr. Krasner has lectured frequently before bar groups and has educated groups on securities laws and investors rights. His qualifications have received favorable judicial recognition on many occasions. *See, e.g., Shapiro v. Consolidated Edison Co.,* [1978 Transfer Binder] Fed. Sec. L. Rep. (CCH) & 96,364 at 93,252 (S.D.N.Y. 1978) ("in the Court's opinion the reputation, skill and expertise of . . . [Mr.] Krasner, considerably enhanced the probability of obtaining as large a cash settlement as was obtained"); *Steiner v. BOC Financial Corp.,* [1980 Transfer Binder] Fed. Sec. L. Rep. (CCH) & 97,656, at 98,491.4, (S.D.N.Y. 1980) ("This Court has previously recognized the high quality of work of plaintiffs' lead counsel, Mr. Krasner"). *The New York Law Journal,* August 1, 1983, at p. 5 (referring to Mr. Krasner as one of the "top rank plaintiffs' counsel" in the securities and class action fields.).

FRED TAYLOR ISQUITH: *admitted*: New York; District of Columbia; Supreme Court of the United States; U.S. Courts of Appeals for the First, Second, Third, Fourth and Eighth Circuits; U.S. District Courts for the Southern, Eastern and Northern Districts of New York, District of Arizona, District of Colorado, Central District of Illinois, Western District of Michigan and District of Nebraska. *Education*: Brooklyn College of the City University of New York (B.A., 1968); Columbia University (J.D., 1971). Author, "Post Arbitration Remedies," for an Introduction to Securities Arbitration (NYSBA, 1994); "A Plaintiff's Lawyer Examines Limited Partnership Roll-ups for Real Estate Exit Strategies" (American Conference Institute, 1994); Federal Civil Practice Supplement, "Representative Actions," (NYSBA, 2000). Columnist for weekly column "From the Courts," for *The Class Act*, National Association of Securities and Class Action Attorneys. Lecturer, IPO Tie In/Claims Seminar, Professional Liability Underwriter Society; Securities Arbitration New York State Bar Association; Real Estate Exit Strategies, American Conference Institute; Fundamental Strategies in Securities Litigation (NYSBA, CLE Program). He is an arbitrator with the American Arbitration Association and with the Civil Court of the City of New York and a mediator for the ADR Program of the Supreme Court, County of New York, Complex Litigation Panel. Member: The Association of the Bar of the City of New York (Committee on Federal

Wolf
Haldenstein
Adler Freeman
& Herz LLP





Courts); New York County Lawyers' Association (Former Chair: Business Tort/Consumer Fraud-Tort Law Section); Brooklyn (Member: Committee on Civil Practice Law and Rules, 1983-; Committees on Legislation and Federal Courts, 1984-), New York State (Member: Committee on Legislation, Trial Lawyers Section, 1981- ); Committee on Securities, Commercial and Federal Litigation Section, 1989- ), and American (Member: Sections on: Litigation; International Law; Individual Rights and Responsibilities) Bar Associations; the District of Columbia Bar; and Legislation and Civil Practice Law and Rules Committee of the Brooklyn Bar Association. Mr. Isquith has been Chairman of the Business Tort/Consumer Fraud Committee of the Tort Law Section of the New York State Bar Association and is a member of that association's Committees on Securities Law and Legislation. He has served as a judge for the Moot Court Competition of Columbia University Law School and Fordham University's National Competition. Mr. Isquith served as President of the National Association of Securities and Commercial Law Attorneys in 2003 and 2004. The April 1987 issue of *Venture* magazine listed Mr. Isquith as among the nation's top securities class action attorneys.

**JEFFREY G. SMITH:** *admitted:* New York; California; Supreme Court of the United States; U.S. Courts of Appeals for the Second, Third, Fourth, Fifth, Sixth, Eighth and Ninth Circuits; U.S. Tax Court; U.S. District Courts for the Southern and Eastern Districts of New York, Southern and Central Districts of California and the Districts of Colorado and Nebraska. *Education*: Vassar College (A.B., *cum laude generali*, 1974); Woodrow Wilson School of Public and International Affairs, Princeton University (M.P.A., 1977); Yale Law School (J.D., 1978). At Yale Law School, Mr. Smith was a teaching assistant for the Trial Practice course and a student supervisor in the Legal Services Organization, a clinical program. Member: The Association of the Bar of the City of New York; New York State and American (Section on Litigation) Bar Associations; State Bar of California (Member: Litigation Section). Mr. Smith has frequently lectured on corporate governance issues to professional groups of Fund trustees and investment advisors as well as to graduate and undergraduate business student groups, and regularly serves as a moot court judge for the A.B.A. and at New York University Law School. Mr. Smith has substantial experience in complex civil litigation, including class and derivative actions, tender offer, merger, and takeover litigation.

**FRANCIS M. GREGOREK:** *admitted:* New York; California; U.S. Courts of Appeals for the District of Columbia and Ninth Circuit; U.S. District Courts

Wolf
Haldenstein
Adler Freeman
& Herz LLP





for the Eastern and Southern Districts of New York, and Central, Southern and Northern Districts of California; *Education*: University of Virginia (B.A., with high distinction, 1975); New York University (J.D., 1978); Durham University, Durham, England. Phi Beta Kappa; Phi Alpha Theta. Member: State Bar of California; American Bar Association.

**MARY JANE FAIT**: *admitted*: New York; Illinois; U.S. District Courts for the Southern and Eastern Districts of New York, and Northern District of Illinois; U.S. Court of Appeals for the Seventh Circuit. *Education*: St. John's College and University of Illinois (B.A., Economics, 1976); Cornell Law School (J.D., 1979). Member: Chicago Bar Association; Illinois Bar Association; Antitrust Division of the American Bar Association.

**PETER C. HARRAR**: *admitted*: New York; U.S. District Courts for the Southern, Eastern and Northern Districts of New York. *Education*: Princeton University (A.B., with high honors, 1980); Columbia University (J.D., 1984). Phi Beta Kappa. Mr. Harrar has extensive experience in complex securities and commercial litigation on behalf of individual and institutional clients.

**LAWRENCE P. KOLKER**: *admitted*: New York; U.S. Courts of Appeals for the Second and Eleventh Circuits; U.S. District Courts for the Southern and Eastern Districts of New York, Western District of Michigan and the District of Colorado. *Education*: State University of New York at Binghamton (B.A., 1978); Brooklyn Law School (J.D., 1983). Editor, *Brooklyn Law Review*, 1982-1983. Panelist, Early Neutral Evaluator for the Eastern District of New York, 1992-1997. Lecturer, Brooklyn Law School, 1989. Assistant Corporation Counsel, City of New York, 1983-1987. Member: The Association of the Bar of the City of New York; New York State Bar Association. Mr. Kolker has spoken at numerous conferences of the Investment Program Association and the Strategic Research Institute concerning limited partnership tender offers and litigation strategies, and has published articles entitled "Litigation Strategies for Limited Partnership Tender Offers" (February 1996) and "Limited Partnership Five Percent Tender Offers" (October 1997) in Standard & Poor's *Review of Securities and Commodities Regulation*. Mr. Kolker has acted as lead counsel in numerous class and derivative actions asserting the rights of investors since joining Wolf Haldenstein in 1989. Mr. Kolker also counsels investment management firms in transactional and securities matters and represents them in corporate and business litigation.

16

**MARK C. RIFKIN:** *admitted*: New York; Pennsylvania; New Jersey; U.S. Supreme Court; U.S. Courts of Appeals for the Second, Third, Fifth, and D.C. Circuits; U.S. District Courts for the Southern and Eastern Districts of New York, the Eastern and Western Districts of Pennsylvania, the District of New Jersey, the Eastern District of Wisconsin and the Western District of Michigan. *Education*:    Princeton    University    (A.B.,    1982);    Villanova University School of Law (J.D. 1985). Contributor, PACKEL & POULIN, *Pennsylvania Evidence* (1987). Mr.  Rifkin has extensive experience in complex class and derivative actions in securities, ERISA, antitrust, intellectual property, and consumer protection litigation. Mr. Rifkin has extensive trial experience in class and derivative actions, including *In re National Media Corp. Derivative Litig.*, C.A. 90-7574 (E.D.Pa.), *Upp v. Mellon Bank, N.A.*, C.A. No. 91-5229 (E.D.Pa.), where the verdict awarded more than $60 million in damages to the Class (later reversed on appeal, 997 F.2d 1039 (3d Cir. 1993)), and *In re AST Research Securities Litigation*, No. 94-1370 SVW (C.D. Cal.), as well as a number of commercial matters for individual clients. Mr. Rifkin has lectured before diverse business and professional organizations in the areas of securities and complex litigation and corporate governance, serves as a moot court judge for the A.B.A. and at New York University Law School, and is a frequent guest lecturer to graduate and undergraduate economics and finance students on corporate governance topics.



**MICHAEL JAFFE:** *admitted*: California; New York; U.S. District Courts for the Southern and Eastern Districts of New York. *Education*: University of California at Berkeley (B.S., with highest distinction, 1982); Hastings College of the Law, University of California (J.D., 1987).   Judicial Extern to the Honorable   Thelton   E.   Henderson,   Northern   District   of   California, 1986-1987. Member: The Association of the Bar of the City of New York. Languages: French.

**BETSY C. MANIFOLD:** *admitted*: Wisconsin; New York; California; U.S. District Courts for the Western District of Wisconsin, Eastern and Southern Districts of New York, and Northern, Central and Southern Districts of California.   *Education*:   Elmira College; Middlebury College (B.A., *cum laude*, 1980); Marquette University (J.D., 1986); New York University. Thomas More Scholar. Recipient, American Jurisprudence Award in Agency. Member: The Association of the Bar of the City of New York. Languages: French.

Wolf
Haldenstein
Adler Freeman
& Herz LLP





**ALEXANDER H. SCHMIDT:** *admitted:* New York; New Jersey; United States Supreme Court, United States Court of Appeals for the Second Circuit, and the United States Court of Federal Claims. *Education:* State University of New York, Stony Brook (B.A., 1981); Brooklyn Law School (J.D., 1985). Mr. Schmidt concentrates on sophisticated commercial litigation, including matters involving antitrust, class actions, banking, commercial factoring, securities fraud, civil RICO, real estate, intra-corporate and partnership disputes, and legal and accounting malpractice. His noteworthy, groundbreaking successes include *Dresses For Less, Inc. v. CIT Group/Commercial Services, Inc.,* 2002 U.S. Dist. LEXIS 18338; 2002-2 Trade Cas. (CCH) P73,828 (S.D.N.Y. Sept. 30, 2002) (sustaining Sherman Act claims against commercial factoring industry); *Atkins & O'Brien L.L.P. v. ISS Int'l Serv. Sys.,* 252 A.D.2d 446; 678 N.Y.S.2d 596 (1st Dep't 1998) (lawyers could recover future fees under estoppel exception to general rule that client can terminate relationship at any time as lawyers founded law firm and expended start-up costs based on client's promises of future fees); *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,* 160 F.R.D. 437 (S.D.N.Y. 1995) (attorney client privilege held waived as to inadvertently disclosed documents not protected by "common interest" doctrine). Mr. Schmidt was an Assistant Adjunct Professor of Law at Brooklyn Law School in 1998 and 1999, where he co-taught a seminar on Federal Discovery Practice.

**GREGORY M. NESPOLE:** *admitted:* New York; U.S. District Courts for the Southern and Eastern Districts of New York. *Education:* Bates College (B.A., 1989); Brooklyn Law School (J.D., 1993). Member: The Association of the Bar of the City of New York; New York State Bar Association. Mr. Nespole's experience includes complex civil and criminal litigation.

**DAVID L. WALES:** *admitted:* New York; District of Columbia; United States Court of Appeals for the Second and Fourth Circuits, the United States District Courts for the Southern, Eastern and Western Districts of New York, and the District of Columbia. *Education:* State University of New York, Albany (B.A., *magna cum laude,* 1984); Georgetown University Law Center, (J.D., *cum laude,* 1987); Notes and Comments Editor, *Georgetown Journal of Law and Technology.* Mr. Wales is a member of the Federal Bar Council and the Federal Courts Committee of the New York County Lawyers Association, and is AV rated by Martindale Hubbell. Mr. Wales is an experienced trial and appellate attorney who specializes in handling complex securities and class action litigation. Mr. Wales was an Assistant





United States Attorney for the Southern District of New York (1992-1998), where he specialized in investigating and prosecuting fraud and white collar criminal cases. Mr. Wales has personally tried more than 15 federal jury trials, and his recent trials include: (i) a jury verdict in May 2005 for more than $11 million, including $1 million in punitive damages, in a derivative action against the general partner of a hedge fund; and (ii) a multi-million dollar settlement with an accounting firm reached during trial of a class action in April 2003. Mr. Wales has been lead or co-lead counsel in numerous securities class actions and derivative actions, including; *In re Sepracor Corp. Securities Litigation*, C.A. No. 02-12338 (D. Mass.) ($52,500,000 recovery in securities fraud class action); *In re Luxottica Group S.p.A. Securities Litigation*, CV-01-3285 (E.D.N.Y.) ($18,250,000 recovery in a Williams Act case); *In re Marque Partners L.P. Derivative Action*, No. 01-604724 (Sup. Ct., N.Y. Co.) ($11,000,000 jury verdict in a derivative action); *In re Jennifer Convertibles Securities Litigation*, CV-94-5570 (E.D.N.Y.) ($9,550,000 recovery, part of the recovery obtained in the middle of trial); and *In re Curative Health Services Securities Litigation*, CV-99-2074 (E.D.N.Y.) ($10,500,000 recovery in a securities fraud action).

**DEMET BASAR:** *admitted*: New York; New Jersey; U.S. District Court for the District of New Jersey, Southern District of New York, and Eastern District of Wisconsin. *Education*: Fairleigh Dickinson University (B.A., *summa cum laude*, 1984), Phi Omega Epsilon; Rutgers University School of Law (J.D., 1990). Recipient, West's Scholarship Award, Senior Notes and Comments Editor, *Rutgers Law Review*. Member: The Association of the Bar of the City of New York. Languages: Turkish.

**ADAM J. LEVITT:** *admitted:* Illinois; Supreme Court of the United States; U.S. Courts of Appeals for the First and Seventh Circuits; U.S. District Courts for the Northern and Southern Districts of Illinois, Northern District of Indiana, District of Nebraska, District of Colorado, and the Northern and Eastern Districts of Texas. *Education*: Columbia College, Columbia University (A.B., *magna cum laude*, 1990); Northwestern University School of Law (J.D., 1993). *Member:* American Law Institute (Members Consultative Groups: Principles of the Law of Aggregate Litigation, the Restatement of the Law (Third) Restitution and Unjust Enrichment, and the Restatement of the Law (Third) Torts: Liability for Economic Loss); Seventh Circuit Contributing Editor, *Class Actions & Derivative Suits* (ABA); Consulting Participant: "Calculation of Securities Litigation Damages" (National Association of Public Pension Attorneys, Securities Litigation Damages

Wolf
Haldenstein
Adler Freeman
& Herz LLP

Calculation Taskforce). **Publications:** Foreign Investors Serving as Lead Plaintiffs in U.S.-Based Securities Cases, International Practice Section Newsletter (Association of Trial Lawyers of America, Washington, D.C.), Winter 2004 and Spring 2005.; Proposed Rule 225: A Death Warrant for Class Actions in Illinois, 93 Illinois Bar Journal 202 (2005); The Big Business Wish List: Proposed Illinois Supreme Court Rule 225 and the Demolition of Consumer Rights, The Class Act (The Newsletter of the National Association of Securities and Consumer Law Attorneys), February 25, 2005; and An Illinois Lawyer's Guide to Service of Process in Mexico, 82 Illinois Bar Journal 434 (1994). Mr. Levitt has also testified before the Illinois Supreme Court Rules Committee on class action practice and related issues. Mr. Levitt regularly serves as a moot court judge in the Julius H. Miner Moot Court Competition, Northwestern University School of Law. In recognition of his achievements to date, Mr. Levitt was named one of the "40 Illinois Attorneys Under 40 Years Old to Watch" by the *Chicago Daily Law Bulletin* and the *Chicago Lawyer*. He is rated "AV" by Martindale-Hubbell.



Substantially all of Mr. Levitt's practice is focused on complex commercial litigation and class action practice on both the trial and appellate court levels, in federal and state courts nationwide, in the areas of securities, consumer protection, technology, and agricultural law. Since 1993, Mr. Levitt has served as lead counsel, co-lead counsel, or in other leadership positions in numerous class and other complex litigations throughout the United States, including *In re StarLink Corn Products Liability Litigation*, MDL No. 1403 (N.D. Illinois) (recovered $110 million for U.S. corn farmers who sustained market losses arising from defendants' contamination of the U.S. food corn supply with an improperly bioengineered corn seed product); *Court Reporting Services, et al. v. Compaq Computer Corporation*, C.A. No. 02 CV 044 (E.D. Texas) (obtained full recovery, valued at not less than $35 million, on behalf of Compaq Presario purchasers with improperly partitioned hard disk drives); and various Internet privacy cases, including *Supnick v. Amazon.com*, Inc. (W.D. Wash.) and *In re DoubleClick, Inc. Privacy Litigation* (S.D.N.Y.).

Mr. Levitt is currently co-lead counsel in a series of thirteen class action lawsuits against the Monsanto Company, Pioneer Hi-Bred International, and E.I. DuPont de Nemours and Company, predicated upon those companies' alleged improper conduct arising from their sale of genetically-engineered soybean and corn seeds or traits; is Class Counsel in *In re Aon*

20







*ERISA Litigation* (ERISA class action lawsuit on behalf of all participants and beneficiaries of Aon's 401(k) savings plan against Aon and certain of its officers and directors, alleging that during the class period, defendants, as fiduciaries of the Plan, each violated ERISA by breaching their duties owed to plaintiffs and the other participants and beneficiaries of the Plan in connection with the Plan's holding of Aon stock); and was recently appointed Designated Co-Lead and Co-Interim Class Counsel in *In Re Genetically Modified Rice Litigation*, MDL 1811 (E.D. Mo.), in which he is representing the interests of United States long-grain rice producers seeking to recover damages they sustained resulting from the contamination of the U.S. rice supply with unapproved, genetically-modified rice seed traits developed and tested by Bayer CropScience LP and related entities. Mr. Levitt is also actively involved in the *In re Initial Public Offering Sec. Litig.*, Master File No. 21 MC 92 (SAS) (S.D.N.Y.) (consolidated action against 309 issuers and 55 underwriters alleging manipulation, misrepresentations, and omissions relating to the market for various high-tech initial public offerings), and also recently served as lead counsel in *In re Comdisco Securities Litigation* (securities class action lawsuit against former Comdisco executives relating to Comdisco's misrepresentations and omissions with respect to its Prism division). Mr. Levitt also provides, or has provided, legal services to various private companies involving complex litigation and general corporate matters.

**THOMAS H. BURT**: *admitted*: New York; U.S. District Courts for the Southern and Eastern Districts of New York. *Education*: American University (B.A., 1993); New York University (J.D., 1997). Articles Editor with New York University Review of Law and Social Change.

**RACHELE R. RICKERT**: *admitted*: California; U.S. District Court for the Southern District of California. *Education*: Point Loma Nazarene College (B.A., 1994); University of California, Hastings College of the Law (J.D., 1997). Member: State Bar of California. Former Deputy Alternate Public Defender for the County of San Diego.

OF COUNSEL

**ROBERT ABRAMS**: *admitted*: New York; U.S. Court of Appeals for the Third Circuit; U.S. District Courts for the Southern and Eastern Districts of New York, Eastern District of Missouri, District of Maryland, and District of Delaware. *Education:* Haverford College (B.A., 1961); Columbia University

21







(Ph.D., 1966), Brooklyn Law School (J.D., 1992). Woodrow Wilson Fellow; International Business Law Fellow. Adjunct Professor, Mediation Clinic, Brooklyn Law School, 1983-1984. Mr. Abrams was formerly a Professor of Political Science at Brooklyn College and the Graduate Center of the City University of New York. Member: New York State Bar Association. Mr. Abrams is the author of books on the theory of collective choice (Columbia University Press) and voting theory (Sage), as well as articles on Soviet politics, game theory and bargaining and negotiations. He has focused his practice on complex securities, ERISA, and consumer actions.

**ROBERT B. WEINTRAUB:** *admitted:* New York; Supreme Court of the United States; U.S. Court of Appeals for the Federal and Second Circuits; District of Columbia; U.S. District Courts for the Southern and Eastern Districts of New York. *Education:* Syracuse University (B.A., *cum laude,* 1972); Georgetown University Law Center (J.D., 1977). Member: 1975-1977, Articles Editor and Member: Executive Board, 1976-1977, Law and Policy in International Business, *Georgetown International Law Journal.* Assistant Editor, Competition Working Group, "The OECD Guidelines for Multinational Enterprises: A Business Appraisal," 1977. Author, "Law Backs Women Warriors," *National Law Journal,* June 7, 1993. Co-contributor: Chapter 7, "The Celler-Kefauver Act of 1950," 4 *Legislative History of the Federal Antitrust Laws and Related Statutes,* edited by E. Kintner, Chelsea House Publishers, 1980. Mediator, U.S. District Court, Southern District of New York. Member: The Association of the Bar of the City of New York (Member: Committee on Securities Regulation; Council on International Affairs; Chair, 1991-1994 and Member: 1987-1990, Committee on Military Affairs and Justice; International Arms Control and Security Affairs, 1990-1991); and American Bar Association. He has counseled corporations on contract negotiation and antitrust matters, and provided antitrust advice on mergers to the arbitrage department of a major brokerage house. He has served as an arbitrator for the NYSE, the NASD and the Municipal Securities Rulemaking Board and as a mediator for the federal District Court in New York. Mr. Weintraub also previously served as Senior Vice President and General Counsel of a broker-dealer investment bank which is a member of the NYSE, the NASD and other principal exchanges. Mr. Weintraub has particular experience in litigation involving investment firms and broker-dealers.

**GUSTAVO BRUCKNER:** *admitted:* New York; New Jersey; United States District Courts for the Districts of New Jersey, Eastern District of New York,

and the Southern District of New York; the United States Court of Appeals for Second Circuit and the Supreme Court of the United States. *Education*: New York University (B.S., 1988); New York University (M.B.A. 1989); Benjamin N. Cardozo School of Law, Yeshiva University (J.D., 1992).

### ASSOCIATES

**THEODORE B. BELL:** *admitted:* Michigan; Illinois; 7th Circuit Court of Appeals; United States District Courts for the Northern, Central and Southern Districts of Illinois. *Education:* University of Michigan (B.A., 1988); University of Detroit Mercy School of Law (J.D., 1992).

**SCOTT J. FARRELL:** *admitted:* New York; New Jersey; U.S. District Courts for the Southern and Eastern Districts of New York, the District of New Jersey, and the District of Colorado. *Education*: Yeshiva University (B.A., *magna cum laude*, 1996), where he was a Max Stern Scholar and Gruss Scholar; New York University School of Law (J.D., 1999), where he was an Article and Note Editor of the *Journal of Legislation and Public Policy*. He is the co-author of "In re Gary Glass and Zoltan Guttman," CFTC Docket No. 93-4, *Futures & Derivatives Law Report*, July/August, 1998.

**KATE McGUIRE:** *admitted*: New York; U.S. District Courts for the Southern and Eastern Districts of New York. *Education*: University of California at Santa Cruz (B.A. 1995), Georgetown University Law Center (J.D., 1998); Member: *Georgetown Immigration Law Journal*.

**STACEY T. KELLY:** *admitted:* New York; New Jersey; U.S. District Courts for the Southern and Eastern Districts of New York. *Education*: New York University (B.A., 1997); Rutgers School of Law - Newark (J.D., 2000). Member: New York State Bar Association; New York County Lawyers Association

**PAULETTE S. FOX:** *admitted:* New York; New Jersey U.S. District Courts for the Southern and Eastern Districts of New York. *Education*: Benjamin N. Cardozo School of Law (J.D. 2001); Syracuse University (B.A. in Public Policy, *summa cum laude*, Phi Beta Kappa, 1998).

Wolf
Haldenstein
Adler Freeman
& Herz LLP

**MATTHEW GUINEY:** *admitted:* New York. *Education*: The College of William & Mary (B.A. in Government and Economics 1998); Georgetown University Law Center (J.D. 2002).

**MARTIN RESTITUYO:** *admitted:* New York. *Education*: Queens College (B.A., 1998); Hofstra University School of Law (J.D. 2002); Hofstra University, Frank G. Zarb School of Business (M.B.A., Finance, 2005). Mr. Restituyo did postgraduate work at the Universidad Autonoma de Santo Domingo, Santo Domingo, in the Dominican Republic, and studied at Faculte de Droit de l'Universite de Nice, in Nice, France. Mr. Restituyo was the Assistant Town Attorney for North Hempstead, New York (2004-2006), an Adjunct Professor at John Jay College of Criminal Justice (2005), and was in the Nassau County Department of Economic Development (2002-2004). In 2003, he was awarded the "Distinguished Alumni Award" from Hofstra University's Clinical Program. He is a member of the Nassau County Bar Association, the Women's Bar Association, the Hispanic Bar Association, the Dominican Bar Association and Hofstra University School of Law, Alumni Board.

**MARISA C. LIVESAY:** *admitted*: California; U.S. Court of Appeals for the Ninth Circuit; U.S. District Courts for the Central, Southern and Northern Districts of California. *Education*: University of Arizona (B.A. 1999, Dean's List with Distinction), where she served on the Associated Student Senate; University of California, Los Angeles (J.D. 2002, Corporate Specialization), where she was a member of the Moot Court Executive Board and staff member of the Journal of International Law and Foreign Affairs. Member: State Bar of California.

**IONA M. EVANS:** *admitted*: New York. *Education*: University of New Hampshire (B.A., 1999); Boston University School of Law (J.D., 2004), where she served as Staff Writer and Business Editor on the *International Law Journal*.

**GEORGE T. PETERS:** *admitted:* New York, U. S. District Courts for the Southern & Eastern Districts of New York. *Education:* Eastern Illinois University, B.A. 1991; attended Howard University School of Law and fulfilled remaining law studies at Wolf Haldenstein Adler Freeman and Herz LLP. Member of the New York State Bar Association.









**RACHEL S. POPLOCK:** *admitted:* New York, U.S. District Courts for the Southern & Eastern Districts of New York. *Education:* Cornell University (B.S. Human Development, 2002), Fordham Law School (J.D. 2005) where she was a member of the Fordham Urban Law Journal and received the Archibald R. Murray Public Service Award for her participation in the Family Advocacy Clinic.

Wolf Haldenstein partners who regularly provide their non-litigation expertise to class action litigation matters

**CHARLES H. BALLER:** *admitted*: New York. *Education*: New York University (B.S., *magna cum laude*, 1954); Columbia University (LL.B., 1957); New York University (L.L.M., Taxation, 1962). Beta Gamma Sigma; Beta Alpha Psi. Harlan Fiske Stone Scholar. Co-Editor and Contributing Author, April, 1981, with 1986 Supplement, *Business Acquisitions*, Practicing Law Institute. Member: The Association of the Bar of the City of New York; New York State and American Bar Associations. Mr. Baller has worked in the office of Chief Counsel, Internal Revenue Service (Interpretative Division). A lecturer and author for the Practicing Law Institute (co-editor of the reference work *Business Acquisitions: Planning and Practice*), Mr. Baller is a corporate and tax attorney with extensive expertise in mergers and acquisitions, complex estate planning (particularly relating to corporate and business holdings), and employee benefits and compensation, including ERISA.

