**Redacted for Public File**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE MORGAN STANLEY ERISA LITIGATION | ) ) ) | Filed Under Seal Pursuant to Court Order |
| _____ | ) | MASTER FILE NO.: 07 Civ. 11285 |
| THIS DOCUMENT RELATES TO: | ) ) | |
| All Actions | ) | |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974**

# TABLE OF CONTENTS

**Page(s)**

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | JURISDICTION AND VENUE | 4 |
| III. | THE PARTIES | 5 |
| | Plaintiffs | 5 |
| | Defendants | 6 |
| | Additional "John Doe" Defendants | 11 |
| IV. | DEFENDANTS' FIDUCIARY STATUS | 11 |
| | Morgan Stanley's Fiduciary Status | 12 |
| | Morgan Stanley's Global Director of Human Resources | 14 |
| | The Morgan Stanley Director Defendants' Fiduciary Status | 14 |
| | MS&Co's Fiduciary Status | 15 |
| | The MS&Co Directors' Fiduciary Status | 16 |
| | The Investment Committee's Fiduciary Status | 17 |
| V. | THE PLANS | 18 |
| | Nature of the Plans | 18 |
| | 401(k) Plan | 19 |
| | The ESOP | 21 |
| VI. | CLASS ACTION ALLEGATIONS | 23 |
| VII. | DEFENDANTS' VIOLATIONS OF ERISA | 25 |
| | Mack Changes Morgan Stanley's Business Model | 25 |
| | Morgan Stanley's Foray into High Risk Products | 27 |
| | Background of Subprime Mortgages | 27 |
| | Morgan Stanley Becomes A Player in the Subprime Mortgage Industry | 30 |

The CDO Market ................................................................................................ 34

The SIV Market ................................................................................................. 35

Morgan Stanley's Business Strategy Required, But Did Not Have, Adequate
Internal Controls ............................................................................................... 36

The LEAD Group .............................................................................................. 41

The Early Days of Mack's Risk Strategy ......................................................... 43

Too Much Risk, Not Enough Risk Management ............................................... 48

The Mess Continues .......................................................................................... 60

2008 Brings In More Bad News ........................................................................ 74

Summary of Defendants' GAAP Violations ...................................................... 76

VIII.   DEFENDANTS KNEW OR SHOULD HAVE KNOWN THAT COMPANY
        STOCK WAS AN IMPRUDENT INVESTMENT FOR THE PLANS .......................... 79

IX.     CERTAIN DEFENDANTS WERE MOTIVATED BY PERSONAL
        INTERESTS WHICH WERE NOT CONSISTENT WITH THEIR FIDUCIARY
        DUTIES ....................................................................................................... 81

X.      CAUSATION ................................................................................................ 82

FIRST CAUSE OF ACTION (AGAINST ALL DEFENDANTS) FAILURE TO
        PRUDENTLY AND LOYALLY MANAGE THE PLANS' ASSETS
        (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF SECTION 404
        OF ERISA, 29 U.S.C. § 1104) ..................................................................... 83

SECOND CAUSE OF ACTION (AGAINST ALL DEFENDANTS) FAILURE TO
        PROVIDE COMPLETE AND ACCURATE INFORMATION (BREACHES OF
        FIDUCIARY DUTIES IN VIOLATION OF SECTION 404 OF ERISA, 29
        U.S.C. § 1104) ............................................................................................ 85

THIRD CAUSE OF ACTION (AGAINST ALL DEFENDANTS) BREACH OF
        DUTY TO AVOID CONFLICTS OF INTEREST (BREACHES OF
        FIDUCIARY DUTIES IN VIOLATION OF SECTION 404 OF ERISA, 29
        U.S.C. § 1104) ............................................................................................ 88

**FOURTH CAUSE OF ACTION** (AGAINST MORGAN STANLEY, MS&CO, THE MORGAN STANLEY  DIRECTOR DEFENDANTS AND THE MS&CO DIRECTOR DEFENDANTS)  FAILURE TO ADEQUATELY MONITOR OTHER FIDUCIARIES AND  PROVIDE THEM WITH ACCURATE INFORMATION (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF SECTION § 404 OF ERISA, 29 U.S.C. § 1104)................................................................90

**FIFTH CAUSE OF ACTION** (AGAINST ALL DEFENDANTS)  CO-FIDUCIARY LIABILITY (BREACH OF FIDUCIARY DUTIES IN VIOLATION OF SECTION 405(A) OF ERISA, 29 U.S.C. § 1105(A)) ........................................92

    Concealing a Breach................................................................................93

    Enabling a Breach...................................................................................94

    Failure to Remedy .................................................................................94

XI.    SECTION 404(C) DEFENSE INAPPLICABLE ...............................................95

XII.    REMEDY FOR BREACHES OF FIDUCIARY DUTY.......................................96

XVIII. PRAYER FOR RELIEF .............................................................................97

**Redacted for Public File**

For their Consolidated Amended Class Action Complaint for Violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), Plaintiffs (defined herein), by their undersigned counsel, allege on knowledge as to themselves and their own acts and, as to all other matters, on information and belief based upon, *inter alia*, an investigation conducted by Plaintiffs' counsel, as follows:

## I.    <u>INTRODUCTION</u>

1.     This is a class action brought by participants in the Morgan Stanley 401(k) Plan (the "401(k) Plan") and the Morgan Stanley Employee Stock Ownership Plan (the "ESOP") (collectively, the "Plans") against Defendants (defined herein) for violations of their fiduciary duties under ERISA. As a matter of substantive law, Sections 409(a) and 502(a)(2) of ERISA, 29 U.S.C. §§ 1109 and 1132(a)(2), authorize participants such as Plaintiffs to sue in a representative capacity for losses to the Plans. As a procedural matter, Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of all participants and beneficiaries of the Plans from August 9, 2006 to the present (the "Class Period"). Plaintiffs seek relief on behalf of the Plans. The Plans themselves, however, are neither plaintiffs nor defendants in this action.

2.     The Plans are retirement plans operated and established by Morgan Stanley ("Morgan Stanley" or the "Company") as a benefit for its employees to permit tax-advantaged savings for retirement and other long-term goals. Morgan Stanley is the sponsor of the ESOP, while Morgan Stanley & Co., Incorporated ("MS&Co"), a wholly-owned subsidiary of Morgan Stanley, is the sponsor of the 401(k) Plan, as the term "sponsor" is defined by Section 3(16)(B) of ERISA, 29 U.S.C. § 1002(16)(B).

3.     At all times relevant in this action, each of the Plans was heavily invested in Morgan Stanley common stock and/or units of a fund that was heavily invested in Morgan

Stanley common stock (collectively, "Company Stock"). Therefore, the long-term retirement savings of the Plans' participants were substantially dependent on the performance of Company Stock and the need for prudent fiduciary decisions by Defendants concerning this enormous, ongoing investment. According to Morgan Stanley's Form 5500, filed with the U.S. Department of Treasury and U.S. Department of Labor on July 12, 2006, Company Stock comprised approximately $4 billion of the approximate $7.3 billion in total assets held by the Plans, or well over 50% of the Plans' total assets. By the end of 2007, the value of Company Stock held by the Plans fell to approximately $2.2 billion.

4.      Plaintiffs allege that Defendants, as "fiduciaries" of the Plans as that term is defined under Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), breached their duties to them and to the other participants and beneficiaries of the Plans during the Class Period in violation of ERISA §§ 404(a) and 405, 29 U.S.C. §§ 1104(a) and 1105.

5.      Specifically, Plaintiffs allege that Defendants knew or should have known that the Plans' ongoing heavy investment in Company Stock was imprudent because Morgan Stanley was encountering enormous and very serious credit problems as a result of, *inter alia*, its significant involvement in Collateralized Debt Obligations ("CDOs"), structured investment vehicles ("SIVs") and other similar vehicles, subprime lending, as well as its inadequate internal controls and risk management failures. As a consequence of these problems, which were not adequately or completely disclosed to the market or to the participants of the Plans, Company Stock was exceedingly risky and its stock price was artificially inflated.

6.      Count I alleges that Defendants breached their fiduciary duties of prudence and loyalty by, *inter alia*: (i) continuing to offer Company Stock as a 401(k) Plan investment option for participant-directed contributions to the 401(k) Plan when it was imprudent to do so;

(ii) maintaining the Plans' heavy investment in Company Stock when it was imprudent to do so;
(iii) continuing to fund all Matching and Profit Sharing contributions to the Plans (hereinafter, "Company Contributions") in the form of Company Stock when it was imprudent to do so; and (iv) maintaining restrictions on the transfer of Company Stock into other investment vehicles when it was imprudent to do so.

  7.  Count II alleges that Defendants breached their fiduciary duty of loyalty by misrepresenting and failing to communicate complete and accurate information to the Plans' participants with respect to Morgan Stanley's major credit problems, risk management and internal control failures, thus preventing the Plans' participants from appreciating the true risks of investing their retirement savings in Company Stock.

  8.  Count III alleges that Defendants breached their fiduciary duty to avoid conflicts of interest by failing to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single minded" fiduciaries with only the best interests of the Plans and their participants in mind.

  9.  Count IV alleges that certain of the Defendants breached their fiduciary duty to monitor other persons to whom the management/administration of Plans' assets was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plans to continue offering Company Stock as an investment option and continuing to invest the Plans' assets in Company Stock when it was no longer prudent to do so.

  10.  Finally, Count V alleges that Defendants breached their duties and responsibilities as co-fiduciaries under Section 405 of ERISA, 29 U.S.C. § 1105, by failing to prevent breaches

by other fiduciaries of their fiduciary duties and/or by enabling breaches by other fiduciaries of their fiduciary duties.

11.    The actions and/or inactions of Defendants, as alleged herein, run directly counter to the express purpose of ERISA retirement plans, which are designed to help provide funds for participants' retirement. *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

12.    As a result of Defendants' fiduciary breaches, the Plans have incurred substantial damages, including the erosion of hundreds of millions of dollars of retirement savings and anticipated retirement income for the Plans' participants, as the trading price for the Company's common stock has plummeted from over $85 per share in early 2007, to under $50 per share as of the end of 2007, and approximately $35 as of the date of this filing.

13.    Because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs' allegations are based upon information and belief. At such time as Plaintiffs have had the opportunity to conduct sufficient discovery, Plaintiffs may, to the extent necessary and appropriate, further amend this Complaint.

## II.    **JURISDICTION AND VENUE**

14.    This Court has subject matter jurisdiction over this action pursuant to Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

15.    This Court has personal jurisdiction over Defendants pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), as one or more of the Defendants may be found in this District. The Court also has personal jurisdiction over Defendants because Morgan Stanley and MS&Co maintain their executive offices in this District. Defendants systematically

and continuously have done and continue to do business in this District, and this case arises out of Defendants' acts within this District.

16.     Venue is proper in this District pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), because the Plans were either administered in this District, some or all of the actionable conduct for which relief is sought occurred in this District, and/or one or more of the Defendants reside or may be found in this District.

## III.     THE PARTIES

### Plaintiffs

17.     **Plaintiff Carolyn Egan** is a resident of the State of Pennsylvania and was at all relevant times a participant in the Plans within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7). During the Class Period, as a result of her or Morgan Stanley's contributions, plaintiff Egan held Company Stock in her individual 401(k) Plan and/or ESOP accounts.

18.     **Plaintiff G. Kenneth Coulter** is a resident of the State of Florida and was at all relevant times a participant in the Plans within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7). During the Class Period, as a result of his or Morgan Stanley's contributions, plaintiff Coulter held Company Stock in his individual 401(k) Plan and/or ESOP accounts.

19.     **Plaintiff John Siefken** is a resident of the State of Washington and was at all relevant times a participant in the Plans within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7). During the Class Period, as a result of his or Morgan Stanley's contributions, plaintiff Siefken held Company Stock in his individual 401(k) Plan and/or ESOP accounts.

20.     **Plaintiff Celeste Martinez** is a resident of the State of New York and was at all relevant times a participant in the Plans within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7). During the Class Period, as a result of his or Morgan Stanley's contributions, plaintiff Siefken held Company Stock in his individual 401(k) Plan and/or ESOP accounts.

21.    **Plaintiff Gregory Major** is a resident of the State of New York and was at all relevant times a participant in the Plans within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  During the Class Period, as a result of his or Morgan Stanley's contributions, plaintiff Major held Company Stock in his individual 401(k) Plan and/or ESOP accounts.

22.    **Plaintiff Michael Chieko** is a resident of the State of New York and was at all relevant times a participant in the Plans within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  During the Class Period, as a result of his or Morgan Stanley's contributions, plaintiff Chieko held Company Stock in his individual 401(k) Plan and/or ESOP accounts.

23.    **Plaintiff Eli Mond** is a resident of the State of New York and was at all relevant times a participant in the Plans within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7). During the Class Period, as a result of his or Morgan Stanley's contributions, plaintiff Mond held Company Stock in his individual 401(k) Plan and/or ESOP accounts.

24.    **Plaintiff John Sudolsky** is a resident of the State of New York and was at all relevant times a participant in the Plans within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  During the Class Period, as a result of his or Morgan Stanley's contributions, plaintiff Sudolsky held Company Stock in his individual 401(k) Plan and/or ESOP accounts.

**Defendants**

25.    Defendants are identified in paragraphs 26 - 38 below.  As alleged in Section IV below ("Defendants' Fiduciary Status"), all Defendants were fiduciaries of the Plans during all or part of the Class Period within the meaning of ERISA and breached their fiduciary duties in the various ways alleged in Section IX below ("Causes of Action").

***Morgan Stanley***

26.    **Defendant Morgan Stanley** is a Delaware corporation headquartered in New York, New York.  Morgan Stanley is a global financial services company that, through its

6

subsidiaries and affiliates, provides its product and services – namely, financial advisory services, investment advisory services covering various investment alternatives, global asset management products and services in equity, fixed income, alternative investments, and private equity – to a large and diversified group of clients and customers, including corporations, governments, financial institutions, and individuals. *See* Securities and Exchange Commission Form 10-K for the fiscal year ended November 30, 2007, filed on January 29, 2008 ("MS 2007 Form 10-K"). As of November 30, 2007, Morgan Stanley had 48,256 employees worldwide. *Id.*

27.     Defendant Morgan Stanley is the "sponsor" of the ESOP. *See* 2007 Summary Plan Description ("2007 SPD") at 23.

28.     At all relevant times herein, defendant Morgan Stanley acted through, *inter alia*, members of its Board of Directors, its officers and employees, members of the Investment Committee (defined herein) and the Plan Administrator (defined herein). As a matter of corporate law, Morgan Stanley is imputed with the knowledge of these individuals.

### *Morgan Stanley's Global Director of Human Resources*

29.     **Defendant Karen Jamesley** was, during the Class Period, Morgan Stanley's Global Director of Human Resources.

30.     Morgan Stanley's Global Director of Human Resources (or his or her delegate) was, during the Class Period, the "Plan Administrator" of the 401(k) Plan. *See* definition of "Plan Administrator" in 401(k) Plan. Morgan Stanley's Global Director of Human Resources (or his or her delegate) was, during the Class Period, also the "Plan Administrator" of the ESOP. *See* Article 1.34 of the ESOP.

### *Morgan Stanley Board of Directors*

31.     The following defendants served as members of the Board of Directors of Morgan Stanley (hereinafter, the "Morgan Stanley Board of Director Defendants"):

(a)    **Defendant John J. Mack** was, at all times during the Class Period, Morgan Stanley's Chief Executive Officer ("CEO") and its Chairman of the Board.

(b)    **Defendant O. Griffith Sexton** was, at all times during the Class Period, an advisory director of Morgan Stanley and a member of its Board.

### *MS&Co*

32.    **Defendant MS&Co**, a Delaware corporation headquartered in New York, New York, is a wholly subsidiary of Morgan Stanley. MS&Co is part of Morgan Stanley's Global Wealth Management Group, providing its individual and business customers with brokerage and investment advice through products such as annuity, insurance, and credit vehicles. MS&Co is Morgan Stanley's primary broker-dealer in the U.S.

33.    Defendant MS&Co is the "sponsor" of the 401(k) Plan. *See* 2007 SPD at 23.

34.    At all relevant times herein, defendant MS&Co acted through, *inter alia*, members of its Board of Directors, its officers and employees, members of the Investment Committee (defined herein) and the Plan Administrator (defined herein). As a matter of corporate law, MS&Co is imputed with the knowledge of these individuals.

### *MS&Co Board of Directors*

35.    The following individuals served as members of the Board of Directors of MS&Co (hereinafter, the "MS&Co Director Defendants") during the Class Period:

(a)    **Defendant Walid A. Chammah** was, during the Class Period, Managing Director of MS&Co and Head of Investment Banking of Morgan Stanley;

(b)    **Defendant Charles Chasin** was, during the Class Period, Managing Director of MS&Co and Chief of Staff to Co-President of Morgan Stanley;

    (c)    **Defendant Zoe Cruz** was, during the Class Period, Managing Director, Chairman, Chief Executive Officer and President of MS&Co and Co-President of Morgan Stanley;

    (d)    **Defendant Richard Portogallo** was, during the Class Period, Managing Director of MS&Co and Regional Co-Head of Americas, Institutional Sales and Trading of Morgan Stanley;

    (e)    **Defendant James P. Gorman** was, during the Class Period, Managing Director of MS&Co and President and Chief Operations Officer, Global Wealth Management Group of Morgan Stanley;

    (f)    **Defendant Neal A. Shear** was, during the Class Period, Managing Director of MS&Co and Co-Head of Institutional Sales and Trading of Morgan Stanley; and

    (g)    **Defendant Cordell G. Spencer** was, during the Class Period, Managing Director of MS&Co and Deputy Head of Investment Banking of Morgan Stanley.

