# EXHIBIT B

WORKING COPY
Incorporating All
Amendments
Adopted Through
November 20, 2007

**MORGAN STANLEY**

**EMPLOYEE STOCK OWNERSHIP PLAN**

**Amended and Restated Effective as of January 1, 2002**

# EXHIBIT B

TABLE OF CONTENTS

ARTICLE 1.  DEFINITIONS ..................................................................................... 1

1.01.     "Account" ...........................................................................................1
1.02.     "Adjustment Factor" ..........................................................................1
1.03.     "Affiliate" ..........................................................................................1
1.04.     "Authorized Absence" .......................................................................1
1.05.     "Beneficiary" .....................................................................................2
1.06.     "Board of Directors" ..........................................................................2
1.07.     "Business Unit" ..................................................................................2
1.08.     "Code" ................................................................................................2
1.09.     "Company" .........................................................................................2
1.10.     "Company Stock" ...............................................................................2
1.11.     "Credit Services Employee" ..............................................................2
1.12.     "DPSP" ...............................................................................................3
1.13.     "Earnings" ..........................................................................................3
1.14.     "Employee" ........................................................................................5
1.15.     "Employer" .........................................................................................6
1.16.     "Employer Contributions" .................................................................7
1.17.     "Employment Commencement Date" .................................................6
1.18.     "Entry Date" .......................................................................................7
1.19.     "ERISA" .............................................................................................7
1.20.     "Exempt Loan" ...................................................................................7
1.21.     "Fiduciary Responsibility" ................................................................8
1.22.     "Foreign Subsidiary" .........................................................................8
1.23.     "Full-time Employee" ........................................................................8
1.24.     "Highly Compensated Employee" ......................................................8
1.25.     "Hour of Service" .............................................................................10
1.26.     "IIG Member" ..................................................................................12
1.27.     "Matching Allocations" ...................................................................12
1.28.     "Member" .........................................................................................12
1.29.     "Participant" .....................................................................................13
1.30.     "Part-time Employee" .......................................................................13
1.31.     "Period of Service" ..........................................................................13
1.32.     "Plan" ................................................................................................13
1.33.     "Plan Year" .......................................................................................13
1.34.     "Plan Administrator" ........................................................................14
1.35.     "Pre-Tax Deferral Contributions" ...................................................14
1.36.     "Profit Sharing Allocations" ............................................................14
1.37.     "Release" ..........................................................................................14
1.38.     "Total and Permanent Disability" ....................................................14
1.39.     "Retirement" .....................................................................................14

1.40.    "Retirement Plan" ................................................................15
1.41.    "Salary" ...............................................................................15
1.42.    "Service" ..............................................................................15
1.43.    "Suspense Account" .............................................................16
1.44.    "Total and Permanent Disability" ........................................16
1.45.    "Trust Fund" .........................................................................16
1.46.    "Trustee" ..............................................................................16
1.47.    "Valuation Date" ..................................................................16
1.48.    "Year" ...................................................................................16
1.49.    "Year of Service" ..................................................................16

ARTICLE 1-A.   ADDITIONAL SERVICE DEFINITIONS AND RULES ...............................17

1-A.01.    Service Rules for Certain Employees ................................17
1-A.02.    Definitions ........................................................................17
1-A.03.    Service of Rehired Employees ..........................................20
1-A.04.    Aggregation of Periods of Service ....................................20

ARTICLE 2.   MEMBERSHIP ...............................................................20

2.01.    Membership ..........................................................................20
2.02.    Non-Duplication of Benefits.................................................22

ARTICLE 3.   CONTRIBUTIONS AND TRANSFERS ...........................22

3.01.    Employer Contributions........................................................22
3.02.    Maximum Annual Additions .................................................24
3.03.    Return of Contributions .......................................................27
3.04.    Limitations on Employer Contributions ...............................27
3.05.    Participant Contributions......................................................27
3.06.    Matching Allocations and Profit Sharing Allocations...........28
3.07.    Special Allocation for 1999 .................................................33
3.08.    Transfers of Company Stock From Other Plans ...................35

ARTICLE 4.   INVESTMENT AND VALUATION OF TRUST FUND ...............37

4.01.    Investment of Trust Fund .....................................................37
4.02.    Valuation of Trust Fund ........................................................38

ARTICLE 5.   ACQUISITION OF COMPANY STOCK WITH PROCEEDS OF AN
             EXEMPT LOAN ..................................................................38

5.01.    Purchase of Company Stock .................................................38
5.02.    Exempt Loan.........................................................................38
5.03.    Suspense Account; Cash Dividends on Unallocated Stock ...39

5.04. Cash Dividends on Allocated Shares ........................................................40
5.05. Non-cash Dividends ..........................................................................................43
5.06. Allocation Assurance ........................................................................................43

ARTICLE 6. VESTING OF MEMBER ACCOUNTS ............................................................ 44

6.01. Vesting Schedule ..............................................................................................44
6.02. Vesting Schedule for Participants Hired on or After January 1, 2004 ..................44
6.03. Vesting Schedule for IIG Members Hired Prior to January 1, 2004 ...................45
6.04. Forfeitures ........................................................................................................45
6.05. Dividends ..........................................................................................................46

ARTICLE 7. DISTRIBUTION OF ACCOUNTS ............................................................... 46

7.01. General ..............................................................................................................46
7.02. Time and Manner of Distribution ....................................................................47
7.03. Latest Commencement of Payments ..................................................................52
7.04. Diversification of Account ...............................................................................53
7.05. Proof of Death and Right of Beneficiary or Other Person ..................................57
7.06. Eligible Rollover Distributions ........................................................................57
7.07. Elections ............................................................................................................59

ARTICLE 8. TENDERS AND VOTING .......................................................................... 59

8.01. Tenders for Company Securities .......................................................................59
8.02. Voting Company Stock .....................................................................................63
8.03. Trustee's Responsibilities .................................................................................64
8.04. Shareholder Communication ...........................................................................67
8.05. One Share Allocation .......................................................................................67

ARTICLE 9. ADMINISTRATION OF PLAN .................................................................... 67

9.01. Plan Administrator ...........................................................................................67
9.02. Procedure and Performance of Duties ..............................................................67
9.03. Individual Accounts .........................................................................................68
9.04. General Powers of Plan Administrator .............................................................69
9.05. Rules and Regulations ......................................................................................69
9.06. Conversion of Amounts of Earnings ...............................................................69
9.07. Service in More Than One Fiduciary Capacity ................................................69
9.08. Limitation of Liability ......................................................................................69
9.09. Indemnification .................................................................................................70
9.10. Meetings ............................................................................................................70
9.11. Compensation ...................................................................................................71
9.12. Claims Procedure; Committee and Hearing Panel ...........................................71

ARTICLE 10. MANAGEMENT OF FUNDS ...................................................................... 76

10.01.     Trust Agreement ................................................................76
10.02.     Exclusive Benefit Rule ......................................................76

ARTICLE 11. GENERAL PROVISIONS.................................................... 76

11.01.     Nonalienation ..................................................................77
11.02.     Conditions of Employment Not Affected by Plan................................78
11.03.     Facility of Payment ..........................................................78
11.04.     Information ..................................................................78
11.05.     Top-Heavy Provisions .........................................................78
11.06.     Disposition of Unclaimed Benefits.............................................83
11.07.     Designation of Beneficiary ...................................................83
11.08.     Treatment of Qualified Military Service ......................................84
11.09.     Costs of Legal Action ........................................................84

ARTICLE 12. AMENDMENT, MERGER AND TERMINATION........................................ 84

12.01.     Amendment of Plan.............................................................84
12.02.     Merger or Consolidation ......................................................85
12.03.     Additional Participating Employers ...........................................85
12.04.     Termination of Plan...........................................................86

ARTICLE 13. CONSTRUCTION .............................................................. 87

13.01.     Choice of Law ................................................................87


APPENDIX A–PARTICIPATING EMPLOYERS ..................................................... A-1

APPENDIX B- RULES RELATING TO CERTAIN EMPLOYEES
OF MORGAN STANLEY DW INC. AND ITS SUBSIDIARIES AND AFFILIATES ...........B-1

APPENDIX C - EGTRRA AMENDMENTS...........................................................C-1

APPENDIX D - PARTICIPANT LOAN RULES ................................................... D-1

APPENDIX E – PARTICIPANTS RESIDING IN PUERTO RICO……………………………...E-1

APPENDIX F – MORGAN STANLEY EMPLOYEE STOCK OWNERSHIP PLAN…...........F-1

iv

MORGAN STANLEY

AMENDED AND RESTATED EMPLOYEE STOCK OWNERSHIP PLAN

## ARTICLE 1.  DEFINITIONS

1.01.   **"Account"** means the account established pursuant to Section 9.03, into which shall be credited the contributions made on a Member's behalf, Company Stock released from the Suspense Account in accordance herewith and earnings on such contributions and, subject to Section 5.04, such Company Stock.  Effective June 25, 2002, amounts transferred to this Plan pursuant to Section 3.08(a) or 3.08(b) (the "Transferred Amounts"), and earnings on such amounts, shall be credited to a "Transferred Subaccount" within the Member's Account.

1.02.   "**Adjustment Factor**" means the cost of living adjustment factor prescribed by the Secretary of the Treasury under Code section 415(d) for calendar years beginning on or after January 1, 1988, and applied to such amounts and in such manner as the Secretary shall provide.

1.03.   **"Affiliate"** means any corporation or unincorporated business controlling, controlled by, or under common control with, an Employer within the meaning of Code sections 414(b) and (c).

1.04.   "**Authorized Absence**" means an absence authorized by the Employer without loss of employment status, including absence on account of illness, business of the Employer, vacation, and military or governmental service, whether or not salary shall be paid during such absence.

1.05.    "**Beneficiary**" means such person, persons or entity as are designated pursuant to Section 11.07 to receive, upon a Participant's death, all or a portion of such Participant's interest in the Trust Fund.

1.06.    "**Board of Directors**" means the Board of Directors of the Company or any authorized committee thereof.

1.07.    "**Business Unit**" means Morgan Stanley, in whole or in part, and any subsidiary, group of subsidiaries, divisions, departments, units, business activity or group of business activities of Morgan Stanley, as determined by the Company for each Plan Year.

1.08.    "**Code**" means the Internal Revenue Code of 1986, as amended from time to time, or any successor revenue code which may hereafter be adopted in lieu thereof, and references herein to any specific provisions of the Code shall be deemed also to refer to the corresponding provisions of the Code as it may hereafter be so amended or replaced.

1.09.    "**Company**" means, for the period prior to May 31, 1997, Morgan Stanley Group Inc., a Delaware corporation, and, for the period beginning on May 31, 1997, Morgan Stanley, a Delaware corporation, and any successor thereto.

1.10.    "**Company Stock**" means the shares of common stock of the Company or shares of preferred or preference stock of the Company that is convertible into such common stock provided that, in either event, such stock is an "employer security" within the meaning of Code section 409(l).

1.11.    "**Credit Services Employee**" means an Employee who is either:

(a) a United States or Puerto Rico Employee employed by Morgan Stanley Dean Witter Credit Corporation or any subsidiary of Morgan Stanley Dean Witter Credit Corporation which is both an Affiliate and an Employer;

(b) an Employee employed by any other Affiliate whose services are primarily rendered to Morgan Stanley Dean Witter Credit Corporation or a subsidiary of Morgan Stanley Dean Witter Credit Corporation; or

(c) an Employee, or classification of Employees, who has been designated in writing by the Plan Administrator as a Credit Services Employee.

1.12.    "**DPSP**" means the Morgan Stanley & Co. Incorporated Deferred Profit Sharing Plan, as amended from time to time.  Effective October 1, 2002, the DPSP shall be merged with and into the Dean Witter START Plan (Saving Today Affords Retirement Tomorrow) (the "START Plan") and the merged plan shall be renamed the "Morgan Stanley 401(k) Plan."  For periods following such merger, references in this Plan to the DPSP and the START Plan shall be deemed to be references to the Morgan Stanley 401(k) Plan, and references to specific provisions and terms defined in the DPSP and the START Plan shall be deemed references to the corresponding provisions and terms of the Morgan Stanley 401(k) Plan.

1.13.    "**Earnings**" means base salary, cash bonuses, commissions, overtime and other cash compensation paid by an Employer to a Participant for services rendered as an Employee.  Earnings also include any salary reduction amounts elected by a Participant pursuant to an arrangement maintained by any Affiliate under Code section 401(k), 125 or 132(f)(4).  Earnings exclude, without limitation: (i) earnings paid for any period prior to the date an individual becomes an Employee or during a period an individual is not an Employee, (ii) non-cash compensation, (iii) imputed income, (iv) cash payments made to or on behalf of a Participant for an employment-related expense or in the nature of an allowance, such as medical or expense reimbursements, cost of living, relocation or transition allowances, tax equalization or gross-up payments and employee referrals, (v) amounts payable under continued service bonus agreements (generally payable by the fourth

anniversary of hire), (vi) amounts paid after the last day of the month in which a Participant's employment with all Affiliates terminates, (vii) any amounts paid as severance award or severance settlement in connection with an Employee's termination of employment, and (viii) amounts paid under any plan or payroll practice on account of retirement, disability or death of an Employee or his/her dependents.  In addition, with respect to deferred (other than under Code section 401(k)) or executive compensation, Earnings (w) will not include any such amount when awarded, contributed or deferred, (x) will not include periodic distributions of earnings or dividend equivalents, such as dividend equivalent payments under the Morgan Stanley Equity Incentive Compensation Plan, (y) will not include amounts that are paid in settlement of an award or deferral, except to the extent that they met the definition of Earnings applicable to the Participant under this Plan for periods prior to January 1, 2004, and (z) will not include any payment or deferral in respect of a carried interest plan or a profits participation plan maintained by Morgan Stanley Real Estate Funds.

If any Member should receive Earnings during the same payroll period from an Employer and also from a Foreign Subsidiary, and if such Member is considered, pursuant to the last sentence of the first paragraph of the definition of "Employee," an Employee of an Employer, the aggregate amount so received shall be treated as his or her Earnings.

Notwithstanding the foregoing, the annual amount of Earnings taken into account in determining Matching Allocations to a Participant under the Plan for any given year shall not exceed $170,000.  The annual Earnings taken into account in determining Profit Sharing Allocations to an eligible Participant under the Plan for any given year shall not exceed $100,000.

1.14.    "**Employee**" means any person who receives regular and stated compensation from, and is treated as an employee for wage withholding purposes by, any Employer, other than a pension, retainer or remuneration in the nature of a consulting fee, and shall not include any person

who is classified by an Employer as (a) a leased employee of any Employer (including, without limitation, a 'leased employee' as defined in Code section 414(n)), an independent contractor or consultant; (b) a provider of services to an Employer pursuant to a contractual arrangement, such as under the PAL or CHIMES systems either with that person or with a third party, other than one specifically providing for an employment relationship with an Employer; (c) a non-resident alien who receives no earned income from an Employer which constitutes U.S. source income (within the meaning of Code section 861(a)(3)); (d) an intern or summer associate; or (e) covered by a collective bargaining agreement with respect to which an Employer is a party, except to the extent that such agreement provides that individuals covered thereby shall be considered to be Employees.  An individual's status as an Employee shall be determined by the Plan Administrator and such determination shall be conclusive and binding on all persons.  If any person excluded as an Employee pursuant to the preceding sentences shall be determined by a court or a federal, state or local regulatory or administrative authority to have served as a common law employee of an Employer, such determination shall not alter this exclusion as an Employee for purposes of this Plan. The Plan Administrator may, in its sole discretion, and on the basis of uniform rules applicable to all persons in similar circumstances, consider as an Employee of the Company any person who is a United States citizen and who is employed outside the continental limits of the United States by a Foreign Subsidiary.

Notwithstanding the foregoing, any person who receives compensation as described in the first sentence of this Section 1.14 from both an Employer and an Affiliate that has adopted a funded defined contribution plan other than the Plan, the DPSP or the START Plan (as defined in Appendix B) for the same period of service shall be considered an Employee only if (i) the business

unit in which he is employed performs a greater amount of services for such Employer than for such Affiliate or (ii) he has been designated in writing by the Plan Administrator as an Employee.

For purposes of the Plan, a "leased employee" as defined in Code section 414(n) shall mean any person (other than an employee of the recipient) who, pursuant to an agreement between the recipient and any other person, has performed services for the recipient (or for the recipient and related persons determined in accordance with Code section 414(n)(6)) on a substantially full time basis for a period of at least one year, and whose services are performed under the primary direction and control of the recipient within the meaning of Code section 414(n)(2)(C).

Notwithstanding the foregoing, the term "Employee" shall not include any individual coded and paid as an hourly employee who is first hired by or first transferred to an Employer on or after July 1, 2004 and who is not a Credit Services Employee.

1.15.    "**Employer**" means the Company or any other Affiliate participating in the Plan, as provided in Section 12.03, with respect to its Employees. An Affiliate that is not otherwise a participating Employer but that is the employer of an Employee described in the second paragraph of Section 1.12 shall become a participating Employer in accordance with the first sentence hereof, but only with respect to such Employee.  A list of participating Employers, and the dates of their respective adoption of the Plan, is annexed hereto as Appendix A.

1.16.    "**Employer Contributions**" mean all amounts contributed pursuant to Section 3.01 of the Plan.

1.17.    "**Employment Commencement Date**" means (a) the first day in respect of which an Employee is entitled to be credited with an Hour of Service for the performance of services for an Employer or Affiliate, or (b) in the case of a former Employee who returns to the employ of an Employer or Affiliate after a period of absence which is not included in his Period of Service, the

6

first day in respect of which, after such period of absence, he is entitled to be credited with an Hour of Service for the performance of services for an Employer or Affiliate.

1.18.   "**Entry Date**" means:

(a) with respect to an Employee, other than a Part-time Employee who is not regularly scheduled to work 20 or more hours per week, either the first practicable pay date following such Employee's Employment Commencement Date or any pay date thereafter; or

(b) with respect to a Part-time Employee who is not regularly scheduled to work 20 or more hours per week, either the first practical pay date following such Eligible Employee's completion of the applicable eligibility requirements set forth in the Plan or any pay date thereafter.

For purposes of this definition, a pay date is each date on which an Employee is scheduled to be paid regular cash compensation (including bonuses) under the payroll system of the Employer that employs such Employee.

1.19.   "**ERISA**" means the Employee Retirement Income Security Act of 1974, as it (or the provisions of the United States Code in which such provisions appear) may be amended from time to time, or any successor legislation adopted in lieu thereof, and references herein to any specific provision of ERISA shall be deemed also to refer to any specific provision of ERISA as it may hereafter be so amended or replaced.

1.20.   "**Exempt Loan**" means any loan to the Plan by the Company (or any other "disqualified person" as defined in Code section 4975(e)(2)) or any loan to the Plan which is guaranteed by the Company (or any other "disqualified person" as defined in Code section 4975(e)(2)).

1.21.  "**Fiduciary Responsibility**" means those operational and administrative duties required to be performed by fiduciaries pursuant to the provisions of Part 4 of Subtitle B of Title I of ERISA.

1.22.  "**Foreign Subsidiary**" means a foreign subsidiary (as defined in Code section 3121(l)(8)) of the Company if the Company has entered into an agreement under Code section 3121(l) (relating to Social Security Taxes) which applies to such foreign subsidiary.

1.23.  "**Full-time Employee**" means any Employee who is not a Part-time Employee.  An Employee who is a Credit Services Employee and who is classified by his or her employer as a "full-time," "flex part-time" or "regular part-time" employee shall be treated under this Plan as a Full-time Employee.

1.24.  "**Highly Compensated Employee**".  For Plan Years beginning before December 31, 1996, "Highly Compensated Employee" shall mean a "Highly Compensated Employee" as defined under the Plan as in effect for such Plan Year.  For Plan Years beginning after December 31, 1996 and prior to December 31, 1999, "Highly Compensated Employee" shall mean any Employee who (i) was a 5% owner (as defined in Code section 416(i)(1)) during the Plan Year or the preceding Plan Year or (ii) for the preceding Plan Year had compensation (within the meaning of Code section 414(q) as in effect for the Plan Year of determination) from the Employer or an Affiliate in excess of $80,000, as adjusted by the Secretary of the Treasury or a delegate thereof in accordance with Code section 414(q).  For Plan Years beginning after December 31, 1999, "Highly Compensated Employee" shall mean any Employee who (i) was a 5% owner (as defined in Code section 416(i)(1)) during the Plan Year or the preceding Plan Year or (ii) for the preceding Plan Year had compensation (within the meaning of Code section 414(q) as in effect for the Plan Year of determination) from the Employer or an Affiliate in excess of $80,000, as adjusted by the Secretary

8

of the Treasury or a delegate thereof in accordance with Code section 414(q), and was in the Top-Paid Group of Employees for such preceding Plan Year.

For Plan Years beginning after December 31, 1996, a former Employee shall be treated as a Highly Compensated Employee if such Employee was a Highly Compensated Employee at the time of his Severance Date or such Employee was a Highly Compensated Employee at any time after attaining age 55. Notwithstanding anything contained herein to the contrary, solely for the purpose of determining the Employees who are Highly Compensated Employees for the 1997 Plan Year, the definition of Highly Compensated Employee in effect for the 1997 Plan Year will be treated as having been in effect for the 1996 Plan Year.

For purposes of the definition of "Highly Compensated Employee", "Top-Paid Group" of Employees means those Employees who are included in the group consisting of the top 20% of the employees of the Employer and its Affiliates when ranked on the basis of compensation paid during the Plan Year, as determined in accordance with Code section 414(q)(3).

For purposes of the definition of "Highly Compensated Employee", (i) "Severance Date" means the date the Employee separates from service within the meaning of Code section 414(q)(6)(A); and (ii) employees of an Affiliate shall include employees of any entity that would be taken into account pursuant to Code section 414(q)(7); (iii) Employee shall not include a non-resident alien who receives no earned income from sources within the United States; and (iv) the number of employees in the Top Paid Group of Employees shall be determined by excluding a person who has not completed at least six months of service, normally works less than 17 ½ hours each week, normally works less than six months during a Plan Year, has not attained age 21, is a non-resident alien and receives no earned income from sources within the United States, or except to

the extent required to be included by Code section 414(q), employees who are included in a unit of employees covered by a collective bargaining agreement.

1.25.    (a) "**Hour of Service**" means, with respect to any applicable computation period,

(i)    each hour for which the Employee is paid or entitled to payment for the performance of services for an Employer or an Affiliate, credited for the Plan Year in which such services were performed;

(ii)    each hour of a period during which no duties are performed due to vacation, holiday, illness, incapacity, layoff, jury duty, military duty or leave of absence, determined in accordance with the following rules:

(A)    if the Employee is directly or indirectly paid, or entitled to payment, by an Employer or Affiliate on account of such period of absence,

(1)    he shall be credited with Hours of Service during the entire period of absence in accordance with paragraphs (b) and (c), if he returns to the employ of an Employer or Affiliate at the conclusion of such period; and

(2)    he shall be credited with Hours of Service in accordance with paragraphs (b) and (c) up to a maximum of 501 Hours of Service in each such period of absence, if he does not return to the employ of an Employer or Affiliate at the conclusion of such period;

(B)    if the Employee is not paid, or entitled to payment, by an Employer or Affiliate on account of such period of absence,

(1) he shall be credited with 40 Hours of Service for each week, or eight Hours of Service for each week day, of the period of absence, if he returns to the employ of an Employer or Affiliate at the conclusion of such period; and

10

(2) he shall be credited with no Hours of Service in respect of such period of absence, if he does not return to the employ of an Employer or Affiliate at the conclusion of such period;

(iii)    each hour during the Employee's period of service in the Armed Forces of the United States, credited on the basis of 40 Hours of Service for each week, or eight Hours of Service for each week day, of such service, if the Employee retains re-employment rights under the Military Selective Service Act and is re-employed by an Employer or Affiliate within the period provided by such Act; and

(iv)    each hour for which an Employee has been awarded, or is otherwise entitled to, back pay from an Employer or Affiliate, irrespective of mitigation of damages, if he is not entitled to credit for such hour under any other provision of this paragraph (a).