**ERIC B. LEVINE:** *admitted*: New York; U.S. Courts of Appeals for the Second and Eleventh Circuits; U.S. District Courts for the Southern and Eastern Districts of New York, and Eastern District of Michigan; U.S. Tax Court. *Education*: State University of New York at Buffalo (B.A., *summa cum laude*, 1974); University of Pennsylvania (J.D., *cum laude*, 1977). Order of the Coif, Phi Beta Kappa. Associate Editor, *University of Pennsylvania Law Review*, 1976-1977. Member: The Association of the Bar of the City of New York; New York State Bar Association. Mr. Levine's practice focuses on complex commercial and civil litigation, including in the area of bankruptcy and receivership litigation, creditors' rights, and lender liability.




**MARK C. SILVERSTEIN:** *admitted*: New York. **Education**: State University of New York at Binghamton (B.S., *summa cum laude*, 1980); New York University (J.D., *cum laude*, 1983). Order of the Coif. Editor, Journal of International Law and Politics, 1982-1983. Member: the Association of the Bar of the City of New York; New York State; American Bar Associations. Mr. Silverstein serves as general counsel to corporations and handles matters involving tax planning and mergers and acquisitions. He also provides counseling in the structure of complex settlements and the administration of complex claims administrations.

**ELI D. GREENBERG:** *admitted*: New York. **Education**: New York University (B.S., *magna cum laude*, 1981. New York University (J.D., 1984). Beta Gamma Sigma. Lecturer, New York University. Member: American Health Lawyers Association. Mr. Greenberg has extensive experience in pension, tax, benefits, and ERISA.



SUBSTANTIAL RECOVERIES OBTAINED IN REPRESENTATIVE PAST CLASS ACTION CASES IN WHICH WOLF HALDENSTEIN WAS LEAD COUNSEL OR HAD ANOTHER SIGNIFICANT ROLE

- *In re BankAmerica Corp. Securities Litigation*, MDL Docket No. 1264 (JFN) (E.D. Mo.) (class recovered $490 million).

- *In re Dynamic Random Access Memory Antitrust Litigation*, (MD-02 1486 (N.D. Cal.) (class recovered $325 million).

- *In re MicroStrategy, Inc. Securities Litigation*, Civ. No. 00-473-A (E.D. Va.) (class recovered $160 million in cash and securities).

- *Kurzweil v. Philip Morris Cos.*, 94 Civ. 2373, 94 Civ. 2546 (S.D.N.Y.) (securities fraud) (class recovered $116.5 million in cash).

- *In re Starlink Corn Products Liability Litigation*, (N.D. Ill.) (class recovered $110 million).

- *In Computer Associates 2002 Class Action Sec. Litigation*, 2:02-CV-1226 (E.D.N.Y.) ($130 million settlement in this and two related actions).

- *In re Sepracor Inc. Securities Litigation*, Civ. No. 02-12338 (MEL) (D. Mass.) (classes recovered $52.5 million).

26





- *In re Merrill Lynch & Co., Inc. Global Technology Fund Securities Litigation*, 02 CV 7854 (JFK) (SDNY); and *In re Merrill Lynch & Co., Inc. Focus Twenty Fund Securities Litigation*, 02 CV 10221 (JFK) (SDNY) (class recovered $39 million in combined cases).

- *In re CNL Hotels & Resorts, Inc. Securities Litigation*, No. 6:04-cv-1231 (Orl-31) (class recovered $35 million, and lawsuit also instrumental in $225 million benefit to corporation).

- *Berger v. Compaq Computer Corp.*, Docket No. 98-1148 (S.D. Tex.) (class recovered $29 million).

- *In re Arakis Energy Corporation Securities Litigation*, 95 CV 3431 (E.D.N.Y.) (class recovered $24 million in cash).

- *In re E.W. Blanche Holdings, Inc. Securities Litigation*, Civ. No. 01-258 (D. Minn.) (class recovered $20 million).

- *In re Globalstar Securities Litigation*, Case No. 01-CV-1748 (SHS) (S.D.N.Y.) (class recovered $20 million).

- *In re Luxottica Group S.p.A. Securities Litigation*, No. CV 01-3285 (E.D.N.Y) (class recovered $18.25 million).

- *In re Musicmaker.com Securities Litigation*, CV-00-2018 (C.D. Cal.) (class recovered $13.75 million).

- *In re Comdisco Securities Litigation*, No. 01 C 2110 (MIS) (N.D. Ill.) (class recovered $13.75 million).

- *In re Acclaim Entertainment, Inc., Securities Litigation*, C.A. No. 03-CV-1270 (E.D.N.Y.) (class recovered $13.65 million).

- *In re Concord EFS, Inc. Securities Litigation*, No. 02-2097 (MA) (W.D. Tenn) (class recovered $13.25 million).

- *In re Bausch & Lomb, Inc. Securities Litigation*, 01 Civ. 6190 (CJS) (W.D.N.Y.) (class recovered $12.5 million).

- *In re Allaire Corp. Securities Litigation*, 00-11972 (D. Mass.) (class recovered $12 million).

Wolf
Haldenstein
Adler Freeman
& Herz LLP

- *Bamboo Partners LLC v. Robert Mondavi Corp.,* No. 26-27170 (Cal. Sup. Ct.) (class recovered $10.8 million).

- *Curative Health Services Securities Litigation,* 99-2074 (E.D.N.Y.) (class recovered $10.5 million).

- *City Partnership Co. v. Jones Intercable,* 99 WM-1051 (D. Colo.) (class recovered $10.5 million).

- *In re Tenfold Corporation Securities Litigation,* 2:00-CV-652 (D. Utah) (class recovered $5.9 million).

- *In re Realogy Corp. Shareholder Litigation,* No. 2621-N (Del. Ch.).

- *In re Industrial Gas Antitrust Litigation,* 80 C 3479 and related cases (N.D. Ill.) (class recovered $50 million in cash and coupons).

- *In re Chor-Alkalai and Caustic Soda Antitrust Litigation,* 86-5428 and related cases (E.D. Pa.) (class recovered $55 million).

- *In re Infant Formula Antitrust Litigation,* MDL No. 878 (N.D. Fla.) (class recovered $126 million).

- *In re Brand Name Prescription Drug Antitrust Litigation,* M.D.L. 940 (N.D. Ill.) (class recovered $715 million).

- *Landon v. Freel,* M.D.L. No. 592 (S.D. Tex.) (class recovered $12 million).

- *Holloway v. Peat, Marwick, Mitchell & Co.,* No. 84 C 814 EU (N.D. Okla.) (class recovered $38 million).

- *In re The Chubb Corp.* Drought Insurance Litigation, C-1-88-644 (S.D. Ohio) (class recovered $100 million.).

- *Wong v. Megafoods,* Civ-94-1702 (D. Ariz.) (securities fraud) (class recovered $12.25 million).

- *In re Del Val Financial Corp. Securities Litigation,* 92 Civ 4854 (S.D.N.Y.) (class recovered $11.5 million).

- *In re Home Shopping Network Shareholders Litigation,* Consolidated Civil Action No. 12868, (Del. Ch. 1995) (class recovered $13 million).





28







- *In re Paine Webber Limited Partnerships Litigation*, 94 Civ 8547 (S.D.N.Y.) (class recovered $200 million).

- *In re Bristol-Meyers Squibb Co. Securities Litigation*, 92 Civ 4007 (S.D.N.Y.) (class recovered $19 million).

- *In re Spectrum Information Technologies Securities Litigation*, CV 93-2245 (E.D.N.Y.) (class recovered $13 million).

- *In re Chase Manhattan Securities Litigation*, 90 Civ. 6092 (LJF) (S.D.N.Y.) (class recovered $17.5 million).

- *Prostic v. Xerox Corp.*, No. B-90-113 (EBB) (D. Conn.) (class recovered $9 million).

- *Steiner v. Hercules*, Civil Action No. 90-442-RRM (D. Del.) (class recovered $18 million).

- *In re Ambase Securities Litigation*, 90 Civ 2011 (S.D.N.Y.) (class recovered $14.6 million).

- *Steiner v. Phillips (In re Southmark Securities Litigation)*, CA No. 3-89-1402-D (N.D. Tex.) (class recovered $70 million).

- *Steiner v. Ideal Basic Industries, Inc.*, No. 86-M 456 (D. Colo. 1989) (securities fraud) (class recovered $18 million).

- *Tucson Electric Power Derivative Litigation*, 2:89 Civ. 01274 TUC. ACM (corporation recovered $30 million).

- *Alleco Stockholders Litigation*, (Md.Cir.Ct. Pr. Georges County) (class recovered $16 million).

- *In re Revlon Group, Inc. Shareholders Litigation*, No. 8362 (Del. Ch.) (class recovered $30 million).

- *In re Taft Broadcasting Company Shareholders Litigation*, No. 8897 (Del. Ch.) (class recovered $20 million).

- *In re Southland Corp. Securities Litigation*, No. 87-8834-K (N.D.Tex.) (class recovered $20 million).







- *In re Crocker Bank Securities Litigation,* CA No. 7405 (Del. Ch.) (class recovered $30 million).

- *In re Warner Communications Securities Litigation,* No. 82 Civ. 8288 (JFK) (S.D.N.Y.) (class recovered $17.5 million).

- *Joseph v. Shell Oil,* CA No. 7450 (Del. Ch.) (securities fraud) (class recovered $200 million).

- *In re Flight Transportation Corp. Securities Litigation,* Master Docket No. 4-82-874, MDL No. 517 (D. Minn.) (class recovered $50 million.).

- *In re Whittaker Corporation Securities Litigation,* CA000817 (Cal. Super. Ct., Los Angeles County) (class recovered $18 million).

- *Naevus International, Inc. v. AT&T Corp.,* C.A. No. 602191/99 (N.Y. Sup. Ct.) (consumer fraud) (class recovered $40 million).

- *Sewell v. Sprint PCS Limited Partnership,* C.A. No. 97-188027/CC 3879 (Cir. Ct. for Baltimore City) (consumer fraud) (class recovered $45.2 million).

REPRESENTATIVE REPORTED OPINIONS SINCE 1990 IN WHICH WOLF HALDENSTEIN WAS LEAD COUNSEL OR HAD ANOTHER SIGNIFICANT ROLE

## Federal Appeals Court Opinions

- *Harzewski v. Guidant Corp.,* 489 F.3d 799 (7th Cir. 2007).

- *In re Pharmatrak, Inc. Privacy Litig.,* 2003 U.S. App. LEXIS 8758 (1st Cir. May 9, 2003).

- *Berger v. Compaq Computer Corp.,* 257 F.3d 475 (2001), clarified, 279 F.3d 313 (5th Cir. 2002).

- *In re Bankamerica Corp. Securities Litigation,* 263 F.3d 795 (8th Cir. 2001).

- *Wright v. Ernst & Young LLP,* 152 F.3d 169 (2d Cir. 1998).

- *Romine v. Compuserve Corp.,* 160 F.3d 337 (6th Cir. 1998).

Wolf
Haldenstein
Adler Freeman
& Herz LLP





- *Felzen v. Andreas,* 134 F.3d 873 (7th Cir. 1998).

- *Brown v. Radica Games (In re Radica Games Securities Litigation),* No. 96-17274, 1997 U.S. App. LEXIS 32775 (9th Cir. Nov. 14, 1997).

- *Robbins v. Koger Properties,* 116 F.3d 1441 (11th Cir. 1997).

- *In re Painewebber Inc. Limited Partnerships Litigation,* 94 F.3d 49 (2d Cir. 1996).

- *Glassman v. Computervision Corp.,* 90 F.3d 617 (1st Cir. 1996).

- *Alpern v. Utilicorp United, Inc.,* 84 F.3d 1525 (8th Cir. 1996).

- *Shaw v. Digital Equipment Corp.,* 82 F.3d 1194 (1st Cir. 1996).

- *Riley v. Simmons,* 45 F.3d 764 (3d Cir. 1995).

- *Stepak v. Addison,* 20 F.3d 398 (11th Cir. 1994).

- *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295 (2d Cir. 1990).

## Federal District Court Opinions

- *Schoenbaum v. E.I. Dupont De Nemours and Co.,* 2007 WL 2768383 (E.D. Mo. Sept. 20, 2007).

- *Jeffries v. Pension Trust Fund,* 99 Civ. 4174 (LMM), 2007 U.S. Dist. LEXIS 61454 (S.D.N.Y. Aug. 20, 2007).

- *Klein v. Ryan Beck,* 06-Civ. 3460 (WCC), 2007 U.S. Dist. LEXIS 51465 (S.D.N.Y. July 13, 2007).

- *Cannon v. MBNA Corp.* No. 05-429 GMS, 2007 U.S. Dist. LEXIS 48901 (D. Del. 2007).

- *In re Aquila ERISA Litig.,* 237 F.R.D. 202 (W.D. Mo. 2006).

- *Smith v. Aon Corp.,* 238 F.R.D. 609 (N.D. Ill. 2006).

- *In re Sepracor Inc. Securities Litigation,* 233 F.R.D. 52 (D. Mass. 2005).

Wolf
Haldenstein
Adler Freeman
& Herz LLP





- *In re Transkaryotic Therapies, Inc. Securities Litigation,* No. 03-10165, 2005 U.S. Dist. LEXIS 29656 (D. Mass. Nov. 28, 2005).

- *In re Luxottica Group, S.p.A. Securities Litigation,* 2005 U.S. Dist. LEXIS 9071 (E.D.N.Y. May 12, 2005).

- *In re CNL Hotels & Resorts, Inc. Securities Litigation,* 2005 U.S. Dist. LEXIS 38876, No. 6:04-cv-1231-Orl-31KRS (M.D. Fla. May 9, 2005).

- *Johnson v. Aegon USA, Inc.,* 1:01-CV-2617 (N.D. Ga. Sept. 20, 2004).

- *Freeland v. Iridium World Communications, Ltd.,* 99-1002 (D.D.C. Aug. 31, 2004).

- *In re Acclaim Entertainment, Inc. Securities Litigation,* 03-CV-1270 (E.D.N.Y. June 22, 2004).

- *In re Sepracor Inc. Securities Litigation,* 308 F. Supp. 2d 20 (D. Mass. 2004).

- *In re Concord EFS, Inc. Securities Litigation,* No. 02-2697 (W.D. Tenn. Jan. 7, 2004).

- *In re Enterprise Mortgage Acceptance Co., LLC, Sec. Litig.,* 02-Civ. 10288 (SWK) (S.D.N.Y. Nov. 5, 2003).

- *In re PerkinElmer, Inc. Securities Litigation,* 286 F. Supp. 2d 46 (D. Mass. 2003).

- *In re Initial Public Offering Securities Litigation,* 241 F. Supp. 2d 281 (S.D.N.Y. 2003).

- *In re Comdisco Securities Litigation,* No. 01 C 2110, 2003 U.S. Dist. LEXIS 5047 (N.D. Ill. Mar. 31, 2003).

- *City Partnership Co. v. Cable TV Fund* 14-B, 213 F.R.D. 576 (D. Colo. 2002).

- *In re Allaire Corporation Securities Litigation,* Docket No. 00-11972 - WGY, 2002 U.S. Dist. LEXIS 18143 (D. Mass., Sept. 27, 2002).

- *In re StarLink Corn Products Liability Litigation,* 212 F.Supp.2d 828 (N.D. Ill. 2002)

Wolf
Haldenstein
Adler Freeman
& Herz LLP





- *In re Comdisco Securities Litigation,* 166 F.Supp.2d 1260 (N.D. Ill. 2001).

- *In re Crossroads Systems, Inc. Securities Litigation,* Master File No. A-00-CA-457 JN, 2001 U.S. Dist. LEXIS 14780 (W.D. Tx. Aug. 15, 2001).

- *In re MicroStrategy, Inc. Securities Litigation,* 150 F. Supp. 2d 896 (E.D. Va. 2001).

- *Lindelow v. Hill,* No. 00 C 3727, 2001 U.S. Dist. LEXIS 10301 (N.D. Ill. July 19, 2001).

- *In re MicroStrategy, Inc. Securities Litigation,* 148 F. Supp. 2d 654 (E.D. Va. 2001).

- *Jeffries v. Pension Trust Fund of the Pension, Hospitalization & Benefit Plan of the Electrical Industry,* 172 F. Supp. 2d 389 (S.D.N.Y. 2001).

- *Carney v. Cambridge Technology Partners, Inc.,* 135 F. Supp. 2d 235 (D. Mass. 2001).

- *Weltz v. Lee,* 199 F.R.D. 129 (S.D.N.Y. 2001).

- *Schoers v. Pfizer, Inc.,* 00 Civ. 6121, 2001 U.S. Dist. LEXIS 511 (S.D.N.Y. Jan. 23, 2001).

- *Kurzweil v. Philip Morris Cos.,* 94 Civ. 2373 (MBM), 2001 U.S. Dist. LEXIS 83 (S.D.N.Y. Jan. 9, 2001).

- *Goldberger v. Bear, Stearns & Co.,* 98 Civ. 8677 (JSM), 2000 U.S. Dist. LEXIS 18714 (S.D.N.Y. Dec. 28, 2000).

- *In re Newell Rubbermaid, Inc., Securities Litigation,* Case No. 99 C 6853, 2000 U.S. Dist. LEXIS 15190 (N.D. Ill. Oct. 2, 2000).

- *Stanley v. Safeskin Corp.,* Case No. 99 CV 454 BTM (LSP), 2000 U.S. Dist. LEXIS 14100, Fed. Sec. L. Rep. (CCH) P91, 221 (S.D. Cal. Sept. 18, 2000).

- *In re MicroStrategy, Inc. Securities Litigation,* 115 F. Supp. 2d 620 (E.D. Va. 2000).

- *In re USA Talks.com, Inc. Securities Litigation,* 2000 U.S. Dist. LEXIS 14823, Fed. Sec. L. Rep. (CCH) P91, 231 (S.D. Cal. Sept. 14, 2000).

Wolf
Haldenstein
Adler Freeman
& Herz LLP





- *In re Sotheby's Holdings, Inc. Securities Litigation*, 00 CIV. 1041 (DLC), 2000 U.S. Dist. LEXIS 12504, Fed. Sec. L. Rep. (CCH) P91, 059 (S.D.N.Y. Aug. 31, 2000).

- *Dumont v. Charles Schwab & Co., Inc.*, Civil Action No. 99-2840 2000 U.S. Dist. LEXIS 10906 (E.D. La. July 21, 2000).

- *Berger v. Compaq Computer Corp.*, Civil Action No. H-98-1148, 2000 U.S. Dist. LEXIS 21424 (S.D. Tex. July 17, 2000).

- *In re BankAmerica Corp. Securities Litigation*, 95 F. Supp. 2d 1044 (E.D. Mo. 2000).

- *In re Carnegie International Corp. Securities Litigation*, 107 F. Supp. 2d 676 (D. Md. 2000).

- *Berger v. Compaq Computer Corp.*, Civil Action No. H-98-1148, 2000 U.S. Dist. LEXIS 21423 (S.D. Tex. Mar. 13, 2000).

- *In re Imperial Credit Industries Securities Litigation*, CV 98-8842 SVW, 2000 U.S. Dist. LEXIS 2340 (C.D.Cal. Feb. 23, 2000).

- *Sturm v. Marriott Marquis Corp.*, 85 F. Supp. 2d 1356 (N.D. Ga. 2000).

- *In re Health Management Systems Securities Litigation*, 82 F. Supp. 2d 227 (S.D.N.Y. 2000).

- *Dumont v. Charles Schwab & Co., Inc.*, Civil Action No. 99-2840, 2000 U.S. Dist. LEXIS 619 (E.D. La. Jan. 19, 2000).

- *In re MicroStrategy, Inc. Securities Litigation*, 110 F. Supp. 2d 427 (E.D. Va. 2000).

- *In re BankAmerica Corp. Securities Litigation*, 78 F. Supp. 2d 976 (E.D. Mo. 1999).

- *Kurzweil v. Philip Morris Cos.*, 94 Civ. 2373 (MBM), 1999 U.S. Dist. LEXIS 18378 (S.D.N.Y. Nov. 24, 1999).

- *In re Nanophase Technologies Corp. Litigation*, 98 C 3450, 1999 U.S. Dist. LEXIS 16171 (N.D. Ill. Sept. 27, 1999).

Wolf
Haldenstein
Adler Freeman
& Herz LLP







- *In re Clearly Canadian Securities Litigation,* File No. C-93-1037-VRW, 1999 U.S. Dist. LEXIS 14273 Cal. Sept. 7, 1999).

- *Yuan v. Bayard Drilling Technologies, Inc.,* 96 F. Supp. 2d 1259 (W.D. Okla. 1999).

- *In re Spyglass, Inc. Securities Litigation,* No. 99 C 512, 1999 U.S. Dist. LEXIS 11382 (N.D. Ill. July 20, 1999).

- *Carley Capital Group v. Deloitte & Touche, L.L.P.,* 1:97-CV-3183-TWT, 1999 U.S. Dist. LEXIS 11595 (N.D.Ga. June 30, 1999).

- *Carley Capital Group v. Deloitte & Touche, L.L.P.,* 1:97-CV-3183-TWT, 1999 U.S. Dist. LEXIS 11596 (N.D. Ga. June 30, 1999).

- *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.,* 98 CV 3287, 1999 U.S. Dist. LEXIS 11363 (E.D.N.Y. June 1, 1999).

- *Carley Capital Group v. Deloitte & Touche, L.L.P.,* 1:97-CV-3183-TWT, 1999 U.S. Dist. LEXIS 1368, Fed. Sec. L. Rep. (CCH) P90, 429 (N.D. Ga. Jan. 19, 1999).

- *Longman v. Food Lion, Inc.,* 186 F.R.D. 331 (M.D.N.C. 1999).

- *Walsingham v. Biocontrol Technology, Inc.,* 66 F. Supp. 2d 669 (W.D. Pa. 1998).

- *Sturm v. Marriott Marquis Corp.,* 26 F. Supp. 2d 1358 (N.D. Ga. 1998).

- *Carley Capital Group v. Deloitte & Touche, L.L.P.,* 27 F. Supp. 2d 1324 (N.D. Ga. 1998).

- *In re MobileMedia Securities Litigation,* 28 F.Supp.2d 901 (D.N.J. 1998).

- *Weikel v. Tower Semiconductor, Ltd.,* 183 F.R.D. 377 (D.N.J. 1998).

- *In re Health Management Systems Securities Litigation,* 97 Civ. 1865 (HB), 1998 U.S. Dist. LEXIS 8061 (S.D.N.Y. May 27, 1998).

- *In re Painewebber Ltd. Partnership Litigation,* 999 F. Supp. 719 (S.D.N.Y. 1998).

Wolf
Haldenstein
Adler Freeman
& Herz LLP





- *Carley Capital Group v. Deloitte & Touche, L.L.P.*, 1:97-cv-3183-TWT, 1998 U.S. Dist. LEXIS 23222 (N.D. Ga. Feb. 10, 1998).

- *In re TCW/DW North American Government Income Trust Securities Litigation*, 95 Civ. 0167 (PKL), 1997 U.S. Dist. LEXIS 18485 (S.D.N.Y. Nov. 20, 1997).

- *Wright v. Ernst & Young, LLP*, 97 Civ. 2189 (SAS), 1997 U.S. Dist. LEXIS 13630 (S.D.N.Y. Sept. 9, 1997).

- *Felzen v. Andreas*, No. 95-2279, 1997 U.S. Dist. LEXIS 23646 (C.D. Ill. July 7, 1997).

- *Felzen v. Andreas*, No. 95-2279, 1997 U.S. Dist. LEXIS 23647 (C.D. Ill. July 7, 1997).

- *A. Ronald Sirna, Jr., P.C. Profit Sharing Plan v. Prudential Securities, Inc.*, 964 F. Supp. 147 (S.D.N.Y. 1997).

- *Kurzweil v. Philip Morris Companies*, 94 Civ. 2373 (MBM), 1997 U.S. Dist. LEXIS 4451 (S.D.N.Y. April 8, 1997).

- *Bobrow v. Mobilmedia, Inc.*, Civil Action No. 96-4715, 1997 U.S. Dist. LEXIS 23806 (D.N.J. March 31, 1997).

- *Kalodner v. Michaels Stores, Inc.*, 172 F.R.D. 200 (N.D.Tex. 1997).

- *In re Painewebber Ltd. Partnerships Litigation*, 171 F.R.D. 104 (S.D.N.Y. 1997).

- *A. Ronald Sirna, Jr., P.C. Profit Sharing Plan v. Prudential Securities, Inc.*, 95 Civ. 8422 (LAK), 1997 U.S. Dist. LEXIS 1226 (S.D.N.Y. Feb. 7, 1997).

- *Dresner Co. Profit Sharing Plan v. First Fidelity Bank, N.A.*, 95 Civ. 1924 (MBM), 1996 U.S. Dist. LEXIS 17913 (S.D.N.Y. Dec. 3, 1996).

- *Simon v. American Power Conversion Corp.*, 945 F. Supp. 416 (D.R.I. 1996).

- *TII Industries, Inc.*, 96 Civ. 4412 (SAS), 1996 U.S. Dist. LEXIS 14466 (S.D.N.Y. Oct. 1, 1996).

Wolf
Haldenstein
Adler Freeman
& Herz LLP





- *In re TCW/DW North American Government Income Trust Securities Litigation*, 941 F. Supp. 326 (S.D.N.Y. Oct. 1, 1996).

- *In re Painewebber Ltd. Partnership Litigation*, 94 Civ. 8547 (SHS), 1996 U.S. Dist. LEXIS 9195 (S.D.N.Y. June 28, 1996).

- *In re Tricord Systems, Inc., Securities Litigation*, Civil No. 3-94-746, 1996 U.S. Dist. LEXIS 20943 (D. Minn. April 5, 1996).

- *In re Painewebber Limited Partnership Litigation*, 94 Civ. 8547 (SHS), 1996 U.S. Dist. LEXIS 1265 (S.D.N.Y. Feb. 6, 1996).

- *Zitin v. Turley*, [1991 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96,123 (D. Ariz. June 20, 1994).

- In re Southeast Hotel Properties Limited Partnership Investor Litigation, 151 F.R.D. 597 (W.D.N.C. 1993).

## State Court Opinions

- *In re Tyson Foods, Inc., Consolidated Shareholder Litigation*, 919 A. 2d 563 (Del. Ch. 2007).

- *Naevus Int'l v. AT&T Corp.*, 283 A.D.2d 171, 724 N.Y.S.2d 721 (2001).

- *Paramount Communications, Inc. v. QVC Network, Inc.*, 637 A.2d 34 (Del. Super. Ct. 1994).

- *In re Western National Corp. Shareholders Litigation*, Consolidated C.A. No. 15927, 2000 Del. Ch. LEXIS 82 (May 22, 2000).

- *In re Cencom Cable Income Partners, L.P. Litigation*, C.A. No. 14634, 2000 Del. Ch. LEXIS 90 (May 5, 2000).

- *In re Cencom Cable Income Partners, L.P. Litigation*, Consolidated C.A. No. 14634, 2000 Del. Ch. LEXIS 10 (Jan. 27, 2000).

- *In re Marriott Hotels Properties II Limited Partnership Unitholders Litigation*, Consolidated C.A. No. 14961, 2000 Del. Ch. LEXIS 17 (Jan. 24, 2000).

Wolf
Haldenstein
Adler Freeman
& Herz LLP







- *Romig v. Jefferson-Pilot Life Insurance Company,* 132 N.C. App. 682, 513 S.E.2d 598 (Ct. App. 1999), aff'd, 351 N.C. 349, 524 S.E.2d 804 (N.C.S. Ct. 2000).

- *Wallace v. Wood,* 752 A.2d 1175 (Del. Ch. 1999).

- *Greenwald v. Batterson,* C.A. No. 16475, 1999 Del. Ch. LEXIS 158 (July 26, 1999).

- *Brown v. Perrette,* Civil Action No. 13531, 1999 Del. Ch. LEXIS 92 (May 18, 1999).