### ***The Investment Committee***

36.    At all times during the Class Period, management of the Plans was in the hands of the Investment Committee, members of which, as alleged herein, were appointed by and served at the pleasure of the Board of Directors of MS&Co. Under the terms of the Plans, the Investment Committee consisted of no fewer than three persons, each of whom was an employee and/or advisory director of Morgan Stanley or MS&Co. The Investment Committee was delegated responsibility for the selection of investment options for the Plans and for monitoring the performance of those investment options. *See* Section 8(f)(i) of the 401(k) Plan.

37.    The following individuals (hereinafter, the "Investment Committee Defendants") served as members of the Investment Committee during all or part of the Class Period:

(a)       **Defendant Michael Rankowitz** has been a member of the Investment Committee throughout the Class Period.  Upon information and belief, defendant Rankowitz was employed by Morgan Stanley or one of its subsidiaries or affiliates during all or part of the Class Period;

(b)       **Defendant Thomas C. Schneider** was a member of the Investment Committee throughout the Class Period.  Upon information and belief, defendant Schneider has been employed by Morgan Stanley or one of its subsidiaries or affiliates during all or part of the Class Period;

(c)       **Defendant Michael T. Cunningham** has been a member of the Investment Committee throughout the Class Period.  Upon information and belief, defendant Schneider has been employed by Morgan Stanley or one of its subsidiaries or affiliates during all or part of the Class Period;

(d)       **Defendant R. Bradford Evans** has been a member of the Investment Committee throughout the Class Period.  Upon information and belief, defendant Evans has been employed by Morgan Stanley or one of its subsidiaries or affiliates during all or part of the Class Period;

(e)       **Defendant Kirsten Feldman** has been a member of the Investment Committee throughout the Class Period.  Upon information and belief, defendant Feldman has been employed by Morgan Stanley or one of its subsidiaries or affiliates during all or part of the Class Period;

(f)       **Defendant Edmund C. Puckhaber** has been a member of the Investment Committee throughout the Class Period.  Upon information and belief, defendant Puckhaber has

been employed by Morgan Stanley or one of its subsidiaries or affiliates during all or part of the Class Period; and

(g)     **Defendant William B. Smith** has been a member of the Investment Committee throughout the Class Period. Upon information and belief, defendant Smith has been employed by Morgan Stanley or one of its subsidiaries or affiliates during all or part of the Class Period.

### Additional "John Doe" Defendants

38.     Without limitation, unknown "John Doe" Defendants 1-10 are other individuals, including members of the Investment Committee and officers, directors and employees of Morgan Stanley and MS&Co, who have been fiduciaries of the Plans during the Class Period within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). The identities of the John Doe Defendants are currently unknown to Plaintiffs. Once their identities are ascertained, Plaintiffs may seek leave to join them to the instant action under their true names.

## IV.    DEFENDANTS' FIDUCIARY STATUS

39.     *Named Fiduciaries*. ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the Plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the Sponsor of the plan is the administrator and thereby the named fiduciary. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

40.     Instead of delegating fiduciary responsibility for the Plans to external service providers, Morgan Stanley and MS&Co chose to comply with the requirement of Section 402(a)(1) of ERISA by assigning their own officers, employees and agents to perform relevant fiduciary functions. Although the Plans had an institutional trustee unrelated to Morgan

11

Stanley, the Trust Agreement governing the Plans required the trustee to take directions from Morgan Stanley.

41.     ***De Facto Fiduciaries***.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who *in fact* perform fiduciary functions (including juridical persons such as Morgan Stanley and MS&Co).  A person is a fiduciary to the extent that he or she (i) exercises any discretionary authority or discretionary control with respect to management of a retirement plan or exercises any authority or control with respect to management or disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of a retirement plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of a retirement plans.  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

42.     Each Defendant was a *de facto* fiduciary with respect to the 401(k) Plan and/or the ESOP and owed fiduciary duties to the Plans and their participants under ERISA in the manner and to the extent set forth in the Plan documents, through their conduct, and under ERISA.

### Morgan Stanley's Fiduciary Status

43.     Under the terms of the 401(k) Plan, the Plan Administrator was a "Named Fiduciary" of the 401(k) Plan.  *See* Sections 14(a) of the 401(k) Plan.  Under the terms of the 401(k) Plan, Morgan Stanley's Global Director of Human Resources was the Plan Administrator of the 401(k) Plan.  *See* definition of Plan Administrator in the 401(k) Plan.

44.     Under the terms of the ESOP, the Plan Administrator was a "Named Fiduciary" of the ESOP.  *See* Article 9.01 of the ESOP.  Under the terms of the ESOP, Morgan Stanley's

Global Director of Human Resources was the Plan Administrator of the ESOP. *See* Article 1.34 of the ESOP.

45.    Because Morgan Stanley's Global Director of Human Resources, the Plan Administrator, acted at all relevant times as an agent and on behalf of Morgan Stanley, Morgan Stanley was a "Named Fiduciary" of both the 401(k) Plan and the ESOP.

46.    In addition, based on its duties, responsibilities and actions, Morgan Stanley was a *de facto* fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. §1002(21). Upon information and belief, Morgan Stanley exercised discretionary authority or discretionary control with respect to management of the Plans, exercised authority or control with respect to management or disposition of the Plans' assets and/or exercised discretionary authority or discretionary responsibility in the administration of the Plans in at least the following ways:

REDACTED

47.     In addition, since Morgan Stanley at all relevant times had effective control over
the activities of its Board of Directors, its officers and employees, members of the Investment
Committee, the Plan Administrator and the MS&Co Director Defendants, any breaches of
fiduciary duties by such individuals are imputed to Morgan Stanley and Morgan Stanley is liable
for such breaches under the doctrine of *respondeat superior*.

**Morgan Stanley's Global Director of Human Resources**

48.     During the Class Period, defendant Jamesley occupied the position of Global
Director of Human Resources for Morgan Stanley, which was the Plan Administrator of both the
401(k) Plan and the ESOP. Defendant Jamesly is therefore herself a fiduciary of the Plans,
since, as alleged above (i) the Plan Administrator was the "Named Fiduciary" of the Plans during
the Class Period; and (ii) the Plan Administrator was a *de facto* fiduciary of the Plans within the
meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that the Plan Administrator
exercised discretionary authority or discretionary control with respect to management of the
Plans, exercised authority or control with respect to management or disposition of the Plans'
assets and/or had discretionary authority or discretionary responsibility in the administration of
the Plans.

**The Morgan Stanley Director Defendants' Fiduciary Status**

49.     Based on their duties, responsibilities and actions, the Morgan Stanley Director
Defendants were *de facto* fiduciaries of the Plans during the Class Period, within the meaning of
ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or
discretionary control with respect to management of the Plans, exercised authority or control
with respect to management or disposition of the Plans' assets and/or had discretionary authority
or discretionary responsibility in the administration of the Plans, in at least the following ways:

REDACTED

**MS&Co's Fiduciary Status**

50.     Based on its duties, responsibilities and actions, MS&Co was a *de facto* fiduciary of the Plans during the Class Period, within the meaning of ERISA §3(21), 29 U.S.C. § 1002(21), in that it exercised discretionary authority or discretionary control with respect to management of the Plans, exercised authority or control with respect to management or disposition of the Plans' assets and/or had discretionary authority or discretionary responsibility in the administration of the Plans, in at least the following ways:

REDACTED

15

# REDACTED

51.     In addition, since at all applicable times MS&Co had effective control over the activities of its Board of Directors, its officers and employees and members of the Investment Committee, any breaches of fiduciary duties by such individuals are imputed to MS&Co and MS&Co is liable for such breaches under the doctrine of *respondeat superior*.

**The MS&Co Directors' Fiduciary Status**

52.     Based on their duties, responsibilities and actions, the MS&Co Director Defendants were *de facto* fiduciaries of the Plans during the Class Period, within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control with respect to management or disposition of the Plans' assets and/or had discretionary authority or discretionary responsibility in the administration of the Plans, in at least the following ways:



REDACTED

### The Investment Committee's Fiduciary Status

53.    At all times during the Class Period, the Investment Committee was a "Named Fiduciary" of the 401(k) Plan under Section 402(a)(2) of ERISA, 29 U.S.C. § 1102(a)(2). *See* Section 8(f)(i)(1) of the 401(k) Plan.

54.    In addition, based on their duties, responsibilities and actions, the members of the Investment Committee were *de facto* fiduciaries of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control with respect to management of the Plans, exercised authority or control with respect to management or disposition of the Plans' assets and/or had discretionary authority or discretionary responsibility in the administration of the Plans, in at least the following ways:



## V.    THE PLANS

### Nature of the Plans

55.    Each Plan is an "employee pension benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A).  The Plans are legal entities that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).

56.    An employee benefit plan, such as the Plans here, must be "established and maintained pursuant to a written instrument."  ERISA § 402(a)(1), 29 U.S.C. 1102(a)(1).  During the Class Period, the Plans were maintained under the following instruments:

- The 401(k) Plan, amended and restated as of October 1, 2002 (the "401(k) Plan"); and

- The ESOP, amended and restated as of January 1, 2002.

57.    As required by ERISA, the Plan Administrator for the Plans, upon information and belief, provided every participant with an SPD.

58.    ERISA and the Internal Revenue Code require that Plan Administrators file a Form 5500 with the Department of Labor and the Department of the Treasury, which, upon information and belief, were filed by the Plan Administrator.

59.    The assets of an employee benefit plan must be "held in trust by one or more trustees."  ERISA §403(a), 29 U.S.C. § 1103(a).  During the Class Period, the assets of the Plans were combined and commingled in the Morgan Stanley Defined Contribution Master Trust ("Master Trust") and held in trust by Mellon Bank, N.A. ("Mellon") pursuant to a Trust Agreement dated February 20, 2001 (the "Trust Agreement") entered into between Mellon and Morgan Stanley.  *See* 2006 and 2007 Forms 11-K.

**401(k) Plan**

60.     The 401(k) Plan is a "defined contribution plan" within the meaning of ERISA

§ 3(34), 29 U.S.C. § 1002(34).  Full-time and Part-time employees who work at least 20 hours

per week are eligible to participate in the 401(k) Plan at the commencement of employment. *See*

2007 Form 11-K.  Part-time employees not regularly scheduled to work 20 or more hours per

week may become participants in the 401(k) Plan as of the first date following either: (i) the date

on or between January 1, 2004 and August 15, 2005 on which they had completed one year of

service, or (ii) the date on or after August 15, 2005, on which they had completed one year of

service and reached 21 years of age.

61.     According to Morgan Stanley's 2007 SPD, the "Morgan Stanley 401(k) Plan and

the Morgan Stanley Employee Stock Ownership Plan (ESOP) provide [employees] an

opportunity to save for retirement on a tax favored basis and supplement [their] savings with

Company contributions." *See* 2007 SPD.

62.     Individual accounts are maintained for each 401(k) Plan participant.  Each

participant's account is credited with employee contributions, Company contributions and the

401(k) Plan's earnings, and charged with the allocation of investment losses and administrative

expenses not otherwise paid by Morgan Stanley. *Id.*

63.     All contributions to the 401(k) Plan are allocated among the available investments

as selected by the participant from among the investments designated by the Investment

Committee.  As of December 31, 2007, there were 27 investment vehicles within the Master

Trust, including a fund consisting of Company Stock, available for selection in the 401(k) Plan.

*Id.*

64.     Plan participants with an annual salary of less than $200,000 per year are eligible

for the Company's matching program.  The Company matches dollar for dollar value up to six

percent of an employee's pre-tax eligible pay (which was limited to $170,000 in pay in 2007) for the first $2,000 of eligible pre-tax contributions, and 50 cents per dollar for each additional dollar of eligible pre-tax contributions. The maximum amount of the Company match in 2007 was $6,100. *Id.*

65.    In addition, the Company may make discretionary profit sharing contributions, the amounts of which vary from year to year and are determined by individual business units. These distributions are measured as a percentage of eligible pay where eligible pay is limited to $100,000 per year. In 2006, the profit sharing distribution was 2% of Eligible Pay (see 2006 11-K), and in 2007 no profit sharing distribution was made. *Id.*

66.    The Company also makes certain other Contributions, including, beginning on for employees hired after June 30, 2007, a "retirement contribution" for employees who have worked at the Company for at least one year. Retirement Contributions are from 2% to 5% of an employee's income per year, depending on the length of time he or she has been with the Company. In 2007, the Retirement Contribution to the Plan was $127,101. *Id.*

67.    Prior to November 1, 2007, each participant could elect to make contributions to the 401(k) Plan on a pre-tax basis through payroll deductions from 1% through 20% of such participant's eligible annual compensation up to an annual maximum of $15,000 for 2006. In addition, participants who are age 50 or older could elect to make a pre-tax catch-up contribution to the 401(k) Plan through payroll deductions from 1% to 20% of eligible compensation to an annual maximum of $5,000 in 2006. Effective November 30, 2007, the Plan increased the pre-tax contribution limit to 30% of eligible pay. For 2007, the maximum amount was $15,500. Participants aged 50 and older could elect a pre-tax "Catch-Up Contribution" of 1% to 30% of eligible pay, that was, again, subject to Tax Code limits of $5,000. A participant can elect to

change the rate at which his/her contribution is determined at any time during the year. *See* 2006 and 2007 Forms 11-K.

68.    In 2006, employees – other than those considered to be non-highly compensated employees – could also elect to contribute up to 10% of eligible compensation in after-tax dollars up to an annual maximum of $10,000. In 2007, the amount rose to 30% of eligible compensation, subject to an annual maximum determined by the Tax Code. *See* 2006 and 2007 Forms 10-K.

69.    Participants are always 100% vested in contributions to the 401(k) Plan made from their eligible compensation and in the earnings thereon. *Id.*

### The ESOP

70.    All Full Time and Part Time employees regularly scheduled to work at least twenty hours per week are eligible to participate in the ESOP. Part Time Employees regularly scheduled to work less than 20 hours per week are not permitted to make employee contributions to the ESOP.

71.    Upon information and belief, participants make contributions to the ESOP through their contributions to the 401(k) Plan. All investments in Company Stock are transferred to the ESOP. "Quarterly transfers are made from the Company Stock Fund, a fund within the [401(k)] Plan, to the ESOP throughout the [401(k)] Plan year and all forfeitures are transferred to the ESOP." *See* 2007 Form 11-K.

72.    Upon information and belief, under the terms of the 401(k) Plan, there was no requirement that any of the 401(k) Plan be invested in Company Stock. The requirement was simply that if a portion of the 401(k) Plan were invested in Company Stock, such portion would be transferred to the ESOP. Thus, the 401(k) Plan is not "designed" to invest primarily in qualifying employer securities.

73.     Participants in the Plans hired on or after January 1, 2004 become vested in Company Contributions and earnings thereon in the ESOP upon the earlier of the following: (1) completion of three years of service; or (2) termination of employment due to death, total and permanent disability, retirement, or release as defined in the 401(k) Plan. *Id.*

74.     Prior to January 1, 2007, only participants of the Plans age 55 and older or no longer employed by Morgan Stanley could transfer their holdings of Company Stock in the ESOP attributable to Company Contributions (*i.e.*, Matching Contributions and Profit Sharing contributions) into other forms of investment. *See* 2006 SPD.

75.     As of January 1, 2007, the restrictions on the transfer of holdings of Company Stock in the ESOP attributable to Company Contributions were loosened, such that (i) participants over 55 or with 3 years service could fully transfer all such holdings; and (ii) participants under age 55 with at least three years of service could transfer such holdings allocated to their accounts after January 2007, and could transfer all such holdings allocated to their accounts before January 2007 in accordance with the following schedule: up to 25% of such holdings on or after January 31, 2007; up to 50% of such holdings on or after May 1, 2007; up to 75% of such holdings on or after August 1, 2007; and 100% of such holdings on or after October 31, 2007. *See* 2007 SPD. (Significant restrictions on the transfer of Company Stock were therefore still in place as the price of Morgan Stanley common stock declined from over $85 per share in January 2007 to $60 per share in October 2007.)

76.     During the Class Period, all Company Contributions were made exclusively in Company Stock and made to the ESOP. *Id.*

77.     Under Section 6(f) of the 401(k) Plan, "Company Contributions [which includes the Matching Contributions] to the Plan for a Plan Year shall be made in the form of cash unless

the Company [MS&Co.] determines that any and all such contributions shall be made in the form

of Company Stock." In both fiscal 2005 and 2006, the expense the Company reported for the

combined Matching and Profit Sharing Contributions was $117 million, and in 2007 (when there

was no profit sharing contribution) that expense was $128 million. *See* MS 2007 Form 10-K and

2007 11-K.

## VI.    CLASS ACTION ALLEGATIONS

78.    Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), and

(b)(2) of the Federal Rules of Civil Procedure on behalf of themselves and the following class of

persons similarly situated (the "Class"):

> All participants in or beneficiaries of the Plans at any time between
> August 9, 2006, and the present (the "Class Period") whose
> accounts included investments in Morgan Stanley Company Stock.
> Excluded from the Class are the Defendants, any entity other than
> the Plans in which the Defendants have a controlling interest, or is
> a parent or subsidiary of or is controlled by the Company, and the
> officers, directors, affiliates, legal representatives, heirs,
> predecessors, successors and assigns of the Defendants.