(b)    The number of an Employee's Hours of Service and the Plan Year or other computation period to which they are to be credited shall be determined in accordance with Section 2530.200b-2 of the Rules and Regulations for Minimum Standards for Employee Pension Benefit Plans, which Section is hereby incorporated by reference into this Plan.

(c)    In the case of an Employee whose compensation is not determined on the basis of certain amounts for each hour worked, such Employee's Hours of Service need not be determined from employment records, and such Employee may, in accordance with uniform and nondiscriminatory rules adopted by the Plan Administrator, be credited with 45 Hours of Service for each week in which he would be credited with any Hours of Service under the provisions of paragraphs (a) or (b).

1.26.    "**IIG Member**" means a Member employed by an Employer listed in Appendix A to the Morgan Stanley 401(k) Plan.

Notwithstanding anything herein to the contrary, to the extent an Eligible Employee is an IIG Member due to employment by Morgan Stanley DW Inc. or a subsidiary thereof immediately prior to the merger of Morgan Stanley DW Inc. with and into Morgan Stanley & Co. Incorporated as of April 1, 2007, such IIG Member shall not cease to be treated as an IIG Member solely as a result of such merger.

1.27.    "**Matching Allocations**" shall mean allocations to the Account of a Member for a Plan Year under Section 3.06 based upon the amount of the Member's Pre-Tax Deferral Contributions under the DPSP for such Plan Year.

1.28.    "**Member**" means any person included in the membership of the Plan as provided in Article 2.

1.29.    "**Participant**" means any Employee for whom an account is maintained under the Plan.

1.30.    "**Part-time Employee**" means an Employee who is either (i) compensated on an hourly basis or (ii) regularly scheduled to work less than a standard 40-hour week.  An Employee who is a Credit Services Employee and who is classified by his or her employer as a "part-time," "prime time" or "temporary" employee shall be treated under this Plan as a Part-time Employee who is not regularly scheduled to work 20 or more hours per week.

1.31.    "**Period of Service**" means

(a)    the period beginning on an Employee's most recent Employment Commencement Date and ending on the date the Employee terminates Service.

(b)    For the purpose of determining the length of an Employee's Period of Service, all nonsuccessive Periods of Service shall be aggregated.

(c)     A Period of Service shall include the period commencing on the date an Employee terminates Service and ending on the date he returns to Service, but only if such period does not exceed 12 months.

(d)     Periods of Service shall include such periods as the Plan Administrator determines are required to be taken into account for eligibility and vesting purposes in order to comply with Code section 414(n).

1.32.   "**Plan**" means the Morgan Stanley Employee Stock Ownership Plan as set forth herein, as it may be amended from time to time.

1.33.   "**Plan Year**" means the calendar year.

1.34.   "**Plan Administrator**" means Morgan Stanley's Global Director of Human Resources or his or her delegate.

1.35.   "**Pre-Tax Deferral Contributions**" shall have the meaning of such term set forth in the DPSP.  For purposes of determining a Member's Matching Allocation for a Plan Year under Section 3.06 of the Plan, the Member's Pre-Tax Deferral Contributions under the DPSP shall not include any catch-up contributions.  For periods following the merger of the DPSP into the START Plan, references in the Plan to a Participant's "Pre-Tax Deferral Contributions" shall be deemed references to such Participant's "Matched Contributions" under the Morgan Stanley 401(k) Plan.

1.36.   "**Profit Sharing Allocations**" means allocations to the Account of a Member for a Plan Year pursuant to Section 3.06(d).

1.37.   "**Release**" means any termination of a Member's employment which is initiated by the Company or an Affiliate by reason of its decision to close permanently a branch

office or other facility, or to reduce permanently the number of employees which it employs due to a substantial change in economic conditions.

1.38.   "**Reserved**.

1.39.   "**Retirement**" means termination of a Participant's employment with an Employer and all Affiliates on or after the date he or she has both (i) attained age 55 and (ii) completed five years of service under the qualified defined benefit plan of the Company or Affiliate covering such Participant, or, in the case of a Participant who is not covered by any such plan, completed five years of service as determined under the Morgan Stanley Employees Retirement Plan.

1.40.   "**Retirement Plan**" means the Morgan Stanley Employees Retirement Plan, as amended from time to time.

1.41.   "**Salary**" means regular semi-monthly base compensation, including amounts deferred or contributed pursuant to Code section 125, 132(f)(4) or 401(k) and short-term disability benefit payments and including, with respect to Members who are paid by commission, periodic cash drawings against commissions in accordance with procedures established from time to time by the Plan Administrator for this purpose, earned by an Employee during any year from an Employer or Affiliate. If any Member should receive Salary during the same payroll period from an Employer and also from a Foreign Subsidiary and if such Member is considered, pursuant to the last sentence of the first paragraph of Section 1.12., an Employee of an Employer, the aggregate amount so received shall be treated as his or her Salary. For Plan Years prior to January 1, 1994, Salary for a year shall not exceed $200,000, as adjusted by any applicable Adjustment Factor. For Plan Years after December 31, 1993, Salary for a given year shall not exceed the limit in effect for such year under Code section 401(a)(17), as such limit is adjusted in accordance with Code section

14

401(a)(17)(B).  Effective January 1, 2002, for purposes of determining allocations to Members'

Accounts under Article 3 of the Plan, the annual amount of Salary taken into account for a Member

in any given year shall not exceed 85% of the limit in effect for such year under Code section

401(a)(17), as such limit is adjusted in accordance with Code section 401(a)(17)(B).  Effective

January 1, 2004, allocations under Article 3 of the Plan shall be based on eligible Members'

Earnings and not on Salary.

     1.42.    "**Service**" shall mean employment by Morgan Stanley & Co., a partnership,

and by the Employer including periods of employment with a Foreign Subsidiary which, pursuant to

the last sentence of the first paragraph of Section 1.12, are considered service as an Employee of the

Company.  "Service" shall also include employment with any parent or subsidiary of the Company,

or any subsidiary of any parent, to the extent recognized by the Board of Directors, in its sole

discretion, on the basis of uniform rules applicable to all persons in similar circumstances.  Effective

as of May 31, 1997, "Service" of an Employee shall include all service with Dean Witter, Discover

& Co., a Delaware corporation, and its subsidiaries, whether on, prior to or after such date.

     1.43.    "**Suspense Account**" means the account comprised of unallocated shares of

Company Stock maintained in accordance with Section 5.03.

     1.44.    "**Total and Permanent Disability**" (or "**Totally and Permanently**

**Disabled**") means a medically determinable physical or mental impairment which is reasonably

expected to last for a continuous period of not less than 12 months or to result in death.  A

Participant shall be considered to be Totally and Permanently Disabled if (i) he or she has been

determined to be totally and permanently disabled by the Company's U.S. long-term disability

administrator and (ii) he or she has terminated employment with the Company and all of its

affiliates.

15

1.45.    "**Trust Fund**" means the fund of assets of the Plan held by the Trustee pursuant to an agreement of trust.

1.46.    "**Trustee**" means the trustee or trustees by whom the assets of the Plan are held as provided in Article 10.

1.47.    "**Valuation Date**" means the last business day of each calendar month, or, effective March 1, 2001, such other dates as the Plan Administrator shall determine.

1.48.    "**Year**" means a calendar year.

1.49.    "**Year of Service**" means a Period of Service of one year.

ARTICLE 1-A.  ADDITIONAL SERVICE DEFINITIONS AND RULES

1-A.01.    Service Rules for Certain Employees.  Notwithstanding anything to the contrary in Article 1 of the Plan, the service of (i) any IIG Member and (ii) any Member hired by an Employer on or after January 1, 2004 for eligibility and vesting purposes shall be determined using the definitions and rules set forth below.  In addition, the historical service crediting rules set forth in Supplement E to the Morgan Stanley 401(k) Plan shall apply with respect to IIG Members to the extent applicable.

1-A.02.    Definitions.  For purposes of this Article 1-A the following terms have the following meanings unless the context clearly indicates a different meaning:

"Affiliated Group" means all Affiliates and any other entity required to be aggregated with any Employer pursuant to Code section 414(o) and the regulations thereunder.

"Employment Commencement Date" means the date on which an Employee first is credited with an Hour of Service.

"Hour of Service" means each hour for which an Employee is paid or entitled to payment for the performance of duties for an Employer or for any member of the Affiliated Group.

"One Year Break" means a Period of Severance of 12 consecutive months.

"Period of Service" means a period beginning on an Employee's Employment Commencement Date or Reemployment Commencement Date and ending on the Employee's Severance Date.  An Employee's Period of Service also includes any other period which constitutes a "Period of Service" under written rules or regulations adopted from time to time by the Plan Administrator.

17

"Period of Service for eligibility and vesting purposes shall include such periods as the Plan Administrator determines are required to be taken into account in order to comply with Code section 414(n)(4).

"Period of Severance" means each period from an Employee's Severance Date to the Employee's next Reemployment Commencement Date.

"Reemployment Commencement Date" means the date on which an Employee first is credited with an Hour of Service after a Severance Date.

"Severance Date" means the earlier of the date on which an Employee quits, retires, is discharged or dies; or the first anniversary of the first date of a period in which an Employee remains continuously absent from service with an employer (with or without pay) for any reason other than quit, retirement, discharge or death. Notwithstanding the foregoing, an Employee shall not have a Severance Date when the Employee:

(i) Takes a leave of absence without pay approved by the appropriate member of the Affiliated Group. In the case of an approved leave of absence without pay for a period in excess of 12 months, the Employee shall be deemed to have a Severance Date as of the end of such 12-month period if the Employee fails to abide by the terms and conditions of such leave, which may include a requirement to return to active employment.

(ii) Enters the military service of the United States, provided the Employee returns to active employment with any member of the Affiliated Group within the time the Employee's reemployment rights are protected under applicable law. If the Employee does not so return, the Employee shall be deemed to have a Severance Date as of the date of entry into military service.

18

(iii)  Is unable to work due to disability or sickness.  If the Employee does not return to employment with a member of the Affiliated Group before the second anniversary of the beginning of an absence due to disability, the Employee shall have a Severance Date on such second anniversary.

(iv)  Is on jury duty, a leave of absence with pay, an approved vacation or a holiday.

(v)  Is absent from work:

(1)  by reason of the pregnancy of the individual,

(2)  by reason of a birth of a child of the individual,

(3)  by reason of the placement of a child with the individual in connection with the adoption of such child by such individual, or

(4)  for purposes of caring for such child for a period beginning immediately following such birth or placement.  If the Employee does not return to employment with a member of the Affiliated Group before the second anniversary of the beginning of such absence the Employee shall have a Severance Date on such second anniversary.

Notwithstanding the foregoing, if an Employee quits, is discharged, dies or retires while on leave, vacation, holiday or jury duty, the Employee shall have a Severance Date on the earlier of the date of such quit, discharge, death or retirement, or 12 months after the commencement of such leave, vacation, holiday or jury duty.  An Employee shall be deemed to have been discharged as of the earlier of the date the Employee received oral or written notice of discharge or the date a written notice of discharge is deposited in the United States mail (on a registered or certified basis) to the Employee's last known address.

"Year of Service" means a Period or Periods of Service, whether or not consecutive, equal to 12 months.

1-A.03.     Service of Rehired Employees.   An Employee's Period of Service shall include any period following the Employee's Severance Date and prior to the Employee's first Reemployment Commencement Date following such Severance Date if such Reemployment Commencement Date occurs no later than 12 months after such Severance Date.   For vesting purposes only, an Employee's Period of Service shall not include any period prior to a One Year Break unless the Employee completes an Hour of Service after returning to employment.

1-A.04.     Aggregation of Periods of Service.   An Employee will receive credit for Periods of Service of less than 12 consecutive months, by aggregating all non-successive Periods of Service and all Periods of Service which are fractional years or which do not constitute a whole 1-year Period of Service, whether or not consecutive.   Fractional periods of a year are expressed in terms of days, on the basis that a day of service is credited if an Employee completes an Hour of Service during such day, and on the basis that 365 days of service equals a 1-year Period of Service.

ARTICLE 2.  MEMBERSHIP

2.01.   Membership.

(a)     Each Employee who was a Member in the Plan on December 31, 2003 shall continue as a Member on January 1, 2004.

(b)     Any other Full-time Employee or Part-time Employee who is regularly scheduled to work 20 or more hours per week shall become a Member as of the Entry Date coincident with or next following his or her Employment Commencement Date.   Any Part-time Employee who is not regularly scheduled to work 20 or more hours per week shall become a

Member as of the first Entry Date (i) on or between January 1, 2004 and August 15, 2005, following his or her completion of one Year of Service, or (ii) on or after August 15, 2005 on which he or she has completed one Year of Service and has attained age 21.  Notwithstanding the foregoing, any Full-time Employee or Part-time Employee whose Employment Commencement Date precedes January 1, 2004, and who has not become a Member prior to January 1, 2004, shall become a Member as of January 1, 2004.

(c)    A Member shall cease to be a Member on the date he or she terminates employment with an Employer and shall again become a Member on the first day he or she returns to employment with an Employer.

(d)    Notwithstanding any other provision of the Plan to the contrary, any Employee who is (i) classified by an Employer as a "leased employee" who provides services to any Employer (including, without limitation, a leased employee as defined in Code section 414(n)), an independent contractor or a consultant or (ii) a provider of services to an Employer pursuant to a contractual arrangement, such as a "PAL", either with that person or with a third party, other than one specifically providing for an employment relationship with the Employer, shall not be eligible to become a Member until the later of the date, if any, on which he becomes an Employee who is not classified as a leased employee, independent contractor, consultant or a provider of services to any Employer and is employed in a job classification that is eligible for membership under the Plan as determined by such Employer.  If any person excluded as an Employee pursuant to the preceding clauses (i) and (ii) shall be determined by a court or a federal, state or local regulatory or administrative authority to have served as a common law employee of the Employer, such determination shall not alter this exclusion as an Employee for purposes of this Plan.

2.02    Non-Duplication of Benefits.

In no event shall an Employee be entitled to an allocation of Employer Contributions pursuant to Article 3 or Appendix B based on compensation or contributions with respect to which the Employee receives an allocation (whether or not vested) of employer contributions under another funded defined contribution plan maintained by an Affiliate (other than "Firm Contributions" under the DPSP, the START Plan, qualified non-elective or qualified matching contributions, or any contributions made by an employer pursuant to an employee's election under Code section 401(k)).

ARTICLE 3.  CONTRIBUTIONS AND TRANSFERS

3.01.   Employer Contributions.

(a) Each Employer may make Employer Contributions to the Plan, in Company Stock or cash, on account of any Plan Year.  The amount of Employer Contributions made by an Employer on account of a Plan Year shall be the amount needed to meet the Compensation Objective (as defined in Section 5.06) for the Plan Year with respect to Members employed by the Employer, after taking into account all other amounts otherwise available for allocation for that year.  Employer Contributions shall be made on behalf of each eligible Member who either (i) was in Service or on Authorized Absence on December 31 of such Plan Year or (ii) terminated employment during such Plan Year by reason of death, Total and Permanent Disability, Retirement or Release.  No Employer Contributions shall be made on behalf of any Member whose employment terminates during such Plan Year for any reason other than one set forth in clause (ii) of the previous sentence and who is not an Employee on December 31 of such Plan Year.  Notwithstanding the foregoing, an otherwise eligible Member whose employment terminates (other than a voluntary termination by the Member) on or after November 1, 2001 and before December 31, 2001 as part of a reduction in force

22

implemented by such Member's Employer shall be entitled to an allocation with respect to any Employer Contributions for such Year.

(b)    (i)    Except as provided in Section 5.04 and subject to the limitations described in Section 3.02, shares of Company Stock released from the Suspense Account for a Plan Year shall be allocated as of the last Valuation Date (or such earlier Valuation Date as the Plan Administrator shall determine) in the Plan Year as follows:  first, in accordance with Section 3.06 below to the Accounts of Members as Matching Allocations; and second, in accordance with Section 3.06(d) below, to the Accounts of Members as Profit Sharing Allocations.

(ii)    Subject to the limitations described in Section 3.02, any Employer Contributions for a Plan Year not used to repay an Exempt Loan shall be allocated as of the last Valuation Date (or such earlier Valuation Date as the Plan Administrator shall determine) in the Plan Year as follows:  first, in accordance with Section 3.06 below to the Accounts of Members as Matching Allocations (but only to the extent that the Company's obligations under Section 3.06 have not been satisfied through the allocation of shares of Company Stock to the Members in accordance with Section 3.01(b)(i) above); and second, in accordance with Section 3.06(d) below, to the Accounts of Members as Profit Sharing Allocations.

3.02.    Maximum Annual Additions.

(a)    The annual addition to a Participant's Account for any Plan Year, which shall be considered the "limitation year" for purposes of Code section 415, when added to the Participant's annual addition for that Plan Year under any other qualified defined contribution plan of an Employer or an Affiliate, shall not exceed an amount which is equal to the lesser of (i) 25% of his or her aggregate remuneration for that Plan Year or (ii) $30,000, or such other amount as may be prescribed pursuant to Code section 415(d).

(b)    For purposes of this Section, the "annual addition" to a Participant's Account for a Plan Year under this Plan or his or her account under any other qualified defined contribution plan maintained by an Employer or an Affiliate shall be the sum of:

(i)    all contributions by an Employer or an Affiliate,

(ii)    all employee contributions (other than Rollover Contributions as defined in the DPSP), and

(iii)    forfeitures.

(c)    For purposes of this Section, the term "remuneration" with respect to a Participant shall mean the total compensation actually paid to the Participant for a Plan Year by the Affiliate that employs the Participant, as reported on the Internal Revenue Service Form W-2 (or its equivalent) issued with respect to the Participant, plus any elective deferrals or contributions made with respect to the Participant as described in Code section 415(c)(3)(D), including elective deferrals or contributions under Code section 401(k), 125 or 132(f)(4), provided that, to the extent applicable, the annual remuneration of a Participant taken into account shall not exceed the $200,000

24

compensation limit under Code section 401(a)(17), as adjusted for cost-of-living increases in accordance with Code section 401(a)(17)(B).

(d)    In the case of a Participant who participates or has participated in this Plan and a qualified defined benefit plan maintained by an Employer or an Affiliate the sum of the defined contribution plan fraction (as defined in Code section 415(e)(3)) and the defined benefit plan fraction (as defined in Code section 415(e)(2)) in any year shall not exceed 1.0. If such sum exceeds one, the Member's defined benefit plan fraction shall be reduced until such sum equals one. This paragraph (d) shall apply only for Plan Years beginning before January 1, 2000.

(e) (i) (I) For Plan Years beginning prior to January 1, 1995, in the event that the Plan Administrator determines that the allocation of a contribution would cause the restrictions imposed by paragraph (a) to be exceeded with respect to this Plan or when combined with any other defined contribution plan, allocations shall be reduced in the following order, but only to the extent necessary to satisfy such restrictions:

(A)    First, the optional deferral of the Member pursuant to Section 3.3(a) of the DPSP shall be returned, in whole or in part as necessary, to the Member;

(B)    Second, the automatic deferral with respect to the Member pursuant to Section 3.2 of the DPSP shall be reduced;

(C)    Third, annual additions under this Plan with respect to the Member shall be reduced; and

(D)    Last, Pre-Tax Deferral Contributions of the Member under the DPSP shall be returned, in whole or in part as necessary, to the Member.

(II)    For Plan Years beginning after December 31, 1994, in the event that the Plan Administrator determines that the allocation of a contribution would cause the restrictions imposed

by paragraph (a) to be exceeded with respect to this Plan or when combined with any other defined contribution plan, allocations shall be reduced in the following order, but only to the extent necessary to satisfy such restrictions:

(A)     First, Pre-Tax Deferral Contributions of the Member under the DPSP shall be returned, in whole or in part as necessary, to the Member.

(B)     Second, the automatic deferral with respect to the Member pursuant to Section 3.2 of the DPSP shall be reduced; and

(C)     Third, annual additions under this Plan with respect to the Member shall be reduced.

(ii)     If it becomes necessary to make an adjustment in annual additions to a Participant's Account under this Plan, either because of the limitations as applied to this Plan alone or as applied to this Plan in combination with another plan, the excess annual addition under this Plan with respect to the affected Participant shall be reallocated proportionately in the same manner as Employer Contributions are allocated to the Accounts of other Members until the annual addition to the Account of each Participant reaches the limits of Code section 415.  If such limits are reached and there are remaining excess Employer Contributions, such contributions shall be placed in an unallocated suspense account and allocated in subsequent years before any Employer Contributions are made.

3.03.   Return of Contributions.

(a) If the Commissioner of Internal Revenue, after timely application made with respect to the initial qualification of the Plan, issues an adverse determination with respect to the Plan's qualified status under Code section 401(a) or 4975(e)(7), all Employer Contributions and earnings thereon may be returned to the applicable Employer.  The return shall be made within one year after the denial of qualification.

(b)     Employer Contributions to the Plan are conditioned on their deductibility under the Code.  If all or part of an Employer's deductions under, Code section 404 for contributions to the Plan are disallowed by the Internal Revenue Service, the portion of the contributions to which that disallowance applies may be returned to such Employer without interest but reduced by any investment loss attributable to those contributions.  The return shall be made within one year after the disallowance of the deduction.

(c)     An Employer may recover without interest the amount of its contributions to the Plan made on account of a mistake in fact, reduced by any investment loss attributable to those contributions, if recovery is made within one year after the date of those contributions.

3.04.   Limitations on Employer Contributions.   In no event shall Employer Contributions for any Plan Year exceed the maximum amount deductible from the Employer's income for that Plan Year under Code section 404(a) or any statute of similar import.

3.05.   Participant Contributions.  Participants are not required or permitted to make any contributions under this Plan, nor are rollover contributions permitted.

3.06.   Matching Allocations and Profit Sharing Allocations.  (a)   Subject to Section 3.06(b) and the limitations in Section 3.02, Matching Allocations shall be allocated to the Accounts

of Members as follows:  As of the last Valuation Date in each Plan Year (or such earlier Valuation Date as the Plan Administrator shall determine), the Account of each Member shall be allocated a Matching Allocation with a value as of that date equal to the dollar amount of the Member's Matched Contributions under the 401(k) Plan for such Plan Year, up to $2,000, plus 50 percent of the dollar amount of the remaining amount of the Member's Matched Contributions under the 401(k) Plan for such Plan Year, up to 6 percent of Earnings.  Subject to Section 5.04, Company Stock or other property (including cash) with a value equal to a Member's Matching Allocation for the Plan Year shall be allocated to the Member's Account, first, from forfeitures pursuant to Article 6 of the Plan, second, to the extent necessary, from shares of Company Stock released from the Suspense Account under Section 3.01(b)(i) as a result of the payment of dividends on Company Stock, third, to the extent necessary, from shares of Company Stock released from the Suspense Account under Section 3.01(b)(i) as a result of Company Contributions, and fourth, to the extent necessary, from Company Contributions allocated under Section 3.01(b)(ii).  The value of shares of Company Stock allocated as Matching Allocations shall be determined as of the Valuation Date for which such Matching Allocations are made.  A Matching Allocation shall be made to the Account of a Member who is an Employee on the applicable Valuation Date under this Section 3.06(a), including a Member on Authorized Absence on such applicable Valuation Date, or who terminated employment during such Plan Year as a result of death, Total and Permanent Disability, Retirement or Release.