- *In re Cencom Cable Income Partners, L.P. Litigation,* C.A. No. 14634, 1997 Del. Ch. LEXIS 146 (Oct. 15, 1997).

- *In re Marriott Hotel Properties II Limited Partnership Unitholders Litigation,* Consolidated C.A. No. 14961, 1997 Del. Ch. LEXIS 128 (Sept. 17, 1997).

- *In re Cheyenne Software Shareholders Litigation,* Consolidated C.A. No. 14941, 1996 Del. Ch. LEXIS 142 (Nov. 7, 1996).

- *Seinfeld v. Robinson,* 246 A.D.2d 291, 676 N.Y.S.2d 579 (N.Y. 1998).

- *Werner v. Alexander,* 130 N.C. App. 435, 502 S.E.2d 897 (N.C. Ct. App. 1998).

Wolf
Haldenstein
Adler Freeman
& Herz LLP

## NON-DISCRIMINATION POLICIES



Wolf Haldenstein does not discriminate or tolerate harassment against any employee or applicant because of race, creed, color, national origin, sex, age, disability, marital status, sexual orientation, or alienage or citizenship status and designs its hiring practices to ensure that minority group members and women are afforded equal employment opportunities without discrimination. The Firm is in compliance with all applicable Federal, State, County, and City equal employment opportunity laws.





Wolf Haldenstein is proud of its long history of support for the rights of, and employment opportunities for, women, the disadvantaged, and minority group persons, including the participation in civil rights and voter registration activities in the South in the early 1960's by partners of the Firm; the part-time employment of disadvantaged youth through various public school programs; the varied *pro bono* activities performed by many of the Firm's lawyers; the employment of many women and minority group persons in various capacities at the Firm, including at the partner level; the hiring of ex-offenders in supported job training programs; and the use of minority and women-owned businesses to provide services and supplies to the Firm.

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
270 MADISON AVENUE
NEW YORK, NY 10016
Telephone  212-545-4600
Telecopier  212-545-4653

WWW.WHAFH.COM

SYMPHONY TOWERS
750 B STREET  SUITE 2770
SAN DIEGO, CA 92101
Telephone   619-239-4599
Telecopier  619-234-4599

55 WEST MONROE STREET
SUITE 1111
CHICAGO, IL 60603
Telephone  312-984-0000
Telecopier  312-984-0001

625 NORTH FLAGLER DRIVE
WEST PALM BEACH, FL 33401
Telephone  561-833-1776

Wolf
Haldenstein
Adler Freeman
& Herz LLP

1

```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF KANSAS
 2                   TOPEKA, KANSAS          ORIGINAL

 3         _____
                                           )
 4         In Re:  WESTAR ENERGY, INC.  )  Case No.
           ERISA LITIGATION             )  03-4032-JAR
 5         _____)

 6

                   TRANSCRIPT OF FAIRNESS HEARING
 7

                PROCEEDINGS had before the Honorable
 8         Julie A. Robinson, United States District
           Court Judge, for the District of Kansas,
 9         Topeka, Kansas, on the 27th day of July,
           2006.

10
           APPEARANCES:
11

           For the            Joseph H. Meltzer, Esq.
12         Plaintiffs:        SCHIFFRIN & BARROWAY, LLP
                              280 King of Prussia Road
13                            Radnor, PA  19087

14                            Ronald P. Pope, Esq.
                              Ralston, Pope & Diehl, LLC
15                            2913 S.W. Maupin Lane
                              Topeka, KS  66614

16

           For Defendant      Sharon Katz, Esq.
17         Westar Energy:     Antoinette Ellison, Esq.
                              DAVIS POLK & WARDWELL
18                            450 Lexington Avenue
                              New York, NY  10017

19
                              Jason M. Hans, Esq.
20                            ROUSE HENDRICKS
                               GERMAN MAY PC
21                            One Petticoat Lane Building
                              1010 Walnut Street
22                            Suite 400
                              Kansas City, MO  64106

23
           For Defendant      Stanley M. Burgess, Esq.
24         Koupal:           ARMSTRONG TEASDALE LLP - KC
                              2345 Grand Boulevard
25                            Suite 2000
                              Kansas City, MO  64108-2617
```

2

```
 1       For Defendant        Kathryn A. Lewis, Esq.
 2       Terrill:             WARDEN TRIPLETT GRIER PA
                              9401 Indian Creek Parkway
 3                            Suite 1100
                              Overland Park, KS  66210
 4
         Court Reporter:      Sherry A. Berner, C.S.R.
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        PROCEEDINGS

 2              THE COURT:  All right.  We will call

 3     In Re:  Westar Energy, Inc. ERISA Litigation,

 4     case number 03-4032.  Your appearances.

 5              We'll begin with you, Ms. Lewis,

 6     you're on the phone.

 7              MS. LEWIS:  Yes.  It's Kathryn Lewis

 8     for Defendant Richard Terrill.

 9              THE COURT:  All right.  And other

10     appearances, please.

11              MR. MELTZER:  Good afternoon, Your

12     Honor.  Joseph Meltzer of Schiffrin &

13     Barroway on behalf of the plaintiffs.  Joined

14     with me is cocounsel, Ron Pope.

15              MS. KATZ:  And Sharon Katz of Davis

16     Polk & Wardwell, and my colleague, Antoinette

17     Ellison, from Davis Polk & Wardwell, for

18     Westar Energy.  And Mr. Hans on--

19              MR. HANS:  Jason Hans on behalf of

20     Westar Energy.

21              THE COURT:  All right.

22              MR. BURGESS:  I'm Matthew Burgess

23     from Armstrong Teasdale on behalf of Carl

24     Koupal.

25              THE COURT:  All right.  And we're
```

4

1    here for the fairness hearing on the

2    settlement of the class action in this case.

3            On May 15th of this year I held a

4    preliminary settlement hearing and

5    preliminarily approved the settlement,

6    ordered that notice be given, as set forth in

7    the order preliminarily approving settlement.

8    And in preliminarily approving the settlement

9    I conditionally certified the class,

10   preliminarily approved the terms of the

11   settlement, and set this date for today's

12   hearing, and, of course, approved the class

13   notice of proposed settlement.

14           You all have now submitted a

15   proposed order and final judgment.  And in

16   addition we've received the motion of the

17   plaintiffs for final approval; a memorandum

18   in support of class counsel's motion for

19   award of attorneys' fees, expenses, and case

20   contribution compensation as well; a

21   declaration of Mr. Meltzer in support of the

22   motions for settlement and awarded fees,

23   compensation, and reimbursement of expenses;

24   a declaration of Mr. Pope concerning that as

25   well.

1              All right.  Mr. Meltzer or Ms. Katz,

2      who is going to proceed?

3              MR. MELTZER:  I will, Your Honor.

4              THE COURT:  All right, go ahead.

5              MR. MELTZER:  Thank you.  Your

6      Honor, we are pleased to be here today.  And

7      as you stated, we're here to present a

8      settlement of all claims in the Westar ERISA

9      litigation.  As Your Honor has alluded to, a

10     lot of papers have been filed in our

11     presentation so I won't cover everything in

12     those papers or it would drag on far too

13     long; but I think I'll hit the relevant

14     points.

15              As I stated, we have a settlement of

16     all claims in the Westar ERISA case.  It

17     was-- the settlement was the product of some

18     rather strenuous and extensive negotiations

19     between the parties.  We're proud to present

20     the settlement.  We think in light of the

21     litigation risk and the damage analogies in

22     this case that it's an excellent result for

23     the ERISA class.

24              The settlement calls for a payment

25     of 9.25 million that will be paid by the

6

```
 1         defendants into the Westar Energy 401(k)

 2         savings plan.  That money will then be

 3         distributed to class members and plan

 4         participants in accordance with the plan of

 5         obligation that we've submitted in

 6         conjunction with the settlement.

 7               Two points I would want to make

 8         quickly.  First, the settlement has been

 9         reviewed by an independent fiduciary.  The

10         independent fiduciary was retained by Westar

11         in its corporate capacity and as a fiduciary

12         of the plan.  The independent fiduciary in

13         this case is Independent Fiduciary Services,

14         Incorporated.  Essentially what they do is

15         they come in to look and see that the

16         settlement meets the DOL class exemption, and

17         also that it's not a prohibited transaction

18         under Section 406 of ERISA.  Essentially,

19         they need to make a determination that the

20         release given in consideration for the value

21         of the settlement is fair and that the

22         fiduciaries were not engaged in self-dealing.

23               They have authorized the settlement.

24         Your Honor has, obviously, the ultimate

25         discretion to approve.  But in a case such as
```

7

1    this it's usually a good sign when the

2    independent fiduciary gives its blessing to

3    the settlement.

4          The other point I would make is that

5    there have been no objections to either the

6    motion for approval or for the application of

7    fees.  That's especially telling in this case

8    because we have a -- as Mr. Pope would tell

9    you -- a very active, interested class.  They

10   were very involved, very engaged in this

11   entire process.  And they have unanimously

12   endorsed the settlement, and no one has

13   lodged any objections to any of the motions

14   pending today.

15         The two motions that are on calendar

16   for today, as Your Honor stated, are a motion

17   for final approval of settlement,

18   certification of the settlement class and

19   approval of the plan of allocation; and a

20   second motion for an award of attorneys'

21   fees, reimbursement of expenses and case

22   contribution compensation.  And, Your Honor,

23   with your permission, I can address the

24   settlement first.

25              THE COURT:  Go ahead.

8

1          MR. MELTZER:  The-- Your Honor,

2    would it be helpful if I gave a background of

3    the claims and the history of the litigation?

4    That's set forth at length in the papers, but

5    I would be happy to do it for the record.

6          THE COURT:  No.  I think you can

7    summarize that.

8          MR. MELTZER:  Okay.  Your Honor,

9    just briefly, the first case in the Westar

10   ERISA litigation was filed in March of 2003.

11   The central claim is that the plan

12   fiduciaries breached their duties under ERISA

13   by allowing investments in the company stock

14   at a time when they knew or should have known

15   that those investments were imprudent.

16          There were many cases that were

17   filed after the Toledo case, the first case

18   filed in March.  There were several cases

19   filed afterwards.

20          Your Honor consolidated those cases

21   in September of 2003.  We filed a

22   consolidated pleading -- which is the

23   operative complaint for today -- in October

24   of 2003, and that touched off a flurry of

25   briefings, several motions to dismiss,

9

1    consolidated response, numerous replies.

2                Your Honor, we started informal

3    settlement negotiations in the summer of

4    2004.  We continued those through the fall to

5    essentially pick a mediator.  Our first

6    mediation -- there wound up being four total

7    -- was in December of 2004 with Gary McGowan,

8    who presided over each and every mediation in

9    this case.

10               Unable to resolve the case, we went

11   back into litigation posture in 2005.  We

12   essentially engaged in a formal

13   discovery protocol at that point that was

14   presided over by Magistrate Judge O'Hara.

15   The defendants produced a large volume of

16   documents.  We prepared, we analyzed, and

17   coded some of those documents.  We set up an

18   electronic database for further analysis.

19               We also continued on a settlement

20   track, fortunately, as we were going through

21   formal discovery.  We had another mediation

22   -- excuse me -- in the spring of 2005 that

23   was, obviously, unsuccessful.  We pressed

24   forward with a lot of discovery in the case.

25               We had yet another mediation in

1     October of 2005.  And while we weren't able

2     to resolve the case at that time, it did

3     break some of the log jam, frankly.  There

4     was a fair amount of progress in October of

5     2005.  That may partly be the result of Your

6     Honor's ruling in September of 2005 on the

7     motions to dismiss.  Gave people a better

8     sense of what the claims were going to be in

9     this litigation.

10     We scheduled a final mediation for

11     January 31st of this year.  We were able to

12     reach an agreement at that time.  We signed

13     the term sheet on that day and began the

14     settlement process which leads us to today's

15     hearing.

16     In terms of the approval process,

17     the Tenth Circuit has established a

18     four-factor test to determine whether the

19     settlement is fair, reasonable, and adequate.

20     The test is set forth in the Tenth Circuit

21     case Jones v. Nuclear Pharmacy.

22     I'll go through them briefly.  The

23     first factor is whether the proposed

24     settlement was fairly and honestly

25     negotiated.  Your Honor, as I just explained,

11

```
 1        there were multiple mediations.  There were
 2        formal negotiations with an experienced
 3        mediator.  There were informal negotiations.
 4        The negotiation process in this case was
 5        arms-length, to say the least, and was
 6        strenuous and was fair and honest.
 7             The second factor is whether serious
 8        questions of law and facts exist, placing the
 9        ultimate outcome of the litigation in doubt.
10        Your Honor, as a lot of courts have noted,
11        these are difficult cases.  ERISA itself is a
12        very difficult statute.  There are complex
13        questions.  And when you factor in the class
14        certification aspects of this case, you find
15        a way to make an ERISA case even more
16        complicated.  So I think that factor also
17        militates in favor of approval.
18             The third factor is whether the
19        value of an immediate recovery outweighs the
20        mere possibility of future relief after
21        protracted and expensive litigation.  Your
22        Honor, in this particular case, given what
23        our prospects were for success, even if we
24        overcame every legal hurdle by very capable
25        opposing counsel, I'm not sure that we would
```

12

```
1     have done any better; and we may have wound
2     up getting a little bit less for the class
3     settlement.  This factor is particularly in
4     favor of approval here because we were able
5     to get a recovery which may well exceed what
6     we would have gotten even if we would have
7     won through judgment.
8              The fourth factor is the judgement
9     of the parties that the settlement is fair
10    and reasonable.  I think everyone here today
11    will essentially endorse the settlement as
12    fair and reasonable.  I know I do.  I'm
13    fairly confident that my colleagues on the
14    defense side will as well.  And I think those
15    four factors are what the Tenth Circuit views
16    in terms of assessing whether a settlement
17    should be approved.  I think they're all met
18    here.
19             The only other point that I would
20    make with respect to the settlement, Your
21    Honor, again, is that there have been no
22    objections.  So the reaction of the class has
23    been overwhelmingly and unanimously, frankly,
24    in support of approval.
25             The other aspect of the settlement
```

13

1     approval is for certification of the

2     settlement class.  We think that Your Honor

3     mentioned that you preliminarily certified

4     the settlement class.  We think that the

5     class certification in this case is very

6     appropriate.  A 23(b)(1) class should be

7     certified.  The class that we're seeking to

8     certify for settlement purposes is a

9     participant or beneficiary in the Westar

10    Energy employees' 401(k) savings plan from

11    July 1st, '98, through January 1st, 2003,

12    whose account included investments in Westar

13    stock.

14            Your Honor, as our papers explain in

15    some length, I think all the factors of 23(a)

16    are met, as well as the factors of 23(b)(1)

17    have also been satisfied.  There have been a

18    number of these cases both in a settlement

19    context and in a litigation context, this

20    ERISA employer stock type of case.  I believe

21    they have all been certified under 23(b)(1)

22    as a non opt-out class.  And we think that's

23    appropriate here.

24            Your Honor, I don't-- I don't have

25    anything more on the settlement itself unless

14

```
 1        Your Honor has any questions.

 2                THE COURT:  I don't believe so.

 3                Would anyone else like to weigh in

 4        on this matter?

 5                MS. KATZ:  If I might just for a

 6        second, Your Honor, just to say on behalf of

 7        Westar that we are very pleased to be here at

 8        what we hope is now the conclusion of the

 9        trilogy of civil cases that had originally

10        been presented to Your Honor, and we are very

11        pleased with the settlement.  We do believe

12        that it is fair, reasonable, and adequate.

13                The settlement negotiations were

14        very, very hard-fought.  This was a very,

15        very difficult case for us to resolve.  But

16        we are very pleased with the results, and we

17        think that they will be of great benefit to

18        the members of the class, and we just urge

19        that Your Honor approve the settlement as

20        described by Mr. Meltzer and the

21        certification of the class.  Thank you.

22                THE COURT:  All right.  Thank you.

23                Anyone else?

24                All right.  I'll begin with the

25        matter of the certification of the class.
```

15

```
 1        And, yes, there have been no objections by
 2    any single class member to the certification
 3    of the class, to the settlement, or to the
 4    related matters concerning allowance of fees
 5    and expenses and compensation.  I did
 6    conditionally certify the class at the
 7    preliminary hearing.  I'll now reiterate my
 8    findings that class certification is proper
 9    for the class, as defined in the preliminary
10    order.
11        The requirements of Rule 23(a) are
12    met.  The numerosity requirement is met.
13    This class consists of several thousand
14    potential class members.  Joinder is not
15    practicable.
16        The requirement of commonality is
17    met.  There are common issues of fact and
18    law, including whether the defendants
19    breached fiduciary duties owed to the plan
20    and their participants in allowing the
21    maintenance of existing, and the addition of
22    new, investments in the company stock during
23    the proposed class period; issues concerning
24    whether the defendants knew or should have
25    known of problems besieging the company that
```

16

```
 1        negatively affected the prudence of Westar

 2        stock as an investment of the plan during the

 3        class period.

 4              Other common issues:  Whether

 5        defendants were fiduciaries of the plan

 6        and/or the participants; whether defendants

 7        breached their fiduciary duties, if they were

 8        fiduciaries; whether the plans and the

 9        participants were injured by such breaches;

10        and whether the class is entitled to damages

11        and injunctive relief.

12              The requirement of typicality is met

13        in that the claims of the class

14        representatives are typical of the claims of

15        the class as a whole.  The plaintiffs in this

16        case and the proposed class are all employees

17        of Westar, a participant of the plan during

18        the class period, and each had part of his or

19        her individual plan investment portfolio

20        invested in Westar stock during the class

21        period.

22              All of them-- all of the plaintiffs

23        sustained injury during the class period; and

24        all of the plaintiffs bring their claims

25        pursuant to ERISA Sections 409 and 502(a)(2)
```

1     for plan-wide relief, so any relief obtained

2     would inure to the plan as a whole and,

3     derivatively, to its participants during the

4     class period.

5            And the requirement for adequacy of

6     representation is also met.  The named

7     plaintiffs and their counsel are adequate

8     representatives of the interests of the class

9     as a whole.  I find that plaintiffs have no

10    interest antagonistic to the interests of the

11    absent class members.

12           Plaintiffs have retained attorneys

13    that are highly qualified and experienced in

14    this type of litigation, ERISA breach of

15    fiduciary class actions, specifically.  And

16    based on all of the pleadings in the entire

17    record, I find that they have diligently

18    represented the class before the Court as

19    well as in negotiations with defendants'

20    counsel that resulted in this settlement.  So

21    all of the requirements of 23(a) are met.

22           Also, the requirements of 23(b)(1)

23    are met in that the only remedy available to

24    the plan participants is in fact plan-wide

25    relief, including the restoration of losses

```
 1          to the plan.  Actions such as this are by law

 2          representative actions which, if successful,

 3          will cause defendants to be obligated to

 4          provide relief applicable to all participants

 5          in the plan.

 6               And given the unique group based

 7          relief offered under ERISA for violations of

 8          the fiduciary duties owed to participants in

 9          covered benefit plans, these actions are

10          appropriate for class treatment under

11          Rule 23(b)(1) to avoid the risk of

12          inconsistent outcomes and inconsistent

13          standards of conduct for defendants; as well

14          as, the prosecution of separate individual

15          actions would, as a practical matter, be

16          dispositive of the interests of other class

17          members who were not parties to the action.

18               Thus, I will certify the proposed

19          class pursuant to Rule 23 for settlement

20          purposes.  The class being defined as set out

21          in the pleadings.  In short:  Any person who

22          was a participant in or beneficiary of the

23          Westar 401(k) employees' savings plan from

24          July 1, 1998, through January 1, 2003, and

25          whose account in the plan included
```

19

1     investments in the Westar Energy, Inc.

2     company stock fund.

3           Excluded from the settlement class

4     are all defendants named in the action, their

5     subsidiaries and affiliates, members of their

6     immediate family, the legal representatives,

7     heirs, successors or assigns of any excluded

8     person, as well as any entity in which the

9     company has or has had a controlling

10    interest.

11          All right.  And then turning to the

12    proposed settlement itself, first of all,

13    I'll find that notice to prospective class

14    members was adequate.  I approved the

15    proposed class notice of proposed settlement

16    at the last hearing.

17          The administrator filed an affidavit

18    on July 17, 2006, establishing that notice

19    was mailed to the class, as ordered, and it

20    was also published in accordance with the

21    terms of the preliminary order.  Notice was

22    sent to 3,871 current and former participants

23    of the plan on May 26, 2006, and the approved

24    publication notice was published nationally

25    in *USA Today* and locally in *The Kansas City*

1    *Star*, *The Wichita Eagle*, and *The Topeka*

2    *Capital-Journal*.  Also, plaintiffs created a

3    dedicated settlement website, which is

4    identified in the pleadings.

5              The form and method of notice was

6    agreed to by the parties; it was approved by

7    the Court; it was effectuated by the

8    plaintiffs, consistent with the order; and it

9    satisfies all due process considerations and

10   meets the requirements of 23(e)(1)(B).

11             All right.  Turning to final

12   approval of the settlement, as Mr. Meltzer

13   has indicated, under the Tenth Circuit

14   prevailing case law there are four factors

15   the Court must address and consider when

16   determining whether the proposed settlement

17   is fair, reasonable, and adequate.

18             The first such factor is that the

19   settlement was fairly and honestly

20   negotiated.  As the pleadings set out in

21   detail, and as Mr. Meltzer summarized, this

22   settlement is the product of lengthy

23   litigation as well as mediation and

24   negotiation:  18 months or more of formal and

25   informal negotiations; multiple mediation

1        sessions with an experienced mediator, who

2        was also the mediator in the Westar

3        securities litigation; voluminous discovery;

4        as well as intense advocacy and litigation

5        through this stage of motions to dismiss and

6        responses to that.

7              In addition, the Court finds that

8        class counsel had an in-depth understanding

9        of the merits of plaintiffs' claims and the

10       defenses available to defendants.  Plaintiffs

11       counsel had the same.  The Court-- in

12       addition, of course, there was this oversight

13       or independent evaluation by a third party

14       experienced in this type of litigation.  So

15       based on all of these things, the Court

16       concludes that the settlement was fairly and

17       honestly negotiated.

18              The second factor is that there be

19       existence of serious questions of law and

20       fact.  This is obviously evident to the Court

21       based on having reviewed and considered and

22       ruling on a number of issues that arose in

23       the context of the motions to dismiss.

24              In addition, more generally, as

25       plaintiffs point out, ERISA is a developing

22

1    and esoteric area of the law.  It does

2    present many difficult issues of law and fact

3    made more complex, of course, in the context

4    of a class action such as this one.  Although

5    plaintiffs survived defendants' motions to

6    dismiss, by and large, defendants would

7    likely have raised serious defenses at the

8    summary judgment phase as well as at trial,

9    if the case proceeded that far.  Many of

10   these issues were legally and factually

11   complex issues that militate in favor of

12   settlement.

13          Also, of course, this case had yet

14   to be certified as a class action, and

15   plaintiffs and defendants, obviously,

16   recognize that courts have not

17   uniformly certified a proposed class to all

18   claims in ERISA cases of this nature.

19          Also, the risks of establishing

20   damages are always complex and generally

21   recognized in the context of these types of

22   actions.  Very complex and require the

23   completion of full discovery and evaluation

24   of the relevant time period by the Court.

25          And there were questions as to

1     whether the losses alleged by plaintiffs

2     could be compensated under ERISA.  There were

3     questions as to the proper measure of

4     damages.  All of which, again, militated in

5     favor of settlement.

6          Had this case gone to trial, likely

7     there would have been a battle of experts.

8     Would be difficult for the parties to

9     anticipate the outcome or the decision that

10    would be made after hearing expert testimony

11    from both sides.

12          A third factor is the value of

13    immediate recovery.  The Tenth Circuit has

14    held that the value of immediate recovery is

15    simply the monetary worth of the settlement.

16    This settlement is for $9.25 million.  And

17    the Court agrees that this amount may well

18    have been in excess of what the class may

19    have obtained even through trial.  This

20    recovery is in addition to the payment the

21    plan will receive from the recovery garnered

22    in the securities litigation and

23    substantially increases the recovery for the

24    individual class members.

25          It is-- it is clear that continued

24

1    litigation would have been protracted,

2    complex, and expensive; requiring more

3    discovery; requiring the battle over class

4    certification; requiring hiring and vetting

5    and discovery of experts; and ultimately, of

6    course, the expenses and time associated if

7    this case went all the way to trial.

8         And then the final factor the Court

9    must look at is the judgment of the parties

10   that the settlement is fair and reasonable.

11   And I've heard from both parties that after

12   -- as Ms. Katz said -- protracted mediation

13   and negotiation and intense negotiation

14   advocacy, they are satisfied that the

15   settlement is fair and reasonable to all.

16        Both parties are represented by

17   nationally-known counsel with extensive

18   experience in ERISA class actions.  This has

19   been vetted by a third party.  It's been

20   mediated.  The Court is convinced that the

21   settlement is fair and reasonable.  Thus, the

22   settlement will be approved at this hearing

23   on final approval of settlement.

24        And now we'll turn to the motion for

25   award of fees, expenses, and contribution of

1     compensation to class members.

2          MR. MELTZER:  Thank you, Your Honor.

3     Your Honor, we put in an application

4     for award of attorneys' fees, reimbursement

5     of expenses and case contribution

6     compensation.  Our request is for 30 percent

7     of the settlement fund.  That amounts to

8     2.775 million, plus reimbursement of expenses

9     of $76,715.59, and a $1,000 award for each

10    named plaintiff for their contribution to

11    this case.

12         With respect to the request for

13    fees, there is a-- again, there's a test that

14    the Tenth Circuit employs to determine

15    whether-- whether the request is reasonable.

16    That-- that test is set out, among others, in

17    <u>Brown v. Phillips Petroleum</u>.  This test is

18    quite a bit longer than the test relating to

19    approval of the settlement so I'll try and

20    run through the factors as quickly as I can.

21    There are, I believe, 10 or so that apply

22    here.

23         First is the time and labor

24    required.  As the application states, Your

25    Honor, the class counsel has spent over 4,000

1     hours in prosecuting this case.  It was a

2     case that was heavily litigated both on the

3     litigation side as well as on the mediation

4     settlement front.

5            The lodestar in the case is a little

6     bit over $1.4 million.  That translates into

7     a multiplier, a lodestar multiplier, of 1.88.

8     I would submit that that is a very modest

9     multiplier.  In comparison, Your Honor, I

10    believe in the Westar securities case the

11    30 percent awarded by Your Honor, I believe

12    that amounted to something like a 3.9

13    multiplier.  So here it is far, far less.

14           The second factor is the novelty and

15    difficulty of the questions presented by the

16    case.  As we've stated in this hearing

17    before, ERISA is a difficult case-- ERISA is

18    a difficult statute to prosecute a case.

19    There are a lot of trapdoors in ERISA.  The

20    legal questions that get presented in a case

21    like this are complex.  They are novel and

22    they are developing.  And unless you practice

23    in it, it is a very difficult area of the law

24    to navigate correctly.

25           The third factor is somewhat related

27

1     to that -- the skill requisite to perform the

2     legal service properly.  Again, ERISA cases

3     are not easy.  When you build in a class

4     action component to them, they go from

5     complicated to extremely complicated.

6              It is difficult to present the case

7     properly both in pleadings as well as in what

8     were essentially summary trials during all of

9     these mediations.  Getting a damage analysis

10    that's credible and gives you a, you know,

11    hope for recovery is not easy.  Navigating

12    the statute and the legal issues that are

13    compounded by difficult issues of fact,

14    again, is not an easy proposition.