79.    Plaintiffs meet the prerequisites of Rule 23(a) to bring this action on behalf of the

Class because:

80.    Numerosity. The members of the Class are so numerous that joinder of all

members is impracticable. While the exact number of Class members is unknown to Plaintiffs at

this time, and can only be ascertained through appropriate discovery, Plaintiffs believes there are,

at a minimum, over ten thousand members of the Class who participated in or were beneficiaries

of the Plans during the Class Period and who held Company Stock in the Plans.

81.    Commonality. Common questions of law and fact exist as to all members of the

Class and predominate over any questions affecting solely individual members of the Class.

Among the questions of law and fact common to the Class are:

(a)     Whether Defendants acted as fiduciaries;

(b)     Whether Defendants breached their fiduciary duties to the Plans and members of the Class by failing to act prudently and solely in the interests of the Plans, and the Plans' participants and beneficiaries;

(c)     Whether Defendants violated ERISA;

(d)     Whether the Plans and members of the Class sustained a loss in vested benefits, and

(e)     The proper measure of loss to the Plans and subsequent allocation of vested benefits to the Plans' participants.

82.     Typicality.  Plaintiffs' claims are typical of the claims of the Class members because the Plans, Plaintiffs and the Class sustained a decrease in vested benefits arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

83.     Adequacy.  Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

84.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the Class members would create a risk of adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the actions or substantially impair or impede their ability to protect their interests.

85.     Class action status is also warranted under Rule 23(b)(2).  This is because: (i) prosecution of separate actions by the Class members create a risk of establishing incompatible

standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Plans and the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Plans or Class as a whole; and (iii) as alleged above, questions of law or fact common to Class members predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy, because, among other reasons, the claims of the individual class members are each relatively small compared to the cost of litigating and proving Defendants' wrongful conduct in this action.

## VII.    DEFENDANTS' VIOLATIONS OF ERISA

### Mack Changes Morgan Stanley's Business Model

86.    In the summer of 2005, defendant Mack became Morgan Stanley's Chief Executive Officer.  In the ten years prior, an internal battle at Morgan Stanley existed between defendant Mack and former CEO Phil Purcell ("Purcell").  When Mack took over as CEO he was touted by the Company as a savior.  Mack immediately instituted a policy of putting more of Morgan Stanley's capital at risk in exchange for the possibility of garnering greater returns. Morgan Stanley, under Mack's leadership, began the practice of dramatically increasing the Company's exposure to credit assets having little or no price transparency, making it difficult for the Plans' Participants and the market to determine the risks associated with investing in these assets.

87.    Defendant Mack desired to transform Morgan Stanley into one of the titans of Wall Street, which meant playing catch-up with the likes of Wall Street powerhouses such as Goldman Sachs, which was already involved in taking big trading risks and making major private equity investments.

88.     Shortly after his arrival at the Company, defendant Mack spoke to investors of his intention to involve Morgan Stanley in "growth opportunities in everything from private equity to mortgages, junk bonds to equity derivatives."  BusinessWeek, *Morgan Stanley's Mack Attack*, June 22, 2006.

89.     Defendant Mack's colleagues, including the Plans' fiduciaries, supported his approach and applauded Morgan Stanley's purported ability to employ successful risk management tactics.

90.     For instance, defendant Zoe Cruz, Managing Director of the Board of Directors of MS&Co. and a fiduciary of the 401(k) Plan, was not only pleased with defendant Mack's appointment as CEO, but shared his "healthy appetite for risk" and, thus, assisted him in seeking out large returns from complex investment vehicles such as mortgage backed securities.  New York Magazine, *"Only Men Survive,"* May 5, 2008.

91.     Defendant Cruz and former CFO David Sidwell reassured the investing public and the Plans' participants that Morgan Stanley was in fact equipped to manage its new business strategy.  On October 9, 2006, CIBC World Markets reported:

> ***Cruz and Sidwell believe the firm is successfully demonstrating better risk management and investment banking market share positioning and view the fourth quarter as progressing nicely***....Cruz believes that MS continues to take on more risk and that the firm is 75% there in terms of risk deployed. Cruz stated that Morgan Stanley already possesses the skillset to generate higher risk-based returns. According to Cruz, the firm is abundantly well-capitalized and specific to risk capital deployed is 75% into plan. (emphasis added)

92.     However, unbeknownst to the Plans' participants, Mack's risky management style was not properly suited for an entity like Morgan Stanley because the Company lacked adequate risk management and internal controls that could properly manage the risk associated with such a strategy or allow proper compliance with Morgan Stanley's reporting obligations.  Indeed, as

discussed below, Defendants not only knew or should have known of such problems, but also knew or should have known that the Company's increased risk made Company Stock an imprudent investment for the Plans.

### Morgan Stanley's Foray into High Risk Products

93.     Traditionally, in the course of its business, Morgan Stanley created and controlled various credit derivative products, including credit default swaps and CDOs.   A CDO is an investment-grade security backed by a pool of bonds, loans and other assets, such as mortgages.

94.     When a company participates in credit derivative product markets, it increases its exposure to credit and liquidity risk.  Liquidity and funding risk refers to the risk that the company will be unable to finance its operations due to a loss of access to the capital markets or difficulty in liquidating its assets.  Credit risk refers to the risk of loss arising from the default by a borrower, counterparty, or other obligor when it is unable or unwilling to meet its obligations.

95.     As part of defendant Mack's unduly ambitious trading strategy, the Company sought to take advantage of the subprime market by backing its credit derivative products with subprime mortgages, as discussed herein.

### Background of Subprime Mortgages

96.     Subprime lending is the practice of making mortgage loans to persons generally unable to access credit from traditional financial institutions because they fail to satisfy credit, documentation, or other underwriting standards mandated by these traditional mortgage lenders and loan buyers, which typically lend only to more credit-worthy borrowers.

97.     From 2001 to mid-2004, prime borrowers with a preference for fixed-rate mortgages refinanced in record numbers as long-term interest rates fell to the lowest rates in a generation.  As interest rates began to rise in 2004 and the pool of potential prime borrowers looking to refinance shrank, lenders struggled to maintain or grow market share in a declining

origination environment, and did so by extending loans to subprime borrowers with troubled credit histories.

98.     Subprime lenders also eased lending standards to take advantage of these borrowers, including limited or no verification of borrower income and high loan-to-value transactions.

99.     The mortgage market was further fueled by significant mortgage-backed securities liquidity, with investors increasingly seeking greater yield through higher risk securitizations that allow financial institutions to access the capital markets to fund mortgage operations, while simultaneously transferring credit risk away from the institutions to securitization investors.

100.     In late 2004 and early 2005, there was a growing sense of concern regarding the subprime industry, and in particular the eased lending standards.  To address those concerns, the Federal Reserve and other banking agencies issued guidance on subprime lending.  The Interagency Guidance on Nontraditional Mortgage Product Risks highlights sound underwriting procedures, portfolio risk management, and consumer protection practices that institutions should follow to prudently originate and manage nontraditional mortgage loans.  A major aspect of this guidance is the recommendation that a lender's analysis of repayment capacity should include an evaluation of the borrower's ability to repay debt by final maturity at the fully indexed rate, assuming a fully amortizing repayment schedule.  The guidance also reminds institutions that they should clearly communicate the risks and features of these products to consumers in a timely manner, before consumers have applied for a loan.

101.     In 2006, mortgage interest rates hit four-year highs, the volume of home sales declined, the rate of home price appreciation decelerated and,  in some cases, home prices fell,

leaving the most recent subprime borrowers vulnerable to payment difficulties. Subprime

borrowers with adjustable rate mortgages ("ARMs") experienced a large increase in delinquency

and foreclosure rates, while prime borrowers experienced almost no increase in delinquencies

and foreclosures. Borrowers were not able to avoid sharp payment increases as they could in

earlier years. Even borrowers with enough equity to refinance their adjustable rate mortgages

faced difficulty finding a loan with affordable payments, as interest rates edged higher than in

earlier years.

102.    In September 2006, the Senate Banking Committee heard testimony from

"leading economists" as to the economic ramifications of the housing bubble, including from

Richard Brown of the FDIC, who stated, "According to the Federal Housing Finance Board, over

30 percent of all conventional mortgages closed in 2004 and 2005 were ARMs. The ARM share

moderated to 25 percent by the second quarter of 2006. The percentage of ARMs among

subprime mortgages is higher. Within subprime mortgage backed securities, the share of ARMs

was far higher, close to 80 percent. The prevalence of subprime loans among all mortgage

originations doubled from 9 percent in 2003 to 19 percent in 2004."

103.    On October 23, 2006, *Bloomberg* reported that "'[d]elinquency trends and home

prices' show a weakening real estate market, said Scott Eichel, head of credit trading for New

York-based Bear Stearns & Co., the biggest underwriter of bonds backed by mortgages. 'A lot of

investors that have concerns about the housing market' are using the ABX index to speculate on

a continued drop, he said."

104.    Three days later, the Commerce Department reported that the median price for a

new home sold in September was $217,100, a drop of 9.7 percent from September 2005. It was

the lowest median price for a new home since September 2004 and the sharpest year-over-year

decline since December 1970. The weakness in new home prices was even sharper than a 2.5 percent fall in the price of existing homes last month, which had been the biggest drop on record.

105.    On December 14, 2006, the Mortgage Bankers Association reported in its quarterly National Delinquency Survey that late payments and new foreclosures on U.S. homes rose in the third quarter and were likely to grow as a massive wave of adjustable-rate mortgages reset at higher interest rates. The Association also reported that delinquencies rose for all home loans, but most notably for adjustable loans to subprime borrowers who were already stretched before mortgage rates climbed and predicted that between $1.1 and $1.5 trillion of mortgages faced rate resets in 2007.

106.    Later that month, a Center for Responsible Lending ("CRL") study revealed that 2.2 million American households were likely to lose their homes and as much as $164 billion due to foreclosures in the subprime mortgage market.  CRL's research suggested that risky lending practices had triggered the worst foreclosure crisis in the modern mortgage market, projecting that approximately one out of five (19.4%) subprime loans issued during 2005-2006 would fail.

107.    In spite of these early market concerns, Defendants Mack , Cruz and Shear continued to strongly advocate for the integration of subprime mortgages into the Morgan Stanley business model.

### Morgan Stanley Becomes A Player in the Subprime Mortgage Industry

108.    In furtherance of defendant Mack's determination to take more risk with the Company's capital, and despite the impending subprime crisis, Morgan Stanley acquired Saxon Capital, Inc. ("Saxon"), a servicer and originator of residential mortgages, for $706 million.  In a press release dated August 9, 2006, the first day of the Class period, Saxon announced the signing of a definitive merger agreement with Morgan Stanley.

109.    The acquisition of Saxon was reported in Morgan Stanley's 2006 Annual Report, filed on February 16, 2006, and was intended to provide Morgan Stanley with access to subprime mortgages that could be repackaged into complex investment vehicles.  In a press release issued by the Company on December 4, 2006, this acquisition was touted as "another important step in our long-term strategy of building a global, vertically integrated residential mortgage business . . . .  Saxon adds a premier servicing operation with a scalable U.S. origination platform to our substantial existing residential mortgage franchise."

110.    Saxon became a material component of Morgan Stanley's business in early 2007. In the first quarter, it accounted for $35 million of servicing and securitization income.  MS 1Q2007 Form 10-Q at 52.  Similarly, Morgan Stanley recognized servicing and securitization income of $42 million, which was primarily attributable to Saxon.  MS 2Q2007 Form 10-Q at 62.

111.    Morgan Stanley's acquisition of Saxon provided the Company with first-hand knowledge of the deterioration, risks, and fraudulent practices associated with the subprime lending market.

112.    For instance, Morgan Stanley/Saxon allegedly engaged in various deceptive and illegal practices including at a minimum: (1) over-inflating home appraisals; (2) falsifying loan documentation; (3) underwriting loans that did not meet Freddie Mac or Fannie Mae guidelines; (4) failing to verify stated incomes and assets on loan applications; (5) strong-arming customers into loans they could not afford and did not understand; and (6) engaging in straw-man buying schemes, foreclosure schemes and identity theft.  Defendants knew or should have known that these and, upon information and belief, other questionable or illegal practices were occurring on

a widespread basis, putting the Company's overall health at risk and rendering Company Stock

an imprudent Plan investment.

113.    New management at Morgan Stanley/Saxon expanded lending guidelines,

loosened underwriting standards, and approved high loan volume. At some Morgan

Stanley/Saxon branches, large numbers of additional employees were hired to deal with the

increased volume of loans being closed.

114.    Loans were underwritten with little or no verification of income and assets as

stated on the loans. Underwriters who attempted to deny loan applications where applicants

either had no assets or stated incomes that did not qualify them for the loans, would invariably

find out that Morgan Stanley/Saxon management later approved the loans anyway. In some

situations, loans were approved by management simply because an applicant's parents had a

Morgan Stanley investment account.

115.    While many other lenders in the industry had loan rejection rates in the range of a

mere 25%. Morgan Stanley/Saxon's loan rejection rate was even lower, at 10%. This is because

Morgan Stanley/Saxon would quickly sell many of these loans into the secondary market.

Morgan Stanley was not concerned that most borrowers defaulted on their first payment, but by

the time the first payment was due, the loan was already sold in the secondary market and off of

Morgan Stanley/Saxon's books. Morgan Stanley/Saxon knew from its business transactions that

other subprime lenders had similar practices.

116.    Morgan Stanley/Saxon management, comprised of former  management of

Fremont General Corp., a now defunct subprime mortgage lender, including Wes Isley and Brian

Bazaar, implemented a system for appraisal reviews with a third-party company called

Nationwide Appraisal Services Corp. ("Nationwide"). Nationwide simply rubber-stamped the

home values submitted by Morgan Stanley/Saxon, despite the fact that those values were completely unsupported and out of bounds with reality, because underwriters, instructed by management, signed off on inflated appraisals on a daily basis.

117.    Morgan Stanley/Saxon stretched the loan to value ("LTV") of properties by using older appraisals of homes which showed higher values. The LTV is a percentage of the loan a borrower is going to receive based on the value of the home. For example, if a home is valued at $100,000 and a borrower wants to borrow $80,000, the LTV would be 80%. The LTV sets the interest rate the borrower is going to receive and how much cash the borrower can borrow.

118.    Morgan Stanley/Saxon's management also purchased extremely large loan portfolios. These large loan portfolios originated in Florida with Nova Star Mortgage.

119.    Morgan Stanley/Saxon's holdings of loans purchased from third-party lenders grew from $6 billion to $12 billion. According to estimates, approximately 35-40% of the loans Morgan Stanley/Saxon purchased were fraudulent. Upon information and belief, if Morgan Stanley had been reviewing these loans with proper due diligence, the Company should have known that these loans were fraudulent. These bundled mortgages could not be refinanced because of the fraud contained in them. For example, the purpose of buying these loans was to sell them in the secondary market. The sales department would solicit borrowers to get them to refinance with Morgan Stanley/Saxon. Since a majority of these loans were in default, the sales department offered modification programs to the borrowers and had to take huge losses on the majority of third-party loans bought because of the fraud underlying them.

120.    Defendants knew or should have known that these and, upon information and belief, other questionable or illegal practices were occurring on a widespread basis in its own business and throughout the credit market, putting the Company's overall health at risk and

rendering Company Stock an imprudent Plan investment. But rather than heed market warnings or address its internal behavior concerning subprime practices, Morgan Stanley allowed a young trader, Howie Hubler, to create a complex trading desk reliant on these subprime mortgages.

121.    Defendant Neal Shear, Hubler's boss, encouraged this activity which used complex investment vehicles such as CDOs and SIVs to hedge against low quality subprime mortgages while betting on high quality mortgages that most analysts considered stable, as described below.

### The CDO Market

122.    Morgan Stanley began underwriting pools of securities tied to subprime mortgages in late 2005. The securitized claims on the pool's payments are carved into classes of risk that are commonly referred to as "tranches."

123.    A super-senior tranche involves the least amount of risk because it has the first claim on payments from the pooled mortgages. This tranche typically has the highest credit rating, AAA. After these senior claims are paid, the middle tranche, or "mezzanine" receives its payments. The mezzanine tranche usually has a credit rating ranging from AA to BB, which reflects its increased risk. An equity tranche is the lowest class of security because it will only receive payments after the senior and mezzanine tranches are paid in full. The equity tranche usually has either a junk rating or no credit rating at all. As such, the equity tranche is highly risky, but also enjoys the highest rate of return. Each tranche of securities is sold separately and can be traded in secondary markets.

124.    During the Class Period, Morgan Stanley would often sell the upper tranches and keep the equity tranche. The equity tranche was not very appealing to investors because they were substantially more risky given that, *inter alia*, they were the last to be paid in the event of any defaults. In addition, Morgan Stanley also held  super senior segments of CDOs throughout

the Class Period. Upon information and belief, at the beginning of 2007, Morgan Stanley held

tens of billions of dollars worth of super-senior CDOs. Morgan Stanley held this volume of

super-senior CDOs, the majority of which were backed by mortgages, in attempt to hedge the

inherent risk of keeping the equity tranches. Morgan Stanley also held tens of billions of worth

of CDOs squared, which are CDOs that securitize assets comprised of CDO securities.

125.    When the subprime melt-down began to take its hold, no tranches were safe. The

upper tranches included subprime mortgages that were losing value because of record defaults.

Thus, these "safe" investments became a liability to Morgan Stanley not only because of their

lost value, but also their inability to function as an adequate hedge against the risk of the equity

tranche.