(b)    For each Plan Year for which any Matching Allocations are made to the Plan, the Plan shall satisfy one of the following actual contribution percentage tests for the Plan Year in accordance with the provisions of Code section 401(m) and the applicable regulations thereunder:

1.    the actual contribution percentage for the Plan Year for the group of eligible Members who are Highly Compensated Employees for the Plan Year shall not exceed the actual

contribution percentage for the prior Plan Year for the group of Members who were eligible and not Highly Compensated Employees for the prior Plan Year multiplied by 1.25; or

2.    the actual contribution percentage for the Plan Year for the group of eligible Members who are Highly Compensated Employees for the Plan Year shall not exceed the actual contribution percentage for the prior Plan Year for the group of Members who were eligible and not Highly Compensated Employees for the prior Plan Year multiplied by two; *provided* that the actual contribution percentage for the Plan Year for the group of eligible Members who are Highly Compensated Employees for the Plan Year does not exceed the actual contribution percentage for the prior Plan Year for the group of Members who were eligible and not Highly Compensated Employees for the prior Plan Year by more than two percentage points.

Notwithstanding the foregoing, with respect to a Plan Year commencing before January 1, 2000, the limitations set forth in paragraphs (1) and (2) above shall be applied by comparing the current Plan Year's actual contribution percentage for the group of eligible Members who are Highly Compensated Employees for the Plan Year with the current Plan Year's actual contribution percentage for the group of eligible Members who are not Highly Compensated Employees for the Plan Year.

(c)    For purposes of Section 3.06(b), the actual contribution percentage for a group of eligible Members for a Plan Year is the average of the actual contribution ratios of the Members in the group.  A Member's actual contribution ratio is a fraction with a numerator equal to the sum of (i) the value of shares of Company Stock allocated to the Account of the Member as Matching Allocations as of the Valuation Date for which such allocation occurs (regardless of the actual value of the Company Contributions made in connection with the release of such shares of Company Stock) and (ii) the amount of any Company Contributions allocated directly to the Account as

29

Matching Allocations, and a denominator equal to the Member's remuneration for the Plan Year, as defined in Section 3.02(c).

In addition, (I) for Plan Years beginning before January 1, 1997, for purposes of determining the actual contribution percentage of any eligible Member who is a Highly Compensated Employee and who is subject to the family aggregation rule of Code section 414(q)(6) because the Member is either a 5% owner or one of the ten most highly paid Highly Compensated Employees, the Matching Allocations made on behalf of any family member, within the meaning of Code section 414(q)(6)(B), of the Highly Compensated Employee for the Plan Year shall, to the extent required by applicable regulations, be treated as made on behalf of the Highly Compensated Employee, any remuneration of such family member for the Plan Year shall, to the extent required by applicable regulations, be treated as remuneration of the Highly Compensated Employee and the family member of the Highly Compensated Employee shall not be considered a separate employee for purposes of calculating actual contribution ratios for the Plan Year; and (II) for Plan Years beginning on or after January 1, 2000, in calculating the actual contribution percentage test described in Section 3.06(b), the actual contribution percentage for the prior Plan Year for the group of Members who were eligible and not Highly Compensated Employees for the prior Plan Year shall be determined in accordance with applicable rules and regulations issued by the Secretary of the Treasury under Code section 401(m).

If the actual contribution percentage for a Plan Year for the group of eligible Members who are Highly Compensated Employees for the Plan Year exceeds the limitations set forth in Section 3.06(b), the amount of excess Matching Allocations shall be determined in accordance with Code section 401(m)(6)(B) by hypothetically reducing Matching Allocations made on behalf of Highly Compensated Employees in the order of their actual contribution ratios

beginning with the highest of such ratios. Effective for Plan Years beginning on or after January 1, 1997, excess Matching Allocations for a Plan Year shall be allocated to Highly Compensated Employees in accordance with Code section 401(m)(6)(C), on the basis of the dollar amounts of such contributions taken into account for purposes of the actual contribution percentage test for the Plan Year, beginning with the Highly Compensated Employee with the highest such dollar amount for the Plan Year and continuing in descending order until the total amount of the excess Matching Allocation has been allocated.

In the event that the Matching Allocations (and any income applicable thereto) for a Highly Compensated Employee must be reduced for a given Plan Year in order to comply with the limitations set forth in Section 3.06(b), the amount of any such reduction shall be (I) for Plan Years beginning before January 1, 1997, reallocated for such Plan Year among the Members in the ratio that the Salary of each such Member (in respect of Service as a Member) bears to the total Salaries of all such Members (in respect of Service as Members) for that Plan Year, subject to the limitations described in Section 3.02 and (II) for Plan Years beginning on or after January 1, 1997 distributed no later than the end of 12 months following such Plan Year, on the basis of the respective portion of such excess Matching Allocations assigned to the Highly Compensated Employee as set forth above. The income or loss allocable to a Highly Compensated Employee's excess Matching Allocations shall be determined by multiplying such income or loss for the applicable Plan Year by a fraction, the numerator of which is the excess Matching Allocation for the applicable Plan Year allocated to the Highly Compensated Employee and the denominator of which is the portion of the Highly Compensated Employee's Account balance attributable to allocations taken into account for purposes of the actual contribution percentage test on the last day of the applicable Plan Year.

In the event that any Matching Allocations made on behalf of a Highly Compensated Employee for a Plan Year relate to excess elective deferrals, excess contributions or excess aggregate contributions under any qualified defined contribution plan maintained by an Employer or other Affiliate, such Matching Allocations shall be forfeited. The actual contribution test for this Plan for a Plan Year shall not take into account any Matching Allocations forfeited in accordance with the preceding sentence.

(d)     (i)     Before the end of each Plan Year, each Business Unit shall determine whether a Profit Sharing Allocation shall be made for such Plan Year to the Accounts of eligible Members employed in such Business Unit, and, if a Profit Sharing Allocation shall be made, the amount of such allocation. For this purpose, a Member shall be eligible to share in the Profit Sharing Allocation with respect to a Business Unit for a Plan Year only if (A) the Member's base salary, bonus and commissions for the Plan Year (prior to any salary reduction amounts or deferrals) are less than $200,000 and (B) the Member (I) is employed in such Business Unit on December 31 of such Plan Year (including any Member on an Authorized Absence) or (II) was employed in such Business Unit immediately prior to his or her termination of employment due to death, Total and Permanent Disability, Retirement or Release during such Plan Year.

(ii)  The Profit Sharing Allocation with respect to a Business Unit for a Plan Year shall be allocated among all eligible Members (in accordance with Section 3.06(d)(i)). An eligible Member's share of the Profit Sharing Allocation with respect to a Business Unit for a Plan Year shall be that amount which bears the same relationship to such Profit Sharing Allocation as the Earnings (up to $100,000) received during such Plan Year by such eligible Member bears to the aggregate of the Earnings (up to $100,000 per eligible Member) received during such Plan Year by all eligible Members entitled to share in such Profit Sharing Allocation, disregarding for this purpose

32

the Earnings of Members who, pursuant to the Section 3.06(d)(i), are not entitled to share in such Profit Sharing Allocation. Subject to the limitations in Section 3.02 and Section 5.04, Company Stock or other property (including cash) with a value equal to an eligible Member's Profit Sharing Allocation for the Plan Year shall be allocated to the Member's Account from the following sources to the extent available: first, from forfeitures pursuant to Article 6 of the Plan, second, to the extent necessary, from shares of Company Stock released from the Suspense Account under Section 3.01(b)(i) as a result of the payment of dividends on Company Stock, third, to the extent necessary, from shares of Company Stock released from the Suspense Account under Section 3.01(b)(i) as a result of Company Contributions, and fourth, to the extent necessary, from Company Contributions allocated under Section 3.01(b)(ii).

      3.07.   Special Allocation for 1999.

      (a) In addition to the allocations contemplated for 1999 by the general provisions of the Plan, a special 1999 allocation of shares will be made as of December 31, 1999 to each Participant's account having a value equal to such Participant's allocable portion of the Adjustment Amount (as defined below) calculated with respect to such Participant for each Reconciliation Date. Such special allocations (and the related contributions to the extent giving rise thereto) are in addition to any other allocations (and related contributions) that would have been made under the Plan without regard to such special allocations (and the related contributions to the extent giving rise thereto), and the Company agrees in good faith not to take such special allocations (or related contributions) into account in determining the level at which any future allocations (or related contributions giving rise thereto) are set.

      (b)    for purposes of this Agreement the following terms shall have the following meanings:

(i)     "Adjustment Amount" with respect to any Reconciliation Date means (i) the excess, if any, of (A) the aggregate dividends which would have been paid with respect to the number of shares of common stock of the Company ("MSDW Common Stock") that would have been held by the Trustee of the Plan on such Reconciliation Date if all of the shares of Convertible Preferred Stock of the Company held by the Trustee of the Plan had been converted to MSDW Common Stock immediately prior to the record date for dividends payable on MSDW Common Stock immediately preceding such Reconciliation Date; over (B) one-fourth of the amount of the annual 1999 dividend which would have been paid on the number of shares of MSDW Preferred Stock that was held by the Trustee of the Plan on such Reconciliation Date; plus (ii) an amount calculated as though interest accrued at an annual rate of 8% on such excess from the day after the relevant Reconciliation Date to December 31, 1999.  As applied to an individual Participant, the allocable portion of the Adjustment Amount shall be determined in accordance with the foregoing with respect to the shares of ESOP Preferred Stock in such Participant's account as of the relevant date.

(ii)     "Reconciliation Date" means each of January 29, 1999, April 30, 1999, July 30, 1999 and October 29, 1999.

(c)     In the event of any distribution during 1999 in respect of a Participant that included accrued dividends (or amounts in respect thereof), the Company agrees to make appropriate additional distributions in respect of such Participant consistent with this Section 3.07 and to cause additional allocations necessary to fund such distributions.

3.08.     Transfers of Company Stock From Other Plans.

(a)  Effective June 25, 2002, each of the MSDW Stock Fund ESOP forming part of the DPSP and the MSDW Stock Fund ESOP forming part of the START Plan shall be transferred to

34

and merged into this Plan.  All assets and liabilities relating to the merged ESOPs shall be transferred to this Plan, and each participant account under each merged ESOP shall be transferred to a Transferred Subaccount established for such person under this Plan.  Effective October 1, 2002, the DPSP shall be merged with and into the START Plan and the START Plan shall be renamed the "Morgan Stanley 401(k) Plan."  For periods prior to October 1, 2002, references to the Morgan Stanley 401(k) Plan in this Section 3.08 or in other provisions of this Plan shall be deemed references to the DPSP and/or the START Plan, as applicable, and any references to specific provisions of the Morgan Stanley 401(k) Plan shall be deemed references to the corresponding provisions of the DPSP and/or the START Plan, as applicable.

(b)    Effective June 25, 2002, any portion of the account of a participant in the Morgan Stanley 401(k) Plan that is then invested in the Morgan Stanley Stock Fund, automatically or pursuant to such person's direction under section 8(d) of that plan, as the case may be, shall, in accordance with procedures established by the Plan Administrator, on or about the Tuesday preceding each record date for dividends on Company Stock, be transferred to this Plan and allocated to such person's Transferred Subaccount.

(c)    (i)    Subject to such conditions or limitations as the Plan Administrator shall determine, including such conditions and limitations as are necessary or advisable to ensure compliance with all applicable securities laws and the Company's policies regarding the trading of investments by employees, a person with a Transferred Subaccount shall be entitled to direct the investment of all or a portion of the amounts credited to such Subaccount into any of the investment funds then available under the Morgan Stanley 401(k) in the manner provided in section 8(d) of that plan; however, no such amounts shall be transferred from the Plan directly to the Morgan Stanley Stock Fund of the Morgan Stanley 401(k).  If such a direction is made, in accordance with

35

procedures established by the Plan Administrator, the amounts subject to such direction shall be transferred from this Plan to the Morgan Stanley 401(k) Plan, allocated to such person's account under the Morgan Stanley 401(k) Plan, and invested as so directed.  Following such a transfer, such person shall have no further right to benefits under this Plan with respect to the amounts so transferred, and all rights with respect to such amounts shall be enforceable only against the Morgan Stanley 401(k) Plan.

(ii)    The distribution options available with respect to a Transferred Subaccount are those options set forth in Article 7, plus such other forms of distribution as may be required to be provided under Code section 411(d)(6), as determined by the Plan Administrator.  To the extent amounts allocated to the Transferred Subaccount are attributable to a diversification transfer to the Morgan Stanley 401(k) Plan pursuant to Section 7.04 (which amounts, pursuant to Section 7.04 and the terms of the Morgan Stanley 401(k) Plan, have been subject to any vesting schedule applicable to such amounts under the terms of this Plan while held in the Morgan Stanley 401(k) Plan), such amounts shall continue to be subject to vesting  under the terms of this Plan. Amounts allocated to a Transferred Subaccount shall be available for loan in the same manner as other amounts allocated to a Participant's Account as provided in Appendix D.

(iii)    Cash dividends on Company Stock allocated to a Transferred Subaccount shall not be applied to the payment of outstanding obligations of the Trust under an Exempt Loan.

(iv)    If amounts allocated to a Transferred Subaccount are attributable to excess elective deferrals, excess contributions or excess aggregation contributions made by a participant under the Morgan Stanley 401(k) Plan, such amounts, adjusted for income or loss, shall be distributed to the participant as provided by that Plan.

36

ARTICLE 4.  INVESTMENT AND VALUATION OF TRUST FUND

4.01.   Investment of Trust Fund.

(a) Except to the extent used to repay an Exempt Loan and except as set forth in Section 7.04, Employer Contributions to the Plan shall be invested in shares of Company Stock. Consistent with the Plan's status as an employee stock ownership plan under Code section 4975(e)(7), the Trustee may keep such amounts of cash, securities or other property as it, in its sole discretion, shall deem necessary or advisable as part of the Trust Fund, all within the limitations specified in the trust agreement.

(b)     Dividends, interest, and other distributions received on the assets held by the Trustee in respect to the Trust Fund shall be reinvested in the Trust Fund, except as otherwise may be provided in Article 5 with respect to dividends on Company Stock.

4.02.   Valuation of Trust Fund.  On each Valuation Date there shall be allocated to the Account of each Participant his or her proportionate share of the increase or decrease in the fair market value of his or her Account in the Trust Fund.  Each Participant shall be furnished with a statement setting forth the value of his or her Account as of the end of each calendar quarter.

ARTICLE 5.  ACQUISTION OF COMPANY STOCK WITH PROCEEDS OF AN
            EXEMPT LOAN

5.01.   Purchase of Company Stock.  (a)  The Plan is an employee stock ownership plan (an "ESOP"), which is designed to invest primarily in qualified employer securities.  The Board of Directors, in its discretion, may direct the Trustee to acquire Company Stock with the proceeds of an Exempt Loan.

(b)     Company Stock acquired by the Trustee hereunder may be purchased on an established securities market, from the Company or from any other person or entity.  However,

37

Company Stock acquired from a "disqualified person" as defined in Code section 4975(e)(2) may not be purchased at a price in excess of "adequate consideration" as defined in ERISA section 3(18).

5.02.    Exempt Loan.  An Exempt Loan shall be used primarily for the benefit of Participants and their Beneficiaries, shall be for a specific term, shall bear a reasonable rate of interest and shall not be payable on demand except in the event of default.  In the event of default, the value of Plan assets transferred in satisfaction of the Exempt Loan shall not exceed the amount of default.  An Exempt Loan may be secured by a collateral pledge of the Company Stock acquired with the proceeds of such loan, contributions (other than contributions of Company Stock) that are made under the ESOP to meet its obligations under the Exempt Loan and earnings attributable to such collateral and the investment of such contributions but no other assets of the Trust may be pledged as collateral for the Exempt Loan and no lender shall have recourse against any assets of the Trust except to the extent permitted under Treas. Reg. section 54.4975-7(b)(5).  Any pledge of Company Stock shall provide for the release of shares so pledged on a pro rata basis as principal and interest on the Exempt Loan are repaid by the Trustee; *provided, however*, that an alternative method of releasing such stock from encumbrance may be utilized if permitted by applicable regulations under Code section 4975 and the Plan Administrator adopts such method.  Such stock shall be allocated as provided in Section 3.01(b)(i).

5.03.    Suspense Account; Cash Dividends on Unallocated Stock.  (a) Company Stock acquired with the proceeds of an Exempt Loan shall be held in the Suspense Account and shall be allocated to the Members' Accounts based on the release of Company Stock from the Suspense Account, as hereinafter provided.  During the term of the Exempt Loan, a number of shares of Company Stock shall be released per Plan Year equal to the number of shares in the Suspense Account multiplied by a fraction, the numerator of which shall be the amount of principal and

interest paid by the Trustee on the Exempt Loan for the Plan Year, and the denominator of which shall be the sum of the numerator and the aggregate principal and interest to be paid by the Trustee on the Exempt Loan for all future Plan Years; *provided, however*, that an alternative method of releasing such stock from encumbrance may be utilized if permitted by applicable regulations under Code section 4975 and the Plan Administrator adopts such method.  For this purpose, the number of future years under the Exempt Loan must be definitely ascertainable and must be determined without taking into account any possible extensions or renewal periods.  If the interest rate under the Exempt Loan is variable, the interest to be paid in future years shall be computed by using the interest rate applicable as of the end of the calendar year.  Shares may also be released from the Suspense Account more frequently than annually, provided in such event that the total number of shares of Company Stock released for a Plan Year shall not be less than the number of shares that would have been released from the Suspense Account for such Plan Year if such release had occurred on an annual basis.

(b)    Any cash dividends received by the Trustee on shares of Company Stock held in the Suspense Account (and any income related to the investment of such dividends) shall be applied to the payment of any outstanding obligations of the Trust under any Exempt Loan unless, in the sole discretion of the Plan Administrator, the Trustee is directed to use such amounts to buy additional shares of Company Stock.  Any shares of Company Stock released from the Suspense Account due to application of such amounts to the repayment of an Exempt Loan or purchased using such dividends shall be allocated to Members' Accounts on the basis set forth in Section 3.01(b)(i).

5.04.    Cash Dividends on Allocated Shares.

(a)   In accordance with such procedures and subject to such conditions as the Plan Administrator may provide, a Participant may elect to have cash dividends that are paid on Company

Stock allocated to his or her Account (as such dividends may be adjusted for any investment losses while held in the Trust or reduced for any withholdings) either: (i) paid to the Trust and reinvested in Company Stock, which may include purchases of additional Company Stock or an allocation of shares following the application of dividends to repayment of an Exempt Loan, (ii) paid directly to the Participant in cash, or (iii) paid to the Trust and distributed by the Trustee in cash to the Participant not later than 90 days after the close of the Plan Year in which paid to the Trust (provided that the Plan Administrator may determine that only one of option (ii) or option (iii), but not both, shall be available to Participants).

(b)     In accordance with such procedures as the Plan Administrator may provide, a Participant shall be given a reasonable opportunity to make an election under this Section 5.04 before the beginning of each quarter of the Company's taxable year with respect to dividends paid in such quarter; *provided, however*, that elections with respect to dividends paid in the taxable year of the Company beginning on December 1, 2001 (the first taxable year with respect to which the elections under this Section 5.04 shall be offered to Participants) shall be made by Participants following the end of such taxable year in December of 2002, with payment of any amounts a Participant elects to have distributed in cash made in or before January of 2003 in accordance with Section 5.04(d).  A Participant may have only one election in effect for his or her Account at any time (and may not make separate elections with respect to the different portions of his or her Account).  If a Participant who has previously made a timely election under this Section 5.04 does not make a new election with respect to dividends paid in a subsequent period, the Participant's prior election shall remain in effect for such subsequent period (and shall apply to all dividends paid on Company Stock during such period with respect to which an election is offered).  In the absence of a timely election, the Participant shall be deemed to have elected to have the dividends with respect to

which an election is offered accumulated in his or her Account and reinvested in Company Stock.

(c)     With respect to cash dividends on allocated shares of Company Stock that are paid in a taxable year of the Company beginning on or after December 1, 2002:

(i)     Any dividends that are the subject of a prior election by a Participant to receive such amounts in cash shall be distributed to the Participant as soon as practicable following payment.  The amount distributed to the Participant shall be the lesser of (A) the original amount of the dividends attributable to that Participant and (B) the amount of such dividends as adjusted for any investment losses while held in the Trust or reduced for any withholdings.

(ii)     Except as provided in subsection (iii), any dividends that are the subject of a prior election (or deemed election) by a Participant to have such amounts reinvested in Company Stock shall be so reinvested, as soon as practicable following payment, through either, at the discretion of the Plan Administrator, purchases of additional Company Stock or an allocation of shares following the application of the dividends to repayment of an Exempt Loan.  Notwithstanding the foregoing, dividends shall not be applied to the repayment of an Exempt Loan unless Company Stock with a fair market value equal to the amount of such dividends so applied is allocated to the Participant's Account for the taxable year of the Company in which the dividends were paid and unless the requirements of Code section 404(k)(2)(A)(iii) are met.  The excess, if any, of the fair market value of Company Stock released from the Suspense Account by reason of the application of dividends described in this Section 5.04 over the fair market value of Company Stock required to be allocated to a Participant's Account pursuant to the preceding sentence shall be allocated among Members' Accounts on the basis set forth in Section 3.01(b)(i) and Section 5(b)(iv) of Appendix B.

(iii)     Any dividends paid on Company Stock (A) allocated to a Participant's Transferred Subaccount, (B) transferred to the Plan from the START Plan in 2001 in accordance

with Appendix B, or (C) acquired through purchases of additional shares, that are the subject of a prior election (or deemed election) by a Participant to have such amounts reinvested in Company Stock shall be so reinvested as soon as practicable following payment.

(d)    With respect to cash dividends on allocated shares of Company Stock that are paid in the taxable year of the Company beginning on December 1, 2001:  Pending Participant elections with respect to such dividends following the end of such taxable year, such dividends shall be invested as directed by the Plan Administrator or by a Participant pursuant to Section 3.08(c) or 7.04 to the extent applicable; *provided, however*, that dividends shall be applied to the repayment of an Exempt Loan only in accordance with Section 5.04(c)(ii).  Notwithstanding the foregoing, pending Participant elections, any such dividends that are paid on Company Stock which is (i) allocated to a Participant's Transferred Subaccount, (ii) transferred to the Plan from the START Plan in 2001 in accordance with Appendix B, or (iii) acquired through purchases of additional shares, shall be invested in Company Stock or as otherwise directed by a Participant pursuant to Section 3.08(c) or 7.04.  If a Participant elects to have any such dividends distributed in cash, distribution will be made as soon as practicable following such election.  The amount distributed to the Participant shall be the lesser of (A) the original amount of the dividends attributable to that Participant, and (B) the amount of such dividends as adjusted for any investment losses while held in the Trust or reduced for any withholdings.

5.05.    Non-cash Dividends.  Any non-cash dividends or distributions on or in respect of Company Stock held in the Trust Fund shall be held or disposed of by the Trustee in the manner directed by the Plan Administrator in its sole discretion.