15             The fourth factor, the preclusion of

16    other employment by the attorneys due to

17    acceptance of the case.  As I stated

18    previously, we dedicated 4,000-- over 4,000

19    hours.  That obviously has an opportunity

20    cost that prevents us or precludes us from

21    working on other matters during the two-plus

22    years or almost three years of litigation

23    that we dedicated here.  I retract that.

24    Three-plus years of litigation here.

25             The-- whether the fee is fixed or

28

```
 1          contingent is another factor.  Here, there

 2          was no guarantee that we would receive

 3          payment for anything.  I believe that is

 4          particularly telling here because with Your

 5          Honor's ruling on the motion to dismiss and

 6          in a developing area of the law, there's no

 7          certainty that you're going to overcome the

 8          initial Rule 12 challenge.  Did not come

 9          until September of 2005, several years into

10          the litigation, after we had expended a lot

11          of time and a lot of money in prosecuting

12          these claims.  So there was a great deal of

13          uncertainty, and there was certainly a fairly

14          large risk that we were going to get no

15          payment whatsoever.

16                  The next factor is the amount

17          involved and the results obtained.  Your

18          Honor, it's a settlement for $9.25 million.

19          I believe it does substantially increase

20          recovery to the class members.  It is in

21          addition to the recovery that the plan will

22          make as part of the Westar securities case.

23          I believe it is an excellent result.  And I

24          believe that factor also supports the

25          requested fee.
```

29

```
 1              The next factor is the experience,
 2      reputation, and ability of the attorneys.  My
 3      firm and-- my firm is an experienced--
 4      Schiffrin & Barroway is an experienced class
 5      action firm.  Mr. Pope and his firm, Ralston,
 6      Pope & Diehl, are very experienced
 7      litigators, especially in this particular
 8      court.  We-- I'll leave the rest of it to the
 9      papers so that I don't stand up and sort of
10      trumpet my success and abilities.
11              The next factor is the
12      undesirability of the case.  Your Honor, it's
13      not a difficult leap to say that an ERISA
14      class action to many practitioners would be
15      viewed as undesirable.  Sometimes my wife
16      feels the same way.  The desirability is--
17      frankly, when cases are easy and not so
18      complex, they become a lot easier to jump
19      into and dedicate your time and resources to.
20      But where they are difficult and complex, as
21      here, it becomes a little more of a-- a
22      little more of a challenge.  And, frankly, I
23      think that factor supports the requested fee
24      as well.
25              Awards in similar cases.  When you
```

30

```
 1      look at what the multiplier is in this case,

 2      I think it compares extremely favorably to

 3      both awards in the Tenth Circuit in class

 4      action cases -- I think that's a very modest

 5      multiplier, the 1.88 -- as well as cases

 6      across the country.  I think you'll see

 7      multipliers that are closer to three, four,

 8      and five for this type of case.  So I think

 9      the requested fee compares very favorably.

10           The final point, Your Honor, is we

11      have no objections to the award of the fees

12      to the class, as unanimously endorsed in our

13      application.

14           The second component is for

15      expenses.  We have expended $76,715.59.  We

16      submitted an application to detail the

17      categories of expense.  A lot of that is

18      discovery related.  Much of-- some of that is

19      travel.  It's travel related.  There are also

20      copying expenses and the like.  I think the

21      expenses, given the length of the case and

22      the complexity of the case, were minimal,

23      fortunately, because we were able to resolve

24      the case before we got further into expert

25      discovery.  So resolving the case before we
```

1    went into really a deposition protocol and

2    before we started submitting summary judgment

3    papers helped keep expenses to a relative

4    minimum.

5              The final component of the

6    application is for case contribution awards.

7    We've asked for $1,000 apiece.  That is a low

8    amount relative to what awards have been in

9    other cases.  But essentially it recognizes

10   that there are quite a few named plaintiffs.

11   In fact, more in this case than in almost any

12   other that I've seen.  But the one thing I

13   will say for the named plaintiffs is they

14   were very active.  They played a big role.

15   They were a large part of us being able to

16   hold the line in settlement negotiations.  I

17   think they did a really excellent job and

18   served the rest of the class very well.

19              THE COURT:  All right.  Thank you.

20              MR. MELTZER:  If you have any

21   questions, I'll be happy to address them.

22              THE COURT:  I don't.

23              Anyone else?

24              All right.  The so-called Johnson

25   factors that have been-- come from a Fifth

1    Circuit case but have been adopted in the

2    Tenth Circuit are those as outlined by

3    Mr. Meltzer.   In the Tenth Circuit the

4    percentage-of-recovery method has been

5    endorsed as an appropriate method for

6    determining an award of attorneys' fees in

7    these types of cases and in other types of

8    cases as well.

9          Based on the entire record, and

10   particularly the parties' pleadings

11   concerning these fees and expenses, I find

12   that the fees requested are reasonable.   The

13   expenses are also reasonable and customary.

14   And the compensation requested for the

15   members, the named plaintiffs, is also

16   reasonable.

17         Many of these factors have already

18   been addressed in summarizing the propriety

19   of the settlement that was approved.   But

20   I'll note further that there was extensive

21   time and labor involved in this case.   Over

22   4,000 combined hours in prosecuting the case

23   that culminated in the settlement.

24         As already addressed, the questions

25   legally and factually were novel and

33

```
 1          difficult and complex.

 2                  Class counsel is experienced,

 3          nationally recognized in this field, and had

 4          the requisite skill necessary to perform the

 5          legal services required in cases as complex

 6          as this.

 7                  Based on the number of hours spent

 8          over the last three-plus years, it's clear

 9          that other employment was precluded to a

10          large degree by the attorneys that

11          represented the class.

12                  The 30 percent request is in keeping

13          with the range of reasonable fee awards or

14          fee awards that have been found reasonable in

15          the Tenth Circuit.  And the multiplication

16          factor as well.

17                  The-- as I've already addressed, the

18          $9.25 million settlement is very favorable to

19          the class.  Given the complexity of the legal

20          and factual issues, the need for protracted

21          and intense advocacy, it's fair to say that

22          this case would have been viewed as

23          undesirable, perhaps, to many.  And that

24          factor needs to be taken into account.

25                  The nature and length of the
```

34

```
 1              professional relationship with the client is
 2              evident, given the length of time that has
 3              been spent to date on this case taking it
 4              through settlement.
 5                      Again, the 33 percent-- or, rather,
 6              the 30 percent requested is in line with the
 7              range of awards in similar cases in this
 8              circuit, including the range of awards given
 9              by this particular Court.
10                      As far as the expenses, we've
11              reviewed those.  They appear to be reasonable
12              and customary expenses associated with
13              discovery and litigation and mediation.
14                      And finally, with respect to the
15              request for $1,000 each as a case
16              contribution award to each of the 27 named
17              plaintiffs, I'll find that that is also
18              reasonable and appropriate, given the
19              litigation support that they provided over
20              the last three-plus years to class counsel to
21              the benefit of all other members of the
22              class.
23                      So the motion for award of
24              attorneys' fees, reimbursement of expenses
25              and case contribution compensation is
```

SHERRY A. BERNER
Official Court Reporter

35

```
 1        granted.

 2                You all had, I think, presented a

 3        proposed order.  I think my law clerk talked

 4        to you about some language that needed to be

 5        changed.  And as soon as you can get that-- I

 6        suppose we could change that, if need be, and

 7        we can get this order out right away.

 8                I do commend all of you.  I know

 9        that you-- I know this was a difficult case

10        for everyone involved.  And I had some sense

11        of that deciding the motion to dismiss, how

12        difficult many of these-- all of these issues

13        really were.  So I do appreciate the obvious,

14        you know, commitment you all made to securing

15        a fair and reasonable settlement that, you

16        know, benefitted the members of the class and

17        benefitted the company.  And I know it took a

18        lot of work and a lot of intense lawyering.

19        And you all, obviously, did a very excellent

20        job in all respects.  So I commend you.  And

21        it's nice to have lawyers such as yourselves

22        appear in this court.  I look forward to

23        seeing you again someday in another complex

24        class action, no doubt.

25                MR. MELTZER:  Thank you, Your Honor.
```

36

1          THE COURT:  All right.  We'll be in

2     recess.

3               (THEREUPON, the hearing

4     concluded).

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

37

```
 1        UNITED STATES OF AMERICA  )
                                    )     ss:
 2        DISTRICT OF KANSAS        )

 3

 4               C E R T I F I C A T E

 5

 6            I, Sherry A. Berner, Certified Shorthand

 7        Reporter in and for the State of Kansas, do

 8        hereby certify that I was present at and

 9        reported in machine shorthand the proceedings

10        had the 27th day of July, 2006, in the

11        above-mentioned court; that the foregoing

12        transcript is a true, correct, and complete

13        transcript of the requested proceedings.

14            I further certify that I am not attorney

15        for, nor employed by, nor related to any of

16        the parties or attorneys in this action, nor

17        financially interested in the action.

18            IN WITNESS WHEREOF, I have hereunto set

19        my hand and official seal at Topeka, Kansas,

20        this  2ND  day of  AUGUST      , 2006.

21

22                    _____
                            Sherry A. Berner
23                      Certified Shorthand Reporter

24

25
```

SHERRY A. BERNER
Official Court Reporter

Mirant Final Approval.txt

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE:  MIRANT CORP.     ) DOCKET NO. 1:03-CV-1027-RWS
ERISA, ET AL.          )
     PLAINTIFFS      ) ATLANTA, GEORGIA
                   )
        V.         ) NOVEMBER 16, 2006
                   )
MIRANT CORPORATION, ET AL  )
      DEFENDANTS.     )
                   )
                   )
                   )
                   )

TRANSCRIPT OF FINAL APPROVAL HEARING
BEFORE THE HONORABLE RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFFS:          GERALD WELLS, ESQ.
                          DEREK W. LOESER, ESQ.
                          GARY GOTTO, ESQ.
                          JOSEPH H. MELTZER, ESQ.
                          JOSHUA A. MILLICAN, ESQ.

FOR THE DEFENDANTS:          HOWARD DOUGLAS HINSON, ESQ.
                          MICHAEL G. MONNOLLY, ESQ.

COURT REPORTER:              SHARON D. UPCHURCH
                          2114 U. S. COURTHOUSE
                          ATLANTA, GEORGIA 30303-3361
                          (404) 215-1354

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
PRODUCED BY COMPUTER.

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

Mirant Final Approval.txt

2

```
 1                    P R O C E E D I N G S
 2              (NOVEMBER 16, 2006; IN OPEN COURT)
 3          THE COURT:  GOOD MORNING.  WE ARE HERE FOR PURPOSES
 4    OF A FINAL HEARING ON THE SETTLEMENT IN THIS MATTER.  AND I
 5    HAVE, OF COURSE, RECEIVED A MOTION AND OTHER DOCUMENTATION
 6    SUBMITTED BY COUNSEL; BUT I WILL HEAR FROM PLAINTIFF AT THIS
 7    TIME.  MR. WELLS, IF YOU WANT TO PROCEED ON BEHALF OF THE
 8    PLAINTIFF.
 9          MR. WELLS:  GOOD MORNING, YOUR HONOR.  WE ARE VERY
10    PLEASED TO BE HERE.  WE ARE HAPPY TO PRESENT TO THE COURT FOR
11    FINAL APPROVAL THIS SETTLEMENT WHICH RESOLVES ALL CLAIMS IN THE
12    MIRANT ERISA LITIGATION.  THE SETTLEMENT IS A PRODUCT OF
13    INTENSE NEGOTIATIONS BETWEEN THE PARTIES THAT INVOLVED AN
14    EXPERIENCED NEGOTIATOR AND WAS DONE OVER THE COURSE OF SEVERAL
15    MEDIATION SESSIONS AS WELL AS SUBSEQUENT TELEPHONE
16    CONVERSATIONS AND THE LIKE.
17          PLAINTIFFS BELIEVE THAT THIS SETTLEMENT IS EXCELLENT
18    BECAUSE IT RECOVERS A SUBSTANTIAL AMOUNT OF DAMAGES AND
19    PROVIDES A CASH SETTLEMENT IN THE AMOUNT OF $9.7 MILLION THAT
20    WILL BE DISTRIBUTED ON A PRO RATA SHARE TO THE PLAN
21    PARTICIPANTS; THAT IS, EACH PARTICIPANT WILL RECEIVE A PORTION
22    OF THE SETTLEMENT IN PROPORTION TO THE TOTAL LOSSES THAT THEY
23    SUSTAINED DUE TO THEIR HOLDINGS IN MIRANT STOCK AND THE MIRANT
24    401K PLANS.  THE SETTLEMENT ITSELF WAS REVIEWED EXTENSIVELY BY
25    AN INDEPENDENT FIDUCIARY, FIDUCIARY COUNSELORS, INC.  THAT
```

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

3

Mirant Final Approval.txt

1    REPORT WAS FINALIZED, AND WE SENT THAT TO YOUR HONOR FOR REVIEW

2    YESTERDAY.

3             BEFORE THE COURT IS APPROVAL OF THE SETTLEMENT ITSELF

4    AS WELL AS APPROVAL OF ATTORNEY'S FEES AND REIMBURSEMENT OF

5    EXPENSES AS WELL AS CASE CONTRIBUTION AWARDS TO THE NAMED

6    PLAINTIFFS.  IF I MAY PROCEED, YOUR HONOR, WE WOULD LIKE TO GO

7    DIRECTLY TO THE FAIRNESS OF THE SETTLEMENT.

8             THE COURT:  YES, SIR.

9             MR. WELLS:  THANK YOU.  WOULD YOUR HONOR LIKE A BRIEF

10   HISTORY OF THE LITIGATION ITSELF OR SHALL WE PROCEED?

11            THE COURT:  YOU MAY PROCEED TO THE FAIRNESS.

12            MR. WELLS:  UNDERSTOOD, YOUR HONOR.

13            THE SETTLEMENT FACTORS THAT ARE CONSIDERED, YOUR

14   HONOR, ARE THE BENNETT FACTORS THAT WERE ENUMERATED BY THE

15   ELEVENTH CIRCUIT.  AND THOSE SIX FACTORS IN ORDER ARE AN

16   ASSESSMENT OF THE LIKELIHOOD THAT PLAINTIFFS WOULD PREVAIL AT

17   TRIAL.  I SUBMITTED IN OUR PAPERS, YOUR HONOR, ALTHOUGH

18   PLAINTIFFS BELIEVE VERY STRONGLY IN THIS CASE AND IN THE MERITS

19   OF THIS CASE, PLAINTIFFS UNDERSTAND THAT NO PLAINTIFF HAS

20   RECOVERED WHEN A CASE HAS BEEN TAKEN THROUGH TRIAL.  THAT BEING

21   SAID, PLAINTIFFS DO BELIEVE STRONGLY IN THEIR CLAIMS AND THAT

22   THEY WOULD, IN FACT, BE ABLE TO PREVAIL.  HOWEVER, GIVEN THE

23   CASE LAW OUT THERE AS WELL AS THE SETTLEMENT AMOUNT ITSELF, WE

24   BELIEVE THAT THIS FACTOR MILITATES IN APPROVING THE SETTLEMENT.

25            THE SECOND FACTOR IS THE RANGE OF POSSIBLE RECOVERY.


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

4


1    HERE, YOUR HONOR, I SUBMITTED IN OUR PAPERS DAMAGES RANGE FROM

2    THE MAXIMUM POSSIBLE RECOVERY OF APPROXIMATELY $30 MILLION

Page 3

Mirant Final Approval.txt

3    TO -- AND THAT IS A BREACH DATE AT THE INCEPTION OF THE CLASS
4    PERIOD -- TO A DAMAGE PERIOD OF ABOUT $11 MILLION IF YOUR HONOR
5    WOULD FIND THAT THE BREACH DATE, THAT IS, WHEN MIRANT STOCK WAS
6    IMPRUDENT, WAS NOT UNTIL SEPTEMBER OF 2002; AND DAMAGES THEN
7    RANGE IN THE NEIGHBORHOOD OF $11 MILLION.  HOWEVER, IF THE
8    BREACH DATE WAS TAKEN EVEN FURTHER OUT, FOR INSTANCE, INTO MAY
9    OF '03 WHEN THE GOING CONCERN ISSUE REGARDING MIRANT WAS
10   ISSUED, DAMAGES WOULD BE SUBSTANTIALLY LOWER.
11           THAT BEING SAID, YOUR HONOR, PLAINTIFFS HAVE
12   RECOVERED ANYWHERE FROM THE MAXIMUM OF 30 PERCENT OF THE
13   RECOVERY TO UPWARDS OF 88 PERCENT OF THE RECOVERY.  THAT IN
14   ITSELF, WE THINK, SPEAKS HIGHLY OF THE SETTLEMENT AND, AGAIN,
15   FACTORS STRONGLY IN APPROVING THE SETTLEMENT.
16           THE THIRD FACTOR, YOUR HONOR, IS CONSIDERATION
17   PROVIDED TO CLASS MEMBERS PURSUANT TO THE SETTLEMENT AS
18   COMPARED TO THE RANGE OF POSSIBLE RECOVERY.  AGAIN, YOUR HONOR,
19   THE CONSIDERATION HERE IS BETWEEN 30 PERCENT AND 88 PERCENT OF
20   THE TOTAL DAMAGES.  WE, AGAIN, BELIEVE THAT THIS FACTORS
21   STRONGLY IN APPROVING THE SETTLEMENT.
22           THE FOURTH IS THE COMPLEXITY, EXPENSE AND POSSIBLE
23   DURATION OF THE LITIGATION HAD IT PROCEEDED.  AS YOUR HONOR IS
24   WELL AWARE, THE CASE WAS ADMINISTRATIVELY CLOSED AFTER BRIEFING
25   ON DEFENDANT'S MOTIONS TO DISMISS AS WELL AS MOTION ON JUDGMENT


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


5


1    OF THE PLEADINGS WAS COMPLETED.  THAT BEING SAID, IF THIS
2    LITIGATION WERE TO CONTINUE, THOSE MOTIONS WOULD HAVE TO BE
3    DECIDED; DISCOVERY, WHICH WOULD BE INTENSE BECAUSE THE

Page 4

Mirant Final Approval.txt

4    DISCOVERY WOULD FACTOR IN TWO SUCH THINGS AS WHETHER OR NOT

5    MIRANT WAS A PRUDENT INVESTMENT FOR PLANS FROM THE INCEPTION,

6    WHETHER OR NOT THE DEFENDANTS THAT WE ALLEGED IN OUR COMPLAINT

7    WERE, IN FACT, FIDUCIARIES OF THE PLAN AND EXERCISED CONTROL

8    AND WERE ABLE TO, IN FACT, DIVEST THE PLANS OF MIRANT STOCK;

9    THROUGH SUMMARY JUDGMENT WHICH, AGAIN, WOULD BE VERY FACT

10   INTENSIVE, AND AS WE HAVE NOTED, THERE ARE A NUMBER OF

11   DECISIONS THAT GO BOTH IN FAVOR OF PLAINTIFFS AS WELL AS

12   AGAINST PLAINTIFFS IN THIS CASE; AND THROUGH TRIAL.

13          CONSERVATIVELY, YOUR HONOR, WE WOULD ESTIMATE THAT

14   TRIAL THROUGH LITIGATION WOULD ESTIMATE BETWEEN THREE OR FOUR

15   YEARS.  AGAIN, THIS EARLY SETTLEMENT IN THIS STAGE OF

16   LITIGATION FACTORS IN FAVOR OF APPROVING THE SETTLEMENT.

17          THEN THE FIFTH FACTOR, YOUR HONOR, IS THE NATURE AND

18   EXTENT OF ANY OBJECTIONS TO THE SETTLEMENT.  AS WE SUBMITTED,

19   THERE IS ONLY ONE OBJECTION SUBMITTED BY ARTHUR LANKFORD TO THE

20   SETTLEMENT ITSELF.  NOTABLY, YOUR HONOR, THE CLASS MEMBER DOES

21   NOT OPPOSE APPROVAL OF THE ATTORNEY'S FEES WHICH THE ORIGINAL

22   REQUESTED WERE 30 PERCENT, NOR DOES HE OPPOSE REIMBURSEMENT OF

23   EXPENSES OR THE CASE CONTRIBUTION AWARDS TO NAMED PLAINTIFFS.

24   RATHER, IN HIS LETTER HE SAID THAT THE SETTLEMENT SHOULD BE

25   HIGHER BECAUSE CERTAIN DEFENDANTS RECEIVED GOLDEN PARACHUTES.


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


6


1           RESPECTFULLY, YOUR HONOR, ALL PLAINTIFFS' COUNSEL

2    AGREE THAT THE SETTLEMENT SHOULD BE HIGHER.  HOWEVER, GIVEN THE

3    OTHER FACTORS HERE AS WELL AS THE CASE LAW AS IT CURRENTLY

4    STANDS, THIS IS A SETTLEMENT THAT WE SIMPLY COULD NOT TURN OUR

5    BACK ON.  MOREOVER, OVER 3500 NOTICES WERE SENT OUT TO CLASS

Page 5

Mirant Final Approval.txt

6   MEMBERS, AND ONLY ONE PERSON FOUND OBJECTION.  WE THINK THIS

7   COUNSELS IN FAVOR OF APPROVING THE SETTLEMENT.

8           FINALLY, YOUR HONOR, THE STATE OF PROCEEDINGS IN

9   WHICH THE SETTLEMENT WAS REACHED.  AS I STATED EARLIER,

10  BRIEFING ON THE MOTION TO DISMISS WAS COMPLETED.  HOWEVER, THIS

11  WOULD STILL BE A VERY LONG ROW TO HOE, AS WELL AS THE FACT THAT

12  WE CLEARLY UNDERSTOOD THE POSITIONS OF THE RESPECTIVE PARTIES

13  THROUGH THE MEDIATION EFFORTS.  MEDIATION SUBMISSIONS WERE

14  SUBMITTED TO THE MEDIATOR, AND MEDIATION SESSIONS TOOK OVER

15  THREE DAYS IN TWO SEPARATE SESSIONS.

16          COMBINED, YOUR HONOR, WE THINK EACH OF THE SIX

17  FACTORS ENUMERATED IN BENNETT SEPARATELY, AS WELL AS COMBINED,

18  FACTOR IN APPROVING THIS SETTLEMENT; AND WE SUBMIT THIS

19  SETTLEMENT FOR APPROVAL.

20          THE COURT:  I WILL HEAR FROM YOU, AS WELL, ON THE

21  REQUEST FOR ATTORNEY'S FEES AND EXPENSES.

22          MR. WELLS:  BEFORE WE TURN TO THAT, YOUR HONOR, THERE

23  IS THE ISSUE OF CERTIFICATION OF CLASS; AND WE WOULD SUBMIT TO

24  THE COURT AS WE SUBMITTED IN THE PAPERS THAT SETTLEMENT HERE IN

25  CERTIFICATION OF A (B)(1) CLASS IS APPROPRIATE GIVEN THE NATURE


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


7

1   OF THE PLAN-WIDE BREACH AND THE HARM SUBMITTED.

2           WITH RESPECT TO THE REQUEST FOR ATTORNEY'S FEES, WE

3   WOULD PUT FORTH THAT EACH OF THE 12 FACTORS, JOHNSON FACTORS,

4   FAVOR IN APPROVING THIS SETTLEMENT.  THE FIRST FACTOR IS THE

5   TIME AND LABOR REQUIRED.  AS PUT FORTH IN OUR PAPERS, OVER 2700

6   HOURS OF BOTH ATTORNEY AND PROFESSIONAL TIME WAS COMMITTED TO

Mirant Final Approval.txt

7    THIS CASE.  THOSE ARE SUBSTANTIAL RESOURCES WITH A LODESTAR

8    THAT AT THIS POINT IS JUST OVER 1.17 MILLION.

9         THE SECOND FACTOR, YOUR HONOR, IS THE NOVELTY AND

10    DIFFICULTY OF THE QUESTIONS PRESENTED.  AS STATED BY MANY

11    COURTS, ERISA CASES IN PARTICULAR AND CLASS ACTIONS IN GENERAL

12    ARE COMPLEX CASES THAT REQUIRE SPECIALIZED EXPERTISE AS WELL AS

13    A GREAT DEAL OF, FOR LACK OF A BETTER TERM, HEAVY LIFTING ON

14    BEHALF OF PLAINTIFF'S COUNSEL.  WE SUBMIT THAT WE'VE DONE THAT

15    HERE AND THAT THE SETTLEMENT EXEMPLIFIES THAT.

16         THIRD IS THE SKILL REQUISITE TO PERFORM THE LEGAL

17    SERVICES.  HERE, YOUR HONOR, CLASS COUNSEL, AS STATED BY

18    INDEPENDENT FIDUCIARY, ARE SOME OF THE -- ARE TWO OF THE FIRMS

19    THAT ARE AT THE FOREFRONT OF THIS TYPE OF LITIGATION AND HAVE

20    PUT FORTH TREMENDOUS EFFORT; AND IT IS THROUGH OUR EFFORT THAT

21    THE SETTLEMENT WAS ABLE TO BE ACHIEVED.

22         FOURTH, YOUR HONOR, IS THE PRECLUSION OF OTHER

23    EMPLOYMENT.  RESPECTFULLY, OVER 2700 HOURS WERE EXPENDED SOLELY

24    ON THIS CASE.  THOSE 2700 HOURS COULD HAVE BEEN PUT FORTH ON

25    OTHER MATTERS THAT HAD A GREATER LIKELIHOOD OF RECOVERY.


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


8


1         WHAT IS UNIQUE TO THIS CASE IS, UNLIKE ANY OTHER, TO

2    MY KNOWLEDGE, FIDUCIARY BREACH CASE OUT THERE, WE HAVE ASSERTED

3    THAT THE COMPANY STOCK WAS IMPRUDENT FROM THE INCEPTION.  THAT

4    IS A UNIQUE FACTOR TO THIS CASE THAT WE THINK, WHILE WE COULD

5    HAVE PROVED AT TRIAL, WOULD RAISE OTHER SUBSTANTIAL HURDLES

6    UNLIKE ANY OTHER CASE AND BECAUSE OF THESE UNIQUE FACTORS,

7    AGAIN, COUNSELS IN FAVOR OF APPROVING THE SETTLEMENT.

8         THE FIFTH FACTOR, YOUR HONOR, IS THE CUSTOMARY FEE.

Mirant Final Approval.txt

9  AS THE ELEVENTH CIRCUIT PUT FORTH IN CAMDEN I, THE CUSTOMARY

10  FEE IN COMMON FUND CASES IS BETWEEN 20 AND 30 PERCENT OF THE

11  TOTAL SETTLEMENT RECOVERED.  HERE PLAINTIFFS ARE REQUESTING

12  27-AND-A-HALF PERCENT OF THE COMMON FUND.