### The SIV Market

126.    During the Class Period, Morgan Stanley also invested in SIVs that banks use to

issue commercial paper. Until recently, SIVs were considered to be highly-rated, short-term

notes that offered investors a safe-haven investment with a yield slightly above certificates of

deposit or government debt.

127.    SIVs use the proceeds from the issuance of commercial paper to purchase longer-

term investments such as corporate receivables, auto loans, credit-card debt or mortgages. Banks

profit from the SIVs by pocketing the spread between the rate at which they borrow money and

the rate at which they lend money.

128.    The vehicles are often established in a tax haven and are run solely for investment

purposes, as opposed to typical corporate activities. However, it is difficult for investors to

assess the financial risks imposed by SIVs because they are off-the-balance-sheet entities.

129.    Upon information and belief, Morgan Stanley represented to money market fund

managers and other investors that its SIVs were safe investments that use the proceeds from the

issuance of commercial paper and short-term notes to invest strictly in high-quality debt securities.

130.    However, investors, including money market funds, have pulled back from debt sold by SIVs because of their exposure to subprime mortgage securities. Because SIVs still owe money to commercial-paper holders, and cannot raise money by selling new commercial paper, they are being forced to sell their assets at fire-sale prices to pay off debt.

**Morgan Stanley's Business Strategy Required,
But Did Not Have, Adequate Internal Controls**

131.    Proper internal controls are essential to companies who participate in the credit derivatives market because these products are, generally speaking, trades of risk or combinations of risk. Without adequate internal controls, the risk presented by the credit derivative market can easily surpass the overall appetite for risk that a company can manage. Effective internal controls are even more critical for companies that utilize CDOs, since many of them are comprised of securities tied to sub-prime mortgages.

132.    Morgan Stanley is required to conform with federal and state regulations governing its internal control environment, including preparing its financial statements in accordance with Generally Accepted Accounting Principles ("GAAP") and the Rules of the Financial Accounting Standards Board ("FASB").

133.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. As set forth in the FASB Statements of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, paragraph 42, states:

Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

134.    Under GAAP, certain executives and officers are responsible for the following:

   a.    The principle that financial reporting should provide information that is useful to present and potential investors in making rational investment decisions and that information should be comprehensible to those who have a reasonable understanding of business and economic activities (FASB Statement of Concepts No. 1, ¶34);

   b.    The principle of materiality, which provides that the omission or misstatement of an item in a financial report is material if, in light of the surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item (FASB Statement of Concepts No. 2, ¶132);

   c.    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general. (FASB Statement of Concepts No. 1, ¶ 50);

   d.    The principle that financial reporting should be reliable in that it represents what it purports to represent. The notion that information should be reliable as well as relevant is central to accounting. (FASB Statement of Concepts No. 2, ¶¶ 58-59);

   e.    The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions. (FASB Statement of Concepts No. 2, ¶ 80);

      f.      The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent. (FASB Statement of Concepts No. 2, ¶¶ 95, 97).

135.    As a publicly traded company, Morgan Stanley is responsible and required to maintain books and records in sufficient detail to reflect the transactions of the company and therefore prepare financial statements in accordance with GAAP. Specifically, the Securities Exchange Act of 1934, 15 U.S.C. § 78m (b) (2) ("the Exchange Act"), requires public companies to:

    (A)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

    (B)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that—

        (i)    transactions are executed in accordance with management's general or specific authorization;

        (ii)    transactions are recorded as necessary (i) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (ii) to maintain accountability for assets;

        (iii)    access to assets is permitted only in accordance with management's general or specific authorization; and

        (iv)    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

136.    As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1). Management is responsible for preparing financial statements that conform with GAAP. As noted by the AICPA professional standards:

> financial statements are management's responsibility . . . .
> [M]anagement is responsible for adopting sound accounting
> policies and for establishing and maintaining internal control that
> will, among other things, record, process, summarize, and report
> transactions (as well as events and conditions) consistent with
> management's assertions embodied in the financial statements.
> The entity's transactions and the related assets, liabilities and
> equity are within the direct knowledge and control of management
> . . . . Thus, the fair presentation of financial statements in
> conformity with Generally Accepted Accounting Principles is an
> implicit and integral part of management's responsibility.

137.    According to Auditing Standard No. 2, "[a] material [internal control] weakness is

a significant deficiency, or a combination of significant deficiencies, that results in more than a

remote likelihood that a material misstatement of the annual or interim financial statements will

not be prevented or detected."  Auditing Standard No. 2, ¶10.

138.    As noted, Morgan Stanley was required to followed the FASB Rules.  Financial

Accounting Standards section 133 ("FAS 133") establishes accounting and reporting standards

for derivative instruments.  FAS 133 states that Accounting for Derivative Instruments and

Hedging Activities:

> establishes accounting and reporting standards for derivative
> instruments, including certain derivative instruments embedded in
> other contracts. . .and for hedging activities.  It requires that an
> entity recognize all derivatives as either assets or liabilities in the
> statement of financial position and measure those instruments at
> fair value.

139.    According to FAS 133, ¶6, a derivative instrument is a financial instrument or

other contract with all three of the following characteristics:

> a.    It has (1) one or more underlyings and (2) one or more
>       notional amounts or payment provisions or both.  Those
>       terms determine the amount of the settlement or
>       settlements, and, in some cases, whether or not a settlement
>       is required.
>
> b.    It requires no initial net investment or an initial net
>       investment that is smaller than would be required for other

types of contracts that would be expected to have a similar response to changes in market factors.

    c.    Its terms require or permit net settlement, it can readily be settled net by a means outside the contract, or it provides for delivery of an asset that puts the recipient in a position not substantially different from net settlement.

140.    Regarding fair value hedges, FAS 133, ¶20 states the following:

An entity may designate a derivative instrument as hedging the exposure to changes in the fair value of an asset or a liability or an identified portion thereof ("hedged item") that is attributable to a particular risk. Designated hedging instruments and hedged items qualify for fair value hedge accounting [if several criteria are met including the following]:

At inception of the hedge, there is formal documentation of the hedging relationship and the entity's risk management objective and strategy for undertaking the hedge, including identification of the hedging instrument, the hedged item, the nature of the risk being hedged, and how the hedging instrument's effectiveness in offsetting the exposure to changes in the hedged item's fair value attributable to the hedged risk will be assessed. There must be a reasonable basis for how the entity plans to assess the hedging instrument's effectiveness.

141.    In addition, Derivatives Implementation Group Statement 133 Implementation Issue No. B6 requires the following:

**Statement 133 requires that an embedded derivative that must be separated from its host contract be measured at fair value.** As stated in paragraph 301 of the basis for conclusions, "...the Board believes it should be unusual that an entity would conclude that it cannot reliably separate an embedded derivative from its host contract." Once the carrying value of the host contract is established, it would be accounted for under generally accepted accounting principles applicable to instruments of that type that do not contain embedded derivatives. Upon separation from the host contract, the embedded derivative may be designated as a hedging instrument, if desired, provided it meets the hedge accounting criteria. http://www.fasb.org/derivatives/issueb6.shtml

142.    On December 1, 2006, Morgan Stanley adopted the provisions of "The Fair Value Option for Financial Assets and Financial Liabilities" ("FAS 159"). FAS 159 provides entities

the option to measure certain financial assets and financial liabilities at fair value with changes in fair value recognized in earnings each period. FAS 159 permits the fair value option election on an instrument-by-instrument basis at initial recognition of an asset or liability or upon an event that gives rise to a new basis of accounting for that instrument. The Company applies the fair value option for certain eligible instruments, including certain loans and loan commitments, certain equity method investments, certain structured notes, certain certificates of deposits and other secured financings. See Morgan Stanley 11/30/2007 Form 10-K for Fiscal Year ended Nov. 30, 2007 ("MS 2007 Form 10-K") at 109-110.

143.    On December 1, 2006, the Company also adopted the provisions of "Fair Value Measurements" ("FAS 157"), which provides that  fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (i.e., the "exit price") in an orderly transaction between market participants at the measurement date.  MS 2007 Form 10-K at 110.

144.    FAS 157, requires, inter alia, that "[v]aluation techniques that are appropriate in the circumstances and for which sufficient data are available shall be used to measure fair value." SFAS 157, ¶19.

145.    As discussed herein, despite adopting these FAS provisions, Morgan Stanley did not have adequate internal controls to properly adhere to the FAS requirements.

**The LEAD Group**

146.    Morgan Stanley's Legal Entity and Accounting Disclosure Group (the "LEAD Group") is operated as part of Morgan Stanley's Finance Division.  The LEAD Group consists of two groups, the Fixed Income Division ("FID") and the Equity Division.  The LEAD Group is essentially responsible for Morgan Stanley's 10-K production as well as FAS reporting, both of which require adequate internal controls as information that is reported to the SEC and the public must be accurate.

41

147.    The LEAD Group is also responsible for obtaining data from various trading and operational platforms and transforming that data into digestible material for balance sheet personnel as well as the profit and loss ("P&L") teams, which report directly to Morgan Stanley's senior management.  In addition, the LEAD Group is in part responsible for accounting for senior, mezzanine and equity tranches of Fixed Income Securities.

148.    Morgan Stanley has a separate LEAD Group for its New York desk and its London desk.  Belraj Mann ("Mann") was the Vice President of the Equity Group in New York and reported to Bridget Carey ("Carey"), Executive Director of the Financial Controls Group.  Carey reported to Mark Cagna ("Cagna"), a managing director for Morgan Stanley's Finance Division, who in turn reported directly to Morgan Stanley's former CFO, David Sidwell ("Sidwell").

149.    In 2006, at Morgan Stanley's direction, external consultant PriceWaterhouseCoopers ("PWC") reviewed the practices of the LEAD Group and prepared a report, suggesting a massive overhaul of the LEAD Group.  This report , which was provided to Morgan Stanley, was part of an ongoing review conducted by PWC for the purpose of addressing the data integrity issues as well as violations of the Sarbanes-Oxley Act, such as the Company's practice of using Microsoft Excel spreadsheets instead of more sophisticated accounting databases, caused by insufficient information technology ("IT") controls.  Upon information and belief, little if any action was taken in response to any of the recommendations made by PWC, and the LEAD Group continued  its wrongful practices throughout the Class Period, as discussed below.

150.    The LEAD Group and the technology available to it were riddled with flaws known to management that ultimately made Morgan Stanley's agenda of being number one on

Wall Street an impossibility. Defendants knew or should have known that throughout the Class Period, the Company's newly developed risk appetite under defendant Mack exceeded the Company's ability to manage risk, thereby putting the Company's overall financial health at risk and rendering Company Stock an imprudent investment for the Plans.

**The Early Days of Mack's Risk Strategy**

151.    On December 19, 2006, Morgan Stanley reported record income from continuing operations for the fourth quarter and full year 2006, reporting a 51% increase in net income from the previous year and net revenues for the fourth quarter of $8.6 billion, 24% above the previous year's fourth quarter.

152.    Commenting on Morgan Stanley's successful quarter and 2006 fiscal year defendant Mack touted these results stating:

> 2006 was a year of outstanding performance and progress for Morgan Stanley. Capitalizing on a strong market environment, the people of Morgan Stanley achieved record fourth quarter results and the best full-year revenues and earnings in the Firm's history. In our securities business, we delivered powerful performance across our Institutional Securities franchise and made significant strides in our Asset Management and Global Wealth Management businesses.

153.    However, as Morgan Stanley successfully headed into the new fiscal year, signs of the subprime mortgage crisis were emerging:

- On January 30, 2007, J.P. Morgan's CEO, speaking at a Citigroup annual financial services conference, stated that "defaults are rising at J.P. Morgan 'a little bit,'" adding, "'home equity is subject to deterioration' from a recession, but that the bank is well positioned to sustain a downturn in the economy. The bank has largely exited the subprime lending area." (MarketWatch, January 30, 2007 Article, "Dimon sees a sign of recession.")

- Bloomberg reported that the subprime market was facing record levels of collapse. For example:

  (1)     Defaults on mortgages to people with poor credit histories or large debt burdens rose in November above their worst levels during the last recession six years ago, according to Friedman Billings Ramsey Group Inc.

  (2)     The percentage of subprime mortgages packaged into bonds and delinquent by 90 days or more, in foreclosure or already turned into seized properties climbed to 10.09 percent from 9.08 percent in October, analysts led by Michael D. Youngblood at the Arlington, Virginia-based firm said in a report today. The default rate fell to 5.37 percent in May 2005 from 10.05 percent in November 2001, when economic growth resumed.

  (3)     Defaults on subprime loans have surged as rates on ones made in 2002, 2003 and 2004 adjust higher as their fixed-rate periods end following an increase in short-term interest rates from the lowest in 45 years. Subprime mortgages made in 2005 and 2006 are suffering from slumping home prices and looser lending standards.

  (4)     "These borrowers are very leveraged and have little skin in the game" because they took out loans with small, or no, down payments and many of them haven't seen their properties appreciate, Debashish Chatterjee, an analyst at Moody's Investors Service in New York, said in an interview Jan. 26.

- On February 7, 2007, the Senate Banking Committee held the first hearing of the 110th Congress addressing legislative solutions to predatory lending in the subprime sector.

- On February 9, 2007, "The Financial Express" online reported that HSBC Holdings Plc's Chief Executive Officer will change lending policies after the bank's losses from bad home loans in the US increased, stating "I am responding, and more action will be taken . . . [t]his is a problem, we have

taken the severity on board." HSBC was forced to set aside nearly $2 billion of its funds for 2006 due to souring subprime-mortgage loans.

- On March 2, 2007, the Federal Reserve announced draft regulations to tighten lending standards and Fremont General not only stopped making subprime loans, but also put its subprime business up for sale.

- On March 8, 2007, New Century Financial, the second largest subprime lender in 2006, stopped making loans.

154. On March 21, 2007, Morgan Stanley announced its results for the first quarter 2007, reporting net revenues up 29% from the first quarter of the previous year and a record net income of $2.672 billion, and increase of 70% from the first quarter of the previous year

155. Regarding Morgan Stanley's robust first quarter results, Defendant Mack stated that the Company's success was "in large part the result of *effective, disciplined risk-taking* by our team in Institutional Securities, which helped deliver record results across our sales and trading businesses." (emphasis added)

156. After the announcement of its first quarter results on March 21, 2007, Morgan Stanley held a conference call to discuss the Company's performance. Sidwell represented Morgan Stanley on the call. Sidwell emphasized that Morgan Stanley's success was in large part due to the Company's favorable positioning in the subprime mortgage market and assured that subprime mortgage delinquencies had no affect on Morgan Stanley.

157. Brad Hintz, an analyst for Sanford C. Bernstein & Co., commented on Morgan Stanley's first quarter results saying that, just as defendant Mack had hoped, "[Defendant Neal] Shear does seem to be turning Morgan Stanley into a Goldman Sachs on the trading side."

Bloomberg.com., *"Mack's Morgan Stanley, With Record Profit, Still Chases Goldman,"* March 22, 2007.

158.    In April 2007, Mack explained Morgan Stanley's exceptional revenues were "in large part due to [defendant Cruz] and the institutional securities-group, which manage a tremendous amount of risk in a smart and disciplined way." New York Magazine, *"Only Men Survive,"* May 5, 2008.

159.    Despite Morgan Stanley's continued success for two consecutive quarters, additional information regarding the subprime credit crisis continued to emerge:

- On April 2, 2007 New Century Financial filed for bankruptcy.

- Freddie Mac announced plans to refinance up to $20 billion of loans held by subprime borrowers who would be unable to afford their adjustable-rate mortgages at the reset rate.

- On April 24, 2007, the National Association of Realtors announced that sales of existing homes fell 8.4% in March from February, the sharpest month-to-month drop in 18 years.

- One month later, the National Association of Realtors reported that sales of existing homes fell by 2.6 percent in April to a seasonally adjusted annual rate of 5.99 million units, the slowest sales pace since June 2003.  The number of unsold homes left on the market reached a record total of 4.2 million.

160.    On May 1, 2007, Morgan Stanley issued a press release announcing the planned retirement of Sidwell as Chief Financial Officer.  Morgan Stanley announced that Thomas Colm Kelleher ("Kelleher") would succeed Sidwell as CFO upon Sidwell's retirement.

161.    It was also near this time that defendant Cruz first became concerned about the Company's involvement with complex trading of mortgage-backed securities.  In response to warnings from a real estate veteran, she began "personally extracting the company from several billion dollars in other mortgage investments, as well as telling clients that they should head for the exits."  New York Magazine, *Only Men Survive*," May 5, 2008.  Upon information and belief, defendant Cruz did not undertake her fiduciary obligations to inform the Plans' participants of her concerns regarding the mortgage-backed securities market or discuss her concerns with co-fiduciaries, but only notified the Company's major clients.

162.    Meanwhile, other players in the subprime market continued to feel the effects of and were forced to react to its deterioration.

- On June 12, 2007, RealtyTrac announced U.S. foreclosure filings surged 90% in May from May 2006. Foreclosure filings were up 19% from April. There were 176,137 notices of default, scheduled auctions and bank repossessions in May.

- Goldman Sachs, the securities firm which defendant Mack was trying to emulate reported flat profits from the prior year due to mortgage market problems.

- Similarly, Bear Stearns had to pledge up to $3.2 billion to bail out one of its hedge funds because of bad bets on the subprime credit market.

163.    Morgan Stanley, however, continued to support its complex trading desk and failed to inform the Plans' participants of the true extent of the Company's risk exposure.