5.06.    Allocation Assurance.

(a) In exercising its powers under the Plan, to determine the amount of dividends to be applied in any year to the payment of principal and/or interest on an Exempt Loan (including but not limited to the powers set out in Plan Sections 5.03(b) and 5.04), the Plan Administrator shall direct the Trustee to apply dividends to repay debt to the extent necessary, but not more than the amount necessary, so as to cause the total allocations under the Plan for the year to meet the Plan's "Compensation Objective" for that year. In deciding how much debt should be repaid with dividends, the Plan Administrator shall take into account both the shares to be made available for the allocation as a result of ESOP debt repayments and all other amounts otherwise available for allocation for that year.

(b)    The "Compensation Objective" for any year shall mean the amount required to satisfy (i) the need for Matching Allocations and (ii) the need for Profit Sharing Allocations in the amount announced to Participants prior to the end of the year.

(c)    If the Plan Administrator determines that less than all dividends shall be applied in any year to the repayment of an Exempt Loan (principal and/or interest), the Plan Administrator shall give directions appropriate to cause allocated dividends to be so applied before so applying unallocated dividends unless the Plan Administrator determines that this ordering rule would make Plan accounting unreasonably burdensome or otherwise interfere with the practicable administration of the Plan.

## ARTICLE 6.  VESTING OF MEMBER ACCOUNTS

6.01.    Immediate Vesting for Certain Participants.  A Participant hired by an Employer before January 1, 2004, other than a Participant who is an IIG Member, shall have a fully vested and non-forfeitable interest in his Account at all times.

6.02.   Vesting Schedule for Participants Hired on or After January 1, 2004.  A Participant hired by an Employer on or after January 1, 2004 shall have a vested and non-forfeitable interest in his Account determined as set forth below.

| Years of Service | Vested Percentage |
| --- | --- |
| Less than 3 | 0% |
| 3 or more | 100% |

Notwithstanding the foregoing, any such Participant shall have a fully vested and non-forfeitable interest in his Account if the Participant reaches age 65  (or any later age) and completes at least three years of service while employed by an Employer or Affiliate or as required under Code section 411(a), or if the Participant terminates employment as a result of death, Total and Permanent Disability, Retirement or Release.

6.03.   Vesting Schedule for IIG Members Hired Prior to January 1, 2004.  An IIG Member hired by an Employer prior to January 1, 2004 shall have a vested and non-forfeitable interest in the portion of his or her Account that is attributable to Matching Allocations with respect to Plan Years beginning on or after January 1, 2002 and Profit Sharing Allocations determined as set forth above in Section 6.02, subject, to the extent applicable, to the last sentence in section 6(a) of Appendix B to the Plan and the related provisions in Supplement E to the Morgan Stanley 401(k) Plan. An IIG Member's vested and non-forfeitable interest in the remainder of his or her Account shall be determined as set forth in section 6(a) of Appendix B.

6.04.   Forfeitures.

(a)      In the event a Participant terminates employment with the Employer and all Affiliates, if the value of the Participant's vested Account is zero, the Participant shall be deemed to have received a distribution of such vested Account.  The non-vested portion of the Participant's

44

Account shall be forfeited as of the end of the month in which the Participant terminates employment with the Employer and all Affiliates.  Notwithstanding the foregoing, if a Participant who terminates employment shall subsequently be credited with one Year of Service before incurring five consecutive One Year Breaks, the amount so forfeited shall be restored to such Member's Account without adjustment for income, gains or losses; provided that such restoration shall be made from forfeitures arising in the Plan Year in which the restoration occurs or as otherwise determined by the Plan Administrator.  The foregoing forfeiture provisions shall only apply to the extent permitted by applicable law.

(b)     Any forfeitures remaining after restoration payments are made may be applied to pay Plan expenses, make allocations to Participants' Accounts in accordance with Section 3.06(a) and (d), or as otherwise determined by the Plan Administrator.

6.05.   Dividends.  Notwithstanding the foregoing, a Participant shall be fully vested in any cash dividends on Company Stock with respect to which the Participant is offered an election under Section 5.04 of the Plan, without regard to whether the Participant is vested in the Company Stock with respect to which such dividends are paid (with separate accounting for vested and unvested amounts allocated to the Participant's Account).

ARTICLE 7.  DISTRIBUTION OF ACCOUNTS

7.01.   General

(a)     A Participant's Account, including a Participant's Transferred Subaccount, shall be distributed as provided in this Article.

(b)     A Participant may request a distribution from his or her Account in accordance with Section 7.04 whether or not he or she has terminated employment.  A Participant

may request a distribution from his or her Account in accordance with Section 7.02(d) or 7.02(e) before terminating employment.

(c)    Automatic Payment.  Notwithstanding any other provision in the Plan to the contrary, if a Participant terminates Service and if the total value of the Participant's vested interest in his or her accounts under the Plan, determined as of the date distribution commences, does not exceed $5,000, the value of such vested interest shall be automatically distributed to the Participant in cash in a single lump-sum.  Effective September 1, 2002, if a Participant terminates service and the total value of his or her vested interest in his or her accounts under this Plan and the Morgan Stanley 401(k) Plan does not exceed $5,000 as of the date distribution commences, the value of such vested interest shall be automatically distributed to the Participant in a single lump-sum.  Effective March 28, 2005, if a Participant's vested accounts under this Plan and the Morgan Stanley 401(k) Plan total $1,000 or less on the date distribution would commence under Section 7.02(a)(ii), then payment of the Participant's Plan Benefit shall be made as soon as practicable after the date as of which the Participant's employment terminates.  If a Participant's vested accounts under this Plan and the Morgan Stanley 401(k) Plan total more than $1,000, but less than the limit in Code section 411(a)(11) (currently $5,000), no distribution shall occur, subject to Sections 7.03(b) through (d), without an election by the Participant.

7.02.    Time and Manner of Distribution.

(a)    A Participant whose employment is terminated for any reason, or the Beneficiary of a deceased Participant shall be entitled, upon request in accordance with procedures established by the Plan Administrator, to receive distribution of his or her entire vested interest in his or her Account in accordance with the rules set forth below.  Furthermore, effective October 1, 2001, such a terminated Participant or Beneficiary may, upon request in accordance with procedures established

46

by the Plan Administrator, receive distribution of a portion of his or her vested interest in his or her Account, provided that a Participant or Beneficiary may not receive more than two partial distributions in any calendar year pursuant to this Section, unless if, after electing two partial distributions in a calendar year, the Participant or Beneficiary elects a final lump sum distribution of the remainder of his or her vested interest in his or her Account. A Participant or Beneficiary may not receive any distribution which is less than $500 or, if less, the value of his or her vested interest in his or her Account. A Participant or Beneficiary may not receive any distribution which is less than $500 or, if less, the value of his or her Account. Notwithstanding the foregoing, in the case of a Participant who is receiving distributions from his or her account under the Morgan Stanley 401(k) Plan pursuant to an installment payment option available for DPSP participants for distributions commencing prior to March 1, 2001, distribution of such Participant's Transferred Subaccount shall be made in accordance with such installment payment option.

        (i)      In general, the distribution of a Participant's Account, determined as of the Valuation Date on or immediately after the Participant's termination of Service, shall be made as soon as practicable following such Valuation Date.

        (ii)     Notwithstanding the foregoing, except as provided in Section 7.01(c), if a Participant's vested interest in his or her Account exceeds $5,000, determined as of the Valuation Date on or immediately after the Participant's termination of Service, and he or she does not consent in writing to an immediate distribution to be made as soon thereafter as administratively feasible, distribution of his or her vested interest shall be made as soon as practicable after such consent is given. Effective September 1, 2002, a Participant must consent to a distribution in accordance with the foregoing sentence if the total value of the Participant's vested interest in his or her accounts under this Plan and the Morgan Stanley 401(k) Plan exceeds $5,000 on the

47

determination date.  Effective March 1, 2001, the Plan Administrator may, on a uniform and nondiscriminatory basis, and consistent with Treas. Reg. section 411(a)-11T (or any successor thereto), substitute other dates for the Valuation Dates described in the first sentence of this Section 7.02(a)(ii).  Effective March 28, 2005, if the value of a Participant's accounts in this Plan and the Morgan Stanley 401(k) Plan total $1,000 or less on the date distribution is to occur, then distribution will be made as soon as practicable after the date as of which the Participant's employment terminates.  If a Participant's vested accounts under this Plan and the Morgan Stanley 401(k) Plan total more than $1,000, but less than the limit in Code section 411(a)(11) (currently $5,000), no distribution shall occur, subject to Sections 7.03(b) through (d), without an election by the Participant.

(iii)    Effective March 1, 2001, any amount distributed to a Beneficiary in the event of a Participant's death shall be distributed no later than December 31st of the calendar year that contains the fifth anniversary of the Participant's death.  As to any portion of the interest of a Participant with respect to which no Beneficiary has been designated either under the terms of the Plan or by such Participant, or the Beneficiary so designated fails to survive the Participant, the Beneficiary shall be the Participant's surviving spouse; or, if none, the person properly designated by the Participant as his or her beneficiary under the Morgan Stanley 401(k) Plan; or if the Participant has not properly designated a beneficiary under the Morgan Stanley 401(k) Plan or the designated beneficiary under that plan does not survive the Participant, the Participant's estate.  Any Beneficiary designation made by a Participant under this Plan on or after October 1, 2002 shall not be effective unless the designated Beneficiary is the same as the beneficiary designated by the Participant under the Morgan Stanley 401(k) Plan.

(b)     Distributions shall be paid in a single sum consisting of shares of Company Stock or cash, at the election of the Participant or his or her Beneficiary, which election shall be made within ten days after the Participant's termination of Service or within such other time period as may be specified by the Plan Administrator.  Unless the participant or Beneficiary elects to receive the distribution in Company Stock, such distribution shall be paid entirely in cash.  If the distribution is made in Company Stock, any unpaid dividends which may be due and any balance in the Account representing fractional shares will be paid in cash.  If the Participant or Beneficiary does not elect to receive the distribution in Company Stock, such Participant or Beneficiary shall be permitted to rollover his or her distributed benefit into the DPSP, provided that (i) such Participant or Beneficiary is also a participant in the DPSP, as defined therein, immediately prior to any such rollover and (ii) such Participant's termination of Service was on account of Retirement.  Any subsequent distributions of such rollover amounts shall be subject to the terms of the DPSP. Effective October 1, 2002, any Participant or Beneficiary who is also a participant in the Morgan Stanley 401(k) Plan shall be permitted to roll over his or her distributed benefit to the Morgan Stanley 401(k) Plan in accordance with, and subject to the conditions set forth in, the two preceding sentences.

(c)     Shares of Company Stock distributed pursuant to Section 7.02(b) that at the time of such distribution are not readily tradable on an established market shall be subject to a put option which shall permit the Participant or Beneficiary to sell such stock to the Company at any time during two option periods, at the fair market value of such shares (as of the most recent Valuation Date).  The first period shall be for at least 60 days beginning on the date of distribution. The second period shall be for at least 60 days beginning on the first Valuation Date in the calendar year following the year in which the distribution was made.  The Company or the Plan Administrator

49

may direct the Trustee to purchase shares tendered to the Company under a put option.  Payment for any shares of stock sold under a put option shall be made in a lump sum or in substantially equal annual installments over a period not exceeding five years, with interest payable at a reasonable rate (as determined by the Plan Administrator).  Except as may be permitted under applicable law or regulations, the rights of a distributee of Company Stock under this Section 7.02(c) shall survive the repayment of any relevant Exempt Loan, the termination of the Plan and any amendment of the Plan.

(d)     A Participant who has attained age 59½ shall be entitled, upon request in accordance with procedures established by the Plan Administrator, to receive a distribution of that portion of his or her Account that is then vested and subject to an election to change investments pursuant to Section 7.04.  Distributions under this Section 7.02(d), when aggregated with distributions under Section 7.02(e), are limited to two per calendar year (excluding hardship withdrawals as described in section 12(f) of the Morgan Stanley 401(k) Plan).  The minimum amount a Participant may elect to withdraw shall be $500 or, if less, the value of the applicable portion of the Participant's Account.  Any such distribution shall be paid in accordance with the applicable provisions of Sections 7.02(b) and 7.02(c).

(e)     The in-service distribution options available under this Plan with respect to vested amounts allocated to a Participant's Transferred Subaccount, including the time, manner and medium of distributions, are the same as the distribution options that would have been available with respect to such amounts under the Morgan Stanley 401(k) Plan had they not been transferred to this Plan.  Distributions under this Section 7.02(e), when aggregated with distributions under Section 7.02(d) are limited to two per calendar year (excluding hardship withdrawals as described in section 12(f) of the Morgan Stanley 401(k) Plan), provided that a Participant shall be allowed one additional

distribution from his or her Transferred Subaccount if, after electing two distributions in a calendar year, the Participant elects a total distribution of his or her Transferred Subaccount.

    7.03.   Latest Commencement of Payments.

    (a)  Notwithstanding the provision of Section 7.01 of the Plan, unless a Participant elects otherwise, the amount in such Participant's Account shall be distributed not later than the 60th day following the end of the Plan Year in which the latest of the following occurs:  (i) the Participant's 65th birthday, (ii)  the tenth anniversary of the date on which he or she became a Member, or (iii)  the date he or she terminates Service with the Employer

    (b)    Anything in the Plan to the contrary notwithstanding, distributions under this Plan shall meet the requirements of Code section 401(a)(9) and the regulations thereunder, including the minimum distribution incidental death benefit requirement of Code section 401(a)(9)(G). Distributions shall be made in accordance with Treas. Reg. sections 1.401(a)(9)-1 through 1.401(a)(9)-9.  Such requirements shall override any inconsistent distribution options in the Plan. Such requirements are incorporated herein by reference.

    (c)    With respect to a Participant who attained age 70 ½ prior to January 1, 1999, payment of the amounts credited to the Participant's accounts shall commence no later than the April 1st next following the Year in which the Participant attained (or would have attained, in the case of a deceased Participant) age 70 ½, whether or not such Employee has terminated Service; *provided,* that a Participant who attained age 70 ½ after December 31, 1995 and prior to January 1, 1999 and who is an Employee on the April 1st next following the Year in which such Participant attained age 70 ½, may make an irrevocable one-time election to defer receipt of payment of the Participant's Account until the Participant's termination from Service, but in no event later than the April 1st next following the Year in which such termination from Service occurs.

(d)    With respect to a Participant who attains age 70 ½ on or after January 1, 1999, payment of the amounts credited to the Participant's accounts shall commence on the April 1st next following the later of the Year in which the Participant (A) attains age 70 ½, or (B) terminates Service.

(e)    Notwithstanding the foregoing, effective January 1, 2002, the following rules shall govern the payment of the annual amount of the minimum required distribution under Section 7.03(c) to a Participant who has not terminated from Service. The minimum required payment for a Year subsequent to the Year in which payment commenced pursuant to Section 7.03(c) shall be made only if the Participant elects at the time and in such manner prescribed by the Plan Administrator to receive payment in such year.  The failure to make such an election shall be deemed to be an election by the Participant to defer receipt of the payment, and the amount of such deferred payment shall thereafter be held in the Account maintained for the Participant under the Plan and adjusted as provided in Section 4.02.

7.04.    Diversification of Account.

(a) In accordance with this Section 7.04, each eligible Participant may make an election to direct the investment of the eligible portion of his or her Account to such designated investment funds (as defined below) as he shall select.  For purposes of this Section 7.04, "designated investment funds" shall be such alternative investment funds established within the Plan or in another defined contribution plan of the Company or one of its Affiliates that is intended to be qualified under Code section 401(a) to receive the transfers described in this Section 7.04 which the Plan Administrator shall designate from time to time as alternative investment funds; an "eligible Participant" shall mean any Participant who has attained age 55 or, after December 31, 2006, is credited with at least three Years of Service.  For purposes of this Section 7.04, including for

purposes of calculating the portion of a Participant's Account that is eligible for diversification at any time pursuant to Section 7.04(b), the Participant's Account shall not include his or her Transferred Subaccount. A Participant shall be entitled to direct the investment of amounts credited to his or her Transferred Subaccount into alternative investment funds under the Morgan Stanley 401(k) Plan in the manner provided in Section 3.08 and section 8(d) of the Morgan Stanley 401(k) Plan. Any portion of a Participant's Account that the Participant elects to diversify into alternative investment funds shall continue to be subject to any vesting schedule applicable to the diversified amounts under the terms of this Plan.

(b)     The portion of an eligible Participant's Account which is subject to an election to change investments is equal to the excess of (i) or (ii), as applicable, over (iii) as follows:

(i)     prior to January 1, 2007, 50% of the total number of shares of Company Stock that have ever been allocated to such Participant's Account as of the date of such Participant's election (adjusted appropriately to reflect subdivision or combinations of such shares or similar transactions); provided that "75%" shall be substituted for "50%" for any eligible Participant who has attained age 60; and

(ii)     on and after January 1, 2007, subject to the transition rule described in subparagraph (iv) of this Section 7.04(b), the total number of shares of Company Stock that have been allocated to such Participant's Account (adjusted appropriately to reflect subdivision or combinations of such shares or similar transactions); and

(iii)     the number of shares of Company Stock alternatively invested or transferred to another plan by the Participant pursuant to his or her prior elections under this Section 7.04.

(iv)     Transition Rule.  In the case of the portion of a Participant's account to which subparagraph (ii) of this Section 7.04(b) applies and which consists of Company Stock that was acquired by the Participant's Account prior to January 1, 2007, subparagraph (ii) shall apply to the following percentages of such portion of the Participant's account beginning in the following fiscal quarters of the Company's 2007 fiscal year (with specific effective dates to be determined by the Plan Administrator):

| Quarter | Applicable Percentage |
|---|---|
| 1st quarter (ending February 28, 2007) | 25% |
| 2nd quarter (ending May 31, 2007) | 50% |
| 3rd quarter (ending August 31, 2007) | 75% |
| 4th quarter (ending November 30, 2007) | 100% |

Notwithstanding the foregoing, in the case of a Participant who attained age 55 and completed at least three Years of Service before January 1, 2006, subparagraph (iv) shall not apply.

(c)     An amount that is subject to an election to direct an investment transfer under this Section 7.04 cannot be reinvested in Company Stock under the Plan, provided, that, effective June 25, 2002, any such amount that is held in the Morgan Stanley 401(k) Plan may be reinvested in Company Stock under this Plan in accordance with section 8(d) of the Morgan Stanley 401(k) Plan and Section 3.08 of this Plan.

(d)     (i)     Notwithstanding anything in the Plan to the contrary, the Plan Administrator may require Participants to complete such process as may be established by the Plan Administrator before any election involving an acquisition or disposition of Company Stock may take effect.  The Plan Administrator shall adopt such rules, restrictions and procedures as it deems advisable with respect to all matters relating to the election and use of Company Stock.  The Plan

Administrator shall have the right, without prior notice to any Participant, to suspend transfers into or out of Company Stock, to delay effecting transfers into or out of Company Stock or to limit the frequency or amount of transfers into or out of Company Stock, if the Plan Administrator determines that such action is necessary or advisable, including without limitation: (1) in light of unusual market conditions, (2) in response to technical or mechanical problems with the Plan's record keeping or administrative systems,  (3) in connection with any suspension of normal trading activity on the New York Stock Exchange or other applicable exchange or automated trading system or (4) in connection with any restrictions on trading that are contained in the Company's Code of Conduct or Code of Ethics, or that are imposed by the Company from time to time.

        (ii)      Notwithstanding anything in the Plan to the contrary, any election by a Participant involving an acquisition or disposition of Company Stock shall be subject to such conditions and restrictions as the Plan Administrator determines to be necessary or advisable to ensure compliance with all applicable securities laws and the Company's policies regarding the trading of investments by employees.  Without limiting the generality of the foregoing, (i) the Plan Administrator may from time to time prescribe rules of uniform application to those Participants subject to Section 16 of the Securities Exchange Act of 1934, as amended, to ensure compliance with the conditions for exemption in Rule 16b-3 under such Section, and (ii) except as the Plan Administrator may otherwise provide in its sole discretion, in accordance with Section 7.04(d)(i), no transaction in allocated Company Stock may be effected at the direction of a Participant or Beneficiary unless such Participant or Beneficiary would be permitted, under the Company's policies regarding trading of investments by employees, to effect such transaction in his or her account other than under the Plan.

        (iii)      The provisions of Sections 7.04(d)(i) and (ii) shall be interpreted in a

manner that is consistent with the requirements of Code section 401(a)(35)(D)(ii)(II).

7.05.  Proof of Death and Right of Beneficiary or Other Person.  The Plan Administrator may require and rely upon such proof of death and such evidence of the right of any Beneficiary or other person to receive the value of the Account of a deceased Participant as the Plan Administrator may deem proper and its determination of death and of the right of that Beneficiary or other person to receive payment shall be conclusive.

7.06.  Eligible Rollover Distributions.

(a) This Section 7.06 applies to distributions made on or after January 1, 1993. Notwithstanding any provision of the Plan to the contrary that would otherwise limit a distributee's election under this Section 7.06, a distributee may elect, at the time and in the manner prescribed by the Plan Administrator, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

(b)  An "eligible rollover distribution" is any distribution of all or any portion of the balance to the credit of the distributee, except that an eligible rollover distribution does not include:  any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under Code section 401(a)(9); and the portion of any distribution that is not includible in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities).  An "eligible rollover distribution" shall not include any distribution that is a distribution of dividends pursuant to Section 5.04.

(c)      An "eligible retirement plan" is an individual retirement account described in Code section 408(a), an individual retirement annuity described in Code section 408(b), an annuity plan described in Code section 403(a), or a qualified trust described in Code section 401(a), that accepts the distributee's eligible rollover distribution.  However, in the case of an eligible rollover distribution to the surviving spouse, an eligible retirement plan is an individual retirement account or individual retirement annuity.

(d)      A "distributee" includes an employee or former employee.  In addition, the employee's or former employee's surviving spouse and the employee's or former employee's spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in Code section 414(p), are distributees with regard to the interest of the spouse or former spouse.

(e)      A "direct rollover" is a payment by the Plan to the eligible retirement plan specified by the distributee.

(f)      Effective January 1, 2007, the non-spouse Beneficiary of a Participant following the death of the Participant may direct the Plan Administrator to directly roll over all or any portion of a distribution or withdrawal made to such non-spouse Beneficiary to an individual retirement plan described in Code sections 408(a) or 408(b).  Any such rollover shall be made in accordance with the requirements of Code section 402(c)(11) and any guidance promulgated thereunder.

7.07.   Elections.

(a) Notwithstanding any other provision of this Plan to the contrary, to the extent permitted by the Code, a Participant may elect a distribution or a form of distribution permitted under this Article 7 by completing a form provided for this purpose by the Plan Administrator, which shall be delivered to the Participant no earlier than 90 days and no later than 30 days prior to

the commencement of a distribution.  A distribution to a Participant will not commence before the expiration of the 30-day period beginning on the date that the Participant is provided with the written notice and explanation contemplated by Treas. Reg. section 1.411(a)-11(c) (the "Notice"), unless the requirements of Section 7.07(b) are satisfied.

(b)    Notwithstanding subparagraph (a) above, if (i) the Plan Administrator informs the Participant that the Participant has the right to a period of at least 30 days after receiving the Notice to consider the decision of whether to elect a distribution and (ii) the Participant, after receiving the Notice, affirmatively elects in writing, or such other method permitted by the Code, to receive an immediate distribution and to waive the remainder of the 30-day period, then a distribution of the Participant's Account may commence at any time following the expiration of the seven-day period beginning on the date that the Notice was first delivered to the Participant.