13        THE SIXTH FACTOR IS WHETHER THE FEE IS FIXED OR

14  CONTINGENT.  PLAINTIFF'S COUNSEL TOOK THIS FEE -- TOOK THIS

15  CASE, RATHER, COMPLETELY ON A CONTINGENT-FEE BASIS; THAT IS,

16  HAD THERE BEEN NO RECOVERY OBTAINED, WE WOULD HAVE BEEN WITHOUT

17  RECOURSE.  WE HAVE FURTHER PUT FORTH OVER $52,000 WORTH OF

18  EXPENSES WITH NO GUARANTEE THAT THOSE EXPENSES WOULD BE

19  REIMBURSED.  AGAIN, OVER 2700 HOURS WITH A LOADSTAR OF 1.17

20  MILLION AS WELL AS OUT-OF-POCKET EXPENSES THAT COULD HAVE BEEN

21  PUT FORTH TO CASES WITH A SUBSTANTIALLY HIGHER LIKELIHOOD OF

22  RECOVERY COUNSELS IN FAVOR OF APPROVING THIS SETTLEMENT.

23        THE SEVENTH FACTOR, YOUR HONOR, IS THE TIME

24  LIMITATIONS IMPOSED BY THE CLIENT UNDER THE CIRCUMSTANCES.

25  RESPECTFULLY, YOUR HONOR, CLASS COUNSEL READILY ADMITS THAT


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

9

1  THIS IS A CLASS CASE; AND, THEREFORE, THE CLIENT EXPECTATIONS

2  WERE THAT THEY WOULD LIKELY RECOVER, AND THERE WAS NO FIX DATE.

3        MOVING ON, YOUR HONOR, TO THE EIGHTH FACTOR, THE

4  AMOUNT INVOLVED AND THE RESULTS OBTAINED.  AS I STATED EARLIER,

5  THE TOTAL OUTWARD RECOVERY IS BETWEEN A MAXIMUM OF 30 MILLION

6  TO A MORE REALISTIC NUMBER OF 11 MILLION.  HERE THE $9.7

7  MILLION RESULTS IN A SUBSTANTIAL AMOUNT OF THE RECOVERY.

8        THE NINTH FACTOR, YOUR HONOR, IS THE EXPERIENCE,

9  REPUTATION AND THE ABILITY OF THE ATTORNEYS.  AS PUT FORTH AND

Mirant Final Approval.txt

10    SEEN IN OUR PAPERS, AS WELL AS THE COMMENTS MADE BY THE

11    INDEPENDENT FIDUCIARY, THESE FIRMS HERE BEFORE YOUR HONOR ARE

12    AT THE FOREFRONT OF THIS TYPE OF PRACTICE AND HAVE USED THEIR

13    KNOWLEDGE HERE TO PUT FORTH AND GO AGAINST SOME OF THE MOST

14    EMINENT DEFENSE ATTORNEYS WITH RESPECT TO THIS FIELD AND WERE

15    ABLE TO PUSH FOR AND ACHIEVE THIS MAGNIFICENT SETTLEMENT.

16            THE TENTH FACTOR, YOUR HONOR, IS THE UNDESIRABILITY

17    OF THIS CASE.  YOUR HONOR, HERE CLEARLY THIS WAS A BANKRUPTCY

18    CASE; SO YOU HAD THE ISSUES INHERENT IN BANKRUPTCY WHICH

19    PLAINTIFF'S COUNSEL WENT THROUGH AND SPENT SUBSTANTIAL TIME IN

20    DEALINGS IN THE BANKRUPTCY COURT ENSURING THAT THE SETTLEMENT

21    HERE WAS PRESERVED AND THESE CLAIMS WERE PRESERVED.

22            FURTHER, YOUR HONOR, BECAUSE OF THE NATURE OF THE

23    CASE, ASSERTING THAT IMPRUDENCE WAS FROM THE INCEPTION, THIS,

24    TOO, COUNSELS IN FAVOR THAT THIS CASE WAS, IN FACT, UNDESIRABLE

25    IN THAT IT WAS NOT THE EASIEST CASE, IT WAS NOT THE EASIEST


            SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


                                            10


1     ERISA CASE, AND IT HAD UNIQUE FACTORS.

2             THE ELEVENTH FACTOR, YOUR HONOR, IS THE NATURE AND

3     LENGTH OF THE PROFESSIONAL RELATIONSHIP WITH THE CLIENT.

4     AGAIN, RESPECTFULLY, YOUR HONOR, THIS IS A CLASS CASE; AND WE

5     SUBMIT THAT WHILE OUR CLIENTS HAVE BEEN FULLY INFORMED AND

6     ADVISED OF THE CASE THROUGHOUT THE COURSE OF THE LITIGATION,

7     THIS IS NOT AN ONGOING RELATIONSHIP.

8             MOVING, YOUR HONOR, TO THE FINAL AND TWELFTH FACTOR,

9     THE AWARDS IN SIMILAR CASES.  AS PUT FORTH IN OUR PAPERS, THERE

10    ARE NUMEROUS CASES OUT THERE IN WHICH SIGNIFICANTLY HIGHER

11    PERCENTAGES WERE OBTAINED AND ACHIEVED IN SIMILAR ERISA CASES;
                            Page 9

Mirant Final Approval.txt

12  NOTABLY, ADC AND WESTSTAR IN WHICH 30 PERCENT RECOVERY WAS

13  APPROVED.  HOWEVER, YOUR HONOR, AGAIN, AS NOTED BEFORE, THE

14  ELEVENTH CIRCUIT HAS SAID BETWEEN 20 AND 30 PERCENT IS

15  APPROPRIATE.  HERE WE SUBMIT THAT OUR REQUEST FOR 27-AND-A-HALF

16  PERCENT, IT FALLS WITHIN THAT NORM; AND AS DEMONSTRATED BY THE

17  AMOUNT OF WORK PUT INTO THE CASE AND THE END RESULT ACHIEVED,

18  THAT THIS FACTORS IN FAVOR OF APPROVING THE SETTLEMENT.

19          YOUR HONOR, THE ELEVENTH CIRCUIT HAS NOTED IN CAMDEN

20  THAT THERE ARE SEVERAL OTHER FACTORS THAT MAY BE UTILIZED IN

21  DETERMINING WHETHER OR NOT A SETTLEMENT IS APPROPRIATE; AND IF

22  YOUR HONOR WOULD LIKE, I CAN GO THROUGH THOSE FIVE ADDITIONAL

23  FACTORS.

24          YOUR HONOR, THE FIRST ONE IS THE TIME REQUIRED TO

25  REACH SETTLEMENT.  AS I STATED EARLIER, THIS INVOLVED TWO


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


11

1   FORMAL MEDIATION SESSIONS, THE FIRST MEDIATION SESSION

2   OCCURRING IN APRIL OF '05.  THAT WAS A TWO-DAY ALL-DAY

3   MEDIATION SESSION.  PRIOR TO THAT SESSION, THERE WERE NUMEROUS

4   PHONE CALLS AND TELEPHONIC CONFERENCES WITH BOTH THE MEDIATOR

5   AS WELL AS DEFENSE COUNSEL TRYING TO SEE IF SETTLEMENT MAY BE

6   AN APPROPRIATE AVENUE.  SUBSEQUENT TO THE APRIL MEDIATION,

7   THERE WAS ANOTHER ALL-DAY MEDIATION IN NOVEMBER OF 2005; AND

8   THAT WAS ABLE TO PUSH THE CASE FURTHER ALONG.  HOWEVER,

9   SETTLEMENT WAS NOT OBTAINED UNTIL EARLY OF 2006.  THAT

10  DEMONSTRATES THAT THERE WAS SUBSTANTIAL TIME PUT FORTH IN

11  OBTAINING THE SETTLEMENT.

12          THE SECOND ONE IS WHETHER OR NOT THERE ARE ANY

Mirant Final Approval.txt

13  SUBSTANTIAL OBJECTORS BY THE CLASS.  AGAIN, THERE'S ONLY ONE

14  OBJECTOR FROM THE CLASS OF OVER 3500.

15          THE THIRD IS WHETHER OR NOT THERE'S ANY NONMONETARY

16  BENEFITS CONFERRED UPON THE SETTLEMENT CLASS.  HERE, YOUR

17  HONOR, AS PUT FORTH IN THE STIPULATION OF SETTLEMENT, THERE IS

18  A SPECIFIC CARVE-OUT SAYING THAT THE RECOVERY HERE WILL IN NO

19  WAY AFFECT THE SECURITIES-RELATED -- SECURITIES LITIGATION, NOR

20  WILL IT ADVERSELY AFFECT THE RELATED SOUTHERN ERISA LITIGATION.

21          THE FOURTH FACTOR, YOUR HONOR, IS THE ECONOMICS

22  INVOLVED IN PROSECUTING THIS CASE.  SIMPLY PUT, YOUR HONOR,

23  CLASS CASES SUCH AS THIS WILL REQUIRE THE EXPENDITURE OF TENS

24  OF THOUSANDS, IF NOT HUNDREDS OF THOUSANDS OF DOLLARS.  BECAUSE

25  WE WERE ABLE TO ACHIEVE THE SETTLEMENT RELATIVELY EARLY IN THAT


                SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


                                              12


1  PROCESS, WE WERE ABLE TO KEEP EXPENSES TO A MINIMUM; BUT WE DID

2  PUT FORTH EXTREME AMOUNTS OF MONEY.

3          THE FIFTH IS ARE THERE ANY OTHER FACTORS UNIQUE TO

4  THIS CASE.  AS I SAID EARLIER, THIS INVOLVES A BANKRUPTCY CASE

5  AS WELL AS IMPRUDENCE FROM THE INCEPTION.  BOTH OF THOSE

6  FACTORS ARE UNIQUE TO THIS ERISA CASE AND STRONGLY SUPPORT THIS

7  SETTLEMENT.

8          THE COURT:  THANK YOU.

9          MR. WELLS:  YOUR HONOR, IN ADDITION, THERE IS ALSO

10  THE MATTER OF THE REIMBURSEMENT OF EXPENSES, IF YOU'D LIKE ME

11  TO ADDRESS THAT.

12          AS PUT FORTH IN OUR PAPERS, WE HAVE EXPENDED OVER

13  $52,000 WORTH OF EXPENSES THAT INCLUDE THE LIKES OF TRAVEL,

14  LODGING, FILINGS AND THE LIKE.  WE THINK THEY ARE REASONABLE

                        Page 11

Mirant Final Approval.txt

15  AND APPROPRIATE, AND WE NOTE FOR YOUR HONOR THAT THERE'S BEEN

16  NO OBJECTION TO THE REIMBURSEMENT OF EXPENSES.

17        THE OTHER MATTER BEFORE YOUR HONOR IS THE ISSUE OF

18  THE CASE CONTRIBUTION AWARD.  AS PUT FORTH IN OUR PAPERS, CASE

19  CONTRIBUTION AWARDS IN THIS CASE, ON THESE TYPE OF CASES, ARE

20  EMINENTLY REASONABLE BECAUSE THESE PLAINTIFFS -- BUT FOR THESE

21  PLAINTIFFS, THIS CASE WOULD NOT BE BROUGHT.  THESE PLAINTIFFS

22  WERE ABLE TO STEP FORWARD, PROVIDE PLAN DOCUMENTS TO CLASS

23  COUNSEL, PROVIDE INFORMATION TO CLASS COUNSEL AS TO THE INNER

24  WORKINGS OF BOTH THE COMPANY IN GENERAL AS WELL AS THE PLANS IN

25  PARTICULAR.


        SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


                                                    13

1         AND WITH THESE CASES, THEY HAVE HELPED FOSTER AND

2   ACHIEVE A $9.7 MILLION SETTLEMENT THAT WOULD BENEFIT OVER 3500

3   CLASS MEMBERS; AND WE THINK THEIR EFFORTS SHOULD BE RECOGNIZED

4   AND AWARDED BY THIS COURT.  RESPECTFULLY, YOUR HONOR, WE ASK

5   THAT A CASE CONTRIBUTION AWARD OF $2,000 FOR EACH OF THE TWO

6   NAMED PLAINTIFFS BE APPROVED.

7         AND WITH THAT, YOUR HONOR, IF THE COURT HAS ANY

8   QUESTIONS, I WOULD BE HAPPY TO ADDRESS THOSE.

9         THE COURT:  I DO NOT.  THANK YOU.

10        MR. HINSON, ANYTHING FROM THE DEFENDANT?

11        MR. HINSON:  YOUR HONOR, AS WE SAID IN OUR WRITTEN

12  SUBMISSION, WE ONLY WOULD ADD THAT WE BELIEVE WE WOULD PREVAIL

13  HAD THE LITIGATION MOVED FORWARD; AND WE BELIEVE THAT IN THAT

14  LIGHT, THIS DEFENSE -- I MEAN THIS SETTLEMENT IS, IN FACT, A

15  FAIR AND REASONABLE SETTLEMENT.  WE TAKE NO POSITION ON THE

Mirant Final Approval.txt

16    ATTORNEY'S FEES ISSUES.  AND, THEREFORE, WE HAVE VERY LITTLE TO

17    ADD.

18              THE COURT:  THANK YOU.  I WOULD NOTE FOR THE RECORD

19    AND AS HAS BEEN ALLUDED TO BY MR. WELLS, THERE WAS ONE

20    OBJECTION FILED TO THE SETTLEMENT BY MR. LANKFORD.  AND THE

21    COURT HAS REVIEWED THAT OBJECTION; AND LIKE MR. WELLS, I

22    UNDERSTAND MR. LANKFORD'S DISSATISFACTION WITH THE TOTAL AMOUNT

23    THAT WILL BE COMING TO HIM AS A MEMBER OF THIS CLASS.  I CAN

24    UNDERSTAND AND APPRECIATE HIS CONCERN, HAVING LOST A

25    SUBSTANTIAL AMOUNT OF HIS LIFE SAVINGS.  HOWEVER, WHILE I


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


14

1     APPRECIATE HIS POSITION, I DO NOT THINK IT JUSTIFIES REJECTION

2     OF THE SETTLEMENT.

3               FOR THE REASONS THAT HAVE BEEN STATED, I DO FIND THAT

4     THE SETTLEMENT IS FAIR AND IS A GOOD SETTLEMENT FOR THE MEMBERS

5     OF THE CLASS.  CERTAINLY THE QUESTION OF LIABILITY, THE RANGE

6     OF POTENTIAL RECOVERIES, PARTICULARLY THE DETERMINATION OF WHEN

7     WE WOULD FIND THEY HAD BREACHED THEIR DUTIES REALLY COULD HAVE

8     HAD A SUBSTANTIAL EFFECT.  AND I KNOW PROBABLY FROM THE

9     PERSPECTIVE OF NEGOTIATION, THAT HAD TO BE A DIFFICULT MATTER

10    TO GRAPPLE WITH, AS WELL.  BUT IT CERTAINLY MILITATES IN FAVOR

11    OF THE SETTLEMENT THAT HAS BEEN REACHED.

12              I WILL APPROVE THE SETTLEMENT.  I WILL CERTIFY THE

13    CLASS AS A (B)(1) CLASS.  I FIND THAT THE ATTORNEY'S FEES ARE

14    ALSO REASONABLE.  COUNSEL, CLASS COUNSEL, ARE OBVIOUSLY

15    EMINENTLY QUALIFIED TO BRING AND PURSUE THIS LITIGATION.  I

16    THINK THAT WHEN ONE VIEWS THE LODESTAR INVOLVED IN THE CASE AS

17    COMPARED TO THE AMOUNT OF RECOVERY, THIS IS A FAIR

Mirant Final Approval.txt

18    COMPENSATION, PARTICULARLY WHEN ONE CONSIDERS, AS WE DISCUSSED

19    EARLIER, THE LIKELIHOOD OF SUCCESS, THE RISK THAT WAS ACCEPTED

20    BY COUNSEL IN TAKING ON THIS LITIGATION AND TAKING IT ON

21    TOTALLY ON A CONTINGENT-FEE BASIS; SO THEY BORE THE ENTIRE

22    RISK.  AND I THINK THERE IS A PUBLIC POLICY ISSUE AT STAKE HERE

23    IN THAT COUNSEL NEED TO BE ENCOURAGED TO TAKE THESE CASES WHEN

24    THEY'RE MERITORIOUS; AND IF THERE'S NOT FULL, COMPLETE AND

25    APPROPRIATE COMPENSATION, THERE WILL NOT BE THAT INCENTIVE TO


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


15

1    TAKE THESE CASES.

2         I DO APPRECIATE THE FACT THAT COUNSEL HAS ADJUSTED

3    ITS REQUEST TO 27.5 PERCENT OF THE COMMON FUND, AND I WILL

4    AWARD FEES OF 27.5 PERCENT OF THE COMMON FUND.  I WILL ALSO

5    AWARD TO COUNSEL THE FULL AMOUNT OF EXPENSES AS REQUESTED IN

6    THE PAPERS FILED WITH THE COURT AND WILL ALSO MAKE THE CASE

7    CONTRIBUTION AWARDS TO THE NAMED PLAINTIFFS OF $2,000 EACH AS

8    REQUESTED.  I THINK THAT'S EMINENTLY FAIR FOR THE PEOPLE WHO

9    CHOOSE TO ALLOW THEMSELVES TO BE PUT OUT THERE AS

10    REPRESENTATIVES OF THE CLASS.  AND WHILE I REALIZE IN A CASE OF

11    THIS TYPE, THEY ARE NOT INTIMATELY INVOLVED IN THE PROCEEDINGS,

12    THEY ARE THERE TO REPRESENT THEIR COLLEAGUES AND TO BE IN TOUCH

13    WITH COUNSEL AND DO HAVE SOME RESPONSIBILITIES AND ROLES IN

14    THAT REGARD.  SO I THINK THAT'S A VERY FAIR AMOUNT TO PROVIDE

15    TO THOSE TWO.

16         YOU HAD SUBMITTED PROPOSED ORDERS ON THESE MATTERS,

17    AND I FIND THEM TO BE APPROPRIATE AND AM INCLINED TO EXECUTE

18    THOSE AS SUBMITTED.  THE QUESTION I WOULD HAVE IS THERE ARE

Mirant Final Approval.txt

19   BLANKS TO BE FILLED IN.  I DID NOT KNOW IF YOU HAVE COMPLETED

20   ONE THAT FILLS IN THE BLANKS OR IF YOU WANTED TO GET IT TO US

21   BY E-MAIL AND WE WOULD DO IT.

22         MR. WELLS:  YOUR HONOR, NOT TO BE PRESUMPTUOUS, BUT

23   WE DID HAVE ONE THAT HAS THE BLANKS FILLED IN.  I WOULD BE

24   HAPPY TO SUBMIT IT TO YOUR HONOR.

25         THE COURT:  I AM NOT OFFENDED BY YOUR PRESUMPTION AT


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


                                        16

1    ALL.  I APPRECIATE IT, AS DOES MY STAFF.

2          MR. WELLS:  THANK YOU, YOUR HONOR.

3          (PAUSE IN THE PROCEEDINGS.)

4          THE COURT:  I HAVE SIGNED THE ORDER OF FINAL

5    JUDGMENT, AND THIS WILL BE -- I'LL LET COUNSEL FILE IT WITH THE

6    CLERK SINCE MY CLERK IS NOT HERE TODAY.  HE'S OUT SICK.  I'LL

7    LET YOU FILE IT WITH THE CLERK.

8          LET ME, HOWEVER, CONCLUDE BY EXPRESSING TO COUNSEL

9    FOR BOTH THE PLAINTIFFS AND THE DEFENDANT MY SINCERE

10   APPRECIATION FOR YOUR LABORS IN THIS CASE.  YOU POINTED OUT,

11   MR. WELLS, THE LAYERS OF THIS LITIGATION AND THE FACT THAT YOU

12   HAD THE BANKRUPTCY ASPECT OF THIS TO DEAL WITH AS WELL AS THE

13   OTHER ISSUES THAT ARE INVOLVED IN THIS CASE.  THIS WAS NOT A

14   SIMPLE CASE.  IT HAD THE EXTRA LAYERS THAT MADE IT MORE

15   DIFFICULT.

16         BUT IT'S VERY CLEAR TO ME THAT ALL OF YOU WORKED VERY

17   HARD AT THIS.  NUMBER ONE, YOU HAD WORKED VERY HARD BEFORE I

18   STAYED THE CASE IN THE MOTION PRACTICE THAT HAD ALREADY BEGUN.

19   I AM CONFIDENT THAT YOU WOULD HAVE WORKED EQUALLY AS HARD HAD

20   THE CASE BEEN REOPENED AND WE HAD GONE THROUGH THE DECIDING OF

Page 15

Mirant Final Approval.txt

21  THOSE MOTIONS AND IF THE CASE SURVIVED, THE ENTIRE ROUTE THAT

22  YOU'VE DESCRIBED, MR. WELLS, THROUGH SUMMARY JUDGMENT, TRIAL,

23  ET CETERA.  AND FROM A JUDGE'S PERSPECTIVE, IT'S JUST REALLY

24  NICE TO HAVE LAWYERS WHO ARE CAPABLE, WHO ARE PROFESSIONAL, WHO

25  WORK TOGETHER, WHO SEEK TO FIND A GOOD RESOLUTION TO A


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


17


1  DIFFICULT CONFLICT; AND I FEEL THAT YOU HAVE IN THIS CASE.

2        I FEEL VERY GOOD ABOUT THIS SETTLEMENT IN EVERY

3  RESPECT.  I THINK THE AMOUNT OF MONEY THAT'S GOING INTO THE

4  POCKETS OF THE MEMBERS OF THE CLASS, WHILE, AGAIN, I WOULD LOVE

5  TO SEE, AS I KNOW YOU WOULD, MORE MONEY GOING INTO THEIR

6  POCKETS, THIS IS COMING OUT A LOT BETTER THAN WHAT COULD HAVE

7  BEEN; AND I THINK YOU FOLKS HAVE DONE A GREAT JOB.

8        AND I KNOW THAT THERE ARE OBSERVERS WHO WOULD

9  CRITICIZE THE AMOUNT OF ATTORNEY'S FEES AND THEY WOULD SAY THIS

10  IS ALL ABOUT LAWYERS MAKING MONEY.  BUT THE REALITY IS IF YOU

11  HAD REPRESENTED EVERY ONE OF THESE FOLKS INDIVIDUALLY, A 27.5

12  CONTINGENT FEE WOULD HAVE BEEN A STEAL ON THEIR PARTS.  THEY

13  COULD NOT HAVE RETAINED COUNSEL TO REPRESENT THEM INDIVIDUALLY

14  ON THAT KIND OF CONTINGENT FEE.  NUMBER ONE, MOST OF THEIR

15  CLAIMS WOULD NOT HAVE BEEN SUFFICIENT TO JUSTIFY THAT.  THEY

16  WOULD HAVE HAD TO PAY AN HOURLY FEE; AND LOOKING AT YOUR

17  LODESTAR, THE TIME THAT WOULD HAVE HAD TO GO INTO IT, THEY

18  WOULDN'T HAVE GOTTEN ANYTHING OUT OF IT.  THEY WOULD HAVE HAD

19  TO PAY A HIGHER CONTINGENCY.

20        SO WHILE I RECOGNIZE MANY FOLKS OUT THERE DON'T

21  APPRECIATE THE ROLE THAT YOU HAVE PLAYED IN THIS AND THEY SEE

Mirant Final Approval.txt

22   THIS AS LAWYERS JUST GETTING RICH AT THE EXPENSE OF THE VICTIMS

23   OF WHAT HAS OCCURRED HERE, I HONESTLY SEE BEYOND THAT AND THINK

24   THAT YOU HAVE DONE A REAL SERVICE BY REPRESENTING THESE FOLKS,

25   AND I THINK THEY HAVE GOTTEN A DEAL IN IT.  AND SO THANK YOU


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


18

1    FOR YOUR WORK ON THE FILE.

2         AND I APPRECIATE THE DEFENDANTS, AS WELL, BEING

3    WILLING TO COME TO THE TABLE AND GET A RESOLUTION OF THIS.

4         I'VE SIGNED THE ORDER.  I WILL LET YOU FILE IT, AND

5    THAT WILL CLOSE THE MATTER.  THANK YOU, AND HAVE A GOOD DAY.

6    WE'RE ADJOURNED.

7         (PROCEEDINGS CONCLUDED.)

8                        * * *

9              REPORTER'S CERTIFICATION

10   I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE
     RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

11

12

13                        _____
                          SHARON D. UPCHURCH, RPR
                          OFFICIAL COURT REPORTER
14                        UNITED STATES DISTRICT COURT
                          NORTHERN DISTRICT OF GEORGIA
15

16

17   DATE: _____

18

19

20

21

22

23
                        Page 17

Mirant Final Approval.txt

24

25


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

6BFAACITC.txt

1

6BFAACITC                Conference
1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
2
3   IN RE: CITIGROUP LITIGATION,
3
4                         03 CV 2932 (LTS)
5
5   ------------------------------x
6                                   New York, N.Y.
6                                   November 15, 2006
7                                   4:30 p.m.
7
8   Before:
8
9                 HON. LAURA TAYLOR SWAIN,
9
10                                   District Judge
10
11                      APPEARANCES
11
12  SCHIFFRIN & BARROWAY, LLP
12        Attorneys for  Plaintiff
13  BY:  EDWARD W. CIOLKO BY:  MARK K. GYANDOH
13
14  LAW OFFICES OF CURTIS V. TRINKO, LLP
14        Attorney for Plaintiff
15  BY:  CURTIS V. TRINKO
15
16  PAUL WEISS RIFKIND WHARTON & GARRISON, LLP
16        Attorneys for Defendant
17  BY:  JONATHAN H. HURWITZ BY:  LEWIS R. CLAYTON
18
19
20  ALSO PRESENT:  MICHAEL T. HEYRICH, ESQ. Citigroup Inc.
21
22
23
24
25

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            2
6BFAACITC                Conference
1        (Case called)
2        THE COURT:  We're here in the matter of Citigroup
3   litigation.  For a conclusion of plaintiff's hearing on
4   approval of the settlement and related applications.  Counsel
5   would be good enough to introduce yourselves again to me.
6        MR. TRINKO:  Curtis Trinko for the plaintiff and with
7   me are Edward Ciolko, Mark Gyandoh, both from the Schiffrin &
8   Barroway firm in Philadelphia.
9        MR. CLAYTON:  Lew Clayton, your Honor, from Paul Weiss
10  for the defendants.  I am here with John Hurwitz of Paul Weiss
11  and also Michael Heyrich of the Citigroup.
12        THE COURT:  Good afternoon.
13        I have received your supplemental submission which
14  I've reviewed carefully and for which I thank you.
15        Do you wish to make statements at this point?
16        MR. TRINKO:  I believe that Mr. Ciolko will be
                        Page 1

6BFAACITC.txt

```
17   addressing the points for supplemental memorandum and any
18   questions that your Honor may have.
19            THE COURT:  Thank you.
20            MR. CIOLKO:  Good after, your Honor.
21            Thank you for giving us the opportunity for providing
22   the supplemental memorandum, the additional report by Professor
23   Ramaswamy.  I'll dispense with going over what was, I think,
24   laid out in maybe painstaking detail in our 140 pages of
25   briefing and maybe just concentrate on the supplemental filing
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                       3

6BFAACITC                       Conference
```
 1   and then, of course, I will be very brief and any questions
 2   your Honor might have.
 3            So I know, to be frank, Professor Ramaswamy in his
 4   analysis is complex, so it took me a bit of time to make sure I
 5   understand stood every nook and cranny.  I think our
 6   supplemental memorandum sets out both the supplemental filing
 7   done by Professor Ramaswamy as well as any potential impact of
 8   the pension -- on the settlement itself.
 9            If it please your Honor just as a quick review, the
10   settlement negotiated by the parties essentially or structural
11   changes to the plan and educational opportunities to be being
12   afforded to plan participants under the Citigroup 401 K plan,
13   formerly, there was two forms, for want of a better term, lot
14   Citigroup or company stock that was held by the plan.  One
15   originated from predecessor plan, The Travellers' had a 401 K
16   plan which came from a predecessor company that Citicorp became
17   Citigroup, and the plans merged to be become the Citigroup 401
18   K plan.  That lock stock under the terms of the plan generally
19   had to stay invested in company stock until a participant from
20   that 401 plan was aged 55.  A second source of locked
21   investment of company stock in the plan was from ongoing
22   Citigroup matching contributions under the plan which formerly
23   had to stay invested in Citigroup stock, generally, again, for
24   five years.
25            The parties engaged in a lengthy and detailed and
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                       4