164.    On June 15, 2007, Morgan Stanley Stock hit a 52-week high of $90.95.

165.    On June 20, 2007, Morgan Stanley issued a press release announcing its  results for the second quarter which ended May 31, 2007,  reporting record income from continuing

operations of $2.582 billion, an increase of 41% from the second quarter of 2006, and net revenues of a record $11.5 billion, 32% above the second quarter from the previous year.

166.    Commenting on Morgan Stanley's successful second quarter, in the June 20, 2007 press release Defendant Mack touted these earnings and painted a rosy picture of the Company's future, stating, "[t]hanks to the commitment and focus of our people, we've now achieved seven straight quarters with ROE above 20 percent, and we're well on our way to reaching our goal of doubling 2005 earnings over five years."

167.    Following the announcement of Morgan Stanley's second quarter results, in a conference call held June 20, 2007, Sidwell reassured the public regarding the threat of the subprime market, stating , "[c]oncerns early in the quarter about whether issues in the subprime market were going to spread dissipated . . ."

**Too Much Risk, Not Enough Risk Management**

168.    In early July 2007, defendant Cruz told defendant Shear and risk manager Tom Daula to cut Morgan Stanley's trading position in the mortgage market because she believed that risk would be too great.  While Shear and Daula cut back, they did not extract Morgan Stanley from the over $1 billion that it had invested in complex mortgage-backed securities trading. New York Magazine, *Only Men Survive*," May 5, 2008.

169.    On July 10, 2007, Morgan Stanley filed its SEC Form 10-Q for the second quarter of 2007 ended May 31, 2007 ("MS 2Q2007 10-Q").

170.    In the MS 2Q2007 10-Q, Morgan Stanley provided the following statement concerning the capability of its internal controls as it had at the end of the first quarter:

> Under the supervision and with the participation of the Company's management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as

48

amended (the "Exchange Act")). Based on this evaluation, our
Chief Executive Officer and Chief Financial Officer concluded that
*our disclosure controls and procedures were effective as of the
end of the period covered by this report.*

MS 2Q2007 10-Q at 103 (emphasis added).

171.    Despite this public reassurance, Defendants knew or should have known that

Morgan Stanley was experiencing a multitude of problems, including problems within its LEAD

Group, which was responsible for the Company's financial reporting.  For example, during the

Class Period, Morgan Stanley staffed the LEAD Group with employees unqualified to conduct

accounting work relating to equity linked notes, credit default swaps, and CDOs.  Although

many of these employees had no familiarity or experience with credit default swaps or CDOs,

they were responsible for the complex accounting relating to these sophisticated financial

products.  As discussed herein, Morgan Stanley was also experiencing problems with its IT

systems, risk management and internal controls.

172.    Yet, through the incorporation by reference of the Company's SEC filings in the

Plan documents and through the subsequent dissemination of those documents, Defendants

reassured the Plans' participants that the Company was well-equipped to oversee its control

processes, despite having employees who were unqualified to manage the risk involved in

Morgan Stanley's derivative products and accurately report it to the public:

> The Company employs control processes to validate the fair value
> of its financial instruments, including those derived from pricing
> models. These control processes are designed to assure that the
> values used for financial reporting are based on observable market
> prices or market-based parameters wherever possible. In the event
> that market prices or parameters are not available, the control
> processes are designed to assure that the valuation approach
> utilized is appropriate and consistently applied and that the
> assumptions are reasonable. These control processes include
> reviews of the pricing model's theoretical soundness and
> appropriateness *by Company personnel with relevant expertise*
> who are independent from the trading desks. Additionally, groups

independent from the trading divisions within the Financial
Control and Market Risk Departments participate in the review and
validation of the fair values generated from pricing models, as
appropriate.

MS 2Q2007 Form 10-Q at 84 (emphasis added).

173.    Nevertheless, in stark contrast to the foregoing statement, the Company was

experiencing extensive problems with its IT that prevented the Company from conducting proper

risk management.

174.    Creating further challenges, Morgan Stanley did not make necessary investments

to upgrade the Company's IT, which is critical to properly account for its complex financial

products and properly manage the risk associated with those products.  During  the Class Period,

Morgan Stanley had an opportunity to upgrade its IT by investing in a modern system called

"Eagle Pace" that was designed to handle complex financial products.  However, Morgan

Stanley declined to implement Eagle Pace because of the expense involved.

175.    Instead, throughout the Class Period and continuing to the present, Morgan

Stanley utilized its archaic Trade Analytic Processing System ("TAPS") database that processed

all trades within the Company.  TAPS was created in the 1980's and was ill-equipped to deal

with sophisticated financial products, such as credit default swaps and CDOs, which were

invented by banks in the mid-1990's, long after the development of TAPS.  As a result, this

database was ineffective and ill-equipped to handle modern investment securities and to

accurately assess Morgan Stanley's risk exposure to those securities.

176.    During the Class Period, Defendants knew or should have known that TAPS

could not handle the functionality of the trading desk because the system's inability to make

calculations necessary to value Morgan Stanley securities was openly discussed among the

LEAD Group members, including its Vice President who reported to senior management.

177.    One of the biggest problems with TAPS was that it could not keep track of which sale went with which hedge. This had a major negative impact on Morgan Stanley's netting and reconciliation process. On one occasion during the Class Period, reports were sent by LEAD Group members to the CFO group, including former CFO David Sidwell, showing that the Company had experienced a "break," or anomaly in reporting, of $47 million and TAPS was unable to reconcile this discrepancy. Over the course of a year, Morgan Stanley experienced breaks totaling in the hundreds of millions of dollars, which had a material effect on the Company's P&L reporting. Upon information and belief, the CFO group failed to properly respond to this or any other memos and reports regarding such breaks.

178.    In addition to the IT difficulties, Morgan Stanley knew or should have known that it was losing track of dollars, critical to its overall accounting.

179.    In addition to being responsible for financial accounting, the LEAD Group also generated an internal report known as "MSR" on a weekly, monthly, quarterly and annual basis. The MSR functioned as the Company's informal 10-K, or snapshot of the Company, which was in essence, an internal and abbreviated version of public filings, listing gains and losses the Company had incurred for a specific period. Throughout the Class Period, the MSR presented consistent losses that, although known, were not reported by the Company.

180.    The LEAD Group also generated a daily credit valuation adjustment ("CVA Daily") report, which was then sent to the CFO Group. The CVA Daily report relates to writedowns and addresses liabilities relating to counterparty exposure in the credit default swap market. In essence, a CVA Daily report is supposed to (1) indicate the value of assets and liabilities with respect to a company's participation in credit default swaps and (2) provide a daily measure of the probability of default. The CVA is equivalent to the credit spread or risk of

default. This number must be calculated by using a formula that relies on several types of input data provided by an outside vendor called Markit. Morgan Stanley should have used this credit default information to compute the value of the CVA. Instead, the LEAD Group would often simply announce the value of the CVA, without providing proper support for its calculations. This practice ultimately affected Morgan Stanley's financial reporting because the CVA is used to calculate fair value in accordance with FASB rules.

181.    Morgan Stanley also misused certain information that it obtained from Bloomberg, its external vendor for its information on interest rates, the LIBOR (London Interbank Offered Rate) and the interest rate bond swap participation. On many occasions during the Class Period, Morgan Stanley ignored Bloomberg data with respect to the substance of Morgan Stanley's portfolios. For example, Morgan Stanley would have a portfolio of mortgage-backed securities or equity-lined notes with an average maturity date of four years. Morgan Stanley would then swap those positions out. In documenting the swap, a benchmark is used to ascertain what the swap rate will be. The swap rate is based on the average duration of the portfolio. If the average duration of the portfolio is four years, Bloomberg would provide the U.S. dollar swap rate for four years and Morgan Stanley would record that figure on a weekly basis in order to keep track of the cash flows. At times, this was not properly done. Instead, these figures were often ignored, creating a material impact on the Company's P&L.

182.    During the Class Period, the LEAD Group would also have to account for notes using their notional value, the face value of a leveraged position's assets. However, Morgan Stanley did not have the technical capabilities to verify notional values. When Morgan Stanley sold a note, that note has a derivative product and a debt product. FAS 133 dictates that the accounting for each product must be bifurcated. The accounting for the debt component of a

traditional amortization schedule is based on the notional value. When the notional value is wrong then the corresponding FAS 133 accounting will necessarily be inaccurate. On one occasion, Executive Director Carey was advised that for a particular note, one Company database showed the note to be valued at $1 billion while another database valued it at $980 million. Rather than address the Company's accounting flaw, Carey ignored the discrepancy and encouraged the LEAD Group to do the same.

183.    This gross mismanagement had a substantial impact on the Company because it affected the accounting for all the products in Morgan Stanley's FAS 133 and FAS 159 portfolios. During the Class Period, Morgan Stanley's Fixed Income Division portfolio ("FID") for FAS 159 was valued at over $1 trillion in notional value. The FID portfolio was made up of mortgages, bonds and currencies. Instead of using a comprehensive system that could handle the enormous task of accounting for the FID portfolio, Morgan Stanley attempted to use desk top computers and Microsoft Excel to process this data. This was impossible because of the sheer volume of the data. Often, the MS Excel spreadsheets could not update with accurate data and the process would break down. Calculations were necessary on a daily basis for the purpose of P&L reporting. In addition, the LEAD Group should have had the source documentation for the trades it was booking. This would have allowed for prior verification of information in the spreadsheets and supplementation of the missing data. However, on information and belief, the LEAD Group was not provided access to this critical information. As such, Morgan Stanley would allow thousands of trades to be unaccounted for on a regular basis. Accordingly, inaccurate P&L data would be reported to the CFO Group. Consequently, and despite knowledge of the reporting problems, the CFO Group would use the inaccurate P&L data in the SEC filings that was disseminated to the public and the Plans participants.

184.    Morgan Stanley continued to assure the market and the Plans' Participants of the value of Company Stock and of the fact that the Company would remain unscathed by the subprime credit crisis, despite the Plans' heavy investment in Company Stock.

185.    Meanwhile, the subprime crisis continued to snowball.  For example:

- Bear Stearns announced that its two hedge funds that invested heavily in the subprime market were essentially worthless, having lost over 90% of their value, equal to over $1.4 billion.

- The Commerce Department announced housing starts were down 19.4% over the previous 12 months.  It also announced is a 7.5% plunge in permits to build new homes, the largest monthly decline since January 1995. Permits were 25.2% below their level a year ago, reflecting continued pessimism among builders over the near-term outlook for new homebuilding.

- On August 1, 2007, the two hedge funds managed by Bear Stearns that invested heavily in subprime mortgages declared bankruptcy.  Investors in the funds filed suit against Bear Stearns, alleging that the investment bank misled them about the extent of the funds' exposure.

- On August 9, 2007, American International Group, one of the biggest U.S. mortgage lenders, warned that mortgage defaults were spreading beyond the subprime sector with delinquencies becoming more common among borrowers in the category just above subprime.

- On August 16, 2007, Countrywide Financial, the nation's largest mortgage lender, drew down $11.5 billion from its credit lines.

- RealtyTrac Inc. announced foreclosures were up 93% in July 2007 from July 2006. The national foreclosure rate in July was one filing for every 693 households. There were 179,599 filings reported last month, up from 92,845 a year earlier.

186.    By August of 2007, it was also very clear within Morgan Stanley that it was going to be taking a multi-billion dollar writedown as a result of its derivative exposures. It was rumored within Morgan Stanley that the writedowns were estimated to be as high as $11 billion. While it was clear that Morgan Stanley was in dire financial trouble, Morgan Stanley had no way to accurately value or calculate that loss because of its inadequate internal controls.

187.    In August 2007, MSR reports were showing consistent losses as Morgan Stanley's risk appetite was overtaken by its inability to manage the risk of the Company's involvement in complex financial markets.

188.    During the first week in August 2007, defendant Shear, who served not only as the head of the FID, but also as a fiduciary of the 401(k) Plan, requested that his team provide a summary of the risk involved with the Company's FAS 133 portfolio. The LEAD Group provided defendant Shear with the resulting calculations showing that the FAS 133 portfolio would continue to have far-reaching risk exposure in the future. The information contained in this report could have provided the public a better picture of Morgan Stanley's actual risk potential. However, defendant Shear, as a fiduciary of the Plans, failed to properly inform the Plans' participants of Morgan Stanley's true risk exposure.

189.    Meanwhile, the subprime mortgage lending crisis continued to intensify:

- On September 6, 2007, the Mortgage Bankers Association released a quarterly report showing that the delinquency rate (the number of people behind in their

payments but have not yet entered the foreclosure process) for mortgage loans on one-to-four-unit residential properties was 5.12% of all loans outstanding in the second quarter of 2007, up 28 basis points from the first quarter of 2007, and up 73 basis points from the previous year. The delinquency rate for subprime loans was up from 13.77% in the first quarter to 14.82% in the second quarter. The delinquency rate for prime loans rose from 2.58% to 2.73%. Compared to this time last year, the seriously delinquent rate was 23 basis points higher for prime loans and 304 basis points higher for subprime loans.

- On September 14, 2007, Merrill Lynch & Co., the biggest underwriter of CDOs, signaled that the subprime mortgage crisis would negatively impact its third-quarter earnings. It reported that it made "fair value adjustments" for potential losses to date on unspecified holdings and financing commitments. Three days later, Merrill Lynch's $1.3 billion bet on subprime lending took a turn for the worse when it confirmed job cuts at its First Franklin Financial Corp. subprime lending unit. Moreover, reports filed with U.S. banking regulators showed that Merrill Lynch Bank & Trust Co., where a lot of the First Franklin franchise was housed, lost $111 million through the first half of 2007.

- Impac Mortgage Holdings Inc. said it would quit most lending activities, while Accredited Home Lenders Holding Co. posted a major quarterly loss and said its survival remained doubtful.

190.    On September 19, 2007, Morgan Stanley issued a press release announcing its results for the third quarter ended August 31, 2007, reporting a 7% decrease in income from the third quarter of the previous year.

191.    Commenting on Morgan Stanley's third quarter results, in the September 19, 2007 press release, defendant Mack first admitted that Morgan Stanley was being affected by the "turbulent market," despite having such an awareness as early as August 2007.

192.    In a conference call on September 19, 2007, following the announcement of the Morgan Stanley's third quarter results, Mr. Sidwell also had to acknowledge the affect that the subprime market had been having on the Company, stating that "markdowns to our loans and commitments led to losses of approximately $940 million reported in our other sales and trading net revenues."

193.    Morgan Stanley was also suffering under the weight of massive credit deterioration, necessitating enormous write-downs of its CDOs as its Level III assets continued to balloon as a result of re-classification.  Morgan Stanley reports different levels of assets in its SEC Form 10-Ks.  Level I assets are the most illiquid assets, such as a stock.  The market for Level II assets is much smaller, but there may be formulas available to do the valuations of that asset.  Level III assets are holdings that are so illiquid, or trade so infrequently, that they lack a reliable price, so their valuations are based on management's best guess.  Level III assets have no market.  In August 2007 and again in November 2007, Morgan Stanley  undertook a major reclassification of debts from Level II to Level III because it had no way to determine the value of those debts.

194.    Regarding Morgan Stanley's Level III assets, during the September 19, 2007 conference call Mr. Sidwell commented, in relevant part, as follows "[w]hile we are still working on the third quarter disclosures, we anticipate that the total of Level 3 asset positions will increase to approximately 8% of total assets when we file our Q."

195.    During the same conference call, Mr. Sidwell also described the Level III assets as corporate and other debt including, "closed leveraged acquisition finance loans, commercial and residential whole loans to be securitized, commercial whole loans for private placements, and mortgage-backed residuals. Corporate and other debt in the liability category includes the marking to market of our pipeline of leveraged loan commitments."

196.    During the Class Period, Morgan Stanley leveraged its super senior tranche transactions in order to achieve more money on the cash invested. In essence, in a leveraged transaction, the notional, or face value, of the tranche will appear greater than the cash value of the investment made. For example, if a $100 investment is made and then leveraged 10 times into a super senior tranche, the notional value of that tranche will be $1000. Accordingly, if the CDO declines by 10 percent, instead of losing $10, the loss would be equal to $100, or the entire amount of the initial cash investment.

197.    During its third quarter, Morgan Stanley took approximately $1.2 billion in write-downs related to leveraged loans, but had yet to take any subprime mortgage-related write-downs. Most of the other investment banks had already taken billions of dollars in write-downs related to the weakening market. Citigroup Inc., for example, which took more than $6 billion in write-downs in the third quarter, announced its plan to take an additional $8 billion to $11 billion in the fourth quarter. Morgan Stanley's silence regarding its subprime exposure led the market to speculate that Morgan Stanley had gone relatively unscathed in the subprime mortgage mess.

198.    On September 20, 2007, following the report of the disappointing third quarter results, Morgan Stanley stock traded as low as $63.36, nearly $27 lower than just one quarter earlier.

199.    Meanwhile, the subprime market continued to deteriorate. For example:

- On September 21, 2007, HSBC Holdings announced its plans to close its U.S. subprime unit, Decision One Mortgage, and record an impairment charge of about $880 million. HSBC states that it no longer believes the mortgage business is sustainable.  Approximately 750 U.S. employees are expected to be affected by the decision.

- On September 27, 2007, Luminent Mortgage Capital, a home-loan investment company, downgraded its second-quarter profit as the company struggled to gain access to credit and bankers seize assets.

- UBS then reported its first quarterly loss in nine years. The largest wealth manager in the world planned to write down $3.4 billion in its fixed-income portfolio and other departments and to cut 1,500 jobs in its investment bank. The loss is attributed to the spreading credit crisis stemming from the emerging housing depression.