ARTICLE 8.  TENDERS AND VOTING

8.01.    Tenders for Company Securities.

(a) Notwithstanding other provisions of this Plan to the contrary, in the event an offer shall be received by the Trustee (including but not limited to a tender offer or exchange offer within the meaning of the Securities Exchange Act of 1934, as from time to time amended and in effect) to acquire any shares of Company Stock held by the Trustee in the Trust, whether or not allocated to the Account of any Participant (hereinafter referred to as an "Offer"), the Trustee shall have no discretion or authority to sell, exchange or transfer any of such shares pursuant to such Offer except in accordance with the provisions of this Section 8.01.  The Trustee shall solicit instructions from each participant, as named fiduciary, with respect to the sale, exchange or transfer of any Company Stock held by the Trustee subject to such Offer and allocated to such Participant's Account, and,

subject to the provisions of paragraphs (e) and (f) of this Section 8.01 and to the provisions of Section 8.03(b), will follow any instructions timely received from such Participants with respect to such Company Stock.  With respect to any Company Stock held by the Trustee subject to such Offer and not allocated to any Account, the Trustee shall sell, exchange or transfer an amount of unallocated Company Stock equal to the total amount of unallocated Company Stock multiplied by a fraction, the numerator of which is the amount of Company Stock allocated to the Accounts of Participants who directed a sale, exchange or transfer of their allocated Company Stock pursuant to the foregoing sentence and the denominator of which is the total amount of Company Stock allocated to all Accounts under the Plan.  A merger or similar transaction with respect to Company Stock that is presented to Company stockholders for a vote shall not be considered an Offer for purposes of this Section 8.01, but shall be subject to the provisions of Section 8.02.

(b)     The failure of any Participant, as named fiduciary, to instruct the Trustee in a timely manner with respect to Company Stock allocated to such Participant's Account shall be deemed to constitute instructions to the Trustee not to sell, exchange or transfer any of such shares. The Trustee shall communicate or cause to be communicated to each Participant the provisions of this Plan relating to the right of such Participant to direct the Trustee with respect to Company Stock subject to the Offer and allocated to such Participant's Account, including the effect of such direction on the Trustee's obligations hereunder with respect to unallocated Company Stock.  Such communication shall also discuss the consequences of any such failure to timely instruct the Trustee, including without limitation the fact that Participants failing to timely instruct the Trustee will not be included in the numerator of the fraction referred to in the third sentence of Section 8.01(a).

(c)     In the event that, under the terms of an Offer or otherwise, any shares of Company Stock tendered for sale, exchange or transfer pursuant to such Offer may be withdrawn

from such Offer, the Trustee shall follow such instructions respecting the withdrawal of such securities allocated to the Account of any Participant from such Offer as shall be timely received by the Trustee from the respective Participants, as named fiduciaries therefor, and shall withdraw a corresponding pro rata number of unallocated shares by applying the fraction set forth in Section 8.01(a), as adjusted to reflect such withdrawals of allocated shares.

(d)    In the event that an Offer for fewer than all of the shares of Company Stock held by the Trustee in the Trust shall be received by the Trustee, each Participant who has been allocated any Company Stock subject to such Offer shall first be entitled to direct the Trustee as to the acceptance or rejection of such Offer (as provided by Section 8.01(a)) with respect to the largest portion of such Company Stock as may be possible given the total number or amount of shares of Company Stock the Plan may sell, exchange or transfer pursuant to the Offer based upon the instructions received by the Trustee from all other Participants who shall timely instruct the Trustee pursuant to this Section 8.01 to sell, exchange or transfer such shares pursuant to such Offer, each on a pro rata basis in accordance with the number or amount of such shares allocated to their respective Accounts.  Only if all Participants directing the tender of their allocated shares are able to tender their entire Accounts in accordance with the foregoing, will the Trustee then sell, exchange or transfer as many unallocated shares in the Offer, in accordance with the provisions of Section 8.01(a), as may remain eligible for sale, exchange or transfer pursuant to the terms of such Offer.

(e)    In the event an Offer shall be received by the Trustee and instructions shall be solicited from Participants pursuant to this Section 8.01 regarding such Offer, and prior to termination of such Offer, another Offer is received by the Trustee for the securities subject to the first Offer, the Trustee shall, if practicable, make a reasonable effort under the circumstances to solicit instructions from the Participants to the Trustee (i) with respect to securities tendered for sale,

60

exchange or transfer pursuant to the first Offer, whether to withdraw such tender, if possible, and, if withdrawn, whether to tender any securities so withdrawn for sale, exchange or transfer pursuant to the second Offer and (ii) with respect to securities not tendered for sale, exchange or transfer pursuant to the first Offer, whether to tender or not to tender such securities for sale, exchange or transfer pursuant to the second Offer. The Trustee shall follow all such instructions received in a timely manner from Participants in the same manner and in the same proportion as provided in Section 8.01(a). With respect to any additional Offer received by the Plan and subject to any earlier Offer (including successive Offers from one or more existing offerors), the Trustee shall act in the same manner as described above.

(f)     In the event an Offer for any Company Stock held by the Trustee in the Trust shall be received by the Trustee and the Participants shall be entitled to determine to accept, reject or withdraw an acceptance of such Offer pursuant to paragraphs (a) through (e) of this Section 8.01, neither the Company nor the Trustee shall improperly interfere in any manner with the decision of any Participant regarding the action of the Participant with respect to such Offer and the Trustee shall arrange for such action to be taken on a confidential basis.

8.02.    Voting Company Stock.

(a) Notwithstanding any other provision of this Plan to the contrary, the Trustee shall have no discretion or authority to vote Company Stock held in the Trust by the Trustee on any matter presented for a vote of the stockholders of the Company except in accordance with the provisions of this Section 8.02. The Trustee shall solicit instructions from each Participant, as named fiduciary, as to the manner in which the Company Stock allocated to such Participant's Account shall be voted. Subject to the provisions of this Section 8.02 and of Section 8.03(b), the Trustee shall follow any such directions that are timely received with respect to such Company

Stock.  With respect to any Company Stock held by the Trustee and not allocated to any Account, the Trustee shall vote all such shares in favor of or against the matter being voted upon in the respective amounts determined by multiplying the total number of unallocated shares of Company Stock by a fraction, the numerator of which is the number of shares of Company Stock allocated to the Accounts of Participants directing a vote in favor of and against the matter, respectively, with respect to their allocated shares and the denominator of which in both cases is the total number of shares of such Company Stock allocated to the Accounts of all such Participants who have provided directions to the Trustee to vote either for or against the matter under the preceding sentence.

(b)    Prior to October 1, 2001, the failure of any Participant, as named fiduciary, to provide in a timely manner instructions to the Trustee with respect to Company Stock allocated to such Participant's Account shall be deemed to constitute instructions to the Trustee not to submit a proxy with respect to such allocated Company Stock.  On and after October 1, 2001, with respect to any Company Stock held by the Trustee and allocated to Participants' Accounts for which no voting directions were timely received, the Trustee shall vote all such shares in favor of or against the matter being voted upon in the respective amounts determined by multiplying the total number of such shares of Company Stock by a fraction, the numerator of which is the number of shares of Company Stock allocated to the Accounts of Participants directing a vote in favor of and against the matter, respectively, with respect to their allocated shares and the denominator of which in both cases is the total number of shares of such Company Stock allocated to the Accounts of all such Participants who have provided directions to the Trustee to vote either for or against such matter. The Trustee shall communicate or cause to be communicated to each Participant the provisions of this Plan relating to the right of such Participant to direct the Trustee with respect to the voting of Company Stock allocated to such Participant's Account and the consequences of any failure to

timely provide voting directions.  Such communication shall also discuss the effect of timely voting directions on the Trustee's obligations hereunder with respect to unallocated and undirected Company Stock.

8.03.    Trustee's Responsibilities.

(a) The Trustee shall distribute or cause to be distributed any and all communications required by this Article 8.  The Company shall provide the Trustee with such information and assistance as the Trustee may reasonably request in connection with any communications or distributions to Participants.

(b)    If, following a change in applicable law (as described below), the Trustee shall determine, based on the opinion of counsel for the Trustee, that such change invalidates under ERISA or other applicable federal law, in all circumstances or in any particular circumstances, any provision or provisions of Section 8.01 regarding the determination to be made as to whether or not Company Stock held by the Trustee shall be tendered pursuant to an Offer, or any provision or provisions of Section 8.02 regarding the manner in which Company Stock held in the Trust shall be voted, or causes any such provisions or provision to conflict with ERISA or other applicable federal law, then, upon notice thereof to the Company and the Plan Administrator, such invalid or conflicting provisions of Section 8.01 or Section 8.02 shall be given no further force or effect.  In such event, the Trustee shall exercise its residual fiduciary responsibility with respect to such matters, unless the Trustee shall have received timely written directions from the Plan Administrator, acting as a named fiduciary of the Plan, with respect to such matters.  For these purposes, the phrase "change in applicable law" shall mean any amendment to ERISA, any enactment or amendment of any other applicable federal law, any court opinion interpreting ERISA or such other applicable federal law, or any regulation issued under, or ruling or interpretation issued with respect to, ERISA

63

or such other applicable federal law by an appropriate governmental agency.  To the extent that the Trustee is required to render any residual fiduciary responsibility with respect to the sale, exchange, transfer or vote of Company Stock, the Trustee shall, unless it is clearly imprudent to do so, take full recognition of any directions timely received from Participants in exercising its fiduciary judgment, as such directions are most indicative of what is in the best interest of Participants.  In addition the Trustee shall take into consideration any relevant financial factors bearing on such decision as well as, to the extent permissible under applicable law, any other relevant factors bearing on such decision, including but not limited to the prospect of the Participants and prospective Participants for future benefits under the Plan, including any subsequent release and allocation of Company Stock held in the Suspense Account.

(c)      In the event that any option, right, warrant or similar property derived from or attributable to the ownership of the Company Stock shall be granted, distributed or otherwise issued which is and shall become exercisable, the Trustee may, in its sole discretion, unless otherwise directed by the Plan Administrator, sell, exercise or retain and keep unproductive of income any such option, right, warrant, or similar property, whether or not attributable to Company Stock allocated or held in any Account or in the Suspense Account.  In the event of a discretionary decision by the Trustee to exercise, the Trustee shall be deemed to be authorized to accumulate the amount equal to the consideration necessary to exercise from any of the sources specified herein and to hold such acquired securities in the Trust as specified herein.  In connection with any discretionary decisions by the Trustee to sell, exercise or retain and keep unproductive of income any such option, right, warrant, or similar property, the Trustee shall consider, in addition to any relevant financial factors bearing on such decision, any relevant non-financial factors or other factors as the Trustee may deem relevant.

(d)    Notwithstanding anything elsewhere in this Plan to the contrary, any proceeds received by the Trustee as a result of the sale, exchange or transfer of Company Stock pursuant to an Offer or any proceeds received as a result of a transaction presented to a vote of Company stockholders shall, unless otherwise directed by the Plan Administrator, be reinvested in Company Stock by the Trustee, if such securities are available for purchase and if not, to the extent attributable to unallocated stock in the Suspense Account, shall be used to pay down the Exempt Loan.  The balance of the proceeds, if any, and the proceeds attributable to allocated Company Stock shall be invested in the discretion of the Trustee in fixed-income investments issued or guaranteed by the United States of America or any agency or instrumentality thereof having a maturity of not more than one year from the time such investment is made until the Trustee is otherwise directed by the Plan Administrator or, until the Participants to whose Accounts such investments are allocated shall be entitled to receive distributions from the Trust in accordance with the Plan.

8.04.    Shareholder Communication.  Notwithstanding anything to the contrary in this Article 8, the Trustee shall make any and all communications or distributions required under the Shareholder Communications Act of 1985 and any rules thereunder.

8.05.    One Share Allocation.  For purposes of this Article 8 only, during the period commencing on the first date of adoption of the Plan by any Employer and ending on the date upon which the first allocation of Company Stock to Members pursuant to Section 3.01 hereof shall be effective, each Member shall be deemed to have one share of each class of Company Stock then held in the Suspense Account allocated to the Account of such Member.

ARTICLE 9.  ADMINISTRATION OF PLAN

9.01.    Plan Administrator.  The responsibility for general administration of the Plan and for carrying out the provisions of the Plan shall be placed in the Plan Administrator.  The Plan Administrator shall be a "named fiduciary" with respect to the Plan, as such term is defined in ERISA section 402(a), and shall be the Plan's "administrator," as such term is defined in ERISA section 3(16).  The Committee established in accordance with Section 9.12 shall be the named fiduciary that, subject to Section 9.12(h), shall have the authority to act with respect to any claim for benefits under the Plan.  The Hearing Panel established in accordance with Section 9.12 shall be the named fiduciary that shall have the authority to act with respect to any appeal from the denial of a claim for benefits under the Plan.

9.02.    Procedure and Performance of Duties; Delegation

(a)    The Plan Administrator may employ such agents, counsel, accountants or other persons (who also may be employed by an Employer or Affiliate) as the Plan Administrator may consider necessary or advisable to properly carry out the administration of the Plan.

(b)    The Plan Administrator may delegate its Fiduciary Responsibilities to any other person as the Plan Administrator in its sole discretion shall decide, provided that such delegation and the acceptance thereof by such other person shall be in writing.  Upon a delegation of Fiduciary Responsibilities, the person or persons to whom such Fiduciary Responsibilities are delegated shall be solely responsible for the performance of such Fiduciary Responsibilities, except as provided by law, and all references in the Plan to the Plan Administrator shall be deemed to be references to such person.  The Plan Administrator shall perform its delegation functions in the same manner as it performs all of its other Fiduciary Responsibilities pursuant to Section 9.02(c) below.

(c)    The Plan Administrator shall perform only its Fiduciary Responsibilities as provided in the Plan, except those Fiduciary Responsibilities which are delegated pursuant to

66

Section 9.02(b) above, if any, and those Fiduciary Responsibilities which are to be performed by the Trustee pursuant to the Trust Agreement.

(d)     The Plan Administrator, Committee, Hearing Panel and each other person who has Fiduciary Responsibilities with respect to the Plan shall be bonded if and as required by ERISA.

9.03.    Individual Accounts.  The Plan Administrator shall establish or cause to be established, and shall maintain or cause to be maintained, records showing the individual balance in each Participant's Account and, if applicable, separately showing the balance in the Participant's Transferred Subaccount.  However, maintenance of such records and Accounts shall not require any segregation of the funds of the Plan.

9.04.    General Powers of Plan Administrator.  The Plan Administrator shall have the power and the duty to take all actions and to make all decisions necessary or proper to carry out its responsibilities under the Plan.  Subject to Section 9.12, The Plan Administrator shall have the exclusive right to determine any question arising under or in connection with the administration of the Plan, including, but not limited to, the authority to interpret the Plan, to remedy ambiguities, inconsistencies or omissions arising under or in connection with the Plan, to direct disbursements by the Trustee and to exercise the other rights and powers specified herein.

9.05.    Rules and Regulations.  Subject to the limitations set forth in the Plan, the Plan Administrator may from time to time establish such uniform and nondiscretionary rules and regulations as it may deem appropriate or necessary for the transaction of business and for the administration of the Plan.

9.06.    Conversion of Amounts of Earnings.  The Plan Administrator shall have full and final authority with respect to Earnings paid in a foreign currency to convert such Earnings into

currency of the United States in such manner as the Plan Administrator may from time to time determine for the purposes of the Plan.

9.07.    Service in More Than One Fiduciary Capacity.  Any individual, entity or group of persons may serve in more than one fiduciary capacity with respect to the Plan and/or the funds of the Plan.

9.08.    Limitation of Liability.  An Employer, the directors of an Employer, the Plan Administrator, the members of the Committee and Hearing Panel established in accordance with Section 9.12, and any officer, employee or agent of an Employer shall not incur any liability individually or on behalf of any other individuals or on behalf of an Employer for any act or failure to act, made in good faith in relation to the Plan or the funds of the Plan.  However, this limitation shall not act to relieve any such individual or an Employer from a responsibility or liability for any fiduciary responsibility, obligation or duty under Part 4 of Subtitle B of Title I of ERISA.

9.09.    Indemnification.  The Plan Administrator, members of the Committee, members of the Hearing Panel, directors, officers, employees and agents of an Employer shall be indemnified by the Employer against any and all liabilities arising by reason of any act, or failure to act, any expenses reasonably incurred in the defense of any claim relating to the Plan or the funds of the Plan, and amounts paid in any compromise or settlement relating to the Plan or the funds of the Plan, except for actions or failures to act due to willful misconduct or lack of good faith.

9.10.    Meetings.

(a)      A meeting of the Committee or Hearing Panel or any delegate of either of them shall be held upon such notice, at such place or places, and at such time or times as the Committee or Hearing Panel or such delegate, as the case may be, may from time to time determine.

(b)      Quorum.  A majority of the members of the Committee or Hearing Panel or any delegate of either of them at the time in office shall constitute a quorum for the transaction of business.  All resolutions or other actions taken by the Committee or Hearing Panel or by such delegate, as the case may be, at any meeting shall be by the vote of a majority of those present at any such meeting.

(c)      Any action required or permitted to be taken at any meeting of the Committee or Hearing Panel or by any delegate of either of them may be taken without a meeting if a written consent thereto is signed by the requisite number of members of the Committee or Hearing Panel or by such delegate, as the case may be, and such written consent is filed with the records of the proceedings of the Committee or Hearing Panel or of such delegate, as the case may be.

(d)      Members of the Committee, the Hearing Panel or any delegate of either of them may participate in a meeting of the Committee, the Hearing Panel or such delegate, as the case may be, by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this Section shall constitute presence in person at such meeting.

9.11.    Compensation.  Neither the Plan Administrator nor any member of the Committee or Hearing Panel who is also an employee of an Employer or Affiliate shall receive any compensation for his or her services as such, although members of the Board of Directors, appointed to the Committee or Hearing Panel, who are not Employees will be compensated at the customary fee payable by the Company for attendance at committee meetings.  Except as may otherwise be required by law, no bond or other security need be required of any member in such capacity in any jurisdiction.

9.12    (a)    <u>Claims Procedure; Committee and Hearing Panel</u>.  This Section 9.12 shall provide the exclusive rules relating to claims for benefits under the Plan.

The Board of Directors shall appoint a claims committee (referred to herein as the "Committee"), which shall consist of two or more individuals who may (but need not) be employees of the Company.  The Committee shall be the named fiduciary that shall have the authority to act with respect to any claim for benefits under the Plan.  The Committee may adopt such rules and procedures, consistent with ERISA and the Plan, as it deems necessary or appropriate in carrying out its responsibilities under this Section 9.12.  The Committee may delegate some or all of its rights, privileges and duties to such person(s) as it may choose; to the extent of such a delegation all references in this Section to the Committee shall be deemed to be references to such person(s).

The Committee in its capacity as named fiduciary shall have the discretionary right to interpret the Plan, including those provisions governing eligibility and benefits, and to determine any questions arising under or in connection with the administration of the Plan, including without limitation, the authority to make factual determinations.  The Committee shall have full authority to determine the entitlement, rights or eligibility of employees, participants and/or any other persons, and the amount of benefits, if any, due under the Plan.  The Committee shall also have the right and authority to remedy ambiguities, inconsistencies or omissions, arising under or in connection with the Plan.  The construction and interpretations of the Plan and the determinations of the Committee hereunder shall be final and binding on all persons, other than the Hearing Panel established in accordance with Section 9.12(c) hereof.

All claims for benefits shall be submitted to the Committee at such address as the Committee shall designate from time to time.  Claims for benefits must be in writing on the form prescribed by the Committee and must be signed by the person or persons indicated on such form.

(b)    Denial of Claims.  In the event any claim for benefits is denied, in whole or in part, the Committee shall notify the claimant of such denial in writing and shall advise the claimant of his right to a review thereof.  Such written notice shall set forth, in a manner calculated to be understood by the claimant, the specific reason or reasons for the denial, reference to the specific Plan provisions upon which the denial is based, a description of any additional information or material that is necessary for the claimant to perfect his claim for benefits, an explanation of why such information or material is necessary, and an explanation of the Plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under ERISA if the claim is denied on review.  Such written notice shall be furnished to the claimant within 90 days after the Committee receives the claim, unless special circumstances require an extension of time for processing the claim.  In no event shall such an extension exceed a period of 90 days from the end of the initial 90-day period; if such an extension is required, written notice thereof shall be furnished to the claimant before the end of the initial 90-day period.  Such notice shall indicate the special circumstances requiring an extension of time and the date by which the Committee expects to render a decision.

(c)    The Hearing Panel.  The Board of Directors shall appoint a "Hearing Panel," which shall consist of three or more individuals who may (but need not) be employees of the Company.  The Hearing Panel shall be the named fiduciary that shall have the authority to act with respect to any appeal from the denial of a claim for benefits under the Plan.  The Hearing Panel may adopt such rules and procedures, consistent with ERISA and the Plan, as it deems necessary or

71

appropriate in carrying out its responsibilities under this Section.  The Hearing Panel may delegate some or all of its rights, privileges and duties to such person(s) as it may choose; to the extent of such a delegation all references in this Section to the Hearing Panel shall be deemed to be references to such person(s).

(d)     Appeals from Claim Denials. Any person whose claim for benefits is denied, in whole or in part, or such person's duly authorized representative, may appeal from such denial by submitting a request for review of the claim to the Hearing Panel within six months after receiving the written notice of denial from the Committee. The request for review may include the reason the claimant believes the claim was improperly denied and any additional comments, documents, records and other information that may be appropriate (which will be considered by the Hearing Panel without regard to whether it was considered by the Committee in its initial review of the claim).  The Hearing Panel shall provide the claimant, upon request and without charge, reasonable access to, and copies of, all documents, records and other information relevant to the claim under applicable legal standards.  A request for review shall be in writing and shall be submitted to the Hearing Panel at such address as the Committee shall designate from time to time. The request for review shall set forth all of the grounds on which it is based, all facts in support thereof and any other matters that the claimant deems pertinent.  The Hearing Panel may require the claimant (or his representative) to submit such additional facts, documents or other material as it deems necessary or appropriate in making its review.

(e)     Decision on Review. The Hearing Panel shall act upon a request for review within 60 days after receipt thereof, unless special circumstances require an extension of time for processing, in which event a decision shall be rendered not more than 120 days after the receipt of the request for review.  If such an extension is required, written notice thereof shall be furnished to

72

the claimant (or his representative) before the end of the initial 60-day period.  If the Hearing Panel extends the review period for the appeal due to the claimant's failure to submit information necessary to decide the appeal, the period for deciding the appeal will be tolled from the date on which the extension notice is sent until the date on which the claimant responds to the request for additional information.  The Hearing Panel shall give written notice of its decision to the claimant (or his representative) and to the Committee.  In the event that the Hearing Panel confirms the denial of the claim for benefits in whole or in part, such notice shall set forth, in a manner calculated to be understood by the claimant, the specific reason or reasons for the denial and reference to the specific Plan provisions upon which such denial is based, the claimant's right to receive, upon request and without charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claim under applicable legal standards, and the claimant's right to bring a civil action under ERISA.

(f)    Exhaustion of Administrative Remedies. No legal or equitable action for benefits under the Plan shall be brought, except as permitted by law, unless and until the claimant (i) has submitted a written claim for benefits in accordance with Section 9.12(a), (ii) has been notified that the claim has been denied, (iii) has filed a written request for a review of the claim in accordance with Section 9.12(d) and (iv) has been notified in writing that the Hearing Panel has affirmed the denial of the claim.  In addition, no legal or equitable action for benefits under the Plan may be brought after the earliest of (i) 6 months after the Hearing Panel has affirmed the denial of the claim, (ii) three years after the date the claimant's benefits under the Plan commenced, or (iii) the end of the otherwise applicable statute of limitations period.