6BFAACITC                       Conference
```
 1   spirited negotiations.  We tried to come to a meeting of the
 2   minds on the case that provided particular challenges on both
 3   sides, I believe, because of both the recovery of Citigroup
 4   stock during the relevant time period, the novel area of the
 5   case law, the large scale investment of the company stock in
 6   the plan.  I think the parties wanted to reach an amicable
 7   settlement that would both address some of the issues that
 8   plaintiffs had raised and protect the participants going
 9   forward.  I think that's what we did.
10            Essentially, under the original terms of the
11   settlement The Traveller's plan stock was immediately to be --
12   from the predecessor plan and the previous, the prior stock in
13   the plan that originated from Citigroup matching contributions
14   that had to be invested in company stock for five years would
15   only have to remain in investment in Citigroup for one year
16   after, essentially, for one year after grant.
17            In addition to that, Citigroup had agreed to provide
18   financial advice and financial investment educational services
19   to active participants in the plan and as well as provided
20   educational materials on the benefits of diversification,
21   retirement plan investments to class members who are no longer
```
                                Page 2

6BFAACITC.txt
22  participants in the plan or employees in the Citigroup.  They
23  provided access to that material through their web site to the
24  people that wanted to gain insight on the advantages of
25  diversification of retirement assets which is at the heart of
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

6BFAACITC              Conference
1   what that settlement case is.
2           As parties brought to your attention at our last final
3   fairness hearing, in our view Congress had kind of caught up
4   with what was forward thinking on our part, I think, and
5   thought that it would be a good thing to eliminate any mandated
6   investment in company stock in these type of defined
7   contribution plans.
8           In general, the Pension Protection Act which was
9   signed into law after the final -- the relevant portions to a
10  settlement here are -- and I am sure my colleagues either next
11  door or behind me will correct me if I get it wrong but I am
12  trying to present it as simply as possible as I understand it.
13  Under the law any plan holdings that previously were locked in
14  the company stock that were generated from company matching
15  contributions before December 31, 2006, have to be allowed to
16  be unlocked or diversified on other plan investments on a
17  graduated scale.  At least a third of these assets have to be
18  divested by the end of 2007, a third by 2008 and the remaining
19  third by 2009.  And that for stock that had been in the plan
20  subject to restriction or lock employer's qualifying, employer
21  security such as the one at issue in this case.
22          So at your Honor's behest we went back to our
23  Professor Ramaswamy and asked him to take a look at the numbers
24  he had already created and if your Honor would remember I think
25  he initially had estimated the value of the unlocks negotiated
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

6BFAACITC              Conference
1   by the parties was somewhere between $23 and $43 million.  He
2   took a look at those numbers again and ran those numbers under
3   a number of different scenarios.  One of which I believe my
4   colleagues behind me at the defense table are better able to
5   discuss, but under three scenarios, one, under the original --
6   I know the terminology in the report is a little confusing, at
7   least was for me at first -- but under the proposed settlement
8   he reran numbers that he had run before trying to be even more
9   conservative than before and came out to essentially the same,
10  21 to 41 million dollar valuation.
11          Then he ran the numbers with the assumption that the
12  parties knew the act would be passed which it did with the
13  mandated divestment of company security -- He ran those numbers
14  and came to the conclusion that the negotiated settlement still
15  worked between, I believe, it's eight and $15 million -- eight
16  and $16 million.
17          Then after the independent fiduciary who had done an
18  11 month investigation into the original set of terms to the
19  original settlement said it would pass muster in their view
20  also took a look at Professor Ramaswamy's new numbers and had
21  asked that he also run additional calculations that -- I have
22  to back up a second.  I apologize.  Since our final fairness
23  hearing Citigroup has sua sponte, not as part of the
24  settlement, changed the 401 K plan where the Citigroup matching
25  contributions that were formally locked for five years and that
                SOUTHERN DISTRICT REPORTERS, P.C.
                        Page 3

6BFAACITC.txt
(212) 805-0300

7

```
     6BFAACITC              Conference
 1   unlocked was moved to one year under the settlement, now is
 2   subject to immediate diversification.  That is so that the
 3   independent fiduciary wanted Professor Ramaswamy to also run
 4   some calculations to take into account that change in the plan
 5   that's not part of the settlement.
 6            And you know while I think informative, I'm not sure
 7   it actually has any bearing one way or another on whether or
 8   not the settlement was beneficial to the classes.  We believe
 9   it is.  In Professor Ramaswamy's final conclusion, even in his
10   supplemental report, is that given that the parties had reached
11   this agreement I believe in the fall of 2004 the better view of
12   the value of the unlocking under the original settlement is
13   that it was worth conservatively $25 million given the amount
14   of lock stock that was then owned by the plan and that would
15   have been added to the plan, the five years come enhanced after
16   the settlement.
17            So the independent fiduciary has reviewed the new
18   numbers that Professor Ramaswamy has put forth and continues to
19   believe that the settlement is fair and the result and
20   beneficial to the class and the result in arms length
21   negotiation.
22            THE COURT:  The independent fiduciary is who?
23            MR. CIOLKO:  Great Bank Trust.
24            THE COURT:  OK.  Thank you.
25            MR. CLAYTON:  And their counsel, your Honor, is Hogan
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

8

```
     6BFAACITC              Conference
 1   and Hartsen --
 2            MR. CIOLKO:  Yes.
 3            THE COURT:  Now, the one sort of premise or structural
 4   element of the Ramaswamy supplemental report that I'm not quite
 5   sure I followed to my complete satisfaction was his pegging of
 6   the valuations to a December 31, 2004 date.  It wasn't clear to
 7   me whether in running the numbers on the diversification as
 8   against risk value of unlocking stock he was making some sort
 9   of, including some sort of assumption as to the opportunity for
10   additional, capturing of additional market value in some
11   retroactive period that isn't applying here.
12            MR. CIOLKO:  Do you mean -- and I actually had a
13   similar question, your Honor.  I think the assumptions that
14   Professor Ramaswamy made when starting in 2004 he was working
15   on the assumption, one, that the one year lock would be in
16   place going forward for five years, and, two, that he estimated
17   the amount of matching contributions that would be made in
18   those five years and took the value of the additional monies
19   that would be unlocked versus the five year unlock.  I don't
20   think he was taking any additional figures in a pretty
21   retroactive manner.  Maybe the easiest way to say this I thing
22   he utilized the same assumptions in his first calculations as
23   in his second.  If anything his numbers are conservative
24   because he would not take into account either the immediate
25   unlock that was negotiated after the settlement or the fact
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

9

```
     6BFAACITC              Conference
 1   that the -- I think the simply answer is that that was the
 2   numbers that he has given, the latest numbers that we had for
```

Page 4

6BFAACITC.txt
```
 3  the plan that he could define what future contributions would
 4  be compared to what past contributions were.
 5          THE COURT:  So as far as you know none of the numbers
 6  that go into his new eight to 16 or 17 million dollar range
 7  assume that a participant would have been able to reinvest at
 8  some point between December 31, 2004 and today stock that
 9  actually remained locked up during all or part of that period
10  that could not physically have been taken to the bank as it
11  were and actually diversified.
12          MR. CIOLKO:  I think that's right.  I think that's
13  exactly right under both.  I don't think he could.  I think in
14  his mind he did -- I think I understand your question and I
15  apologize, your Honor.  He wanted to, in order to do that he
16  would have made the calculations more complicated.  I think he
17  wanted a more conservative approach.  He assumed that the value
18  of the stock that was unlocked could be diversified, but that
19  was it.  There was no additional -- in his supplemental
20  analysis there was no additional stock he said would be able to
21  be unlocked even though effectively it couldn't have been cause
22  it wasn't unlocked.
23          THE COURT:  All right.  Just another question.  Where
24  does the implementation of the unlocking provisions stand as of
25  today when I haven't yet signed the final order approving?
```
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

6BFAACITC                     Conference
```
 1  Have accounts actually been unlocked or accounts still unlocked
 2  and awaiting the great release as it were?
 3          MR. CIOLKO:  That might be a question better answered
 4  by Mr. Clayton.
 5          MR. CLAYTON:  Yes, your Honor.
 6          We have not yet implemented that as the papers
 7  indicate under the stipulation in part of the settlement in
 8  part of the New Pension Act and some other factors Citi
 9  decided, not as matter of compulsion under the settlement but
10  as a matter of administration, completely to unlock these
11  shares to go beyond even the one year restriction and that is,
12  we believe, scheduled to happen at the start of the new year
13  '07.
14          THE COURT:  1/1/07?
15          MR. CLAYTON:  Maybe a few days after 1/1/07 but it's
16  January '07.
17          THE COURT:  Thank you.  Now, that gives me the
18  predicate for asking one more time the question that I was
19  trying to formulate.
20          Does any of the numbers, to counsel's knowledge, in
21  the Ramaswamy report assume that participants could have at any
22  point prior to today invested stock that is in Citigroup stock
23  and locked under the current terms of the plan in some other
24  investment that would match their assumed risk and target
25  return profile?
```
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

6BFAACITC                     Conference
```
 1          MR. CIOLKO:  No, your Honor.  What I think the
 2  assumption was that once your Honor signed the settlement and
 3  the -- were put into effect certain previously locked stock
 4  would be available for divestment at that date, and that number
 5  was included in Professor Ramaswamy's calculations because it
 6  would be.  Formerly, there had been stock that say was, granted
 7  in 2003, subject to a five year lock, that assuming that the
```
                            Page 5

6BFAACITC.txt

8   defendants had not, Citigroup had not changed their locking
9   provision it would be subject to one year locking and
10  effectively would have been immediately available for
11  investment.  So he took that into account, but immediately
12  available for investment upon the date of the change.
13          THE COURT:  Yes.  Prospectively.
14          MR. CIOLKO:  Prospectively.
15          THE COURT:  All right.  Thank you.  Is that it?  That
16  was my one question.
17          MR. CIOLKO:  That's it.  One other thing.
18          I know we had given your Honor a modified final
19  order --
20          THE COURT:  Yes.
21          MR. CIOLKO:  -- for your review.  And thank you for
22  the suggested revision.  Mr. Trinko also has a modified fee
23  award quarter which we have shown to defendants and they're
24  fine with the substance of it.  But we literally had just
25  finalized this today.
              SOUTHERN DISTRICT REPORTERS, P.C.
                 (212) 805-0300

12

6BFAACITC              Conference
1          THE COURT:  It's been modified proposed fee order
2  accompanied by an affidavit that lays out whatever additional
3  work you want me to factor into the Loadstar calculation on the
4  supplemental analysis?
5          MR. CIOLKO:  To be honest with you, your Honor, we
6  didn't actually include that.  Because the Loadstar number was
7  so close to one effectively we're asking for our fees which in
8  this type of case we think it's reasonable in this situation,
9  in fact, the defendants had agreed to a fee request up to a
10  million dollars.  We thought that given the tally and the
11  circumstances that what we were asking for was essentially what
12  our fees would be with no multiplier.  So any additional work
13  that we put in would just be clarifying something that came
14  along out of the blue.  We could put the additional hours in
15  and it would actually be a fractional multiplier.
16          THE COURT:  Let me put it this way, if you are asking
17  me to award a greater amount of dollars then you asked me the
18  last time on account of what you had done have you documented
19  that if you are asking me the same number?
20          MR. CIOLKO:  Same number.
21          MR. TRINKO:  The only revision that was made to our
22  fee order, your Honor, was just to note that we're having the
23  supplemental hearing and just to indicate just as to why.
24          THE COURT:  Thank you.
25          MR. TRINKO:  If I could approach, your Honor, I'll
              SOUTHERN DISTRICT REPORTERS, P.C.
                 (212) 805-0300

13

6BFAACITC             Conference
1  hand it up.
2          THE COURT:  Yes.
3          (Pause)
4          THE COURT:  Mr. Clayton, did you or any of your
5  colleagues wish to be heard?
6          MR. CLAYTON:  Very little to say, your Honor.
7          We appreciate the Court's time and the fact that we
8  have been able to make some supplemental submissions so that
9  the Court has a full record before it.  We think this is a
10  quite reasonable settlement.  We did make it sufficient, as
11  your Honor knows, concerning some recent changes to the Citi
12  plans.  We wanted that to be on the record here, but we do not
                   Page 6

6BFAACITC.txt
13    believe that those changes have any effect on this settlement.
14    Thank you, your Honor.
15        MR. CIOLKO:  Your Honor, one more thing.
16        You asked at the previous hearing that we also answer
17    a question whether any portion or provision of Pension
18    Protection Act was violated by term of settlement or was in
19    conflict with and we've reviewed it and it is not.
20        THE COURT:  Thank you.  And I think you also made that
21    representation in the written submission.
22        Well, I do thank you for your extensive original and
23    supplemental submissions in support of this proposed
24    settlement.  The proposed orders cover much, if not all, of the
25    technical ground that I need to cover in terms of approving the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              14
      6BFAACITC              Conference
1     settlement.  I will make a few further remarks on the record
2     and these remarks and the orders that I will sign will
3     constitute the Court's findings of fact and conclusions of law
4     for purposes of Rule 52.
5         I note that the Court has jurisdiction of these
6     matters pursuant to Section 1132 of Title 29 of ARISSA as well
7     as Section 1331 of Title 28 of the U.S.C.
8         I find for the reasons documented at some length in
9     the submissions that these were arms length negotiations.
10        I also find that the parties and their attorneys were
11    creative in approaching the legal issues presented and the
12    challenge of coming up with meaningful and constructive relief
13    for plan members in the context of a settlement and that it was
14    the product of arms length bargaining.
15        I have considered the requisite ^gran nel factors in
16    relation to the substantive terms of the settlement.  Just to
17    remark with respect to the reaction of the class as documented,
18    again, at some length in the original submissions there were
19    very few objections filed, a fraction of one percent of the
20    class and only eight of those, something like 11 objections
21    made specific comment on features of the settlement.
22        At least one of those letters requested that there be
23    no lock up at all, as I recall, and I note that the ultimate
24    result here including the voluntary plan changes eliminating
25    the lock up provisions address or would moot even that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              15
      6BFAACITC              Conference
1     objection.
2         The Court has taken seriously its obligation to
3     consider the propriety and fairness of the settlement even as
4     to non objecting class members and finds that the requisite
5     factors are well and properly addressed here, that the risks of
6     litigation are well responded to and balanced in this
7     settlement.  It is a non monetary settlement.
8         I find that it is reasonable under the circumstances,
9     given the nature of the litigation and the legal risks and
10    novel issues presented here, I do find based on the analyses by
11    Professor Ramaswamy that there is real monetary value going to
12    class members in connection with the settlement by virtue of
13    the elimination of what we had been calling the lock up
14    provisions in the plan, that the settlement provisions for
15    elimination and or carve back of the lock up provisions are
16    more generous than those now mandated by law under the Pension
17    Protection Act of 2006.  And that the additionally voluntary
                            Page 7

6BFAACITC.txt
```
18  step taken by Citigroup improves that benefit to plan
19  participants even more.
20          I also find that the educational investment -- I'm
21  going to say advisory but not necessarily in the technical
22  sense of word -- provisions of the settlement are also
23  beneficial to and meaningful for class members.
24          I also find that final certification of the class in
25  connection with this settlement is appropriate and that the
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

16

6BFAACITC                    Conference
```
 1  requisite factors are met pursuant to Rules 23(A) and 23 (B)
 2  (1) and (2) of the Federal Rules of Civil procedure.
 3          I further find having considered the Loadstar
 4  calculations with respect to the fee application and the
 5  Goldberger factors that the fees request is both reasonable and
 6  appropriate in relation to the work performed in risks faced by
 7  class counsel here, and, therefore, I find that it's
 8  appropriate to approve the proposed settlement, certify in
 9  connection with that settlement the class and award the
10  requested attorney's fees and expenses.
11          Is there anything further that counsel feel I should
12  address orally on the record in addition to the matters that
13  are covered in the proposed orders?
14          MR. CIOLKO:  Thank you very much, your Honor.
15          The matter of the case contribution award for the
16  individual plaintiffs.
17          THE COURT:  Yes.  I have considered carefully as well
18  the proposed case contribution award and I find that it is
19  reasonable and appropriate in structure and amount and so that
20  application is approved as well.
21          Now, that is not covered in these revised orders that
22  you gave me, is it?  I don't remember it being covered in the
23  revised orders, the final judgment order dismissal.
24          MR. CIOLKO:  It maybe in the separate proposed fee
25  order.  That's right.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

6BFAACITC                    Conference
```
 1          THE COURT:  It's in the --
 2          MR. TRINKO:  Paragraph five, your Honor.
 3          THE COURT:  Yes.  Thank you.
 4          All right, then, give me just one moment.
 5          Let's see.  And the request I have to confess that
 6  that was an aspect of it that I focused on at least one hearing
 7  ago.  So the specific request for the case contribution award
 8  the amount requested was what?
 9          MR. CIOLKO:  It was $2500 per plaintiff.
10          THE COURT:  Yes.  And I had considered that and had
11  concluded that it was an appropriate amount.  So I will fill
12  that in.  And the figure that you were seeking in attorney's
13  fees and expenses.
14          MR. CIOLKO:  The attorney's fees I believe were
15  $750,000.
16          THE COURT:  And the expenses number is what?
17          MR. CIOLKO:  31,921.
18          THE COURT:  31,921?
19          MR. CIOLKO:  That's right.
20          THE COURT:  And on the final judgment and order of
21  dismissal I've crossed out the word "corrected" in the title
22  since I've never entered one before, so this can be the final
```
Page 8

6BFAACITC.txt
23    judgment.  I'm also crossing out the reference to "correction"
24    in paragraph one and the reference to objectors having appeared
25    by counsel and having -- I'm just going to cross out "having
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                    18
        6BFAACITC               Conference
1     appeared by counsel".  Just for the record, no one was here to
2     speak at the August hearing but I have heard the objector by
3     way of reviewing their objections.
4           So with those changes I have also dated the final
5     judgment and order of dismissal with today's date and signed
6     that as well as the attorney fee and class representative case
7     contribution award order and I wish to thank and congratulate
8     all of you.
9           I know it has been a very long road for you and it's
10    got to be fun to work on something that's precedent setting as
11    well as challenging and that reaches a result that is so
12    beneficial all around.  So congratulations to all of you.  I am
13    glad to have met you and I am sure that we will all live long
14    enough to see each other again.
15          Ms. Cypher will organize getting copies to you.  Will
16    it be acceptable to you if she faxed them out to your
17    respective firms rather than doing the Xeroxing tonight?
18          All right.  Again, thank you all.  Good night.
19                              o 0 o
20
21
22
23
24
25


                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

1

 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEW JERSEY
 2              CIVIL ACTION  2:03-cv-01214-DRD-SDW

 3

IN RE: HONEYWELL ERISA      : TRANSCRIPT OF PROCEEDINGS
 4  LITIGATION               :
                          :      M O T I O N
 5  - - - - - - - - - - - - - - -

                    Pages 1 - 45
 6

                    Date:  July 19, 2005
 7                   Newark, New Jersey

 8

B E F O R E:   HONORABLE DICKINSON R. DEBEVOISE,
 9               SENIOR UNITED STATES DISTRICT JUDGE

10

A P P E A R A N C E S:

11

DRINKER BIDDLE & SHANLEY
12  BY:  JOHN J. FRANCIS, ESQ., and
ROBERT ECCLES, ESQ.,
13  Attorney for Honeywell Corporation

14

TRUJIILLO RODRIQUEZ & RICHARDS
15  BY:  LISA RODRIGUEZ, ESQ. and
SCHIFFRIN & BARROWAY
16  BY:  JOSEPH MELTZER, ESQ.,
Attorney for the Plaintiffs

17

18

                                            
19  Pursuant to Section 753 Title 28 United States Code, the
following transcript is certified to be an accurate record as
20  taken stenographically in the above entitled proceedings.

21

MOLLIE ANN GIORDANO
22  Official Court Reporter

23

24

25

     MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

Colloquy                                    2

1              THE COURT:  Good morning.  I gather you've given your

2       appearances to Miss Giordano, so we're ready to proceed.

3              Let me ask before we start in, the gentlemen back

4       here, are you here to make any comments about the settlement?

5              VOICE:  No, sir.

6              THE COURT:  All right.  So we have nobody appearing at

7       this point anyway to address the approval of the settlement?

8       Any other applications?  All right, well, Miss Rodriguez, are

9       you presenting this?

10             MS. RODRIGUEZ:  Actually, your Honor, Mr. Meltzer will

11      be presenting on behalf of the plaintiffs today.

12             THE COURT:  All right.  Mr. Meltzer, go ahead.

13             MR. MELTZER:  Good morning, your Honor.  We are very

14      pleased to be here today.  We are here to present the

15      settlement in all the claims in the Honeywell ERISA litigation.

16      The settlement is a product of a rather lengthy, sometimes

17      rather intense negotiations between the parties.  Your Honor,

18      to summarize what the settlement provides for, monetary and

19      structural relief.  On the monetary side, it calls for 14

20      million dollars to pay into the Honeywell plans.  It will be

21      distributed to the participants and further pro rata share, and

22      in accordance with how much they may have lost due to their

23      investments in Honeywell stock.  Your Honor, if I could, one

24      bit of housekeeping.  We had submitted a plan.

25             THE COURT:  And I gather you propose not to pursue

<div align="center">Colloquy                    3</div>

1    that this morning?

2             MR. MELTZER:  That's right.

3             THE COURT:  We will address that question later.

4             MR. MELTAER:  It's largely worked out, and I think

5    there's some details that I think we need to finalize, and the

6    parties will get together and submit something in due course.

7             With respect to the structural part of the settlement,

8    previously the Honeywell plan provided that participants cannot

9    invest their honey in anything but Honeywell stock until they

10   were 55, and had accumulated 10 years of service in the plan.

11   Those restrictions have been lifted or unlocked, so to speak,

12   so now participants can move their money about in any of the

13   plans in investment alternatives.

14            The other motion before your Honor today is counsel's

15   motion for fees, expenses, and payment of case contribution

16   orders; namely, plaintiffs.

17            With respect to the motion for approval of settlement,

18   we seek the Court's finding that the settlement is fair,

19   adequate, and reasonable under Rule 23 and the Third Circuit

20   standards.  We also seek final certification of settlement

21   class, and I can give you a brief background of the litigation

22   to this point.

23            THE COURT:  All right.

24            MR. MELTZER:  Okay.  The cases were initially filed in

25   March, 2003.  They allege breaches of fiduciary duty under

```
                              Colloquy                    4

 1    ERISA, specifically Section 409 and 502 of ERISA.  There were

 2    two cases filed.  They were ultimately consolidated in May of

 3    2003.  There was a consoldation and organizational order

 4    entered by the Court.  At that time, my firm and Ms. Rodriguez

 5    leads with the liaison counsel, and we secured certain

 6    documents, ERISA-related documents that relate to the governing

 7    of the plan.  They are essentially the trust agreement and all

 8    the governing instruments under which the plans are operated.

 9              We then continue by our investigation of the claims,

10    and essentially to prepare the filing of the consolidated

11    complaint.  The consolidated pleading was filed on July 28,

12    2003.  It is fairly long, it's fairly detailed, it essentially

13    groups three sets of defendants, Honeywell International,

14    members of the retirement plan's committee, members of the

15    company's investment committee, and it sets out a variety of

16    allegations relating to why Honeywell stock, at least

17    plaintiffs allege, was imprudent during that period.  Problems

18    that the company was having related to certain mergers, Allied

19    Signal mergers.  Also a contemplated merger with General

20    Electric.  Claims for relief based on breach of fiduciary

21    duties under ERISA; to monitor fiduciaries under ERISA; and

22    also prohibit transactions.

23              Following the filing of that consolidated pleading,

24    that touched off some motion practice.  Defendants moved to

25    dismiss the complaint, and we of course opposed it.
```

Colloquy                                    5

1          THE COURT:  You're familiar with what took place here

2     in court?

3          MR. MELTZER:  That ultimately resulted in oral

4     argument before your Honor, and ultimately an order granted in

5     part, denied in part, defendant's motion.

6          At that time the parties were also engaged in class

7     certification discoveries as a result of the magistrate waiting

8     to enter an order bifurcating discovery in the matter.  We were

9     engaged in propounded discovery, compounded discovery.  We had

10    several meet and confer sessions, some rather lengthy, some

11    rather contentious, but we ultimately framed a couple of issues

12    for the Court.  We had a couple of motions to compel pending

13    the time the settlement was reached.

14          The other aspect of the litigation that I would point

15    out is that the ERISA plaintiffs and counsel here today appear

16    before your Honor in the securities case because there was some

17    questions if they were reached in their case.

18          THE COURT:  What was the settlement figure in that

19    case?

20          MR. MELTZER:  In the securities litigation?

21          THE COURT:  Yeah.

22          MR. MELTZER:  I believe it was a hundred million

23    dollars.

24          Yeah, we appeared at the fairness hearing in the

25    securities litigation to make sure the relief was not -- could

Colloquy                                         6

1   not be read to the certain defense in this litigation.

2   Settlement discussions began sometime in the spring of '04, and

3   frankly, your Honor, I believe they were touched off by an

4   inquiry you made during the contest of a securities hearing as

5   to whether class counsel in the ERISA case has begun a

6   settlement dialogue.  And we're appreciative of that fact,

7   because sometimes that's just the kind of push the parties need

8   to talk about settlement in a fruitful way.  We had rather

9   protracted settlement discussions.

10          There is essentially two grounds, if you will, in

11  negotiation.  We had asked your Honor to refrain from issuing

12  his opinion on the motion to dismiss, sort of insuring the

13  maximum amount of uncertainty while settlement talks were

14  proceeding.  We reached an impasse at some point.  We then

15  contacted your Honor and asked that you issue your opinion.

16  And after it's received, we sort of picked up on settlement

17  negotiations at that time.

18          Beyond the settlement, we went over the terms of the

19  actual agreement.  We proceeded with some confirmatory

20  discovery that involved largely the production of.  Corporate

21  minutes, there are two committees I mentioned before,

22  Retirement Plan Committee that deal with operations an

23  administration of the plans.  We reviewed some of those

24  minutes.  We talked to a large --

25          THE COURT:  How far will discovery proceed in the

```
                         Colloquy                    7
```

1   securities class action?  Have they gotten into merits

2   discovery.

3           MR. MELTZER:  My involvement was limited, your Honor.

4   But as I understand it, I think they were well into merits --

5           THE COURT:  Well, the point of my question is, were

6   you able to draw on the information and discovery in that case

7   to assist you in this case?

8           MR. FRANCIS:  Judge, if I may, I was the only one who

9   was in both cases.  There were a limited number of depositions

10  in the securities litigation, fair amount of document

11  discovery, and very little depositions.

12          THE COURT:  And the document discovery?

13          MR. FRANCIS:  Yes, yes, a fair amount of that.

14          MR. MELTZER:  The only thing I can say, your Honor, in

15  direct response, I didn't have access to anything that went on

16  in the securities litigation, with the exception of pleadings

17  that were filed.

18          THE COURT:  And there were motions filed --

19          MR. MELTZER:  Right.

20          THE COURT:  -- in that case.  And I assume you've

21  followed whatever was going on in the court?

22          MR. MELTZER:  Yes, especially with respect to

23  settlement.  You do what you have to do.

24          THE COURT:  All right.

25          MR. MELTZER:  Beyond that, that's sort of where our

```
                        Colloquy                        8
```

1    involvement ended.

2              THE COURT:  All right.

3              Well then, what was the data on which you relied in

4    determining the merits of your case?

5              MR. MELTZER:  Your Honor, we got both the

6    ERISA-related documents, we did a lot of precomplaint sort of

7    informal discovery.  Anything that we were able to obtain from

8    probable available sources, SEC filings, the DOL, anything that

9    we got from the defendants, both before the complaint was filed

10   and in the context of discussing settlement.  That's the kind

11   of information we relied upon.  There included information with

12   regard to the insurance that the company had taken out for

13   fiduciary claims, it included information regarding the plans,

14   purchases, and sales of Honeywell stock during the time period.

15   Again, the minutes of the committees that were assessing the

16   propriety in investing in Honeywell stock were produced the day

17   after the agreement was reached in a confirmatory capacity.