- The credit ratings agency, Moody's Investors Service, then reported that subprime mortgage bonds originated in the first half of 2007 included loans going delinquent at the fastest recorded rate. The Moody's report predicted that accelerating delinquencies from 2007 bonds are likely to surpass the number of delinquencies in 2006, which hit a peak not seen since 2000.

200.    On October 10, 2007, Morgan Stanley issued its SEC Form 10-Q for the fiscal third quarter ended August 31, 2007 ("MS 3Q2007 Form 10-Q").  Morgan Stanley reported identical information regarding the adequacy of its internal controls as it had in the previous quarters. MS 3Q2007 Form 10-Q at 93.

201.    The information disclosed in the press releases, conference calls and MS 3Q2007 10-Q were materially incomplete, false and misleading. Morgan Stanley failed to properly disclose the problems with its subprime loan portfolio or its CDO hedging strategy. In reality, however, Morgan Stanley faced tremendous exposure to the subprime mortgage market. Moreover, Morgan Stanley lacked adequate internal controls to address the burgeoning credit and liquidity crisis and to hedge the risks associated with its CDO exposure, in spite of its repeated public announcements to the contrary.

202.    On October 11, 2007, Countrywide Financial Corp. reported that September mortgage lending was down 44.3% from a year earlier. Funding for adjustable-rate mortgages fell 76%, which was still lower than the 92% decline in nonprime loan funding. Delinquencies as a percentage of unpaid principal balances rose 1.81% to 5.85% from a year earlier.

203.    That same day, Morgan Stanley announced that Mr. Kelleher would officially take over for Sidwell as the Executive Vice President and Chief Financial Officer of Morgan Stanley. *See* Form 8-K, October 2007, at 2.

204.    One week later, Standard & Poor's ("S&P") cut the credit ratings on $23.35 billion of securities backed by pools of home loans offered to borrowers during the first half of the year. The downgrades even hit securities rated AAA, which is the highest of the 10 investment-grade ratings and the rating of government debt.

**The Mess Continues**

205.    A meeting of the LEAD Group was held in November 2007. At the meeting, Carey advised the LEAD Group to be "tight-lipped" regarding the losses Morgan Stanley would be taking. Carey further cautioned that they didn't need to scare people, since a lot of people were throwing numbers around.

206.    The *Wall Street Journal* published an article on November 7, 2007, revealing that two analysts - David Trone of Fox-Pitt, Kelton and Mike Mayo of Deutsche Bank AG - projected a range of $3 billion to $6 billion on a possible Morgan Stanley writedown. Mr. Trone characterized the basis for his Morgan Stanley estimate as an "educated guesses" tied to the firm's disclosed levels of credit and real-estate exposure. He estimated the firm's exposure to CDOs to be about $16 billion and that the write-downs were likely to total 25% of its CDO exposures, or $4 billion. He also said the firm could take an additional $2 billion hit on straight mortgages and other risks such as exposure to SIVs.

207.    On the same day, Morgan Stanley issued a press release announcing that it would write-down the value of its subprime mortgage-related exposure by $3.7 billion, due to the "continued market deterioration" since August. Morgan Stanley attributed the loss to deterioration in capital markets, triggered in large part by the struggles of thousands of homeowners to keep up with mortgage payments. Morgan Stanley further explained that the actual hit to its fourth-quarter results would depend on future market developments and could differ from the amount noted. "It is expected that market conditions will continue to evolve, and that the fair value of these exposures will frequently change and could further deteriorate."

208.    According to an article published by the *Wall Street Journal* on November 12, 2007, the biggest piece of the $3.7 billion in pretax paper losses, Morgan Stanley's data indicated, came from a write-down of the CDO position from $11.4 billion on August 28 to $8.3 billion on October 31. Such securities fell as much as 4.4% in August and 4.5% in September, but tumbled as much as 27% in October. Mr. Kelleher further noted that the mortgage-related bets "did not come out of our client-facing activities" such as underwriting; rather, Morgan Stanley "began with a short position in the subprime asset class, which went right through to the

first quarter." As the downturn spread to the senior CDO holdings that were meant to hedge the subprime bet, Morgan Stanley's exposure changed "from short to flat to long." In a related *Wall Street Journal* article published on November 10, 2007, according to Mr. Kelleher, "[y]ou go short, expecting a certain predefined range of losses . . . that range of losses was burnt through by the excessive market action. And then you ended up effectively going long." One of Morgan Stanley's problems with its residential exposure in recent months was the weakening of its hedging positions as the market plunged far deeper than risk-management models had predicted, explained Mr. Kelleher.

209.    Through the first nine months of the fiscal year that ended in August, Morgan Stanley continued its bearish hedge. The Company's disclosure of the paper losses and its remaining positions in early November, however, prompted two ratings firms to issue negative outlooks for Morgan Stanley's credit.

210.    Speculation by investors that Morgan Stanley had gone relatively unscathed in the subprime mortgage mess was immediately dashed and the gravity of the situation weighed on the stock, contributing to the eventual broad sell-off in the market.

211.    S&P changed its outlook on Morgan Stanley to negative from stable after the bank said it would write down $3.7 billion in securities backed by residential mortgages. A negative outlook indicates that a ratings cut is likely over the next two years. S&P rated Morgan Stanley's senior unsecured debt "AA-minus," the fourth-highest investment grade. Fitch Ratings also affirmed its ratings of "AA-minus" on the bank, saying the loss was manageable. Fitch placed a negative outlook on Morgan Stanley. Home Equity Wire, "*MS Hit on Subprime Exposure*," November 15, 2007.

212.    The loss was a result of increased risk-taking in proprietary trading at the bank,

S&P said in a statement. "This misstep points to the increased risk Morgan Stanley bears owing

to management's growth strategy and, more broadly, increased trading risks for all the broker-

dealers in the current environment." Home Equity Wire, "*MS Hit on Subprime Exposure*,"

November 15, 2007.

213.    Moody's Investors Service also cut the ratings on 86 classes of Morgan Stanley

mortgage securities while placing another 37 tranches under review on November 9, 2007. "The

ratings were downgraded and placed under review for downgrade based on higher than

anticipated rates of delinquency, foreclosure, and ROE in the underlying collateral relative to

credit enhancement levels," Moody's reported. See Reuters Limited, "*Moody's Cuts Morgan

Stanley Alt-A Mortgage Securities*," November 9, 2007.   The article further noted that the

collateral backing of the the deals consists of first lien fixed and adjustable-rate, Alt-A mortgage

loans which were originated in late 2005 through 2006. *Id.*

214.    On November 13, 2007, Morgan Stanley participated in a Merrill Lynch Banking

and Finacial Services Investor Conference Call in which it noted that it expected revenue and

common equity growth to decline in 2008 amid a more challenging environment. "While we

expect 2008 to be another growth year, we do not expect the current growth trajectory in revenue

and average common equity to continue," Mr. Kelleher said during the call.   "We plan to be

more judicious in how we allocate capital, to ensure the highest risk-return in this environment,"

he said. According to Mr. Kelleher, Morgan Stanley intends to "bring down" its balance sheet to

keep leverage levels on par with previous quarter.  Mr. Kelleher also said that Morgan Stanley

expects "the market to take longer, several quarters, to return to more normal operating levels."

Demand for CDOs will remain muted, hobbling the structured finance business "for an extended period."

215.    In November of 2007, the Company's Balance Substantiation Team, responsible for substantiating what is on Morgan Stanley's balance sheet per its form 10-K, commenced a clean-up project because Morgan Stanley was missing $637 million in receivables on its derivative contracts. In addition, Morgan Stanley was missing $400 million on payables, or money that Morgan Stanley owed to investment banks and hedge funds. The project concluded in December 2007. By January 2008, Morgan Stanley was aware of billions of dollars in breaks.

216.    On November 21, 2007, Morgan Stanley stock traded as low as $47.56 per share.

217.    On November 29, 2007,  defendant Cruz was terminated: "Morgan Stanley, its reputation battered over a recent $3.7 billion loss linked to subprime mortgages, has become the latest Wall Street firm to force the retirement of a senior banking executive . . . . The move represents a sharp reversal for John Mack, the chief executive, who had supported and cultivated the career of Cruz. . . ." *Subprime woes claim Morgan Stanley career*, International Herald Tribune, Dec. 1, 2007.

218.    On December 19, 2007, Morgan Stanley issued a press release reporting its results for the fourth quarter of 2007 and for its fiscal year ended Nov. 30, 2007. Most significantly, Morgan Stanley announced that it was taking *an additional $5.7 billion mortgage-related write-down*, resulting in *a total write down related to mortgages of $9.4 billion*. One analyst called this news "a 'complete breakdown' in the company's risk-management." David Ellis, *More Woes for Morgan Stanley*, CNNMoney.com, Dec. 20, 2007. In addition, it reported record decreased income of $2.5 billion down from $6.3 billion from the previous year. Similarly, net revenues were down 6% from the previous year. In addition, Morgan Stanley recognized losses

of $129 million related to SIVs. In the December 19, 2007 press release, commenting on

Morgan Stanley's fourth quarter and 2007 fiscal year, defendant Mack not only admitted that the

Company has a disappointing quarter but also accepted accountability for the unsatisfactory

results.

219.    After the announcement of its fourth quarter results on December 19, 2007,

Morgan Stanley held a conference call to discuss Morgan Stanley's performance. Mr. Kelleher

and Chairman and defendant Mack represented Morgan Stanley on the call. Mr. Mack reported

the following regarding Morgan Stanley's additional write-downs:

> So let's start with the mortgage business. Let me give you a quick
> recap of what led to this write-down on our subprime trading
> position. We had a large and liquid trade on our book in the
> deteriorating credit market. ***An early view was to hold the position
> rather than incur the cost of the unwind, as it was believed we
> had adequate hedges in place.*** However, the hedges did not
> perform adequately in extraordinary market conditions of late
> October and November; subsequently, given the liquidity of
> positions, we are now writing it down to these levels.
>
> We have moved aggressively to address these issues. ***We've been
> as transparent as possible about our exposure.*** Indeed back in
> early November, we provided you details on the net exposure of
> the subprime trading position in our mortgage business. We did
> tell you that as of October 31, we expected to take a 3.7 billion
> write-down of this subprime position. We also made clear that our
> year-end marks were dependent on market conditions.
>
> During the month of November, the value of that position
> continued to deteriorate. It led us to write down another 4.1 billion
> on the subprime trading position in the fourth quarter. We were
> also taking a write-down of 1.6 billion on other mortgage related
> assets that had suffered deterioration in value as a result of
> dislocations in the mortgage market. And Colm will take you
> through that later on.
>
> Virtually all write-downs this quarter were the result of trading by
> a single desk in our mortgage business. ***But I want to be
> absolutely clear, as a head of this firm, I take responsibility for
> performance.***

220.    However, these public statements, as so many before them, are misleading to the public on several fronts. First, Morgan Stanley was aware that it had weak, if any, capability of hedging against the risk of its new complex transactions. Second, the Company was anything but transparent about its exposure because it knew of this inability as early as August, yet said nothing. Lastly, the write-downs were not solely because of the down-turn in the subprime mortgage market, but because of Morgan Stanley's inability to conduct proper accounting and thereby assess its true risk exposure. Morgan Stanley's failure to own up to these problems continued to harm the Plans and their participants.

221.    Following these dismal results, S&P downgraded Morgan Stanley and placed its rating on Morgan Stanley on "CreditWatch," commenting that "'MS' dismal fourth-quarter results heighten our concern regarding its strategic direction and risk appetite." *S&P: Morgan Stanley 'AA-/A-1+' Ratings Put On CreditWatch*, Market News Publishing, Dec.19, 2007.

222.    On December 22, 2007, The Financial Times reported that Morgan Stanley was reviewing the position of chief risk officer Tom Daula: "A person close to Colm Kelleher, Morgan Stanley's chief financial officer, said the bank was 'evaluating the risk function, including the top of that function' and looking at switching the reporting lines for risk management to Mr. Kelleher. . . . The decision on Mr. Daula's future will shed light on whether the blame for the losses is seen to lie with people monitoring the risk or with more senior executives." Henry Sender, Financial Times, *Morgan Stanley reviews position of risk officer over writedowns*, Dec. 22, 2007, at 15. The article further states that "Mr. Daula's supporters within the bank say his repeated warnings were ignored." *Id.*

223.    On January 29, 2008, Morgan Stanley filed its 2007 Form 10-K for the fiscal year ended Nov. 30, 2007 ("MS 2007 Form 10-K").

224.    In that 10-K filing, the Company failed to adequately disclose, among others, problems with its ineffective valuations systems and falsely attributed its difficulty in valuing certain securities to market volatility, stating:

> The Company recorded $9.4 billion in mortgage-related writedowns in the fourth quarter of fiscal 2007, including $7.8 billion relating to our U.S. subprime trading positions and $1.6 billion relating to other mortgage-related products, such as commercial mortgage-backed securities, ALT-A and other loans, conduit and non-performing loans and European non-conforming loans, and an impairment charge related to mortgage-related securities portfolios in our domestic subsidiary banks. We continue to have exposure to these markets and products and as market conditions continue to evolve the fair value of these mortgage-related instruments could further deteriorate. ***In addition, recent market volatility has made it extremely difficult to value certain of our securities.***

MS 2007 Form 10-K at 14 (emphasis added).

225.    Morgan Stanley's 10-K for 2007 described its Operations and Information Technology departments and systems as follows:

> Morgan Stanley's Operations and Information Technology departments provide the process and technology platform that supports Institutional Securities sales and trading activity, including post-execution trade processing and related internal controls over activity from trade entry through settlement and custody, such as asset servicing. This is done for proprietary and customer transactions in listed and OTC transactions in commodities, equity and fixed income securities, including both primary and secondary trading, as well as listed, OTC and structured derivatives in markets around the world. This activity is undertaken through Morgan Stanley's own facilities, through membership in various clearing and settlement organizations, and through agreements with unaffiliated third parties.

226.    During the Class Period, the Company provided public assurances regarding the adequacy of its Operations and Information Technology and the effectiveness of Morgan Stanley's internal control of its technology platforms.

227.    The MS 2007 Form 10-K contained the following assurance as to the

effectiveness of Morgan Stanley's internal controls in "Item 9A. Controls and Procedures":

> Under the supervision and with the participation of our
> management, including our Chief Executive Officer and our Chief
> Financial Officer, we conducted an evaluation of our disclosure
> controls and procedures, as such term is defined under Exchange
> Act Rule 13a-15(e). Based on this evaluation, our Chief Executive
> Officer and our Chief Financial Officer concluded that our
> disclosure controls and procedures were effective as of the end of
> the period covered by this annual report.
>
> *      *      *
>
> Our internal control over financial reporting includes those policies
> and procedures that:
>
> - Pertain to the maintenance of records that, in reasonable detail,
>   accurately and fairly reflect the transactions and dispositions of
>   the assets of Morgan Stanley;
>
> - Provide reasonable assurance that transactions are recorded as
>   necessary to permit preparation of financial statements in
>   accordance with generally accepted accounting principles, ***and
>   that our receipts and expenditures are being made only in
>   accordance with authorizations of Morgan Stanley's
>   management and directors; and***
>
> - ***Provide reasonable assurance regarding prevention or timely
>   detection of unauthorized acquisition, use or disposition of
>   our assets that could have a material effect on our financial
>   statements.***

MS 2007 Form 10-K at 182 (emphasis added).

228.    Morgan Stanley also failed to properly disclose that much of its financial

valuation personnel was unqualified to manage the valuation of the Company's securities and the

Company's valuation systems and models were not capable of valuing its securities, and instead

provided the following generic and misleading reassurance in its 2007 10-K at 16:

> ***We are subject to operational risk and an operational event could
> adversely affect our businesses.*** Our businesses are highly
> dependent on our ability to process, on a daily basis, a large

number of transactions across numerous and diverse markets in many currencies. In general, the transactions we process are increasingly complex. We perform the functions required to operate our different businesses either by ourselves or through agreements with third parties. *We rely on the ability of our employees, our internal systems and systems at technology centers operated by third parties to process a high volume of transactions.* (Emphasis added)

229.    As discussed above, Morgan Stanley was aware yet failed to properly disclose that its internal controls were incapable of accounting for and managing its hedging activities. Although the Company stated that its "hedging strategies and risk management techniques *may* not be fully effective," Morgan Stanley was aware that TAPS was incapable of matching hedges with corresponding sales. MS 2007 Form 10-K at 20. See also ¶ 149 (referring to PWC report)

230.    Morgan Stanley did not even have a valuation model for FAS 159 valuation. See ¶¶ 255 - 262 ("Summary of GAAP Violations"). Instead, the Company used Microsoft Excel spreadsheets which were incapable of proper valuation pursuant to FAS 159. The spreadsheets were incomplete, inaccurate, and contained errors as egregious as incorrect notional values. Yet, the Company reported:

> Equity sales and trading revenues also benefited from the widening of the Company's credit spreads on financial instruments that are accounted for at fair value, including, but not limited to, those for which the fair value option was elected pursuant to the Statement of Financial Accounting Standards ("SFAS") No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities" ("SFAS No. 159") on December 1, 2006 (see Note 3 to the consolidated financial statements).

MS 2007 Form 10-K at 40.

231.    Morgan Stanley also assured the Plans' participants that, "the Company is committed to employing qualified personnel with appropriate expertise in each of its various administrative and business areas to implement effectively the Company's risk management and

69

monitoring systems and processes." MS 2007 Form 10-K at 84. In reality, however, the majority of the LEADS Group finance staff was inexperienced and not qualified to perform requisite valuation functions, as discussed herein.