(g)    Authority of Hearing Panel.  The Hearing Panel in its capacity as named fiduciary shall have the discretionary right to interpret the Plan, including those provisions

governing eligibility and benefits, and to determine any questions arising under or in connection with the administration of the Plan, including without limitation, the authority to make factual determinations. The Hearing Panel shall have full authority to determine the entitlement, rights or eligibility of employees, participants and/or any other persons, and the amount of benefits, if any, due under the Plan. The Hearing Panel shall also have the right and authority to remedy ambiguities, inconsistencies or omissions, arising under or in connection with the Plan. The construction and interpretations of the Plan and the determinations of the Hearing Panel hereunder shall be final and binding on all persons.

(h)     Small Claims. Any claim to be determined by the Committee may be determined by Morgan Stanley's Global Director of Human Resources, or his delegate, if the Global Director of Human Resources (or such delegate) determines that the amount involved is $20,000 or less. In any case where the Global Director of Human Resources (or delegate) determines a claim, the provisions of this Article 9 shall apply to the Global Director of Human Resources (or delegate) in the same manner as would be applicable to the Committee. The Global Director of Human Resources has delegated his authority under this provision to the Director of Benefits.

(i)     The Board of Directors shall have the express authority to terminate the appointment of any member of the Committee and the Hearing Panel provided for in this Article 9 through written action of the Board of Directors or its delegate.

## ARTICLE 10.  MANAGEMENT OF FUNDS

10.01. Trust Agreement. The funds of the Plan shall be held by a Trustee appointed from time to time by the Board of Directors under one or more trust agreements adopted, or as amended, by the Board of Directors for use in providing the benefits of the Plan and paying Plan

expenses not paid directly by an Employer.  An Employer shall have no liability for the payment of benefits under the Plan nor for the management of the fund paid over to the Trustee.

10.02.  Exclusive Benefit Rule.  Except as otherwise provided in the Plan, no part of the corpus or income of the funds of the Plan shall be used for, or diverted to, purposes other than for the exclusive benefit of Participants and other persons entitled to benefits under the Plan.  No person shall have any interest in or right to any part of the earnings of the funds of the Plan, or any right in, or to, any part of the assets held under the Plan, except as and to the extent expressly provided in the Plan.

ARTICLE 11.  GENERAL PROVISIONS

11.01.  Nonalienation.  Except as required by any applicable law, no benefit under the Plan shall in any manner be anticipated, assigned or alienated, and any attempt to do so shall be void.  Nor may any person create a lien on the Trust Fund, security or other asset held under the Plan other than liens permitted pursuant to Section 5.02.  However, payment shall be made in accordance with the benefit offset provisions of certain judgments or settlements described in Code section 401(a)(13)(C) or, in accordance with the provisions of any judgment, decree, or order which:

(a)    creates for, or assigns to, a spouse, former spouse, child or other dependent of a Participant the right to receive all or a portion of the Participant's benefits under the Plan for the purpose of providing child support, alimony payments or marital property rights to that spouse, child or dependent,

(b)    made pursuant to a State domestic relations law,

(c)    does not require the Plan to provide any type of benefit, or any option, not otherwise provided under the Plan, and

(d)     otherwise meets the requirements of a qualified domestic relations order described in Code section 414(p) (a "QDRO"), as determined by the Plan Administrator. Notwithstanding anything contained in this Plan to the contrary, effective January 1, 1996, the Plan may pay benefits pursuant to a QDRO that provides for the payment of benefits to an "alternate payee" (as such term is defined in Code section 414(p)) prior to the date that a Participant has attained "earliest retirement age" (as such term is defined in Code section 414(p)).

11.02.  Conditions of Employment Not Affected by Plan.  (a) The establishment of the Plan shall not confer any legal rights upon any Employee or other person for a continuation of employment, nor shall it interfere with the rights of an Employer to discharge any Employee and to treat him or her without regard to the effect which that treatment might have upon him or her as a Participant or potential Participant of the Plan.

(b)     The adoption of the Plan shall not be construed as limiting the authority of the Board of Directors to pay bonuses to, and to establish from time to time, and to amend or discontinue, profit sharing or other supplemental compensation plans for Employees and to pay bonuses or other supplemental compensation to Members or Participants, in addition to any amounts allocated to them hereunder, if deemed advisable by the Board of Directors.

11.03.  Facility of Payment.  If the Plan Administrator shall find that a Member, Participant or other person entitled to a benefit is unable to care for his or her affairs because of illness or accident or is a minor, the Plan Administrator may direct that any benefit due him or her, unless claim shall have been made for the benefit by a duly appointed legal representative, be paid to his or her spouse, a child, a parent or other blood relative, or to a person with whom he resides.  Any payment so made shall be a complete discharge of the liabilities of the Plan for that benefit.

11.04.   Information.   Each Member, Participant or other person entitled to a benefit, before any benefit shall be payable to him or her or on his or her account under the Plan, shall file with the Plan Administrator the information that it shall require to establish his or her rights and benefits under the Plan.

11.05.   Top-Heavy Provisions.   (a) The Plan shall meet the requirements of this Section 11.05 in the event that the Plan is or becomes a Top-Heavy Plan.

(b)      Subject to the aggregation rules set forth in Section 11.05(c), the Plan shall be considered a Top-Heavy Plan pursuant to Code section 416(g) in any Plan Year if, as of the Determination Date, the value of the Accounts of all Key Employees exceeds 60% of the value of the Accounts of all of the Employees as of such Date, excluding former Key Employees, and excluding any Employee who has not performed any services for an Employer during the five consecutive Plan Year periods ending on the Determination Date.   For purposes of the above ratio, the Account of a Key Employee shall be counted only once each Plan Year, notwithstanding the fact that an individual may be considered a Key Employee for more than one reason in any Plan Year.

(c)      For purposes of determining whether the Plan is a Top-Heavy Plan and for purposes of meeting the requirement of this Section 11.05, the Plan shall be aggregated and coordinated with other qualified plans in a Required Aggregation Group and may be aggregated or coordinated with other qualified plans in a Permissive Aggregation Group.   If such Required Aggregation Group is Top-Heavy, this Plan shall be considered a Top-Heavy Plan.   If such Permissive Aggregation Group is not Top-Heavy, this Plan shall not be a Top-Heavy Plan.

(d)      For the purpose of determining whether the Plan is Top-Heavy, the following definitions shall be applicable:

(i) The term "Determination Date" shall mean, in the case of the first Plan Year, the last day of such Plan Year and in the case of any subsequent Plan Year, the last day of the preceding Plan Year.  The value of an Account shall be determined as of the Determination Date.

(ii) (A) An individual shall be considered a Key Employee if he or she is an Employee or former Employee who at any time during the current Plan Year or any of the four preceding Plan Years:

(I) was an officer of an Employer who has annual compensation from the Employer in the applicable Plan Year in excess of 50% of the dollar limitation under Code section 415(b)(1)(A); *provided, however*, that the number of individuals treated as Key Employees by reason of being officers hereunder shall not exceed the lesser of 50 and 10% of all Employees, and provided further that if the number of Employees treated as officers is limited to 50 hereunder, the individuals treated as Key Employees shall be those who, while officers, received the greatest annual compensation in the applicable Plan Year and any of the four preceding Plan Years (without regard to the limitation set forth in Section 11.05(e) hereof);

(II) was one of the ten Employees owning or considered as owning the largest interests in an Employer who has annual compensation from the Employer in the applicable Plan Year in excess of the dollar limitation under Code Section 415(c)(1)(A) as increased under Code section 415(d);

(III) was a more than 5% owner of an Employer; or

(IV) was a more than 1% owner of an employer whose annual compensation from the Employer in the applicable Plan Year exceeded $150,000.

(B) For purposes of determining who is a Key Employee, ownership shall mean ownership of the outstanding stock of an Employer or of the total combined

voting power of all stock of an Employer, taking into account the constructive ownership rules of Code section 318, as modified by Code section 416(i)(1).

(C)    For purposes of paragraph (I) but not for purposes of (II), (III) and (IV) (except for purposes of determining compensation under (IV)), the term "Employer" shall include any entity aggregated with an Employer pursuant to Code section 414(b), (c) or (m).

(D)    For purposes of paragraph (II), an Employee (or former Employee) who has some ownership interest is considered to be one of the top ten owners unless at least ten other Employees (or former Employees) own a greater interest than such Employee (or former Employee) provided that if an Employee has the same ownership interest as another Employee, the Employee having greater annual compensation from an Employer is considered to have the larger ownership interest.

(iii)    The term "Non-Key Employee" shall mean any Employee who is a Member or Participant and who is not a Key Employee.

(iv)    Whenever the term "Key Employee", "former Key Employee", or "Non-Key Employee" is used herein, it includes the Beneficiary or Beneficiaries of such individual. If an individual is a Key Employee by reason of the foregoing sentence as well as a Key Employee in his or her own right, both the value of his or her inherited benefit and the value of his or her own Account will be considered his or her Account for purposes of determining whether the Plan is a Top-Heavy Plan.

(v)    For purposes of Section 11.05(d)(ii), except as otherwise specifically provided, the term "compensation" has the meaning given such term in Code section 414(q)(7).

(vi)    The term "Required Aggregation Group" shall mean all other qualified defined benefit and defined contribution plans (including a terminated plan) in which a Key

Employee participates, and each other plan (including a terminated plan) of an Employer which enables any plan in which a Key Employee participates to meet the requirements of Code section 401(a)(4) or 410.

(vii)    The term "Permissive Aggregation Group" shall mean all other qualified defined benefit and defined contribution plans maintained by an Employer that meet the requirements of Code sections 401(a)(4) and 410 when considered with a Required Aggregation Group.

(e)    In the event the Plan is determined to be Top-Heavy for any Plan Year, the following requirements shall be applicable:

(i)    Minimum Allocations shall be as follows:

(A)    In the case of the Non-Key Employee who is covered under this Plan but does not participate in any qualified defined benefit plan maintained by an Employer, the Minimum Allocation of contributions plus forfeitures allocated to the account of each Non-Key Employee who has not separated from service at the end of a Plan Year in which the Plan is Top-Heavy shall equal the lesser of 3% of compensation, within the meaning of Code section 415, for such Plan Year or the largest percentage of such compensation provided on behalf of any Key Employee for such Plan Year.  The Minimum Allocation provided hereunder may not be suspended or forfeited under Code section 411(a)(3)(B) or (D).

(B)    A Non-Key Employee who is covered under this Plan and under a qualified defined benefit plan maintained by an Employer shall not be entitled to the Minimum Allocation under this Plan but shall receive the minimum benefit provided under the terms of the qualified defined benefit plan.  If a Non-Key Employee is covered under one or more qualified defined contribution plans in addition to this Plan, the Minimum Allocation requirements may be

80

satisfied through contributions and forfeitures allocated to his or her accounts under such other plans.

(ii)     For purposes of computing the defined benefit plan fraction and defined contribution plan fraction as set forth in Code section 415(e)(2)(B) and (e)(3)(B), the dollar limitations on benefits and annual additions applicable to a limitation year shall be multiplied by 1.0 rather than by 1.25. This Section 11.05(e)(ii) shall apply only for Plan Years beginning before January 1, 2000.

(iii)     The annual compensation of a Key Employee taken into account under the Plan shall not exceed $200,000 adjusted for increases in the cost of living pursuant to regulations issued under Code section 416.

11.06.  Disposition of Unclaimed Benefits.  In the event that any check in payment of benefits under the Plan remains outstanding at the expiration of six months from the date of mailing of such check to the last known address of the payee, the Plan Administrator shall notify the Trustee to stop payment of all such outstanding checks and to suspend the issuance of any further checks, if any, to such payee.  If, during the two-year period (or such other period as specified by the Plan Administrator) from the date of mailing of the first such check, the Plan Administrator cannot establish contact with the payee by taking such action as it deems appropriate and the payee does not make contact with the Plan Administrator, the amount due such payee shall be forfeited and used to reduce the Employer Contributions.  In the event the payee is located subsequent to the date the benefits were forfeited, the dollar amount of such benefits shall be restored by an Employer Contribution made for such purpose.

11.07.  Designation of Beneficiary.  (a) Except as provided in Section 11.07(b), each Participant may designate a Beneficiary or Beneficiaries and may change such designation of

81

Beneficiary or Beneficiaries with the Plan Administrator in a form to be prescribed by the Plan Administrator, provided that no such designation shall be effective unless so filed prior to the death of such Participant.

(b)     If the Participant is survived by a spouse to whom the Participant was married on the date of the Participant's death, such Participant's entire Account balance shall be payable to such surviving spouse, unless such spouse has consented in writing to the designation of a Beneficiary other than such spouse, and such consent is witnessed by a member of the Plan Administrator or by a notary public.  Whether a person is a spouse or a surviving spouse will be determined using the eligibility standards for U.S. h Security benefits.

11.08.  Treatment of Qualified Military Service.  Notwithstanding any provision of the Plan to the contrary, contributions, benefits and service credit with respect to qualified military service will be provided in accordance with Code section 414(u).

11.09   Costs of Legal Action.  If a legal action arises because of conflicting claims to a Participant's or other person's benefits, including in connection with a Participant's or other person's death or divorce, the cost to the Trustee, Employers, Plan Administrator, Committee or Hearing Panel or any member thereof of bringing, prosecuting or defending the action shall be charged to the extent permitted by law to the sums, if any, which were involved in the action or were payable to the person concerned.

ARTICLE 12.  AMENDMENT, MERGER AND TERMINATION

12.01.  Amendment of Plan.  The Board of Directors or any person(s) designated by the Board may at any time and from time to time, and retroactively if deemed necessary or appropriate, amend in whole or in part any or all of the provisions of the Plan.  However, no

82

amendment shall make it possible for any part of the funds of the Plan to be used for, or diverted to, purposes other than for the exclusive benefit of persons entitled to benefits under the Plan.  No amendment shall be made which has the effect of decreasing the balance of the Account of any Participant on the date on which the amendment is adopted or, if later, the date on which the amendment becomes effective.

12.02.  Merger or Consolidation.  The Plan may not be merged or consolidated with, and its assets or liabilities may not be transferred to, any other Plan unless each person entitled to benefits under the Plan would, if the resulting Plan were then terminated, receive a benefit immediately after the merger, consolidation or transfer which is equal to or greater than the benefit he or she would have been entitled to receive immediately before the merger, consolidation or transfer if the Plan had then terminated.

12.03.  Additional Participating Employers.  (a) If any company is or becomes an Affiliate, the Board of Directors may include the Employees of that Affiliate in the membership of the Plan upon appropriate action by that Affiliate necessary to adopt the Plan.  In that event, or if any persons become Employees of an Employer as the result of merger or consolidation or as the result of acquisition of all or part of the assets or business of another company, the Board of Directors shall determine to what extent, if any, previous service with the subsidiary or associated company shall be recognized under the Plan, but subject to the continued qualification of the trust for the Plan as tax-exempt under the Code.

(b)     Any Affiliate may terminate its participation in the Plan upon appropriate action by it.  In that event, the treatment of the funds of the Plan held on account of Participants in the employ of that Affiliate, and Participants who have separated from the employ of that Affiliate, shall be determined by the Plan Administrator.

12.04.  Termination of Plan.  The Board of Directors may terminate the Plan or completely discontinue contributions under the Plan for any reason at any time.  In case of the termination or partial termination of the Plan or complete discontinuance of contributions to the Plan, the rights of affected Participants to their Accounts under the Plan as of the date of the termination or discontinuance shall be nonforfeitable.

ARTICLE 13.  CONSTRUCTION

        13.01.  Choice of Law.  The Plan shall be construed, regulated and administered under ERISA and the laws of the State of New York, except where ERISA controls.

        To record the amendment and restatement of the Plan to read as set forth herein, the Corporation has caused its authorized officer to execute this instrument effective as of January 1, 2002.

        Morgan Stanley


        By_____[Working Copy]_____

A-1

APPENDIX A

PARTICIPATING EMPLOYERS

| Participating Employer | Date of Adoption |
|---|---|
| Morgan Stanley & Co. Incorporated | 01/01/1990 |
| Morgan Stanley Realty Incorporated (formerly Brooks, Harvey & Co., Inc.) | 01/01/1990 |
| Morgan Stanley Investment Management Inc. | 01/01/1990 |
| MS Securities Services Inc. | 01/01/1990 |
| MS Trust Company | 01/01/1989 - 09/30/1998 |
| Morgan Stanley International Incorporated (excluding, effective 1/1/99, MSII employees primarily servicing business units and/or cost centers of subsidiaries of the former Dean Witter, Discover & Co., determined immediately prior to its merger with Morgan Stanley Group Inc., that are not Employers) with a date of adoption of 1/1/90 | 01/01/1990 |
| Morstan Development Company Inc. | 01/01/1990 |
| Morgan Stanley Investments LP (formerly Miller Anderson & Sherrerd, L.L.P.) | 01/01/1996 |
| Van Kampen Investments Inc. and its subsidiaries | 01/01/1997 |
| Morgan Stanley DW Inc. | 01/01/2001 |
| Morgan Stanley Real Estate Advisor, Inc. | 11/20/2003 |
| Barra, Inc. | 06/03/2004 |
| PULSE EFT Association, Inc. | 01/16/2005 |
| Morgan Stanley Management Services II, Inc. | 09/01/2005 |
| Morgan Stanley Fund Services Inc. | 05/01/2005 |

A-2

| | |
|---|---|
| Broadway 522 Fifth JV LLC | 11/16/2006 |
| Morgan Stanley Capital International Inc. | 05/01/2003 |
| Morgan Stanley Capital Group Inc. | 11/16/2004 |
| FrontPoint Partners LLC | 01/01/2007 |
| FrontPoint Management Inc. | 01/01/2007 |
| Morgan Stanley Mortgage Capital Holdings LLC | 06/16/2007 |

Each employee and each partner of Miller Anderson & Sherrerd, L.L.P. ("MAS") as of January 1, 1996 will be deemed to have an Employment Commencement Date as of the date such employee's or partner's service with MAS commenced. As of January 1, 1996, the term Service as defined in Section 1.34 of the Plan shall also include all service with MAS prior to January 1, 1996.

Each former employee of LTCB-MAS Investment Management, Inc. ("LTCB") who is employed by an Employer on or after January 1, 1996 will be deemed to have an Employment Commencement Date as of the date such employee's service with LTCB commenced. As of January 1, 1996, the term "Service" as defined in Section 1.34 of the Plan shall also include all service with LTCB prior to January 1, 1996.

With respect to Employees who were formerly employees of VK/AC Holding, Inc. and its subsidiaries (collectively referred to as "VKAC"), Employees who were participants in the Van Kampen American Capital, Inc. Profit Sharing and Savings Plan on December 31, 1996 will automatically become Members of the Plan on January 1, 1997. Each former employee of VK/AC Holding, Inc. and its subsidiaries ("VKAC") as of January 1, 1997 will be deemed to have an Employment Commencement Date as of the date such employee's service with VKAC commenced. As of January 1, 1997, the term Service as defined in Section 1.34 of the Plan shall also include all service with VKAC prior to January 1, 1997.

With respect to Employees who were formerly employees of Kearny Realty Investors, Inc. or its subsidiaries (collectively, "*Kearny*"), the following rules shall apply: As of January 1, 1998, the term Service as defined in Section 1.34 of the Plan shall also include all service with Kearny prior to January 1, 1998. Notwithstanding the foregoing, Employees who were participants in the Kearny Realty Investors, Inc. 401(k) Profit Sharing Plan as of December 31, 1998 will automatically become Members of the Plan on January 1, 1999. Each such former employee of Kearny will be deemed to have an Employment Commencement Date as of the date the employee's service with Kearny commenced.

Each former Member who was an Employee in the Corporation's global custody or correspondent clearing businesses immediately prior to the date of the sales of those businesses and

A-3

who (i) remains an employee of the purchasers of those businesses (or their successors), as applicable, as of December 31, 1998, or (ii) terminates employment with the Corporation without having received an offer of employment from the purchasers of those businesses on or before December 31, 1998 will, to the extent permitted by ERISA and the Internal Revenue Code, receive an Employer Contribution and a Matching Allocation equal to the amount that would have been contributed or allocated on behalf of such former Member had he remained an Employee as of December 31, 1998, based on the Base Salary paid to (and eligible Pre-Tax Deferral Contributions made by) such former Member while an Employee for the 1998 Plan Year.

   Graystone Partners. Each former employee of Graystone Partners, L.P. ("Graystone") who is employed by an Employer on or after November 1, 1999, will be deemed to have an Employment Commencement Date as of the date such employee's service with Graystone commenced.  As of November 1, 1999, an Hour of Service as defined in Section 1.22 of the Plan shall include each hour for which an employee of Graystone was paid, or entitled to payment, for the performance of services for Graystone.

   Weyerhaeuser Corporation. Each former employee of the Weyerhaeuser Corporation ("Weyerhaeuser") who is hired by a Employer as of April 13, 2000, to work in the business of Morgan Stanley Dean Witter Alternative Investment Partners will be deemed to have an Employment Commencement Date as of the date such employee's service with Weyerhaeuser commenced.  As of April 13, 2000, an Hour of Service as defined in Section 1.22 of the Plan shall include each hour for which an employee of Weyerhaeuser was paid, or entitled to payment, for the performance of services for Weyerhaeuser.

   Dean Witter Financial Advisors.  Notwithstanding any provision of the ESOP to the contrary, effective January 1, 2000, an Employee shall not include an employee of Dean Witter Reynolds Inc. who is a Financial Advisor licensed under state law as a Morgan Stanley & Co. Incorporated employee in order to provide commercial brokerage mortgage services, regardless of such employee's classification for other purposes of the Corporation.

   AWAS, Inc.  Each former employee of Ansett Worldwide Aviation Services, Inc. ("AWAS, Inc.") who is employed by an Employer on or after September 28, 2000 will be deemed to have an Employment Commencement Date as of the date such employee's service with AWAS, Inc. commenced.  As of September 28, 2000, the term "Service" as defined in Section 1.34 of the Plan shall also include all service with AWAS, Inc. prior to September 28, 2000.  Notwithstanding the foregoing, effective March 1, 2002, (i) employees of AWAS shall cease to actively participate in the Plan and no additional allocations shall be made to the accounts of such employees except as provided in the first sentence of Section 5.04 and (ii) AWAS shall cease to be a participating Employer in the Plan.

   Lend Lease.  With respect to any individual who becomes an Employee in connection with a transfer of assets to the Company or an affiliate pursuant to an agreement between Morgan Stanley Realty Incorporated, et al., and Lend Lease Corporation Limited ("Lend Lease") on or after November 20, 2003 and who was, immediately prior to becoming an Employee, an employee of

A-4

Lend Lease, the term "Service" shall include such individual's service with Lend Lease for purposes of determining (i) such Employee's eligibility to participate in the Plan pursuant to Article 2 of the Plan and (ii) the vested percentage of such Employee's Plan Benefit pursuant to Article 6 of the Plan; provided, however, that each such Employee shall only be credited with the lesser of his actual period of service with Lend Lease or five years for purposes of this sentence. An Hour of Service as defined in Section 1.22 of the Plan shall include each hour for which a former employee of Lend Lease was paid, or entitled to payment, for the performance of services for Lend Lease.