18   There was, in addition to whatever we got in the context of

19   class certification, the discovery, in the way of discovery

20   responses.  Frankly speaking, I'm not sure how much that

21   dovetails to the merits of the claim.  It did somewhat, but

22   that's not entire overlapping.

23              THE COURT:  All right.

24              MR. MELTZER:  There was a fairly substantial amount of

25   information that we were -- that we had access to, both in the

Colloquy                                           9

1    context of preparing for our complaint and the motion practice,

2    and in proceeding with settlement negotiations that I think

3    span settlement -- six or seven months.

4            THE COURT:  Good.  Okay.

5            MR. MELTZER:  Your Honor, I would just like to touch

6    real briefly on the structural relief part of the settlement.

7    We are particularly pleased with that.  There is a -- there is

8    a report that we would draw your Honor's attention to that

9    we've submitted with our approval papers.  It's from a

10   Professor Ramaswamy.  He is a professor -- he sort of is a

11   specialist in trying to quantify what value it brings.  He puts

12   a broad range in terms of value, less concerned about what the

13   actual value is, and more concerned that people are going to be

14   able to kind of spread our investments out over a variety of

15   investments, especially if they see some kind of down turn in

16   any particular sector of the market.  It helps to mitigate

17   against these kinds of claims going forward, otherwise I can

18   rely on the submission, and we're not seeking a fee on the

19   value that he quantifies, fairly large.

20           THE COURT:  And it's pretty speculative --

21           MR. MELTZER:  Yeah, it is.

22           THE COURT:  -- value?

23           MR. MELTZER:  Well, it's speculative in one sense

24   because obviously you're not dealing with people and their

25   investment decisions in the future.  And on the other hand,

```
                          Colloquy                    10
```

1  it's fairly empirical, and it's at least well reasoned, and

2  it's actually based on actual data.

3        With respect to settlement as a whole, both the

4  monetary and structural components of it, we would ask that the

5  Court enter a finding that it's fair, reasonable, and adequate,

6  under Rule 23E, within the Third Circuit.  There is a nine

7  factor test.  Frankly, preliminarily, your Honor, the

8  settlement is presumptively fair under Third Circuit case law.

9  It was negotiated at arm's length.  There was sufficient

10 discovery so counsel could assess the merits, and counsel has

11 experienced a similar action, and only a small portion of the

12 class objected.  And those are inadequate notice to the class

13 participants, and I'll touch on that in a second.  Those are

14 the elements for sort of a presumptive finding of fairness.

15       With respect to notice, the notice in this case, and

16 it's a non-class, those standards are lower or somewhat

17 relaxed.  Frankly, the notices in this case were outstanding.

18 There were individual notices mailed out to over a hundred

19 thousand participants.  There was publication in the USA Today,

20 the Minneapolis Star Union.  There was a web site that we made

21 available through the claims administrator which gave everybody

22 information regarding the settlement, including court

23 documents, that had twenty-thousand, two hundred hits in the

24 small amount of time since notice was effectuated.

25       Despite the notice efforts, there were roughly 18

Colloquy                                              11

1    objections, as I counted them.  Given the size of the class,

2    that's a rather small number.

3             With respect to the Dirsh factors, I can run through

4    those fairly quickly.  The first factor, and this is the

5    nine-factor test that the Third Circuit has enunciated, I think

6    it's a 1975 case, but it's been reiterated and reiterated.  The

7    first factor is complexity and likely duration of the

8    litigation.  Your Honor, these are fairly novel claims, and

9    these are fairly new lines of cases.  The case law, as your

10   Honor probably knows from issuing the opinion, is very

11   unsettled.  There is a lot of inherent complexities.  Courts in

12   this district alone have noted the difficulties in trying to

13   prove one of these cases and advance it all the way to trial.

14   The expense and likely duration of the litigation, had we not

15   settled at this point, the litigation probably would have gone

16   on for at least another year.  And a factor of that, the

17   expense would have been very considerable.  Experts in this

18   kind of case alone are in the hundreds of thousand of dollars.

19   Document production would have cost some factor of that.  So

20   that factor militates in favor of approval of the settlement.

21            The second Dirsh factor is the reaction of the class

22   to the settlement.  As I say, your Honor, there were roughly 18

23   objectors.  Given the size, winds up to be .01 percent of the

24   class.  The other thing to note about the reaction of the

25   class, some say too little in terms of settlement, some say

```
                              Colloquy                    12
 1    it's far too much.  We seem to obstruct that.
 2            THE COURT:  Well, I guess you had a few people who
 3    just don't like class action or class action lawyers.
 4            MR. MELTZER:  Unfortunately, your Honor, the person in
 5    my position is always the case.  There are always people who
 6    are dissatisfied with the way Rule 23 operates.  By and large
 7    the class is -- by not objecting is sort of affirming the
 8    reasonableness of the settlement, and I think that factor also
 9    militates in favor of the finding fair and reasonable.  The
10    proceedings and the amount of discovery, as we discussed
11    previously, the case was settled after your Honor issued the
12    motion to dismiss.  Class certification, the discovery was
13    ongoing at the time.  The class, as I addressed briefly,
14    earlier, class certification and discovery was proceeding
15    because it hadn't bifurcated at that point.  Merits discovery
16    has been stayed, despite our objection.  We lost on that one.
17    Class certification discovery was determined first, and then
18    subsequent to a finding on class certification, we were to move
19    into merits discovery.  We had discovery that was produced
20    informally] before the complaint was filed.  We had a lot of
21    publicly available information.  We had dozens and dozens of
22    participants who had contacted my firm, who gave us
23    information.  We also ad information that was produced in the
24    context of negotiating the settlement.  All of those factors
25    essentially amounts to us having clearly a considerable amount
```

Colloquy                    13

1    of information and enough information that we can assess the

2    propriety of moving forward with this settlement today.

3         The fourth and fifth test of the Dirsh test is showing

4    liability.  These are difficult cases, as I touched on briefly.

5    There is a dirth of case law with respect to whether the cases

6    are meritorious and can go forward on any number of fronts,

7    whether it's in the face of a presumption or in terms of

8    standing to bring the claims.  There is a District Court

9    opinion, your Honor, in this district shortly before you issued

10   your opinion on the motion to dismiss, which dismissed all the

11   claims in analogous actions based on standing and the inability

12   to proceed in this type of action.  There is a limited number

13   of circuit court decisions that guide us.  And frankly, I have

14   felt we had strong claims with respect to liability, as the

15   defendants I'm sure think they have very strong offenses with

16   respect to liability.

17        In terms of damages, this particular case is not a

18   sort of fraud of the century, if you will.  It's not an Enron

19   or Worldcom.  It's not a case where the company spiraled into

20   bankruptcy.  I think the close, the trade was somewhere up to

21   forty dollars a share.  It's obviously a viable company.

22   Factor that with the sort of performance of the stock, visa-vis

23   the market during the time period, and whether it

24   underperformed or out performed certain indexes, damages would

25   be a very difficult proposition for us to prove.  There was a

Colloquy                                    14

1    drop in the stock obviously between the beginning and end of

2    our class period.  Whether we could tie that to the specific

3    fiduciary action or inaction, obviously is something that we

4    would only ote if we proceed through an entire trial.  But

5    based upon our experience in other cases, this was a difficult

6    case in terms of trying to prove up the actual damages.  And

7    frankly, your Honor, if you look at the memorandum that the

8    defendants filed yesterday, we would have been lucky to prove

9    any damages at all, based on the statements made in that

10   memorandum.

11          The sixth Dirsh factor is the risk of maintaining a

12   class action through trial.  Frankly, your Honor, I think the

13   class would have been certified.  I think these cases make for

14   perfect class actions under 23D-1.  I think they said all the

15   elements of 23A pretty clearly, and the cutting against that of

16   course is that the defendants had already undertaken a very

17   aggressive class certification.  And in light of that, they

18   would have attacked the accuracy of our named plaintiffs.  We

19   were preparing for depositions at the time we settled.  There

20   was certainly a risk that we wouldn't be able to maintain a

21   class at trial, albeit I think a small one.

22          The seventh Dirsh factor is the ability of the

23   defendants to withstand a greater judgment.  Your Honor, we

24   don't challenge whether Honeywell could sustain a greater

25   judgment than what we would have secured here.  This factor

Colloquy                                      15

1   standing alone doesn't preclude the entry of a settlement.  I

2   think the waiver and anti-trust case in the Third Circuit, just

3   because the company could pay more, doesn't mean that the

4   settlement shouldn't be approved.  You have to look at all the

5   other compliments and all the other factors.

6           The eighth and ninth factors within the Dirsh test are

7   the range of reasonableness of the settlement in light of the

8   best possible recovery and the range of reasonableness of the

9   settlement fund to possible recovery in light of the attendant

10  risks of litigation.  Frequently they are analyzed together.

11  The Third Circuit has pointed out that this settlement, these

12  factors should be interpreted essentially as to whether the

13  settlement represents a good value for a relatively weak case.

14  In light of some of the problems, not only in terms of the law,

15  but as they apply to the facts of this particular case, clearly

16  a solvent company and very viable company.  I think this is an

17  excellent result, both in terms of securing almost all the

18  fiduciary liability policies, despite the fact that there was a

19  denial of coverage and very -- essentially, when you -- base it

20  again on the risk that we wouldn't be able to get anything at

21  all, it's an excellent recovery.  And when you base it against

22  the best possible recovery, and the problem we would have, I

23  think again the factor is clearly supportive of approving the

24  settlement.

25          Finally, the motion for approval seeks final

Colloquy                                16

1    certification of the settlement classes.  Obviously it's not

2    opposed by the defendant's settlement classes.  Any person who

3    is a participant in the --

4              THE COURT:  I don't think you have to read the

5    definition over.

6              MR. MELTZER:  That's set forth in the papers.  We

7    think it clearly meets all the Rule 23 requirements, and we

8    would seek certification of the settlement class under 23A, and

9    then 23B(1) and B(2).

10             THE COURT:  All right.

11             MR. MELTZER:  There's all I have with respect to

12   approval, your Honor.

13             THE COURT:  Then we get to the application for fees

14   and expenses.

15             MR. MELTZER:  Okay.

16             Your Honor, we submitted a motion for attorney's fees,

17   reimbursement for expenses and case contribution.  We requested

18   25 percent of the settlement fund that nets out to 3.5 million

19   dollars, as well as reimbursement of forty-three thousand,

20   eight hundred and eighty-seven dollars in expenses as well as

21   an award of twenty-five hundred dollars for each of the named

22   plaintiffs.

23             THE COURT:  In the securities class action I awarded

24   20 percent.

25             MR. MELTZER:  Yes.

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

Colloquy                                17

1        THE COURT:  Is there some reason why there should be a

2    higher percent in this case than in that case?

3        MR. MELTZER:  Your Honor, the answer I guess is, given

4    the higher number, sometimes when you have higher awards,

5    courts will take the percentages down and the Third Circuit

6    called it frankly the range of settlement.  The fee awards in

7    these types of cases have been between 20 and 30.  I think 25

8    is reasonable.  I think it is, in light of the multiplier, it

9    is certainly reasonable.  I think these are a little more novel

10   in terms of whether we'd ever be able to to recover anything,

11   including our times, as opposed to security litigation --

12       THE COURT:  You see a greater risk.

13       MR. MELTZER:  There's somewhat of a greater risk in

14   this action.  Beyond that, I think -- you know, if you look at

15   the factors, the Third Circuit sets out, I think, given the

16   complexity, and I think your Honor said the risk of not payment

17   all at all, and there was a fairly substantial risk of

18   nonpayment, particularly after that District Court opinion in

19   New Jersey that dismissed the claims, which came down before --

20   before we settled.  I think that militates in favor of a

21   slightly higher percentage, especially when you couple that

22   with the fact that it's a smaller aggregate amount, which

23   doesn't require sort of a slide back.  They call it a slide

24   back on a mega settlement fund.  And there's also fairly --

25   again, I believe very substantial and valuable structural

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

```
                        Colloquy                    18
```

1    relief that is attendant to the settlement, for which we're not

2    seeking any fee at all.

3            THE COURT:  All right.  And I guess that's to the --

4    to the case contribution payment to the named plaintiffs.  I

5    don't see that as much of a problem.  How many named plaintiffs

6    do you have?

7            MR. MELTZER:  Six.

8            THE COURT:  All right.  I guess that's all the

9    applications you've got.

10           MR. MELTZER:  I believe so.

11           THE COURT:  Mr. Francis.

12           MR. FRANCIS:  Your Honor, Mr. Eccles has a few brief

13   remarks to make.

14           MR. ECCLES:  Thank you, your Honor.  And I will be

15   brief.

16           Let me exercise the main points why we think this

17   settlement should be approved.  First, it's clearly an arm's

18   length settlement.  This was an adversarial process the way

19   it's supposed to be.  I say not at all uncivil, but contentious

20   is not a bad word to use.  We were litigating this hard and the

21   settlement stopped there.  It's also that both Mr. Meltzer's

22   firm and my firm have many other cases that look a little like

23   this, and we've been through this, and have the able to assess

24   what cases are worth, and what cases should go forward.  And

25   from a procedural viewpoint, I don't think that's any question

1    that all the class proceedings and notice were more than

2    adequate to provide notice to the class.

3         From our point of view, and we put this in submission,

4    so I'll be very brief, from the defendant's point of view, we

5    thought we had terrific defenses.  And the court defense in a

6    nutshell was the stock market went down, and the Honeywell

7    stock went down with it, and there's nothing extraordinary

8    about that.  No fraud, no nothing else.  And we cited that one

9    of the other funds, a gross equity fund within these plans the

10   participants could have put their money in, actually it went

11   down more than the Honeywell stock over each of the three big

12   years involved here.

13        And so we thought we had an excellent set of defenses,

14   your Honor.  But like most cases, nothing certain, except that

15   they'll be a lot of expenses, I think an additional year of

16   litigation would have been an extremely optimistic viewpoint.

17   There would have been a lot of depositions and a lot more

18   document discovery.  And so from our viewpoint, it made sense

19   for both sides to get together and talk, and that's exactly

20   what we did.  And reached a settlement, which I think is

21   definitely an arm's length settlement, definitely a fair

22   settlement to the class.

23        The one other point we make, your Honor, is although

24   some of the objectors did focus on the fees, which is not our

25   issue, it's a separate issue from the fairness of the rest of

1    the settlement, and I think will effectively get taken care of

2    when the Court approves whatever fee is fair.  And unless the

3    Court has questions with that, we ask the settlement be

4    approved.

5         THE COURT:  All right.  Thank you.

6         Anyone else at the counsel table want to speak.

7         MR. MELTZER:  Only to point out for the record, and I

8    think Mr. Eccles knows this, to the point where I was

9    contentious, to the extent I say contentious, and it was not

10   well taken on the other side, it was not my intent.  It was a

11   hard fight, I should have said.

12        THE COURT:  I didn't take it in any invidious sense.

13   Is there a Mr. Smith in the courtroom?  I think he filed a

14   notice and wanted to be heard.  All right.  And there's nobody

15   else who has appeared either in favor of, or in opposition to

16   the settlement.

17        I think it's important or useful at least to resolve

18   the matter at this point, so I'm going to impose upon you to

19   read a rather lengthy opinion into the record.  I'll reserve

20   the opportunity to correct any transcript which results from

21   that before it's officially made a part of the record.

22        This action was commenced on March 17th, 2003, when

23   Plaintiff Richard Ramseyer, a participant in the Honeywell

24   Savings and Ownership Plan I, filed a class action complaint

25   asserting claims under the Employee Retirement Income Security

Colloquy                              21

1    Act of 1974 (ERISA).  The Ramseyer action sought relief for

2    losses to the Honeywell Savings and Ownership Plans I and II,

3    (collectively the "Plan").  On May 8th, 2003, the Ramseyer

4    action was consolidated with Freund v. Honeywell International,

5    Inc., et al., 03-cv-1626 (District of New Jersey), a related

6    action involving similar allegations and claims.  The order of

7    consolidation also appointed Shiffren & Borroway, LLP and

8    Trujillo Rodriguez & Richards, LLC as lead and liaison counsel

9    for plaintiffs, respectively.  Plaintiffs filed a consolidated

10   complaint for breach of fiduciary duty on July 28th 2003.

11         After extensive investigation, and a motion to dismiss

12   the complaint, a hearing on the motion, class discovery and

13   settlement discussions, the parties arrived at a settlement.

14   Upon motion of the plaintiffs, the Court preliminarily approved

15   the settlement, conditionally certified a settlement class

16   pursuant to Federal Rule of Civil Procedure 23, approved a

17   notice plan and scheduled a final fairness hearing.  The case

18   is now before the Court for certification of a settlement

19   class, a ruling upon the fairness, reasonableness and adequacy

20   of the settlement, approval of the cash contribution awards for

21   named plaintiffs, and award of attorneys' fees and expenses.

22   Originally plaintiffs moved for final approval of a plan of

23   allocation, but both plaintiffs and defendants have requested

24   this motion be a adjourned for a brief period to permit

25   refinement to be made in the plan.

```
                          Colloquy                    22

1           First, proceedings.  The consolidated complaint names

2      the defendants Honeywell, members of the Company's Retirement

3      Plans Committee, members of the Company's Pension Investment

4      Committee, and Michael R. Bonsignore, Chairman and CEO of

5      Honeywell from April 2000, through June, 2001.  The

6      consolidated complaint alleges, inter alia,, that defendants

7      breached their fiduciary duties by allowing the Plan to

8      purchase and hold Honeywell common stock at a time when

9      Honeywell stock was an imprudent investment.  In particular,

10     plaintiffs allege that the Plan was allowed to accumulate and

11     maintain, through company-encouraged participant investments

12     and company-matching contributions, a large position in

13     Honeywell common stock.

14           According to plaintiffs, such a heavy single-equity

15     investment, in addition to being inherently risky, was

16     particularly imprudent, given the persuasive problems that

17     beset the company stemming from the consummated Allied Signal

18     transaction, and the failed General Electra merger, the

19     ramifications of which defendants were fully aware.  Further,

20     plaintiffs allege that Honeywell and certain individual

21     defendants made material misrepresentations through Securities

22     and Exchange Commission filings and other public

23     pronouncements, and withheld pertinent information, that

24     compromised participants' ability to make informed investment

25     decisions.  When the company finally disclosed that the Allied
```

Colloquy                                      23

1    Signal transaction resulted in expensive operational problems

2    and substantial customer losses, and that the General Electric

3    merger would not be effectuated, the Plan's assets were

4    depleted as the value of the Honeywell stock declined.

5            The consolidated complaint further alleges that

6    defendants are liable under ERISA as a result of their:  One,

7    engaging in prohibited transactions involving the Plan's assets

8    with parties-in-interest; two, failing to properly monitor and

9    provide material information to the Pension Investment

10   Committee; three, allowing or abetting fiduciary breaches of

11   their cofiduciaries; and four, failing to avoid or remedy

12   inherent conflicts of interest between their corporate

13   interests and their fiduciary responsibilities to the Plan

14   under ERISA.  The consolidated complaints seeks plan-wide

15   relief under Section 409 and 502 of ERISA.

16           Plaintiffs' counsel conducted a thorough investigation

17   into these allegations.  They reviewed documents produced by

18   defendants and publicly-available materials related to the

19   company and the Plan.  They analyzed specific corporate

20   transactions and interviewed Plan participants.  In addition,

21   counsel derived certain information from a securities class

22   action initiated in 2000 in this court and which involved many

23   factual allegations relevant to the claims in this action.  In

24   re Honeywell Securities Litigation, No. 00-3605.

25           Defendants vigorously contested the litigation.  On

Colloquy                                    24

1   September 29th, 2003, they filed a motion to dismiss.  After

2   extensive briefing, oral argument was heard on January 26,

3   2004, after which there was further briefing.

4        During this period the parties engaged in a extensive

5   litigation concerning class action discovery issues.  On

6   January 14th, 2004, Magistrate Judge Wigenton, over plaintiffs'

7   objections, bifurcated class and merits discovery, staying

8   merits discovery pending resolution of plaintiffs' motion for

9   class certification.

10       Also during this period the parties to the parallel

11  Securities Class Action settled.  It was necessary for

12  plaintiffs' counsel in the instant case to ensure that the

13  settlement in that action and its release of claims did not

14  affect plaintiffs' ability to pursue relief in this case.

15       Beginning in the spring in 2004, the parties commenced

16  settlement negotiations and exchanged information relevant to

17  that subject, such as performance of Plan investments during

18  the relevant period, insurance available to satisfy any

19  possible judgment, including documents evidencing denial of

20  coverage under the fiduciary insurance policy, settlement in

21  analogous cases, the precise number of Honeywell shares held by

22  the Plan, and demographic information for participants as a

23  means of measuring the impact of proposed structural changes to

24  the Plan.

25       The parties requested the Court to refrain from

Colloquy                                     25

1   issuing its ruling on defendants motion to dismiss while

2   settlement negotiations were ongoing.  In early September 2004,

3   the parties reached an impasse.  Notified of this development,

4   the Court on September 16, 2004, issued its opinion and order

5   granting the motion to dismiss with respect to plaintiffs'

6   prohibited transaction claims and claims for monetary relief

7   under ERISA, Section 502(a)(3) and denying the motion in all

8   other respects.  In re Honeywell International ERISA

9   litigation, 2004, U.S. District, LEXIS 21585, (District of New

10  Jersey, 2004).

11          Upon issuance of the court's opinion, the parties

12  resumed class certification discovery and resumed settlement

13  negotiations.  Ultimately agreement was reached, resulting in

14  the agreement now before the Court for approval.  Two, the

15  proposed settlement.

16          The settlement agreement provides the defendants shall

17  pay $14 million into an interest-bearing escrow account, (the

18  "Settlement Fund").  The principal (less amounts expended for

19  certain approved costs) will accrue interest between

20  preliminary approval and distribution.  The net amount of the

21  settlement funds, including interest, and after payment of, and

22  establishment of reserves for, any taxes and Court-approved

23  costs, fees and expenses (including and Court-approved

24  compensation to be paid the named plaintiffs), will be paid to

25  the Plan.  After payment of implementation expenses, the

Colloquy                                        26

1    remaining amount will be allocated to the Plan accounts of

2    members of the settlement class according to a Plan of

3    allocation to be approved by the Court.

4           In addition, the settlement agreement provides for

5    certain structural changes in the Plan.  The operative

6    documents of each Plan will be amended to state that each Plan

7    participant who is or has become one hundred percent vested in

8    his or her Company Matching Contribution Account shall have the

9    right to direct the investment of his or her Company Matching

10   Contribution Account balance in the same manner and among the

11   same investment alternatives as are available for the

12   investment of employee contributions to the respective plans.

13   This provides participants with the ability to diversify rather

14   than being required to remain invested in Honeywell stock.

15   Plaintiffs retained Professor Krishna Ramaswamy of the Wharton

16   School at the University of Pennsylvania to analyze the

17   structural term of the settlement and estimate the value to the

18   Plan and its participants of the unlocking of Company matching

19   contributions, past and future.  The expert provided a detailed

20   report of his analysis and estimated that allowing the Plan's

21   participants to diversify company-matching contributions

22   previously "locked" into Honeywell stock would provide a

23   benefit of between $34.1 million to $211.4 million, depending

24   primarily on the percentage of the Plan's Honeywell equity

25   investments originating from company-matching contributions.

Colloquy                         27

1        The notice to Plan participants advised that class

2    counsel would file a motion for payment of attorneys' fees of

3    up to 30 percent of the settlement fund, plus expenses of

4    litigation, notice and settlement administration, and case

5    contribution awards for the named plaintiffs.

6        Three, class certification.  Plaintiffs urge

7    certification of the following class for settlement purpose.

8    "Any person who was a participant in the Honeywell Savings and

9    Ownership Plan I and II and/or the predecessor Plan named the

10   Data Instruments, Inc. Employee Stock Ownership Plan, the

11   Honeywell DMC Savings Plan, and the Honeywell Savings and Stock

12   Ownership Plan (collectively the "Plan" or "Plan,") at any time

13   between December 20, 1999 and February 28, 2005 (the "class

14   period") and whose Plan accounts included investments in the

15   Honeywell Common Stock Fund, or a beneficiary, alternate payee

16   representative, or successor-in-interest of any such person

17   (the "settlement class")."

18       Rule 23(a) sets forth four prerequisites to class

19   certification:  One, numerosity; two, commonality; three,

20   typicality; and four, adequacy of representation.  Each of

21   these requirements is met.

22       The class is sufficiently numerous because the number

23   and diverse location of putative class members is such that it

24   is impractical to join all of the class members in one action.

25   There are more than 100,000 potential class members, which

Colloquy                                    28

1    clearly satisfies the numerosity requirement.

2         There is commonality when the proposed class

3    representatives share at least one question of law or fact with

4    the claims of the prospective class.  In the present case, the

5    principal question of law and fact applicable to all

6    participants is whether the defendant breached fiduciary duties

7    owed to the Plan and its participants in allowing the

8    maintenance of existing, and addition of new, heavy investments

9    in Honeywell common stock when defendants knew or should have

10   known of its operational problems and accounting irregularities

11   which negatively affected the prudence of Honeywell stock as an

12   investment of the Plan during the class period.  It is

13   unnecessary to catologue the several other commons question of

14   law and fact that exist as to all members of the class and

15   predominant over any questions affecting solely individual

16   class members.

17        The proposed class representatives' claims arise from

18   the same event or course of conduct that gives rise to the

19   claims of the other class members and are based on the same

20   legal theories.  Class plaintiffs share the incentives of the

21   absent class members to pursue this action to its conclusion.

22   Typicality can be met in class actions brought for breaches of

23   fiduciary duty under ERISA and is met here.  In re Ikon Office

24   Solutions, Inc., 191 Federal Rule of Decisions, 457, 465

25   Eastern District of Pennsylvania, 2002).  Each class member was

Colloquy                                29

1    an employee of Honeywell, a participant in the Plan during the

2    class period, and had part of his or her individual Plan

3    investment portfolio invested in Honeywell stock during that

4    time.  All Plan participants sustained injury arising out of

5    defendants' alleged wrongful conduct and plaintiffs bring their

6    claims pursuant to ERISA Sections 409 and 502(a)(2) for

7    Plan-wide relief; so any relief obtained for such claims would

8    enure to the Plan as a whole and, derivatively, its

9    participants during the class period.

10         The class representatives meet the adequacy

11   requirement of Rule 24(a)(4).  They have represented and will

12   represent the members of the class so as to fairly and

13   adequately protect the interest of the class.  The named

14   plaintiffs have no interest antagonistic to the class and are

15   in the same position as all all other members.  Class counsel,

16   Schiffren & Barroway, LLP has had extensive experience in

17   litigating complex ERISA breach of fiduciary duty class

18   actions.

19         While it is necessary for class certification to

20   qualify under only one of the requirements of Rule 23(b),

21   plaintiffs in the instant case qualify under all three.

22         They qualify under Rule 23(b)(1)(a) and (B).  The

23   relief to be accorded is Plan-wide.  Failure to certify could

24   expose defendants to multiple lawsuits and risk inconsistent

25   decisions.  Failure to certify would create the risk that

Colloquy                    30

1   future plaintiffs would be without relief.  Rankin v. Rots, 220

2   Federal Rule of Decisions 511, 523 (Eastern District of

3   Michigan, );, Ikon 191 F.R.D. at 466.

4            Although the proposed class meets the requirements of

5   Rule 23(b)(2), and Rule 23(b)(3), no further discussion is

6   warranted, as the Court will rely on Rule 23(b)(1) alone.

7            In sum, the action will be certified as a class action

8   under Rule 23(a) and (b) on behalf of the plaintiffs' proposed

9   class.

10           Four, Objections to Settlement.  Eighteen persons have

11  lodged specific objections to the settlement terms and/or to

12  plaintiffs' request for attorneys' fees and expenses, and case

13  contribution awards for the named plaintiffs.  One person, Mr.