232.    Furthermore, Morgan Stanley's Value at Risk ("VAR") calculation was ineffective in that it was not consistent with the risk per the accounting records. The VAR "model" used historical data (around 4 years) as well as current year data. However, with traders marking wrong positions and prevalent inaccurate P&L attribution, the VAR was unreliable. Furthermore the VAR failed to consider the "operational risk" associated with Morgan's increasingly complex trading positions, which Morgan Stanley reported was "an integral part of the Company's culture." MS 2007 Form 10-K at 84-85.

233.    Morgan Stanley did not have a proper fair value model. The Company, however, failed to disclose this deficiency in its SEC filings that were disseminated to the Plans' participants. Morgan Stanley claimed that the "Company's assets and liabilities recorded at fair value have been categorized based upon a fair value hierarchy in accordance with SFAS No. 157." However, upon information and belief, the Company misstated the following financial instruments as a result of its improper fair value model valuations:

| | |
|---|---|
| **Assets:** | |
| Corporate and other debt | $147.7 billion |
| Corporate equities | $ 87.4 billion |
| Derivative contracts | $77.0 billion |
| **Liabilities:** | |
| Corporate and other debt | $ 7.6 billion |
| Corporate equities | $ 30.9 billion |
| Derivative contracts | $71.6 billion |

MS 2007 Form 10-K at 122.

234.    The Company also falsely reported that TAPS was capable of managing and capturing all transactions regarding Morgan Stanley's long-term borrowings including structured notes reporting that these with respect to these instruments "the fair value option was elected for these positions as they are risk managed on a fair value basis." MS 2007 Form 10-K at 125.

235.    Similarly, Morgan Stanley reported that "[a]ll of the instruments within Financial instruments owned and Financial instruments sold, not yet purchased, are measured at fair value, either through the fair value option election (discussed below) or as required by other accounting pronouncements." However, these financial instruments were not reported at fair value as Morgan Stanley claimed in its Form 10-K filing because Morgan Stanley did not have a valuation model capable of properly valuing its financial instruments pursuant to FAS 157 MS 2007 Form 10-K at 109.

236.    Again, Morgan Stanley did not report in compliance with FAS 157 since the Company did not have a valuation model capable of properly valuing its financial instruments.

> The Company adopted the provisions of SFAS No. 157, "Fair Value Measurements" ("SFAS No. 157"), effective December 1, 2006. See "Accounting Developments" herein for additional information regarding the Company's adoption of SFAS No. 157. Under this standard, fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (i.e., the "exit price") in an orderly transaction between market participants at the measurement date. In determining fair value, the Company uses various valuation approaches, including market, income and/or cost approaches. SFAS No. 157 establishes a hierarchy for inputs used in measuring fair value that maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring that the most observable inputs be used when available. Observable inputs are inputs that market participants would use in pricing the asset or liability developed based on market data obtained from sources independent of the Company. Unobservable inputs are inputs that reflect the Company's assumptions about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances.

*See* Morgan Stanley 2007 Form 10-K at 120.

237.     Contrary to assertions by Morgan Stanley that its Over the Counter ("OTC") pricing models were widely accepted, the Company's OTC pricing models were ineffective and incapable of accurate pricing.

> OTC Derivative Contracts. OTC derivative contracts include forward, swap and option contracts related to interest rates, foreign currencies, credit standing of reference entities, equity prices or commodity prices. Depending on the product and the terms of the transaction, the fair value of OTC derivative products can be modeled using a series of techniques, including closed-form analytic formulae, such as the Black-Scholes option-pricing model, and simulation models or a combination thereof. Many pricing models do not entail material subjectivity because the methodologies employed do not necessitate significant judgment, and the pricing inputs are observed from actively quoted markets, as is the case for generic interest rate swap and option contracts. *In the case of more established derivative products, the pricing models used by the Company are widely accepted by the financial services industry. A substantial majority of OTC derivative products valued by the Company using pricing models fall into this category and are categorized within Level 2 of the fair value hierarchy.*

*See* Morgan Stanley 2007 Form 10-K at 11.

238.     The Company made the following statement in the Form 10-K with regard to structured notes:

> Structured Notes. The Company issues structured notes that have coupons or repayment terms linked to the performance of debt or equity securities, indices, currencies or commodities. Fair value of structured notes is estimated using valuation models described in this section for the derivative and debt features of the notes. These models incorporate observable inputs, including prices that the notes are linked to, interest rate yield curves, option volatility and currency rates. The impact of the Company's own credit spreads also is included based on the Company's observed secondary bond market spreads. Most structured notes are categorized in Level 2 of the fair value hierarchy.

*See* Morgan Stanley 2007 Form 10-K at 114.

239.    However, Morgan Stanley failed to disclose that the valuation models used by the Company to value its structured notes were flawed because neither the debt feature of the notes nor the valuation model inputs including interest rates and currency rates were accurate.

240.    Morgan Stanley also reported that as of the end of the quarter, the Company's funds still held $8.2 billion of SIVs. *Id.* at 55.

241.    Morgan Stanley publicly conveyed no real sense of concern regarding its assertive push into the emerging aspects of the credit derivative market or its inability to hedge the associated risk.  Instead, the Company continued with non-descript language to assure investors concerning risk management.  For example, "In order to help protect the Company from losses resulting from these activities, Institutional Credit analyzes all material lending and derivative transactions and ensures that the creditworthiness of the Company's counterparties and borrowers is reviewed regularly and that credit exposure is actively monitored and managed. Institutional Credit assigns obligor credit ratings to the Company's counterparties and borrowers." *Id.* at 103.

242.    On January 29, 2008, Kelleher participated in a Citigroup Financial Services conference call where he continued to downplay the severity of the 2007 results, saying "[t]hese losses were the result of an error in judgment by a small team in one area of Fixed Income and a failure to manage that risk appropriately in that we had poor trade execution.  We moved aggressively to address those issues and to make necessary changes, hold people accountable and put new senior management in place led by James [Gorman] and Walid [Chammah]."

243.    Following this news, on January 31, Morgan Stanley stock traded as low as $46.45.

**2008 Brings In More Bad News**

244.    On March 19, 2008, Morgan Stanley announced its results from continuing operations for the first quarter of ended February 29, 2008, reporting decreased income of $1.551 billion, down from $2.314 billion in the first quarter of 2007.  Similarly, net revenues were down 17% from the previous year's first quarter.

245.    After the announcement of its first quarter results on March 19, 2008, Morgan Stanley held a conference call to discuss its performance.  Kelleher represented Morgan Stanley on the call and acknowledged there "was a negative $1.1 billion driven primarily by write downs in our lending business and to a lesser extent the U.S. banks liquidity portfolio that we reclassified from available for last quarter."  Furthermore, Kelleher addressed Morgan Stanley's approach to risk management and announced that the Company was changing the organization of its risk management team, which should not have been necessary given that Morgan Stanley had been touting their excellent capabilities and tools for well over a year.

246.    Following this news, on March 20, 2008, Morgan Stanley stock traded as low as $43.08.

247.    On April 14, 2008, States News Service reported that despite the Company's substantial losses in 2007, defendant Mack received $41.7 million in compensation including stock awards valued at $40.1 million.  *AFL-CIO's New Executive Payway Website Shows How CEO Packages Helped Create Mortgage Crisis*, State News Service, April 14, 2008, at 2.  The article further stated: "Mack pushed his firm to take more risk and bet more of its own money on big trades and investments, a strategy that prompted the company to dive deeply into sub-prime mortgages, leveraged loans and derivatives and which backfired badly." *Id.*

248.    The information disclosed in these press releases and conference calls were materially incomplete, false and misleading.  Morgan Stanley failed to properly disclose its

74

problems with its subprime loan portfolio or its CDO hedging strategy. In reality, however, Morgan Stanley faced tremendous exposure to the subprime mortgage market. Moreover, Morgan Stanley lacked adequate internal financial controls to address the burgeoning subprime crisis and to hedge the risks associated with its CDO exposure, in spite of its repeated public announcements to the contrary.

249.    On June 18, 2008, Morgan Stanley announced its results from continuing operations for the first quarter of ended May 31, 2008, reporting decreased income of approximately $1 billion, compared with $2.3 billion in the second quarter of 2008. Similarly, net revenues were 38 percent below the previous year's second quarter. Although the Company posted a profit, there were losses totaling $1.182 billion attributable to mortgage, credit, and asset management related activities.

250.    Following the Company's report of its second quarter results, on June 18, 2008, Morgan Stanley stock traded as low as $37.42.

251.    On June 19, 2008 the *Wall Street Journal* reported that Morgan Stanley's poor fiscal second quarter was a result of "bad trades, poor management and investments, as well as less than stellar risk management." David Reilly and Peter Eavis, *Bad Trades, Woes in Management Risk,* Wall St. J., June 19, 2008. The report further cautioned, "it is tough to justify Morgan Stanley's premium until the firm shows that it has the basics under control and can prevent its traders from causing whiplash volatility." *Id.*

252.    The information disclosed in these press releases and conference calls were materially incomplete, false and misleading. Morgan Stanley failed to properly disclose its problems with its subprime loan portfolio or its CDO hedging strategy. In reality, however, Morgan Stanley faced tremendous exposure to the subprime mortgage market. Moreover,

Morgan Stanley lacked adequate internal financial controls to address the burgeoning subprime crisis and to hedge the risks associated with its CDO exposure, in spite of its repeated public announcements to the contrary.

253.    These types of statements were misleading and failed to explain to the Plans' participants that Morgan Stanley had immersed itself into sophisticated credit derivative transactions, often backed by sub-prime mortgages, without the tools necessary to effectively hedge systemic risk.

254.    Not only did Morgan Stanley invite these risky transactions into its business model, but Defendants also continued to offer Company stock as an investment option and permitted the Plans to purchase additional shares in spite of Morgan Stanley's inability to properly manage its self-created risk.  No prudent fiduciary would choose such action with respect to the Plans' investments under such circumstances.

### Summary of Defendants' GAAP Violations

255.    At all relevant times during the Class Period, Defendants knew or should have known that Morgan Stanley's financial statements when issued were not prepared in conformity with GAAP, which are recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time.  However, in order to artificially inflate the price of Company stock, Defendants knew or should have known that the Company used improper accounting practices in violation of GAAP and SEC reporting requirements to falsely overstate the Company's assets, understate its liabilities, and inflate its stockholders' equity and earnings during the Class Period.

256.    Morgan Stanley's materially false and misleading Financial Statements resulted from a series of deliberate senior management decisions designed to conceal the truth regarding the gravity of the Company's lack of internal controls and failure to timely record and report

asset impairment charges. Specifically, Defendants knew or should have known that the Company violated GAAP by improperly valuing numerous financial instruments, including equity derivatives, credit derivatives, interest rate and currency products, and asset-backed securities.

257.    In numerous instances, Morgan Stanley failed to test whether its financial instruments or other contracts met the requirements of derivative classification pursuant to FAS 133, ¶6. Moreover, in clear violation of FAS 133, Morgan Stanley's valuation and accounting systems did not have the proper capability to match its hedges with corresponding financial instruments ("hedged items").

258.    Morgan Stanley was also unable to properly identify the interest rate swaps ("hedge instrument") used to hedge its hedged items, including structured notes. Moreover, this violation was prevalent throughout numerous divisions of Morgan Stanley's Institutional Securities Group ("ISG").

259.    Morgan Stanley also violated FAS 133 by employing inappropriate valuation techniques and using inaccurate data including, but not limited to the following:

- pricing and quantity data in connection with the Company's fair value models;

- interest rates in connection with the Company's fair value models;

- currency rates in connection with the Company's fair value models; and

- Day One Values in connection with the Company's fair value models.

260.    Morgan Stanley violated FAS 157 by employing inappropriate valuation techniques and using inaccurate data including, but not limited to the following:

- used pricing and quantity data in the Company's SFAS No. 157 fair value models inconsistent with the attributes of the actual financial instruments being valued;

- manipulated quantity and notional data used in its fair value models;

- improperly inflated the value of its assets by including "Hidden Fee Costs" in connection with the Company's SFAS No. 157 fair value calculations;

- used inaccurate interest rates in connection with Level II and Level III inputs applied to the Company's fair value models;

- failed to monitor and apply changes in currency rates used in its fair value models; and

- manipulated Credit Default Swap data and consequently misstated the Company's counter-party risk assessment.

261.    Because of the material internal control weaknesses that plagued Morgan Stanley during the Class Period, Defendants knew or should have known that the repeated assurances to investors and the Plans' participants that Morgan Stanley's internal controls were sufficient and reliable were false and misleading.  Indeed, defendant Mack and Mr. Kelleher signed certifications pursuant to Rule 13a-14, 17 CFR 240.13a-14 promulgated under Section 302 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. §7242 (2008), attesting to the adequacy of Morgan Stanley's internal controls.  These certifications are plan communications that were disseminated to the Plans' participants.

262.    Contrary to the requirements of GAAP and SEC rules, Morgan Stanley failed to implement and maintain an adequate internal accounting control system, or knowingly or negligently tolerated the failure to use existing internal controls in a manner that would ensure GAAP compliance.  Despite Defendants' knowledge or what should have been their knowledge of Morgan Stanley's inadequate internal controls throughout the Class Period, Defendants cultivated a positive outlook concerning Morgan Stanley stock as an investment for the Plans.

## VIII.  DEFENDANTS KNEW OR SHOULD HAVE KNOWN THAT COMPANY STOCK WAS AN IMPRUDENT INVESTMENT FOR THE PLANS

263.    Upon information and belief, each Defendant, in the performance of his or her fiduciary duties, knew or should have known that Morgan Stanley failed to disclose material adverse information concerning the risks associated with Morgan Stanley's exposure to the subprime market and that as a consequence of such failure, the price of Company Stock was artificially inflated, and that Company Stock was therefore an imprudent investment for the Plans.

264.    Through their high ranking positions within Morgan Stanley – especially the Morgan Stanley Board of Director Defendants – Defendants knew or should have known of the existence of the above-described problems.

265.    As a result of Defendants' knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the true financial health of Morgan Stanley, any generalized warnings of market and diversification risks that Defendants made to the Plans' participants regarding the Plans' investment in Company Stock did not effectively inform the Plans' participants of the past, immediate and future dangers of investing in Company Stock.

266.    In addition, upon information and belief, Defendants failed to adequately review the performance of the other fiduciaries of the Plans to ensure that they were fulfilling their fiduciary duties under the Plans and ERISA.  Defendants also failed to conduct an appropriate investigation into whether Company Stock was a prudent investment for the Plans and, in connection therewith, failed to provide the Plans' participants with information regarding Morgan Stanley's deep-rooted problems so that participants could make informed decisions regarding whether to include Company Stock in the Plans.

267.    An adequate (or even cursory) investigation would have revealed that investment by the Plans in Company Stock, under these circumstances, was imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions. Defendants failed to make such investigation and thereby failed to protect the Plans' participants against the resulted unnecessary losses.

268.    Because Defendants knew or should have known that Company Stock was not a prudent investment option for the Plans, they had a duty to protect the Plans and their participants from unreasonable and entirely predictable losses incurred as a result of the Plans' investment in Company Stock.

269.    Defendants had available to them several different options for satisfying this duty, including, but not limited to: (i) making appropriate public disclosures as necessary; (ii) divesting the Plans of Company Stock; (iii) discontinuing further contributions to and/or investment in Company Stock in the Plans; (iv) eliminating all restrictions on the transfer of Company Stock into alternative investments; (v) consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plans; (vi) notifying appropriate federal agencies, including the Department of Labor, of the facts and circumstances that made Company Stock an unsuitable and imprudent investment for the Plans and/or (vii) resigning as fiduciaries of the Plans to the extent that as a result of their employment by Morgan Stanley they could not loyally serve the Plans and its participants in connection with the Plans' acquisition and holding of Company Stock.

270.    Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses resulting from the Plans' investment in Company Stock.

274.    At the same time, during the Class Period, certain Defendants sold substantial

amounts of their personal holdings of Company Stock, evidencing awareness that Company

Stock was highly precarious and seeking to protect themselves against a major decline.

Specifically, on March 23, 2007, when Company Stock was trading at $80 per share, defendant

Mack sold 207,331 shares for total proceeds of over $16 million.

## X.    CAUSATION

275.    The Plans suffered massive losses because a substantial amount of their assets

were imprudently invested by the Plans in Company Stock during the Class Period, in breach of

Defendants' fiduciary duties.

276.    Had Defendants properly discharged their fiduciary duties, including the

provision of full and accurate disclosure of material facts concerning Company Stock and

divesting the Plans from Company Stock offered by the Plans when such investments became

imprudent, the Plans would have avoided losses suffered as a result of imprudent investment in

the Fund, as opposed to the returns they would have achieved with alternative prudent

investments offered in the Plans.

277.    As a result of Defendants' actions and/or inactions, Plaintiffs and the Class, which

invested in Company Stock through the Plans, were damaged, as the Plans suffered substantial

losses from Defendants' failure to fulfill their fiduciary responsibilities as described herein.  Had

the fiduciaries acted prudently and in accordance with their fiduciary duties, they would have

taken steps to eliminate or reduce the amount of Company Stock held by the Plans, eliminated

the option for participants to invest funds in Company Stock, or fully disclosed the material

adverse facts concerning Company Stock described herein.  Plaintiffs and the Class are entitled

to the best alternative investment available to them under the circumstances, and the Plans would

have achieved gains and avoided losses but for Defendants' breaches of fiduciary duty as described herein.