Barra, Inc. With respect to any individual who becomes an Employee in connection with the acquisition by the Company or an affiliate pursuant to an Agreement and Plan of Merger among Barra, Inc., Morgan Stanley and Morgan Stanley Risk Holdings, Inc. on or after June 3, 2004 and who was, immediately prior to becoming an Employee, an employee of Barra, Inc. or an affiliate, the term "Period of Service" shall include such individual's service up to five years with Barra, Inc. for purposes of determining (i) such Employee's eligibility for membership in the Plan pursuant to Article 2 of the Plan and (ii) such Employee's vested interest in his Account pursuant to Article 6 of the Plan. An Hour of Service as defined in Section 1-A.02 of the ESOP shall include each hour for which a former employee of Barra, Inc. was paid, or entitled to payment, for the performance of services for Barra, Inc.

PULSE EFT Association, Inc. Any individual who became an Employee in connection with the acquisition of PULSE EFT Association pursuant to an Agreement and Plan of Merger dated as of November 13, 2004 among Discover Financial Services, Inc., DAP I Acquisition Co. and PULSE EFT Association, and who was, immediately prior to becoming an Employee, an employee of PULSE EFT Association, shall (i) become eligible to commence participation in the Plan effective January 16, 2005, and (ii) the term "Period of Service" shall include such individual's service up to five years with PULSE EFT Association for purposes of determining the vested percentage of such Employee's Plan Benefit pursuant to Article 6 of the Plan. An Hour of Service as defined in Section 1.25 of the Plan shall include each hour for which a former employee of PULSE EFT Association was paid, or entitled to payment, for the performance of services for PULSE EFT Association.

FrontPoint Partners LLC and FrontPoint Management Inc. Any individual who became an Employee in connection with the acquisition of FrontPoint Partners LLC and FrontPoint Management Inc. pursuant to an agreement titled "Agreement and Plan of Merger Dated as of October 31, 2006 Among MS Holdings Incorporated, MS Acquisition Sub X LLC, FrontPoint Partners LLC and the Unitholder's Committee Identified Herein," and who was, immediately prior to becoming an Employee, an employee of FrontPoint Partners LLC or FrontPoint Management Inc., shall (i) become eligible to commence participation in the Plan effective January 1, 2007, and (ii) the term "Period of Service" shall include such individual's service up to five years with FrontPoint Partners LLC or FrontPoint Management Inc. for purposes of determining the vested percentage of such Employee's Plan Benefit pursuant to Article 6 of the Plan. An Hour of Service as defined in Section 1-A.02 of the Plan shall include each hour for which a former employee of FrontPoint Partners LLC or FrontPoint Management Inc. was paid, or entitled to payment, for the performance of services for FrontPoint Partners LLC or FrontPoint Management Inc.

A-5

<u>Cessation of Participation of Discover Employers</u>.  Effective July 1, 2007, Discover Financial Services (fka Novus Services, Inc.), Discover Bank (fka Greenwood Trust Company), NOVUS Credit Services Inc., and PULSE EFT Association, Inc. shall cease to be participating Employers in the Plan as set forth in Appendix F.

B-1

APPENDIX B

RULES RELATING TO CERTAIN EMPLOYEES
OF MORGAN STANLEY DW INC. AND ITS SUBSIDIARIES AND AFFILIATES

1.    Establishment and Purpose.

This Appendix B is established, effective January 1, 2001, to provide for matching and other allocations under the Plan for certain eligible employees of Morgan Stanley DW Inc. and its subsidiaries and affiliates that are participating companies in the START Plan.  It is the intent of this Appendix B that the benefits formerly delivered as matching contributions under the START Plan shall be delivered effective January 1, 2001 as matching allocations under this Plan without material modification of the START Plan's rules relating to participation, vesting and amount of benefits, and the provisions of this Appendix B shall be interpreted accordingly.  This Appendix B is part of the Plan and its provisions shall apply to eligible employees notwithstanding anything in the Plan to the contrary. Eligible employees subject to the provisions of this Appendix B shall be entitled only to the contributions and allocations provided for in Section 5 of this Appendix, and shall not in any event be entitled to the contributions and allocations provided for in Article 3 of the Plan.

Notwithstanding the foregoing, effective for Plan Years beginning on or after January 1, 2004, no additional contributions and allocations shall be made for IIG Members pursuant to section 5 of this Appendix.  For such Plan Years, IIG Members shall be entitled solely to the contributions and allocations provided for in Article 3 of the Plan.  In addition, effective January 1, 2004, Eligible IIG Employees shall become IIG Members in the Plan solely in accordance with the provisions of Article 2 of the Plan, and shall be subject to the vesting provisions set forth in Article 6 of the Plan.

2.    Special Definitions.  For purposes of this Appendix:

"IIG Match Obligation" means the allocation required to be made to the Accounts of IIG Members for any Plan Year pursuant to the first and second sentences of section 5(c) below.

"IIG Member" means each Member subject to the provisions of this Appendix.

"Matching Allocations" means allocations to the Account of an IIG Member for a Plan Year under section 5 below based on the amount of such Member's contributions under the START Plan.

"Matching Contribution Account" means the account maintained for an IIG Member under the START Plan to which employer matching contributions were allocated for plan

1

B-2

years beginning before January 1, 2001.

"Other Member" means each Member not subject to the provisions of this Appendix.

"Release" means any termination of an IIG Member's employment which is initiated by the Company or an Affiliate by reason of its decision to close permanently a branch office or other facility, or to reduce permanently the number of employees which it employs due to substantial change in economic conditions.

"Retirement" means termination of an IIG Member's employment with the Company and its Affiliates upon or after the date he or she would be eligible to retire immediately under Part II of the Morgan Stanley Employees Retirement Plan.

"START Plan" means the Dean Witter START Plan (Saving Today Affords Retirement Tomorrow), as amended from time to time. Effective October 1, 2002, the DPSP shall be merged with and into the START Plan and the merged plan shall be renamed the "Morgan Stanley 401(k) Plan." For periods following such merger, references to the START Plan and the DPSP in this Appendix B shall be deemed references to the Morgan Stanley 401(k) Plan, and references to specific provisions and terms defined in the START Plan shall be deemed references to the corresponding provisions and terms of the Morgan Stanley 401(k) Plan.

"Total and Permanent Disability" (or "Totally and Permanently Disabled") means that, due to a medically determinable physical or mental impairment which is reasonably expected to last for a continuous period of not less than 12 months or to result in death, the IIG Member is unable to perform his or her regularly assigned job or another job for which the IIG Member will be paid Earnings approximately equivalent to the Earnings paid with respect to such regularly assigned job. The Plan Administrator shall determine whether a person ceased to be an employee by reason of Total and Permanent Disability based on such person's eligibility to receive long-term disability benefits under a plan of his or her employer.

"Basic Contributions", "Basic Pre-Tax Contributions", "Earnings", "Eligible Employees", "Immediately Eligible Employees", "Matching Contributions", "One Year Break", "Participating Company", "Puerto Rico Eligible Employee", "Puerto Rico Participant", and "Year of Service" will have the meanings given to such terms under the START Plan. For periods following the merger of the START Plan into the DPSP, references in this Appendix B to "Eligible Employees" and "Immediately Eligible Employees" shall be deemed references to "Eligible IIG Employees", references to "Basic Contributions" shall be deemed references to "Matched Contributions", and references to "Basic Pre-Tax Contributions" shall be deemed references to "Pre-Tax Contributions," in each case as defined in section 2 of the Morgan Stanley 401(k) Plan.

All other capitalized terms that appear in this Appendix will have the meanings given

B-3

to such terms under Article 1 of this Plan.

3.      Participation.

Effective January 1, 2001, each company that has been designated as a Participating Company in the START Plan (as listed on Appendix A thereto and as effective for January 1, 2001) shall be a participating Employer in the Plan.  Effective January 1, 2001, Eligible Employees and Immediately Eligible Employees of such Employers shall be Employees under the Plan and shall become IIG Members in the Plan on the date on or after January 1, 2001, that their participation in the START Plan commences, or as soon as practicable thereafter.  Notwithstanding the foregoing, Employees who are participants in the START Plan on January 1, 2001, shall automatically become IIG Members as of January 1, 2001.

4.      Transfer of Assets and Liabilities.

(a)      As of such date as may be determined by the Plan Administrator, which shall not be later than December 31, 2001 (the "Transfer Date"), all assets and liabilities relating to each IIG Member's Matching Contribution Account established under the START Plan (including in relation to any loan pursuant to Section 12(h) of the START Plan charged against any Matching Contribution Account) shall be transferred to an Account established for such IIG Member in accordance with Section 9.03 of the Plan, provided, however, that any portion of an individual's Matching Contribution Account that the individual has elected to diversify pursuant to Section 6(d) of the START Plan prior to the Transfer Date shall not be transferred to the Plan.  IIG Members' interests in the transferred amounts shall not vest on an accelerated basis as a result of such transfers, but shall continue to vest in accordance with the schedule set forth in section 6 below (which is intended to be consistent with the schedule under the START Plan on the Transfer Date).  For each Plan Year beginning on or after January 1, 2001, matching allocations made to IIG Members based on their contributions to the START Plan shall be made under this Plan in lieu of Matching Contributions under the START Plan.

(b)      (i)      Following the Transfer Date, any loan repayments with respect to the portion of an outstanding loan to an IIG Member transferred to the Plan from the START Plan shall be made to the Plan and shall be credited to the IIG Member's Account under the Plan at the time and in the manner determined by the Plan Administrator, consistent with the terms of the loan.  On and after the Transfer Date, no new loans may be made with respect to any IIG Member's Account under the Plan except as provided in Appendix D to the Plan.

(ii)      For purposes of the foregoing, the provisions of the START Plan and of any loan procedures promulgated by the Plan Administrator under the START Plan relating to loans, each as may be amended from time to time, shall be incorporated into and form part of this Plan.

5.      Employer Contributions; Allocations.

B-4

(a)    For each Plan Year beginning on or after January 1, 2001, each Employer of IIG Members may make Employer Contributions to the Plan pursuant to the first sentence of Section 3.01(a) of the Plan.  Employer Contributions may be made on behalf of each IIG Member who is entitled to a Matching Allocation for the Plan Year pursuant to this section 5 and was either an Employee as of the last day of such Plan Year or ceased to be an Employee during such Plan Year as a result of such Member's death, Total and Permanent Disability, Retirement or Release.  Such Employers may also make, in the manner and in an amount determined by the Board of Directors of the Company, additional matching contributions and Qualified Non-Elective Contributions ("QNECs") to the Plan, as provided in section 5(d) below.   Effective January 1, 2002, for purposes of determining the matching or other Employer contributions to be made on behalf of an IIG Member for a Plan Year pursuant to this section 5, the annual amount of Earnings taken into account for the IIG Member for a Plan Year shall not exceed 85% of the limit in effect under Code section 401(a)(17) for such year.  Effective July 1, 2002, for purposes of determining the matching or other Employer contributions to be made on behalf of an IIG Member for a Plan Year pursuant to this section 5, the IIG Member's Basic Contributions under the START Plan shall not include any catch-up contributions.

(b)    (i)    The shares of Company Stock released from the Suspense Account each Plan Year shall be allocated between IIG Members and Other Members by the Company in accordance with clause (iii) below.  Except as provided in Section 5.04 of the Plan and subject to the limitations described in Sections 3.02 (which shall be applied by reference to the START Plan in place of the DPSP) and 3.06(b) of the Plan, the portion of such shares allocated to IIG Members shall be allocated as of the last Valuation Date (or such earlier Valuation Date as the Plan Administrator shall determine) in the Plan Year as follows: first, in accordance with the first sentence of section 5(c) below to the Accounts of IIG Members as Matching Allocations; and second, to the Accounts of any or all IIG Members, as determined by the Company, in proportion to each such Member's Basic Contributions under the START Plan for the Plan Year.

(ii)    Subject to the limitations described in Sections 3.02 (which shall be applied by reference to the START Plan in place of the DPSP) and 3.06(b) of the Plan, any Employer Contributions for a Plan Year that are not used to repay an Exempt Loan and that are allocated to IIG Members by the Company in accordance with clause (iii) below shall be allocated as of the last Valuation Date (or such earlier Valuation Date as the Plan Administrator shall determine) in the Plan Year as follows:  first, in accordance with the first sentence of section 5(c) below to the Accounts of IIG Members as Matching Allocations (but only to the extent that the Company's obligations under section 5(c) have not been satisfied through the allocation of shares of Company Stock to the IIG Members in accordance with section 5(b)(i)); and second, to the Accounts of any or all IIG Members, as determined by the Company, in proportion to each such Member's Basic Contributions under the START Plan for the Plan Year.

B-5

(iii)     The Company shall notify the Trustee in writing as to the amount of released shares or Employer Contributions, as applicable, to be allocated to IIG Members and to Other Members.  The portion of such shares or Employer Contributions allocated to IIG Members for each Plan Year shall be such portion as is equal in value to the IIG Match Obligation for such year, less any forfeitures allocated to IIG Members for such year pursuant to section 6(b)(ii) below.  The remaining portion of such shares or Employer Contributions shall be allocated to Other Members.

(iv)     The provisions of Article 5 of the Plan, including, without limitation, those provisions dealing with the application of dividends on allocated and unallocated shares, shall apply to IIG Members in the same manner as they apply to Other Members, except that (A) all references in such provisions to the allocation method under Section 3.01(b)(i) of the Plan shall refer instead to this section 5(b) in the case of IIG Members, and (B) with respect to Section 5.04 of the Plan, cash dividends payable with respect to Company Stock that is transferred to the Plan from the START Plan shall not be applied to the payment of outstanding obligations of the Trust under an Exempt Loan.  The provisions of Section 5.06 of the Plan shall be applied by deeming the Plan's Compensation Objective also to include the IIG Match Obligation.

(c)     Subject to Section 3.06(b) of the Plan and the limitations in Section 3.02 of the Plan (which shall be applied by reference to the START Plan in place of the DPSP), as of the last Valuation Date (or such earlier Valuation Date as the Committee shall determine) in each Plan Year beginning on or after January 1, 2001, the Account of each IIG Member shall be allocated a Matching Allocation with a value as of that date equal to at least 25% but not more than 116% of the first $2,000, and at least 10% but not more than 46% of the remaining amount, of Basic Contributions (up to 6% of Earnings) made by the IIG Member under the START Plan for such Plan Year, said percentages to be determined relative to the amount of Pre-tax Income for the fiscal year ending within such Plan Year of the Business Segment in which the IIG Member was an Employee on the last day of such Plan Year or on the Member's last day of employment immediately preceding the Member's death, Total and Permanent Disability, Retirement or Release, as the case may be.  In addition, the Company may, in its sole discretion, determine that a Matching Allocation in excess of the amount required to be allocated pursuant to the preceding sentence may be allocated to the Accounts of any or all IIG Members, as determined by the Company, in proportion to each such Member's Basic Contributions under the START Plan for the Plan Year; provided, however, that such determination is made in writing prior the end of the Plan Year.  Subject to Section 5.04 of the Plan, Company Stock or other property (including cash) with a value equal to the IIG Member's total Matching Allocation shall be allocated to the IIG Member's Account as follows: first, from forfeitures pursuant to section 6(b) below; second, to the extent necessary, from shares of Company Stock released from the Suspense Account under section 5(b)(i) as a result of the payment of dividends on Company Stock; third, to the extent necessary, from shares of Company Stock released from the Suspense Account under section 5(b)(i) as a result of Employer Contributions; and fourth, to the extent necessary, from Employer Contributions allocated under section 5(b)(ii).  The value of shares of Company

B-6

Stock allocated as Matching Allocations shall be determined as of the Valuation Date for which such Matching Allocations are made.  A Matching Allocation shall not be made to the Account of an IIG Member who neither is an Employee on the applicable Valuation Date nor terminated employment during the Plan Year as a result of death, Total and Permanent Disability, Retirement or Release.

(i)     The Company shall determine one or more Business Segments for which Matching Allocations shall be calculated.  For each such Business Segment, the Company shall determine the levels of Pre-tax Income, expressed as a series of ranges, to be used for purposes of this section 5(c) and the percentages to be used to calculate Matching Allocations based upon the range into which the amount of Pre-tax Income for the year falls.  The determinations shall be made prior to end of the Plan Year with respect to which the Matching Allocation is made.

(ii)     For purposes of this section 5(c), "Pre-tax Income" means revenues, less expenses, exclusive of Employer Contributions under the Plan and before the provision for accounting adjustments, extraordinary items and the payment of Federal, state and local income taxes, attributable to the consolidated activities of each Business Segment as audited by the Company's independent public accountants.

(iii)     For purposes of this section 5(c), "Business Segment" shall mean the Company, in whole or in part, and any subsidiary, group of subsidiaries, divisions, departments, units, business activity or group of business activities of the Company as determined by the Company for each Plan Year.

(d)     For each Plan Year beginning on or after January 1, 2001, Employers of IIG Members may also make matching contributions in excess of those required to be allocated under the first sentence of section 5(c) and QNECs to the Plan.  Any such additional matching contributions may be made with respect to any or all IIG Members, as determined by the Company, and shall be allocated in proportion to each such Member's Basic Contributions under the START Plan for the Plan Year.  Any such QNECs may be made with respect to any or all Immediately Eligible Employees or Eligible Employees under the START Plan, as determined by the Company, and shall be allocated in a manner determined by the Company.  Such QNECs may be taken into account for purposes of satisfying the actual contribution test described in Section 3.06(b) of the Plan in the manner, and subject to the conditions, described in section 5(h)(3) of the START Plan.

(e)     In no event shall an IIG Member be entitled to an allocation under this section 5 based on Basic Pre-Tax or other Basic Contributions made by the Member to the START Plan with respect to which the Member receives an allocation under the START Plan (other than Basic Pre-Tax or other Basic Contributions, or discretionary Qualified Non-Elective or Qualified Matching Contributions that are made pursuant to Supplement G of the START Plan).  To the extent an IIG Member receives such an allocation under the START Plan, such allocation shall reduce, on a dollar-for-dollar basis, any allocation to which the Member

B-7

would otherwise be entitled under this section 5.

6.        Vesting; Forfeitures.

(a)        The vested portion of the Account of an IIG Member under this Appendix B shall be determined based on his or her Years of Service under the START Plan and the Plan as follows:

| Years of Service | Vested Percentage |
|---|---|
| Less than 5 | 0% |
| 5 or more | 100% |

Notwithstanding the foregoing, an IIG Member shall be fully vested in his Account if the IIG Member attains age 65 (or any later age) while employed by an Employer or Affiliate, or if the IIG Member terminates employment as a result of death, Total and Permanent Disability, Retirement or Release.  The vested portion of the Account of an IIG Member who was a pre-January 1, 1989 hire described in section 10(a)(i) of the START Plan or a Credit Services Employee described in section 10(a)(iv) of the START Plan shall be determined in accordance with the applicable provisions of those sections of the START Plan.

(b)        (i)        In the event an IIG Member terminates employment with the Employer and all affiliates, if the value of the IIG Member's vested Account is zero, the IIG Member shall be deemed to have received a distribution of such vested Account.  The non-vested portion of the Account of an IIG Member shall be forfeited as of the end of the month in which the Member terminates employment with the Employer and all Affiliates. Notwithstanding the foregoing, if an IIG Member who terminates employment shall subsequently be credited with one Year of Service before incurring five consecutive One Year Breaks, the amount so forfeited shall be restored to such Member's Account without adjustment for income, gains or losses; provided that such restoration shall be made from forfeitures arising in the Plan Year in which the restoration occurs or as otherwise determined by the Plan Administrator.

(ii)        Any forfeitures remaining after restoration payments are made may be applied to pay Plan expenses, make allocations to IIG Members' Accounts under section 5(c) above, or as otherwise determined by the Plan Administrator.

(c)        Notwithstanding the foregoing, an IIG Member shall be fully vested in any cash dividends on Company Stock with respect to which the IIG Member is offered an election under Section 5.04 of the Plan, without regard to whether the IIG Member is vested in the Company Stock with respect to which such dividends are paid (with separate accounting for vested and unvested amounts allocated to the Member's Account).

B-8

7.    Distributions; Diversification of Accounts.

(a)    The forms of distribution (including for these purposes the time, manner and medium of distribution) available with respect to IIG Members' Accounts shall be the forms of distribution available under the otherwise applicable provisions of the Plan plus, and for amounts transferred to this Plan pursuant to section 3 above, such forms of distribution as may be required to be provided under Code section 411(d)(6).

(b)    Beneficiary designations made under the START Plan prior to the Transfer Date shall be given effect as if made under the Plan, unless and until superceded by a new actual or deemed designation under this Plan.  Notwithstanding the foregoing, if no actual beneficiary designation has been made by an IIG Member under this Plan or the START Plan, or if no beneficiary designated by the Member under either plan survives the Member, the beneficiary of the Member's Account under this Plan shall be, in accordance with section 11(e) of the START Plan, the Member's surviving spouse, or, if none, the Member's estate. Qualified domestic relations orders (as defined in Code section 414(p)) applicable to START Plan benefits transferred to this Plan also shall be given effect as if made under the Plan.

(c)    The fourth and fifth sentences of Section 7.02(b) of the Plan (dealing with rollovers of certain distributions into the DPSP) shall apply to IIG Members in the same manner as they apply to Other Members, except that all references to the DPSP shall refer instead to the START Plan in the case of IIG Members (for which purpose "Retirement" shall have the meaning provided in section 2 of this Appendix).

(d)    An IIG Member who is an "eligible Participant," as defined in Section 7.04 of the Plan, shall have the diversification rights described in that Section.  For this purpose, it is currently intended that the alternative investment funds designated for IIG Members shall be such investment funds established within the START Plan as the Plan Administrator may designate from time to time.  The number of diversification elections made by an IIG Member under the START Plan in 2001 prior to the Transfer Date shall reduce the number of elections available to the IIG Member under Section 7.04(c) during the period between the Transfer Date and the end of the 2001 Plan Year.

8.    IIG Members in Puerto Rico.

The provisions of this Appendix shall apply to Puerto Rico Eligible Employees and Puerto Rico Participants under the START Plan, subject to sections 4 and 6 of Supplement D of the START Plan.

9.    Plan Provisions Apply.

Except as specifically provided in this Appendix, IIG Members shall be subject to all provisions of the Plan.

C-1

APPENDIX C

EGTRRA AMENDMENTS

1.    Purpose.

This Appendix C to the Plan reflects certain provisions of the Economic Growth and Tax Relief Reconciliation Act of 2001 ("EGTRRA"). This Appendix is intended to comply in good faith with the requirements of EGTRRA and is to be construed in accordance with EGTRRA. Certain provisions of this Appendix limit the application of optional changes under EGTRRA. Except as otherwise provided below, the provisions of this Appendix shall be effective as of January 1, 2002. For periods on or following January 1, 2002, the provisions of this Appendix shall supersede the foregoing provisions of the Plan to the extent those provisions are inconsistent with the provisions of this Appendix.

2.    Compensation Limit.

Notwithstanding anything in the Plan or the START Plan to the contrary, for Plan Years beginning on or after January 1, 2002, the annual amount of Salary taken into account in determining allocations to a Participant under Section 3.01, and the annual amount of Earnings taken into account in determining allocations to an IIG Member under Section 5 of Appendix B, for any given year shall not exceed 85% of the limit in effect for such year under Code section 401(a)(17), as such limit is adjusted in accordance with Code section 401(a)(17)(B).

3.    Code section 415(c) Limitations on Contributions.

Effective January 1, 2002, the following provisions modify the provisions of Section 3.02 of the Plan. Except to the extent modified herein, the provisions of Section 3.02 shall continue to apply.