14  Steven K. Smith, wished to be heard at the hearing to express

15  his objections.  He did not appear at the hearing.  These 18

16  objectors represent .016 percent of the more than one hundred

17  and fifteen thousand settlement class members to whom

18  individual notice of the settlement was sent.  The Court has

19  read and considered each objection with care.

20           A few are from persons who object to this class action

21  proceedings per se, either because they do not believe in class

22  actions as a matter of principle, or because the concept of

23  awarding substantial attorneys' fees to attorneys who take on

24  class action cases offends them, or because they believe

25  Honeywell voluntarily turned over shares of its stock to the

```
                          Colloquy                     31
```

1    Plan, and employees who benefited from these contributions

2    should not sue their benefactor Honeywell.  While these views

3    are entitled to respectful consideration, they have in effect

4    been rejected when the Court did not grant defendants' motion

5    to dismiss and proceeded with the case.  They cannot be

6    advanced again at this time.

7              There are objections either to the settlement or to

8    the payment of attorneys fees.  The objections must be treated

9    with utmost sympathy, because they are submitted by persons who

10   believe that they have been grievously injured by the conduct

11   of the defendants as charged in the complaint.  Some are by

12   employees who had worked loyally for the company for many years

13   and had counted on their interests in the Plan to provide

14   comfortable old age, an expectation that in some cases has not

15   been fulfulled.  A few others assert that they had been close

16   to the management of the Plan and had expressed doubts about

17   the way they were being handled during the class period,

18   warnings that had been ignored.

19             The objections generally address three aspects of the

20   settlement.  A number of them attack the adequacy of the

21   settlement award, others challenge the 30 percent potential

22   attorneys' fee request; a few challenge payment of a cash

23   contribution award to the named plaintiffs.  In their

24   submissions, plaintiffs have discussed each objector's

25   contentions, explaining why they believe they are not a basis

Colloquy                                                32

1   for rejection of the proposed settlement.  Each of these

2   objections will be addressed generally in the context of the

3   discussions of these subjects in the sections of the opinion

4   that follow.

5           Five, Fairness, Reasonableness and Adequacy.  The

6   fairness reasonableness and the adequacy of the settlement

7   agreement is supported by the prevailing circumstances.

8   Settlement of disputed claims, especially those advanced in

9   complex class action litigation, are favored by the courts.

10  The Court of Appeals affords an initial procedural presumption

11  of fairness of a settlement if adequate notice was given to

12  affected members of the proposed settlement class and "if the

13  Court finds that (1) the negotiations occurred at arm's length;

14  (2) there was sufficient discovery; (3) the proponents of the

15  settlement are experienced in similar litigation; and (4) only

16  a small fraction of the class objected."

17          In re Cendant Corporation Litigation, 264 F. 3d 201,

18  223, Note 18 (3rd Circuit 2001).  As described above, each of

19  these four factors was fully met in this case.

20          Beyond these procedural criteria, courts in this

21  Circuit apply the nine-factor test enumerated in Girsh v.

22  Jepson, 521 F. 2d 153, 157 (3rd Circuit 1975).  Applying these

23  factors, the Court concludes that the settlement for $14

24  million in cash, plus significant structural changes in the

25  Plan, is fair, reasonable and adequate.

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

Colloquy                                      33

1        A.   Complexity, expense and likely duration.  All

2    defendants have denied wrongdoing and liability.  They

3    vigorously through able counsel, defended the action up to the

4    point of settlement and would no doubt continue to do so,

5    absent a settlement, defending through continued class action

6    and merits discovery, class certification, objections, trial,

7    and, if unsuccessful at trial, on appeal.  This action is

8    complex and raises novel issues in the ERISA context, issues

9    that have not been decided definitively by the Supreme Court

10   and Courts of Appeals.  If successful, plaintiffs' ultimate

11   recovery would be delayed for years during which enormous

12   attorneys' fees and expenses would be incurred.  Settlement

13   ensures prompt payment and enjoyment of the restructured

14   provisions of the Plan.

15       B.   Reaction of the Class to the Settlement.  As noted

16   above, only .016 percent of the more than one hundred fifteen

17   thousand class members submitted objections to the settlement

18   agreement, which reinforces the fairness and adequacy of its

19   provisions.

20       C.   Stage of Proceedings and Discovery.  The extensive

21   investigation of the circumstances of this case was described

22   above.  It is apparent the plaintiffs' counsel had full

23   information relating to the merits of the case and were in a

24   position to negotiate and evaluate the terms of the settlement.

25       D.   Risk of Establishing Liability and Damages.

Colloquy                                34

1    Plaintiffs' counsel who have thoroughly familiarized themselves

2    with the facts of this case and the applicable law have

3    concluded that the terms of the settlement represent an

4    appropriate balance of the amount that might ultimately be

5    recovered if successful and the risks of not recovering at all.

6    There are novel and complex issues, some of which the Court

7    recognized when it addressed defendants' motion to dismiss.

8    ERISA law is in the process of development.  In re Xcel Energy,

9    Inc. Securities, Derivative & ERISA Litigation, 364 F. Supp.

10   2d, 980, (District of Minnesota, 2005).  In re Global Crossing

11   Securities and ERISA litigation, 225 F.R.D., 436, 459 Note 13

12   (Southern District of New York 2004).  Computing damages raises

13   distinct problems.  Unlike securities law claims, ERISA

14   provides relief for the imprudent purchase and holding of stock

15   by a Plan during the class period.  In re Ikon Office

16   Solutions, Inc., 191 F.R.D. 457, 464 (Eastern District of

17   Pennsylvania, 2000), but there is little law explaining the

18   basic principle's application to the type of defined

19   contribution Plan at issue here.  Damages calculations in ERISA

20   cases such as this one require a sophisticated computer model

21   of the Plan involved and require consideration of a number of

22   complex interrelated factors.  The legal and factual

23   complexities and uncertainties of calculating and proving ERISA

24   damages point strongly towards approving the settlement.

25           E.  Risk of Maintaining Class Action Through Trial.

1    There is always a risk that class action status might not be

2    maintained through trial.  If it could not be maintained, the

3    value of the action would decline precipitously.  The Court

4    does not consider this to be a very serious risk and by itself

5    it would not be a compelling reason to approve a settlement.

6           F.   Ability of Defendants to Withstand a Greater

7    Judgment.  Undoubtedly Honeywell could withstand a greater

8    judgment, but the other factors weigh sufficiently in favor of

9    approving the settlement.  The risks entailed in seeking a

10   larger recovery through trial militate against rejecting the

11   opportunity to receive prompt payment of a lesser sum.

12          G.   Reasonableness of the Settlement Fund.  One of the

13   principal grounds of those who filed objections is that the

14   case is being settled for an inadequate amount, specifically

15   that plaintiffs should hold out for more than $14 million in

16   cash and the changes in the Plan that will allow for greater

17   diversification among the participant accounts.  This is "in

18   plaintiffs' counsel's estimation, an outstanding result."

19   Considering the skill and extensive experience of counsel and

20   the vigor with which this case has been pursued, this

21   estimation is entitled to considerable deference.

22          The persons who object to the settlement are well

23   aware of the losses incurred and the hurt that the losses have

24   caused to Plan participants.  They cannot be expected to be

25   aware of the legal uncertainties in computing damages for

Colloquy                                                36

1    recovery purposes and of the legal hurdles to be faced to

2    secure any recovery at all.  One objector urged that plaintiffs

3    should have calculated how many additional shares of Honeywell

4    stock the Plan should have been able to purchase if the

5    company's equity was not inflated in the settlement class

6    period and compare that to what the Plan held at the end of

7    that period as an approach to estimating damages.  It is

8    relevant to note that the decline in value of the Honeywell

9    Common Stock Fund was less in each of the three years of the

10   2000 through 2002 bear market than the decline in value of a

11   diversified stock fund that was also an investment option under

12   the Plan.

13          One objector noted that the Plan held about 10 percent

14   of Honeywell's outstanding shares.  Of significance, $14

15   million represents 14 percent of the monetary settlement

16   reached in the related securities case which this Court

17   approved some months ago.  Further, the $14 million represents

18   93 percent of the company's fiduciary liability policy, an

19   obligation which the insurance company originally disclaimed.

20   Although no precise value could be placed upon the negotiated

21   structural relief, the opinion of Professor Ramaswamy

22   establishes that it is substantial, far more than the $14

23   million cash payment.

24          Weighing the various factors, the Court concludes that

25   the settlement is fair, reasonable and adequate.

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

Colloquy                    37

1        Six, attorneys' Fees and Expenses.  Plaintiffs'

2    attorneys seek fees in the amount of 25 percent of the total

3    recovery and out-of-pocket expenses of $43,887.09 incurred

4    since this lawsuit began.  Several of the objectors filed

5    objections to the maximum amount of 30 percent that the class

6    Notice advised might be requested, but the Court will assume

7    that the objections would be advanced to the 25 percent

8    request.  One objector contended simply that the case does not

9    require extensive legal work or a complicated determination.

10   Another would limit fees to what real estate brokers typically

11   earn, namely 6 percent.  Others objected on principle to fees

12   being paid to attorneys who appear in class actions.  Some

13   simply objected to 30 percent as being too high a percentage.

14        It is understandable that lay persons cannot

15   appreciate both the amount of work and the risk of receiving no

16   fee that enter into representation in a class action case.  In

17   the present case, the work which the attorneys performed is

18   described above.  In accomplishing this work, the three law

19   firms representing plaintiffs devoted 2223.6 hours of attorney

20   and paralegal time (Schiffrin & Barroway LLP - 2212.6 hours;

21   Brodsky & Smith, LLC - 28.3 hours; Trujillo Rodriguez &

22   Richards, LLC - 82.70 hours).

23        It is universally recognized in the courts that

24   attorneys who generate a fund of recovery for the benefit of a

25   class should be fairly compensated.  Boeing Co. v. Van Gemert

```
                          Colloquy                        38
```

1   444 U.S. 472, 478 (1980).  Application of a portion of the

2   collected funds to the payment of attorneys' fees spreads the

3   payment proportionately among those who benefited from the

4   suit.  It encourages attorneys to undertake these kinds of

5   difficult cases.

6          The Court of Appeals for the Third Circuit as well as

7   the courts of many other circuits have expressed a preference

8   for awarding attorneys' fees from a common fund pursuant to the

9   percentage of the fund method of calculation.  In re Prudential

10  Insurance Company Am. Sales Practices Litigation Agent Actions,

11  148 F. 3d 288, 333, (3rd Circuit 1998).  This method is an

12  alternative to the lodestar method in which a fee is computed

13  by multiplying the reasonable number of hours the attorneys

14  expended on the case by the rates charged by comparable

15  attorneys in the area in which the services were rendered.  To

16  arrive at the ultimate fee, this lodestar figure is usually

17  multiplied by a factor to reflect the degree of success, the

18  risk of nonpayment the attorneys faced and perhaps the delay in

19  payment that they encountered.  But, as noted, the preference

20  is for computing the award on the basis of a percentage of

21  recovery, perhaps checking the result against a lodestar

22  computation to ensure that it is not grievously out of line.

23         The amount of the percentage varies case to case, 15

24  percent, 20 percent, 25 percent, 30 percent, 33 1/3 percent, 38

25  percent having been awarded.  Thiry percent or 33 1/3 percent

Colloquy                                    39

1   is quite common.  The Court has reviewed the various factors

2   that govern the determination of an appropriate percentage and

3   concludes that the requested 25 percent of the class recovery

4   is reasonable, particularly in light of the fact that the value

5   of the structural changes in the Plan is not included in the

6   amount to which the percentage is applied.  Gunter v. Ridgewood

7   Energy Corporation, 223 F. 3d 195 (3rd Circuit 2000).

8           The proposed settlement appears to be favorable to the

9   class, conferring the immediate benefit of $14 million plus

10  accrued interest less attorneys' fees and expenses and the

11  named plaintiffs case contributions.  In addition, in the

12  future each Plan participant who is or has become 100 percent

13  vested in his or her Company Matching Contribution Account

14  shall have the right to direct the investment of his or her

15  Company Matching Contribution Account balance in the same

16  manner and among the same investment alternatives as are

17  available for the investment of employee contributions.

18          As described above, very few members of the class

19  voiced objections to attorneys' fees with an upper limit of 30

20  percent.  Eighteen out of the 115,000 to whom notices were sent

21  filed objections, and not all of the objections were to

22  attorney's fees.  Understandably these few objectors were

23  unaware of the principles that the courts have developed over

24  the years for awarding attorneys' fees.  The Court recognizes

25  that very few class members are likely to analyze the notices

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

Colloquy                               40

1   which are sent to them.  Despite every effort to make them

2   readily understandable to lay people, they cannot help but be

3   technical in nature, lengthy and complex.  The vast majority of

4   class members rely upon the good faith of the class

5   representatives and their attorneys and upon the oversight role

6   of the Court.  Thus in the case where the class members do not

7   include institutional investors an absence of a large number of

8   objections to the Plan itself and to the requested attorney's

9   fees is of limited significance.  However, in the present case

10  where the few objections filed did not raise substantial

11  grounds to reject the requested attorney's fees, the absence of

12  a significant number of objections and the lack of merit of the

13  few objections that were filed are factors pointing towards

14  approving the fee application.

15          Plaintiffs' counsel undoubtedly possess great skill

16  and experience in this kind of case and have exhibited that

17  experience during the course of these proceedings.

18          Unlike the typical securities fraud case, a field in

19  which the law has well developed during the prior decades,

20  ERISA class actions are a relatively new phenomenon, presenting

21  complex issues as the courts deal with the complicated ERISA

22  statute.  Faced with this statute, counsel had to engage in

23  extensive factual explorations and address legal problems both

24  in the context of seeking class certification and during the

25  course of the motion to dismiss.  In this context both the

Colloquy                                    41

1    merits and class litigation, and the settlement negotiations

2    were conducted with experienced lawyers and powerful law firms

3    on the opposing side.  The Ramseyer lawsuit was commenced on

4    March 17, 2003, and was consolidated on May 8, 2003.  The

5    consolidated complaint was filed on July 28, 2003.  Intense

6    investigative and litigation activity, described above,

7    proceeded thereafter and continued until October, 2004 when a

8    settlement was agreed upon.  Had the case proceeded to

9    additional class action and merits discovery its duration would

10   have been greater, but one of the objections of the percentage

11   of recovery method of computing attorneys' fees is to encourage

12   early resolution of cases and to bring to an end continued

13   litigation that would generate extensive efforts and increasing

14   attorneys' fees.

15        The risk of not succeeding on the merits (which would

16   result in no recovery by the class members and, of course, no

17   attorneys' fees) was far greater in this case than in a typical

18   securities fraud case.  Apart from the usual difficulties in

19   developing the factual predicates underlying the legal theory

20   on the basis of which recovery is sought, in this, an ERISA

21   case, the legal theories themselves are still subject to

22   challenge.  In particular, the application of long-standing

23   fiduciary principles in the ERISA context has yet to be

24   authoritatively developed.  As the Court stated in In re Global

25   Securities and ERISA Litigation 225 F.R.D 436, 456 (Southern

Colloquy                                    42

1    District of New York, 2004).

2            "The ERISA cases would pose additional factual and

3    legal issues.  Fiduciary status, the scope of fiduciary

4    responsibility, the appropriate fiduciary response to the

5    Plan's concentration in company stock and defendant's business

6    practicse sould be issues for proof, and numerous legal issues

7    concerning fiduciary liability in connection with company stock

8    in 401(k) Plan remained unresolved.  These uncertainties would

9    substantially increase the ERISA cases' complexity, duration,

10   and expense - and thus militate in favor of settlement

11   approval."

12           The legal and factual contentions of the class members

13   would be challenged vigorously by defendants' able counsel.

14   The risks inherent in this case support approval of the

15   settlement and approval of the attorneys' fees application.

16           Class counsel have described the work they have

17   performed and the hours expended performing that work -

18   specifically 2223.6 hours - see the foregoing sections of this

19   opinion.  They will have to continue expending time finalizing

20   the settlement, overseeing claims administration and dealing

21   with any appellate issues, should they arise.  Without

22   consideration of the additional legal work that will have to be

23   performed the lodestar in this case is $937,160, and the

24   requested fee represents a multiplier of 3.8.  In fund in court

25   cases multipliers have ranged from 1.7 to 2.66 to 3.15 to 6 and

```
                         Colloquy                       43
 1    even higher.  Prompt resolution of a case is often reflected in
 2    a higher multiplier, rewarding prompt recovery for the members
 3    of the class and discouraging unnecessary protracted
 4    litigation.  If I were to compute the lodestar in this case for
 5    the purpose of actually computing the fee, I might have arrived
 6    at a somewhat lesser figure, finding that the rates the
 7    attorneys project to be somewhat high.  However, I might well
 8    apply a somewhat higher multiplier, and the end result would be
 9    substantially the same.
10             Considering all these factors, I find that the
11    attorneys' fees being requested are reasonable and they well be
12    allowed.  No objection has been raised to reimbursement of the
13    attorneys' expenses totaling at least $43,887.09 as of the date
14    of this application.  They appear to have been reasonably
15    incurred and will be allowed.
16             Seven, Named Plaintiffs' Case Contribution Awards.
17    Class counsel seek approval of case contribution awards to the
18    named plaintiffs in the amount of $2500 each.  A few class
19    members objected to the payment of these sums.  However, the
20    persons who agreed to be named as class plaintiffs undertook
21    responsibilities in connection with the litigation.  They had
22    to provide information and subjected themselves to depositions
23    to a greater degree than the other members of the class.
24    Courts frequently allow modest compensation for the role on the
25    occasion of the settlement of a class action.  The modest
```

Colloquy                          43

1   cases multipliers have ranged from 1.7 to 2.66 to 3.15 to 6 and

2   even higher.  Prompt resolution of a case is often reflected in

3   a higher multiplier, rewarding prompt recovery for the members

4   of the class and discouraging unnecessary protracted

5   litigation.  If I were to compute the lodestar in this case for

6   the purpose of actually computing the fee, I might have arrived

7   at a somewhat lesser figure, finding that the rates the

8   attorneys project to be somewhat high.  However, I might well

9   apply a somewhat higher multiplier, and the end result would be

10  substantially the same.

11          Considering all these factors, I find that the

12  attorneys' fees being requested are reasonable and they well be

13  allowed.  No objection has been raised to reimbursement of the

14  attorneys' expenses totaling at least $43,887.09 as of the date

15  of this application.  They appear to have been reasonably

16  occurred and will be allowed.

17          Seven, Named Plaintiffs' Case Contribution Awards.

18  Class counsel seek approval of case contribution awards to the

19  name plaintiffs in the amount of $2500 each.  A few class

20  members objected to the payment of these sums.  However, the

21  persons who agreed to be named as class plaintiffs undertook

22  responsibilities in connection with the litigation.  They had

23  to provide information and subjected themselves to depositions

24  to a greater degree than the other members of the class.

25  Courts frequently allow modest compensation for the role on the

Colloquy                                                44

1    occasion of the settlement of a class action.  The modest

2    amounts suggested for this purpose are reasonable and will be

3    allowed.

4            Eight, Plan of Allocation.  A ruling on a plan of

5    allocation will be deferred for a brief period.

6            Nine, Conclusion.  For the reasons set forth above, an

7    order will be entered:  One, certifying the class; two,

8    approving the settlement as fair, reasonable and adequate;

9    three, approving class plaintiffs' attorneys' petition for

10   payment of attorneys' fees and reimbursement of expenses; and

11   four, approving the requested payment of a case contribution

12   award for the the named plaintiffs.

13           Now, I have one problem here, what is the amount of

14   the expenses which are being requested for reimbursement?  I

15   have two figures, one would seem rather enormous, four hundred

16   thousand dollars, which I don't think is correct.

17           MR. MELTZER:  No, your Honor.  Forty-three thousand,

18   eight hundred and eighty-seven dollars and nine cents.

19           THE COURT:  All right.  I must have had a typo here.

20   That will be contradicted, and the figure which I now have will

21   be inserted.  Forty-three thousand, eight hundred and

22   eighty-seven dollars and nine cents.

23           MR. MELTZER:  Correct.

24           THE COURT:  All right.  That figure will be

25   substituted for the four hundred odd thousand, which I stated

Colloquy                              45

1   previously.

2            THE COURT:  We have orders and what not to be signed.

3            MR. ECCLES:  Your Honor, assuming that the parties

4   reach agreement on the allocation, is it agreeable to file

5   consent orders rather than file a formal motion for approval?

6            THE COURT:  I went over the plan of allocation as

7   submitted, I saw nothing wrong with it.  Does anyone have any

8   comments on the plan, which I assume is a subject of what will

9   be coming next?

10           MR. ECCLES:  I think there are some expenses that were

11  not considered at our end that need to be plugged in there.

12  That's the only --

13           THE COURT:  They seem to be fairly trivial.  Well,

14  maybe not to you.

15           MR. ECCLES:  Well --

16           THE COURT:  Maybe not to you.

17           MR. ECCLES:  It's not going to change drastically.

18           THE COURT:  Do we need a separate hearing?

19           MR. ECCLES:  I don't think we need a separate hearing.

20           THE COURT:  Could we just submit a consent order?

21           MR. ECCLES:  Yes, your Honor.

22           THE COURT:  I'll look at it and see if there's any

23  other changes in my mind.  I doubt that they would, what you

24  hve given me.

25           MS. RODRIGUEZ:  They're the proposed orders, both with

Colloquy                                    46

1    regard to the settlement and the attorneys' fees.

2            THE COURT:  All right.  WeLL, let me see what you have

3    here.

4            In the first paragraph, I'm going to add:  For the

5    reasons stated in the bench opinion.  I'm going to add that

6    after duly reached.

7                    (Matter concluded)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                        \*
IN RE:                                  \*
                                        \*  No. C.02-MD-1335-B
TYCO INTERNATIONAL, LTD.                \*  November 2, 2007
                                        \*  10:40 a.m.
Multidistrict Securities                \*
Litigation                              \*
                                        \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


TRANSCRIPT OF FAIRNESS HEARING
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:

For Securities         Richard S. Schiffrin, Esq.
Plaintiffs:            David Kessler, Esq.
                       Katharine M. Ryan, Esq.
                       Michael K. Yarnoff, Esq.
                       Darren J. Check, Esq.
                       Schiffrin, Barroway, Topaz &
                           Kessler, LLP

                       Jay W. Eisenhofer, Esq.
                       Sidney S. Liebesman, Esq.
                       Geoffrey C. Jarvis, Esq.
                       Grant & Eisenhofer, P.A.

                       Leigh Smith, Esq.
                       Sanford Dumain, Esq.
                       Milberg, Weiss, Bershad, Hynes &
                           Lerach, LLP

                       Bart M. Schwartz, Esq.

                       Louis P. Malone, Esq.
                       O'Donoghue & O'Donoghue

                       Cindy Rougeou, Esq.

                       William L. Chapman, Esq.
                       Orr & Reno, P.A.

COPY

2

| | |
|---|---|
| For Tyco: | Ann M. Galvani, Esq.<br>David Boies, Esq.<br>Marilyn C. Kunstler, Esq.<br>Jonathan W. Davenport, Esq.<br>Boies, Schiller & Flexner, LLP |
| | Frank P. Barron, Esq.<br>Cravath, Swain & Moore<br>(by telephone) |
| For PwC: | Michael P. Carroll, Esq.<br>Michael Flynn, Esq.<br>Davis, Polk & Wardwell |
| | Richard J. DeMarco, Jr., Esq.<br>PricewaterhouseCoopers, LLP |
| For Belnick: | Scott Mirelson, Esq.<br>Steptoe & Johnson, LLP |
| For Ashcroft: | Amanda Kosowsky, Esq.<br>Cadwalader, Wickersham & Taft, LLP |

Objectors:

| | |
|---|---|
| U.S. Trust Co.: | Robert E. Murphy, Jr., Esq.<br>Wadleigh, Starr & Peters, PLLC |
| State of PA: | Lenann T. Engler, Esq. |
| Court Reporter: | Diane M. Churas, CSR, CRR<br>Official Court Reporter<br>U.S. District Court<br>55 Pleasant Street<br>Concord, NH   03301<br>(603) 225-1442 |

3

```
 1                      BEFORE THE COURT
 2          THE CLERK:  Court is now in session and has
 3   for consideration today a fairness hearing in Case No.
 4   02-MD-1335-PB, In Re:  Tyco Securities litigation.
 5          THE COURT:  On Wednesday I held a telephone
 6   conference with the parties to the proposed settlement
 7   and those objectors who indicated a desire to speak
 8   today.  It appears that two objectors wish to speak
 9   challenging only the attorneys' fee issue.  So I propose
10   to proceed by first taking presentations from plaintiffs
11   and Tyco regarding the adequacy of the settlement, to
12   deal separately with the attorneys' fee question, give
13   the objectors an opportunity to make their presentations
14   and give the plaintiffs an opportunity to respond.
15   Anybody have any different idea about how we should
16   proceed?
17          All right.  Why don't we go ahead.  Before --
18   and I think Mr. Schiffrin should have an opportunity to
19   make his presentation, and then I understand someone
20   from Tyco would wish to speak as well.  I will hear
21   Tyco.
22          Before I do, Mr. Schiffrin, at the telephone
23   conference you informed me that there are certain minor
24   mistakes in your pleading that you wanted to correct,
25   and this is a good time to do that.  So why don't you do
```

49

```
1   the dollar, and I understand how individual shareholders
2   might feel that way, but it's simply not the reality in
3   something this complex.  So I don't think you need to
4   comment more than to say I am completely satisfied that
5   the amount of this settlement is an outstanding result
6   for this class.  I have no question about it, that it's
7   an outstanding amount for the class.  This is real
8   money, a significant percentage of what might be
9   recovered.  There were and are real risks to the class
10  in this case.  This is not a slam-dunk case for the
11  reasons I've identified, and do we have to come back to
12  the fact that your original effort to plead an
13  acquisition accounting fraud case, I threw out at the
14  12(b)(6) stage.  And the connection -- the problems of
15  connecting the corrective -- the looting claims with the
16  acquisition accounting fraud remain significant.  There
17  are a whole host of other risks.  So by any measure,
18  this is an outstanding result for the class.
19        MR. SCHIFFRIN:  I appreciate that, Judge,
20  obviously and share those sentiments.
21        What I was going to cover next, and you can
22  tell me if you'd like me to do this, is the objections
23  to the settlement.  There are a group of resolved and
24  then unresolved.  It's pretty short; so with the Court's
25  permission --
```

134

```
1    and I am uncomfortable being so complimentary.  That's
2    not like me.  It's out of character.  I'm usually
3    critical.  But I also want to say there's no doubt in my
4    mind about the quality of the legal work that the
5    plaintiffs have done here.  It has been of
6    extraordinarily high quality, equal to the high quality
7    work that Tyco has done.  The case -- and I'm sure
8    Maryanne shares this view.  That we want nothing to do
9    with this case is not because of the lawyers involved.
10   It's because we all have other things that we have to
11   do, and this is just a very big burden to take on.  It's
12   very hard in this world of ours to balance appropriately
13   the duty of zealous advocate and the duty of officer of
14   the Court.  When the stakes are as high as this, it
15   becomes even harder to do that, and one of the things I
16   know to be true is that the quality of the advocacy has
17   been very, very high and the civility of the lawyers has
18   been very, very high.  It hasn't been perfect.  We've
19   had a few minor problems, but it's a good thing for me
20   that in the most difficult case I've had, I've had some
21   of the best lawyering done in front of me, and I
22   appreciate that, and that extends to plaintiffs'
23   counsel, it extends to Tyco, it extends to PwC, and the
24   individual lawyers representing the individual
25   defendants in the case.  So I have no doubt about that.
```