278.    Furthermore, under ERISA, fiduciaries – not participants – exercise control over the selection of investment options made available to participants. Thus, whether or not participants are provided with the ability to select among different investment options, and whether or not participants exercised effective control over their investment decisions (which was not the case here), liability attaches to the fiduciaries if an imprudent investment option is selected by the fiduciaries and presented as an option to participants, and as a result of such action the Plans suffered losses. Because this is precisely what occurred in this case, Defendants are liable for the losses incurred by the Plans and are not entitled to any protection under ERISA § 404(c).

279.    The losses suffered by the Plans and Plans' participants and beneficiaries, including Plaintiffs and the Class, were the direct and necessary result of the alleged misconduct of Defendants herein. Plaintiffs and the Class were unaware, and in the exercise of reasonable diligence could not have been aware, of the true and accurate extent of Defendants' continuing breaches of fiduciary duty in failing to disclose material facts.

### FIRST CAUSE OF ACTION
**(Against All Defendants)**

**Failure to Prudently and Loyally Manage the Plans' Assets**
**(Breaches of Fiduciary Duties in Violation of**
**Section 404 of ERISA, 29 U.S.C. § 1104)**

280.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

281.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1) and/or ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

282.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that investment in Company Stock in the Plans was prudent and that such investments were consistent with the Plans' purposes. Defendants are liable for losses incurred as a result of such investments being imprudent.

283.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

284.    Defendants breached their duties prudently and loyally to manage the Plans' assets. During the Class Period, as alleged herein, Defendants knew or should have known that Company Stock was not a suitable and appropriate investment for the Plans and clearly did not serve the Plans' purpose of helping participants save for retirement. Despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect

participants of the Plans from the inevitable losses they knew would ensue as the non-disclosed material problems, such as the measures available to them as alleged herein.

285.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans lost a significant amount of their value.

286.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## SECOND CAUSE OF ACTION
### (Against All Defendants)

### Failure to Provide Complete and Accurate Information
### (Breaches of Fiduciary Duties in Violation of
### Section 404 of ERISA, 29 U.S.C. § 1104)

287.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

288.    At all relevant times, the scope of the fiduciary responsibility of all Defendants included Plan-related communications and material disclosures.

289.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information participants need to exercise their rights and interests. This duty to inform participants includes an obligation to provide plan participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding investment options such that participants can make informed decisions with regard to the prudence of investing in such options as are made available. This duty applies to all plan investment options, including investment in the stock of the participant's employer.

290.    During the Class Period, Defendants made direct and indirect communications with the Plans' participants, including statements regarding investments in Company Stock. These communications included, but were not limited to, SEC filings, annual reports, press releases and Plan documents (including SPDs and/or prospectuses regarding the Plans' holdings of Company Stock), which included and/or reiterated these statements. At all times during the Class Period, Morgan Stanley's SEC filings were incorporated into and part of the SPDs and/or the Form S-8 registration statements.

291.    Further, Defendants, as the Plans' fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plans' participants, well-recognized in the 401(k) literature and the trade press, concerning investment in company stock, including that:

(a)    employees tend to interpret a match in company stock as an endorsement of the company and its stock;

(b)    out of loyalty, employees tend to invest in company stock;

(c)    employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(d)    employees tend not to change their investment option allocations in the plan once made;

(e)    no qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

(f)    lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(g)    even for risk-tolerant investors, the risks inherent to company stock are not commensurate with it rewards.

292.    While Defendants knew or should have known these facts and knew of the high concentration of the Plans' funds in Company Stock, they still disseminated inaccurate, incomplete and materially misleading statements Plan-wide regarding the Morgan Stanley's

financial and operational health and future prospects and/or did nothing to correct such statements.

293.    Defendants knew that investment in Company Stock carried with it an inherently high degree of risk.  This inherent risk made the Defendants' duty to provide complete and accurate information particularly important.

294.    Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding Morgan Stanley's exposure to the subprime market, and the consequent risk and inflation of the value of the Company Stock and, generally, by conveying inaccurate information regarding Morgan Stanley's future outlook.  These failures were particularly devastating to the Plans and their participants – losses in this investment had an enormous impact on the value of participants' retirement assets.

295.    These actions and failures to act were uniform and caused the Plans, and/or the participants and beneficiaries of the Plans, to continue to make and maintain substantial investments in Company Stock in the Plans at a time when Defendants knew or should have known that the Plans' participants and beneficiaries lacked complete and accurate information concerning their investments.  Plaintiffs and the Class relied to their detriment on these Defendants' incomplete, inaccurate and materially misleading statements regarding the performance and future health of Company Stock.

296.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable participant of a plan resulting in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his detriment.  Here, the above-described statements, acts and omissions of the Defendants constituted misrepresentations and omissions that were

fundamentally deceptive concerning the prudence of investments in the Company Stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of his or her invested assets of the Plans in Company Stock during the Class Period. Plaintiffs and other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts and omissions of the Defendants as described herein.

297.    As a consequence of Defendants' breaches of fiduciary duty, the Plans suffered hundreds of millions of dollars in losses. If Defendants had discharged their fiduciary duties to manage prudently and invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

298.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

**THIRD CAUSE OF ACTION**
**(Against All Defendants)**

**Breach of Duty to Avoid Conflicts of Interest**
**(Breaches of Fiduciary Duties in Violation of**
**Section 404 of ERISA, 29 U.S.C. § 1104)**

299.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

300.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

301.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*:  failing to timely engage independent fiduciaries who could make independent judgments concerning the Plans' investments in Company Stock; and by otherwise placing their own interests above the interests of the participants with respect to the Plans' investment in the Company Stock.

302.    In addition, certain of the Defendants had significant personal investments in the stock of Morgan Stanley through, *inter alia*, receipt of such stock pursuant to incentive and stock options and restricted share awards.  Those Defendants had a significant personal financial incentive to maintain a high price for Company Stock.  Defendants had an incentive not to disclose negative financial results to the Plans' participants in hopes that such participants would select Company Stock for their retirement accounts and therefore help maintain a high price for Company Stock.

303.    Defendants also had an incentive to maintain Company Stock as an investment in the Plans because the elimination of Company Stock as an investment in the Plans would have sent a negative signal to Wall Street analysts, which in turn would have resulted in reduced demand for Company Stock and a drop in the stock price.  Since the compensation of certain Defendants depended on the market price of the common stock of Morgan Stanley, this sequence of events would reduce their compensation.

304.    As such, Defendants breached their fiduciary duty of loyalty because they were faced with a conflict of interest, which they did not promptly resolve, between their own interest and the interests of the Plans' participants.  Defendants' interest in maintaining an artificially high price for Company Stock was in direct conflict with the participants' interests in (i) avoiding investing their retirement accounts in Company Stock when it was imprudent to do so

and (ii) receiving accurate information concerning Morgan Stanley upon which to base their investment decisions.

305.    As a consequence of Defendants' breaches of fiduciary duty, the Plans suffered hundreds of millions of dollars in losses. If Defendants had discharged their fiduciary duties prudently to manage and invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans lost a significant amount of their value.

306.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

**FOURTH CAUSE OF ACTION**
**(Against Morgan Stanley, MS&Co, the Morgan Stanley**
**Director Defendants and the MS&Co Director Defendants)**

**Failure to Adequately Monitor Other Fiduciaries and**
**Provide them with Accurate Information**
**(Breaches of Fiduciary Duties in Violation of Section § 404 of ERISA, 29 U.S.C. § 1104)**

307.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

308.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of the MS&Co Director Defendants included the responsibility to appoint, evaluate and monitor the members of the Investment Committee.

309.    In addition, the other Defendants named in this Count had a fiduciary duty to give information to and review the actions of these fiduciaries. In this case, that means that the monitoring fiduciaries had the duty to:

(a)    Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their

duties.  They must be knowledgeable about the operations of the Plans, the goals of the Plans, and the behavior of the Plans' participants;

(b)    Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

(c)    Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plans' investments;

(d)    Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

(e)    Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plans' investment options; and

(f)    Ensure that the monitored fiduciaries report regularly to Morgan Stanly and/or MS&Co and/or the directors of Morgan Stanley and/or the director of MS&Co.  Morgan Stanley and/or MS&Co must then review, understand, and approve the conduct of the hands-on fiduciaries.

310.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

311.    The Defendants named in this Count breached their fiduciary monitoring duties by, among other things, failing to ensure that the monitored fiduciaries (a) had access to knowledge about Morgan Stanley's business problems alleged above, which made Company Stock an imprudent retirement investment, and (b) completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company Stock, an investment that was imprudent and subject to inevitable and significant depreciation.

312.    The Defendants named in this Count, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of Morgan Stanley, which they knew or should have known as alleged herein, in order to allow the fiduciaries to make sufficiently informed decisions.  By remaining silent and continuing to conceal such information from the other fiduciaries, the Defendants named in this Count breached their monitoring duties under the Plans and ERISA.

313.    The Defendants named in this Count knew or should have known that the fiduciaries they were responsible for monitoring were (i) imprudently allowing the Plans to continue offering the Company Stock as an investment alternative for the Plans, and (ii) continuing to invest the assets of the Plans in Company Stock when it was no longer prudent to do so.  Despite this knowledge, the Defendants named in this Count failed to take action to protect the Plans, and concomitantly the Plans' participants, from the consequences of these fiduciaries' failures.

314.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans lost a significant amount of their value.

315.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), the Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties.

**FIFTH CAUSE OF ACTION**
**(Against all Defendants)**

**Co-Fiduciary Liability**
**(Breach of Fiduciary Duties in Violation of Section 405(a) of ERISA, 29 U.S.C. § 1105(a))**

316.    Plaintiffs incorporate the foregoing paragraphs herein by reference

317.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary

92

responsibility of another fiduciary with respect to the same plan if (i) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (ii) she fails to comply with § 1104(a)(l) in the administration of her specific responsibilities which give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (iii) he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

### Concealing a Breach

318.    ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes co-fiduciary liability on a fiduciary for a fiduciary breach of another fiduciary if he participates knowingly in, or knowingly undertake to conceal, an act or omission by such other fiduciary, knowing such action or omission is a breach.

319.    As alleged herein, Morgan Stanley, through its officers and employees, withheld material information from and provided misleading disclosures to the Plans' participants. In addition, as alleged herein, the other Defendants participated in and/or knew about the Morgan Stanley's misrepresentations and omissions regarding the Morgan Stanley's financial condition, and thus had knowledge at all relevant times of the factual matters pertaining to the imprudence of Company Stock as an investment for the participants' retirement assets.

320.    Despite this knowledge, Defendants knowingly participated in their co-fiduciaries' failures prudently and loyally to manage the Plans' investment and holding of Company Stock during the Class Period. They did so by themselves making imprudent and disloyal decisions respecting the Plans' investment in Company Stock in the manner alleged herein.

**Enabling a Breach**

321.    ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes co-fiduciary liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(l), in the administration of his or her specific responsibilities that give rise to his or her status as a fiduciary, he or she has enabled another fiduciary to commit a breach.

322.    To the extent it is determined that any of the Investment Committee Defendants lacked knowledge of the circumstances rendering the Plans' investment in Company Stock imprudent, then all other Defendants enabled the imprudent decisions of those Defendants by failing to provide those Defendants with complete and accurate information, including the information alleged herein regarding Morgan Stanley's exposure to the subprime credit market. In failing to inform their co-fiduciaries, who lacked knowledge, these Defendants breached ERISA § 405(a)(2).

323.    In addition, through their failure properly and effectively to monitor their appointees, including the removal of those whose performance was inadequate as alleged in this Complaint, Defendants enabled the Investment Committee Defendants' imprudent management of Company Stock in the Plans.

**Failure to Remedy**

324.    ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if she has knowledge of a breach by such other fiduciary, unless she makes reasonable efforts under the circumstances to remedy the breach.

325.    Defendants failed to undertake any effort to remedy their co-fiduciaries' failures prudently and loyally to manage the Plans' investment in Company Stock, as well as other fiduciary breaches.  Instead, they allowed the harm to continue and contributed to it throughout

the Class Period in violation of ERISA § 405(a)(3). The actions that could have been taken, included but are not limited to: (i) objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Boards of Directors; (ii) disclosing the imprudence of the investment in Company Stock to the Plans' participants; (iii) notifying the U.S. Department of Labor of their co-fiduciaries actions; or (iv) preparing to obtain an injunction from a Federal District Court.

326.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), ERISA § 409, 29 U.S.C. § 1109(a), and ERISA § 405, 29 U.S.C. § 1105, Defendants are liable to restore the losses to the Plans caused by their co-fiduciary breaches of fiduciary duties alleged in this Count.

## XI.    SECTION 404(c) DEFENSE INAPPLICABLE

327.    The Plans suffered losses, and the Plaintiffs and the other Class members suffered losses, because substantial assets in the Plans were invested in Company Stock during the Class Period in violation of the Defendants' fiduciary duties.

328.    As to contributions invested in Company Stock, Defendants were responsible for the prudence of investments provided under the Plans during the Class Period, unless the Plans satisfied the procedural and substantive requires of ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated under it.

329.    Section 404(c) provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions, but not for liability for the selection of imprudent investment options for the Plans. In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions. In addition, § 404(c) only applies if participants are informed that "the Plan is intended to constitute a plan described in § 404(c) and [the regulations], and that fiduciaries of the plan may be relieved of

liability for any losses which are the direct and necessary result of investment instructions given by such participants or Beneficiary." 29 C.F.R. § 2550.404c-1(b)(2)(B)(1)(i)

330.    As alleged above, Defendants failed to provide participants with complete and accurate information regarding Company Stock in the Plans. Accordingly, participants failed to exercise the requisite independent control over their investment in Company Stock in the Plans.

331.    In addition, § 404(c) does not apply to any portion of the Plans (i) derived from Company Contributions as those investments/investment vehicles were made/invested by/through the sole discretion of Morgan Stanley; or (ii) deemed an ESOP in that the Secretary of Labor has interpreted the provision to apply only to plans that provide plan participants with a full range of investment options, which an ESOP by its very nature does not. See 29 C.F.R. § 2550.404c-1 (1996).

332.    Defendants' liability to the Plans, Plaintiffs and the Class for relief stemming from the Plans' imprudent investments in Company Stock, is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plans during the Class Period, without regard to whether or not the participants relied upon statements, acts or omissions of Defendants.

## XII.    REMEDY FOR BREACHES OF FIDUCIARY DUTY

333.    As noted above, as a consequence of the Defendants' breaches, the Plans suffered significant losses.

334.    ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

335.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the plan assets to what they would have been if the plan had been properly administered.

336.    Plaintiffs, the Plans and the Class are therefore entitled to relief from the Defendants in the form of: (i) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (iii) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (iv) taxable costs; and (v.) interests on these amounts, as provided by law; and (vi.) such other legal or equitable relief as may be just and proper.

337.    Each Defendant is jointly liable for the acts of each other Defendant as a co-fiduciary.

## XVIII. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for:

A.    A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Plans and their participants;

B.     A Declaration that Defendants, collectively and separately, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.     An Order compelling Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

D.     Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

E.     Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.     An Order that Defendants allocate the Plans' recoveries to the accounts of all participants who had any portion of their account balances invested in the common stock of Morgan Stanley maintained by the Plans in proportion to the accounts' losses attributable to the decline in the stock price of Morgan Stanley;

G.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.     An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.      An Order for equitable restitution and other appropriate equitable monetary relief
against Defendants.

Dated:  July 25, 2008

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

_____
Mark C. Rifkin
Michael Jaffe
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653
Email: rifkin@whafh.com
       jaffe@whafh.com

Sanford P. Dumain
Lori G. Feldman
Arvind Khurana
MILBERG LLP
One Pennsylvania Plaza
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
Email: sdumain@milberg.com
       lfeldman@milberg.com
       akhurana@milberg.com

*Interim Co-Lead Counsel for Plaintiffs*

Robert I. Harwood
Samuel K. Rosen
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
Telephone: (212) 935-7400
Facsimile: (212) 753-3630
Email: rharwood@hfesq.com
       srosen@hfesq.com

99

Joseph H. Meltzer
Edward W. Ciolko
Katherine B. Bornstein
SCHIFFRIN BARROWAY TOPAZ
   & KESSLER LLP
280 King of Prussia Road
Radnor, PA 198087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
Email: jmeltzer@sbtklaw.com
       eciolko@sbtklaw.com

***Executive Committee of Co-Lead Counsel***
  ***for Plaintiffs***

Jeffrey Abraham
ABRAHAM FRUCHTER & TWERSKY LLP
One Penn Plaza
Suite 2805
New York, NY 10119
Email: jabraham@aftlaw.com

***Additional Counsel for Plaintiffs***

\516453

100

## CERTIFICATE OF SERVICE

I, Kate McGuire, one of Plaintiffs' Counsel in the *In re Morgan Stanley ERISA Litigation*, Master File No.: 07 Civ. 11285 (S.D.N.Y.), hereby certify that on Friday, July 23, 2008, I caused the foregoing redacted *Consolidated Amended Class Action Complaint* to be served, along with an unredacted copy of the *Consolidated Amended Class Action Complaint*, by upon the following Defendants' via the following delivery methods:

BY HAND:

> Robert F. Wise, Jr., Esq.
> DAVIS POLK & WARDELL
> 450 Lexington Avenue
> New York, NY 10017
> Telephone: (212) 540-4000
> Facsimile: (212 540-3800
> Email: robert.wise@dpw.com

BY FEDERAL EXPRESS:

> Morgan Stanley
> General Counsel
> 1211 Avenue Of The Americas
> New York, NY 10036

_____
Kate McGuire

516332