The annual addition to a Participant's Account for any limitation year beginning on or after January 1, 2002, when added to the Participant's annual addition for that year under any other qualified defined contribution plan of an Employer or an Affiliate, shall not exceed an amount which is equal to the lesser of -

(a)    $40,000, as adjusted for increases in the cost-of-living under Code section 415(d), or

(b)    100% of the Participant's compensation, within the meaning of Code section 415(c)(3), for the limitation year.

C-2

The compensation limit referred to in (b) shall not apply to any contribution for medical benefits after separation from service (within the meaning of Code section 401(h) or 419A(f)(2)) which is otherwise treated as an annual addition.

For purposes of these provisions, the terms "limitation year" and "annual addition" shall have the meanings given to such terms in Section 3.02 of the Plan, and any annual additions in excess of the above limit shall be administered in accordance with the provisions of Section 3.02(e) of the Plan.

4.      Vesting of Employer Matching Contributions.

The following provisions shall apply to an IIG Member who completes an Hour of Service under the Plan on or after January 1, 2002. The portion of the Account of such an IIG Member that is attributable to Matching Allocations with respect to Plan Years beginning on or after January 1, 2002 shall vest according to the following schedule:

| Years of Service under the Plan and START Plan | Vested Percentage |
| --- | --- |
| Less than 3 | 0% |
| 3 or more | 100% |

The portion of the Account of such an IIG Member that is attributable to Matching Allocations with respect to Plan Years beginning before January 1, 2002 shall vest in accordance with Section 6 of Appendix B. Notwithstanding the above vesting schedule, such an IIG Member shall be fully vested in his Account if the IIG Member attains age 65 (or any later age) while employed by an Employer or Affiliate, or if the IIG Member terminates employment as a result of death, Total and Permanent Disability, Retirement or Release (as defined in the START Plan).

5.      Rollovers of Plan Distributions.

Effective for distributions made on or after January 1, 2002, Section 7.06 of the Plan shall be modified as follows:

(a)      The term "eligible retirement plan," as defined in Section 7.06(c), shall also include an annuity contract described in Code section 403(b) and an eligible plan under Code section 457(b) that is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state, and which agrees to separately account for amounts transferred into such plan from this Plan. This definition of "eligible retirement plan" shall also apply in the case of a distribution to a surviving spouse, or to a spouse or former spouse who is the alternate payee under a qualified domestic relation order,

C-3

as defined in Code section 414(p).

(b)    In the event that hardship distributions are permitted under the terms of the Plan, no portion of a hardship distribution shall be treated as an eligible rollover distribution, and a Participant may not elect to have any portion of such a distribution paid directly to an eligible retirement plan.

(c)    No portion of a distribution shall fail to be an eligible rollover distribution merely because the portion consists of after-tax employee contributions.  However, such portion may be transferred only to an individual retirement account or annuity described in Code section 408(a) or (b), or to a qualified defined contribution plan described in Code section 401(a) or 403(a) that agrees to separately account for amounts so transferred, including separately accounting for the portion of such distribution that is includible in gross income and the portion of such distribution which is not so includible.

(d)    Effective January 1, 2007, the non-spouse Beneficiary of a Participant following the death of the Participant may direct the Plan Administrator to directly roll over all or any portion of a distribution or withdrawal made to such non-spouse Beneficiary to an individual retirement plan described in Code sections 408(a) or 408(b).  Any such rollover shall be made in accordance with the requirements of Code section 402(c)(11) and any guidance promulgated thereunder.

6.    Modification of Top-Heavy Rules.

The following provisions modify the top-heavy provisions in Section 11.05 of the Plan and shall apply for purposes of determining whether the Plan is top-heavy under Code section 416(g) for Plan Years beginning on or after January 1, 2002, and whether the Plan satisfies the minimum benefits requirements of Code section 416(c) for such years. Except to the extent modified herein, the provisions of Section 11.05 shall continue to apply.

(a)    <u>Determination of Top-Heavy Status</u>.

(i)    "<u>Key Employee</u>" shall mean any Employee or former Employee (including any deceased Employee) who at any time during the Plan Year that includes the Determination Date (as defined in Section 11.05(d)(i)) was an officer of an Employer or Affiliate having annual compensation greater than $130,000 (as adjusted under Code section 416(i)(1) for Plan Years beginning after December 31, 2002), a 5-percent owner of an Employer or Affiliate, or a 1-percent owner of an Employer or Affiliate having annual compensation of more than $150,000. For this purpose, annual compensation means compensation within the meaning of Code section 415(c)(3). The determination of who is a Key Employee will be made in accordance with Code section 416(i)(1) and the regulations issued thereunder.

C-4

        (ii)    <u>Determination of Present Value and Amounts</u>.  For purposes of determining the present values of accrued benefits and the amounts of account balances of Employees as of the Determination Date, the following provisions shall apply:

        (A)    <u>Distributions During Year Ending on the Determination Date</u>. The present values of accrued benefits and the amounts of account balances of an Employee as of the Determination Date shall be increased by the distributions made with respect to the Employee under the Plan and any plan aggregated with the Plan under Code section 416(g)(2) during the 1-year period ending on the Determination Date. The preceding sentence shall also apply to distributions under a terminated plan which, had it not been terminated, would have been aggregated with the Plan under Code section 416(g)(2)(A)(i). In the case of a distribution made for a reason other than separation from service, death or disability, this provision shall be applied by substituting "5-year period" for "1-year period."

        (B)    <u>Employees Not Performing Services During Year Ending on the Determination Date</u>.  The accrued benefits and accounts of any individual who has not performed services for an Employer or Affiliate during the 1-year period ending on the Determination Date shall not be taken into account.

        (b)    <u>Minimum benefits</u>.

        (i)    Matching Contributions.  Employer matching contributions shall be taken into account for purposes of satisfying the minimum contribution requirements of Code section 416(c)(2) and the Plan.  The preceding sentence shall apply with respect to matching contributions under the Plan or, if the Plan provides that the minimum contribution requirement shall be met in another plan, such other plan.  Employer matching contributions that are used to satisfy the minimum contribution requirements shall be treated as matching contributions for purposes of the actual contribution percentage test and other requirements of Code section 401(m).

        (ii)    Contributions under other plans.  If a top-heavy minimum benefit is due to a non-Key Employee who is also a participant in another qualified defined contribution plan maintained by an Employer, it shall be provided under this Plan and not under such other plan.

D-1

APPENDIX D

PARTICIPANT LOAN RULES

Effective June 25, 2002, loans shall be available to Participants from their Accounts under the Plan, subject to the following rules:

1.      Availability of Loans.

A Participant may elect, subject to such conditions and in such form and manner as the Plan Administrator may prescribe, to borrow from the Trust an amount in cash not to exceed the amount permitted under Section 2 of this Appendix D.  No more than one loan to a Participant may be outstanding at any time.  A Participant taking a loan under this Appendix D shall be ineligible to take another loan until the expiration of 12 full calendar months following the date of such loan.

2.      Limitations on Loans.

A loan under this Appendix D shall be limited to an amount not to exceed (when added to the outstanding balance of all other loans made to the Participant by all plans maintained by an Employer or Affiliate) the lesser of:

(a)  $50,000 reduced by the excess, if any, of the highest outstanding balance of loans from all such plans to the Participant during the one-year period ending on the day before the date on which the loan is made, over the outstanding balance of loans from all such plans to the Participant on the date on which the loan is made, and

(b)  one-half of the vested balance of the Participant's Account as of the most recent Valuation Date.

Notwithstanding the foregoing, no loan shall be granted in an amount less than $500.

3.      Sources of Loan Proceeds and Designation of Payments.

Loans shall be appropriately charged against the Participant's accounts in such order as the Plan Administrator shall determine on a nondiscriminatory basis.  Prior to the disbursement of the proceeds of a loan, an amount equal to the loan amount shall be transferred from the Participant's Account to a special loan fund (consisting solely of the Participant's loan) established for the purpose of disbursing the loan to the Participant.

4.      Loans Evidenced by Note and Secured by Interest in Account.

A loan shall be evidenced by such documents as the Plan Administrator shall

D-2

designate including a note which shall bear a reasonable rate of interest as determined by the Plan Administrator from time to time in a nondiscriminatory manner and which otherwise shall conform to the repayment terms set forth in this Appendix D. A loan shall be secured by an interest in the Participant's Account and/or by such other interests as the Plan Administrator may determine to constitute adequate security. The occurrence of an event of default under the loan note shall entitle the Trustee to reduce the balance of the Participant's Account up to the amount of the Plan's security interest therein. The loan note shall be an asset solely of the borrowing Participant's Account and interest on the loan shall be credited to the Participant's Account. The loan note shall not be subject to transfer to the Morgan Stanley 401(k) Plan pursuant to Section 3.08 or 7.04.

5.      Loan Repayment Terms.

A loan shall be repaid over a period not to exceed five years from the date of the loan, unless the Participant certifies in writing to the Plan Administrator that the loan proceeds are to be used solely to acquire a dwelling unit which is to be used, within a reasonable period of time, as the Participant's principal residence, in which case, the loan shall be repaid over a period not to exceed 15 years from the date of such loan. Such repayment shall be made in level installments of principal and interest which the Participant shall authorize to be repaid by payroll deductions or by such other method as is determined by the Plan Administrator on a uniform and nondiscriminatory basis. Loan repayments (principal and interest) will be proportionately credited among the Participant's accounts from which the loan proceeds were transferred pursuant to section 3 above and reinvested in Company Stock. The entire outstanding amount of the loan may be prepaid without penalty at any time. Partial prepayment shall not be permitted. The note shall provide that in all events the outstanding principal and interest due thereon shall be repaid not later than the date of the Participant's termination of employment or such other date as the Plan Administrator shall specify. In the event of default, foreclosure on the note and attachment of security will not occur until a distributable event occurs under the Plan.

6.      Loans Available on Nondiscriminatory Basis.

All loans made pursuant to this Appendix D shall be made available to all Participants on a reasonably equivalent, nondiscriminatory basis; and any Participant to whom a loan is made agrees to such changes in the terms of the loan as may be required by changes in the applicable law or regulations.

7.      Other Provisions Relating to Loans.

To the extent required by ERISA section 408 or Code section 4975, notwithstanding the preceding provisions of this Appendix D, loans may be made to a Participant who is, at the time of the loan, both a former employee and a "party in interest" as defined in ERISA section 3(14) with respect to the Plan. In the case of any such loan, the preceding provisions of this Appendix D dealing with payment by payroll deduction and acceleration on

D-3

termination of employment shall not apply.  Loans shall not be made available to highly compensated employees (as defined in Code section 414(q)) in an amount greater than the amount made available to other employees.

8.      Suspension of Loan Repayments during Military Service.

        Loan repayments will be suspended under this Plan as permitted under Code section 414(u)(4).

9.      Securities Law Restrictions.

        Notwithstanding anything in this Appendix D to the contrary, a Participant's ability to take a loan, or to prepay the outstanding balance of a loan, shall be subject to such conditions and restrictions as the Plan Administrator may determine to be necessary or advisable to ensure compliance with all applicable securities laws.

10.     Loan Procedures.

        The Plan Administrator shall promulgate loan procedures consistent with this Appendix D, which, as amended from time to time, are hereby incorporated into and which hereby form a part of this Plan.

E-1

APPENDIX E

MORGAN STANLEY EMPLOYEE STOCK OWNERSHIP PLAN

(Effective January 1, 2005)

PARTICIPANTS RESIDING IN PUERTO RICO

1.  Establishment and Purpose.  This Appendix E is established effective January 1, 2005 as part of the Morgan Stanley Employer Stock Ownership Plan, to provide for compliance with the provisions of the Puerto Rico Code.  Puerto Rico Employees will be subject to the provisions of the Plan, in addition to and as modified by the provisions of this Appendix E.

2.  New Definitions.  For the purposes of this Appendix, certain terms are defined and added to Article 1 of the Plan.  Except as provided in paragraph 3 of this Appendix E, any other capitalized term has the meaning assigned to it in Article 1 of the Plan.

"Puerto Rico Code" or "PR Code" means the Puerto Rico Internal Revenue Code of 1994, as amended from time to time.

"Puerto Rico Employee" means any Employee who is a resident of Puerto Rico.

"Puerto Rico Highly Compensated Employee" means any Employee residing in Puerto Rico who is "highly compensated" with the meaning of PR Code section 1165(e)(3)(E)(iii).

3.  Altered Definitions.  For the purposes of this Appendix only, certain definitions contained in Article 1 of the Plan are altered as follows:

(a)  "Earnings" means base salary, cash bonuses, commissions, overtime and other cash compensation paid by an Employer to a Participant for services rendered as a Puerto Rico Employee.  Earnings also include any salary reduction amounts elected by a Participant pursuant to an arrangement maintained by any Affiliate under Puerto Rico Code section 1165(e).  Earnings exclude, without limitation: (i) earnings paid for any period prior to the date an individual becomes an Employee or during a period an individual is not an Employee, (ii) non-cash compensation, (iii) imputed income, (iv) cash payments made to or on behalf of a Participant for an employment-related expense or in the nature of an allowance, such as medical or expense reimbursements, cost of living, relocation or transition allowances, tax equalization or gross-up payments and employee referrals, (v) amounts payable under continued service bonus agreements (generally payable by

E-2

the fourth anniversary of hire), and (vi) amounts paid after the last day of the month in which a Participant's employment with all Affiliates terminates. In addition, with respect to deferred (other than under Puerto Rico Code section 1165(e)) or executive compensation, Earnings (w) will not include any such amount when awarded, contributed or deferred, (x) will not include periodic distributions of earnings or dividend equivalents, such as dividend equivalent payments under the Morgan Stanley Equity Incentive Compensation Plan, (y) will not include amounts that are paid in settlement of an award or deferral, except to the extent that they met the definition of Earnings applicable to the Participant under this Plan for periods prior to January 1, 2004, and (z) will not include any payment or deferral in respect of a carried interest plan or a profits participation plan maintained by Morgan Stanley Real Estate Funds.

If any Member should receive Earnings during the same payroll period from an Employer and also from a Foreign Subsidiary, and if such Member is considered, pursuant to the last sentence of the first paragraph of the definition of "Employee," an Employee of an Employer, the aggregate amount so received shall be treated as his or her Earnings.

Notwithstanding the foregoing, the annual amount of Earnings taken into account in determining Matching Allocations to a Participant under the Plan for any given year shall not exceed $170,000. The annual Earnings taken into account in determining Profit Sharing Allocations to an eligible Participant under the Plan for any given year shall not exceed $100,000.

4.    Revised Section 3.03 Return of Contributions. For purposes of this Appendix only, Section 3.03 of the Plan will read as follows:

3.03    Return of Contributions. (a) If the Commissioner of Internal Revenue, after timely application made with respect to the initial qualification of the Plan, issues an adverse determination with respect to the Plan's qualified status under Code section 401(a) or 4975(e)(7), or the Puerto Rico Secretary of the Treasury, after timely application made with respect to the initial qualification of the Plan under the Puerto Rico Code, issues an adverse determination with respect to the Plan's qualified status under Puerto Rico Code section 1165(a), all Employer Contributions and earnings thereon, made with respect to Employees residing in Puerto Rico, may be returned to the applicable Employer. The return shall be made within one year after the denial of qualification.

(b)    Employer Contributions to the Plan are conditioned on their deductibility under the Code and the Puerto Rico Code. If all or part of an Employer's deductions under Code section 404 for contributions to the Plan are disallowed by the Internal Revenue Service, or all or part of an Employer's deductions under Puerto Rico Code section 1023(n) for contributions to the Plan made with respect to Puerto Rico

E-3

Employees are disallowed by the Puerto Rico Department of the Treasury, the portion of the contributions to which that disallowance applies may be returned to such Employer without interest but reduced by any investment loss attributable to those contributions. The return shall be made within one year after the disallowance of the deduction.

(c) An Employer may recover without interest the amount of its contributions to the Plan made on account of a mistake in fact, reduced by any investment loss attributable to those contributions, if recovery is made within one year after the date of those contributions.

5.  Revised Section 3.04 Limitations on Employer Contributions.  For purposes of this Appendix only, Section 3.04 of the Plan will read as follows:

3.04    Limitations on Employer Contributions.  In no event shall Employer Contributions for any Plan Year exceed the maximum amount deductible from the Employer's income for that Plan Year under Code section 404(a) or any statute of similar import, including Puerto Rico Code section 1023(n) with respect to Employer Contributions made on behalf of Puerto Rico Employees.

6.  Revised Section 7.06 Eligible Rollover Distributions.  For purposes of this Appendix only, Section 7.06 of the Plan, as amended by Appendix C, EGTRRA AMENDMENTS shall for purposes of compliance with the Puerto Rico Code read as follows:

7.06  Eligible Rollover Distributions.

(a) This Section 7.06 applies to distributions made on or after January 1, 1993.  Notwithstanding any provision of the Plan to the contrary that would otherwise limit a distributee's election under this Section 7.06, a distributee who is a resident of Puerto Rico may elect, at the time and in the manner prescribed by the Plan Administrator, to have an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

(b) An "eligible rollover distribution" is any distribution of all or any portion of the balance to the credit of the distributee.  An "eligible rollover distribution" shall not include any distribution that is a distribution of dividends pursuant to Section 5.04.

(c)  With respect to a Participant who is a resident of Puerto Rico or such Participant's spouse, an "eligible retirement plan" is a qualified trust described in Code section 401(a) that is also qualified under section 1165(a) of the Puerto Rico Code, that accepts the distributee's eligible rollover distribution.

E-4

(d)   A "distributee" includes an employee or former employee.  In addition, the employee's or former employee's surviving spouse and the employee's or former employee's spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in Code section 414(p), are distributees with regard to the interest of the spouse or former spouse.

(e)   A "direct rollover" is a payment by the Plan to the eligible retirement plan specified by the distributee.

(f)   No portion of a distribution shall fail to be an eligible rollover distribution merely because the portion consists of after-tax employee contributions. However, with respect to a distributee who is a resident of Puerto Rico such portion may be transferred only to a qualified defined contribution plan described in Code section 401(a) that is also a qualified plan under section 1165 of the Puerto Rico Code that agrees to separately account for amounts so transferred, including separately accounting for the portion of such distribution that is includible in gross income and the portion of such distribution which is not so includible.

7.   Payment of Employer Contributions.  For the purposes of this Appendix only, the portion of any Employer Contribution made by each Employer in Puerto Rico for each Plan Year shall be determined by the Employer and shall be paid to the Trustee at such time or times as the Employer in Puerto Rico shall determine, but in any event before the date for filing such Employer's Puerto Rico income tax return for the Plan Year, including any extension of such date.

8.   Amendment and Termination of this Appendix.

(a)   Amendment Required for Qualification.   All provisions of this Appendix, and all benefits and rights granted hereunder, are subject to any amendments, modifications or alterations which are necessary from time to time to qualify the Plan and Appendix E under Code section 401(a) or 501(a) or under PR Code section 1165(a), to continue the Plan as so qualified or to comply with any other provision of law.  Accordingly, notwithstanding Section 12.01 of the Plan or any other provision of this Plan, the Board of Directors or any person designated by the Board of Directors may amend, modify or alter the Plan, with or without retroactive effect, in any respect or manner necessary to qualify the Plan and Appendix E under Code section 401(a) or under PR Code section 1165(a).

F-1

APPENDIX F

MORGAN STANLEY EMPLOYEE STOCK OWNERSHIP PLAN


    1.    <u>Definitions</u>.  For purposes of this Appendix, the following terms shall have the following meanings:

    (a)    "<u>Discover Employer</u>" means Discover Financial Services and any affiliate spun off from the Morgan Stanley Group pursuant to the Distribution Agreement.

    (b)    "<u>Discover 401(k) Plan</u>" means the Discover Financial Services 401(k) Plan.

    (c)    "<u>Discover Stock</u>" means the common stock of Discover Financial Services."

    (d)    "<u>Distribution Agreement</u>" means the 2007 Separation and Distribution Agreement between Morgan Stanley and Discover Financial Services.

    (e)    "<u>Effective Time</u>" means the time of the spin-off of the Discover Employers from the Morgan Stanley Group pursuant to the Distribution Agreement.

    (f)    "<u>Morgan Stanley Group</u>" means Morgan Stanley and all Affiliated Group members (determined by treating Morgan Stanley as a Participating Company), excluding, for periods after the Effective Time, the Discover Employers.

    (g)    "<u>Transferred Employee</u>" means (i) any current employee of a Discover Employer as of the Effective Time and (ii) any former employee of a Discover Employer as of the Effective Time, excluding any former employee more recently employed by a member of the Morgan Stanley Group that is not a Discover Employer.  A Transferred Employee also shall include any individual not described in the preceding sentence who, as of the Effective Time, has a benefit under the Plan with respect to employment with an entity listed in Supplement C, D, E or F of Exhibit B to the Morgan Stanley Employees Retirement Plan, other than an entity which is a member of the Morgan Stanley Group and not a Discover Employer.

    2.    <u>Special Provisions in Connection with Plan Transfer</u>.

    (a)    <u>Transfer of Assets and Liabilities</u>.  As of the Effective Time, the assets and liabilities attributable to all benefits accrued by all Transferred Employees under the Plan shall be transferred to the Discover 401(k) Plan.

    (b)    <u>Discover Employers</u>.  As of the Effective Time, each Discover

F-2

Employer shall cease to be an Employer under this Plan and shall instead become a participating employer in the Discover 401(k) Plan.

(c)     Participation and Benefits.  As of the Effective Time, each Transferred Employee participating in the Plan shall cease to participate in the Plan and shall instead become a participant in the Discover 401(k) Plan in accordance with the provisions of the Discover 401(k) Plan.  The Discover 401(k) Plan shall provide each Transferred Employee with a benefit that is not less than the accrued benefit of such Transferred Employee under the Plan as of the Effective Time (plus the accrued benefit of such Transferred Employee under the Morgan Stanley 401(k) Plan as of the Effective Time, which shall also be transferred to the Discover 401(k) Plan as of the Effective Time), and all rights with respect to such accrued benefit, including, without limitation, rights with respect to vesting and forms of distribution, required by applicable law.  No Transferred Employee who is employed by a Discover Employer immediately prior to the Effective Time shall be treated as experiencing a termination of employment for Plan purposes at the Effective Time solely by reason of the spin-off of the Discover Employers.

(d)     Cessation of Liability With Respect to Transferred Employees.  As of the Effective Time, the Plan shall have no further liability or responsibility with respect to the benefits accrued by the Transferred Employees under the Plan, and such transfer shall be in full discharge of such responsibilities and liabilities.

(e)     Conditions.  The transfers described in the foregoing provisions shall be conditioned upon the following: (i) the providing by Discover Financial Services to the Plan Administrator of all records and information reasonably necessary to carry out such transfers; and (ii) a commitment by Discover Financial Services to apply for and obtain a determination letter from the Internal Revenue Service that the Discover 401(k) Plan is qualified under Code section 401(a).

3.     Special Provisions in Connection with Spin-off of Discover Employers.  As soon as practicable following the Effective Time, all Discover Stock investments held in each Participant's account under the Plan as a result of the spin-off of Discover Financial Services and the other Discover Employers from the Morgan Stanley Group shall be transferred to the Morgan Stanley 401(k) Plan and allocated to such Participant's account under that plan.  Following such transfer, the amounts transferred shall continue to be subject to any vesting restrictions applicable to such amounts under this Plan.  The forms of distribution available with respect to such amounts shall be the forms of distribution available under the Morgan Stanley 401(k) Plan, plus such other forms as may be required to be provided under Code section 411(d)(6), as determined by the Plan Administrator.